2024-1037

_____

# United States Court of Appeals
# for the Federal Circuit

_____

**In re: GESTURE TECHNOLOGY PARTNERS, LLC,**
*Appellant*,

Appeal from the United States Patent and Trademark Office in
*Ex parte* Reexamination Control No. 90/015,900

**OPENING BRIEF OF APPELLANT
GESTURE TECHNOLOGY PARTNERS, LLC**

*/s/ Fred I. Williams*
Fred I. Williams
*Principal Attorney*
WILLIAMS SIMONS & LANDIS PLLC
The Littlefield Building
601 Congress Ave, Suite 600
Austin, TX 78701
512.543.1354 telephone
fwilliams@wsltrial.com

John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A#453
Philadelphia, PA 19103
512.543.1373 telephone
johnw@wsltrial.com

January 22, 2024

COUNSEL FOR APPELLANT GESTURE TECHNOLOGY PARTNERS, LLC

## PATENT CLAIMS AT ISSUE

Pursuant to FED. CIR. R. 28(a)(12) the patent claims at issue include claims 1-9, 11, 12, 14-30 of U.S. Patent No. 8,553,079.

1.  A computer implemented method comprising:

    providing a light source adapted to direct illumination through a work volume above the light source;

    providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

    determining, using the camera, the gesture performed in the work volume and illuminated by the light source.

2.  The method according to claim 1 wherein the light source includes a light emitting diode.

3.  The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

4.  The method according to claim 1 wherein detecting a gesture includes analyzing sequential images of the camera.

5.  The method according to claim 1 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

6.  The method according to claim 1 further including determining the pointing direction of a finger in the work volume.

7.  The method according to claim 1 further including providing a target positioned on a user that is viewable in the work volume.

8.  The method according to claim 1 further including determining the three-dimensional position of a point on a user.

9.    The method according to claim 1 wherein the camera and the light source are positioned in fixed relation relative to a keypad.

11.    A computer apparatus comprising:

 a light source adapted to illuminate a human body part within a work volume generally above the light source;

 a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

 a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output.

12.    The computer apparatus of claim 11 further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display.

14.    The computer apparatus of claim 11 wherein the light source includes a light emitting diode.

15.    The computer apparatus of claim 11 wherein the light source includes a plurality of light emitting diodes.

16.    The computer apparatus of claim 12 wherein the display includes a three-dimensional display.

17.    The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume.

18.    The computer apparatus of claim 11 wherein the determined gesture includes a pinch gesture.

19.    The computer apparatus of claim 11 wherein the determined gesture includes a pointing gesture.

20.    The computer apparatus of claim 11 wherein the determined gesture includes a grip gesture.

21.    A computer implemented method comprising:

  providing a camera oriented to observe a gesture performed in a work volume above the camera;

  providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and

  detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume.

22.    The method according to claim 21 wherein the light source includes a light emitting diode.

23.    The method according to claim 21 wherein the light source includes a plurality of light emitting diodes.

24.    The method according to claim 21 wherein detecting a gesture includes analyzing sequential images of the camera.

25.    The method according to claim 21 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

26.    The method according to claim 21 further including determining the pointing direction of one of the user's fingers using the first and second cameras.

27.    The method according to claim 21 further including providing a target positioned on the user that is viewable by the camera.

28.    The method according to claim 21 further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers.

29.    The method according to claim 21 further including providing a three-dimensional display viewable by the user.

30.    The method according to claim 21 wherein the camera and the light source are positioned in fixed relation relative to a keypad.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1037 |
| **Short Case Caption** | In re: Gesture Technology Partners, LLC |
| **Filing Party/Entity** | Gesture Technology Partners, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/22/2024

Signature: /s/ Fred I. Williams

Name: Fred I. Williams

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Gesture Technology Partners, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)   ☐  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

I.    STATEMENT OF RELATED CASES ..............................................1

II.   JURISDICTIONAL STATEMENT ................................................1

III.  STATEMENT OF THE ISSUES ...................................................2

IV.   STATEMENT OF THE CASE AND FACTS ...............................2

      A.    Procedural Background ...............................................2

      B.    Subject Matter of the '079 Patent..............................4

      C.    The Board's Decision On Appeal ...............................5

V.    SUMMARY OF THE ARGUMENT ...........................................8

VI.   STANDARD OF REVIEW.........................................................9

VII.  ARGUMENT..............................................................................11

      A.    The Board Improperly Construed the "Computer Apparatus" Term in Independent Claim 11. ...................................................11

      B.    The Board Erred in Determining That *Liebermann* Anticipates Claims 1, 4-9, 11, 12, and 17-20. ......................................16

            1.    *Liebermann* does not anticipate independent claim 11.............16

                  a.    *Liebermann* fails to disclose the claimed "light source," "camera," and "processor" are all disposed within the same computing device. ...............................16

                  b.    *Liebermann* fails to disclose a processor adapted to determine the gesture based on the camera output.........21

            2.    *Liebermann* does not anticipate independent claim 1...............23

                  a.    *Liebermann* fails to disclose that the determining step is executed by the same computing device that provides the light source and camera. ...........................23

　　　　　b.　　*Liebermann* fails to disclose determining the gesture using the camera. ........................................................25

　　　3.　　*Liebermann* does not anticipate dependent claim 8. .................27

　　　4.　　*Liebermann* does not anticipate claims 4-7, 9, 12, and 17-20. ..........................................................................29

C.　　The Board Erred In Determining That The Combination Of *Liebermann* And *Sears* Renders Dependent Claims 2, 3, 14 And 15 Unpatentable. ..........................................................................30

　　　1.　　*Sears* is non-analogous art and cannot be cited in any obviousness rejection. ............................................30

　　　　　a.　　*Sears* fails the first test for analogous art. ....................30

　　　　　b.　　*Sears* fails the second test for analogous art. .................32

　　　2.　　*Sears* and *Liebermann* do not render claims 2 and 14 obvious. ..................................................................34

　　　3.　　*Sears* and *Liebermann* do not render claims 3 and 15 obvious. ..................................................................38

D.　　The Board Erred In Determining That The Combination Of *Liebermann* And *Mack* Renders Dependent Claim 16 Unpatentable. ..........................................................................41

E.　　The Board Erred In Determining That The Combination Of *Liebermann* And *Sako* Renders Claims 21, 24-28, and 30 Unpatentable. ..........................................................................41

　　　1.　　*Liebermann* and *Sako* do not render independent claim 21 obvious. ..................................................................41

　　　2.　　*Liebermann* and *Sako* do not render claim 28 unpatentable. .....43

　　　3.　　*Liebermann* and *Sako* do not render claims 24-27 and 30 unpatentable. ..........................................................44

F.    The Board Erred In Determining That The Combination Of *Liebermann*, *Sako*, and *Sears* Renders Dependent Claims 22 and 23 Obvious. ...........................................................................................44

    1.    *Liebermann*, *Sako*, and *Sears* do not render claim 22 obvious. ...................................................................................44

    2.    *Liebermann*, *Sako*, and *Sears* do not render claim 23 obvious. ...................................................................................45

G.    The Board Erred In Determining That The Combination Of *Liebermann*, *Sako*, and *Mack* Renders Dependent Claim 29 Obvious. ...........................................................................................45

H.    The Board Erred By Not Vacating The Reexam Order Because No Substantial New Question (SNQ) Of Patentability Exists..................46

I.    The USPTO Does Not Have Jurisdiction Over the Expired '079 Patent. ............................................................................................47

VIII.    CONCLUSION AND RELIEF SOUGHT ...................................................49

# TABLE OF AUTHORITIES

### Cases

*Airbus S.A.S. v. Firepass Corp.*,
    941 F.3d 1374 (Fed. Cir. 2019) ........................................................31

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) (en banc) ........................................14

*Donner Technology, LLC v. Pro Stage Gear, LLC*,
    979 F.3d 1353 (Fed. Cir. 2020) ................................................ 30, 33

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990) ........................................................15

*In re Abbott Diabetes Care, Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012) ..........................................................9

*In re Klein*,
    647 F.3d 1343 (Fed. Cir. 2011) ................................................ 10, 30

*In re Man Mach. Interface Techs. LLC*,
    822 F.3d 1282 (Fed. Cir. 2016) ........................................................10

*In re Rambus, Inc.*,
    753 F.3d 1253 (Fed. Cir. 2014) ..........................................................9

*In re Recreative Techs. Corp.*,
    83 F.3d 1394 (Fed. Cir. 1996) ..........................................................46

*In re Suitco Surface, Inc.*,
    603 F.3d 1255 (Fed. Cir. 2010) ........................................................10

*In re Vivint, Inc.*,
    14 F.4th 1342 (Fed. Cir. 2021) ........................................................11

*Intel Corp. v. PACT XPP Schweiz AG*,
    61 F.4th 1373 (Fed. Cir. 2023) ........................................................37

*IntelCorp. v. Qualcomm Inc.*,
    21 F.4th 801 (Fed. Cir. 2021) ............................................................9

*Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*,
  50 F.4th 147 (Fed. Cir. 2022) ................................................................10

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ................................................................ 47, 49

*P&G v. Kraft Foods Global, Inc.*,
  549 F.3d 842 (Fed. Cir. 2008) ................................................................46

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) ......................................................... 10, 37

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................... 11, 14

*Storage Tech. Corp. v. Cisco Sys.*,
  329 F.3d 823 (Fed. Cir. 2003) ................................................................16

*Tf3 Ltd. v. Tre Milano, LLC*,
  894 F.3d 1366 (Fed. Cir. 2018) ................................................................28

**Statutes**

28 U.S.C. §1295 ................................................................................1, 4

35 U.S.C. § 134 ......................................................................................3

35 U.S.C. § 141 ...............................................................................1, 4

35 U.S.C. § 303 ....................................................................................46

35 U.S.C. § 306 ......................................................................................3

35 U.S.C. § 6 ..........................................................................................1

**Regulations**

37 C.F.R. § 41.37 ..................................................................................3

37 C.F.R. § 41.41 ..................................................................................3

## I.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Gesture Technology Partners, LLC ("GTP") states that no other appeal in or from the same proceeding in the originating tribunal was previously before this or any other appellate court.

Cases pending in this or any other court which will directly affect or be directly affected by this Court's decision in the pending appeal are listed below.

- *Gesture Technology Partners, LLC v. Apple Inc. et al.*, 2023-1463 (Court of Appeals for the Federal Circuit)

- *Gesture Technology Partners, LLC v. Apple Inc.*, 4:22-cv-04806-YGR (U.S. District Court for the Northern District of California)

- *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, 1:22-cv-03535(U.S. District Court for the Northern District of Illinois)

- *Gesture Technology Partners, LLC v. LG Electronics Inc. et al.*, 2:21-cv-19234-EP-MAH (U.S. District Court for the District of New Jersey)

## II.    JURISDICTIONAL STATEMENT

Pursuant to 35 U.S.C. § 6(b), the Patent Trial and Appeal Board (the "Board") issued its Decision on Appeal on August 8, 2023 (the "Decision").  Appx0001-0030. Patent Owner timely filed a Notice of Appeal on October 6, 2023.  Appx0624-0656. This Court has jurisdiction pursuant to 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. § 141(b).

## III. STATEMENT OF THE ISSUES

1. Whether the Board erred by construing the claim term "computer apparatus" to include a distributed physically distributed system with multiple devices that are geographically separated from each other?

2. Whether U.S. Patent No. 5,982,853 ("*Liebermann*") anticipates claims 1, 4-9, 11, 12, and 17-20 when "computer apparatus" is properly construed?

3. Whether the combination of *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") renders claims 2, 3, 14, and 15 obvious?

4. Whether the combination of *Liebermann* and U.S. Patent No. 6,198,485 ("*Mack*") renders claim 16 obvious?

5. Whether the combination of *Liebermann* and U.S. Patent No. 5,689,575 ("*Sako*") renders claims 21, 24-28, and 30 obvious?

6. Whether the combination of *Liebermann*, *Sears*, and *Sako* renders claims 22 and 23 obvious?

7. Whether the combination of *Liebermann*, *Mack*, and *Sako* renders claim 29 obvious?

8. Whether a substantial new question of patentability exists?

9. Whether the USPTO has jurisdiction over expired patents?

## IV. STATEMENT OF THE CASE AND FACTS

### A. Procedural Background

This appeal involves one patent owned by GTP: U.S. Patent No. 8,553,079 (the "'079 Patent"). The '079 Patent was filed on December 14, 2012, as U.S. Application No. 13/714,748. Appx0032. The '079 Patent issued on October 8, 2013. *Id.* The '079 Patent claims priority to several patent applications, including

U.S. Provisional Application No. 60/107,652, which was filed on July 4, 2013. Appx0032.

Samsung Electronics Co., Ltd. filed a request for *ex parte* reexamination of the '079 Patent on November 11, 2021. Appx0048-0136. The USPTO issued an order granting *ex parte* reexamination of the '079 Patent on December 20, 2021 (the "Reexam Order"). Appx0283-0302.

During the reexamination proceeding, the Examiner issued a Final Office Action on June 27, 2022 (the "Final OA"), rejecting claims 1-9, 11, 12, and 14-30 of the '079 Patent. Appx0385-0478. Appellant filed a Notice of Appeal pursuant to 35 U.S.C. §§ 134 and 306 on August 29, 2022 (*see* Appx0479), and then filed an Appeal Brief pursuant to 37 C.F.R. § 41.37 on October 31, 2022 ("Appeal Br."). Appx0481-0526. The Examiner issued an Answer on December 12, 2022 ("Answer") (Appx0527-0609), and Appellant filed a Reply Brief pursuant to 37 C.F.R. § 41.41 on February 13, 2023. *See* Appx0610-0623.

On August 8, 2023, the Board issued its Decision on Appeal (the "Decision"). Appx0001-0030. The Board affirmed the Examiner's rejections of claims 1-9, 11, 12, and 14-30 of the '079 Patent. Appx0028-0029.

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1, 4–9, 11, 12, 17–20 | 102(e) | Liebermann | 1, 4–9, 11, 12, 17–20 | |
| 2, 3, 14, 15 | 103(a) | Liebermann, Sears | 2, 3, 14, 15 | |
| 16 | 103(a) | Liebermann, Mack | 16 | |
| 21, 24–28, 30 | 103(a) | Liebermann, Sako | 21, 24–28, 30 | |
| 22, 23 | 103(a) | Liebermann, Sears, Sako | 22, 23 | |
| 29 | 103(a) | Liebermann, Mack, Sako | 29 | |
| Overall Outcome | | | 1–9, 11, 12, 14–30 | |

*Id.* Pursuant to 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. § 141(b), a Notice of Appeal was filed with this Court on October 6, 2023. Appx0624-0656.

## B.  Subject Matter of the '079 Patent

The '079 Patent is titled "More Useful Man Machine Interfaces And Applications." Appx0032. The '079 Patent is directed to a computing device and a computer-implemented method "for determining a gesture illuminated by a light source." Appx0032 (Abstract). The gesture is performed in "a work volume above the light source. A camera is positioned to observe and determine the gesture performed in the work volume." Appx0032 (Abstract). *See also* Appx0041-0042 (2:39-3:61). The light source for illuminating the performed gesture, the camera for capturing the performed gesture, and the processor for determining the performed gestured based on the one or more images captured by the camera are all disposed within the same computing apparatus (i.e., same computing device), such as a laptop,

4

a cellphone, etc.  *See* Appx0041-0042 (2:39-3:61), Appx0034 (Fig. 1), Appx0039

(Fig. 6).  Figure 1 of the '079 Patent is reproduced below:



Appx0034 (Figure 1) (annotated).  As shown, one or more cameras 100, 101, 105,

106, light source 122, and the processor (inside the laptop) are all disposed within a

single computer apparatus (e.g., laptop).  The gesture is performed in work volume

170 while being illuminated by light source 122 and captured by one or more of

cameras 100, 101, 105, 106.

### C.    The Board's Decision On Appeal

The Final OA asserted six grounds of unpatentability based on four alleged

prior art references:  (1) anticipation of claims 1, 4-9, 11, 12, and 17-20 in view of

U.S. Patent No. 5,982,853 ("*Liebermann*") (Appx0419-0461 (Final OA, pp. 34-76));

(2) obviousness of claims 2, 3, 14, and 15 in view of *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") (Appx0461-0463 (Final OA, pp. 76-78)); (3) obviousness of claim 16 in view of *Liebermann* and U.S. Patent No. 6,198,485 ("*Mack*") (Appx0463-0466 (Final OA, pp. 78-81)); (4) obviousness of claims 21, 24-28, and 30 in view of *Liebermann* and U.S. Patent No. 5,689,575 ("Sako") (Appx0466-0470 (Final OA, pp. 81-85)); (5) obviousness of claims 22 and 23 in view of *Liebermann*, *Sears*, and *Sako* (Appx0470-0472 (Final OA, pp. 85-87)); and (6) obviousness of claim 29 in view of *Liebermann*, *Mack*, and *Sako* (Appx0472-0475 (Final OA, pp. 87-90)).

