2024-1037

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
———————————————————

IN RE: GESTURE TECHNOLOGY PARTNERS, LLC,

Appellant.

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Ex Parte Reexamination No. 90/014,900

_____

BRIEF FOR APPELLEE - DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE


FARHEENA Y. RASHEED
Acting Solicitor

AMY J. NELSON
Acting Deputy Solicitor

MARY L. KELLY
PETER J. SAWERT
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

May 15, 2024

**Representative claims 1 and 11**

1.  A computer implemented method comprising:

providing a light source adapted to direct illumination through a work volume above the light source;

providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

determining, using the camera, the gesture performed in the work volume and illuminated by the light source.

11.  A computer apparatus comprising:

a light source adapted to illuminate a human body part within a work volume generally above the light source;

a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output.

(Appx47.)

# TABLE OF CONTENTS

I. STATEMENT OF THE ISSUES ............................................................ 1

II. STATEMENT OF THE CASE ............................................................ 2

   A. The claimed method and apparatus for determining a gesture ............ 3

   B. The cited prior art ........................................................................ 6

      1. Liebermann's computer-implemented, gesture-based
         method and apparatus for communication by and with
         a deaf person .......................................................................... 6

      2. Sears' gesture-based electronic reading apparatus
         and method .......................................................................... 10

   C. The Examiner's rejections ........................................................... 13

   D. The Board's decision .................................................................. 16

      1. Anticipation of claims 1, 4-9, 11, 12, and 17-20 by
         Liebermann ........................................................................... 17

         a. Construction of the term "computer apparatus" in
            claim 11 ........................................................................ 17

         b. Anticipation of representative claims 1 and 11 ............ 18

         c. Anticipation of dependent claim 8 .............................. 19

      3. Obviousness of claims 2 and 3 based on Liebermann
         and Sears .............................................................................. 20

      4. The substantial new question of patentability raised by
         Liebermann ........................................................................... 25

      5. The USPTO's jurisdiction over the reexamination of
         the '079 patent ..................................................................... 24

i

III. SUMMARY OF THE ARGUMENT .................................................... 25

IV. ARGUMENT ........................................................................... 31

    A.  Standard of review ....................................................... 31

    B.  Substantial evidence supports the Board's finding that
        Liebermann anticipates representative claims 1 and 11 ........... 33

        1.  The Board correctly construed the "computer apparatus" of
            representative claim 11 as not limited to a unitary device ..... 33

        2.  Liebermann anticipates representative claims 1 and 11 ......... 37

        3.  Liebermann teaches "determining a three-dimensional
            position of a point on a user" as recited in
            dependent claim 8 ................................................ 39

    C.  Substantial evidence supports the Board's finding that claims 2
        and 3 would have been obvious based on Liebermann and Sears ...... 43

        1.  Sears is analogous art to the '079 patent ..................... 44

        2.  An ordinary artisan would have been motivated to replace
            Liebermann's lamps with Sears' more intense and
            more efficient LEDs ............................................. 47

        3.  An ordinary artisan would have been motivated to incorporate
            a plurality of LEDs according to dependent claim 3 ............ 49

        4.  The Board correctly found that Gesture failed to separately
            argue for it remaining claims .................................. 51

    D.  Liebermann makes out an SNQ warranting ex parte reexamination
        of the '079 patent ..................................................... 51

    E.  The USPTO has the authority to reexamine an expired patent where,
        as here, the public franchise has not expired ........................ 52

V.  CONCLUSION .................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*Alza Corp. v. Mylan Labs., Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) .........................................................................31

*Bigio, In re*,
381 F.3d 1320 (Fed. Cir. 2004) ..........................................................................

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
576 F.3d 1348 (Fed. Cir. 2009) (en banc) ..........................................................34

*Cellect, LLC, In re*,
81 F.4th 1216 (Fed. Cir. 2023) ..........................................................................30

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)……………………………………………………………..31

*Corning v. Burden*,
56 U.S. 252 (1853)....................................................................................16, 33

*Cruciferous Sprout Litig., In re*,
301 F.3d 1343 (Fed. Cir. 2002)……………………………………………..33

*CSB-Sys. Int'l, In re*,
832 F.3d 1335 (Fed. Cir. 2016) ...................................................................25, 52

*CSE-Sys. Int'l, Inc., In re*,
832 F.3d 1335, 1341 (Fed. Cir. 2016) ...............................................................32

*Dembiczak, In re*,
175 F.3d 994 (1999).........................................................................................47

*Digitech Image Techs. LLC v. Elec. for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014) ....................................................................16, 32

*Dionex Softron GmbH v. Agilent Techs., Inc.*,
56 F.4th 1353 (Fed. Cir. 2023) ..........................................................................30

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020) .........................................................................41

*Gartside, In re*,
    203 F.3d 1305 (Fed. Cir. 2000) .......................................................31

*Genetics Inst., LLC v. Novartis Vaccines and Diagnostics, Inc.*,
    655 F.3d 1291 (Fed. Cir. 2011) .....................................................51

*Gleave, In re*,
    560 F.3d 1331 (Fed. Cir. 2009) ...............................................30, 35

*Hewlett-Packard Co. v. Bausch & Lomb, Inc., Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990) .....................................................34

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
    946 F.3d 1322 (Fed. Cir. 2020) ............................................... 30-31

*ICON Health & Fitness, Inc., In re*,
    496 F.3d 1374 (Fed. Cir. 2007) .....................................................31

*Intel Corp. v. PACT XPP Schweiz AG*,
    61 F.4th 1373 (Fed. Cir. 2023)……………………………………22, 41

*Invitrogen Corp. v. Biocrest Mfr'g, L.P.*,
    327 F.3d 1364 (Fed. Cir. 2003) .....................................................37

*Jolley, In re*,
    308 F.3d 1317 (Fed. Cir. 2002) .....................................................31

*Keranos, LLC v. Silicon Storage Tech, Inc.*,
    797 F.3d 1025 (Fed. Cir. 2015) .....................................................51

*Kotzab, In re*,
    217 F.3d 1365 (Fed. Cir. 2000)……………………………………..30

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..........................................................22, 23, 40, 41

*Markman v. Westview Insts., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) .........................................................32

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008) .....................................................51

*Nuijten, In re*,
    500 F.3d 1346 (Fed. Cir. 2007) ....................................................16, 32

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
    138 S. Ct 1365 (2018)...........................................................25, 29, 50

*Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*,
    73 F.3d 1085 (Fed. Cir. 1995) ...........................................................31

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)...................................................32, 35

*Rambus, In re*,
    753 F.2d 1235 (Fed. Cir. 2019)...................................................25, 52

*Rijckaert, In re*,
    9 F.3d 1531 (Fed. Cir. 1993) .............................................................47

*Schrieber, In re*,
    128 F.3d 1473 (Fed. Cir. 1997) .........................................................39

*Sony Corp. v. Iancu*,
    924 F.3d 1235, 1238 ..................................................................25, 51

*Swanson, In re*,
    540 F.3d 1368, 1375 (Fed. Cir. 2008)...............................................30

*Tf3 Ltd. v. Tre Milano, LLC*,
    894 F.3d 1366 (Fed. Cir. 2018)........................................................39

*Thrift, In re*,
    298 F.3d 1357 (Fed. Cir. 2002) .........................................................30

*Van Geuns, In re*,
    988 F.2d 1181 (Fed. Cir. 1993) .........................................................32

*Watts, In re*,
    354 F.3d 1362 (Fed. Cir. 2004) .........................................................30

*Weber, Inc. v. Provisur Techs., Inc.*,
    92 F.4th 1059 (Fed. Cir. 2024) .........................................................30

**Statutes**

35 U.S.C. § 101 ..........................................................................16, 27, 32

35 U.S.C. § 102 ..................................................................................2

35 U.S.C. § 103 ..................................................................................2

35 U.S.C. § 301 *et seq.* ....................................................................51

35 U.S.C. § 302 ............................................................................25, 52

35 U.S.C. § 304 ................................................................................24

## STATEMENT OF RELATED CASES

Appellant, Gesture Technology Partners, LLC, (Gesture), seeks relief from the final decision of the Patent Trial and Appeal Board (Board) of the U.S. Patent and Trademark Office (USPTO) in the ex parte reexamination of its expired patent, U.S. Patent No. 8,553,079 (the '079 patent).  The Director is not aware of any other appeal in connection with this proceeding that was previously before this Court.  To the Director's knowledge, there are no other cases pending in this or any other tribunal that will directly affect or be directly affected by a decision in this appeal beyond those cases identified in Gesture's opening brief to this Court.

# I.  STATEMENT OF THE ISSUES

Gesture seeks the reversal of an ex parte reexamination decision holding all but two of its patent claims anticipated and/or obvious.  Representative claims 1 and 11 are broadly drawn to a computer-implemented method and apparatus, respectively, comprising a light source for illuminating a work volume, a camera for capturing a finger gesture made within the work volume, and a processor for determining the gesture.

The Board found claims 1 and 11 anticipated by Liebermann's electronic communication system, which uses lamps to illuminate a work volume, a camera positioned to capture finger gestures formed by a deaf person using American Sign Language (ASL), and a central processing facility to determine the gestures and convey a corresponding message to another person.  The Board also affirmed the Examiner's finding that dependent claim 8's step of determining a position of a point on a user is anticipated by Liebermann's teachings concerning the use of a fast Fourier transform (FFT) algorithm to calculate the center of gravity of a user's hands and path analysis.