In its Decision, the Board affirmed the Examiner and mainly adopted the Examiner's positions and reasoning: "we adopt as our own (1) the findings and reasons set forth by the Examiner in the [Final OA] from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer." Appx0008. The Board's findings and determinations are summarized immediately below.

First, the Board construed the "computer apparatus" term in the preamble of independent claim 11 to include a physically distributed system with multiple computing devices geographically separated from each other. *See* Appx0009-0011. The Board relied on a generic dictionary definition of "apparatus" and case law

6

construing the term "machine" from 35 U.S.C. § 101. *See id.* In doing so, the Board improperly gave inadequate weight to the specification of the '079 Patent. *See id.*

Second, under its improper construction, the Board determined that *Liebermann* anticipates independent claims 1 and 11 because *Liebermann* purportedly discloses all the claimed components and claimed steps. *See* Appx0009-0013. *Liebermann* is a physically distributed system, with multiple computing devices geographically separated from each other and connected via the public telephone network. *See* Appx0306 (*Liebermann*, Fig. 2). Although no single computing device in *Liebermann* has all of the claimed components or performs all of the claimed steps, that was of no import to the Board because it improperly construed "computer apparatus" to include such a physically distributed system. *See* Appx0009-0011.

Third, the Board determined that the combination of *Liebermann* and *Sears* renders dependent claims 2, 3, 14, and 15 obvious. *See* Appx0017-0025. To make a finding that *Sears* is analogous art, the Board improperly excluded "electronic reading machines" from *Sears'* field of endeavor and improperly ignored most of the claim language to define the problem being solved by the '079 Patent. *See* Appx0017-0022.

Further, claims 2, 3, 14, and 15 require one or more light emitting diodes (LEDs). While *Sears* discloses LEDs (Appx0339 (*Sears*, 5:15-19)), *Liebermann*

only discloses lamps (Appx0323 (*Liebermann*, 5:57-59)).  The Board/Examiner's motivation for substituting *Liebermann's* "lamps" with *Sears'* "LEDs" included more intense and efficient light.  *See* Appx0404 (Final OA, p.19).  But the Board/Examiner provided no evidence that *Sears'* "LEDs" have those superior properties compared to *Liebermann's* "lamps."  The Board also argued that the proposed combination of *Liebermann* and *Sears* is a "simple substitution." Appx0025.  But the Board/Examiner offered no evidence that following such a "simple substitution," the LEDs meet the positioning requirements with respect to the claimed "work volume," as claims 3 and 15 require.

Fourth, the Board determined that the USPTO has jurisdiction over expired patents.  Appx0025-0027.  But the Board did not consider the *Oil States* case from the Supreme Court in reaching that conclusion.  *Id.*

## V.    SUMMARY OF THE ARGUMENT

The Board's decision affirming the Examiner's rejection rests on an incorrect construction of "computer apparatus" that essentially writes the term out of the claims.  According to the Board, the parts of the claimed "computer apparatus" can be flung to different parts of the globe.  The specification, as well as common sense, however, mandate that parts of the "computer apparatus" cannot be geographically separated from each other.  As a result, the distributed system of *Liebermann*, with its "central processing facility" or "Center," cannot anticipate the claims of the '079

Patent. *Liebermann* fails for the additional reason that claim 11 requires that the processor determine a gesture based on the output of a camera, whereas *Liebermann* determines sign language based on identifiers that are generated at a different physical location.

The Board also erred by determining that the combination of *Liebermann* and *Sears* renders dependent claims 2, 3, 14, and 15 unpatentable. The Board disregarded the fact that *Sears* is directed to electronic reading machines, which is far afield from the subject matter of the '079 Patent. For that reason, *Sears* fails both tests for analogous art, and cannot be the basis for an obviousness rejection.

Finally, the USPTO does not have jurisdiction over expired patents, therefore, the Board's decision should be vacated.

## VI.   STANDARD OF REVIEW

"Claim construction is ultimately a question of law, decided *de novo* on review, as are the intrinsic-evidence aspects of a claim-construction analysis." *IntelCorp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021). The Board's decision may be vacated and remanded to the Board to consider the patentability grounds under the proper construction. *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012).

Anticipation is a question of fact, reviewed for substantial evidence on appeal. *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014). Substantial evidence is

9

something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (cleaned up). Anticipation determinations that are based on an improper construction should be vacated. *See id*. at 1259-61.

"Obviousness is a mixed question of law and fact, and we review the Board's ultimate obviousness determination *de novo* and underlying fact-findings for substantial evidence." *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 152 (Fed. Cir. 2022) (cleaned up). Obviousness determinations that are based on an improper construction should be vacated. *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1288-89 (Fed. Cir. 2016). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact. The presence or absence of a reasonable expectation of success is also a question of fact. What a reference teaches and whether it teaches toward or away from the claimed invention are questions of fact." *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1196-97 (Fed. Cir. 2014) (cleaned up). The Board's determination that a prior art reference is analogous art presents an issue of fact, reviewed for substantial evidence. *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

"The ultimate question of whether the reexamination is based on a substantial new question of patentability remains a question of law." *In re Vivint, Inc.*, 14 F.4th 1342, 1348 (Fed. Cir. 2021) (cleaned up).

## VII.  ARGUMENT

### A.    The Board Improperly Construed the "Computer Apparatus" Term in Independent Claim 11.

Independent claim 11 of the '079 Patent recites "A computer apparatus comprising:  a light source . . . a camera . . . and a processor adapted to determine the gesture."  Appx0047 (claim 11).  In its Decision, the Board construed the "computer apparatus" term to include a physically distributed system, where the claimed "light source" and "camera" are components of a first computing device, while the claimed "processor adapted to determine the gesture" is a component of a second computing device that is geographically separated from the first computing device.  *See* Appx0009-0011.  The Board's construction is erroneous for multiple reasons.

First, the Board ignored the ordinary meaning of the "computer apparatus" term.  The words of a claim "are generally given their ordinary and customary meaning."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  The "ordinary meaning" of a claim term "is its meaning to the ordinary artisan after reading the entire patent."  *Id*. at 1321 (emphasis added).  The specification "is the single best guide to the meaning of a disputed term."  *Id*. at 1315 (cleaned up).  "Even

11

when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Id*. at 1321 (cleaned up).

Every embodiment of the '079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture discloses those components as disposed <u>within the same computer apparatus</u> (e.g., a laptop computer, a handheld computer, etc.). *See* <u>Appx0041</u> (2:39-40) ("A <u>laptop (or other) computer</u> keyboard based embodiment is shown in FIG. 1") (emphasis added), <u>Appx0041-0042</u> (2:65-3:2) ("<u>cameras</u> such as 100/101 are used to simply look at the tip of a finger 201 (or thumb) of the user . . . <u>central light 122</u> can be used to illuminate the finger") (emphasis added), <u>Appx0042</u> (3:56-61) ("The <u>cameras</u> can also see one's fingers directly, to allow typing as now, but without the physical keys . . . This is useful for those applications where the keyboard of conventional style is too big (e.g., the <u>hand held computer</u> of FIG. 6)") (emphasis added), <u>Appx0041</u> (2:58-59) ("finger position data can be used to <u>determine gestures</u>") (emphasis added), <u>Appx0034</u> (Fig. 1), <u>Appx0039</u> (Fig. 6).

Further, each and every limitation of independent claim 11 includes the term "work volume." The '079 Patent specification only uses the term "work volume" in reference to Figure 1, which as discussed above, discloses each component disposed within the same computing device (e.g., a laptop computer, a handheld computer,

etc.).  *See* Appx0041 (2:39-40) ("A laptop (or other) computer keyboard based embodiment is shown in FIG. 1"), Appx0041 (2:44-45) ("toward the center of the desired work volume 170 above the keyboard") (emphasis added), Appx0042 (3:4-6) ("illumination is directed or concentrated in an area where the finger is typically located such as in work volume 170") (emphasis added).  Figure 1 of the '079 Patent is reproduced below:



**FIG. 1**

Appx0034 (Fig. 1) (annotated).

Because the specification repeatedly, consistently, and exclusively discloses the claimed "light source," "camera," and "processor adapted to determine the

gesture" as being disposed within the same computing device, a POSITA would understand that the "computer apparatus" term means a single computing device (e.g., laptop computer, handheld computer, etc.) comprising all three components. Accordingly, that is the "ordinary meaning" of the "computer apparatus" term.

Second, the Board's Decision relied on extrinsic evidence in the form of a non-contemporaneous, generic online dictionary for evidence that the definition of "apparatus" should include "a collection of machines." *See* Appx0011. But this Court has explained that the Board may not rely on a dictionary or treatise to "contradict any definition found in or ascertained by a reading of the patent documents." *Phillips* at 1322-23 (cleaned up) (emphasis added). Yet that is exactly what the Board did. Further, even if the generic definition of "apparatus" included "a collection of machines," there is still no mention of such multiple machines being geographically separated from each other, as required for the Board's improper construction of "computer apparatus."

Third, the Board's Decision ignored the case law regarding the term "apparatus." This Court has defined "apparatus" as a "tangible item" and has noted that it is synonymous with "device." *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1362 (Fed. Cir. 2009) (en banc) ("We have noted the distinction between a claim to a product, device, or apparatus, all of which are tangible items, and a claim to a process, which consists of a series of acts or steps . . . Thus, a

component of a tangible product, device, or apparatus is a tangible part of the product, device, or apparatus.") (cleaned up) (emphasis added); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("apparatus claims cover what a device is, not what a device does") (emphasis added).  Neither "item" nor "device" implies multiple components/parts that are geographically separated from each other, as required for the Board's improper construction of "computer apparatus."

Fourth, the Board's Decision noted that the "case law construes the statutory term 'machine' to include either a singular device or a combination of devices (e.g., a system)."  Appx0010 (emphasis added).  By the Board's own admission, if the patentee had intended to capture multiple devices each having a subset of the claimed components (i.e., "light source," "camera," "processor adapted to determine the gesture"), the patentee could have easily drafted claim 11 to recite "computer system" or even just "system."  Instead, the patentee chose "computer apparatus" to protect only a single computing device (e.g., laptop computer, handheld computer, etc.) having all three of the claimed components.

Fifth, the Board's Decision found that "Appellant's narrow claim construction is improperly predicated on reading in a limitation from the Specification." Appx0011.  Appellant does not seek to read limitations from the specification into the claims.  Instead, Appellant is relying on the specification of the '079 Patent to

15

interpret the term "computer apparatus," which is expressly recited in claim 11.  As explained previously by this Court, "interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation," only the latter of which "is improper."  *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 831 (Fed. Cir. 2003) (cleaned up).

For the aforementioned reasons, the Board's improper construction of the "computer apparatus" term in independent claim 11 should be vacated.

**B.    The Board Erred in Determining That *Liebermann* Anticipates Claims 1, 4-9, 11, 12, and 17-20.**

**1.    *Liebermann* does not anticipate independent claim 11.**

Claim element 11[c] recites "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output."  Appx0047 (13:37-40) (emphasis added).  The Board's finding that *Liebermann* discloses claim element 11[c] is not supported by substantial evidence.

**a.    *Liebermann* fails to disclose the claimed "light source," "camera," and "processor" are all disposed within the same computing device.**

As shown above under the proper claim construction, the claimed "light source," "camera," and "processor adapted to determine the gesture" are all disposed within the same computer apparatus (e.g., laptop computer, handheld computer, etc.).  *See* Section VII.A *supra*.  *Liebermann* fails to disclose those requirements of claim element 11[c].

*Liebermann* is fundamentally different because it is a distributed system. Specifically, *Liebermann* discloses a "public kiosk" for use by a deaf person and a geographically separate, and thus physically separate, "central processing facility" or "Center" that executes gesture recognition processing. Figures 2, 3, and 5C of *Liebermann* are reproduced below:



Appx0309 (*Liebermann*, Fig. 5C) (excerpted and annotated).



Appx0306 (*Liebermann*, Fig. 2) (annotated).



Appx0307 (*Liebermann*, Fig. 3) (annotated).

In *Liebermann*, a deaf person performs sign language in front of "camera 44" of "public kiosk 42," while "lamps 48" light the deaf person's hand, face, and body." *See* Appx0322 (*Liebermann*, 4:60-61), Appx0323 (*Liebermann*, 5:53-59, 6:42-43). Each "captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines [from the public kiosk] to the central processing facility (i.e., the Center)." Appx0322-0323 (*Liebermann*, 4:60-5:2) (emphasis added). Accordingly, *Liebermann* discloses that the "central processing facility" or "Center" is geographically separate from "public kiosk 42." *Id.* *Liebermann* also discloses that it is the separate "Center" that then processes the received "identifiers" to determine the words being signed:

> These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center. Subsequently, syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content.

Appx0323 (*Liebermann*, 5:2-7) (emphasis added). Accordingly, after "public kiosk 44" transforms the captured images to "identifiers" and transmits the "identifiers" to the "Center," the "rest of the processing is completed at the center. This includes identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content." Appx0323 (*Liebermann*, 6:53-57) (emphasis added).

At bottom, *Liebermann* discloses that the "central processing facility" is the computing device with the artificial intelligence, the translation software, and the vocabulary database that identifies the words in the sign language performed by the deaf person. Because *Liebermann* discloses that the "public kiosk" is connected by "normal telephone lines" to the "central processing facility," Appx0323 (*Liebermann*, 5:1), the "public kiosk" and the "central processing facility" are not the same computer apparatus. To the contrary, *Liebermann* describes a distributed architecture in which different components are separated by substantial physical distance.

In its Decision, the Board adopted the Examiner's mappings. *See* Appx0008 ("we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer."). The Board/Examiner mapped *Liebermann's* "bottom most lamp" of the "public kiosk 42" to the claimed "light source," and mapped *Liebermann's* "camera 44" of the "public kiosk 42" to the claimed "camera." *See* Appx0444 (Final OA, p. 59), Appx0448 (Final OA, p. 63). But the Board/Examiner mapped *Liebermann's* "central processing facility," which is found at a different physical location, executing "translation software, (i.e., artificial intelligence) to produce data representing numbers, words, and phrases which are then combined into coherent sentences" to the claimed "processor." *See* Appx0450-0452 (Final

20

OA, pp. 65-67).   That mapping is contrary to what claim element 11[c] requires because, as shown above, the "processor" must be disposed within the same "computer apparatus" (i.e., same computing device) as the "camera" and "light source." *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") and *Liebermann's* "public kiosk 42" (having the Examiner identified "camera" and "light source") are different computing devices, found in different geographical locations.

For the aforementioned reasons, the Board's findings that *Liebermann* discloses claim element 11[c] are not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates independent claim 11 should be vacated or reversed.

> **b.** ***Liebermann* fails to disclose a processor adapted to determine the gesture based on the camera output.**

Claim element 11[c] requires "a processor adapted to determine the gesture . . . based on the camera output."  As discussed above, the Board/Examiner mapped *Liebermann's* "camera 44" to the claimed "camera," and mapped *Liebermann's* "central processing facility" (i.e., the "Center") to the claimed "processor."  *See* Appx0448-0452 (Final OA, pp. 63-67).  *Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of

21

<u>identifiers, in the form of tables of numbers, that travels the normal</u>
<u>telephone lines to the central processing facility (i.e., the Center).</u>
These identifiers, <u>and not the images themselves</u>, are then correlated
with a database of vocabulary and grammar by using artificial
intelligence at the Center.

<u>Appx0322-0323</u> (*Liebermann*, 4:60-5:5) (emphasis added). The output of

*Liebermann's* "camera 44" is one or more "images." But *Liebermann's* "central

processing facility" (i.e., the Examiner identified "processor") executes its functions

based on "identifiers," not the "images" themselves. *Id*. That is because the

"images" are not transmitted to the "central processing facility." *Id*. Only the

"identifiers" generated at the public kiosk "travel[] the normal telephone lines to the

central processing facility (i.e., the Center)." *Id*. Thus, *Liebermann's* "central

processing facility" (i.e., the Examiner identified "processor") is not determining

anything based on *Liebermann's* "images" (i.e., the Examiner identified "camera

output").

The Board argues that because "the identifiers are themselves based on the

captured image, the executed functions are therefore also determined based on the

captured image." <u>Appx0013</u>. But *Liebermann's* transformation from "image" to

"set of identifiers" is undisclosed and ambiguous. The only thing known about the

"set of identifiers" is that it takes "the form of <u>tables</u> of numbers." <u>Appx0322</u>

(*Liebermann*, 4:66-67) (emphasis added). This unknown number of tables, each

having unknown dimensions and an unknown meaning must be drastically different

from the original "image." Accordingly, despite some relationship existing between the two, a POSITA would not consider a determination based on *Liebermann's* "set of identifiers" to be the same as a determination based on *Liebermann's* one or more "images" (the Board-identified "camera output"), as claim element 11[c] requires.

For the aforementioned reasons, the Board's findings that *Liebermann* discloses claim element 11[c] are not supported by substantial evidence. Accordingly, the Board's conclusion that *Liebermann* anticipates independent claim 11 should be vacated or reversed.