Finally, the Board found that ordinary artisans would have been motivated to substitute Liebermann's lamps with Sears' LED light sources according to dependent claims 2 and 3 because LEDs were known to provide more intense light and be more energy efficient.

Gesture's opening brief raises five issues on appeal:

1. Whether the Board correctly construed the term "computer apparatus" in the preamble of claim 11 as not restricting its components (i.e., the light source, camera, and processor) to a unitary device;

2. Whether substantial evidence supports the Board's finding that Liebermann anticipates representative claims 1 and 11 and dependent claim 8;

3. Whether substantial evidence supports the Board's finding that Liebermann and Sears render dependent claims 2 and 3 obvious;

4. Whether Liebermann raises a substantial new question of patentability warranting reexamination of the '079 patent; and

5. Whether the agency's grant of reexamination was proper given that the '079 patent was already expired at the time of grant.

## II.  STATEMENT OF THE CASE

Gesture is the owner of the expired '079 patent.  A third party sought and was granted ex parte reexamination of the '079 patent.  (*See* Appx48; Appx54; Apxx283-285.)  During subsequent reexamination, the Examiner rejected claims 1, 4-9, 11, 12, and 17-20 under 35 U.S.C. § 102 as being anticipated by Liebermann. (Appx385-400; Appx419-461.)  The Examiner also rejected claims 2, 3, 14, and 15 under 35 U.S.C. § 103 as obvious over Liebermann and Sears, and claims 16, and 21-30 as obvious over Liebermann and other prior art.  (Appx400-418; Appx461-476.)  The Board affirmed each of the Examiner's rejections.[1]  (*See* Appx29.) Gesture now appeals the Board's determination to this Court.

---

[1]  Claims 10 and 13 of the '079 patent were confirmed by the Examiner during reexamination.  (Appx2.)

## A.  The claimed method and apparatus for determining a gesture

The '079 patent discloses a method and apparatus "for determining a gesture illuminated by a light source . . . [within] a work volume above the light source" and a camera "positioned to observe and determine the gesture performed in the work volume."  (Appx32 at Abstract.)  The '079 patent describes "[f]inger gestures" as "a sequence of finger movements . . . such as the motion of the finger, or one finger with respect to another such as in pinching something."  (Appx42 at col.3, ll.48-51; *see also* Appx41 at col.2, ll.58-59.)

In the "computer keyboard-based embodiment" depicted in Figure 1 (below), a pair of cameras 100 and 101 located on each side of the keyboard are pointed toward the center of a work volume 170 located above the keyboard:



**FIG. 1**

(Appx34; *see also* Appx41 at col.2, ll.39-45.)  As shown, a central light 122 illuminates the work volume 170, thereby allowing cameras 100 and 101 to better capture finger gestures made within the work volume 170.  (*See* Appx42 at col.3, ll.1-8, 48-51.)

In other embodiments, the camera(s) may be attached to a handheld device or wall mounted.



*FIG. 6*

(*See* Appx39 at Fig.6; *see also* Appx45 at col.9, ll.26-43 (describing cameras 902 and 910 mounted on side of a handheld computer 901); *id.* at col.10, ll.26-29 (describing wall-mounted cameras 980 and 981 "used to look at the handheld computer module 901.").)

Once a gesture is determined from camera data, the gesture may prompt a computer to perform certain responsive functions, such as playing a prerecorded message (*see* Appx43 at col.5, ll.49-58) or moving a virtual object on a TV or computer screen (*see* Appx44 at col.7, ll.30-34, 39-52). The '079 patent specifically teaches that vectors (i.e., mathematical representations of the gesture data) indicating the gesture may be relayed over the internet to a remote computer 1030 to determine an appropriate responsive function for the gesture. (*See* Appx45 at col.10, ll.50-53; Appx46 at col.11, ll.12-25; Appx40 at Fig. 7A.)

Independent claim 1 is representative of Gesture's method claims:

> 1. A computer implemented **method comprising**:
>
> **providing a light source adapted to direct illumination through a work volume** above the light source;
>
> **providing a camera oriented to observe a gesture performed in the work volume**, the camera being fixed relative to the light source; and
>
> **determining, using the camera, the gesture performed in the work volume** and illuminated by the light source.

(Appx47 (emphases added).) Dependent claims 2 and 3 recite that the light source of claim 1 further includes "a light emitting diode" and/or "a plurality of light emitting diodes," respectively. *Id.* Dependent claim 8 recites the method of claim 1 further including a step of "determining the three-dimensional position of a point on a user." *Id.*

5

Independent claim 11 is representative of Gesture's apparatus claims:

11.  A computer **apparatus comprising**:

    **a light source adapted to illuminate** a human body part within **a work volume** generally above the light source;

    **a camera** in fixed relation relative to the light source and oriented **to observe a gesture performed** by the human body part **in the work volume**; and

    **a processor adapted to determine the gesture** performed in the work volume and illuminated by the light source based on the camera output.

(Appx47 (emphases added).)

## B.  The cited prior art[2]

### 1.  Liebermann's computer-implemented, gesture-based method and apparatus for communication by and with a deaf person

Liebermann[3] discloses a computer-implemented method and apparatus that

enables a deaf person to communicate with a hearing person.  (Appx321 at col.1,

ll.11-14; Appx322 at col.3, ll.11-13, 19-21, 26-33.)  Broadly speaking,

Liebermann's method and apparatus uses a camera to capture finger gestures

formed as a deaf person "speaks" using ASL, determines the gestures, and relates

the corresponding words (i.e., the signed message) to another person.  During

---

[2] The Mack and Sako prior art references, included in the obviousness combinations for certain dependent claims, (*see* Appx29), are not separately at issue in this appeal, (*see* Br. 8-9, 41-45).  The Director has therefore not included them in the following discussion of the prior art.
[3] U.S. Patent No. 5,982,853 (Liebermann).  (Appx304-328.)

operation, the images entering the camera "are processed by a digital device which does initial and extended image processing . . . whereby [each] image is transformed into manageable identifiers." (Appx322 at col.4, ll.61-66.) These identifiers are then transmitted to a central processing facility either wirelessly or over conventional telephone lines. (*See* Appx322 at col.4, ll.66 to Appx323 at col.5, l.5; Appx323 at col.5, l.67 to col.6, l.2.) Next, the processing center correlates the identifiers with a database of vocabulary and grammar using artificial intelligence. (Appx323 at col.5, ll.2-5.) The resulting message may then undergo a text-to-synthesized-speech transformation, and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person on the other end. (*See* Appx323 at col.5, ll.7-11.) In turn, the hearing person may speak normally into their telephone and the processing center will use speech recognition algorithms to convert the spoken word to text, which is conveyed back to the deaf person as signing animation. (Appx323 at col.5, ll.14-25.)

In one embodiment (*see* Figure 6 below), Liebermann discloses a "portable transmitter/receiver" in the "form of a cellular telephone":



FIG. 6

(Appx310 at Fig.6; Appx322 at col.4, ll.20-21; Appx323 at col.5, ll.62-63.) This embodiment includes portable transmitter/receiver 8 for use by a deaf person, a video camera with lens 10 disposed in the upright portion 12 of base portion 13 to capture finger gestures made in the area above base portion 13, and an LCD display panel 14 positioned below the area above base portion 13 where the gestures are made. (*See* Appx323 at col.5, l.62 to col.6, l.14.) This embodiment also includes an antenna 18 so that the device "may be transported and communicate as a wireless remote or through a cellular telephone network." (Appx323 at col.5, l.67 to col.6, ll.1-2.) Liebermann explains that the cellphone works in conjunction with "a dedicated central computer facility" to "provide a novel electronic communication system for use by deaf persons to enable . . . communication by and to deaf persons." (Appx322 at col.3, ll.11-24; Appx323 at col.6, ll.10-12.)

In other embodiments, Liebermann discloses that the method and apparatus may comprise "a personal computer 30 including [a] monitor 32 and a video camera 34" (*see* Figure 5a below), "a computer unit 36 and a video camera 38 . . . on top of a standard television set 40 so as to be at hand level" (*see* Figure 5b below), or "a public kiosk 42 [that] has built into it, a video camera 44, a video monitor 46, and lamps 48 [to] ensure adequate lighting of the user's hands, face and body" (*see* Figure 5c below):



(Appx309 at Fig.5; Appx323 at col.5, ll.53-59.)

Regarding determining a gesture, Liebermann instructs that "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations,"

and that "[a]t any particular instant, one has to combine information about the handshape (Stokoe's dez[4]), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab)." (Appx325 at col.10, ll.59-64.) As illustrated in Figure 9, this requires "calculating centers of gravity for both hands," which itself involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands. (Appx313 at Fig.9; *see also* Appx322 at col.4; ll.31-32.)  In other portions of this process, a "2 hand FFT and their location" are determined by a static gesture manager, and a "right hand FFT" is determined by a spelling mode manager. (Appx313 at Fig.9.)