### 2.    *Liebermann* does not anticipate independent claim 1.

Claim element 1[c] recites "<u>determining</u>, using the <u>camera</u>, the gesture performed in the work volume and illuminated by the <u>light source</u>." Appx0047 (13:8-9) (emphasis added). The Board's finding that *Liebermann* discloses claim element 1[c] is not supported by substantial evidence.

#### a.    *Liebermann* fails to disclose that the determining step is executed by the same computing device that provides the light source and camera.

In its Decision, the Board adopted the Examiner's mappings. *See* Appx0008. Similar to independent claim 11, the fundamental disagreement between Appellant and the Examiner/Board is whether *Liebermann's* distributed system anticipates the claimed process, which is executed in a computer, not a distributed system. Claim 1 recites a "computer implemented method" with three claim elements (i.e., a step

that provides a specifically configured light source, a step that provides a specifically configured camera, and a step that determines, using the camera, a gesture illuminated by the light source). Appx0047 (claim 1). As discussed in Section VII.A *supra*, in the '079 Patent, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computing device. Accordingly, the same computer must perform each step of independent claim 1.

*Liebermann* discloses that the "central processing facility" (i.e., the "Center") is the computing device with the artificial intelligence, the translation software, and the vocabulary database that identifies the words in the sign language performed by the deaf person. *See* Appx0323 (*Liebermann*, 5:2-7, 6:53-57). Again, because *Liebermann* discloses that the "public kiosk" is connected by "normal telephone lines" to the "central processing facility," Appx0323 (*Liebermann*, 5:1), the "public kiosk" and the "central processing facility" are not the same computing device. To the contrary, *Liebermann* describes a distributed architecture in which different computers are separated by substantial physical distance.

The Board/Examiner mapped the "bottom most lamp" in *Liebermann's* "public kiosk 42" to the claimed "light source," and "camera 44" in *Liebermann's* "public kiosk 42" to the claimed "camera." Appx0422 (Final OA, p. 37), Appx0426 (Final OA, p. 41). But the functions executed by *Liebermann's* "central processing facility" (e.g., identification of words in sign language performed by the deaf person)

were mapped to the "determining" step of claim element 1[c].  Appx0428-0429 (Final OA, pp. 43-44).  That is contrary to what claim element 1[c] requires because the "determining" step must be executed by the same computer that provides the claimed "light source" and the claimed "camera."  Accordingly, *Liebermann* fails to disclose claim element 1[c].

For the aforementioned reasons, the Board's findings that *Liebermann* discloses claim element 1[c] are not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates independent claim 1 should be vacated or reversed.

### b. *Liebermann* fails to disclose determining the gesture using the camera.

Claim element 1[c] requires "determining, <u>using the camera</u>, the gesture performed in the work volume and illuminated by the light source."  Appx0047 (13:8-9) (emphasis added).  As discussed above, the Examiner mapped *Liebermann's* "camera 44" of the "public kiosk" to the claimed "camera," and mapped the functions executed by *Liebermann's* "central processing facility" (i.e., the "Center") to the "determining" step of claim element 1[c].  *See* Appx0426-0429 (Final OA, pp. 41-44).  But *Liebermann's* "central processing facility" does not have access to *Liebermann's* "camera 44."  *Liebermann* discloses that the Center does not process the output of the camera:

[T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby the image is transformed into manageable identifiers.  <u>It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center).</u> These identifiers, <u>and not the images themselves</u>, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

<u>Appx0322-0323</u> (*Liebermann*, 4:60-5:2) (emphasis added).   In other words, *Liebermann's* "central processing facility" executes its functions based on "identifiers," <u>not</u> on the "images" themselves.  *Id*.  That is because the "images" from *Liebermann's* "camera 44" are not transmitted to the "central processing facility."  *Id*.  Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)."  *Id*.  Thus, *Liebermann's* "central processing facility" is <u>not</u> using *Liebermann's* "camera 44" (i.e., the Examiner identified "camera") to determine the gesture.  That is contrary to what claim element 1[c] requires.  Accordingly, *Liebermann* fails to disclose claim element 1[c].

When discussing claim element 1[c] in its Decision, the Board referenced its findings with respect to claim element 11[c].  *See* <u>Appx13</u> ("we reach the same result as in section A.2.b above for <u>claim 11</u>.  As above, contrary to Appellant's argument, [Appx0322-0323 (*Liebermann*, 4:60-5:5)] <u>teaches determining 'using' the captured image.</u>") (emphasis added).  For all the reasons discussed in Section VII.B.1.b *supra*,

a POSITA would not consider using "the set of identifiers" to be the same as using the captured "image," as claim element 1[c] requires.

For the aforementioned reasons, the Board's findings that *Liebermann* discloses claim element 1[c] are not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates independent claim 1 should be vacated or reversed.

### 3. *Liebermann* does not anticipate dependent claim 8.

As a threshold matter and as shown above, the Board's determination that *Liebermann* anticipates independent claim 1 should be vacated or reversed. Claim 8 depends from and adds limitations to independent claim 1. Accordingly, the Board's determination that *Liebermann* anticipates claim 8 should be vacated or reversed for at least the same reasons.

Further, claim 8 recites "determining the three-dimensional position of a point on a user." Appx0047 (13:24-25) (emphasis added). In its Decision, the Board noted that "we agree with the Examiner's [] reasoning and adopt it as our own." Appx0016. The Board/Examiner contends that *Liebermann* anticipates claim 8 because *Liebermann* "describes using three dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'" Appx0437 (Final OA, p. 53 (citing Appx0327 (*Liebermann*, 13:29-31))). But "enhancing spatial differences" does not necessarily mean "determining the three-dimensional position

of a point on a user," as required by claim 8.  In fact, enhancing spatial difference can (and is more likely to) refer to enhancing contrast between the deaf users hands while signing and the background.  Thus, the Board's reliance on "enhancing spatial differences" is insufficient for an anticipation rejection:  "anticipation requires that the identical invention must be shown <u>in as complete detail</u> as contained in the patent claim." *Tf3 Ltd. v. Tre Milano, LLC*, <u>894 F.3d 1366, 1374</u> (Fed. Cir. 2018) (cleaned up) (emphasis added).

The Board/Examiner also contends that *Liebermann's* "method requires 'calculating centers of gravity for both hands,' which involves finding an 'FFT [fast Fourier transform] of paths of the hands' as well as performing an 'explicit path analysis' of the hands."    <u>Appx0438</u> (Final OA, p. 53) (citing <u>Appx0313</u> (*Liebermann*, Fig. 9)).    But *Liebermann* is silent regarding any of these analyses/calculations "determining the <u>three-dimensional</u> position of a point on a user" as required by claim 8.  Performing a "path analysis" of hands does not necessarily implicate three-dimensions.  For example, hands moving left to right follow a one- or two-dimensional path.  Calculating "centers of gravity" for both hands also does not necessarily implicate three dimensions, especially when the "center of gravity" is being calculated from an image.

The Board/Examiner also points to a passage in *Liebermann* regarding the need to combine information including "the spatial location of the hands relative to

28

the rest of the body (Stokoe's tab)." Appx0016 (quoting Appx0437 (Final OA, p. 52)) (emphasis added). But in American Sign Language (ASL), Stokoe's tab identifies a part of the head, arm, or torso where the sign is to be performed. Appx0371 (Ex. PA-9, p. 41). Because Stokoe's tab refers to a portion of the surface of the human body, it is, at best, two-dimensional; but Stokoe's tab refers to portions of the body by name, not by coordinate, so it does not have any dimensions (e.g., neutral or inside of wrist). Accordingly, Stokoe's tab is not a three-dimensional position, as dependent claim 8 requires.

For the aforementioned reasons, the Board's findings that *Liebermann* discloses claim 8 are not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates dependent claim 8 should be vacated or reversed.

### 4. *Liebermann* does not anticipate claims 4-7, 9, 12, and 17-20.

Claims 4-7, 9, 12, and 17-20 depend from and add limitations to independent claims 1 or 11. Accordingly, the Board's determination that *Liebermann* anticipates dependent claims 4-7, 9, 12, and 17-20 should be vacated or reversed for at least the same reasons discussed in Sections VII.B.1 and VII.B.2, *supra*.

**C.    The Board Erred In Determining That The Combination Of *Liebermann* And *Sears* Renders Dependent Claims 2, 3, 14 And 15 Unpatentable.**

    **1.    *Sears* is non-analogous art and cannot be cited in any obviousness rejection.**

*Sears* is non-analogous art and thus it cannot be used in an obviousness rejection of any claim of the '079 Patent.  A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention.  *See In re Klein*, <u>647 F.3d 1343, 1348</u> (Fed. Cir. 2011).  Two separate tests define the scope of analogous prior art:  (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.  *Donner Technology, LLC v. Pro Stage Gear, LLC*, <u>979 F.3d 1353, 1359</u> (Fed. Cir. 2020).

    **a.    *Sears* fails the first test for analogous art.**

In its Decision, the Board argued that Appellant has too narrowly interpreted *Sears'* field of endeavor to be electronic reading systems.  <u>Appx0019</u>.  The Board's position is contrary to the *Sears* reference itself, which is replete with references to "electronic reading machines:"  *Sears'* Title, Abstract, "Technical Field" section, "Background Art" section, "Summary of the Invention" section, and independent claims all disclose or reference electronic reading machines.  *See* <u>Appx0330</u> (*Sears*, Title), <u>Appx0330</u> (*Sears*, Abstract) ("An optical-input <u>print reading device with</u>

30

voice output for people with impaired or no vision") (emphasis added), Appx0337 (*Sears*, 1:23-29) ("The present invention relates to an electronic reading system for converting text to synthesized speech") (emphasis added), Appx0338 (*Sears*, 3:12-15) ("It was our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems") (emphasis added), Appx0338 (*Sears*, 4:12-19) ("The present invention is also directed to an electronic reading apparatus for converting text to spoken words for a user.") (emphasis added), Appx0350 (*Sears*, independent claim 1) ("A method for electronically reading text") (emphasis added), Appx0351 (Sears, independent claim 31) ("An electronic reading apparatus for converting text to spoken words for a user") (emphasis added), and Appx0351 (*Sears*, independent claim 33) ("A method for electronically reading aloud text under interactive control by a user with a computer-based system") (emphasis added).  It was improper for the Board to disregard the substance of the *Sears* reference to maintain a baseless position. Accordingly, *Sears'* field of endeavor is electronic reading machines.  *See Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380-81 (Fed. Cir. 2019) (the court finding the PTAB's reliance on the title, specification, and claims of a prior art reference to determine the reference's field of endeavor reasonable).

Further, the term "optical character recognition" or "OCR" appears more than 40 times in *Sears*, and the terms "text-to-speech," "text-to-voice," "text to spoken

word," or "speech synthesis" appear at least 10 times in *Sears*. It is well-known that electronic reading machines perform these processes (i.e., "OCR," "text-to-speech," etc.). *See* Appx0337 (*Sears*, 1:45-51). The numerous references to "OCR," "text-to-speech," etc., reinforce that *Sears'* field of endeavor is electronic reading machines.

In contrast, Appellant maintains that the field of endeavor for the '079 Patent is computing devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing object or human positions and/or orientations." Appx0041 (1:54-57), Appx0034 (Fig. 1), Appx0039 (Fig. 6). These "human positions and/or orientations" include "gestures comprising a sequence of finger movements," and may "allow [for] typing as now, but without the physical keys." Appx0042 (3:48-60), Appx0045 (10:23-25). Electronic reading machines do not belong to this field of endeavor. Thus, *Sears* fails the first test for analogous art.

### b. *Sears* fails the second test for analogous art.

Regarding the second test for analogous art, as explained by this Court,

the dividing line between reasonable pertinence and less-than-reasonable pertinence is context dependent, it ultimately rests on the extent to which the reference of interest and the claimed invention relate to a similar problem or purpose . . . Thus, when addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory, the problems to which both relate must be identified and compared.

*Donner Tech., LLC* at 1359 (emphasis added). In other words, under the second test for analogous art, the Board/Examiner must identify the problem being solved by the '079 Patent, identify the problem being solved by *Sears*, and compare the two problems.

*Sears* expressly discloses:

> reading machine systems, unfortunately, <u>suffer from a variety of operational insufficiencies</u> that limit their effectiveness. For instance, before the reading machine can begin to read a page, the user must typically wait over a minute. . .

> <u>Another insufficiency</u> of conventional reading machines is that scanners are limited in the size of page they can process, and reading a newspaper page would require multiple passes through the scanner. Furthermore, the keypad navigation of current reading machines requires that the user move through the text in the same order in which the computer organizes the data . . .

> For example, the mechanisms [in conventional magnifying systems] for tracking lines of text are <u>often difficult to use</u>, since they are manually-guided mechanical systems that require relatively precise and steady hand movements to guide the movement.

> This requirement <u>is difficult</u> for certain people, especially the elderly who have fine motor problems, but also because it involves cognitive feedback control at the same time that considerable effort is being devoted to interpreting the images on the screen. Furthermore, when short columns of text are being read, the user must engage in frequent control of both vertical and horizontal mechanical guiding systems. Also, because of the small field of view of the camera and the limited movement of the mechanical system, the page must often be repositioned on the mechanical guides. Because of the small field of view of these systems, it is difficult for the user to understand the overall structure of text and graphics on a complexly formatted page. In addition, the system depends entirely on the user's vision, even though this vision may be adequate only for very slow reading . . .

> It was <u>our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems</u>, that gave rise to the current invention.

Appx0337-0338 (*Sears*, 1:66-3:15) (emphasis added).    Accordingly, *Sears* is directed towards solving the problems associated with existing electronic reading machines and magnifying systems.    While multiple problems are expressly mentioned, lighting and light sources are <u>not</u>.

In its Decision, the Board asserted that "Appellant's claims define the particular problem . . . as selecting a light source."    Appx0021.    As a threshold matter, Appellant disagrees with that definition of the problem because the "light source" is only one feature of claims 2 and 3.    The Board's formulation of that definition ignores all the limitations of independent claim 1, which claims 2 and 3 include by virtue of depending from claim 1.    Regardless, even assuming *arguendo* that the Board-identified problem is proper, as discussed above, "selecting a light source" is not the problem to which *Sears* relates, and thus *Sears* fails the second test for analogous art.

Because *Sears* fails both tests for analogous art, it is non-analogous art and cannot be cited in any obviousness rejections.

### 2.    *Sears* and *Liebermann* do not render claims 2 and 14 obvious.

Claims 2 and 14 depend from and add limitations to independent claims 1 and 11, respectively.    As discussed above, *Liebermann* fails to teach or suggest each and

every limitation of independent claims 1 and 11. *Sears* does not cure the deficiencies of *Liebermann*. Thus, the combination of *Liebermann* and *Sears* does not render claims 1 and 11 unpatentable. By virtue of their dependencies from independent claims 1 or 11, the combination of *Liebermann* and *Sears* also does not render dependent claims 2 and 14 unpatentable. Accordingly, the Board's determination that the combination of *Liebermann* and *Sears* renders claims 2 and 14 obvious is not supported by substantial evidence and should be vacated.

Further, claim 2 recites, in part, "wherein the light source includes a light emitting diode." Appx0047. The Board/Examiner mapped *Liebermann's* "bottom most lamp" of the "public kiosk 42" to the claimed "light source." Appx0422 (Final OA p. 37), Appx0444 (Final OA, p. 59). But the Board/Examiner concedes that *Liebermann* does not disclose light emitting diodes (LEDs). *See* Appx0461-0462 (Final OA, pp. 76-77). *Sears* discloses "[t]hese illumination sources 45 may comprise rows of LEDs." Appx0339 (*Sears*, 5:17-19). To meet the requirements of claims 2 and 14, the Board/Examiner proposed substituting *Liebermann's* "bottom most lamp" of the "public kiosk 42" (i.e., the Board/Examiner identified "light source") with *Sears*' "LED." *See* Appx0461-0463 (Final OA, pp. 76-78).

According to the Board/Examiner, an LED "provides <u>more</u> intense light and is [a] <u>more</u> efficient light source [than *Liebermann's*] lamps." Appx0404 (Final OA, p. 19) (emphasis added). This serves as the motivation for the Board/Examiner's

substitution. *See* Appx0403-0406 (Final OA, pp. 18-21). But the Board/Examiner provides no evidence that *Sears'* LEDs actually have these superior properties compared to *Liebermann's* lamps. The Board/Examiner does not compare the intensity and the efficiency of *Liebermann's* lamps with the intensity and the efficiency of *Sears'* LEDs. Nor does the Board/Examiner evaluate any of the downsides to using LEDs (e.g., cost) that would have been material at the time of the claimed invention. Accordingly, the Board/Examiner's proposed motivation for the substitution is defective.