Liebermann also reveals that "special gloves" may be worn by the user to better discriminate between the hands and the background and "enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language."  (Appx326 at col.12, ll.40-43; *see also* Appx317 at

---

[4] "Stokoe notation" is a phonemic script created by William Stokoe for ASL, wherein Latin letters and numerals are used to symbolize hand shapes in fingerspelling, and iconic glyphs are used to transcribe the position, movement, and orientation of the hands. *See* Sign Language Structure, William Stokoe, Linstok Press (1978) (Appx353-357; Appx367-370) (cited in Liebermann at Appx325 at col.10, ll.54-58).  Stokoe notation uses terms *tab* ("tabula or sign location), *dez* ("designator" or handshape and orientation), and *sig* ("signation" or motion and action) to categorize features of sign-language phonemes, somewhat like the distinction between consonant, vowel, and tone is used in the description of oral languages.  *Id.*

Fig.13, Appx318 at Fig. 14.) To that end, Liebermann also describes using three-dimensional video cameras to "facilitate recognition of signing motions by enhancing spatial differences." (Appx327 at col.13, ll.29-31.)

### 2. Sears' gesture-based electronic reading apparatus and method

Sears[5] describes a gesture-based reading method and apparatus including a camera oriented to observe a work volume wherein:

> **An optical-input print reading device with voice output** for people with impaired or no vision **in which the user provides input to the system from hand gestures**. Images of the text to be read, on which the user performs finger- and hand-based gestural commands, are input to **a computer, which decodes the text images into their symbolic meanings through optical character recognition**, and further **tracks the location and movement of the hand and fingers in order to interpret the gestural movements** into their command meaning. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. . . In addition, **alternative device configurations . . . include[e] the use of cameras located** on worn platforms, such as eyeglasses, or **on a fingertip system**. The use of gestural commands is natural, allowing for rapid training and ease of use.

(Appx330 at Abstract (emphases added).)

In the embodiment depicted in Figure 1a (below), Sears' electronic reading machine 29 comprises a main system 35 mounted on video monitor 31, a camera mount 37 that protrudes beyond the top front edge of monitor 31 so that the camera lens 43 is positioned over the surface on which printed material 33 is placed:

---

[5] U.S. Patent No. 6,115,482 (Sears). (Appx330-351.)



**Fig. 1a**

**Fig. 1b**

(Appx331 at Fig.1; *see also* Appx338 at col.4, l.63 to Appx339 at col.5, l.4, Appx339 col.5, ll.8-12.)  As shown in Figure 1b, camera mount 37 "comprises one or more electronic imaging devices (such as CCD or CMOS . . . cameras)." (Appx339 at col.5, ll.5-6.)

Sears discloses that, in some embodiments, camera mount 37 may also incorporate one or more illumination sources, so as to provide constant illumination over the field of view, which are shown in Figure 1b as two rows of illumination sources 45 along the lateral edges of camera mount 37.  (Appx339 at col.5, ll.13-1.7.)  Sears indicates that "illumination sources 45 may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for

backlit displays on portable computers), or may be other sources including incandescent sources." (Appx339 at col.5, ll.16-20.)

## C. The Examiner's rejections

The Examiner found that Liebermann's gesture-based, computer-implemented method and apparatus anticipates representative claims 1 and 11. In particular, the Examiner found that Liebermann's deaf person's station embodiment in Figure 5a includes a work station with a monitor 32 and a video camera 34; the personal computer embodiment shown in Figure 5b includes a computer unit 36 and a video camera 38 on top of a standard television set 40 so as to be at hand level; and the public kiosk 42 embodiment shown in Figure 5c includes a video monitor 46 and a video camera 44, positioned so that the camera will record the signing movement of the hands and fingers and body and facial motions and expressions. (Appx666 (citing Appx323 at col.5, l.61 to col.6, l.14).)

With respect to the kiosk embodiment, the Examiner found that the claimed "'work volume' is the space in the point of view of Liebermann's camera/lens that captures image of signing/gesture." (Appx665.) The Examiner also found that illumination of the work volume according to claim 1 is best exemplified in this embodiment where the "bottom most lamp is below the work space where a user signs." (Appx666, Appx669.)

Next, the Examiner found that Liebermann's cellphone embodiment in Figure 6 includes a portable transmitter/receiver 8 for use by a deaf person, a video camera with lens 10 disposed in the upright portion 12 of base portion 13 to capture finger gestures made in the area above base portion 13, and LCD display panel 14 positioned below the area above base portion 13 where the gestures are made.  (Appx665 (citing Appx323 at col.5, l.61 to col.6, l.14).)  The Examiner found that this embodiment includes "'hardware that works with [a] camera to view and obtain images of hand gestures'" and performs "'initial processing'" of the hand gestures according to claim 1.  (Appx663 (quoting Appx323 at col.5, l.62 to col.6, l.10; *id.* at col.6, ll.40-52).)

The Examiner also found that Liebermann's cellphone embodiment may include an antenna to "communicate as a wireless remote or through a cellular telephone network" with "'a dedicated central computer facility."  (Appx665 (quoting Appx323 at col.5, l.62 to col.6, l.2; citing Appx322 at col.3, ll.11-13, 22-67, Appx323 at col.5, l.62 to col.6, l.14).)  The Examiner found that the central computer facility uses the camera image data to determine the gesture performed in the work volume, as recited in claim 1.  (Appx663 (citing Appx323 at col.5, l.62 to col.6, l.2).)  The Examiner further found that the data captured by the camera in Liebermann's kiosk embodiment are processed in much the same way as in

Liebermann's cellphone embodiment. (Appx665-666 (citing Appx323 at col.6, ll.36-38; Appx313-316 at Figs.9-12).)

On the foregoing findings, the Examiner found that Liebermann discloses every limitation recited in and, thus, anticipates representative claims 1 and 11. (Appx663-672.)

The Examiner also found that Liebermann discloses the further limitation in dependent claim 8 of "determining the three-dimensional position of a point on a user." Specifically, the Examiner found that Liebermann's method and apparatus calculates the center of gravity of a user's hand using FFT and conducts path analysis to determine the position of a point on the user's hand. (Appx681 (citing Appx325 at col.10, ll.59-64; Appx313 at Fig.9).) The Examiner also cited Liebermann's disclosures regarding the use "special gloves" to "allow discrimination of the hands from the background for the image processing system" and determining direction of a pointing finger by a deaf person signing. (Appx681-682 (citing Appx327 at col.13, ll.22-23 (for suggesting that "coordinates" of signs are determined); Appx324 at col.7, l.44 to Appx325 at col.9, l.27 (for disclosing an algorithm for detecting and tracking the location of various parts of the head, torso, arms, and legs) (cleaned up).) Based on these findings, the Examiner found that Liebermann discloses every limitation recited in and, thus, anticipates dependent claim 8. (Appx681-682.)

Finally, the Examiner found that it would have been obvious to replace Liebermann's lamps 48 with a light source that includes "a light emitting diode" according to dependent claim 2 and/or "a plurality of light emitting diodes" according to dependent claim 3. In particular, the Examiner found that it would have been obvious for artisans to substitute one light source for another light source "'to ensure adequate lighting of the user's hands, face and body'" and "'to provide constant illumination over the field of view,'" as described in Liebermann and Sears. (Appx706 (quoting Appx323 at col.5, ll.52-58 and Appx323 at col.5, ll.13-35, respectively).) The Examiner found that an ordinary artisan would have been further motivated to substitute Liebermann's lamp 48 with an LED light source or a plurality of LEDs as used by Sears because LEDs were known in the art to be a "more intense and more efficient light source." (Appx599 (citing Appx829 at col.14, ll.44-56).) Accordingly, the Examiner found that dependent claims 2 and 3 would have been obvious based on the disclosures in Liebermann and Sears. (Appx601.)

**D. The Board's decision**

The Board affirmed the Examiner's rejection of Gesture's claims 1, 4-9, 11, 12, and 17-20 as anticipated by Liebermann, claims 2, 3, 14 and 15 as obvious over Liebermann and Sears, and claims 16 and 21-30 as obvious over Liebermann and other prior art. (*See* Appx28-29.) Only the first two sets rejections are at issue on

appeal.  In its decision, the Board expressly adopted the findings and reasoning in the Examiner's final Office Action and the responses to Gesture's arguments in the Examiner's Answer.  (Appx8.)

### 1.  Anticipation of claims 1, 4-9, 11, 12, and 17-20 by Liebermann

In affirming the Examiner's anticipation rejection, the Board designated claim 1 as representative of claims 4-7 and 9 and claim 11 as representative of claims 12 and 17-20.  (Appx4.)

### a.  Construction of the term "computer apparatus" in representative claim 11

Before assessing the novelty of representative claim 11, the Board first responded to Gesture's claim construction argument.  (Appx9.)  In particular, the Board found unpersuasive Gesture's argument that the term "computer apparatus" should be construed so as to limit claim 11 to a unitary device containing a light source, a camera, and a processor adapted to determine a gesture.  The Board began its analysis by observing that the list of patent-eligible subject matter in 35 U.S.C. § 101 does not include an "apparatus," but rather lists a "machine." (Appx10.)  The Board then noted that the courts have consistently construed the term "machine" to include "either a singular device or a combination of devices (e.g., a system)."  *Id.* (citing *Digitech Image Techs. LLC v. Elec. for Imaging, Inc.*, 758 F.3d 1344, 1348-49 (Fed. Cir. 2014); *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007) (quoting *Corning v. Burden*, 56 U.S. 252, 267 (1854)).  The Board also

17

found that nothing recited in claim 11 precluded a distributed system.  (Appx11, Appx13.)  Accordingly, the Board found no distinction between a "'machine' (as in the statute) and an 'apparatus' (as claimed here)," and construed the term "computer apparatus" to include either a singular device or a combination of devices.  (Appx10-11.)