Further, the Board/Examiner contends that "it would have been obvious to an artisan to substitute [a lamp for an LED]. . . to ensure adequate lighting of the user's hands, face and body" and "to provide constant illumination over the field of view." Appx0463 (Final OA, p. 78). But *Liebermann* expressly discloses that "lamps 48" already "ensure adequate lighting of the user's hands, face and body" in front of "camera 44." Appx0323 (*Liebermann*, 5:53-59). The Board/Examiner presented no evidence to the contrary. *See* Appx0403-0406 (Final OA, pp. 18-21), Appx0461-0463 (Final OA, pp. 76-78). Further, the Board/Examiner failed to (1) demonstrate that *Liebermann's* "lamps 48" do not already provide constant illumination over "camera 44's" field of view, or (2) explain why only an LED can provide constant illumination over "camera 44's" field of view. Again, the Board/Examiner's proposed motivation for the substitution is defective.

In its Decision, the Board noted this Court's precedent "does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away." Appx22 (quoting *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1197-98 (Fed. Cir. 2014)).  The Board's reliance on *Par Pharm* is misplaced.  In *Par Pharm*, multiple methods allegedly existed to achieve the goal of reducing "the viscosity and interpatient variability concerns with Megace OC." *Par Pharm.* at 1197.  Even though combining the prior art was not the best option for achieving that goal, it was still a suitable option (i.e., it still achieved that goal), and thus a motivation to combine the prior art existed.  *See Par Pharm* at 1197-98. In the present case, however, neither the Board nor the Examiner provides any evidence that combining *Liebermann* and *Sears* would provide "more intense light more efficiently." Appx0404 (Final OA, p. 19).   Accordingly, the goal of "more intense light more efficiently" cannot serve as the motivation for combining *Liebermann* and *Sears*.

In its Decision, the Board argued that "Sears teaches a known light source technique for a gesture-based environment.  'And if there's a known technique to address a known problem using prior art elements according to their established functions, then there is a motivation to combine.'" Appx0023 (quoting *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023)) (cleaned up).  But

the Board failed to identify the "known problem" allegedly being addressed by *Sears'* "light source technique."

For the aforementioned reasons, the Board's determination that the combination of *Sears* and *Liebermann* renders claims 2 and 14 obvious is not supported by substantial evidence, and thus should be vacated.

### 3.    *Sears* and *Liebermann* do not render claims 3 and 15 obvious.

Claims 3 and 15 depend from and add limitations to independent claims 1 and 11, respectively. As shown above, *Liebermann* fails to teach or suggest each and every limitation of independent claims 1 and 11. *Sears* does not cure the deficiencies of *Liebermann*. Thus, the combination of *Liebermann* and *Sears* does not render claims 1 and 11 unpatentable. By virtue of their dependencies from independent claims 1 or 11, dependent claims 3 and 15 are also not rendered unpatentable by the combination of *Liebermann* and *Sears*. Accordingly, the Board's determination that the combination of *Liebermann* and *Sears* renders claims 3 and 15 obvious is not supported by substantial evidence and should be vacated.

Further, claim 3 recites "wherein the light source includes a plurality of light emitting diodes." Appx0047. Based on the plain language of the claim, the "light source," and thus the "plurality of light emitting diodes," are located below the claimed "work volume." *Compare* Appx0047 (claim 3) *with* Appx0047 (claim element 1[a]) ("providing a light source adapted to direct illumination through a

work volume above the light source") (emphasis added). The Board/Examiner mapped the space within the field of view (FOV) of *Liebermann's* "camera 44" to the claimed "work volume." *See* Appx0422 (Final OA p. 37), Appx0444 (Final OA, p. 59).

Again, *Liebermann*'s "public kiosk 42" has multiple lamps. *See* Appx0309 (*Liebermann*, Fig. 5C). But only the "bottom most lamp" of the "public kiosk" could possibly qualify as the claimed "light source" because only the "bottom most lamp" is allegedly below the space within the FOV of *Liebermann's* "camera 44" (the Board/Examiner identified "work volume"), as independent claim 1 requires. Accordingly, the Board/Examiner mapped *Liebermann's* "bottom most lamp" of the "public kiosk 42" to the claimed "light source." *See* Appx0422 (Final OA p. 37), Appx0444 (Final OA, p. 59). It is that "bottom most lamp" (the Board/Examiner-identified "light source") that must "include[] a plurality of light emitting diodes" to meet the requirements of claim 3.

According to the Board, to meet the requirements of claim 3 the "Examiner here proposes a 'simple substitution of one light source for another,' i.e., 'a row of lamps in Lieberman[n]' (such as seen in Figure 5C) with [] 'a row of LEDs in Sears.'" Appx0025 (citing Appx0603 (Answer, p. 76)). But Board/Examiner failed to explain why after this "simple substitution," there will be two or more LEDs (i.e.,

a plurality of LEDs) below the space within the FOV of *Liebermann's* "camera 44" (the Board/Examiner identified "work volume"), as claim 3 requires.

Further, the Examiner's proposed motivation for the substitution is defective for the same reasons discussed above in reference to claims 2 and 14. Further still, according to the Board/Examiner, an LED "provides more intense light and is [a] more efficient light source [than Liebermann's] lamps." Appx0404 (Final OA, p. 19). Even if that is true—and Appellant does not concede that it is true—the Board/Examiner still failed to explain why a POSITA would replace the "bottom most lamp" of *Liebermann's* "public kiosk 42" with multiple LEDs, as required by claim 3. Again according to the Board/Examiner, a single LED supposedly provides more intense visible light and is more efficient than *Liebermann's* lamps. Thus, based on the Board/Examiner's statements, substituting the "bottom most lamp" of *Liebermann's* "public kiosk 42" with a single LED would already provide more intense light compared to the light that was available before. Substituting the "bottom most lamp" of *Liebermann's* "public kiosk 42" with multiple LEDs, as proposed by the Bord/Examiner, is unnecessary and only increases the circuit complexity with little return. That is not rational.

For the aforementioned reasons, the Board's determination that the combination of *Sears* and *Liebermann* renders claim 3 obvious is not supported by substantial evidence, and thus should be vacated. Claim 15 is similar to claim 3.

*See* Appx0005 ("we select claim 3 as the representative claim for the § 103 rejection of claim 15"). Accordingly, the Board's determination that the combination of *Sears* and *Liebermann* renders claim 15 obvious is also not supported by substantial evidence, and thus should be vacated.

### D. The Board Erred In Determining That The Combination Of *Liebermann* And *Mack* Renders Dependent Claim 16 Unpatentable.

Claim 16 depends from independent claim 11. As noted by the Board, "this rejection of claim 16 turns on our decision as to the rejection of claim 11." Appx0005. For the reasons set forth regarding claim 11 in Section VII.B.1 *supra*, the Board's determination that the combination of *Liebermann* and *Mack* renders claim 16 obvious is not supported by substantial evidence, and thus should be vacated.

### E. The Board Erred In Determining That The Combination Of *Liebermann* And *Sako* Renders Claims 21, 24-28, and 30 Unpatentable.

#### 1. *Liebermann* and *Sako* do not render independent claim 21 obvious.

In its Decision, the Board adopted the Examiner's mappings. *See* Appx0008. As with independent claims 1 and 11, the fundamental disagreement between Appellant and the Board/Examiner is whether *Liebermann's* distributed system renders obvious the claimed process, which is executed in a computer, not a distributed system. Claim 21 recites a "computer implemented method" with three

41

claim elements (i.e., a step that provides a specifically configured camera, a step that provides a specifically configured light source, and a step that determines, using the camera, a gesture). Appx0047. As discussed in sections VII.A and VII.B *supra*, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus. Accordingly, the same computer must perform each step of independent claim 21.

Claim element 21[c] recites "detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume." To meet claim element 21[c], the Board/Examiner cites to the mappings and arguments presented in the Final OA for independent claims 1 and 11. *See* Appx0466-0467 (Final OA, pp. 81-82) (the facts "cited above for challenge[d] claim[s] 1 and 11 relied on herein show Liebermann describes a computer implemented method comprising . . . detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand."). As discussed above, however, *Liebermann* fails to teach claim element 1[c] and claim element 11[c], which are similar to claim element 21[c]. *Compare* Appx0047 (claim element 1[c]) and Appx0047 (claim element 11[c]) *with* Appx0047 (claim element 21[c]). Accordingly, *Liebermann* fails to teach claim element 21[c] for at least the same reasons as those discussed above for claim elements 1[c] and 11[c]. The Board/Examiner does not contend that *Sako* cures the deficiencies of *Liebermann*. *See* Appx0468-0469 (Final OA, pp. 83-

84).  Thus, the combination of *Liebermann* and *Sako* fails to teach or suggest claim element 21[c].

For the aforementioned reasons, the Board's determination that the combination of *Liebermann* and *Sako* renders claim 21 obvious is not supported by substantial evidence, and thus should be vacated.

### 2.    *Liebermann* **and** *Sako* **do not render claim 28 unpatentable.**

In its Decision, the Board adopted the Examiner's mappings.  *See* Appx0008. Claim 28 recites "determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers."  According to the Board/Examiner, "claims 24-28 and 30 recite [the] same limitations as recited in challenge[d] claims 4-9 . . . facts cited above regarding challenge[d] claims 4-9 are relied on herein for challenge[d] claims 24-28 and 30." Appx0469 (Final OA, p. 84).  Claim 28 is similar to claim 8.  *Compare* Appx0047 (claim 8) *with* Appx0047 (claim 28).  Accordingly, the cited art fails to render claim 28 unpatentable for all the reasons discussed above in reference to claim 8.

For the aforementioned reasons, the Board's determination that the combination of *Liebermann* and *Sako* renders claim 28 obvious is not supported by substantial evidence, and thus should be vacated.

    **3.**    ***Liebermann*** **and** ***Sako*** **do not render claims 24-27 and 30 unpatentable.**

Claims 24-27 and 30 depend from and add limitations to independent claim 21.  For the reasons set forth regarding claim 21 in Section VII.E.1 *supra*, the Board's determination that the combination of *Liebermann* and *Sako* renders dependent claims 24-27 and 30 obvious is not supported by substantial evidence, and thus should be vacated.

**F.**    **The Board Erred In Determining That The Combination Of** ***Liebermann*****,** ***Sako*****, and** ***Sears*** **Renders Dependent Claims 22 and 23 Obvious.**

    **1.**    ***Liebermann*****,** ***Sako*****, and** ***Sears*** **do not render claim 22 obvious.**

Claim 22 recites "wherein the light source includes a light emitting diode." Claim 22 is similar to claim 2.  *Compare* Appx0047 (claim 22) *with* Appx0047 (claim 2).  As discussed above, the combination of *Liebermann* and *Sears* does not render claim 2 unpatentable.  Accordingly, the combination of *Liebermann* and *Sears* also does not render claim 22 unpatentable for the same reasons.  *Sako* does not cure the deficiencies of *Liebermann* and *Sears*.  Accordingly, claim 22 is patentable over the combination of *Liebermann*, *Sako*, and *Sears*.

For the aforementioned reasons, the Board's determination that the combination of *Liebermann, Sako*, and *Sears* renders claim 22 obvious is not supported by substantial evidence, and thus should be vacated.

44

      2.    **_Liebermann_, _Sako_, and _Sears_ do not render claim 23 obvious.**

Claim 23 recites "wherein the light source includes a plurality of light emitting diodes." Claim 23 is similar to claim 3. _Compare_ Appx0047 (claim 23) _with_ Appx0047 (claim 3). As discussed above, the combination of _Liebermann_ and _Sears_ does not render claim 3 unpatentable. Accordingly, the combination of _Liebermann_ and _Sears_ also does not render claim 23 unpatentable for the same reasons. _Sako_ does not cure the deficiencies of _Liebermann_ and _Sears_. Accordingly, claim 23 is patentable over _Liebermann_, _Sako_, and _Sears_.

For the aforementioned reasons, the Board's determination that the combination of _Liebermann, Sako_, and _Sears_ renders claim 22 obvious is not supported by substantial evidence, and thus should be vacated.

### G.    The Board Erred In Determining That The Combination Of _Liebermann_, _Sako_, and _Mack_ Renders Dependent Claim 29 Obvious.

Claim 29 depends from independent claim 21. As noted by the Board, "this rejection of claim 29 turns on our decision as to the rejection of claim 21." Appx0007. For the reasons set forth regarding claim 21 in Section VII.E.1 _supra_, the Board's determination that the combination of _Liebermann_, _Sako_, and _Mack_ renders claim 16 obvious is not supported by substantial evidence, and thus should be vacated.

**H.     The Board Erred By Not Vacating The Reexam Order Because No Substantial New Question (SNQ) Of Patentability Exists**

Section 303 of Title 35 "requires the examiner to determine whether a 'substantial new question of patentability' is raised by the reexamination request. Only if a new question of patentability is raised, can the patent be reexamined." *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1396 (Fed. Cir. 1996). The USPTO "considers the standard for reexamination met when there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not the claim is patentable." *P&G v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed. Cir. 2008) (cleaned up).

In the Reexam Order granting the request for *ex parte* reexamination of the '079 Patent, the Office asserted that *Liebermann* raised a SNQ of patentability because *Liebermann* appeared to teach all the claim elements, and these claim elements were missing from the art cited during the original prosecution. Appx0300-0301 (Reexam Order, pp. 16-17). Appellant disagrees. As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c], and is fundamentally different than the claimed invention because of *Liebermann's* distributed architecture. In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent. Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and thus

*Liebermann* does not raise a SNQ of patentability. The order for *ex parte* reexamination should be vacated.

## I.     The USPTO Does Not Have Jurisdiction Over the Expired '079 Patent.

In *Oil States*, the Supreme Court explained that the "decision to <u>grant</u> a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, <u>138 S. Ct. 1365, 1373</u> (2018) (emphasis in original). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id.* (internal quotation marks omitted). The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id.* at 1368. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine— and perhaps cancel—a patent claim in an inter partes review." *Id.* at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the Patent Office may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages arising from the public franchise that formerly existed through an infringement action in district court. But because

the public franchise no longer exists after the patent expires, the Patent Office has nothing in its authority to cancel or amend.  Expiration thus removes the patent from the Patent Office's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages.  If this were not so, the Patent Office would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '079 Patent issued in October 2013 and expired in November 2019, long before the *ex parte* reexamination request was filed in November 2021.  *See* Appx0032, Appx0136.  With the expiration of the '079 Patent in November 2019, the USPTO ceased to have jurisdiction over the '079 Patent, and the order granting reexamination should be vacated as a result.

In rejecting Patent Owner's argument, the Board argued "we disagree that Appellant has no rights under the expired patent."  Appx0026.  Appellant never argued that it had no rights under the expired patent.  Appellant argued that the USPTO loses its jurisdiction to cancel or amend the patent when the patent expires. *See* Appx0518-0520 (Appeal Br., pp. 33-35).

Further, in rejecting Patent Owner's argument, the Board relied on Title 35 of the United States Code and identified several cases where this Court reviewed the

Board's decision even though the patent under reexamination expired prior to the Board issuing its decision.  *See* Appx0026-0027.  But the Board failed to address the fundamental issue of whether the Patent Office has jurisdiction over expired patents in view of the *Oil States* decision.  *See id*.  It does not, for the foregoing reasons.

## VIII.  CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully requests that the Court (1) vacate the Board's claim construction for the "computer apparatus" term in independent claim 11, (2) vacate or reverse the Board's determinations that claims 1-9, 11, 12, and 14-30 are anticipated or rendered obvious by the cited art, (3) vacate the order granting *ex parte* reexamination of claims 1-9, 11, 12, and 14-30, and (4) vacate the Board's Decision because the USPTO does not have jurisdiction over expired patents.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on January 22, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:     January 22, 2024                    */s/ Fred I. Williams*
                                                Fred I. Williams

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1037

**Short Case Caption:** In re: Gesture Technology Partners, LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __10,328__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __01/22/2024__

Signature: __/s/ Fred I. Williams__

Name: __Fred I. Williams__

Save for Filing

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036          7590          08/08/2023
Williams Simons & Landis PLLC/GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/08/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

———————————————

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2
Technology Center 3900

———————————————

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.


DECISION ON APPEAL

STATEMENT OF THE CASE

     Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology
Partners, LLC (Appellant)[1] appeals from the final rejection of claims 1−9,
11, 12, and 14−30.  Appeal Br. 6−33.  Patent claims 10 and 13 have been
confirmed by the Examiner, and thus are not at issue.  Final Act. 90.  We
have jurisdiction under 35 U.S.C. § 6(b).

     We affirm.

———————————————

[1] Appellant identifies the real party in interest as Gesture Technology
Partners, LLC.  Appeal Br. 1.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## CLAIMED SUBJECT MATTER

Claims 1–3, 8, and 11 are illustrative of the claimed subject matter (emphasis, formatting, and bracketed material added):

1. A computer implemented method comprising:

   [1.A.] providing a light source adapted to direct illumination through a work volume above the light source;

   [1.B.] providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

   [1.C.] determining, ***using*** the camera, the gesture performed in the work volume and illuminated by the light source.

2. The method according to claim 1 wherein the light source includes a light emitting diode.

3. The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

8. The method according to claim 1 further including determining the ***three-dimensional position*** of a point on a user.