### b.  Anticipation of representative claims 1 and 11

Proceeding to the Examiner's anticipation findings with respect to representative claims 1 and 11, the Board considered each of Gesture's rebuttal arguments and found them to be unconvincing.

Based on its construction of the term "computer apparatus," the Board found Gesture's argument that Liebermann cannot anticipate claim 11 because Liebermann's system operates over several devices unavailing.  (Appx11, Appx13.)  The Board was similarly unswayed by Gesture's argument that Liebermann's system does not function according to claims 1 and 11 because the gesture data captured by the claimed camera is *sent directly* from the camera to a computer, whereas the signed images captured by Liebermann's camera are *converted* into manageable identifiers *and then sent* to a central processing unit (i.e., sent indirectly).  (Appx12 (citing Appx499-500) (emphases added).)  The Board found the alleged distinction immaterial because Liebermann's "identifiers are themselves based on the captured image" and, thus, its "executed functions are

. . . determined based on the captured image." (Appx13 (citing Appx322 at col.4, l.60 to Appx323 at col.5, l.5).)  Accordingly, the Board found that Liebermann teaches "determining . . . 'based on' the captured image" within the meaning of claim 11. (Appx13.)  The Board found Gesture's related arguments about claim 1 inapt for the same reasons. (Appx14.)

### c. Anticipation of dependent claim 8

Finally, the Board was unconvinced by Gesture's argument that Liebermann does not anticipate dependent claim 8, which further recites "determining the three-dimensional position of a point on a user." (Appx524.)  In particular, Gesture disputed the Examiner's finding that Liebermann's system uses "three[-]dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'" (Appx504 (quoting Appx438, in turn quoting Appx327 at col.13, ll.29-31).)  According to Gesture, "'enhancing spatial differences' does not necessarily mean 'determining the three-dimensional position of a point on a user,' as required by claim 8." (Appx504; *see also* Appx15.)  Gesture further argued that Liebermann's "'path analysis' of hands does not necessarily implicate three-dimensions" because "Liebermann is silent regarding any of the analyses/calculations" used in the path analysis. (Appx504 (emphasis omitted); *see also* Appx16.)

The Board disagreed, finding that "Liebermann *does* characterize its calculation as 'calculating centers of gravity for both hands' at Figure 9 on the left side at the fifth box down in the figure." (Appx16 (emphasis original); *see also* Appx313 at Figure 9.) The Board also agreed with the Examiner that Liebermann's system must determine the position of a point on a user's fingers and hands because "'ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations,'" which "'[a]t any particular instant, one has to combine information about the handshape . . . , motion . . . and . . . spatial location of the hands relative to the rest of the body.'" Appx16 (emphasis omitted) (quoting Appx437-438, in turn quoting Appx325 at col.10, ll.59-64).) Accordingly, the Board found that Liebermann uses FFT to "determine the position of a point on the user's hand, which is a 'point on a user'" as recited in dependent claim 8.

### 3. Obviousness of claims 2, 3, 14, and 15 based on Liebermann and Sears

In affirming the Examiner's obviousness rejection, the Board designated claim 2 as representative of 14 and claim 3 as representative of 15. (Appx5.) The Board agreed with the Examiner that Liebermann and Sears render obvious the limitation in dependent claims 2 and 3 requiring that the light source of claim 1 include either "a light emitting diode" (claim 2) or "a plurality of light emitting diodes" (claim 3). Specifically, the Board found that it would have been obvious to substitute Sears' LEDs into Liebermann's lamp 48 to illuminate the claimed

work volume given Liebermann's disclosures about the need to "ensure adequate lighting of the user's hands, face and body" (Appx323 at col.5, ll.52-58), and Sears' similar disclosures regarding the inclusion of LED illumination sources 45 in computer-mounted and freestanding cameras "to provide constant illumination over [a] field of view" and "relatively even illumination" (Appx339 at col.5, ll.13-35). (Appx17 (citing Appx463).) Next the Board found each of Gesture's rebuttal arguments uncompelling.

*First*, the Board rejected Gesture's argument that Sears was nonanalogous art. More specifically, the Board did not agree with Gesture's argument that the claimed method and Sears are in different fields of endeavor because the claimed method allegedly concerns computing devices whereas Sears concerns an electronic reading machine. (Appx18 (citing Appx506, Appx618).) Rather, the Board found that the '079 patent expressly teaches that the claimed invention "*relates to simple input devices for computers*, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, *and operating by optically sensing object or human positions and/or orientations*." (Appx19 (quoting Appx41 at col.1, ll.53-57) (emphases added by Board).) The Board found that Sears similarly discloses that "[i]t is an object of [Sears'] invention . . . *to specify control system parameters through manual gestures*." (Appx19 (quoting Appx338 at col.3, ll.19-21) (emphases added by Board).) The Board also found

21

this disclosure consistent with (1) Sears' description of the field of the invention as

"'Gesture-Based Navigation,'" (2) Sears' disclosure that its methods include

"'determining a command signal from a sequence of user-generated spatial

configurations of at least one pointer[],'" and (3) Sears' claims reciting "'capturing

a temporal sequence of digital images of user-generated spatial configurations of at

least one pointer [and] determining a command signal from the temporal sequence

of digital images.'"  (Appx19-20 (respectively quoting Appx330 at Abstract,

Appx338 at col.4, ll.3-7, Appx350 at claim 1).)

Given the foregoing disclosures, the Board found that the claimed method

and Sears' method both relate to methods for detecting manual gestures and

performing a responsive function, i.e., they are in the same field of endeavor.

(Appx20.)

The Board also found little merit in Gesture's argument that Sears is not

reasonably pertinent to the question facing the inventor in the '079 patent.  As the

Board described it, Gesture essentially argued that neither the '079 patent nor Sears

are directed to the problem resolved in claims 2 and 3, which Gesture argued is

selecting a light source for use in a gesture-based environment.  (Appx21 (citing

Appx506-507).)  The Board found, however, that Sears was reasonably pertinent to

the problem facing the inventor in the '079 patent – whether defined broadly as

selecting a light source or narrowly as selecting a light source for use in a gesture-

22

based environment – because the inventor and Sears were both concerned with illuminating a work area well enough so that a camera could accurately capture hand movements. (Appx20-21.) Based on these findings, the Board determined that Sears is analogous art to the methods of claims 2 and 3. *Id.*

*Second*, the Board was unconvinced by Gesture's argument that the Examiner's motivation to combine findings on claim 2 "'lack[] articulated reasoning and rational underpinnings.'" (Appx22 (quoting Appx508).) Specifically, Gesture faulted the Examiner's reliance on Numazaki[6] for disclosing that "LED provides more intense visible light as compared to lamps that emit[] light in both visible and non-visible spectrum." (Appx509-510 (citing Appx403-404); *see also* Appx403-404 (citing Numazaki Appx829 at col.14, ll.44-56).) According to Gesture, this finding – and impliedly the Examiner's related findings – is defective because Numazaki discloses that "'LED for emitting lights with the wavelength in the infrared range can be used'" for illuminating target object 106 in one of Numazaki's photo-detection embodiments. (Appx620-621 (quoting Numazaki Appx489 at col.54, ll.35-36) (emphasis omitted).)

The Board found this argument uncompelling because Sears teaches "a known light source for a gesture-based environment," and it would have been

---

[6] Numazaki *et al.*, U.S. Patent No. 6,144,366 (issued Nov. 7, 2000) (Appx721-867).

obvious to substitute one known prior art element for another known prior art element according to their established functions. (Appx23 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007); *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023)).) The Board also found this argument unmerited because, although the Examiner cited Numazaki in response to Appellant's arguments about Sears, Sears formed the basis for the rejection of claims 2 and 3. (Appx23.)

*Third*, the Board was unpersuaded by Gesture's assertion that the Examiner failed to explain why ordinary artisans would replace the bottom most lamp in Liebermann's public kiosk 42 with multiple LEDs, as required by claim 3, given that doing so would allegedly be "'unnecessary and only increase[] circuit complexity with little return.'" (Appx24 (quoting Appx512).) The Board found that this argument rested on the faulty premise that the ordinary "artisan is an automaton capable of only rote application of the teachings of the references and incapable of using plural LEDs as set forth in the proposed combination." (Appx24-25 (citing *KSR v. Teleflex*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.")).) The Board agreed with the Examiner that the claimed invention required nothing more than a "'simple substitution of one light source for another,' i.e., 'a row of lamps in Lieberman[ n ]' (such as seen in Figure 5C [Appx309]) with 'a row of LEDs in Sears.'"

(Appx25 (quoting Appx603).)  The Board also found that Gesture's attempts to limit the replacement of lamps in Liebermann's kiosk to only the bottom lamp and/or restrict the replacement of the lamps on a 1-to-1 basis unfairly characterized the Examiner's findings.  (Appx25.)

### 4.  The substantial new question of patentability raised by Liebermann

The Board was unconvinced by Gesture's argument that Liebermann does not raise an SNQ of patentability, as required for ex parte reexamination under 35 U.S.C. § 304.  In particular, the Board found that Gesture's SNQ argument merely restates its contentions that as Liebermann does not teach all of Gesture's claim limitations and, thus, Liebermann cannot form the basis of an SNQ. (Appx28 (citing Appx521).)  The Board found that Liebermann provides the teachings missing from the prior art during the original prosecution of the '079 patent – and, thus, raises an SNQ of patentability – for the same reasons that Liebermann anticipates Gesture's claims.