11. A computer ***apparatus*** comprising:

   [11.A.] a light source adapted to illuminate a human body part within a work volume generally above the light source;

   [11.B.] a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

   [11.C.] a processor adapted to determine the gesture performed in the work volume and illuminated by the light source ***based on*** the camera output.

2

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## REFERENCES[2]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Sako | US 5,689,575 | Nov. 18, 1997 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Sears | US 6,115,482 | Sept. 5, 2000 |
| Mack | US 6,198,485 B1 | Mar. 6, 2001 |

## REJECTIONS[3]

### A.[4]

The Examiner rejects claims 1, 4–9, 11, 12, and 17–20, under
35 U.S.C. § 102 as being anticipated by Liebermann. Final Act. 34–76.

Appellant presents arguments for claims 1, 8, and 11. Appeal Br. 6–
20. Appellant does not present separate arguments for claims 4–7, 9, 12,
and 17–20. We select claim 1 as the representative claim for the § 102
rejection of claims 4–7 and 9; and we select claim 11 as the representative
claim for the § 102 rejection of claims 12 and 17–20. Except for our
ultimate decision, we do not address the merits of this § 102 rejection of
claims 4–7, 9, 12, and 17–20 further herein.

---

[2] All citations herein are by the first named inventor.

[3] For simplicity herein, we refer to the Examiner's rejection under § 102(e)
as a rejection under § 102; and we refer to the Examiner's rejections under
§ 103(a) as rejections under § 103.

[4] Although the heading for this rejection also lists claims 21, 24–28, and 30
(Final Act. 34), these claims are not discussed in the § 102 rejection that
follows the heading. Instead, these claims are separately rejected under
§ 103 as discussed *infra*.

3

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## B.

The Examiner rejects claims 2, 3, 14, and 15 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sears.  Final Act. 76–78.

Appellant presents separate arguments for claims 2 and 3.  Appeal Br. 20–28.  Appeal Br. 6–20.  Appellant does not present separate arguments for claims 14 and 15.  We select claim 2 as the representative claim for the § 103 rejection of claim 14; and we select claim 3 as the representative claim for the § 103 rejection of claim 15.  Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 14 and 15 further herein.

## C.

The Examiner rejects claim 16 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Mack.  Final Act. 78–81.

To the extent that Appellant discusses this rejection of claim 16, Appellant merely references (or repeats) the argument directed to claim 11.  Appeal Br. 28.  Such a referenced (or repeated) argument is not an argument for "separate patentability."  Thus, Appellant does not present separate arguments for this rejection of claim 16.  Therefore, this rejection of claim 16 turns on our decision as to the rejection of claim 11.  Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 16 further herein.

4

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.

The Examiner rejects claims 21, 24−28, and 30 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sako. Final Act. 81−85.

To the extent that Appellant discusses this rejection of claims 21, 24−28, and 30, Appellant merely references (or repeats) the arguments directed to claims 1, 8, and/or 11. Appeal Br. 29−31. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claims 21, 24−28, and 30. Therefore, this rejection of claims 21, 24−28, and 30 turns on our decision as to the rejection of claims 1, 8, and/or 11. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 21, 24−28, and 30 further herein.

### E.

The Examiner rejects claims 22 and 23 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Sears, and Sako. Final Act. 85−87.

To the extent that Appellant discusses this rejection of claims 22 and 23, Appellant merely references (or repeats) the arguments directed to claims 2 and/or 3. Appeal Br. 32. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claims 22 and 23. Therefore, this rejection of claims 22 and 23 turns on our decision as to the rejection of claims 2 and/or 3. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 22 and 23 further herein.

5

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

F.

The Examiner rejects claim 29 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Mack, and Sako. Final Act. 87–90.

To the extent that Appellant discusses this rejection of claim 29, Appellant merely references (or repeats) the argument directed to claim 21. Appeal Br. 33. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 29. Therefore, this rejection of claim 29 turns on our decision as to the rejection of claim 21. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 29 further herein.

PRINCIPLES OF LAW − CLAIM CONSTRUCTION

A.[5]

During examination of a patent application, a claim is given its broadest reasonable construction consistent with the specification. *In re Prater*, 415 F.2d 1393, 1404–1405 (CCPA 1969). However, "[w]hen a patent expires during a reexamination proceeding, the PTO should thereafter apply the *Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)] standard for claim construction." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016).

---

[5] The subject patent of this appeal expired on November 3, 2019 before the filing of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 34 (last two lines). The Examiner acknowledges "the [']079 Patent expired in November 2019." Final Act. 5; Ans. 80.

6

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

### B.

"Claims must be read in view of the specification, of which they are a part." *Markman v. Westview Insts., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). However, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)).

### OPINION

We have reviewed the Examiner's rejections in light of Appellant's arguments (Appeal Brief) that the Examiner has erred. We disagree with Appellant's conclusions. Except as noted below, we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer in response to Appellant's Appeal Brief.

### A. Claim 11 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 11 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 6–15.

7

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## A.1. Claim 11 – First Argument

### A.1.a. Claim 11 – First Argument – Appellant's Contentions

Appellant argues:

> One need look no further than the plain language of claim 11 to determine that the claim ***does not cover a physically distributed system***. The preamble of claim 11 requires "a computer apparatus." That is why the claimed computer apparatus must include the claim elements that follow the preamble.
>
> The same holds true for the specification. In every disclosed embodiment of the '079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture, those components are located within the ***same computing device*** (e.g., laptop computer, handheld computer, etc.).

Appeal Br. 10 (emphasis added).

> The Examiner even acknowledges that "an apparatus [claim] recites what a device is rather than what a device does." Action, p. 58 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis added)). Accordingly, independent claim 11 requires that the claimed "processor," "camera," and "light source" all be components of the same computing device.

Appeal Br. 11.

> Claim element 11[c] requires "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" located in the same "computer apparatus" as the "camera" and "light source." But those requirements of claim 11 are fundamentally different than the distributed architecture of *Liebermann*.

Appeal Br. 12.

> In the present case, Patent Owner is not attempting to read limitations from the specification into the claims. Instead, Patent Owner is relying on the specification of the '079 Patent to

8

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> interpret the term "computer apparatus," which is expressly
> recited by independent claim 11.

Reply Br. 3.

### A.1.b. Claim 11 − First Argument – Panel's Analysis

We are not persuaded by Appellant's argument. First, the term

"apparatus" is not explicitly listed among the patent eligible subject matter

in the statute. Rather, the term "machine" is listed.

> Whoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor, subject
> to the conditions and requirements of this title.

35 U.S.C. § 101.

> A machine is a "concrete thing, consisting of parts, or of certain
> devices and combination of devices." *Digitech* [*Image Techs.,
> LLC v. Electronics for Imaging, Inc.*], 758 F.3d [1344,] 1348–49
> [(Fed. Cir. 2014)] (quoting *Burr v. Duryee*, 68 U.S. 531, 570 . . .
> (1863)). This category "includes every mechanical device or
> combination of mechanical powers and devices to perform some
> function and produce a certain effect or result." [*In re*] *Nuijten*,
> 500 F.3d [1346,] 1355[ (Fed. Cir. 2007)] (quoting *Corning v.
> Burden*, 56 U.S. 252, 267 . . . (1854)).

MPEP § 2106.03 I. Thus, the case law construes the statutory term

"machine" to include either a singular device or a combination of devices

(e.g., a system). We see no distinction between a 'machine' (as in the

statute) and an 'apparatus' (as claimed here). We therefore construe the

claim term "apparatus" to include either a singular device or a combination

of devices.

Second, we do not find where appellant cites either a reference (e.g.,

dictionary) or case law that actually requires Appellant's restrictive reading

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

of "apparatus."  Rather, the general definition[6] of the term "apparatus" (a noun) is:

> 1. a collection of instruments, machines, tools, parts, or other equipment used for a particular purpose[.]
>
> 2. a machine having a specific function: *breathing apparatus.*

These definitions of "apparatus" include both a singular machine as well as a collection of machines.  The definitions do not support Appellant's argument.

Third, our analysis of claim 11 finds nothing in the claim that precludes a distributed system.  Although the particular same computer embodiment advocated by Appellant is well-supported in the Specification, and we do not read claim 11 to be so limited.  Therefore, Appellant's narrow claim construction is improperly predicated on reading in a limitation from the Specification.

> "[L]imitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee[-]Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (emphasis and parallel citation omitted).

---

[6] Dictionary.com, https://www.dictionary.com/browse/apparatus. Definitions numbers 1 and 2. (Accessed July 28, 2023).  Based on Collins English Dictionary - Complete & Unabridged 2012 Digital Edition © William Collins Sons & CO. LTD. 1979, 1986 © Harpercollins Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012.

10

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2. Claim 11 − Second Argument

#### A.2.a. Claim 11 − Second Argument – Appellant's Contentions

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:5 (emphasis added). The output of *Liebermann's* "camera 44" is one or more "images." But *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.* Thus, *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is ***not determining anything based on*** *Liebermann's* "images" (i.e., the Examiner identified "camera output"). Accordingly, *Liebermann* fails to disclose claim element 11[c].

Appeal Br. 14−15 (Appellant emphasis omitted; Panel emphasis added).

11

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2.b. Claim 11 – Second Argument – Panel's Analysis

We are not persuaded by Appellant's argument. As Appellant acknowledges, Liebermann's captured image is transformed into manageable identifiers and Liebermann's system executes (i.e., determines) its functions based on these identifiers. Since these identifiers are themselves based on the captured image, the executed functions are therefore also determined based on the captured image. Contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "based on" the captured image.

### B. Claim 1 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 1 under 35 U.S.C. § 102 as being anticipated.

### B.1. Claim 1 – First Argument

> Similar to independent claim 11, the fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann's **distributed system*** anticipates the claimed process, which is executed in a computer, not a distributed system. . . . As discussed above in reference to independent claim 11, in the '079 Patent, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus. Accordingly, the same computer must perform each step of independent claim 1.

Appeal Br. 15–16.

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.1.a. above for claim 11, and we reach the same result as in section A.1.b. above for claim 11.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## B.2. Claim 1 − Second Argument

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:[5] (emphasis added). In other words, *Liebermann's* "central processing facility" executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" from *Liebermann's* "camera 44" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.* Thus, *Liebermann's* "central processing facility" is ***not using*** *Liebermann's* ***"camera 44"*** (i.e., the Examiner identified "camera") ***to determine the gesture***. This is contrary to the requirements of claim element 1[c]. Accordingly, *Liebermann* fails to disclose claim element 1[c].

Appeal Br. 18 (Appellant emphasis omitted; Panel emphasis added).

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.2.a. above for claim 11, and we reach the same result as in section A.2.b. above for claim 11. As above, contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "using" the captured image.

13

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### C. Claim 8 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 8 under 35 U.S.C. § 102 as being anticipated.

> The Examiner contends that Liebermann anticipates claim 8 because *Liebermann* "describes using three[-]dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'" Action, p. 53 (citing *Liebermann*, 13:29-31). But "enhancing spatial differences" does <u>not</u> necessarily mean "determining the three-dimensional position of a point on a user," as required by claim 8. The Examiner also contends that *Liebermann's*
>
> > method requires "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands.
>
> Action, p. 53 (citing *Liebermann*, 4:31-32, FIG. 9). Notably, *Liebermann **does not characterize*** its calculation as "calculating centers of gravity for both hands." Putting that aside, *Liebermann **is silent*** regarding any of these analyses/calculations "determining the <u>three-dimensional</u> position of a point on a user," as required by claim 8. Performing a "path analysis" of hands does not necessarily implicate three-dimensions. For example, hands moving left to right follow a one- or two-dimensional path. Thus, *Liebermann* does not anticipate claim 8.

Appeal Br. 19 (emphasis and formatting added).

> [T]he Examiner now admits that the Examiner must "interpret" *Liebermann* or rely on what *Liebermann* "suggests" to find anticipation. But anticipation requires express teachings, not "interpretation" or "suggestions."

Reply Br. 4.

14

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We are not persuaded by Appellant's arguments. First, contrary to Appellant's argument, Liebermann ***does*** characterize its calculation as "calculating centers of gravity for both hands" at Figure 9 on the left side at the fifth box down in the figure.

Second, although we agree with Appellant that the Examiner's discussion of Liebermann, column 13, lines 22–23, by using the term "suggesting" (Final Act. 53; Ans. 67) does not support the anticipation rejection of claim 8, we find this Examiner error to be harmless in light of the Examiner's remaining reasoning at pages 52–53 of the Final Action. We agree with the Examiner's remaining reasoning and adopt it as our own. The remaining reasoning is by itself sufficient to support the anticipation rejection of claim 8. Particularly, as the Examiner finds:

> "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the **spatial location of the hands relative to the rest of the body** (Stokoe's 'tab')." [Liebermann,] 10:59-64 (internal quotations added). . . . FIG. 9 discloses in other portions of the conversion process that a "**2 hand FFT and their location**" are determined by the static gesture manager[.] . . . [A] POSITA would understand that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed in Liebermann includes determining the position of a point on the user's hand, which is a "point on a user."

Final Act. 52–53.

Third, contrary to Appellant's argument, we find no error in the Examiner's use of the term "interpreted" at page 69 of the Answer because, in this context, it is a reasonable substitute for an alternative term such as "understood."

15

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

D. Claims 2 and 3 – Section 103 – Liebermann and Sears

Claims 2 and 3 depend from claim 1 and further recite "the light source includes" either "a light emitting diode" (claim 2) or "a plurality of light emitting diodes" (claim 3). The Examiner concludes:

> [I]t would have been obvious to an artisan to **substitute** one light source for the other to provide a light source such as "a light emitting diode", and "a plurality of light emitting diodes" so as to direct illumination through a work volume, to ["]ensure adequate lighting of the user's hands, face and body["] ([Liebermann], 5:52-58), and "to provide constant illumination over the field of view" ([Sears], 5:13-35).

Final Act. 78 (Examiner's emphasis omitted; Panel emphasis added).

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 2 and 3 under 35 U.S.C. § 103 over the combination of Liebermann and Sears. Appeal Br. 20–28.

### D.1. Analogous Art

Appellant correctly states:

> A reference qualifies as prior art for an obviousness determination **only when it is analogous to the claimed invention**. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear*, LLC, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

Appeal Br. 20 (emphasis added).

16

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.1.a. Analogous Art – First Test

As to claims 2 and 3, Appellant argues:

> Regarding the first test for analogous art, *Sears* describes itself as relating to
>
>> an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.
>
> *Sears*, 1:23−29. In contrast, the '079 Patent is directed to computing devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing object or human positions and/or orientations." '079 Patent, 1:54−57, Fig. 1, Fig. 6. These "human positions and/or orientations" include "gestures comprising a sequence of finger movements," and may "allow [for] typing as now, but without the physical keys." *Id.*, 3:48−60, 10:23−25. Accordingly, *Sears* and the '079 Patent are <u>not</u> from the same field of endeavor, and Sears fails the first test for analogous art.

Appeal Br. 21 (formatting added).

> It is clear . . . that "electronic reading machines" are absent from the Examiner-identified field of endeavor for *Sears*. This is improper. *Sears'* Title, Abstract, Technical Field section, Background Art section, Summary of the Invention section, and independent claims all disclose or reference electronic reading machines. See *Sears* at Title, Abstract, 1:23−29, 3:12−15, 4:12−19, independent claims 1, 31, and 33. Accordingly, *Sears'* field of endeavor necessarily includes electronic reading machines.

Reply Br. 6.

We are not persuaded by Appellant's argument. Firstly, Appellant starts from the wrong perspective—the field of endeavor of Sears—and then

17

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

looking to see if the '079 Patent is in that field.  As Appellant notes in its
citation of the law, the focus of the first test is whether Sears is "within the
field of the inventor's endeavor," not the other way around.  Appeal Br. 20;
*see also In re Klein*, 647 F.3d at 1348 (citing *In re Bigio,* 381 F.3d 1320,
1325 (Fed.Cir.2004); *In re Clay,* 966 F.2d 656, 658 (Fed.Cir.1992)).  Thus,
even if Sears is focused on a subset of the field of endeavor of the '079
Patent, it can still be within the same field of the '079 Patent.

The '079 Patent states:

1. Field of the Invention

***The invention relates to simple input devices for
computers***, particularly, but not necessarily, intended for use
with 3-D graphically intensive activities, ***and operating by
optically sensing object or human positions and/or
orientations***.

'079 Patent, 1:53–57 (emphasis added).

Appellant too narrowly interprets Sears' field of endeavor to limit it to
be "an electronic reading system."  Appeal Br. 21.  Like the '079 Patent,
Sears points out that "[i]t is an object of the invention . . . ***to specify control
system parameters through manual gestures***."  Sears, 3:19–21. (emphasis
added).  Also, Sears' title states his invention's concern with "Gesture-Based
Navigation."  Further, Sears' states:

An optical-input print reading device with voice output for
people with impaired or no vision in which the user provides
input to the system from hand gestures.  Images of the text to be
read, on which the user performs finger- and hand-based gestural
commands, are input to a computer, which decodes the text
images into their symbolic meanings through optical character
recognition, and further tracks the location and movement of the
hand and fingers in order to interpret the gestural movements into
their command meaning.