### 5.  The USPTO's jurisdiction over the reexamination of the '079 patent

The Board found little merit in Gesture's jurisdictional argument that the USPTO has no authority to institute reexamination of expired patents and, thus, the Examiner erred in granting reexamination of the '079 patent after it expired. Briefly, Gesture argued that the USPTO's authority to conduct reexamination stems from the fact that a patent is a public franchise subject to cancellation, and

that this authority ends when a patent expires and is no longer a public franchise. (Appx25 (citing *Oil States Energy Servs., LLC v. Greene's Energy Grp.*, LLC, 138 S. Ct 1365, 1373 (2018) ("Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." (internal quotation marks omitted))).)

The Board disagreed, noting that "the statute authorizing reexamination does not limit the timing of [] reexamination in the manner argued by Appellant.  To the contrary, the statute states that '[a]ny person *at any time* may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301.'"  (Appx26 (quoting 35 U.S.C. § 302) (emphasis added by Board).)  The Board also disagreed with Gesture's assertion that a patent ceases to be a public franchise upon expiration because the patentee allegedly no longer has any rights in the expired patent.  The Board found, instead, that any decision by this Court on appeal from USPTO proceedings "could have a consequence on any infringement that occurred during the life of the . . . patent." (Appx27 (citing *Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019)).) The Board further noted that this Court "regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision.  In none of these cases has the Federal Circuit found a lack of jurisdiction before the

[USPTO]." (Appx27 (citing *In re Rambus*, 753 F.3d 1253 (Fed. Cir. 2014); *In re CSB-Sys. Int'l*, 832 F.3d 1335, 1338 (Fed. Cir. 2016)).)

For these reasons, the Board concluded that "the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent." (Appx27.)

## III.  SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board's that Gesture's representative claims 1 and 11, and dependent claim 8 are anticipated by Liebermann and that representative claims 2 and 3 would have been obvious over the combination of Liebermann and Sears.

As the Board found, Liebermann's electronic communication system for the deaf uses lamps to illuminate a work volume, a camera to capture finger gestures formed by a deaf person using ASL, and a central processing facility to determine the gestures as recited in claims 1 and 11.  And, as the Board found, Liebermann's teachings concerning the use of FFT to calculate the center of gravity of a user's hand and path analysis satisfies claim 8's step of "determining the three-dimensional position of a point on the user."

The Board also rightly found that an ordinary artisan would have been motivated to substitute Sears' LEDs for Liebermann's lamps as recited in

dependent claims 2 and 3 because they provide more intense light and are more energy efficient.

None of Gesture's rebuttal arguments establish reversible error. _First_, the Board correctly construed the term "computer apparatus" in the preamble of claim 11, and found that it does not restrict its components to a unitary device. While the list of patentable subject matter in 35 U.S.C. § 101 does not recite an "apparatus," the Board noted that it does recite a "machine." This Court has consistently construed the term "machine" to include either a single device or a combination of devices. Given that nothing in the language of claim 11 requires that the claimed light source, camera, and processor be located within the same device, the Board correctly construed the term "computer apparatus" as open to unitary devices and nonunitary devices. Gesture's arguments against the Board's construction impermissibly seek to import limitations from its specification.

_Second_, Gesture's arguments against anticipation by Liebermann lack merit. Gesture's assertion that Liebermann's apparatus cannot anticipate claim 11 because Liebermann's processing facility is geographically distant from Liebermann's lamps and camera is simply a repackaging of its claim construction argument and fails for the same reason. Gesture also erroneously argues that Liebermann cannot anticipate claims 1 and 11 because Liebermann's processing center uses identifiers to determine a gesture rather than direct camera output.

However, nothing in the language of the claims or the '079 patent supports Gesture's position that a finger gesture may only be determined directly from camera output. Accordingly, the Board correctly found claim 1 and 11's "determining a gesture" limitation sufficiently met because Liebermann's identifiers are themselves derived from camera output. Finally, the Board correctly found no merit in Gesture's argument that Liebermann's use of FFT to calculate the center of gravity of a user's hands and path analysis are insufficient to satisfy claim 8's step of determining a position of a point on a user.

*Third*, Gesture cannot defeat the obviousness of claims 2 and 3 on grounds that Sears is nonanalogous art. The Board correctly found that the '079 patent and Sears are both directed to computer-based devices for sensing manual gestures and, thus, are in the same field of endeavor. The Board also correctly found that Sears is reasonably pertinent to the problem facing the inventor in claims 2 and 3, i.e., selecting a light source for a gesture-based environment. Gesture also shows no reversible error in the Board's finding that an ordinary artisan would have been motivated to substitute Sears' LEDs for Liebermann's lamps because LEDs were known in the art to be more intense and more energy efficient.

*Fourth*, Gesture's arguments that Liebermann cannot form the basis of a proper SNQ merely repeat its unsuccessful arguments on anticipation and, therefore, likewise fail to establish reversible error.

*Fifth*, the agency properly granted ex parte reexamination of the expired '079 patent.  The statutes authorizing ex parte reexamination place no limit on its timing, and Gesture's attempts to create such a limit for expired patents is contrary to this Court's caselaw.  According to Gesture's syllogism, the Supreme Court's recent decision in *Oil States* holds that a patent is a "public franchise" → as a public franchise, a patent is subject to reexamination by the USPTO → a patent ceases to be a "public franchise" when the patent owner no longer has exclusionary rights under the patent → a patent owner no longer has exclusionary rights under an expired patent  ∴  the USPTO has no authority to reexamine an expired patent.  The problem with this syllogism is clear:  a patent owner retains the right to bring suit for pre-expiration infringement and collect money damages for up to 6 years after a patent expires.  Thus, even using Gesture's logic, a patent does not cease to carry enforceable rights immediately upon expiration – a fact that Gesture is certainly aware of given that, by its own admission, it had four such infringement suits pending in district court at the time it filed its opening brief.

For all these reasons, the Court should affirm the Board's decision on all grounds.

# IV.  ARGUMENT

## A.  Standard of review

Gesture has the burden of showing that the Board committed reversible error.  *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).

Claim construction is a question of law which may include underlying questions of fact related to extrinsic evidence. *Weber, Inc. v. Provisur Techs., Inc*., 92 F.4th 1059, 1066-67 (Fed. Cir. 2024).  This Court reviews the Board's ultimate claim construction de novo and its supporting factual determinations for substantial evidence.  *Dionex Softron GmbH v. Agilent Techs., Inc*., 56 F.4th 1353, 1358 (Fed. Cir. 2023).

Anticipation is a question of fact that this Court reviews for substantial evidence.  *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009).

Obviousness "'is a legal conclusion based on underlying findings of fact.'" *In re Thrift*, 298 F.3d 1357, 1363 (Fed. Cir. 2002) (quoting *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)).  These factual determinations include the scope and content of the prior art (*Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1328-29 (Fed. Cir. 2020)); what a reference teaches (*Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc*., 73 F.3d 1085, 1088 (Fed. Cir. 1995)); whether a reference is analogous art (*In re ICON Health & Fitness, Inc*., 496 F.3d 1374, 1378 (Fed. Cir. 2007)); and whether there is a motivation to combine prior art references

31

as claimed (*Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006)).  This Court reviews the Board's ultimate determination of obviousness without deference, and its underlying factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000)).

This Court has defined substantial evidence as that which "'a reasonable mind might accept as adequate to support a conclusion.'"  *Gartside*, 203 F.3d at 1312 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence."  *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

Whether a substantial new question of patentability exists is a question of fact that this Court reviews for substantial evidence.  *In re Cellect, LLC*, 81 F.4th 1216, 1223 (Fed. Cir. 2023) (citing *In re Swanson*, 540 F.3d 1368, 1375, 1381 (Fed. Cir. 2008)).

Finally, the USPTO's jurisdiction to decide the patentability of patent claims is a matter of law, which this Court reviews de novo.  *See Gartside*, 203 F.3d at 1315.

### B. Substantial evidence supports the Board's findings that representative claims 1 and 11 and dependent claim 8 are anticipated by Liebermann

The Board rightly affirmed the Examiner's rejection of claims 1, 4-9, 11, 12, and 17-20 as anticipated by Liebermann. (Appx4-16.) In affirming, the Board designated claim 1 as representative of claims 4-7 and 9, and claim 11 as representative of claims 12, and 17-20. (Appx4.) As an initial matter, the Board addressed Gesture's claim construction argument with respect to representative claim 11. (Appx10-11.) The Board then addressed Gesture's arguments with respect representative claims 1 and 11 and dependent claim 8. Appx12-16.

### 1. The Board correctly construed the "computer apparatus" of representative claim 11 as not limited to a unitary device

The claims of an expired patent are construed during ex parte reexamination using the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See also In re CSE-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016). Under this standard, claim terms are given their ordinary and customary meaning according to a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313-18. Moreover, although a claim's terms must be read in light of its specification, this Court has cautioned that "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993); *see also Markman v. Westview lnsts., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc).