18

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Sears, Abstract. Furthermore, Sears at column 4, lines 3−7, states, "[t]he method includes . . . determining a command signal from a sequence of user-generated spatial configurations of at least one pointer[.]" Also further, Sears claims:

> capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;
>
> determining a command signal from the temporal sequence of digital images;

Sears claim 1, 28:39−42.

Thus, consistent with the Examiner's findings (Ans. 69–70), we conclude that Sears is within the field of endeavor of the claimed invention and thus analogous art.

### D.1.b. Analogous Art – Second Test

Turning to the second test for analogous art, Appellant also argues as follows:

> When addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory (i.e., the second test for analogous art), the **problems** to which both relate must be identified and compared. *Donner*, 979 F.3d at 1359. The problem being solved cannot be one that the patent or prior art identifies as being known: "As the '023 patent readily discloses, guitar effects had <u>already</u> been mounted on a pedalboard[.] . . . Thus, that <u>could not possibly</u> be a **relevant purpose of the invention**." *Donner*, 979 F.3d at 1360 (emphasis added).
>
> . . . .
>
> *Sears* discloses
>
>> [t]hese <u>illumination sources</u> 45 may comprise rows of <u>LEDs</u>, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> portable computers), or may be other sources
> including incandescent sources.

*Sears*, 5:16-20 (emphasis added).  The '079 Patent discloses

> FIG. 2 illustrates another keyboard embodiment
> using special datums or <u>light sources such as LEDs</u>.

'079 Patent, 2:19-20 (emphasis added).  These passages from *Sears* and the '079 Patent imply light emitting diodes were known.  Further, considering these passages both use the acronym "LEDs" without first spelling it out only reinforces that light emitting diodes were well-known.  Accordingly, in view of the *Donner* decision, the use of one or more LEDs for illumination ***cannot be the purpose*** of *Sears* or the '079 Patent ***with respect to the analogous-art analysis***.

Appeal Br. 21–22 (formatting and emphasis added).

We are not persuaded by Appellant's argument.  Essentially, Appellant is arguing that "the use of one or more LEDs for illumination cannot be the purpose of Sears or the '079 Patent with respect to the analogous-art analysis" in this situation where claims 2 and 3 are directed to the purpose of using a "light source includ[ing] a light emitting diode(s)."

We determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved" because Appellant's claims define the particular problem of these dependent claims as selecting a light source.  Even if we limit the inventor's particular problem to selecting a light source for a gesture-based environment, we still determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved."

Appellant's citation to *Donner* is inapposite.  In that case, the Federal Circuit held that the Board defined the field of endeavor too "narrowly," not too broadly.  *Donner*, 979 F.3d at 1360.  The analysis of "[t]he problems to

20

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

which the claimed invention and reference at issue relate" "must be carried out from the vantage point of a PHOSITA who is considering turning to the teachings of references outside her field of endeavor" and therefore must not "rule out all such art" that is "outside her field of endeavor." *Id.* Contrary to Appellant's argument, the Federal Circuit held that "if the two references have 'pertinent similarities' such that [the prior art reference] is reasonably pertinent to one or more of the problems to which the [patent-in-suit] pertains, then [the prior art reference] is analogous art." *Id.* at 1361. Such is the case here with Sears.

Therefore, we again conclude that Sears is analogous art.

### D.2. Claim 2

As to claim 2, Appellant further argues "*Sears* does not cure the deficiencies of *Liebermann.*" Appeal Br. 23.

> According to the Examiner, an LED "provides <u>more</u> intense light and is [a] <u>more</u> efficient light source [than *Liebermann's*] lamps." Action, p. 19 (emphasis added). This serves as the motivation for the Examiner's ***substitution***. *See* Action, pp. 18-21. But the Examiner provides no evidence that *Sears'* LEDs actually have these superior properties compared to *Liebermann's* lamps. . . . Accordingly, the Examiner's proposed motivation for the substitution is defective.
>
> . . . .
>
> In view of the above, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

21

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Appeal Br. 24–25 (emphasis added).

> *Numazaki* discloses "a LED for emitting lights with the wavelength in the <u>infrared range</u> can be used." *Numazaki*, 54:35-36 (emphasis added). In other words, contrary to the Examiner's contentions, the Examiner's cited evidence discloses LEDs can and do emit light in the non-visible spectrum (e.g., infrared). Accordingly, the Examiner's proposed motivation for the substitution is defective.

Reply Br. 9.

We are not persuaded by Appellant's arguments. First, Federal Circuit precedent "does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away." *PAR Pharma., Inc. v. TWi Pharma., Inc.*, 773 F.3d 1186, 1197–1198 (Fed. Cir. 2014).

Second, as discussed above, Sears teaches a known light source technique for a gesture-based environment.

> And if there's a known technique to address a known problem using "prior art elements according to their established functions," then there is a motivation to combine.

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023).

> [I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 550 U.S. at 417.

Third, although Numazaki is cited by the Examiner in the responses to Appellant's arguments, it is Sears that is relied upon in the rejection, and we find Sears sufficient for this rejection without any reliance on Numazaki.

22

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We conclude the Examiner has set forth a proper articulated reasoning with a rational underpinning to support the legal conclusion of obviousness.

### D.3. Claim 3

As to claim 3, Appellant further argues "*Sears* does not cure the deficiencies of *Liebermann.*" Appeal Br. 26.

> [T]he Examiner . . . fails to explain why a POSITA would replace the "bottom most lamp" of *Liebermann's* "public kiosk 42" with <u>multiple</u> LEDs, as required by claims 3 and 15. . . . Substituting the "bottom most lamp" of *Liebermann's* "public kiosk 42" with <u>multiple</u> LEDs, as proposed by the Examiner, is unnecessary and only increases the circuit complexity with little return. Accordingly, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. *See KSR*[, 550 U.S. at 418].

Appeal Br. 27.

> Patent Owner asserts replacing a row of lamps with a row of LEDs is <u>not</u> the same as replacing a single lamp (i.e., *Liebermann's* bottom most lamp) with multiple LEDs.

Reply Br. 10.

We are not persuaded by Appellant's argument. First, for the reasons already set forth above, we again conclude the Examiner has set forth a proper articulated reasoning with a rational underpinning to support the legal conclusion of obviousness.

Second, we conclude the premise of Appellant's argument is contrary to our reviewing courts' guidance. To the extent that Appellant argues an artisan would not use Sears' LED teaching to "replac[e] a single lamp (i.e., *Liebermann's* bottom most lamp) with multiple LEDs" (Reply Br. 10), Appellant is arguing that the artisan is an automaton capable of only rote application of the teachings of the references and incapable of using plural

23

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

LEDs as set forth in the proposed combination. To the contrary, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. The Examiner here proposes a "simple substitution of one light source for another," i.e., "a row of lamps in Lieberman[n]" (such as seen in Figure 5C) with a "a row of LEDs in Sears." Ans. 76. Appellant limits this to "substituting the 'bottom most lamp' of Liebermann's 'public kiosk 42' with a <u>single</u> LED," i.e., rote replacement of a single LED for each lamp in Liebermann. Appeal Br. 27 (emphasis omitted). That is not a fair substitution, nor does it accurately reflect the Examiner's combination or the knowledge of a person of ordinary skill in the art, including how small the typical LED is. Regardless of whether each lamp in Liebermann is replaced by a single LED light bulb (i.e., *multiple* individual LEDs) or a row of LEDs with enough individual LEDs to achieve the same brightness as Liebermann's lamp, the combination of Liebermann and Sears renders this claim obvious.

## E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending that the Examiner erred in granting the reexamination request filed in November 2021 on a patent that expired in November 2019. Appeal Br. 34.

> In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights-specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id.* (internal quotation marks omitted). The Court explained that "Congress [has] significant

24

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id.* at 1368[, 1373]. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine and perhaps cancel—a patent claim in an inter partes review." *Id.* at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, ***the public franchise ceases to exist*** and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, ***the USPTO has nothing in its authority to cancel or amend***. Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

Appeal Br. 33–34 (emphasis added).

We are not persuaded by Appellant's argument. First, the statute authorizing reexamination does not limit the timing of a reexamination in the manner argued by Appellant. To the contrary, the statute states:

Any person ***at any time*** may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added).

Second, we disagree that Appellant has no rights under the expired patent.

25

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> It is well-established that [the Federal Circuit's] decision (and the
> Board's decision on remand) would have a consequence on any
> infringement that occurred during the life of the . . . patent. *See
> Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed.
> Cir. 2011) ("[A]n expired patent may form the basis of an action
> for past damages subject to the six-year limitation under 35
> U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech.,
> Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the
> patentee has fewer rights to transfer when the patent has
> expired," the owner of an expired patent can license the rights or
> transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors,
> Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an
> expired patent . . . includes more than merely the right to recover
> damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

Third, our reviewing court regularly reviews Board decisions where a
patent under reexamination expired prior to the Board issuing its decision.
In none of these cases has the Federal Circuit found a lack of jurisdiction
before the United States Patent and Trademark Office (USPTO). *See, e.g.,
In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an
*inter partes* reexamination of expired U.S. patent 6,034,918)[7]; *see also CSB-
Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the
reexamination.").

We conclude the USPTO has jurisdiction for this reexamination so
long as any right remains under the expired patent.

---

[7] The Board noted in a related *ex parte* reexamination appeal that "[t]he '918
patent term expired during the reexamination proceedings." *Ex parte
Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12,
2011).

26

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

### F.1.

> As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c]. In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent. Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and *Liebermann* does not raise a SNQ of patentability. The order for *ex parte* reexamination should be vacated.

Appeal Br. 36.

We are not persuaded by Appellant's argument. For the reasons already set forth above in section A.1., we determine that Liebermann does provide the teachings that were missing from the art during the original prosecution of the '079 Patent, and thus, does raise a SNQ of patentability.

### CONCLUSIONS

The Examiner has not erred in rejecting claims 1, 4−9, 11, 12, and 17−20 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 2, 3, 14−16, and 21−30 as being unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejection of claims 1, 4−9, 11, 12, and 17−20 as being anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejections of claims 2, 3, 14−16, and 21−30 as being unpatentable under 35 U.S.C. § 103.

27

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1, 4−9, 11, 12, 17−20 | 102(e) | Liebermann | 1, 4−9, 11, 12, 17−20 | |
| 2, 3, 14, 15 | 103(a) | Liebermann, Sears | 2, 3, 14, 15 | |
| 16 | 103(a) | Liebermann, Mack | 16 | |
| 21, 24−28, 30 | 103(a) | Liebermann, Sako | 21, 24−28, 30 | |
| 22, 23 | 103(a) | Liebermann, Sears, Sako | 22, 23 | |
| 29 | 103(a) | Liebermann, Mack, Sako | 29 | |
| **Overall Outcome** | | | 1−9, 11, 12, 14−30 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination

proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

28

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX  78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

**Exhibit PAT-A**

**U.S. Patent No. 8,553,079 ("the '079 patent")**



US008553079B2

(12) **United States Patent**
Pryor

(10) **Patent No.:**     **US 8,553,079 B2**
(45) **Date of Patent:**     **Oct. 8, 2013**

(54) **MORE USEFUL MAN MACHINE INTERFACES AND APPLICATIONS**

(71) Applicant: **Timothy R. Pryor**, Sylvania, OH (US)

(72) Inventor: **Timothy R. Pryor**, Sylvania, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/714,748**

(22) Filed: **Dec. 14, 2012**

(65) **Prior Publication Data**

US 2013/0169535 A1     Jul. 4, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/700,055, filed on Feb. 4, 2010, which is a continuation of application No. 10/866,191, filed on Jun. 14, 2004, now abandoned, which is a continuation of application No. 09/433,297, filed on Nov. 3, 1999, now Pat. No. 6,750,848.

(60) Provisional application No. 60/107,652, filed on Nov. 9, 1998.

(51) **Int. Cl.**
*H04N 9/47*     (2006.01)
*H04N 7/18*     (2006.01)

(52) **U.S. Cl.**
USPC ............................................. **348/77**; 348/155

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,909,002 A | 9/1975 | Levy | |
| 4,219,847 A | 8/1980 | Pinkney et al. | |
| 4,339,798 A | 7/1982 | Hedges et al. | |

| | | | | |
|---|---|---|---|---|
| 4,631,676 A | | 12/1986 | Pugh | |
| 4,791,589 A | | 12/1988 | Blazo et al. | |
| 4,843,568 A | | 6/1989 | Krueger et al. | |
| 4,908,704 A | | 3/1990 | Fujioka et al. | |
| 4,988,981 A | | 1/1991 | Zimmerman et al. | |
| 5,008,946 A | | 4/1991 | Ando | |
| 5,088,928 A | | 2/1992 | Chan | |
| 5,227,986 A | | 7/1993 | Yokota et al. | |
| 5,249,053 A | | 9/1993 | Jain | |
| 5,297,061 A | | 3/1994 | Dementhon et al. | |
| 5,365,597 A | | 11/1994 | Holeva | |
| 5,376,796 A | | 12/1994 | Chan et al. | |
| 5,388,059 A | | 2/1995 | DeMenthon | |
| 5,454,043 A | | 9/1995 | Freeman | |
| 5,459,793 A | * | 10/1995 | Naoi et al. | ................... 382/165 |
| 5,491,507 A | | 2/1996 | Umezawa et al. | |
| 5,528,263 A | * | 6/1996 | Platzker et al. | ............. 345/156 |
| 5,534,921 A | | 7/1996 | Sawanobori | |
| 5,572,251 A | * | 11/1996 | Ogawa | ..................... 348/207.99 |
| 5,581,276 A | | 12/1996 | Cipolla et al. | |
| 5,594,469 A | | 1/1997 | Freeman et al. | |
| 5,616,078 A | * | 4/1997 | Oh | ..................................... 463/8 |
| 5,624,117 A | | 4/1997 | Ohkubo et al. | |
| 5,781,647 A | | 7/1998 | Fishbine et al. | |
| 5,781,650 A | | 7/1998 | Lobo et al. | |
| 5,808,672 A | * | 9/1998 | Wakabayashi et al. | .... 348/220.1 |
| 5,828,770 A | | 10/1998 | Leis et al. | |
| 5,845,006 A | | 12/1998 | Sumi et al. | |
| 5,853,327 A | | 12/1998 | Gilboa | |
| 5,864,334 A | * | 1/1999 | Sellers | ........................ 345/168 |

(Continued)

*Primary Examiner* — Peling Shaw

(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

A method for determining a gesture illuminated by a light source utilizes the light source to provide illumination through a work volume above the light source. A camera is positioned to observe and determine the gesture performed in the work volume.

**30 Claims, 7 Drawing Sheets**



US 8,553,079 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,878,174 | A | 3/1999 | Stewart et al. |
| 5,904,484 | A | 5/1999 | Burns |
| 5,926,168 | A | 7/1999 | Fan |
| 5,936,610 | A * | 8/1999 | Endo ............................ 345/157 |
| 5,940,126 | A | 8/1999 | Kimura |
| 5,982,352 | A | 11/1999 | Pryor |
| 5,999,840 | A | 12/1999 | Grimson et al. |
| 6,052,132 | A | 4/2000 | Christian et al. |
| 6,098,458 | A | 8/2000 | French et al. |
| 6,108,033 | A | 8/2000 | Ito et al. |
| 6,148,100 | A | 11/2000 | Anderson et al. |
| 6,160,899 | A | 12/2000 | Lee et al. |
| 6,204,852 | B1 | 3/2001 | Kumar et al. |
| 6,252,598 | B1 * | 6/2001 | Segen ........................... 715/863 |
| 6,342,917 | B1 | 1/2002 | Amenta |
| 6,346,929 | B1 * | 2/2002 | Fukushima et al. .............. 345/8 |
| 6,359,647 | B1 | 3/2002 | Sengupta et al. |
| 6,363,160 | B1 | 3/2002 | Bradski et al. |
| 6,373,472 | B1 | 4/2002 | Palalau et al. |
| 6,442,465 | B2 | 8/2002 | Breed et al. |
| 6,508,709 | B1 | 1/2003 | Karmarkar |
| 6,529,617 | B1 | 3/2003 | Prokoski |
| 6,597,817 | B1 | 7/2003 | Silverbrook |
| 6,663,491 | B2 | 12/2003 | Watabe et al. |
| 6,750,848 | B1 | 6/2004 | Pryor |
| 6,775,361 | B1 | 8/2004 | Arai et al. |
| 6,788,336 | B1 | 9/2004 | Silverbrook |
| 6,911,972 | B2 | 6/2005 | Brinjes |
| 7,489,863 | B2 | 2/2009 | Lee |

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*



FIG. 5



*FIG. 6*



**FIG. 7A**



**FIG. 7B**

US 8,553,079 B2

1

## MORE USEFUL MAN MACHINE INTERFACES AND APPLICATIONS

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/700,055, filed Feb. 4, 2010, which is a continuation of U.S. patent application Ser. No. 10/866,191, filed Jun. 14, 2004, which is a continuation of U.S. patent application Ser. No. 09/433,297, filed Nov. 3, 1999 (now U.S. Pat. No. 6,750,848), which claims benefit of U.S. Provisional Application No. 60/107,652, filed Nov. 9, 1998. These applications are hereby incorporated by reference.