33

Gesture argues that the term "computer apparatus" limits claim 11 to a unitary device containing a light, camera, and a processor.  As the Board correctly observed (Appx10), the list of patent-eligible subject matter in 35 U.S.C. § 101 does not include an "'apparatus,'" but rather lists a " 'machine.'"  This Court has consistently construed the term "machine" to include "either a singular device or a combination of devices (e.g., a system)."  *See Digitech Image Techs. LLC v. Elec. for Imaging, Inc.*, 758 F.3d 1344, 1348-49 (Fed. Cir. 2014) (defining a "machine" as a "concrete thing, *consisting of* parts, or of *certain devices and combination of devices*" (emphasis added)); *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007) (defining a "machine" as including "every mechanical device *or combination of* mechanical powers and *devices* to perform some function and produce a certain effect or result" (emphasis added)); *see also Corning v. Burden*, 56 U.S. at 267.

Additionally, no language recited in the body of claim 11 requires that the components of the claimed computer apparatus (i.e., the light source, camera, and processor) be located within the same device.  Further, Gesture fails to identify any disclosure in the '079 patent that mandates that all components must be on the same device, or provide any technological reason why an ordinary artisan would expect the claimed processor incapable of determining a hand gesture if the processor were located in a separate location from the camera and light source.

Nevertheless, Gesture asserts that ordinary artisans would understand the term "computer apparatus" to refer to a single computing device comprising a camera, light source, and processor because every embodiment in the '079 patent allegedly contains three components within the same device.  (*See* Br. at 12-14.) As the Board correctly found, this narrow construction is predicated on the improper importation of a limitation from the specification of the '079 patent into claim 11.  (Appx11 (citing *In re Cruciferous Sprout Litig.,* 301 F.3d 1343, 1348 (Fed. Cir. 2002) (holding that it is improper to interpret what a claim means by adding an extraneous limitation appearing in the specification)).)  The same reasoning defeats Gesture's argument (*see* Br. at 12-14) that claim 11 should be limited to a single device because it recites the term "work volume" and the specification uses this term only in conjunction with a laptop embodiment having all three components in the same device.  (*See* Br. at 12-14.)

Gesture's reliance on the decisions in *Cardiac Pacemakers* and *Hewlett-Packard* as support for a more limited construction is similarly misplaced.  (*See* Br. at 14-15.)  More specifically, Gesture's opening brief quotes a portion of the *Cardiac Pacemakers* decision explaining that claims to "'a product, device, or apparatus'" encompass "'tangible items,'" whereas claims to processes encompass intangible steps.  (*See* Br. at 14 (quoting *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 576 F.3d 1348, 1362 (Fed. Cir. 2009) (en banc)) (emphasis omitted).)

Gesture's brief also quotes a sentence from the *Hewlett-Packard* decision similarly stating that "'apparatus claims cover what a device is, not what [it] does.'" (Appx15 (quoting *Hewlett-Packard Co. v. Bausch & Lomb, Inc., Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990)).)  At most, these statements establish that apparatus claims are not defined by their functions.  Neither case suggests – let alone holds – that all the components of an apparatus claim must be located within a single device.

Gesture's argument (Br. at 14) that the Board improperly relied on a noncontemporaneous dictionary definition when construing the term "computer apparatus" is misplaced.  The Board cited this definition merely to confirm that its construction of the term "apparatus" based on the intrinsic record – and this Court's precedent – did not conflict with the ordinary meaning of that word.  (*See* Appx10-11.)  Gesture presented – and presents – no evidence that the term "apparatus" had a different meaning at the time of the invention, i.e., a definition of "apparatus" that did not include one or more devices.  In the absence of such evidence, the fact that the Board consulted a noncontemporaneous dictionary definition does not establish reversible error.

For all these reasons, Gesture fails to establish any reversible error in the Board's construction of the term "computer apparatus" as recited in representative claim 11.

## 2. Liebermann anticipates representative claims 1 and 11

An invention is anticipated when the prior art expressly or inherently discloses every limitation of a claimed invention.  *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

The Board and the Examiner correctly found that Liebermann teaches all of the elements of representative claims 1 and 11.  Gesture's opening brief disputes these findings only as they relate to two limitations allegedly found in claims 1 and 11.

*First*, Gesture argues that Liebermann fails to disclose a light source, camera, and processor "all disposed within the same computing device," as allegedly required by claim 11, because Liebermann's "central processing facility" is not located with lamps 48 and camera 44 inside public kiosk 42.  (Br. at 16, *see also* Br. at 17-21.)  Gesture makes a nearly identical argument with respect to claim 1's determining step, i.e., that the determining step "must be executed by the same computer that provides 'the claimed light source' and the claimed 'camera.'" (Br. at 25; *see also* Br. at 23-24.)  Both arguments depend entirely on Gesture's proposed construction of the term "computer apparatus."  As discussed above, the Board properly rejected Gesture's proffered claim construction as inconsistent with the intrinsic evidence  Gesture's anticipation arguments fail for the same reason.

_Second_, Gesture argues that Liebermann fails to disclose a processor adapted to determine a gesture "based on [direct] camera output," as allegedly required by claim 11, because Liebermann's system transforms camera 44's output data into "identifiers" and these identifiers are used by the processor to determine a signed gesture. (Br. at 21; _see also_ Br. at 22-23.) As above, Gesture makes a nearly identical argument as to the "determining, using the camera, the gesture performed" limitation of claim 1. (_See_ Br. at 25-27 (emphasis omitted).) Nothing in either of these claims limits the gesture determination in the manner suggested by Gesture.

In particular, Claim 11 recites "a processor adapted to determine [a] gesture . . . based on the camera output." (Appx47 at claim 11.) Gesture fails to identify any language in claim 11 or in the specification that limits the processor's gesture determination to direct, unaltered output from the camera. (_See_ Br. at 25-27.) As the Board correctly found, because Liebermann's "identifiers are themselves based on the captured images," Liebermann's gesture determinations "are therefor also based on the captured image data." (Appx13.)

Moreover, nothing in claim 1 prohibits the inclusion of an additional step of transforming the camera output data into manageable identifiers prior to determining the gesture. The preamble of claim 1 recites a "computer-implemented method comprising." (Appx47 at claim 1.) It is well-established that

method claims reciting the transitional phrase "comprising" are open to additional steps. *See, e.g.*, *Invitrogen Corp. v. Biocrest Mfr'g, L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."). Thus, Gesture exposes no reversible error in the Board's finding that Liebermann discloses all of the limitations of representative claims 1 and 11.

### 3. Liebermann teaches "determining a three-dimensional position of a point on a user" as recited in dependent claim 8

The Board correctly found that Liebermann discloses determining a three-dimensional position of a point on a user according to claim 8. Liebermann uses three-dimensional video cameras to "'facilitate recognition of signing motions by enhancing spatial differences.'" (*See* Appx504 (quoting Appx327 at col.13, ll.29-31).) Liebermann also calculates the center of gravity of a user's hand using FFT and conducts path analysis. (Appx16 (quoting Appx437-438), Appx437-438 (quoting Appx325 at col.10, ll.59-64).) In addition, Liebermann teaches that this system may also be used in conjunction with "special gloves" that "allow discrimination of the hands from the background for the image processing system" and determining direction of a pointing finger by a deaf person signing. (Appx681-682 (citing Appx327 at col.13, ll.22-23 (for teaching one of ordinary skill in the art that "coordinates" of signs are determined); Appx324 at col.7, l.44 to Appx 325 at col.9, l.27 (for disclosing an algorithm for detecting and tracking

the location of various parts of the head, torso, arms, and legs.).)  Gesture makes

three uncompelling arguments to attempt to rebut these anticipation findings.

*First*, Gesture argues that Liebermann "likely" enhances spatial differences

in order to "enhance[e] contrast between the deaf user[']s hands while signing and

the background," rather than to determine the position of a point on a user.  (Br. at

28.)  Even accepting this as true, Liebermann's reason for enhancing spatial

differences is irrelevant to the anticipation inquiry so long as Liebermann's method

accomplishes the recited function.  *See In re Schrieber*, 128 F.3d 1473, 1478 (Fed.

Cir. 1997). (finding claims to a container for dispensing popcorn anticipated by a

prior art oil can capable of performing the same function).  Furthermore,

Liebermann's teaching about enhancing spatial differences must be read in

conjunction with its teaching that the determination of gestures includes

calculating the centers of gravity for both hands.  *See* Appx313 at Fig. 9; *In re

Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (explaining reference is "read for all

that it teaches").  Thus, Gesture provides no persuasive argument or evidence

showing that Liebermann fails to disclose the additional limitation of claim 8.

*Second*, Gesture argues that Liebermann's "'path analysis' of hands does not

necessarily implicate three-dimensions" because "Liebermann is silent regarding

any of [the] analyses/calculations" used in this analysis.  (Br. at 28; *see also*

Appx504.)  Because Liebermann provides a flow chart explaining the steps for

capturing and processing camera data using path analysis and FFT (*see* Appx313 at Fig.9), teaches use of "coordinates" and "specific locations" (see Appx327 at col.13, ll.22-28), and specifically discloses the use of "three dimensional video cameras" to "enhanc[e]" operation, one of ordinary skill would have understood the improvement stemming from the use of three dimensional cameras to lie in the improved three-dimensional coordinate information supplied to the path analysis and FFT algorithm. To the extent Gesture faults Liebermann for failing to provide the details of those calculations, the '079 patent fails to provide even the most rudimentary explanation of the processes – let alone the calculations – used to determine a three-dimensional position of a point on a user according to claim 8. Thus, Liebermann provides at least as much detail as contained in claim 8. (*See* Br. at 28 (citing *Tf3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1374 (Fed. Cir. 2018) ("[A]nticipation requires that '[t]he identical invention must be shown in as complete detail as contained in the patent claim.'")).)