### REFERENCES TO RELATED APPLICATIONS BY THE INVENTORS

U.S. patent application Ser. No. 09/138,339, filed Aug. 21, 1998.

U.S. Provisional Application No. 60/056,639, filed Aug. 22, 1997.

U.S. Provisional Application No. 60/059,561, filed Sep. 19, 1998.

Man Machine Interfaces: Ser. No. 08/290,516, filed Aug. 15, 1994, and now U.S. Pat. No. 6,008,800.

Touch TV and Other Man Machine Interfaces: Ser. No. 08/496,908, filed Jun. 29, 1995, and now U.S. Pat. No. 5,982, 352.

Systems for Occupant Position Sensing: Ser. No. 08/968, 114, filed Nov. 12, 1997, now abandoned, which claims benefit of Ser. No. 60/031,256, filed Nov. 12, 1996.

Target holes and corners: U.S. Ser. No. 08/203,603, filed Feb. 28, 1994, and Ser. No. 08/468,358 filed Jun. 6, 1995, now U.S. Pat. No. 5,956,417 and U.S. Pat. No. 6,044,183.

Vision Target Based Assembly: U.S. Ser. No. 08/469,429, filed Jun. 6, 1995, now abandoned; Ser. No. 08/469,907, filed Jun. 6, 1995, now U.S. Pat. No. 6,301,763; Ser. No. 08/470, 325, filed Jun. 6, 1995, now abandoned; and Ser. No. 08/466, 294, filed Jun. 6, 1995, now abandoned.

Picture Taking Method and Apparatus: Provisional Application No. 60/133,671, filed May 11, 1998.

Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application No. 60/133,673 filed May 11, 1998.

Camera Based Man-Machine Interfaces: Provisional Patent Application No. 60/142,777, filed Jul. 8, 1999.

The copies of the disclosure of the above referenced applications are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing object or human positions and/or orientations. The invention in many preferred embodiments, uses real time stereo photogrammetry using single or multiple TV cameras whose output is analyzed and used as input to a personal computer, typically to gather data concerning the 3D location of parts of, or objects held by, a person or persons.

This continuation application seeks to provide further detail on useful embodiments for computing. One embodiment is a keyboard for a laptop computer (or stand alone keyboard for any computer) that incorporates digital TV cameras to look at points on, typically, the hand or the finger, or

2

objects held in the hand of the user, which are used to input data to the computer. It may also or alternatively, look at the head of the user as well.

Both hands or multiple fingers of each hand, or an object in one hand and fingers of the other can be simultaneously observed, as can alternate arrangements as desired.

2. Description of Related Art

My referenced co-pending applications incorporated herein by reference discuss many prior art references in various pertinent fields, which form a background for this invention.

### BRIEF DESCRIPTION OF FIGURES

FIG. 1 illustrates a laptop or other computer keyboard with cameras according to the invention located on the keyboard surface to observe objects such as fingers and hands overhead of the keyboard.

FIG. 2 illustrates another keyboard embodiment using special datums or light sources such as LEDs.

FIG. 3 illustrates a further finger detection system for laptop or other computer input.

FIG. 4 illustrates learning, amusement, monitoring, and diagnostic methods and devices for the crib, playpen and the like.

FIG. 5 illustrates a puzzle toy for young children having cut out wood characters according to the invention.

FIG. 6 illustrates an improved handheld computer embodiment of the invention, in which the camera or cameras may be used to look at objects, screens and the like as well as look at the user along the lines of FIG. 1.

FIGS. 7A-B illustrate new methods for internet commerce and other activities involving remote operation with 3D virtual objects display.

### DESCRIPTION OF THE INVENTION

FIG. 1

A laptop (or other) computer keyboard based embodiment is shown in FIG. 1. In this case, a stereo pair of cameras 100 and 101 located on each side of the keyboard are used, desirably having cover windows 103 and 104 mounted flush with the keyboard surface 102. The cameras are preferably pointed obliquely inward at angles Φ toward the center of the desired work volume 170 above the keyboard. In the case of cameras mounted at the rear of the keyboard (toward the display screen), these cameras are also inclined to point toward the user at an angle as well.

Alternate camera locations may be used such as the positions of cameras 105 and 106, on upper corners of screen housing 107 looking down at the top of the fingers (or hands, or objects in hand or in front of the cameras), or of cameras 108 and 109 shown.

One of the referenced embodiments of the invention is to determine the pointing direction vector 160 of the user's finger (for example pointing at an object displayed on screen 107), or the position and orientation of an object held by the user. Alternatively, finger position data can be used to determine gestures such as pinch or grip, and other examples of relative juxtaposition of objects with respect to each other, as has been described in co-pending referenced applications. Positioning of an object or portions (such as hands or fingers of a doll) is also of use, though more for use with larger keyboards and displays.

In one embodiment, shown in FIG. 2, cameras such as 100/101 are used to simply look at the tip of a finger 201 (or thumb) of the user, or an object such as a ring 208 on the

US 8,553,079 B2

3

finger. Light from below, such as provided by single central light **122** can be used to illuminate the finger that typically looks bright under such illumination.

It is also noted that the illumination is directed or concentrated in an area where the finger is typically located such as in work volume **170**. If the light is of sufficient spectral content, the natural flesh tone of the finger can be observed—and recognized by use of the color TV cameras **100/101**.

As is typically the case, the region of the overlapping cameras viewing area is relatively isolated to the overlapping volumetric zone of their fields **170** shown due to focal lengths of their lenses and the angulation of the camera axes with respect to each other. This restricted overlap zone helps mitigate against unwanted matches in the two images due to information generated outside the zone of overlap. Thus there are no significant image matches found of other objects in the room, since the only flesh-toned object in the zone is typically the finger or fingers of the user. Or alternatively, for example, the user's hand or hands. Similarly objects or targets thereon can be distinguished by special colors or shapes.

If desired, or required, motion of the fingers can be also used to further distinguish their presence vis-a-vis any static background. If for example, by subtraction of successive camera frames, the image of a particular object is determined to have moved it is determined that this is likely the object of potential interest which can be further analyzed directly to determine if is the object of interest.

In case of obscuration of the fingers or objects in the hand, cameras in additional locations such as those mentioned above, can be used to solve for position if the view of one or more cameras is obscured.

The use of cameras mounted on both the screen and the keyboard allows one to deal with obscurations that may occur and certain objects may or may not be advantageously delineated in one view or the other.

In addition, it may be in many cases desirable to have a datum on the top of the finger as opposed to the bottom because on the bottom, it can get in the way of certain activities. In this case the sensors are required on the screen looking downward or in some other location such as off the computer entirely and located overhead has been noted in previous application.

To determine finger location, a front end processor like that described in the target holes and corners co-pending application reference incorporated U.S. Ser. Nos. 08/203,603 and 08/468,358 can be used to also allow the finger shape as well as color to be determined.

Finger gestures comprising a sequence of finger movements can also be detected by analyzing sequential image sets such as the motion of the finger, or one finger with respect to another such as in pinching something can be determined. Cameras **100** and **101** have been shown at the rear of the keyboard near the screen or at the front. They may mount in the middle of the keyboard or any other advantageous location.

The cameras can also see one's fingers directly, to allow typing as now, but without the physical keys. One can type in space above the plane of the keyboard (or in this case plane of the cameras). This is useful for those applications where the keyboard of conventional style is too big (e.g., the hand held computer of FIG. **6**).

FIG. 2

It is also desirable for fast reliable operation to use retroreflective materials and other materials to augment the contrast of objects used in the application. For example, a line target such as **200** can be worn on a finger **201** and advantageously can be located if desired between two joints of the

4

finger as shown. This allows the tip of the finger to be used to type on the keyboard without feeling unusual—the case perhaps with target material on tip of the finger.

The line image detected by the camera can be provided also by a cylinder such as retroreflective cylinder **208** worn on the finger **201** which effectively becomes a line image in the field of view of each camera (assuming each camera is equipped with a sufficiently coaxial light source, typically one or more LEDs such as **210** and **211**), can be used to solve easily using the line image pairs with the stereo cameras for the pointing direction of the finger that is often a desired result. The line, in the stereo pair of images provides the pointing direction of the finger, for example pointing at an object displayed on the screen **140** of the laptop computer **138**.

FIG. 3

It is also possible to have light sources on the finger that can be utilized such as the 2 LED light sources shown in FIG. **3**. This can be used with either TV camera type sensors or with PSD type analog image position sensors as disclosed in references incorporated.

In particular the ring mounted LED light sources **301** and **302** can be modulated at different frequencies that can be individually discerned by sensors imaging the sources on to a respective PSD detector. Alternatively, the sources can simply be turned on and off at different times such that the position of each point can be independently found allowing the pointing direction to be calculated from the LED point data gathered by the stereo pair of PSD based sensors.

The "natural interface keyboard" here described can have cameras or other sensors located at the rear looking obliquely outward toward the front as well as inward so as to have their working volume overlap in the middle of the keyboard such as the nearly full volume over the keyboard area is accommodated.

Clearly larger keyboards can have a larger working volume than one might have on a laptop. The pair of sensors used can be augmented with other sensors mounted on the screen housing. It is noted that the linked detection afforded for calibration between the sensors located on the screen and those on the keyboard is provided by the laptop unitary construction.

One can use angle sensing means such as a rotary encoder for the laptop screen tilt. Alternatively, cameras located on the screen can be used to image reference points on the keyboard as reference points to achieve this. This allows the calibration of the sensors mounted fixedly with respect to the screen with respect to the sensors and keyboard space below. It also allows one to use stereo pairs of sensors that are not in the horizontal direction (such as **101/102**) but could for example be a camera sensor such as **100** on the keyboard coupled with one on the screen, such as **106**.

Knowing the pointing angles of the two cameras with respect to one another allows one to solve for the 3D location of objects from the matching of the object image positions in the respective camera fields.

As noted previously, it is also of interest to locate a line or cylinder type target on the finger between the first and second joints. This allows one to use the fingertip for the keyboard activity but by raising the finger up, it can be used as a line target capable of solving for the pointed direction for example.

Alternatively one can use two point targets on the finger such as either retroreflective datums, colored datums such as rings or LED light sources that can also be used with PSD detectors which has also been noted in FIG. **2**.

When using the cameras located for the purpose of stereo determination of the position of the fingers from their flesh tone images it is useful to follow the preprocessing capable of

US 8,553,079 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

processing data obtained from the cameras in order to look for the finger. This can be done on both color basis and on the basis of shape as well as motion.

In this invention, I have shown the use of not only cameras located on a screen looking downward or outward from the screen, but also cameras that can be used instead of or in combination with those on the screen placed essentially on the member on which the keyboard is incorporated. This allows essentially the keyboard to mounted cameras which are preferably mounted flush with the keyboard surface to be unobtrusive, and yet visually be able to see the users fingers, hands or objects held by the user and in some cases, the face of the user.

This arrangement is also useful for 3D displays, for example where special synchronized glasses (e.g., the "Crystal Eyes" brand often used with Silicon Graphics work stations) are used to alternatively present right and left images to each eye. In this case the object may appear to be actually in the workspace **170** above the keyboard, and it may be manipulated by virtually grasping (pushing, pulling, etc.) it, as has been described in co-pending applications.

FIG. **4**: Baby Learning and Monitoring System

A baby's reaction to the mother (or father) and the mother's analysis of the baby's reaction is very important. There are many gestures of babies apparently indicated in child psychology as being quite indicative of various needs, wants, or feelings and emotions, etc. These gestures are typically made with the baby's hands.

Today this is done and learned entirely by the mother being with the baby. However with an Electro-optical sensor based computer system, such as that described in co-pending applications located proximate to or even in the crib (for example), one can have the child's reactions recorded, not just in the sense of a video tape which would be too long and involved for most to use, but also in terms of the actual motions which could be computer recorded and analyzed also with the help of the mother as to what the baby's responses were. And such motions, combined with other audio and visual data are very important to the baby's health, safety, and learning.

Consider for example crib **400** with computer **408** having LCD monitor **410** and speaker **411** and camera system (single or stereo) **420** as shown, able to amuse or inform baby **430**, while at the same time recording (both visually, aurally, and in movement detected position data concerning parts of his body or objects such as rattles in his hand) his responses for any or all of the purposes of diagnosis of his state of being, remote transmission of his state, cues to various programs or images to display to him or broadcast to others, or the like.

For one example, baby's motions could be used to signal a response from the TV either in the absence of the mother or with the mother watching on a remote channel. This can even be over the Internet if the mother is at work.

For example, a comforting message could come up on the TV from the mother that could be prerecorded (or alternatively could actually be live with TV cameras in the mother's or father's workplace for example on a computer used by the parent) to tell the baby something reassuring or comfort the baby or whatever. Indeed the parent can be monitored using the invention and indicate something back or even control a teleoperater robotic device to give a small child something to eat or drink for example. The same applies to a disabled person.

If the father or mother came up on the screen, the baby could wave at it, move its head or "talk" to it but the hand gestures may be the most important.

If the mother knows what the baby is after, she can talk to baby or say something, or show something that the baby recognizes such as a doll. After a while, looking at this live one can then move to talking to the baby from some prerecorded data.

What other things might we suppose? The baby for example knows to puts its hand on the mother's cheek to cause the mother to turn to it. The baby also learns some other reflexes when it is very young that it forgets when it gets older. Many of these reflexes are hand movements, and are important in communicating with the remote TV based mother representation, whether real via telepresense or from CD Rom or DVD disk (or other media, including information transmitted to the computer from afar) and for the learning of the baby's actions.

Certainly just from the making the baby feel good point-of-view, it would seem like certain motherly (or fatherly, etc.) responses to certain baby actions in the form of words and images would be useful. This stops short of physical holding of the baby which is often needed, but could act as a stop gap to allow the parents to get another hour's sleep for example.

As far as the baby touching things, I've discussed in other applications methods for realistic touch combined with images. This leads to a new form of touching crib mobiles that could contain video imaged and to be imaged themselves—plus if desired—touched in ways that would be far beyond any response that you could get from a normal mobile.

For example, let us say there is a targeted (or otherwise TV observable) mobile **450** in the crib above the baby. Baby reaches up and touches a piece of the mobile which is sensed by the TV camera system (either from the baby's hand position, the mobile movement, or both, and a certain sound is called up by the computer, a musical note for example. Another piece of the mobile and another musical note. The mobile becomes a musical instrument for the baby that could play either notes or chords or complete passages, or any other desired programmed function.

The baby can also signal things. The baby can signal using agitated movements would often mean that it's unhappy. This could be interpreted using learned movement signatures and artificial intelligence as needed by the computer to call for mother even if the baby wasn't crying. If the baby cries, that can be picked up by microphone **440**, recognized using a voice recognition system along the lines of that used in IBM Via Voice commercial product for example. And even the degree of crying can be analyzed to determine appropriate action.

The computer could also be used to transmit information of this sort via the internet email to the mother who could even be at work. And until help arrives in the form of mother intervention or whatever, the computer could access a program that could display on a screen for the baby things that the baby likes and could try to sooth the baby through either images of familiar things, music or whatever. This could be useful at night when parents need sleep, and anything that would make the baby feel more comfortable would help the parents.

It could also be used to allow the baby to input to the device. For example, if the baby was hungry, a picture of the bottle could be brought up on the screen. The baby then could yell for the bottle. Or if the baby needed his diaper changed, perhaps something reminiscent of that. If the baby reacts to such suggestions of his problem, this gives a lot more intelligence as to why he is crying and while mothers can generally tell right away, not everyone else can. In other words, this is pretty neat for babysitters and other members of the household so they can act more intelligently on the signals the baby is providing.

US 8,553,079 B2

7

Besides in the crib, the system as described can be used in conjunction with a playpen, hi-chair or other place of baby activity.

As the child gets older, the invention can further be used also with more advanced activity with toys, and to take data from toy positions as well. For example, blocks, dolls, little cars, and moving toys even such as trikes, scooters, drivable toy cars and bikes with training wheels.

The following figure illustrates the ability of the invention to learn, and thus to assist in the creation of toys and other things.

FIG. 5: Learning Puzzle Roy

Disclosed in FIG. 5 is a puzzle toy 500 where woodcut animals such as bear 505 and lion 510 are pulled out with handle such as 511. The child can show the animal to the camera and a computer 530 with TV camera (or cameras) 535 can recognize the shape as the animal, and provide a suitable image and sounds on screen 540.

Alternatively, and more simply, a target, or targets on the back of the animal can be used such as triangle 550 on the back of lion 511. In either case the camera can solve for the 3D, and even 5 or 6D position and orientation of the animal object, and cause it to move accordingly on the screen as the child maneuvers it. The child can hold two animals, one in each hand and they can each be detected, even with a single camera, and be programmed in software to interact as the child wishes (or as he learns the program).