*Third*, Gesture argues that the Board and the Examiner's reliance on Liebermann's teachings about determining "Stokoe's tab" is misplaced because "Stokoe's tab is <u>not</u> a three-dimensional position." (Br. at 29 (emphasis original).) Even if true, the Board and the Examiner did not rely solely on Liebermann's assessment of Stokoe's tab. Rather, the Board and the Examiner relied on Liebermann's disclosure that determining an ASL sign is a "'visual-spatial'"

process "combin[ing] information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). (Appx16 (quoting Appx325 at col.10, ll.59-64) (emphasis omitted); *see also* Appx437-438.) Gesture provides no argument or evidence that the combined information of Stokoe's dez, sig, and tab are not a three-dimensional position. Regardless, Liebermann teaches a method and apparatus for going beyond Stokoe information precisely because "there is a need to effect linguistic analysis beyond what was recognized by William Stokoe." (Appx325 at col.10, ll.54-56.)

For the foregoing reasons, Gesture fails to demonstrate reversible error in the Board's findings that Liebermann anticipates dependent claim 8.

## C. Substantial evidence supports the Board's finding that claims 2 and 3 would have been obvious based on Liebermann and Sears

An invention is likely obvious when it involves the simple substitution of one known element for another according to its established function with predictable results. *KSR v. Teleflex*, 550 U.S. at 417.

The Board correctly affirmed the Examiner's rejection of claims 2, 3, 14, and 15 as obvious over the combination of Liebermann and Sears.  Appx17-25.  In affirming, the Board found that claim 2 is representative of claim 14 and claim 3 is representative of claim 15.  Appx5.

Regarding representative claims 2 and 3, which depend from claim 1, the Board found that Liebermann and Sears render obvious the requirement that the light source includes either "a light emitting diode" (claim 2) or "a plurality of light emitting diodes [LED]" (claim 3).  Specifically, the Board agreed with the Examiner that it would have been obvious to an artisan to substitute Sears' LEDs into Liebermann's lamp 48 to illuminate the claimed work volume given Liebermann's disclosures about the need to "ensure adequate lighting of the user's hands, face and body" (Appx323 at col.5, ll.52-58), and Sears' disclosures regarding the inclusion of LED illumination sources 45 in computer-mounted and freestanding cameras "to provide constant illumination over [a] field of view" and "relatively even illumination" (Appx339 at col.5, ll.13-35).  (*See* Appx17 (citing Appx463); *see also* Appx23 (citing *KSR v. Teleflex*, 550 U.S. at 417; *Intel Corp. v. PACT XPP Schweiz AG*, 61 F .4th 1373, 1380 (Fed. Cir. 2023)).)  The Board and the Examiner found that an ordinary artisan would be particularly motivated to make this specific substitution because LEDs were known to be "more intense" and "more efficient" than incandescent lamps like Liebermann's lamps 48.

(Appx22 (emphasis omitted); Appx599 (citing Appx829 at col.14, ll.44-56).)

Gesture raises several arguments to rebut the obviousness of claims 2 and 3 by

Liebermann and Sears.  (*See* Br. at 30-34.)  Each fails.

### 1.  Sears is analogous art to the '079 patent

Gesture inaptly argues that Sears is not analogous prior art to the '079

patent.  (Br. at 30-34.)  A reference is analogous prior art if it (1) "is from the same

field of endeavor," or (2) "reasonably pertinent to the particular problem with

which the inventor is involved."  *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979

F.3d 1353, 1359 (Fed. Cir. 2020) (citing *In re Bigio*, 381 F.3d 1320, 1325 (Fed.

Cir. 2004)) (cleaned up).  Gesture argues that Sears fails as analogous art under

both prongs of this test.

As before the Board, Gesture inaptly argues that the '079 patent and Sears

are in different fields of endeavor.  (Br. at 30-31; Appx506, Appx618).)  Gesture

does not dispute the Board's finding that the '079 patent's field of endeavor

"*relates to simple input devices for computers*'" that "'*operat[e] by optically*

*sensing object or human positions and/or orientations*."  (Appx19 (quoting

Appx41 at col.1, ll.5357) (emphases added by Board); *see also* Br. at 32

(describing quoted text as the '079 patent's "field of endeavor")  Instead, Gesture

disputes the Board's finding that Sears' similarly relates to a "*gesture-based*

*navigation*" system that uses a camera and a computer to "'*recogniz[e] and further*

*track[] the location and movement of the hand and fingers in order to interpret the gestural movements* into their command meaning.'" (Appx19 (quoting Appx330, Appx338 at col.3, ll.19-21) (emphases added by Board); *see* Br. at 30-32 (quoting same).)

According to Gesture, Sears' field of invention broadly concerns electronic reading machines using optical-character recognition (OCR) and voice-to-text software. Gesture's opening brief includes several snippets taken from Sears' specification as support. (*See* Br. at 30-31.) Some of these snippets misleadingly omit text supporting the Board's finding that Sears, like the '079 patent, is directed to a system for recognizing and determining hand gestures:

- "An optical-input print reading device with voice output for people with impaired or no vision **in which the user provides input to the system from hand gestures**."

  (Appx330 at Abstract (complete sentence); Br. at 30-31 (emphasis added to text omitted by Gesture).)

- "The present invention relates to an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people, as well as others that have difficulty reading printed text, and **more particularly relates to an electronic reading system that includes improved functionality for allowing the user to navigate within the text**."

  Appx337 at col.1, ll.23-29 (complete sentence); Br. at 31 (emphasis added to text omitted by Gesture).

Other snippets taken from Sears' claims similarly omit portions of claim text supporting the Board's findings about Sears' field of endeavor. For example,

Gesture quotes the preamble of claim 1 (Br. at 31), but disregards the fact that all of the claim's steps are directed to the recognition and determination of finger gestures (*see* Appx350 at claims 1 and 2). Other citations merely indicate how many times terms like "OCR" and "text" appear in Sears' specification without any further analysis. (*See* Br. at 31-32.) In short, the evidence Gesture relies on to attempt to establish that Sears is from a different field of endeavor ignore Sears' express teaching that its improvement to prior art reading devices is "provid[ing] a system to permit users to designate text to be read and to specify control system parameters through manual gestures." (Appx338 at col.3, ll.19-21.) The evidence also fails to undermine the Board's related finding that Sears is in the same field of endeavor as the '079 patent as both concern a gesture-based system. (Appx19-20 (quoting Appx338 at col.4, ll.3-7, Appx350 at claim 1).)

Gesture similarly fails to evince reversible error in the Board's finding that Sears is reasonably pertinent to the question facing the inventor in the '079 patent. Gesture's opening brief includes a statement reading that "the Board asserted that 'Appellant's claims define the particular problem . . . as selecting a light source.'" (Br. at 34 (quoting Appx21) (ellipses original).) The Board's statement must be read in context and in its entirety:

> We determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved" because Appellant's claims define the particular problem of these dependent claims as selecting a light source. **Even if we limit**

> **the inventor's particular problem to selecting a light source for a gesture-based environment, we still determine that Sears is "reasonably pertinent** to the particular problem with which the inventor is involved."

(Appx21 (emphases added by Board).)  When read in context and without ellipses, it becomes clear that the Board found Sears reasonably pertinent to the problem facing the inventor in the '079 patent – regardless of whether the problem is defined broadly as "selecting a light source" or more narrowly as "selecting a light source for use in a gesture-based environment" – because both concern illuminating an area so that a camera can better capture hand movements. (Appx20-21.)  Nothing in Gesture's opening brief establishes reversible error in the Board's determination that Sears is analogous art to the methods of claims 2 and 3.

### 2. An ordinary artisan would have been motivated to replace Liebermann's lamps with Sears' more intense and more efficient LEDs

Gesture makes several unavailing arguments for why the Board and the Examiner's motivation to combine findings on claim 2 are "defective."  (Br. at 36; *see also* Appx22 (quoting Appx508).)  First, Gesture argues that "neither the Board nor the Examiner provides any evidence that combining Liebermann and Sears would provide 'more intense light more efficiently.'"  (Br. at 37 (quoting Appx404).)  Not so.  The Examiner cited the Numazaki reference as evidence that

LEDs were known in the art to be "a more intense and more efficient light source" than incandescent lamps:

> **[I]t is known property (i.e., design incentive consideration) . . . generally known that a LED provides more intense light more efficiently than lamps**.  In this case, a light emitting diode (LED) provides more intense light and is [a] more efficient light source than lamps since a **LED provides more intense visible light [because] it emits light** in [the] visible spectrum but do not emit in non-visible spectrum as compared to lamps that emit light in both visible and non-visible spectrum such that **lamps [are] less efficient than a LED (e.g., *see* [Numazaki, Appx829 at col.14. ll.44-56])**.  Also, a LED can be used as the light source, where the LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller (that is, when the pulse interval is longer [when] compared with a single pulse width), so that it is possible to utilize the lighting power efficiently).  [] Hence, the property of LED [] being a more intense and more efficient light source as a design incentive would cause an artisan to substitute one light source of a LED or a plurality of LEDs as used in Sears for another . . . to illuminate a human body part within a work volume.