This is clearly for very young children of two or three years of age. The toys have to be large so they can't be swallowed.

With the invention in this manner, one can make a toy of virtually anything, for example a block. Just hold this block up, teach the computer/camera system the object and play using any program you might want to represent it and its actions. To make this block known to the system, the shape of the block, the color of the block or some code on the block can be determined. Any of those items could tell the camera which block it was, and most could give position and orientation if known.

At that point, an image is called up from the computer representing that particular animal or whatever else the block is supposed to represent. Of course this can be changed in the computer to be a variety of things if this is something that is acceptable to the child. It could certainly be changed in size such as a small lion could grow into a large lion. The child could probably absorb that more than a lion changing into a giraffe for example since the block wouldn't correspond to that. The child can program or teach the system any of his blocks to be the animal he wants and that might be fun.

For example, he or the child's parent could program a square to be a giraffe where as a triangle would be a lion. Maybe this could be an interesting way to get the child to learn his geometric shapes!

Now the basic block held up in front of the camera system could be looked at just for what it is. As the child may move the thing toward or away from the camera system, one may get a rough sense of depth from the change in shape of the object. However this is not so easy as the object changes in shape due to any sort of rotations.

Particularly interesting then is to also sense the rotations if the object so that the animal can actually move realistically in 3 Dimensions on the screen. And perhaps having the de-tuning of the shape of the movement so that the child's rela-tively jerky movements would not appear jerky on the screen or would not look so accentuated. Conversely of course, you can go the other way and accentuate the motions.

This can, for example, be done with a line target around the edge of the object is often useful for providing position or

8

orientation information to the TV camera based analysis soft-ware, and in making the object easier to see in reflective illumination.

Aid to Speech Recognition

The previous co-pending application entitled "Useful man machine interfaces and applications" referenced above, dis-cussed the use of persons movements or positions to aid in recognizing the voice spoken by the person.

In one instance, this can be achieved by simply using ones hand to indicate to the camera system of the computer that the voice recognition should start (or stop, or any other function, such as a paragraph or sentence end, etc.).

Another example is to use the camera system of the inven-tion to determine the location of the persons head (or other part), from which one can instruct a computer to preferen-tially evaluate the sound field in phase and amplitude of two or more spaced microphones to listen from that location—thus aiding the pickup of speech—which often times is not able to be heard well enough for computer based automatic speech recognition to occur.

Digital Interactive TV

As you watch TV, data can be taken from the camera system of the invention and transmitted back to the source of programming. This could include voting on a given proposi-tion by raising your hand for example, with your hand indi-cation transmitted. Or you could hold up 3 fingers, and the count of fingers transmitted. Or in a more extreme case, your position, or the position of an object or portion thereof could be transmitted—for example you could buy a coded object—whose code would be transmitted to indicate that you person-ally (having been pre-registered) had transmitted a certain packet of data.

If the programming source can transmit individually to you (not possible today, but forecast for the future), then much more is possible. The actual image and voice can respond using the invention to positions and orientations of persons or objects in the room—just as in the case of prerecorded data—or one to one internet connections. This allows group activity as well.

In the extreme case, full video is transmitted in both direc-tions and total interaction of users and programming sources and each other becomes possible.

An interim possibility using the invention is to have a program broadcast to many, which shifts to prerecorded DVD disc or the like driving a local image, say when your hand input causes a signal to be activated.

Handwriting Authentication

A referenced co-pending application illustrated the use of the invention to track the position of a pencil in three dimen-sional space such that the point at which the user intends the writing point to be at, can be identified and therefore used to input information, such as the intended script.

As herein disclosed, this part of the invention can also be used for the purpose of determining whether or not a given person's handwriting or signature is correct.

For example, consider authentication of an Internet com-mercial transaction. In this case, the user simply writes his name or address and the invention is used to look at the movements of his writing instrument and determine from that whether or not the signature is authentic. (A movement of one or more of his body parts might also or alternatively be employed). For example a series of frames of datum location on his pen can be taken, to determine one or more positions on it as a function of time, even to include calculating of its pointing direction, from a determined knowledge in three axes of two points along the line of the pen axis. In this case

US 8,553,079 B2

9

a particular pointing vector sequence "signature" would be learned for this person, and compared to later signatures.

What is anticipated here is that in order to add what you might call the confirming degree of authenticity to the signature, it may not be necessary to track the signature completely. Rather one might only determine that certain aspects of the movement of the pencil are the authentic ones. One could have people write using any kind of movement, not just their signature having their name. The fact is that people are mostly used to writing their name and it would be assumed that that would be it. However, it could well be that the computer asks the user to write something else that they would then write and that particular thing would be stored in the memory.

Optionally, one's voice could be recognized in conjunction with the motion signature to add further confirmation.

This type of ability for the computer system at the other end of the Internet to query a writer to write a specific thing in a random fashion adds a degree of cryptographic capacity to the invention. In other words, if I can store the movements in my hand to write different things, then clearly this has some value.

The important thing though is that some sort of representation of the movements of the pencil or other instrument can be detected using the invention and transmitted.

FIG. **6**: Hand Held Computer

FIG. 6 illustrates an improved handheld computer embodiment of the invention. For example, FIG. **8** of the provisional application referenced above entitled "camera based man machine interfaces and applications" illustrates a basic hand held device and which is a phone, or a computer or a combination thereof, or alternatively to being hand held, can be a wearable computer for example on one's wrist.

In this embodiment, we further disclose the use of this device as a computer, with a major improvement being the incorporation of a camera of the device optionally in a position to look at the user, or an object held by the user—along the lines of FIG. **1** of the instant disclosure for example.

Consider hand held computer **901** of FIG. **6**, incorporating a camera **902** which can optionally be rotated about axis **905** so as to look at the user or a portion thereof such as finger **906**, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include camera **910** can also be used. It too may rotate, as desired. Alternatively fixed cameras can be used as in FIG. 1, and FIG. 8 of the referenced co-pending application, when physical rotation is not desired, for ruggedness, ease of use, or other reasons (noting that fixed cameras have fixed fields of view, which limit versatility in some cases).

When aimed at the user, as shown, it can be used, for example, to view and obtain images of:

Ones self-facial expression etc., also for image reasons, id etc., combined effect.

Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

One or more pbjects in one's hand. Includes a pencil or pen, and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

One's Gestures.

The camera **902** (and **910** if used, and if desired), can be optionally rotated and used to viewpoints in space ahead of the device, as shown in dotted lines **902***a*. In this position for example it can be used for the purposes described in the previous application. It can also be used to observe or point at

10

(using optional laser pointer **930**) points such as **935** on a wall, or a mounted LCD or projection display such as **940** on a wall or elsewhere such as on the back of an airline seat.

With this feature of the invention, there is no requirement to carry a computer display with you as with a infrared connection (not shown) such as known in the art one can also transmit all normal control information to the display control computer **951**. As displays become ubiquitous, this makes increasing sense—otherwise the displays get bigger the computers smaller trend doesn't make sense if they need to be dragged around together. As one walks into a room, one uses the display or displays in that room (which might themselves be interconnected).

The camera unit **902** can sense the location of the display in space relative to the handheld computer, using for example the four points **955-958** on the corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen, including control icons. And it allows the objects on the screen to be sensed directly by the camera—if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer.

The camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field.

A reverse situation also exists where the cameras can be on the wall mounted display, such as cameras **980** and **981** be used to look at the handheld computer module **901** and determine its position and orientation relative to the display.

Note that a camera such as **902**, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with a screen on a wall, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, one looking at wall thing, other at you (as **902** and **902***a*) in this manner, one can dynamically compare ref frames of the display to the human input means in determining display parameters. This can be done in real time, and if so one can actually wave the handheld unit around while still imputing accurate data to the display using ones fingers, objects or whatever.

Use of a laser pointer such as **930** incorporated into the handheld unit has also been disclosed in the referenced copending applications. For example, a camera on the hand held computer unit such as **902** viewing in direction **902***a* would look at laser spot such as **990** (which might or might not have come from the computers own laser pointer **930**) on the wall display say, and recognized by color and size/shape reference to edge of screen, and to projected spots on screen.

FIGS. 7A-B: Internet and Other Remote Applications

FIG. 7A illustrates new methods for internet commerce and other activities involving remote operation with 3D virtual objects displayed on a screen. This application also illustrates the ability of the invention to prevent computer vision eye strain.

Let us first consider the operation of the invention over the internet as it exists today in highly bandwidth limited form dependent on ordinary phone lines for the most part. In this case it is highly desirable to transmit just the locations or pointing vectors of portions (typically determined by stereo photo-grammetry of the invention) of human users or objects associated therewith to a remote location, to allow the remote computer **10** to modify the image or sound transmitted back to the user.

Another issue is the internet time delay, which can exist in varying degrees, and is more noticeable, the higher resolution of the imagery transmitted. In this case, a preferred arrange-

US 8,553,079 B2

11

ment is to have real time transmission of minimal position and vector data (using no more bandwidth than voice), and to transmit back to the user, quasi stationary images at good resolution. Transmission of low resolution near real time images common in internet telephony today, does not convey the natural feeling desired for many commercial applications to now be discussed. As bandwidth becomes more plentiful these restrictions are eased.

Let us consider the problem posed of getting information from the internet of today. A user **1000** can go to a virtual library displayed on screen **1001** controlled by computer **1002** where one sees a group **1010** of books on stacks. Using the invention as described herein and incorporated referenced applications to determine my hand and finger locations, I the user, can point at a book such as **1014** in a computer sensed manner, or even reach out and "grab" a book, such as **1020** (dotted lines) apparently generated in 3D in front of me.

My pointing, or my reach and grab is in real time, and the vector (such as the pointing direction of ones finger at the book on the screen, or the position and orientation closing vectors of one's forefinger and thumb to grab the 3D image **1020** of the book) indicating the book in question created is transmitted by internet means to the remote computer **1030** which determines that I have grabbed the book entitled War and Peace from the virtual shelf. A picture of the book coming off the shelf is then generated using fast 3D graphical imagery such as the Merlin VR package available today from Digital Immersion company of Sudbury, Ontario. This picture (and the original picture of the books on the shelves) can be retransmitted over the internet at low resolution (but sufficient speed) to give a feeling of immediacy to the user. Or alternatively, the imagery can be generated locally at higher resolution using the software package resident in the local computer **1002** which receives key commands from the distant computer **1030**.

After the book has been "received" by the user, it then can be opened automatically to the cover page for example under control of the computer, or the users **10** hands can pretend to open it, and the sensed hands instruct the remote (or local, depending on version) computer to do so. A surrogate book such as **1040** can also be used to give the user a tactile feel of a book, even though the real book in questions pages will be viewed on the display screen **1001**. One difference to this could be if the screen **1001** depicting the books were life size, like real stacks. Then one might wish to go over to a surrogate book incorporating a separate display screen—just as one would in a real library, go to a reading table after removing a book from a stack.

Net Grocery stores have already appeared, and similar applications concern picking groceries off of the shelf of a virtual supermarket, and filling ones shopping cart. For that matter, any store where it is desired to show the merchandise in the very manner people are accustomed to seeing it, namely on shelves or racks, generally as one walks down an aisle, or fumbles through a rack of clothes for example. In each case, the invention, which also can optionally use voice input, as if to talk to a clothing sales person, can be used to monitor the person's positions and gestures.

The invention in this mode can also be used to allow one to peruse much larger objects. For example, to buy a car (or walk through a house, say) over the internet, one can lift the hood, look inside, etc., all by using the invention to monitor the 3D position of your head or hands and move the image of the car presented accordingly. If the image is presented substantially life-size, then one can be monitored as one physically walks around the car in one's room say, with the image changing accordingly. In other words just as today.

12

Note that while the image can be apparently life-size using virtual reality glasses, the natural movements one is accustomed to in buying a car are not present. This invention makes such a natural situation possible (though it can also be used with such glasses as well).

It is noted that the invention also comprehends adding a force based function to a feedback to your hands, such that it feels like you lifted the hood, or grabbed the book, say. For this purpose holding a surrogate object as described in co-pending applications could be useful, in this case providing force feedback to the object.

If one looks at internet commerce today, some big applications have turned out **10** to be clothes and books. Clothes are by far the largest expenditure item, and let's look closer at this.

Consider too a virtual mannequin, which can also have measurements of a remote shopper. For example, consider diagram **78**, where a woman's measurements are inputted by known means such as a keyboard **1050** over the internet to a CAD program in computer **1055**, which creates on display screen **1056** a 3D representation of a mannequin **1059** having the woman's shape in the home computer **1060**. As she selects a dress **1065** to try on, the dress which let's say comes in 10 sizes, 5 to 15, is virtually "tried on" the virtual mannequin and the woman **1070** looks at the screen **1056** and determines the fit of a standard size 12 dress. She can rapidly select larger or smaller sizes and decide which she thinks looks and/or fits better.

Optionally, she can signal to the computer to rotate the image in any direction, and can look at it from different angles up or down as well, simply doing a rotation in the computer. This signaling can be conventional using for example a mouse, or can be using TV based sensing aspects of the invention such as employing camera **1070** also as shown in FIG. **1** for example. In another such case, she can reach out with her finger **1075** for example, and push or pull in a virtual manner the material, using the camera to sense the direction of her finger. Or she can touch herself at the points where the material should be taken up or let out, with the camera system sensing the locations of touch (typically requiring at least a stereo pair of cameras or other electro-optical system capable of determining where her fingertip is in 3D space. Note that a surrogate for the tried on dress in this case, could be the dress she has on, which is touched in the location desired on the displayed dress.

The standard size dress can then be altered and shipped to her, or the requisite modifications can be made in the CAD program, and a special dress cut out and sewed which would fit better.

A person can also use her hands via the TV cameras of the invention to determine hand location relative to the display to take clothes off a virtual manikin which could have a representation of any person real or imaginary. Alternatively she can remotely reach out using the invention to a virtual rack of clothes such as **1090**, take an object off the rack, and put it on the manikin **1070**. This is particularly natural in near life-size representation, just like being in a store or other venue. This ability of the invention to bring real life experience to computer shopping and other activity is a major advantage.

The user can also feel the texture of the cloth if suitable haptic devices are **15** available to the user, which can be activated remotely by the virtual clothing program, or other type of program.

Modifications of the invention herein disclosed will occur to persons skilled in the art, and all such modifications are deemed to be within the scope of the invention as defined by the appended claims.

13

14

The invention claimed is:

**1**. A computer implemented method comprising:

providing a light source adapted to direct illumination through a work volume above the light source;

providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source;

determining, using the camera, the gesture performed in the work volume and illuminated by the light source.

**2**. The method according to claim **1** wherein the light source includes a light emitting diode.

**3**. The method according to claim **1** wherein the light source includes a plurality of light emitting diodes.

**4**. The method according to claim **1** wherein detecting a gesture includes analyzing sequential images of the camera.

**5**. The method according to claim **1** wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

**6**. The method according to claim **1** further including determining the pointing direction of a finger in the work volume.

**7**. The method according to claim **1** further including providing a target positioned on a user that is viewable in the work volume.

**8**. The method according to claim **1** further including determining the three-dimensional position of a point on a user.

**9**. The method according to claim **1** wherein the camera and the light source are positioned in fixed relation relative to a keypad.

**10**. The method according to claim **9** the camera, the light source and the keypad form part of a laptop computer.

**11**. A computer apparatus comprising:

a light source adapted to illuminate a human body part within a work volume generally above the light source;

a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output.

**12**. The computer apparatus of claim **11** further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display.

**13**. The computer apparatus of claim **12** wherein the display is pivotable relative to the keyboard.

**14**. The computer apparatus of claim **11** wherein the light source includes a light emitting diode.

**15**. The computer apparatus of claim **11** wherein the light source includes a plurality of light emitting diodes.

**16**. The computer apparatus of claim **12** wherein the display includes a three-dimensional display.

**17**. The computer apparatus of claim **11** further including a target that is viewable by the camera when in the work volume.

**18**. The computer apparatus of claim **11** wherein the determined gesture includes a pinch gesture.

**19**. The computer apparatus of claim **11** wherein the determined gesture includes a pointing gesture.

**20**. The computer apparatus of claim **11** wherein the determined gesture includes a grip gesture.

**21**. A computer implemented method comprising:

providing a camera oriented to observe a gesture performed in a work volume above the camera;

providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and

detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume.

**22**. The method according to claim **21** wherein the light source includes a light emitting diode.

**23**. The method according to claim **21** wherein the light source includes a plurality of light emitting diodes.

**24**. The method according to claim **21** wherein detecting a gesture includes analyzing sequential images of the camera.

**25**. The method according to claim **21** wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

**26**. The method according to claim **21** further including determining the pointing direction of one of the user's fingers using the first and second cameras.

**27**. The method according to claim **21** further including providing a target positioned on the user that is viewable by the camera.

**28**. The method according to claim **21** further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers.

**29**. The method according to claim **21** further including providing a three-dimensional display viewable by the user.

**30**. The method according to claim **21** wherein the camera and the light source are positioned in fixed relation relative to a keypad.

\* \* \* \* \*