(Appx599 (emphases added).)

Second, Gesture complains that the Board and the Examiner "d[id] not compare the intensity and the efficiency of *Liebermann's lamps* with the intensity and the efficiency of *Sears' LEDs*."  (Br. at 36 (emphases added).)  In a similar vein, Gesture faults the Examiner for not providing evidence that Liebermann's lamps 48 did not sufficiently illuminate a user's hands, which Gesture implies is a predicate to a finding that a motivation for an alternative light source existed.  *Id.*  The Examiner's finding that LEDs were generally known to be brighter and more

48

efficient than incandescent lamps, combined with the Examiner's citation to corroborating evidence, are more than sufficient to meet the agency's burden to specify the prima facie case for a motivation to combine.

Finally, Gesture criticizes the Board and the Examiner for not evaluating "any of the downsides to using LEDs (e.g., cost) that would have been material at the time of the claimed invention." (Br. at 36.)  The Examiner met the burden of production by setting forth a prima facie case of obviousness with a reasoned motivation for swapping Liebermann's lamps 48 with Sears' LEDs.  After that, the burden shifted to Gesture to come forward with countering evidence, for example, argument or evidence that LEDs were too cost prohibitive to suggest their use. *See*, *e.g*., *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1993).  Gesture failed to do so.  (*See* Appx509.)  Accordingly, this argument also does not establish reversible error.

### 3. An ordinary artisan would have been motivated to incorporate a plurality of LEDs according to dependent claim 3

Gesture raises an unavailing argument that the Board and the Examiner's motivation to combine findings are lacking as to claim 3.  (Br. at 39-40.)  The Examiner made two findings relevant to this argument:  (1) that the bottom most lamp(s) in Liebermann's kiosk embodiment satisfy the requirement of claims 1 and 3 that the "light source [is] adapted to direct illumination through a work volume *above the light source*" (Appx422 (emphasis original)); and (2) that an ordinary

artisan would have been motivated to replace *a row of lamps* in Liebermann's kiosk embodiment, including the bottom most lamps, with a plurality of lights as disclosed by Sears for the reasons discussed with respect to claim 2 (*see* Appx573, Appx603). According to Gesture, the Board and the Examiner's motivation findings are defective because they allegedly "fail[] to explain why a POSITA would replace the 'bottom most lamp' of Liebermann's 'public kiosk,'" especially given that doing so "increases the circuit complexity with little return." (Br. at 40.)

This argument misconstrues the Examiner's motivation findings. Liebermann's kiosk embodiment includes two perpendicular rows of lamps 48. (*See* Appx309 at Fig.5c.) The Examiner expressly found that an ordinary artisan would have been motivated to replace at least one row of lamps 48 with a row of LEDs, as disclosed by Sears, to better illuminate a user's hands and body. (*See* A573 (citing Appx339 at col.5, ll.15-17 ("In FIG. lb [Appx331], such illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37.") (emphasis omitted)); *see also* Appx25.) Such a replacement would inherently include at least one of Liebermann's bottom most lamps. Thus, in contrast to Gesture's assertions, the Examiner adequately explained why a POSITA would replace the bottom most lamp in Liebermann's kiosk embodiment.

For all these reasons, Gesture fails to establish reversible error in the Board's finding that Liebermann and Sears render dependent claims 2 and 3 obvious.

### 4. The Board correctly found that Gesture failed to separately argue its remaining claims

As before the Board, Gesture's arguments against obviousness for any of the remaining claims merely repeat its unavailing rebuttal arguments on the anticipation of claims 1 and 11. (*See* Br. at 41-47; Appx5-7 (citing Appx491-505, Appx513-518).)  Specifically, Gesture asserts that Liebermann does not teach the "determining, using the camera, the gesture performed" step of claim 1 or the "processor adapted to determine the gesture . . . based on the camera output" element of claim 11. *Id.*  As the Board found, this argument turns on the anticipation rejection of claims 1 and 11 and is not a separate argument for patentability. (Appx5-7.)

## D. Liebermann makes out an SNQ warranting ex parte reexamination of the '079 patent

Before the Board and now, Gesture argues that Liebermann cannot form the basis of an SNQ because it allegedly does not teach all of the limitations of the claimed invention. (*See* Appx521, Br. at 46-47.)  Specifically, Gesture asserts that Liebermann does not teach the "determining, using the camera, the gesture performed" step of claim 1 or the "processor adapted to determine the gesture . . . based on the camera output" element of claim 11. (Br. at 46-47.)  Thus, Gesture's SNQ argument is based on the same faulty premise as its novelty arguments, and it collapses for the same reasons:  claim 1 does not restrict the determining the

51

gesture step to data coming directly from the camera to the computer, and claim 11 does not require that the processor be physically located within the claimed apparatus. Accordingly, Gesture fails to demonstrate any reversible error in the Examiner's SNQ findings or in the USPTO's grant of ex parte reexamination based thereon.

### E. The USPTO has the authority to reexamine an expired patent where, as here, the public franchise has not expired

In a last-ditch effort to avoid unpatentability, Gesture inaptly argues that the USPTO had no authority to reexamine its expired patent. Gesture relies on a statement in the *Oil States* decision that patents are public franchises "'subject to the qualification that the [US]PTO has the authority to reexamine – and perhaps cancel – a patent claim in an inter partes review.'" (Br. at 47 (quoting *Oil States v. Greene's Energy*, 138 S.Ct. at 1373).) According to Gesture, it necessarily follows that the USPTO's authority to conduct ex parte reexamination is similarly premised on a patent being a public franchise. Gesture argues that, conversely, the USPTO has no authority to reexamine an expired patent because "the public franchise ceases to exist" and the patentee "no longer has the right to exclude others." (Br. at 47.)

The Court need not engage in lengthy legal analysis to decide this issue. Even if Gesture's articulation of the USPTO's authority to conduct ex parte reexamination were entirely correct – which the USPTO does not concede –

Gesture has not and cannot establish that its right to exclude others under the '079 patent ended when the patent expired.  Binding precedent holds that "an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286."  *Genetics Inst., LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1299 (Fed. Cir. 2011).  Moreover, although a patentee has fewer rights to transfer when a patent has expired, the owner of an expired patent can license the rights or transfer title to an expired patent.  *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an expired patent . . . includes more than merely the right to recover damages for past infringement."), mandate recalled and amended on other grounds by *Mars, Inc. v. Coin Acceptors, Inc.*, 557 F.3d 1377 (Fed. Cir. 2009); *see also Keranos, LLC v. Silicon Storage Tech, Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015); *Sony Corp. v. Iancu*, 924 F .3d 1235, 1238 n.1 (Fed. Cir. 2019).

Gesture does not deny that it is still "entitled to collect [money] damages arising from the public franchise that formerly existed [before the '079 patent expired] through an infringement action in district court."  (Br. at 47.)  Nor could it.  Gesture has availed itself of this right, as evidenced by the pending infringement suits identified in its Opening Brief.  Nevertheless, Gesture argues that Congress intended to "remove . . . the Patent Office's jurisdiction [over

validity] and return[] it to . . . Article III Courts" upon expiration. (Br. at 48.) Gesture provides no cogent explanation for this assertion. Nor could it.

As the Board correctly observed, the statutes authorizing reexamination, 35 U.S.C. § 301 *et seq.*, do not limit the timing of reexamination. (Appx26.) To the contrary, the statute states that "[a]ny person *at any time* may file a request for reexamination by the Office of *any claim of a patent* on the basis of any prior art cited under the provisions of section 301." 35 U.S.C. § 302 (emphasis added). Moreover, this Court regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision. In none of these cases, has the Federal Circuit found a lack of jurisdiction before the USPTO. *See, e.g.*, *Rambus*, 753 F.3d 1253 (Fed. Cir. 2014) (appeal from inter partes reexamination of expired patent); *CSB-Sys. Int'l*, 832 F.3d 1335 (Fed. Cir. 2016) (appeal from patent that expired during reexamination). Thus, as the Board correctly articulated (Appx26-27), the USPTO has jurisdiction for this reexamination so long as any right remains under the expired '079 patent.

# V.  CONCLUSION

This Court should affirm because the Board's determination that claims 1, 11, and 8 claims are unpatentable as anticipated, and that claims 1 and 3 are unpatentable as obvious was correct.  The Board's underlying factual findings are supported by substantial evidence, and Gesture's opening brief fails to identify any reversible error therein.  For the same reasons, the Court should also affirm the Board's determination that Liebermann provides an SNQ.  Finally, the Court should hold that the USPTO had authority to reexamine the expired '079 patent.

Respectfully submitted,

*/s/ Mary L. Kelly*
FARHEENA Y. RASHEED
Acting Solicitor

AMY J. NELSON
Acting Deputy Solicitor

MARY L. KELLY
PETER J. SAWERT
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

May 15, 2024

*Attorneys for the Director of the*
*United States Patent and Trademark Office*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. Proc. 32(a)(7), I certify that the foregoing BRIEF

FOR DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies

with the type-volume limitation required by the Court's rule.  The total number of

words in the foregoing brief, excluding table of contents and table of authorities, is

12.030 words as calculated using the Microsoft Word® software program.

*/s/ Mary L. Kelly*
Mary L. Kelly
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450