2024-1037

_____

# United States Court of Appeals

# for the Federal Circuit

_____

**In re: GESTURE TECHNOLOGY PARTNERS, LLC,**

*Appellant,*

_____

Appeal from the United States Patent and Trademark Office in
*Ex parte* Reexamination Control No. 90/015,900

_____

## JOINT APPENDIX

Fred I. Williams
WILLIAMS SIMONS & LANDIS PLLC
601 Congress Ave., Suite 600
Austin, TX 78701
(512) 543-1354
fwilliams@wsltrial.com

John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A#453
Philadelphia, PA 19103
(512) 543-1373
johnw@wsltrial.com

*Counsel for Appellant Gesture Technology Partners, LLC*

Farheena Y. Rasheed
Acting Solicitor

Amy J. Nelson
Acting Deputy Solicitor

Mary J. Kelley
Peter J. Sawert
Associate Solicitor

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

## TABLE OF CONTENTS

| # | Description | Beg APPX | End APPX |
|---|---|---|---|
| 1 | Board Decision | APPX0001 | APPX0030 |
| 2 | U.S. Patent No. 8,553,079 | APPX0031 | APPX0047 |
| 3 | Request for Ex Parte Reexamination of U.S. Patent No. 8,553,079 | APPX0048 | APPX0136 |
| 4 | Declaration of Dr. Gregory D. Abowd | APPX0137 | APPX0282 |
| 5 | Order Granting Request for Ex Parte Reexamination | APPX0283 | APPX0302 |
| 6 | U.S. Patent No. 5,982,853 ("Liebermann") | APPX0303 | APPX0328 |
| 7 | U.S. Patent No. 6,115,482 ("Sears") | APPX0329 | APPX0351 |
| 8 | Sign Language Structure by William C. Stokoe | APPX0352 | APPX0384 |
| 9 | Final Office Action | APPX0385 | APPX0478 |
| 10 | Notice of Appeal from the Examiner to the Patent Trial and Appeal Board | APPX0479 | APPX0480 |
| 11 | Appeal Brief Under 37 C.F.R. § 41.37 | APPX0481 | APPX0526 |
| 12 | Examiner's Answer | APPX0527 | APPX0609 |
| 13 | Reply Brief Under 37 C.F.R. § 41.41 | APPX0610 | APPX0623 |
| 14 | Patent Owner's Notice of Appeal to the Court of Appeals for the Federal Circuit | APPX0624 | APPX0656 |
| 15 | Non-Final Office Action | APPX0657 | APPX0720 |
| 16 | U.S. Patent No. 6,144,366 ("Numazaki") | APPX0721 | APPX0867 |
| 17 | Certified List | APPX0868 | APPX0905 |

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036          7590          08/08/2023
Williams Simons & Landis PLLC/GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/08/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

———————————

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2
Technology Center 3900

———————————

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.

DECISION ON APPEAL

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology
Partners, LLC (Appellant)[1] appeals from the final rejection of claims 1–9,
11, 12, and 14–30.  Appeal Br. 6–33.  Patent claims 10 and 13 have been
confirmed by the Examiner, and thus are not at issue.  Final Act. 90.  We
have jurisdiction under 35 U.S.C. § 6(b).

We affirm.

———————————

[1] Appellant identifies the real party in interest as Gesture Technology
Partners, LLC.  Appeal Br. 1.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## CLAIMED SUBJECT MATTER

Claims 1−3, 8, and 11 are illustrative of the claimed subject matter (emphasis, formatting, and bracketed material added):

1. A computer implemented method comprising:

[1.A.] providing a light source adapted to direct illumination through a work volume above the light source;

[1.B.] providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

[1.C.] determining, ***using*** the camera, the gesture performed in the work volume and illuminated by the light source.

2. The method according to claim 1 wherein the light source includes a light emitting diode.

3. The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

8. The method according to claim 1 further including determining the ***three-dimensional position*** of a point on a user.

11. A computer ***apparatus*** comprising:

[11.A.] a light source adapted to illuminate a human body part within a work volume generally above the light source;

[11.B.] a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

[11.C.] a processor adapted to determine the gesture performed in the work volume and illuminated by the light source ***based on*** the camera output.

2

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## REFERENCES[2]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Sako | US 5,689,575 | Nov. 18, 1997 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Sears | US 6,115,482 | Sept. 5, 2000 |
| Mack | US 6,198,485 B1 | Mar. 6, 2001 |

## REJECTIONS[3]

### A.[4]

The Examiner rejects claims 1, 4–9, 11, 12, and 17–20, under 35 U.S.C. § 102 as being anticipated by Liebermann. Final Act. 34–76.

Appellant presents arguments for claims 1, 8, and 11. Appeal Br. 6–20. Appellant does not present separate arguments for claims 4–7, 9, 12, and 17–20. We select claim 1 as the representative claim for the § 102 rejection of claims 4–7 and 9; and we select claim 11 as the representative claim for the § 102 rejection of claims 12 and 17–20. Except for our ultimate decision, we do not address the merits of this § 102 rejection of claims 4–7, 9, 12, and 17–20 further herein.

---

[2] All citations herein are by the first named inventor.

[3] For simplicity herein, we refer to the Examiner's rejection under § 102(e) as a rejection under § 102; and we refer to the Examiner's rejections under § 103(a) as rejections under § 103.

[4] Although the heading for this rejection also lists claims 21, 24–28, and 30 (Final Act. 34), these claims are not discussed in the § 102 rejection that follows the heading. Instead, these claims are separately rejected under § 103 as discussed *infra*.

3

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## B.

The Examiner rejects claims 2, 3, 14, and 15 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sears. Final Act. 76–78.

Appellant presents separate arguments for claims 2 and 3. Appeal Br. 20–28. Appeal Br. 6–20. Appellant does not present separate arguments for claims 14 and 15. We select claim 2 as the representative claim for the § 103 rejection of claim 14; and we select claim 3 as the representative claim for the § 103 rejection of claim 15. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 14 and 15 further herein.

## C.

The Examiner rejects claim 16 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Mack. Final Act. 78–81.

To the extent that Appellant discusses this rejection of claim 16, Appellant merely references (or repeats) the argument directed to claim 11. Appeal Br. 28. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 16. Therefore, this rejection of claim 16 turns on our decision as to the rejection of claim 11. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 16 further herein.

4

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

D.

The Examiner rejects claims 21, 24–28, and 30 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sako. Final Act. 81–85.

To the extent that Appellant discusses this rejection of claims 21, 24–28, and 30, Appellant merely references (or repeats) the arguments directed to claims 1, 8, and/or 11. Appeal Br. 29–31. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claims 21, 24–28, and 30. Therefore, this rejection of claims 21, 24–28, and 30 turns on our decision as to the rejection of claims 1, 8, and/or 11. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 21, 24–28, and 30 further herein.

E.

The Examiner rejects claims 22 and 23 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Sears, and Sako. Final Act. 85–87.

To the extent that Appellant discusses this rejection of claims 22 and 23, Appellant merely references (or repeats) the arguments directed to claims 2 and/or 3. Appeal Br. 32. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claims 22 and 23. Therefore, this rejection of claims 22 and 23 turns on our decision as to the rejection of claims 2 and/or 3. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 22 and 23 further herein.

5

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## F.

The Examiner rejects claim 29 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Mack, and Sako. Final Act. 87–90.

To the extent that Appellant discusses this rejection of claim 29, Appellant merely references (or repeats) the argument directed to claim 21. Appeal Br. 33. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 29. Therefore, this rejection of claim 29 turns on our decision as to the rejection of claim 21. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 29 further herein.

## PRINCIPLES OF LAW – CLAIM CONSTRUCTION
### A.[5]

During examination of a patent application, a claim is given its broadest reasonable construction consistent with the specification. *In re Prater*, 415 F.2d 1393, 1404–1405 (CCPA 1969). However, "[w]hen a patent expires during a reexamination proceeding, the PTO should thereafter apply the *Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)] standard for claim construction." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016).

---

[5] The subject patent of this appeal expired on November 3, 2019 before the filing of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 34 (last two lines). The Examiner acknowledges "the [']079 Patent expired in November 2019." Final Act. 5; Ans. 80.

6

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

### B.

"Claims must be read in view of the specification, of which they are a part." *Markman v. Westview Insts., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). However, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)).

### OPINION

We have reviewed the Examiner's rejections in light of Appellant's arguments (Appeal Brief) that the Examiner has erred. We disagree with Appellant's conclusions. Except as noted below, we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer in response to Appellant's Appeal Brief.

### A. Claim 11 − Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 11 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 6–15.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.1. Claim 11 − First Argument

### A.1.a. Claim 11 − First Argument – Appellant's Contentions

Appellant argues:

> One need look no further than the plain language of claim 11 to determine that the claim ***does not cover a physically distributed system***.  The preamble of claim 11 requires "a computer apparatus."  That is why the claimed computer apparatus must include the claim elements that follow the preamble.

> The same holds true for the specification.  In every disclosed embodiment of the '079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture, those components are located within the ***same computing device*** (e.g., laptop computer, handheld computer, etc.).

Appeal Br. 10 (emphasis added).

> The Examiner even acknowledges that "an apparatus [claim] recites what a device is rather than what a device does."  Action, p. 58 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis added)). Accordingly, independent claim 11 requires that the claimed "processor," "camera," and "light source" all be components of the same computing device.

Appeal Br. 11.

> Claim element 11[c] requires "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" located in the same "computer apparatus" as the "camera" and "light source."  But those requirements of claim 11 are fundamentally different than the distributed architecture of *Liebermann.*

Appeal Br. 12.

> In the present case, Patent Owner is not attempting to read limitations from the specification into the claims.  Instead, Patent Owner is relying on the specification of the '079 Patent to

8

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> interpret the term "computer apparatus," which is expressly
> recited by independent claim 11.

Reply Br. 3.

> A.1.b. Claim 11 – First Argument – Panel's Analysis

We are not persuaded by Appellant's argument.  First, the term

"apparatus" is not explicitly listed among the patent eligible subject matter

in the statute.  Rather, the term "machine" is listed.

> Whoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor, subject
> to the conditions and requirements of this title.

35 U.S.C. § 101.

> A machine is a "concrete thing, consisting of parts, or of certain
> devices and combination of devices." *Digitech* [*Image Techs.,
> LLC v. Electronics for Imaging, Inc.*], 758 F.3d [1344,] 1348–49
> [(Fed. Cir. 2014)] (quoting *Burr v. Duryee*, 68 U.S. 531, 570 . . .
> (1863)).  This category "includes every mechanical device or
> combination of mechanical powers and devices to perform some
> function and produce a certain effect or result." [*In re*] *Nuijten*,
> 500 F.3d [1346,] 1355[ (Fed. Cir. 2007)] (quoting *Corning v.
> Burden*, 56 U.S. 252, 267 . . . (1854)).

MPEP § 2106.03 I.  Thus, the case law construes the statutory term

"machine" to include either a singular device or a combination of devices

(e.g., a system).  We see no distinction between a 'machine' (as in the

statute) and an 'apparatus' (as claimed here).  We therefore construe the

claim term "apparatus" to include either a singular device or a combination

of devices.

Second, we do not find where appellant cites either a reference (e.g.,

dictionary) or case law that actually requires Appellant's restrictive reading

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

of "apparatus." Rather, the general definition[6] of the term "apparatus" (a noun) is:

> 1. a collection of instruments, machines, tools, parts, or other equipment used for a particular purpose[.]
>
> 2. a machine having a specific function: *breathing apparatus.*

These definitions of "apparatus" include both a singular machine as well as a collection of machines. The definitions do not support Appellant's argument.

Third, our analysis of claim 11 finds nothing in the claim that precludes a distributed system. Although the particular same computer embodiment advocated by Appellant is well-supported in the Specification, and we do not read claim 11 to be so limited. Therefore, Appellant's narrow claim construction is improperly predicated on reading in a limitation from the Specification.

> "[L]imitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee[-]Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (emphasis and parallel citation omitted).

---

[6] Dictionary.com, https://www.dictionary.com/browse/apparatus. Definitions numbers 1 and 2. (Accessed July 28, 2023). Based on Collins English Dictionary - Complete & Unabridged 2012 Digital Edition © William Collins Sons & CO. LTD. 1979, 1986 © Harpercollins Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012.

10

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2. Claim 11 – Second Argument

### A.2.a. Claim 11 – Second Argument – Appellant's Contentions

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:5 (emphasis added).    The output of *Liebermann's* "camera 44" is one or more "images."  But *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.*   Thus, *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is ***not determining anything based on*** *Liebermann's* "images" (i.e., the Examiner identified "camera output").   Accordingly, *Liebermann* fails to disclose claim element 11[c].

Appeal Br. 14–15 (Appellant emphasis omitted; Panel emphasis added).

11

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2.b. Claim 11 – Second Argument – Panel's Analysis

We are not persuaded by Appellant's argument. As Appellant acknowledges, Liebermann's captured image is transformed into manageable identifiers and Liebermann's system executes (i.e., determines) its functions based on these identifiers. Since these identifiers are themselves based on the captured image, the executed functions are therefore also determined based on the captured image. Contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "based on" the captured image.

### B. Claim 1 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 1 under 35 U.S.C. § 102 as being anticipated.

### B.1. Claim 1 – First Argument

> Similar to independent claim 11, the fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann's **distributed system*** anticipates the claimed process, which is executed in a computer, not a distributed system. . . . As discussed above in reference to independent claim 11, in the '079 Patent, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus. Accordingly, the same computer must perform each step of independent claim 1.

Appeal Br. 15–16.

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.1.a. above for claim 11, and we reach the same result as in section A.1.b. above for claim 11.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### B.2. Claim 1 − Second Argument

Also, Appellant argues:

> *Liebermann* discloses that the Center does not process the output of the camera:
>
> > [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.
>
> *Liebermann*, 4:60-5:[5] (emphasis added). In other words, *Liebermann's* "central processing facility" executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" from *Liebermann's* "camera 44" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.* Thus, *Liebermann's* "central processing facility" is ***not using*** *Liebermann's* ***"camera 44"*** (i.e., the Examiner identified "camera") ***to determine the gesture***. This is contrary to the requirements of claim element 1[c]. Accordingly, *Liebermann* fails to disclose claim element 1[c].

Appeal Br. 18 (Appellant emphasis omitted; Panel emphasis added).

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.2.a. above for claim 11, and we reach the same result as in section A.2.b. above for claim 11. As above, contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "using" the captured image.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### C. Claim 8 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 8 under 35 U.S.C. § 102 as being anticipated.

> The Examiner contends that Liebermann anticipates claim 8 because *Liebermann* "describes using three[-]dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'" Action, p. 53 (citing *Liebermann*, 13:29-31). But "enhancing spatial differences" does <u>not</u> necessarily mean "determining the three-dimensional position of a point on a user," as required by claim 8. The Examiner also contends that *Liebermann's*
>
> > method requires "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands.
>
> Action, p. 53 (citing *Liebermann*, 4:31-32, FIG. 9). Notably, *Liebermann **does not characterize*** its calculation as "calculating centers of gravity for both hands." Putting that aside, *Liebermann **is silent*** regarding any of these analyses/calculations "determining the <u>three-dimensional</u> position of a point on a user," as required by claim 8. Performing a "path analysis" of hands does not necessarily implicate three-dimensions. For example, hands moving left to right follow a one- or two-dimensional path. Thus, *Liebermann* does not anticipate claim 8.

Appeal Br. 19 (emphasis and formatting added).

> [T]he Examiner now admits that the Examiner must "interpret" *Liebermann* or rely on what *Liebermann* "suggests" to find anticipation. But anticipation requires express teachings, not "interpretation" or "suggestions."

Reply Br. 4.

14

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We are not persuaded by Appellant's arguments. First, contrary to
Appellant's argument, Liebermann ***does*** characterize its calculation as
"calculating centers of gravity for both hands" at Figure 9 on the left side at
the fifth box down in the figure.

Second, although we agree with Appellant that the Examiner's
discussion of Liebermann, column 13, lines 22−23, by using the term
"suggesting" (Final Act. 53; Ans. 67) does not support the anticipation
rejection of claim 8, we find this Examiner error to be harmless in light of
the Examiner's remaining reasoning at pages 52−53 of the Final Action.
We agree with the Examiner's remaining reasoning and adopt it as our own.
The remaining reasoning is by itself sufficient to support the anticipation
rejection of claim 8. Particularly, as the Examiner finds:

> "ASL is a visual-spatial language requiring simultaneous,
> multiple, dynamic articulations," "[a]t any particular instant, one
> has to combine information about the handshape (Stokoe's
> 'dez'), the motion (Stokoe's 'sig') and the **spatial location of the
> hands relative to the rest of the body** (Stokoe's 'tab')."
> [Liebermann,] 10:59-64 (internal quotations added). . . . FIG. 9
> discloses in other portions of the conversion process that a
> "**2 hand FFT and their location**" are determined by the static
> gesture manager[.] . . . [A] POSITA would understand that
> calculating the center of gravity of a hand, performing a fast
> Fourier transform, and conducting path analysis as discussed in
> Liebermann includes determining the position of a point on the
> user's hand, which is a "point on a user."

Final Act. 52−53.

Third, contrary to Appellant's argument, we find no error in the
Examiner's use of the term "interpreted" at page 69 of the Answer because,
in this context, it is a reasonable substitute for an alternative term such as
"understood."

15

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

D. Claims 2 and 3 – Section 103 – Liebermann and Sears

Claims 2 and 3 depend from claim 1 and further recite "the light source includes" either "a light emitting diode" (claim 2) or "a plurality of light emitting diodes" (claim 3). The Examiner concludes:

> [I]t would have been obvious to an artisan to **substitute** one light source for the other to provide a light source such as "a light emitting diode", and "a plurality of light emitting diodes" so as to direct illumination through a work volume, to ["]ensure adequate lighting of the user's hands, face and body["] ([Liebermann], 5:52-58), and "to provide constant illumination over the field of view" ([Sears], 5:13-35).

Final Act. 78 (Examiner's emphasis omitted; Panel emphasis added).

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 2 and 3 under 35 U.S.C. § 103 over the combination of Liebermann and Sears. Appeal Br. 20–28.

### D.1. Analogous Art

Appellant correctly states:

> A reference qualifies as prior art for an obviousness determination **only when it is analogous to the claimed invention**. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear*, LLC, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

Appeal Br. 20 (emphasis added).

16

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.1.a. Analogous Art – First Test

As to claims 2 and 3, Appellant argues:

> Regarding the first test for analogous art, *Sears* describes itself as relating to
>
>> an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.
>
> *Sears*, 1:23−29. In contrast, the '079 Patent is directed to computing devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing object or human positions and/or orientations." '079 Patent, 1:54−57, Fig. 1, Fig. 6. These "human positions and/or orientations" include "gestures comprising a sequence of finger movements," and may "allow [for] typing as now, but without the physical keys." *Id.*, 3:48−60, 10:23−25. Accordingly, *Sears* and the '079 Patent are <u>not</u> from the same field of endeavor, and Sears fails the first test for analogous art.

Appeal Br. 21 (formatting added).

> It is clear . . . that "electronic reading machines" are absent from the Examiner-identified field of endeavor for *Sears*. This is improper. *Sears'* Title, Abstract, Technical Field section, Background Art section, Summary of the Invention section, and independent claims all disclose or reference electronic reading machines. See *Sears* at Title, Abstract, 1:23−29, 3:12−15, 4:12−19, independent claims 1, 31, and 33. Accordingly, *Sears'* field of endeavor necessarily includes electronic reading machines.

Reply Br. 6.

We are not persuaded by Appellant's argument. Firstly, Appellant starts from the wrong perspective—the field of endeavor of Sears—and then

17

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

looking to see if the '079 Patent is in that field. As Appellant notes in its citation of the law, the focus of the first test is whether Sears is "within the field of the inventor's endeavor," not the other way around. Appeal Br. 20; *see also In re Klein*, 647 F.3d at 1348 (citing *In re Bigio,* 381 F.3d 1320, 1325 (Fed.Cir.2004); *In re Clay,* 966 F.2d 656, 658 (Fed.Cir.1992)). Thus, even if Sears is focused on a subset of the field of endeavor of the '079 Patent, it can still be within the same field of the '079 Patent.

The '079 Patent states:

> 1. Field of the Invention
>
> ***The invention relates to simple input devices for computers***, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, ***and operating by optically sensing object or human positions and/or orientations***.

'079 Patent, 1:53–57 (emphasis added).

Appellant too narrowly interprets Sears' field of endeavor to limit it to be "an electronic reading system." Appeal Br. 21. Like the '079 Patent, Sears points out that "[i]t is an object of the invention . . . ***to specify control system parameters through manual gestures***." Sears, 3:19–21. (emphasis added). Also, Sears' title states his invention's concern with "Gesture-Based Navigation." Further, Sears' states:

> An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which the user performs finger- and hand-based gestural commands, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning.

18

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Sears, Abstract. Furthermore, Sears at column 4, lines 3–7, states, "[t]he method includes . . . determining a command signal from a sequence of user-generated spatial configurations of at least one pointer[.]" Also further, Sears claims:

> capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;
>
> determining a command signal from the temporal sequence of digital images;

Sears claim 1, 28:39–42.

Thus, consistent with the Examiner's findings (Ans. 69–70), we conclude that Sears is within the field of endeavor of the claimed invention and thus analogous art.

### D.1.b. Analogous Art – Second Test

Turning to the second test for analogous art, Appellant also argues as follows:

> When addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory (i.e., the second test for analogous art), the **problems** to which both relate must be identified and compared. *Donner*, 979 F.3d at 1359. The problem being solved cannot be one that the patent or prior art identifies as being known: "As the '023 patent readily discloses, guitar effects had <u>already</u> been mounted on a pedalboard[.] . . . Thus, that <u>could not possibly</u> be a **relevant purpose of the invention**." *Donner*, 979 F.3d at 1360 (emphasis added).

> . . . .

> *Sears* discloses

>> [t]hese <u>illumination sources</u> 45 may comprise rows of <u>LEDs</u>, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on

19

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> portable computers), or may be other sources
> including incandescent sources.

*Sears*, 5:16-20 (emphasis added). The '079 Patent discloses

> FIG. 2 illustrates another keyboard embodiment
> using special datums or <u>light sources such as LEDs</u>.

'079 Patent, 2:19-20 (emphasis added). These passages from
*Sears* and the '079 Patent imply light emitting diodes were
known. Further, considering these passages both use the
acronym "LEDs" without first spelling it out only reinforces that
light emitting diodes were well-known. Accordingly, in view of
the *Donner* decision, the use of one or more LEDs for
illumination ***cannot be the purpose*** of *Sears* or the '079 Patent
***with respect to the analogous-art analysis***.

Appeal Br. 21–22 (formatting and emphasis added).

We are not persuaded by Appellant's argument. Essentially,
Appellant is arguing that "the use of one or more LEDs for illumination
cannot be the purpose of Sears or the '079 Patent with respect to the
analogous-art analysis" in this situation where claims 2 and 3 are directed to
the purpose of using a "light source includ[ing] a light emitting diode(s)."

We determine that Sears is "reasonably pertinent to the particular
problem with which the inventor is involved" because Appellant's claims
define the particular problem of these dependent claims as selecting a light
source. Even if we limit the inventor's particular problem to selecting a
light source for a gesture-based environment, we still determine that Sears is
"reasonably pertinent to the particular problem with which the inventor is
involved."

Appellant's citation to *Donner* is inapposite. In that case, the Federal
Circuit held that the Board defined the field of endeavor too "narrowly," not
too broadly. *Donner*, 979 F.3d at 1360. The analysis of "[t]he problems to

which the claimed invention and reference at issue relate" "must be carried out from the vantage point of a PHOSITA who is considering turning to the teachings of references outside her field of endeavor" and therefore must not "rule out all such art" that is "outside her field of endeavor." *Id.* Contrary to Appellant's argument, the Federal Circuit held that "if the two references have 'pertinent similarities' such that [the prior art reference] is reasonably pertinent to one or more of the problems to which the [patent-in-suit] pertains, then [the prior art reference] is analogous art." *Id.* at 1361. Such is the case here with Sears.

Therefore, we again conclude that Sears is analogous art.

### D.2. Claim 2

As to claim 2, Appellant further argues "*Sears* does not cure the deficiencies of *Liebermann.*" Appeal Br. 23.

> According to the Examiner, an LED "provides <u>more</u> intense light and is [a] <u>more</u> efficient light source [than *Liebermann's*] lamps." Action, p. 19 (emphasis added). This serves as the motivation for the Examiner's **substitution**. *See* Action, pp. 18-21. But the Examiner provides no evidence that *Sears'* LEDs actually have these superior properties compared to *Liebermann's* lamps. . . . Accordingly, the Examiner's proposed motivation for the substitution is defective.
>
> . . . .
>
> In view of the above, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

21

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Appeal Br. 24–25 (emphasis added).

> *Numazaki* discloses "a LED for emitting lights with the wavelength in the <u>infrared range</u> can be used." *Numazaki*, 54:35-36 (emphasis added). In other words, contrary to the Examiner's contentions, the Examiner's cited evidence discloses LEDs can and do emit light in the non-visible spectrum (e.g., infrared). Accordingly, the Examiner's proposed motivation for the substitution is defective.

Reply Br. 9.

We are not persuaded by Appellant's arguments. First, Federal Circuit precedent "does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away." *PAR Pharma., Inc. v. TWi Pharma., Inc.*, 773 F.3d 1186, 1197–1198 (Fed. Cir. 2014).

Second, as discussed above, Sears teaches a known light source technique for a gesture-based environment.

> And if there's a known technique to address a known problem using "prior art elements according to their established functions," then there is a motivation to combine.

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023).

> [I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 550 U.S. at 417.

Third, although Numazaki is cited by the Examiner in the responses to Appellant's arguments, it is Sears that is relied upon in the rejection, and we find Sears sufficient for this rejection without any reliance on Numazaki.

22

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We conclude the Examiner has set forth a proper articulated reasoning

with a rational underpinning to support the legal conclusion of obviousness.

### D.3. Claim 3

As to claim 3, Appellant further argues "*Sears* does not cure the

deficiencies of *Liebermann.*" Appeal Br. 26.

> [T]he Examiner . . . fails to explain why a POSITA would
> replace the "bottom most lamp" of *Liebermann's* "public kiosk
> 42" with <u>multiple</u> LEDs, as required by claims 3 and 15. . . .
> Substituting the "bottom most lamp" of *Liebermann's* "public
> kiosk 42" with <u>multiple</u> LEDs, as proposed by the Examiner, is
> unnecessary and only increases the circuit complexity with little
> return.    Accordingly, the Examiner's *prima facie* case of
> obviousness is improper because it lacks articulated reasoning
> and rational underpinnings.  *See KSR*[, 550 U.S. at 418].

Appeal Br. 27.

> Patent Owner asserts replacing a row of lamps with a row of
> LEDs is <u>not</u> the same as replacing a single lamp (i.e.,
> *Liebermann's* bottom most lamp) with multiple LEDs.

Reply Br. 10.

We are not persuaded by Appellant's argument.  First, for the reasons

already set forth above, we again conclude the Examiner has set forth a

proper articulated reasoning with a rational underpinning to support the legal

conclusion of obviousness.

Second, we conclude the premise of Appellant's argument is contrary

to our reviewing courts' guidance.  To the extent that Appellant argues an

artisan would not use Sears' LED teaching to "replac[e] a single lamp (i.e.,

*Liebermann's* bottom most lamp) with multiple LEDs" (Reply Br. 10),

Appellant is arguing that the artisan is an automaton capable of only rote

application of the teachings of the references and incapable of using plural

23

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

LEDs as set forth in the proposed combination. To the contrary, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. The Examiner here proposes a "simple substitution of one light source for another," i.e., "a row of lamps in Lieberman[n]" (such as seen in Figure 5C) with a "a row of LEDs in Sears." Ans. 76. Appellant limits this to "substituting the 'bottom most lamp' of Liebermann's 'public kiosk 42' with a <u>single</u> LED," i.e., rote replacement of a single LED for each lamp in Liebermann. Appeal Br. 27 (emphasis omitted). That is not a fair substitution, nor does it accurately reflect the Examiner's combination or the knowledge of a person of ordinary skill in the art, including how small the typical LED is. Regardless of whether each lamp in Liebermann is replaced by a single LED light bulb (i.e., *multiple* individual LEDs) or a row of LEDs with enough individual LEDs to achieve the same brightness as Liebermann's lamp, the combination of Liebermann and Sears renders this claim obvious.

## E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending that the Examiner erred in granting the reexamination request filed in November 2021 on a patent that expired in November 2019. Appeal Br. 34.

> In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights-specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id.* (internal quotation marks omitted). The Court explained that "Congress [has] significant

24

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id.* at 1368[, 1373]. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine and perhaps cancel–a patent claim in an inter partes review." *Id.* at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, ***the public franchise ceases to exist*** and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, ***the USPTO has nothing in its authority to cancel or amend***. Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

Appeal Br. 33–34 (emphasis added).

We are not persuaded by Appellant's argument. First, the statute authorizing reexamination does not limit the timing of a reexamination in the manner argued by Appellant. To the contrary, the statute states:

Any person ***at any time*** may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added).

Second, we disagree that Appellant has no rights under the expired patent.

25

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> It is well-established that [the Federal Circuit's] decision (and the Board's decision on remand) would have a consequence on any infringement that occurred during the life of the . . . patent. *See Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the patentee has fewer rights to transfer when the patent has expired," the owner of an expired patent can license the rights or transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an expired patent . . . includes more than merely the right to recover damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

Third, our reviewing court regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision. In none of these cases has the Federal Circuit found a lack of jurisdiction before the United States Patent and Trademark Office (USPTO). *See, e.g., In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an *inter partes* reexamination of expired U.S. patent 6,034,918)[7]; *see also CSB-Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the reexamination.").

We conclude the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent.

---

[7] The Board noted in a related *ex parte* reexamination appeal that "[t]he '918 patent term expired during the reexamination proceedings." *Ex parte Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12, 2011).

26

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

### F.1.

> As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c]. In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent. Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and *Liebermann* does not raise a SNQ of patentability. The order for *ex parte* reexamination should be vacated.

Appeal Br. 36.

We are not persuaded by Appellant's argument. For the reasons already set forth above in section A.1., we determine that Liebermann does provide the teachings that were missing from the art during the original prosecution of the '079 Patent, and thus, does raise a SNQ of patentability.

## CONCLUSIONS

The Examiner has not erred in rejecting claims 1, 4−9, 11, 12, and 17−20 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 2, 3, 14−16, and 21−30 as being unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejection of claims 1, 4−9, 11, 12, and 17−20 as being anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejections of claims 2, 3, 14−16, and 21−30 as being unpatentable under 35 U.S.C. § 103.

27

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1, 4–9, 11, 12, 17–20 | 102(e) | Liebermann | 1, 4–9, 11, 12, 17–20 | |
| 2, 3, 14, 15 | 103(a) | Liebermann, Sears | 2, 3, 14, 15 | |
| 16 | 103(a) | Liebermann, Mack | 16 | |
| 21, 24–28, 30 | 103(a) | Liebermann, Sako | 21, 24–28, 30 | |
| 22, 23 | 103(a) | Liebermann, Sears, Sako | 22, 23 | |
| 29 | 103(a) | Liebermann, Mack, Sako | 29 | |
| **Overall Outcome** | | | 1–9, 11, 12, 14–30 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

28

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX 78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

29

US008553079B2

(12) **United States Patent**
Pryor

(10) **Patent No.:**     **US 8,553,079 B2**
(45) **Date of Patent:**     **Oct. 8, 2013**

(54) **MORE USEFUL MAN MACHINE INTERFACES AND APPLICATIONS**

(71) Applicant: **Timothy R. Pryor**, Sylvania, OH (US)

(72) Inventor: **Timothy R. Pryor**, Sylvania, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/714,748**

(22) Filed: **Dec. 14, 2012**

(65) **Prior Publication Data**

US 2013/0169535 A1      Jul. 4, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/700,055, filed on Feb. 4, 2010, which is a continuation of application No. 10/866,191, filed on Jun. 14, 2004, now abandoned, which is a continuation of application No. 09/433,297, filed on Nov. 3, 1999, now Pat. No. 6,750,848.

(60) Provisional application No. 60/107,652, filed on Nov. 9, 1998.

(51) **Int. Cl.**
 *H04N 9/47* (2006.01)
 *H04N 7/18* (2006.01)
(52) **U.S. Cl.**
 USPC ............................................. 348/77; 348/155
(58) **Field of Classification Search**
 None
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,909,002 A | 9/1975 | Levy |
| 4,219,847 A | 8/1980 | Pinkney et al. |
| 4,339,798 A | 7/1982 | Hedges et al. |
| 4,631,676 A | 12/1986 | Pugh |
| 4,791,589 A | 12/1988 | Blazo et al. |
| 4,843,568 A | 6/1989 | Krueger et al. |
| 4,908,704 A | 3/1990 | Fujioka et al. |
| 4,988,981 A | 1/1991 | Zimmerman et al. |
| 5,008,946 A | 4/1991 | Ando |
| 5,088,928 A | 2/1992 | Chan |
| 5,227,986 A | 7/1993 | Yokota et al. |
| 5,249,053 A | 9/1993 | Jain |
| 5,297,061 A | 3/1994 | Dementhon et al. |
| 5,365,597 A | 11/1994 | Holeva |
| 5,376,796 A | 12/1994 | Chan et al. |
| 5,388,059 A | 2/1995 | DeMenthon |
| 5,454,043 A | 9/1995 | Freeman |
| 5,459,793 A * | 10/1995 | Naoi et al. .................. 382/165 |
| 5,491,507 A | 2/1996 | Umezawa et al. |
| 5,528,263 A * | 6/1996 | Platzker et al. .............. 345/156 |
| 5,534,921 A | 7/1996 | Sawanobori |
| 5,572,251 A * | 11/1996 | Ogawa .................... 348/207.99 |
| 5,581,276 A | 12/1996 | Cipolla et al. |
| 5,594,469 A | 1/1997 | Freeman et al. |
| 5,616,078 A * | 4/1997 | Oh .................................. 463/8 |
| 5,624,117 A | 4/1997 | Ohkubo et al. |
| 5,781,647 A | 7/1998 | Fishbine et al. |
| 5,781,650 A | 7/1998 | Lobo et al. |
| 5,808,672 A * | 9/1998 | Wakabayashi et al. .... 348/220.1 |
| 5,828,770 A | 10/1998 | Leis et al. |
| 5,845,006 A | 12/1998 | Sumi et al. |
| 5,853,327 A | 12/1998 | Gilboa |
| 5,864,334 A * | 1/1999 | Sellers ........................ 345/168 |

(Continued)

*Primary Examiner* — Peling Shaw

(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

A method for determining a gesture illuminated by a light source utilizes the light source to provide illumination through a work volume above the light source. A camera is positioned to observe and determine the gesture performed in the work volume.

**30 Claims, 7 Drawing Sheets**



**US 8,553,079 B2**

Page 2

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,878,174 A | | 3/1999 | Stewart et al. |
| 5,904,484 A | | 5/1999 | Burns |
| 5,926,168 A | | 7/1999 | Fan |
| 5,936,610 A | * | 8/1999 | Endo ........................... 345/157 |
| 5,940,126 A | | 8/1999 | Kimura |
| 5,982,352 A | | 11/1999 | Pryor |
| 5,999,840 A | | 12/1999 | Grimson et al. |
| 6,052,132 A | | 4/2000 | Christian et al. |
| 6,098,458 A | | 8/2000 | French et al. |
| 6,108,033 A | | 8/2000 | Ito et al. |
| 6,148,100 A | | 11/2000 | Anderson et al. |
| 6,160,899 A | | 12/2000 | Lee et al. |
| 6,204,852 B1 | | 3/2001 | Kumar et al. |
| 6,252,598 B1 | * | 6/2001 | Segen ........................... 715/863 |
| 6,342,917 B1 | | 1/2002 | Amenta |
| 6,346,929 B1 | * | 2/2002 | Fukushima et al. .............. 345/8 |
| 6,359,647 B1 | | 3/2002 | Sengupta et al. |
| 6,363,160 B1 | | 3/2002 | Bradski et al. |
| 6,373,472 B1 | | 4/2002 | Palalau et al. |
| 6,442,465 B2 | | 8/2002 | Breed et al. |
| 6,508,709 B1 | | 1/2003 | Karmarkar |
| 6,529,617 B1 | | 3/2003 | Prokoski |
| 6,597,817 B1 | | 7/2003 | Silverbrook |
| 6,663,491 B2 | | 12/2003 | Watabe et al. |
| 6,750,848 B1 | | 6/2004 | Pryor |
| 6,775,361 B1 | | 8/2004 | Arai et al. |
| 6,788,336 B1 | | 9/2004 | Silverbrook |
| 6,911,972 B2 | | 6/2005 | Brinjes |
| 7,489,863 B2 | | 2/2009 | Lee |

* cited by examiner



*FIG. 1*



FIG. 2



FIG. 3



FIG. 4



*FIG. 5*



FIG. 6



*FIG. 7A*



*FIG. 7B*

US 8,553,079 B2

1

# MORE USEFUL MAN MACHINE INTERFACES AND APPLICATIONS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/700,055, filed Feb. 4, 2010, which is a continuation of U.S. patent application Ser. No. 10/866,191, filed Jun. 14, 2004, which is a continuation of U.S. patent application Ser. No. 09/433,297, filed Nov. 3, 1999 (now U.S. Pat. No. 6,750,848), which claims benefit of U.S. Provisional Application No. 60/107,652, filed Nov. 9, 1998. These applications are hereby incorporated by reference.

## REFERENCES TO RELATED APPLICATIONS BY THE INVENTORS

U.S. patent application Ser. No. 09/138,339, filed Aug. 21, 1998.

U.S. Provisional Application No. 60/056,639, filed Aug. 22, 1997.

U.S. Provisional Application No. 60/059,561, filed Sep. 19, 1998.

Man Machine Interfaces: Ser. No. 08/290,516, filed Aug. 15, 1994, and now U.S. Pat. No. 6,008,800.

Touch TV and Other Man Machine Interfaces: Ser. No. 08/496,908, filed Jun. 29, 1995, and now U.S. Pat. No. 5,982, 352.

Systems for Occupant Position Sensing: Ser. No. 08/968, 114, filed Nov. 12, 1997, now abandoned, which claims benefit of Ser. No. 60/031,256, filed Nov. 12, 1996.

Target holes and corners: U.S. Ser. No. 08/203,603, filed Feb. 28, 1994, and Ser. No. 08/468,358 filed Jun. 6, 1995, now U.S. Pat. No. 5,956,417 and U.S. Pat. No. 6,044,183.

Vision Target Based Assembly: U.S. Ser. No. 08/469,429, filed Jun. 6, 1995, now abandoned; Ser. No. 08/469,907, filed Jun. 6, 1995, now U.S. Pat. No. 6,301,763; Ser. No. 08/470, 325, filed Jun. 6, 1995, now abandoned; and Ser. No. 08/466, 294, filed Jun. 6, 1995, now abandoned.

Picture Taking Method and Apparatus: Provisional Application No. 60/133,671, filed May 11, 1998.

Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application No. 60/133,673 filed May 11, 1998.

Camera Based Man-Machine Interfaces: Provisional Patent Application No. 60/142,777, filed Jul. 8, 1999.

The copies of the disclosure of the above referenced applications are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing object or human positions and/or orientations. The invention in many preferred embodiments, uses real time stereo photogrammetry using single or multiple TV cameras whose output is analyzed and used as input to a personal computer, typically to gather data concerning the 3D location of parts of, or objects held by, a person or persons.

This continuation application seeks to provide further detail on useful embodiments for computing. One embodiment is a keyboard for a laptop computer (or stand alone keyboard for any computer) that incorporates digital TV cameras to look at points on, typically, the hand or the finger, or

2

objects held in the hand of the user, which are used to input data to the computer. It may also or alternatively, look at the head of the user as well.

Both hands or multiple fingers of each hand, or an object in one hand and fingers of the other can be simultaneously observed, as can alternate arrangements as desired.

### 2. Description of Related Art

My referenced co-pending applications incorporated herein by reference discuss many prior art references in various pertinent fields, which form a background for this invention.

## BRIEF DESCRIPTION OF FIGURES

FIG. 1 illustrates a laptop or other computer keyboard with cameras according to the invention located on the keyboard surface to observe objects such as fingers and hands overhead of the keyboard.

FIG. 2 illustrates another keyboard embodiment using special datums or light sources such as LEDs.

FIG. 3 illustrates a further finger detection system for laptop or other computer input.

FIG. 4 illustrates learning, amusement, monitoring, and diagnostic methods and devices for the crib, playpen and the like.

FIG. 5 illustrates a puzzle toy for young children having cut out wood characters according to the invention.

FIG. 6 illustrates an improved handheld computer embodiment of the invention, in which the camera or cameras may be used to look at objects, screens and the like as well as look at the user along the lines of FIG. 1.

FIGS. 7A-B illustrate new methods for internet commerce and other activities involving remote operation with 3D virtual objects display.

## DESCRIPTION OF THE INVENTION

### FIG. 1

A laptop (or other) computer keyboard based embodiment is shown in FIG. 1. In this case, a stereo pair of cameras 100 and 101 located on each side of the keyboard are used, desirably having cover windows 103 and 104 mounted flush with the keyboard surface 102. The cameras are preferably pointed obliquely inward at angles Φ toward the center of the desired work volume 170 above the keyboard. In the case of cameras mounted at the rear of the keyboard (toward the display screen), these cameras are also inclined to point toward the user at an angle as well.

Alternate camera locations may be used such as the positions of cameras 105 and 106, on upper corners of screen housing 107 looking down at the top of the fingers (or hands, or objects in hand or in front of the cameras), or of cameras 108 and 109 shown.

One of the referenced embodiments of the invention is to determine the pointing direction vector 160 of the user's finger (for example pointing at an object displayed on screen 107), or the position and orientation of an object held by the user. Alternatively, finger position data can be used to determine gestures such as pinch or grip, and other examples of relative juxtaposition of objects with respect to each other, as has been described in co-pending referenced applications. Positioning of an object or portions (such as hands or fingers of a doll) is also of use, though more for use with larger keyboards and displays.

In one embodiment, shown in FIG. 2, cameras such as 100/101 are used to simply look at the tip of a finger 201 (or thumb) of the user, or an object such as a ring 208 on the

US 8,553,079 B2

**3**

finger. Light from below, such as provided by single central light **122** can be used to illuminate the finger that typically looks bright under such illumination.

It is also noted that the illumination is directed or concentrated in an area where the finger is typically located such as in work volume **170**. If the light is of sufficient spectral content, the natural flesh tone of the finger can be observed—and recognized by use of the color TV cameras **100/101**.

As is typically the case, the region of the overlapping cameras viewing area is relatively isolated to the overlapping volumetric zone of their fields **170** shown due to focal lengths of their lenses and the angulation of the camera axes with respect to each other. This restricted overlap zone helps mitigate against unwanted matches in the two images due to information generated outside the zone of overlap. Thus there are no significant image matches found of other objects in the room, since the only flesh-toned object in the zone is typically the finger or fingers of the user. Or alternatively, for example, the user's hand or hands. Similarly objects or targets thereon can be distinguished by special colors or shapes.

If desired, or required, motion of the fingers can be also used to further distinguish their presence vis-a-vis any static background. If for example, by subtraction of successive camera frames, the image of a particular object is determined to have moved it is determined that this is likely the object of potential interest which can be further analyzed directly to determine if is the object of interest.

In case of obscuration of the fingers or objects in the hand, cameras in additional locations such as those mentioned above, can be used to solve for position if the view of one or more cameras is obscured.

The use of cameras mounted on both the screen and the keyboard allows one to deal with obscurations that may occur and certain objects may or may not be advantageously delineated in one view or the other.

In addition, it may be in many cases desirable to have a datum on the top of the finger as opposed to the bottom because on the bottom, it can get in the way of certain activities. In this case the sensors are required on the screen looking downward or in some other location such as off the computer entirely and located overhead has been noted in previous application.

To determine finger location, a front end processor like that described in the target holes and corners co-pending application reference incorporated U.S. Ser. Nos. 08/203,603 and 08/468,358 can be used to also allow the finger shape as well as color to be determined.

Finger gestures comprising a sequence of finger movements can also be detected by analyzing sequential image sets such as the motion of the finger, or one finger with respect to another such as in pinching something can be determined. Cameras **100** and **101** have been shown at the rear of the keyboard near the screen or at the front. They may mount in the middle of the keyboard or any other advantageous location.

The cameras can also see one's fingers directly, to allow typing as now, but without the physical keys. One can type in space above the plane of the keyboard (or in this case plane of the cameras). This is useful for those applications where the keyboard of conventional style is too big (e.g., the hand held computer of FIG. **6**).

FIG. **2**

It is also desirable for fast reliable operation to use retroreflective materials and other materials to augment the contrast of objects used in the application. For example, a line target such as **200** can be worn on a finger **201** and advantageously can be located if desired between two joints of the

**4**

finger as shown. This allows the tip of the finger to be used to type on the keyboard without feeling unusual—the case perhaps with target material on tip of the finger.

The line image detected by the camera can be provided also by a cylinder such as retroreflective cylinder **208** worn on the finger **201** which effectively becomes a line image in the field of view of each camera (assuming each camera is equipped with a sufficiently coaxial light source, typically one or more LEDs such as **210** and **211**), can be used to solve easily using the line image pairs with the stereo cameras for the pointing direction of the finger that is often a desired result. The line, in the stereo pair of images provides the pointing direction of the finger, for example pointing at an object displayed on the screen **140** of the laptop computer **138**.

FIG. 3

It is also possible to have light sources on the finger that can be utilized such as the 2 LED light sources shown in FIG. **3**. This can be used with either TV camera type sensors or with PSD type analog image position sensors as disclosed in references incorporated.

In particular the ring mounted LED light sources **301** and **302** can be modulated at different frequencies that can be individually discerned by sensors imaging the sources on to a respective PSD detector. Alternatively, the sources can simply be turned on and off at different times such that the position of each point can be independently found allowing the pointing direction to be calculated from the LED point data gathered by the stereo pair of PSD based sensors.

The "natural interface keyboard" here described can have cameras or other sensors located at the rear looking obliquely outward toward the front as well as inward so as to have their working volume overlap in the middle of the keyboard such as the nearly full volume over the keyboard area is accommodated.

Clearly larger keyboards can have a larger working volume than one might have on a laptop. The pair of sensors used can be augmented with other sensors mounted on the screen housing. It is noted that the linked dimension afforded for calibration between the sensors located on the screen and those on the keyboard is provided by the laptop unitary construction.

One can use angle sensing means such as a rotary encoder for the laptop screen tilt. Alternatively, cameras located on the screen can be used to image reference points on the keyboard as reference points to achieve this. This allows the calibration of the sensors mounted fixedly with respect to the screen with respect to the sensors and keyboard space below. It also allows one to use stereo pairs of sensors that are not in the horizontal direction (such as **101/102**) but could for example be a camera sensor such as **100** on the keyboard coupled with one on the screen, such as **106**.

Knowing the pointing angles of the two cameras with respect to one another allows one to solve for the 3D location of objects from the matching of the object image positions in the respective camera fields.

As noted previously, it is also of interest to locate a line or cylinder type target on the finger between the first and second joints. This allows one to use the fingertip for the keyboard activity but by raising the finger up, it can be used as a line target capable of solving for the pointed direction for example.

Alternatively one can use two point targets on the finger such as either retroreflective datums, colored datums such as rings or LED light sources that can also be used with PSD detectors which has also been noted in FIG. **2**.

When using the cameras located for the purpose of stereo determination of the position of the fingers from their flesh tone images it is useful to follow the preprocessing capable of

US 8,553,079 B2

**5**

processing data obtained from the cameras in order to look for the finger. This can be done on both color basis and on the basis of shape as well as motion.

In this invention, I have shown the use of not only cameras located on a screen looking downward or outward from the screen, but also cameras that can be used instead of or in combination with those on the screen placed essentially on the member on which the keyboard is incorporated. This allows essentially the keyboard to mounted cameras which are preferably mounted flush with the keyboard surface to be unobtrusive, and yet visually be able to see the users fingers, hands or objects held by the user and in some cases, the face of the user.

This arrangement is also useful for 3D displays, for example where special synchronized glasses (e.g., the "Crystal Eyes" brand often used with Silicon Graphics work stations) are used to alternatively present right and left images to each eye. In this case the object may appear to be actually in the workspace **170** above the keyboard, and it may be manipulated by virtually grasping (pushing, pulling, etc.) it, as has been described in co-pending applications.

FIG. **4**: Baby Learning and Monitoring System

A baby's reaction to the mother (or father) and the mother's analysis of the baby's reaction is very important. There are many gestures of babies apparently indicated in child psychology as being quite indicative of various needs, wants, or feelings and emotions, etc. These gestures are typically made with the baby's hands.

Today this is done and learned entirely by the mother being with the baby. However with an Electro-optical sensor based computer system, such as that described in co-pending applications located proximate to or even in the crib (for example), one can have the child's reactions recorded, not just in the sense of a video tape which would be too long and involved for most to use, but also in terms of the actual motions which could be computer recorded and analyzed also with the help of the mother as to what the baby's responses were. And such motions, combined with other audio and visual data can be very important to the baby's health, safety, and learning.

Consider for example crib **400** with computer **408** having LCD monitor **410** and speaker **411** and camera system (single or stereo) **420** as shown, able to amuse or inform baby **430**, while at the same time recording (both visually, aurally, and in movement detected position data concerning parts of his body or objects such as rattles in his hand) his responses for any or all of the purposes of diagnosis of his state of being, remote transmission of his state, cues to various programs or images to display to him or broadcast to others, or the like.

For one example, baby's motions could be used to signal a response from the TV either in the absence of the mother or with the mother watching on a remote channel. This can even be over the Internet if the mother is at work.

For example, a comforting message could come up on the TV from the mother that could be prerecorded (or alternatively could actually be live with TV cameras in the mother's or father's workplace for example on a computer used by the parent) to tell the baby something reassuring or comfort the baby or whatever. Indeed the parent can be monitored using the invention and indicate something back or even control a teleoperater robotic device to give a small child something to eat or for example. The same applies to a disabled person.

If the father or mother came up on the screen, the baby could wave at it, move its head or "talk" to it but the hand gestures may be the most important.

If the mother knows what the baby is after, she can talk to baby or say something, or show something that the baby

**6**

recognizes such as a doll. After a while, looking at this live one can then move to talking to the baby from some prerecorded data.

What other things might we suppose? The baby for example knows to puts its hand on the mother's cheek to cause the mother to turn to it. The baby also learns some other reflexes when it is very young that it forgets when it gets older. Many of these reflexes are hand movements, and are important in communicating with the remote TV based mother representation, whether real via telepresense or from CD Rom or DVD disk (or other media, including information transmitted to the computer from afar) and for the learning of the baby's actions.

Certainly just from the making the baby feel good point-of-view, it would seem like certain motherly (or fatherly, etc.) responses to certain baby actions in the form of words and images would be useful. This stops short of physical holding of the baby which is often needed, but could act as a stop gap to allow the parents to get another hour's sleep for example.

As far as the baby touching things, I've discussed in other applications methods for realistic touch combined with images. This leads to a new form of touching crib mobiles that could contain video imaged and or be imaged themselves—plus if desired—touched in ways that would be far beyond any response that you could get from a normal mobile.

For example, let us say there is a targeted (or otherwise TV observable) mobile **450** in the crib above the baby. Baby reaches up and touches a piece of the mobile which is sensed by the TV camera system (either from the baby's hand position, the mobile movement, or both, and a certain sound is called up by the computer, a musical note for example. Another piece of the mobile and another musical note. The mobile becomes a musical instrument for the baby that could play either notes or chords or complete passages, or any other desired programmed function.

The baby can also signal things. The baby can signal using agitated movements would often mean that it's unhappy. This could be interpreted using learned movement signatures and artificial intelligence as needed by the computer to call for mother even if the baby wasn't crying. If the baby cries, that can be picked up by microphone **440**, recognized using a voice recognition system along the lines of that used in IBM Via Voice commercial product for example. And even the degree of crying can be analyzed to determine appropriate action.

The computer could also be used to transmit information of this sort via the internet email to the mother who could even be at work. And until help arrives in the form of mother intervention or whatever, the computer could access a program that could display on a screen for the baby things that the baby likes and could try to soothe the baby through either images of familiar things, music or whatever. This could be useful at night when parents need sleep, and anything that would make the baby feel more comfortable would help the parents.

It could also be used to allow the baby to input to the device. For example, if the baby was hungry, a picture of the bottle could be brought up on the screen. The baby then could yell for the bottle. Or if the baby needed his diaper changed, perhaps something reminiscent of that. If the baby reacts to such suggestions of his problem, this gives a lot more intelligence as to why he is crying and while mothers can generally tell right away, not everyone else can. In other words, this is pretty neat for babysitters and other members of the household so they can act more intelligently on the signals the baby is providing.

US 8,553,079 B2

7

Besides in the crib, the system as described can be used in conjunction with a playpen, hi-chair or other place of baby activity.

As the child gets older, the invention can further be used also with more advanced activity with toys, and to take data from toy positions as well. For example, blocks, dolls, little cars, and moving toys even such as trikes, scooters, drivable toy cars and bikes with training wheels.

The following figure illustrates the ability of the invention to learn, and thus to assist in the creation of toys and other things.

FIG. **5**: Learning Puzzle Roy

Disclosed in FIG. **5** is a puzzle toy **500** where woodcut animals such as bear **505** and lion **510** are pulled out with handle such as **511**. The child can show the animal to the camera and a computer **530** with TV camera (or cameras) **535** can recognize the shape as the animal, and provide a suitable image and sounds on screen **540**.

Alternatively, and more simply, a target, or targets on the back of the animal can be used such as triangle **550** on the back of lion **511**. In either case the camera can solve for the 3D, and even 5 or 6D position and orientation of the animal object, and cause it to move accordingly on the screen as the child maneuvers it. The child can hold two animals, one in each hand and they can each be detected, even with a single camera, and be programmed in software to interact as the child wishes (or as he learns the program).

This is clearly for very young children of two or three years of age. The toys have to be large so they can't be swallowed.

With the invention in this manner, one can make a toy of virtually anything, for example a block. Just hold this block up, teach the computer/camera system the object and play using any program you might want to represent it and its actions. To make this block known to the system, the shape of the block, the color of the block or some code on the block can be determined. Any of those items could tell the camera which block it was, and most could give position and orientation if known.

At that point, an image is called up from the computer representing that particular animal or whatever else the block is supposed to represent. Of course this can be changed in the computer to be a variety of things if this is something that is acceptable to the child. It could certainly be changed in size such as a small lion could grow into a large lion. The child could probably absorb that more than a lion changing into a giraffe for example since the block wouldn't correspond to that. The child can program or teach the system any of his blocks to be the animal he wants and that might be fun.

For example, he or the child's parent could program a square to be a giraffe where as a triangle would be a lion. Maybe this could be an interesting way to get the child to learn his geometric shapes!

Now the basic block held up in front of the camera system could be looked at just for what it is. As the child may move the thing toward or away from the camera system, one may get a rough sense of depth from the change in shape of the object. However this is not so easy as the object changes in shape due to various rotations.

Particularly interesting then is to also sense the rotations if the object so that the animal can actually move realistically in 3 Dimensions on the screen. And perhaps having the detuning of the shape of the movement so that the child's relatively jerky movements would not appear jerky on the screen or would not look so accentuated. Conversely of course, you can go the other way and accentuate the motions.

This can, for example, be done with a line target around the edge of the object is often useful for providing position or

8

orientation information to the TV camera based analysis software, and in making the object easier to see in reflective illumination.

Aid to Speech Recognition

The previous co-pending application entitled "Useful man machine interfaces and applications" referenced above, discussed the use of persons movements or positions to aid in recognizing the voice spoken by the person.

In one instance, this can be achieved by simply using ones hand to indicate to the camera system of the computer that the voice recognition should start (or stop, or any other function, such as a paragraph or sentence end, etc.).

Another example is to use the camera system of the invention to determine the location of the persons head (or other part), from which one can instruct a computer to preferentially evaluate the sound field in phase and amplitude of two or more spaced microphones to listen from that location—thus aiding the pickup of speech—which often times is not able to be heard well enough for computer based automatic speech recognition to occur.

Digital Interactive TV

As you watch TV, data can be taken from the camera system of the invention and transmitted back to the source of programming. This could include voting on a given proposition by raising your hand for example, with your hand indication transmitted. Or you could hold up 3 fingers, and the count of fingers transmitted. Or in a more extreme case, your position, or the position of an object or portion thereof could be transmitted—for example you could buy a coded object—whose code would be transmitted to indicate that you personally (having been pre-registered) had transmitted a certain packet of data.

If the programming source can transmit individually to you (not possible today, but forecast for the future), then much more is possible. The actual image and voice can respond using the invention to positions and orientations of persons or objects in the room—just as in the case of prerecorded data—or one to one internet connections. This allows group activity as well.

In the extreme case, full video is transmitted in both directions and total interaction of users and programming sources and each other becomes possible.

An interim possibility using the invention is to have a program broadcast to many, which shifts to prerecorded DVD disc or the like driving a local image, say when your hand input causes a signal to be activated.

Handwriting Authentication

A referenced co-pending application illustrated the use of the invention to track the position of a pencil in three dimensional space such that the point at which the user intends the writing point to be at, can be identified and therefore used to input information, such as the intended script.

As herein disclosed, this part of the invention can also be used for the purpose of determining whether or not a given person's handwriting or signature is correct.

For example, consider authentication of an Internet commercial transaction. In this case, the user simply writes his name or address and the invention is used to look at the movements of his writing instrument and determine from that whether or not the signature is authentic. (A movement of one or more of his body parts might also or alternatively be employed.) For example a series of frames of datum location on his pen can be taken, to determine one or more positions on it as a function of time, even to include calculating of its pointing direction, from a determined knowledge in three axes of two points along the line of the pen axis. In this case

US 8,553,079 B2

9

a particular pointing vector sequence "signature" would be learned for this person, and compared to later signatures.

What is anticipated here is that in order to add what you might call the confirming degree of authenticity to the signature, it may not be necessary to track the signature completely. Rather one might only determine that certain aspects of the movement of the pencil are the authentic ones. One could have people write using any kind of movement, not just their signature having their name. The fact is that people are mostly used to writing their name and it would be assumed that that would be it. However, it could well be that the computer asks the user to write something else that they would then write and that particular thing would be stored in the memory.

Optionally, one's voice could be recognized in conjunction with the motion signature to add further confirmation.

This type of ability for the computer system at the other end of the Internet to query a writer to write a specific thing in a random fashion adds a degree of cryptographic capacity to the invention. In other words, if I can store the movements in my hand to write different things, then clearly this has some value.

The important thing though is that some sort of representation of the movements of the pencil or other instrument can be detected using the invention and transmitted.

FIG. **6**: Hand Held Computer

FIG. **6** illustrates an improved handheld computer embodiment of the invention. For example, FIG. **8** of the provisional application referenced above entitled "camera based man machine interfaces and applications" illustrates a basic hand held device and which is a phone, or a computer or a combination thereof, or alternatively to being hand held, can be a wearable computer for example on one's wrist.

In this embodiment, we further disclose the use of this device as a computer, with a major improvement being the incorporation of a camera of the device optionally in a position to look at the user, or an object held by the user—along the lines of FIG. **1** of the instant disclosure for example.

Consider hand held computer **901** of FIG. **6**, incorporating a camera **902** which can optionally be rotated about axis **905** so as to look at the user or a portion thereof such as finger **906**, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include camera **910** can also be used. It too may rotate, as desired. Alternatively fixed cameras can be used as in FIG. **1**, and FIG. **8** of the referenced co-pending application, when physical rotation is not desired, for ruggedness, ease of use, or other reasons (noting that fixed cameras have fixed fields of view, which limit versatility in some cases).

When aimed at the user, as shown, it can be used, for example, to view and obtain images of:

Ones self-facial expression etc., also for image reasons, id etc., combined effect.

Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

One or more pbjects in one's hand. Includes a pencil or pen, and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

One's Gestures.

The camera **902** (and **910** if used, and if desired), can be optionally rotated and used to viewpoints in space ahead of the device, as shown in dotted lines **902***a*. In this position for example it can be used for the purposes described in the previous application. It can also be used to observe or point at

10

(using optional laser pointer **930**) points such as **935** on a wall, or a mounted LCD or projection display such as **940** on a wall or elsewhere such as on the back of an airline seat.

With this feature of the invention, there is no requirement to carry a computer display with you as with a infrared connection (not shown) such as known in the art one can also transmit all normal control information to the display control computer **951**. As displays become ubiquitous, this makes increasing sense—otherwise the displays get bigger the computers smaller trend doesn't make sense if they need to be dragged around together. As one walks into a room, one uses the display or displays in that room (which might themselves be interconnected).

The camera unit **902** can sense the location of the display in space relative to the handheld computer, using for example the four points **955**-**958** on the corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen, including control icons. And it allows the objects on the screen to be sensed directly by the camera—if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer.

The camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field.

A reverse situation also exists where the cameras can be on the wall mounted display, such as cameras **980** and **981** be used to look at the handheld computer module **901** and determine its position and orientation relative to the display.

Note that a camera such as **902**, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with a screen on a wall, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, one looking at wall thing, other at you (as **902** and **902***a*) in this manner, one can dynamically compare ref frames of the display to the human input means in determining display parameters. This can be done in real time, and if so one can actually wave the handheld unit around while still imputing accurate data to the display using ones fingers, objects or whatever.

Use of a laser pointer such as **930** incorporated into the handheld unit has also been disclosed in the referenced copending applications. For example, a camera on the hand held computer unit such as **902** viewing in direction **902***a* would look at laser spot such as **990** (which might or might not have come from the computers own laser pointer **930**) on the wall display say, and recognized by color and size/shape reference to edge of screen, and to projected spots on screen.

FIGS. **7**A-B: Internet and Other Remote Applications

FIG. **7**A illustrates new methods for internet commerce and other activities involving remote operation with 3D virtual objects displayed on a screen. This application also illustrates the ability of the invention to prevent computer vision eye strain.

Let us first consider the operation of the invention over the internet as it exists today in highly bandwidth limited form dependent on ordinary phone lines for the most part. In this case it is highly desirable to transmit just the locations or pointing vectors of portions (typically determined by stereo photo-grammetry of the invention) of human users or objects associated therewith to a remote location, to allow the remote computer **10** to modify the image or sound transmitted back to the user.

Another issue is the internet time delay, which can exist in varying degrees, and is more noticeable, the higher resolution of the imagery transmitted. In this case, a preferred arrange-

US 8,553,079 B2

11

ment is to have real time transmission of minimal position and vector data (using no more bandwidth than voice), and to transmit back to the user, quasi stationary images at good resolution. Transmission of low resolution near real time images common in internet telephony today, does not convey the natural feeling desired for many commercial applications to now be discussed. As bandwidth becomes more plentiful these restrictions are eased.

Let us consider the problem posed of getting information from the internet of today. A user **1000** can go to a virtual library displayed on screen **1001** controlled by computer **1002** where one sees a group **1010** of books on stacks. Using the invention as described herein and incorporated referenced applications to determine my hand and finger locations, I the user, can point at a book such as **1014** in a computer sensed manner, or even reach out and "grab" a book, such as **1020** (dotted lines) apparently generated in 3D in front of me.

My pointing, or my reach and grab is in real time, and the vector (such as the pointing direction of ones finger at the book on the screen, or the position and orientation closing vectors of one's forefinger and thumb to grab the 3D image **1020** of the book) indicating the book in question created is transmitted by internet means to the remote computer **1030** which determines that I have grabbed the book entitled War and Peace from the virtual shelf. A picture of the book coming off the shelf is then generated using fast 3D graphical imagery such as the Merlin VR package available today from Digital Immersion company of Sudbury, Ontario. This picture (and the original picture of the books on the shelves) can be retransmitted over the internet at low resolution (but sufficient speed) to give a feeling of immediacy to the user. Or alternatively, the imagery can be generated locally at higher resolution using the software package resident in the local computer **1002** which receives key commands from the distant computer **1030**.

After the book has been "received" by the user, it then can be opened automatically to the cover page for example under control of the computer, or the users **10** hands can pretend to open it, and the sensed hands instruct the remote (or local, depending on version) computer to do so. A surrogate book such as **1040** can also be used to give the user a tactile feel of a book, even though the real book in questions pages will be viewed on the display screen **1001**. One difference to this could be if the screen **1001** depicting the books were life size, like real stacks. Then one might wish to go over to a surrogate book incorporating a separate display screen—just as one would in a real library, go to a reading table after removing a book from a stack.

Net Grocery stores have already appeared, and similar applications concern picking groceries off of the shelf of a virtual supermarket, and filling ones shopping cart. For that matter, any store where it is desired to show the merchandise in the very manner people are accustomed to seeing it, namely on shelves or racks, generally as one walks down an aisle, or fumbles through a rack of clothes for example. In each case, the invention, which also can optionally use voice input, as if to talk to a clothing sales person, can be used to monitor the person's positions and gestures.

The invention in this mode can also be used to allow one to peruse much larger objects. For example, to buy a car (or walk through a house, say) over the internet, one can lift the hood, look inside, etc., all by using the invention to monitor the 3D position of your head or hands and move the image of the car presented accordingly. If the image is presented substantially life-size, then one can be monitored as one physically walks around the car in one's room say, with the image changing accordingly. In other words just as today.

12

Note that while the image can be apparently life-size using virtual reality glasses, the natural movements one is accustomed to in buying a car are not present. This invention makes such a natural situation possible (though it can also be used with such glasses as well).

It is noted that the invention also comprehends adding a force based function to a feedback to your hands, such that it feels like you lifted the hood, or grabbed the book, say. For this purpose holding a surrogate object as described in co-pending applications could be useful, in this case providing force feedback to the object.

If one looks at internet commerce today, some big applications have turned out **10** to be clothes and books. Clothes are by far the largest expenditure item, and let's look closer at this.

Consider too a virtual mannequin, which can also have measurements of a remote shopper. For example, consider diagram **78**, where a woman's measurements are inputted by known means such as a keyboard **1050** over the internet to a CAD program in computer **1055**, which creates on display screen **1056** a 3D representation of a mannequin **1059** having the woman's shape in the home computer **1060**. As she selects a dress **1065** to try on, the dress which let's say comes in 10 sizes, 5 to 15, is virtually "tried on" the virtual mannequin and the woman **1070** looks at the screen **1056** and determines the fit of a standard size 12 dress. She can rapidly select larger or smaller sizes and decide which she thinks looks and/or fits better.

Optionally, she can signal to the computer to rotate the image in any direction, and can look at it from different angles up or down as well, simply doing a rotation in the computer. This signaling can be conventional using for example a mouse, or can be using TV based sensing aspects of the invention such as employing camera **1070** also as shown in FIG. **1** for example. In another such case, she can reach out with her finger **1075** for example, and push or pull in a virtual manner the material, using the camera to sense the direction of her finger. Or she can touch herself at the points where the material should be taken up or let out, with the camera system sensing the locations of touch (typically requiring at least a stereo pair of cameras or other electro-optical system capable of determining where her fingertip is in 3D space. Note that a surrogate for the tried on dress in this case, could be the dress she has on, which is touched in the location desired on the displayed dress.

The standard size dress can then be altered and shipped to her, or the requisite modifications can be made in the CAD program, and a special dress cut out and sewed which would fit better.

A person can also use her hands via the TV cameras of the invention to determine hand location relative to the display to take clothes off a virtual manikin which could have a representation of any person real or imaginary. Alternatively she can remotely reach out using the invention to a virtual rack of clothes such as **1090**, take an object off the rack, and put it on the manikin. This is particularly natural in near life-size representation, just like being in a store or other venue. This ability of the invention to bring real life experience to computer shopping and other activity that is a major advantage.

The user can also feel the texture of the cloth if suitable haptic devices are **15** available to the user, which can be activated remotely by the virtual clothing program, or other type of program.

Modifications of the invention herein disclosed will occur to persons skilled in the art, and all such modifications are deemed to be within the scope of the invention as defined by the appended claims.

US 8,553,079 B2

13

14

The invention claimed is:

1. A computer implemented method comprising:

providing a light source adapted to direct illumination through a work volume above the light source;

providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

determining, using the camera, the gesture performed in the work volume and illuminated by the light source.

2. The method according to claim 1 wherein the light source includes a light emitting diode.

3. The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

4. The method according to claim 1 wherein detecting a gesture includes analyzing sequential images of the camera.

5. The method according to claim 1 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

6. The method according to claim 1 further including determining the pointing direction of a finger in the work volume.

7. The method according to claim 1 further including providing a target positioned on a user that is viewable in the work volume.

8. The method according to claim 1 further including determining the three-dimensional position of a point on a user.

9. The method according to claim 1 wherein the camera and the light source are positioned in fixed relation relative to a keypad.

10. The method according to claim 9 the camera, the light source and the keypad form part of a laptop computer.

11. A computer apparatus comprising:

a light source adapted to illuminate a human body part within a work volume generally above the light source;

a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output.

12. The computer apparatus of claim 11 further including a display and a keyboard, wherein the work volume is above keyboard and in front of the display.

13. The computer apparatus of claim 12 wherein the display is pivotable relative to the keyboard.

14. The computer apparatus of claim 11 wherein the light source includes a light emitting diode.

15. The computer apparatus of claim 11 wherein the light source includes a plurality of light emitting diodes.

16. The computer apparatus of claim 12 wherein the display includes a three-dimensional display.

17. The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume.

18. The computer apparatus of claim 11 wherein the determined gesture includes a pinch gesture.

19. The computer apparatus of claim 11 wherein the determined gesture includes a pointing gesture.

20. The computer apparatus of claim 11 wherein the determined gesture includes a grip gesture.

21. A computer implemented method comprising:

providing a camera oriented to observe a gesture performed in a work volume above the camera;

providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and

detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume.

22. The method according to claim 21 wherein the light source includes a light emitting diode.

23. The method according to claim 21 wherein the light source includes a plurality of light emitting diodes.

24. The method according to claim 21 wherein detecting a gesture includes analyzing sequential images of the camera.

25. The method according to claim 21 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

26. The method according to claim 21 further including determining the pointing direction of one of the user's fingers using the first and second cameras.

27. The method according to claim 21 further including providing a target positioned on the user that is viewable by the camera.

28. The method according to claim 21 further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers.

29. The method according to claim 21 further including providing a three-dimensional display viewable by the user.

30. The method according to claim 21 wherein the camera and the light source are positioned in fixed relation relative to a keypad.

* * * * *

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re *Ex Parte* Reexamination of: ) | |
| ) | |
| U. S. Patent No. 8,553,079 ) | Control No.: *To be assigned* |
| ) | |
| Issue Date: October 8, 2013 ) | Group Art Unit: *To be assigned* |
| ) | |
| Inventor: Timothy R. Pryor ) | Examiner: *To be assigned* |
| ) | |
| Appl. No. 13/714,748 ) | Confirmation No.: *To be assigned* |
| ) | |
| Filing Date: December 14, 2012 ) | |
| ) | |
| For: MORE USEFUL MAN MACHINE ) | |
| INTERFACES AND APPLICATIONS ) | |

Mail Stop *Ex Parte* Reexam
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REQUEST FOR *EX PARTE* REEXAMINATION OF U.S. PATENT NO. 8,553,079

Request for *Ex Parte* Reexamination
U.S. Patent No. 8,553,079

## TABLE OF CONTENTS

I.  Introduction ................................................................................................. 1

II.  Identification of Claims and Citation of Prior Art Presented ........................... 2

III.  Overview of the '079 Patent ........................................................................ 2

    A.  Specification and Drawings of the '079 Patent ...................................... 2

    B.  Claims of the '079 Patent ..................................................................... 6

    C.  The '079 Patent Prosecution History .................................................... 6

    D.  The Effective Priority Date of Claims 1-30 of the '079 Patent ............. 7

IV.  Claim Construction ...................................................................................... 8

    A.  "light source adapted to direct illumination through a work volume above the light source" of claims 1-3, 9-10 ................................................... 11

    B.  "light source adapted to illuminate a human body part within a work volume generally above the light source" of claims 11, 14-15 ........................... 11

    C.  "light source in fixed relation relative to the camera and adapted to direct illumination through the work volume" of claims 21-23, 30 ............................ 11

    D.  "gesture" of claims 1, 4-5, 11, 18-21, 24-25 ....................................... 12

    E.  "work volume above the light source" of claims 1, 6-7 ..................... 12

    F.  "work volume generally above the light source" of claims 11-12 ..................... 13

    G.  "work volume above the camera" of claim 21 .................................... 13

    H.  "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" of claim 11 ................................................................................................. 13

    I.  "three-dimensional position" of claims 8, 28 .................................... 14

    J.  "adapted to" of claims 1, 11, 21 ........................................................ 15

V.  Statement of Substantial New Questions of Patentability ............................. 15

    A.  SNQ1: *Liebermann* ........................................................................... 16

    B.  SNQ2: *Liebermann* in view of *Harakawa* ........................................ 52

    C.  SNQ3: *Liebermann* in view of *Mack* ................................................ 59

    D.  SNQ4: *Liebermann* in view of *Bushnag* ........................................... 67

    E.  SNQ5: *Liebermann* in view of *Meins* ................................................ 71

    F.  SNQ6: *Liebermann* in view of *Auten* ................................................ 75

APPX0049

VI.    Detailed Explanation of the Pertinence and Manner of Applying the Prior Art to

the Claims ................................................................................................ 79

A.    Bases for Proposed Rejections of the Claims .................................... 79

B.    Proposed Rejections .......................................................................... 81

VII.   Conclusion .............................................................................................. 82

## <u>LIST OF EXHIBITS</u>:

| | |
|---|---|
| Ex. PA-SB08 | USPTO Form SB/08 |
| Ex. PAT-A | U.S. Patent No. 8,553,079 ("the '079 patent") |
| Ex. PAT-B | Prosecution History of the '079 patent |
| Ex. PA-DEC | Declaration of Dr. Gregory D. Abowd |
| Ex. PA-DEC CV | Curriculum vitae of Dr. Gregory D. Abowd |
| Ex. PA-1 | U.S. Patent No. 5,982,853 to Liebermann ("*Liebermann*") |
| Ex. PA-2 | U.S. Patent No. 6,385,331 to Harakawa *et al.* ("*Harakawa*") |
| Ex. PA-3 | U.S. Patent No. 6,198,485 to Mack *et al.* ("*Mack*") |
| Ex. PA-4 | Canadian Patent No. 2,175,288 to Bushnag ("*Bushnag*") |
| Ex. PA-5 | U.S. Patent No. 6,587,700 to Meins *et al.* ("*Meins*") |
| Ex. PA-6 | U.S. Patent No. 6,912,410 to Auten *et al.* ("*Auten*") |
| Ex. PA-7 | Bushnag Bibliographic Summary, Canadian Patents Database |
| Ex. PA-8 | William Stokoe, *Semiotics and Human Sign Languages* (Mouton 1972) |

| Ex. PA-9 | William Stokoe, *Sign Language Structure* (Linstok Press 1978) |
|---|---|
| Ex. PA-10 | U.S. Patent No. 5,835,133 to Moreton *et al.* ("*Moreton*") |
| Ex. PA-11 | U.S. Patent No. 6,192,257 to Ray ("*Ray*") |
| Ex. PA-12 | U.S. Patent No. 5,901,206 to Soon ("*Soon*") |
| Ex. PA-13 | V. Pavlovic *et al.*, *Visual Interpretation of Hand Gestures for Human-Computer Interaction: A Review*, 19 IEEE TRANSACTIONS ON PATTERN ANALYSIS AND MACHINE INTELLIGENCE 677 (1997). |
| Ex. PA-14 | U.S. Patent No. 6,115,482 to Sears *et al.* ("*Sears*") |
| Ex. PA-15 | U.S. Patent No. 5,454,043 to Freeman ("*Freeman*") |
| Ex. PA-16 | U.S. Patent No. 6,256,033 to Nguyen ("*Nguyen*") |
| Ex. PA-17 | U.S. Patent No. 4,988,981 to Zimmerman *et al.* ("*Zimmerman*") |
| Ex. PA-18 | U.S. Patent No. 5,594,469 to Freeman *et al.* ("*Freeman-469*") |
| Ex. PA-19 | U.S. Patent No. to 6,144,366 to Numazaki *et al.* ("*Numazaki*") |
| Ex. PA-20 | Microsoft Announces Release of Windows CE 2.0 – Stories |

| Ex. COMPLAINT-1 | Complaint (Dkt. No. 1) in *Gesture Partners, LLC v. Samsung Elecs. Co.*, No 2:21-cv-00041 (E.D. Tex. Feb. 4, 2021) |
|---|---|
| Ex. CC-1 | P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 55) and Appendix 1 (Dkt. No. 55-1) in *Gesture Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex. July 16, 2021) (consolidated with *Gesture Partners, LLC v. Samsung Elecs. Co.*, No. 2:21-cv-0041) |
| Ex. CC-2 | Plaintiff's Opening Claim Construction Brief (Dkt. No. 64) and Supporting Declaration (Exhibit E, Dkt. No. 64-5) in *Gesture Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex. Aug. 15, 2021) (consolidated with *Gesture Partners, LLC v. Samsung Elecs. Co.*, No. 2:21-cv-0041) |
| Ex. CC-3 | Claim Construction Memorandum and Order (Dkt. No. 93) in *Gesture Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex. Oct. 12, 2021) (consolidated with *Gesture Partners, LLC v. Samsung Elecs. Co.*, No. 2:21-cv-0041) |

## I.    Introduction

An *ex parte* reexamination is requested on claims 1-30 ("the challenged claims") of U.S. Patent No. 8,553,079 that issued on October 8, 2013, to Pryor ("the '079 patent," Ex. PAT-A), for which the U.S. Patent and Trademark Office ("Office") files identify Gesture Technology Partners, LLC ("GTP") as the assignee.  In accordance with 37 C.F.R. § 1.510(b)(6), Requester Samsung Electronics Co., Ltd. ("Requester") hereby certifies that the statutory estoppel provisions of 35 U.S.C. § 315(e)(1) and 35 U.S.C. § 325(e)(1) do not prohibit it from filing this *ex parte* reexamination request.

This request raises substantial new questions of patentability based on prior art that the Office did not have before it or did not fully consider during the prosecution of the '079 patent, and which discloses the features recited in the challenged claims.[1]  The Office should find the claims unpatentable over this art.

On February 4, 2021, Patent Owner ("PO") initiated a litigation campaign asserting, *inter alia*, infringement of the '079 patent against five defendants across two different venues in *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, Case No. 2:21-cv-00040 (EDTX), *Gesture Technology Partners, LLC v. Samsung Electronics Co., Ltd.*, Case No. 2:21-cv-00041 (EDTX) (consolidated with Case No. 2:21-cv-0040 for all pretrial issues), *Gesture Technology Partners, LLC v. Apple Inc.*, Case No. 6:21-cv-00121 (WDTX), *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, Case No. 6:21-cv-00122 (WDTX), and *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, Case No. 6:21-cv-00123 (WDTX).  The *LG* case was transferred to *Gesture Technology Partners, LLC v. LG Electronics Inc.*, Case No. 2-21-cv-19234 (DNJ).  Requester respectfully urges that this Request be granted and that reexamination be conducted with "special dispatch" pursuant to 35 U.S.C. § 305.

In accordance with 37 C.F.R. § 1.20(c)(1), the fee for *ex parte* reexamination (non-streamlined) is submitted herewith.  If this fee is missing or defective, please charge the fee as well as any additional fees that may be required to Deposit Account No. 50-2613.

---

[1] At the time of filing of this Request, there are two pending *inter partes* reviews (IPR2021-00922 and IPR2022-00090) challenging the claims of the '079 patent based on prior art not presented in this Request.

## II.    Identification of Claims and Citation of Prior Art Presented

Requester respectfully requests reexamination of claims 1-30 of the '079 patent in view of the following prior art references, which are also listed on the attached PTO Form SB/08 (Ex. PA-SB08).

| | |
|---|---|
| Exhibit PA-1 | U.S. Patent No. 5,982,853 to Liebermann ("*Liebermann*") |
| Exhibit PA-2 | U.S. Patent No. 6,385,331 to Harakawa *et al.* ("*Harakawa*") |
| Exhibit PA-3 | U.S. Patent No. 6,198,485 to Mack *et al.* ("*Mack*") |
| Exhibit PA-4 | Canadian Patent No. 2,175,288 to Bushnag ("*Bushnag*") |
| Exhibit PA-5 | U.S. Patent No. 6,587,700 to Meins *et al.* ("*Meins*") |
| Exhibit PA-6 | U.S. Patent No. 6,912,410 to Auten *et al.* ("*Auten*") |

A copy of each of the above-listed references is attached to this request pursuant to 37 C.F.R. § 1.510(b)(3).  A copy of the '079 patent is also attached to this request as Exhibit PAT-A pursuant to 37 C.F.R. § 1.510(b)(4).

## III.    Overview of the '079 Patent

### A.    Specification and Drawings of the '079 Patent

The '079 patent generally relates to "simple input devices" that use cameras to "determine gestures" performed in a "work volume" and illuminated by a light source.  (Ex. PAT-A, 1:54, 2:54-3:8.)  The devices are particularly "intended for use with 3-D graphically intensive activities" and operate "by optically sensing object or human positions and/or orientations."  (*Id.*, 1:55-57.)  This optical sensing is accomplished with "real time stereo photogrammetry using single or multiple TV cameras whose output is analyzed and used as input to a personal computer, typically to gather data concerning the 3D location of parts of, or objects held by, a person or persons."  (*Id.*, 1:57-62.)  In stereo photogrammetry, the devices use a processor to process "data obtained from

the cameras in order to look for the finger," which "can be done on both color basis and on the basis of shape as well as motion." (*Id.*, 4:65-5:3.) Alternatively, the optical sensing of gestures can be accomplished with an "electro-optical system capable of determining" the location of the relevant body parts in 3D space. (*Id.*, 12:38-42.)

The '079 patent "seeks to provide further detail on useful embodiments for computing," including a number of embodiments featuring "a keyboard for a laptop computer" and incorporating "digital TV cameras to look at points on, typically, the hand or the finger, or objects held in the hand of the user, which are used to input data to the computer." (*Id.*, 1:64-2:2, FIG. 1-3.) For example, FIG. 1 (reproduced below) "illustrates a laptop or other computer keyboard with cameras according to the invention located on the keyboard surface to observe objects such as fingers and hands overhead of the keyboard." (*Id.*, 2:15-18.) FIGS. 2 and 3 (reproduced below) further build on FIG. 1 by illustrating all features disclosed in FIG. 1 and introducing the use of additional finger detection features.



**FIG. 1**



**FIG. 2**



**FIG. 3**

(*Id.*, FIGS. 1-3.)

In the above embodiments, "a stereo pair of cameras 100 and 101 located on each side of the keyboard are used," with cameras "pointed obliquely inward at angles Φ toward the center of the desired work volume 170 above the keyboard." (*Id.*, 2:40-45.) Cameras 100 and 101 are "mounted at the rear of the keyboard (toward the display screen)," but may be placed in "[a]lternate camera locations . . . such as the positions of cameras 105 and 106, on upper corners of screen housing 107 looking down at the top of the fingers (or hands, or objects in hand or in front of the cameras), or of cameras 108 and 109 shown." (*Id.*, 2:40-53.) "Light from below, such as provided by single central light 122 can be used to illuminate the finger" that is "typically located . . . in work volume 170." (*Id.*, 3:1-6.) Using the cameras and the light source, as well as a "front end processor" that can be used "[t]o determine finger location," "[f]inger gestures comprising a sequence of finger movements" can be detected. (*Id.*, 3:43-51.) Additionally, "the pointing direction vector 160 of the user's finger" can also be detected using these features. (*Id.*, 2:55-56.)

"It is also desirable for fast reliable operation to use retroreflective materials and other materials to augment the contrast of objects used in the application." (*Id.*, 3:63-65.) FIG. 2 shows the use of "a line target such as 200 [which] can be worn on a finger 201," as well as a "retroreflective cylinder 208" which is also worn on the finger. (*Id.*, 3:65-66, 4:5-6.) "[A]ssuming each [stereo] camera is equipped with a sufficiently coaxial light source, typically one or more LEDs such as 210 and 211," such targets "effectively become[] a line image in the field of view of each camera," and "can be used to solve . . . for the pointing direction of the finger." (*Id.*, 4:4-14.) As shown in FIG. 3, "[i]t is also possible to have light sources on the finger" such as "the ring mounted LED light sources 301 and 302." (*Id.*, 4:16-22.) These light sources, which "can be used with either TV camera type sensors or with PSD type analog image position sensors as disclosed in references incorporated," can also aid in determination of "the pointing direction" by either being "modulated at different frequencies that can be individually discerned by sensors imaging the sources on to a respective PSD detector," or by being "turned on and off at different times such that the position of each point can be independently found allowing the pointing direction to be calculated from the LED point data gathered by the stereo pair of PSD based sensors." (*Id.*, 4:16-28.)

While the challenged claims broadly recite limitations relating to some of these high-level features, as demonstrated below, such features were already known and disclosed in the prior art before the alleged invention.

### B.    Claims of the '079 Patent

The '079 patent includes 30 claims, with claims 1, 11, and 21 as the only independent claims. (Ex. PAT-A, claims 1-30.)  Independent claim 1 recites a computer-implemented method providing a light source and a camera, where the light source is "adapted to direct illumination through a work volume above the light source" and the camera is "oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source." (*Id.*, claim 1.) Additionally, independent claim 1 recites "determining, using the camera, the gesture performed in the work volume and illuminated by the light source." (*Id.*)

Independent claims 11 and 21 are very similar to claim 1, although slightly narrower in scope. (*Id.*, claims 1, 11, 21.)  Claim 11 recites a computer apparatus, and like claim 1, it recites a light source and "a camera in fixed relation relative to the light source," with the camera "oriented to observe a gesture performed . . . in the work volume." (*Id.*, claims 1, 11.)  However, the light source is "adapted to illuminate a human body part within a work volume generally above the light source" and the camera is "oriented to observe a gesture performed by the human body part in the work volume." (*Id.*, claim 11.)  Claim 11 also recites "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output." (*Id.*)  Claim 21, like claim 1, recites a computer-implemented method where the light source is "adapted to direct illumination through the work volume" and a "light source in fixed relation relative to the camera." (*Id.*, claims 1, 21.)  However, the camera is "oriented to observe a gesture performed in a work volume above the camera" and the camera is used to "detect[] . . . a gesture performed by at least one of a user's fingers and a user's hand in the work volume. (*Id.*, claim 21.)

The dependent claims, which are similar for the three independent claims, further specify: a light source of light emitting diodes; detecting a gesture by analyzing sequential camera images; various types of detected gestures; determining a pointing direction; positioning a target on a user; determining various three-dimensional point positions; a keypad; a three-dimensional display; various fixed relationships between components; and a laptop computer comprised of the elements. (*Id.*, claims 1-30.)

### C.    The '079 Patent Prosecution History

The application leading to the '079 patent—U.S. Application No. 13/714,748—was filed on December 14, 2012 as a continuation of application No. 12/700,055, filed on February 4, 2010,

which is a continuation of application No. 10/866,191, filed on June 14, 2004, which is a continuation of application No. 09/433,297, filed on November 3, 1999 (now U.S. Patent No. 6,750,848), which claims benefit of U.S. Provisional Application No. 60/107,652, filed November 9, 1998.  (Ex. PAT-A, Cover.)

Before examination, original claims 1-20 were cancelled and claims 21-50 were added. (Ex. PAT-B, 133-138.)  The Examiner allowed all of the claims 21-50, now claims 1-30, because "[t]he closest prior arts of record issued to Naoi et al. (US 5459793 A), Platzker et al. (US 5528263 A), Sellers (US 5864334 A) and Fukushima et al. (US 6346929 B1) fail to teach or suggest" the limitations of the independent claims.  (*Id.*, 153.)  The dependent claims were "considered allowable on the same basis as the independent claims."  (*Id.*)

The references forming the substantial new questions of patentability—*Liebermann*, *Harakawa*, *Mack*, *Bushnag*, *Meins*, and *Auten*—were not cited or considered during prosecution of the '748 application. (Ex. PAT-A, Cover; Ex. PAT-B.) Likewise, these references are not cited and will not be considered in the pending IPRs.  *Apple Inc. v. Gesture Technology Partners LLC*, IPR2021-00922 (filed May 18, 2021); *LG Electronics, Inc. et al. v. Gesture Technology Partners LLC*, IPR2022-00090 (filed November 5, 2021).

### D.     The Effective Priority Date of Claims 1-30 of the '079 Patent

For purposes of this reexamination only, Requester assumes that claims 1-30 are entitled to the filing date of Provisional application No. 60/107,652, identified on the cover of the '079 patent, which is November 9, 1998, listed on the cover of the '079 patent.  (Ex. PAT-A, Cover.)

*Liebermann* issued on November 9, 1999, from Application No. 08/653,732 filed May 23, 1996; *Harakawa* issued on May 7, 2002, from Application No. 09/040,436 filed March 18, 1998; *Mack* issued on March 6, 2001, from Application No. 09/123,965 filed July 29, 1998; *Meins* issued on July 1, 2003, from Application No. 08/979,110 filed November 26, 1997; and *Auten* issued on June 28, 2005, from Application No. 09/138,920 filed August 24, 1998.  Thus, *Liebermann*, *Harakawa*, *Mack*, *Meins*, and *Auten* qualify as prior art at least under pre-AIA 35 U.S.C. § 102(e).

*Bushnag* is a publication of a patent application laid "Open to Public Insp[ection]" (i.e., publically accessible as a printed publication) by the Canadian Intellectual Property Office on October 30, 1997.  *See eBay v. MoneyCat*, CBM2014-00092, Paper 12 at 12 (P.T.A.B. Sep. 24, 2014) (crediting "Open to Public Insp." date as establishing Canadian laid-open patent application

as publicly accessible printed publication) (citing *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981)); *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981); *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374 (Fed. Cir. 2006) (determining a Canadian patent application was publically accessible and thus a printed publication); *see also* Ex. PA-4, 1 (listing an October 30, 1997 date); Ex. PA-7 (listing the open to public inspection date of the *Bushnag* reference as October 30, 1997).  Thus, *Bushnag* qualifies as prior art at least under pre-AIA 35 U.S.C. § 102(b).

## IV.    Claim Construction

In a reexamination proceeding involving claims of an expired patent, claim construction pursuant to the principle set forth by the court in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention) should be applied since the expired claim[s] are not subject to amendment.  MPEP § 2258 I.(G) (citing *Ex parte Papst-Motoren*, 1 USPQ2d 1655 (Bd. Pat. App. & Inter. 1986)).  The '079 patent, which lists November, 3, 1999, as the date of the earliest related continuation and does not list any term extensions or adjustments, has expired.  (*See* Ex. PAT-A, Cover.)  Therefore, the claim interpretations submitted or implied herein for the purpose of this reexamination adhere to the *Phillips* standard.  *See In re CSB-System Int'l, Inc.*, 832 F.3d 1335, 1340-42 (Fed. Cir. 2016).[2]

The district court in the related Eastern District of Texas cases recently construed/considered ten terms recited in the claims of the '079 patent under the *Phillips* standard. (Ex. CC-3.)  A summary of the district court constructions/interpretations and the constructions advanced by the parties in the litigation is listed in the below table.

---

[2] Requester reserves all rights to raise claim constructions and other arguments in other venues. For example, Requester has not necessarily raised all challenges to the '079 patent in this proceeding, including those under 35 U.S.C. § 112, given the limitations placed by the Rules governing this proceeding.  For example, Requester has alleged some terms are indefinite in district court proceedings.  But given how closely the prior art maps to the claims (as explained below), those issues do not need to be resolved to assess patentability in this proceeding.  In addition, a comparison of the claims to any accused products in litigation may raise controversies that need to be resolved through claim construction that are not presented here given the similarities between the references and the '079 patent.  Thus, the SNQs presented herein should not be interpreted to (and do not) conflict with Requester's indefiniteness positions in other proceedings regarding the '079 patent (and how the Court ruled on such positions) (Ex. CC-3.).

| '079 Patent Terms | E.D. Texas Construction | Construction Advanced by Defendant(s) | Construction Advanced by PO |
|---|---|---|---|
| "light source adapted to direct illumination through a work volume above the light source" of claims 1-3, 9-10 | plain meaning (Ex. CC-3, 61-63) | "a light source designed to transmit light directly through a work volume above the component" (Ex. CC-3, 61-63) | no construction necessary (Ex. CC-3, 61-63) |
| "light source adapted to illuminate a human body part within a work volume generally above the light source" of claims 11, 14-15 | plain meaning (Ex. CC-3, 61-63) | "a light source designed to transmit light directly onto a human body part within a work volume generally above the component" (Ex. CC-3, 61-63) | no construction necessary (Ex. CC-3, 61-63) |
| "light source in fixed relation relative to the camera and adapted to direct illumination through the work volume" of claims 21-23, 30 | plain meaning (Ex. CC-3, 61-63) | "a light source in fixed relation relative to the camera and designed to transmit light directly through the work volume" (Ex. CC-3, 61-63) | no construction necessary (Ex. CC-3, 61-63) |
| "gesture" of claims 1, 4-5, 11, 18-21, 24-25 | "movement of hands or other body parts that conveys meaning" (Ex. CC-3, 54-57) | "a sequence of positions that conveys a meaning" (Ex. CC-3, 54-57) | no construction necessary (Ex. CC-3, 54-57) |
| "work volume above the light source" of claims 1, 6-7 | "space that is above the light source and wherein gestures can be performed and detected" (Ex. CC-3, 68-71) | "volume of space above the light source visible to the camera within which gestures are performed" (Ex. CC-3, 68-71) | no construction necessary (Ex. CC-3, 68-71) |
| "work volume generally above the light source" of claims 11-12 | "space that is generally above the light source and wherein gestures can be performed and detected" (Ex. CC-3, 68-71) | "volume of space generally above the light source visible to the camera within which gestures are performed" (Ex. CC-3, 68-71) | no construction necessary (Ex. CC-3, 68-71) |
| "work volume above the camera" of claim 21 | "space that is above the camera and wherein gestures can | "volume of space above the camera visible to the camera | no construction necessary (Ex. CC-3, 68-71) |

| '079 Patent Terms | E.D. Texas Construction | Construction Advanced by Defendant(s) | Construction Advanced by PO |
|---|---|---|---|
| | be performed and detected" (Ex. CC-3, 68-71) | within which gestures are performed" (Ex. CC-3, 68-71) | |
| "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" of claim 11 | plain meaning (Ex. CC-3, 64-66) | terms invoke 35 U.S.C. § 112, ¶ 6: function = "determine the gesture performed in the work volume and illuminated by the light source based on the camera output"; structure = indefinite[3] (Ex. CC-3, 64-66) | no construction necessary and the terms do not invoke 35 U.S.C. § 112, ¶ 6 (Ex. CC-3, 64-66) |
| "three-dimensional position" of claims 8, 28 | plain meaning (Ex. CC-3, 66-67) | "a position defined with respect to three perpendicular axes (xyz)" (Ex. CC-3, 66-67) | no construction necessary (Ex. CC-3, 66-67) |
| "adapted to" of claims 1, 11, 21 | plain meaning (Ex. CC-3, 57-60) | light source: "designed to"; processor: "programmed to" (Ex. CC-3, 57-60) | no construction necessary (Ex. CC-3, 57-60) |

The prior art mappings found in Section V of this Request explain how the claims of the '079 patent are invalid under the constructions of the district court as well as the constructions advanced by both PO and Defendants. Indeed, the claims would be unpatentable under any reasonable construction of the terms given how closely the prior art maps to the claims. More generally, Section V demonstrates how the prior art meets the limitations of the challenged claims under their plain meaning (as adopted by the district court) unless otherwise noted. Specific

---

[3] While the district court declined to find this term indefinite, Requester does not concede the claim is definite by demonstrating how the prior art discloses/suggests this limitation below. Instead, as noted, Requester presents how a substantial new question of patentability is raised by the prior art where the term is interpreted under the district court's (and PO's) plain meaning interpretation of the claimed term, and also as construed below.

information regarding disputed terms in the Eastern District of Texas litigation concerning the '079 patent follows.

### A. "light source adapted to direct illumination through a work volume above the light source" of claims 1-3, 9-10

The Defendants have contended that the above limitation should be construed to mean "a light source designed to transmit light directly through a work volume above the component." (Ex. PAT-A, FIGS. 1-3, 2:49-58, 3:1-3. 4:4-24, 4:61-64; *see also id.*, claims 1-3, 9-10.)  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction.  (Ex. CC-1, 13-14; Ex. CC-2, 20.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning mapping warranted by the district court's construction order.  (Ex. CC-3, 61-63.)

### B. "light source adapted to illuminate a human body part within a work volume generally above the light source" of claims 11, 14-15

The Defendants have contended that the above limitation should be construed to mean "a light source designed to transmit light directly onto a human body part within a work volume generally above the component."  (Ex. PAT-A, FIGS. 1-3, 2:49-58, 3:1-3. 4:4-24, 4:61-64; *see also id.*, claims 11, 14-15.)  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction.  (Ex. CC-1, 13-14; Ex. CC-2, 20.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning mapping warranted by the district court's construction order.  (Ex. CC-3, 61-63.)

### C. "light source in fixed relation relative to the camera and adapted to direct illumination through the work volume" of claims 21-23, 30

The Defendants have contended that the above limitation should be construed to mean "a light source in fixed relation relative to the camera and designed to transmit light directly through

the work volume." (Ex. PAT-A, FIGS. 1-3, 2:49-58, 3:1-3. 4:4-24, 4:61-64; *see also id.*, claims 21-23, 30.) Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction. (Ex. CC-1, 13-14; Ex. CC-2, 20.) Requester likewise demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning mapping warranted by the district court's construction order. (Ex. CC-3, 61-63.)

### D.    "gesture" of claims 1, 4-5, 11, 18-21, 24-25

The Defendants have contended that the claimed "gesture" should be construed to mean "a sequence of positions that conveys a meaning." (Ex. PAT-A, 2:54-64, 3:48-51, 5:23-39, 5:63-65, 9:49-62; *see also id.*, claims 5, 18-20, 25.) Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction. (Ex. CC-1, 13; Ex. CC-2, 19.) The district court construed "gesture" to mean "movement of hands or other body parts that conveys meaning." (Ex. CC-3, 54-57.) Requester likewise demonstrates below in Section V how the prior art addresses this limitation under both PO's interpretation (i.e., plain meaning) and the district court's construction order.

### E.    "work volume above the light source" of claims 1, 6-7

The Defendants have contended that the above limitation should be construed to mean "volume of space above the light source visible to the camera within which gestures are performed." (Ex. PAT-A, FIGS. 1-2, 2:39-48, 3:4-20, 3:56-61, 4:29-40, 5:14-21.) Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction. (Ex. CC-1, 16; Ex. CC-2, 22-23.) The district court construed the above limitation to mean "space that is above the light source and wherein gestures can be performed and detected." (Ex. CC-3, 68-71.) Requester likewise demonstrates below in Section V how the prior art addresses this limitation under both PO's interpretation (i.e., plain meaning) and the district court's construction order.

### F.     "work volume generally above the light source" of claims 11-12

The Defendants have contended that the above limitation should be construed to mean "volume of space generally above the light source visible to the camera within which gestures are performed."  (Ex. PAT-A, FIGS. 1-2, 2:39-48, 3:4-20, 3:56-61, 4:29-40, 5:14-21.)  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction.  (Ex. CC-1, 16; Ex. CC-2, 22-23.)  The district court construed the above limitation to mean "space that is generally above the light source and wherein gestures can be performed and detected."  (Ex. CC-3, 68-71.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under both PO's interpretation (i.e., plain meaning) and the district court's construction order.

### G.     "work volume above the camera" of claim 21

The Defendants have contended that the above limitation should be construed to mean "volume of space above the camera visible to the camera within which gestures are performed."  (Ex. PAT-A, FIGS. 1-2, 2:39-48, 3:4-20, 3:56-61, 4:29-40, 5:14-21.)  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction.  (Ex. CC-1, 16; Ex. CC-2, 22-23.)  The district court construed the above limitation to mean "space that is above the camera and wherein gestures can be performed and detected."  (Ex. CC-3, 68-71.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under both PO's interpretation (i.e., plain meaning) and the district court's construction order.

### H.     "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" of claim 11

PO argued in district court that this "processor" does not require construction and does not invoke § 112, ¶ 6.  (Ex. CC-1, 20; Ex. CC-2, 26-28, 69.)  Requester demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning mapping warranted by the district court's construction order.  (Ex. CC-3, 64-66.)

To the extent this limitation is found to be subject to 35 U.S.C. § 112, ¶ 6, Requester proposes the following construction (under the assumption the Office determines appropriate structure is provided in the '079 patent, which Requester does not concede).

Construing a means-plus-function claim term requires that the function recited in the claim term be first identified; then, the written description of the specification must be consulted to identify the corresponding structure that performs the identified function and equivalents thereof. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015); *see also Gracenote, Inc. v. Iceberg Indus., LLC*, IPR2013-00551, Paper No. 6 at 15 (Feb. 28, 2014).

The identified function is to "determine the gesture performed in the work volume and illuminated by the light source based on the camera output." (Ex. PAT-A, 2:58-61, 3:48-51, claim 11.) The dependent claims from claim 11 further add to the function, including determining a pointing gesture (claim 19). (*Id.*, claims 18-20.)

A structure disclosed in the specification qualifies as corresponding structure only if it is clearly linked by the patent's specification (or possibly the prosecution history) to performing the claimed function. *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). Where a means-plus-function term is directed to software, the specification must "disclose an algorithm for performing the claimed function." *Williamson*, 792 F.3d at 1352. For purposes of this proceeding only, Requester interprets the corresponding structure of the above-identified function as software running on a processor configured to performed the identified function or equivalents thereof given the lack of relevant disclosure in the '079 patent specification. (*See also supra* footnote 2.) Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

## I.      "three-dimensional position" of claims 8, 28

The Defendants have contended that the claimed "three-dimensional position" should be construed to mean "a position defined with respect to three perpendicular axes (xyz)." (Ex. PAT-A, 8:63-67, claims 8, 28.) Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction. (Ex. CC-1, 15-16; Ex. CC-2, 22.) Requester likewise demonstrates below in Section V how the prior art addresses

this limitation under PO's interpretation, which also reflects the plain meaning mapping warranted by the district court's construction order.  (Ex. CC-3, 66-67.)

### J.    "adapted to" of claims 1, 11, 21

The Defendants have contended that the claimed light source that is "adapted to" operate as claimed should be construed to mean a light source that is "designed to" operate as claimed; and the claimed processor that is "adapted to" operate as claimed should be construed to mean a processor that is "programmed to" operate as claimed.  (Ex. PAT-A, FIGS. 1-3, 2:49-61, 3:1-3, 3:48-51, 4:4-24, 4:61-64; *see also id.*, claims 1-3, 9-12, 14-15, 18-23, 30.)  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the above limitation does not require construction.  (Ex. CC-1, 15; Ex. CC-2, 19-20.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning mapping warranted by the district court's construction order.  (Ex. CC-3, 57-60.)

## V.    Statement of Substantial New Questions of Patentability

As mentioned above, *Liebermann*, *Harakawa*, *Mack*, *Bushnag*, *Meins*, and *Auten* were never made of record or considered by the Office during original prosecution.  But the references (in various combinations for respective claims, as discussed below) disclose or suggest all of the features of claims 1-30.

**SNQ1**: *Liebermann* raises a substantial new question of patentability (SNQ1) with respect to claims 1, 4-9, 11-12, 17-21, 24-28, and 30 of the '079 patent.

**SNQ2**: *Liebermann* in view of *Harakawa* raises a substantial new question of patentability (SNQ2) with respect to claims 6 and 26 of the '079 patent.

**SNQ3**: *Liebermann* in view of *Mack* raises a substantial new question of patentability (SNQ3) with respect to claims 7, 16, 17, 27, and 29 of the '079 patent.

**SNQ4**: *Liebermann* in view of *Bushnag* raises a substantial new question of patentability (SNQ4) with respect to claim 10 of the '079 patent.

**SNQ5**: *Liebermann* in view of *Meins* raises a substantial new question of patentability (SNQ5) with respect to claim 13 of the '079 patent.

**SNQ6**: *Liebermann* in view of *Auten* raises a substantial new question of patentability (SNQ6) with respect to claims 2, 3, 14, 15, 22, and 23 of the '079 patent.

Thus, for these reasons and the reasons discussed below and in the accompanying declaration of Dr. Gregory D. Abowd (Ex. PA-DEC), the above grounds raise substantial new questions of patentability with respect to the '079 patent. (*See also* Ex. PA-DEC, ¶¶ 1-36.) Proposed rejection 1, discussed below in Section VI.B.1, corresponds to SNQ1; proposed rejection 2, discussed below in Section VI.B.2, corresponds to SNQ2; proposed rejection 3, discussed below in Section VI.B.3, corresponds to SNQ3; proposed rejection 4, discussed below in Section VI.B.4, corresponds to SNQ4; proposed rejection 5, discussed below in Section VI.B.5, corresponds to SNQ5; and proposed rejection 6, discussed below in Section VI.B.6, corresponds to SNQ6.

## A. SNQ1: *Liebermann*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* discloses or suggests the limitations of claims 1, 4-9, 11-12, 17-21, 24-28, and 30 of the '079 patent. (Ex. PA-DEC, ¶¶ 51-54, 71-153.)

### 1. Overview of *Liebermann*

*Liebermann* discloses "a novel electronic communication system" and "a unique method utilizing such an electronic communication system to enable communication by and to deaf persons." (Ex. PA-1, 3:11-24.) FIG. 6 discloses a cellular telephone that serves as a "portable transmitter/receiver generally designated by the numeral 8 for use by a deaf person," which "contains a video camera, the lens 10 of which is disposed in the upright portion 12. In the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions." (*Id.*, FIG. 6, 4:21-22, 5:62-67.) The cellular phone also has an antenna 18 to allow wireless communication "through a cellular telephone network." (*Id.*, 5:67-6:2.) The visual display of the cellular phone may "present multiple [types of] information to the deaf person such as touchless function buttons, system status indicators, alarms, a printed translation, and a playback of the image being recorded, as well as the signing images and text of the hearing person's responses." (*Id.*, 6:31-36.) FIG. 6 of *Liebermann* is reproduced below.



CELLULAR
TELEPHONE
VERSION

*FIG. 6*

(*Id.*, FIG. 6.)

      In order to communicate through the device, "[t]he device is supported in a stable position and the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions." (*Id.*, 6:2-6.) "The signing motions captured by the camera are converted into digital data for processing by the translation software." (*Id.*, 6:6-8.) "In the initial processing, each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers." (*Id.*, 6:47-49.) The resulting information is then sent via a phone line to a central data processing, where "[t]he rest of the processing is completed." (*Id.*, 6:50-53.) "This includes identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content." (*Id.*, 6:53-57.) The text is then converted to synthesized speech and sent to the hearing person on the other end of the phone line. (*Id.*, 6:53-63.) A hearing person's responsive speech is sent to the central processing center,

where it is "transformed into the equivalent signing content and then into textual material." (*Id.*, 7:10-12.) The resulting data is then sent back to the signing user's device, where "[s]oftware in the device converts the text into reduced identifying pointers for each gesture, which are then converted into animated images which portray in sign language the content of the speech processed in the center." (*Id.*, 7:12-17.) "The result is an animated content on the LCD of the [signing person's device] which portrays in sign language the spoken content of the normally hearing person." (*Id.*, 7:41-43.)

*Liebermann* additionally discloses detailed algorithms for translating sign language to spoken content, and converting speech back to sign language. (*Id.*, 7:44-9:27 (disclosing an algorithm for figure tracking for use in the sign language to speech translation), 9:28-10:53 (disclosing an algorithm for increasing accuracy of speech recognition and conversion to digital data).) *Liebermann* provides helpful schematics as well that illustrate the methods for "converting signing into speech" (FIG. 9) and converting "text to signing animation" (FIG. 11), as well as more specific illustrations of "translation of American Sign Language to English text" (FIG. 16) and "translation of English text to American Sign Language (ASL)" (FIG. 15). (*Id.*, FIGS. 9, 11, 15, 16.) FIG. 9, which illustrates conversion of signing to speech and thus handles most of the gesture recognition in *Liebermann*, is reproduced below.



*FIG. 9*

(*Id.*, FIG. 9.)

Because *Liebermann* relates to personal computing devices that perform optical sensing of human inputs, *Liebermann* is in the same or similar technical field as the '079 patent, and a POSITA would have had reason to consider the teachings of *Liebermann*. (*Supra* Section III.A; Ex. PA-DEC, ¶¶51-54.) To the extent *Liebermann* is not within the field of endeavor of the '079 patent, *Liebermann* is reasonably pertinent to problems associated with optically sensing and detecting human inputs/gestures using personal computing devices, problems with which the inventor was involved. (*Supra* Section III.A; Ex. PA-DEC, ¶¶51-54.)

2.    **Claim 1**

As explained below, *Liebermann* discloses or suggests the limitations recited in claim 1. (Ex. PA-DEC, ¶¶ 72-96.)

a.    **[1.a] A computer implemented method comprising:**

*Liebermann* discloses or suggests this preamble to the extent limiting. (Ex. PA-DEC, ¶¶ 72-89.) *Liebermann* discloses a "portable transmitter/receiver," as shown in FIG. 6, that is in the "form of a cellular telephone," which a person of ordinary skill in the art (POSITA) would have understood contains a computer within the cellular phone frame. (Ex. PA-1, 4:21-22, 5:62-63; Ex. PA-DEC, ¶ 73.) In particular, *Liebermann* discloses that the cellular telephone includes hardware that works with the camera to view and obtain images of hand gestures, performs related "initial processing," and populates a phone display, among other things. (Ex. PA-1, 5:62-6:10, 6:40-52, FIG. 8; Ex. PA-DEC, ¶ 73.) Thus, a POSITA would have understood that the cellular telephone necessarily includes a computer or similar component for performing various disclosed computer implemented functions, including, but not limited to, controlling cameras, driving a display, transmitting information, receiving information, processing data, etc. (Ex. PA-1, 5:62-6:47, FIGS. 1, 8.) *See* MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of ordinary skill in the art to describe a variety of devices with varying degrees of complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994). The *Liebermann* cellular phone also has a video camera, an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network." (Ex. PA-1, 5:62-6:2; Ex. PA-DEC, ¶ 74.) Through this wireless connection, the cellular phone works in conjunction with "a dedicated central computer facility" to "provide a novel electronic communication system for use by deaf persons to enable them to communicate by signing" as well as "a unique method utilizing such an electronic communication system to enable communication by and to deaf persons." (Ex. PA-1, 3:11-13, 3:22-24, 5:62-6:14; Ex. PA-DEC, ¶ 74.)

*Liebermann* describes how these computers work together to effect communication via a computer-implemented method. (Ex. PA-DEC, ¶ 75.) The deaf user "uses sign language in front of the transmitter/receiver device containing the camera" (i.e., the cellular phone) and the camera

"record[s] the signing movement of the hands and fingers and body and facial motions and expressions" of the user. (Ex. PA-1, 6:2-6, 6:42-43.)  "The camera in the cellular phone transmits the image for initial processing in the cellular phone." (*Id.*, 7:19-21.)  The cellular phone's internal computer performs the initial processing, during which "each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers." (*Id.*, 6:47-49.)  The cellular phone—which "maintains two cellular connections on line, one to the [central processing] center (voice/data) and one to the [hearing] caller"—then sends the "reduced data . . . to the center for processing." (*Id.*, 7:21-26.)  "The rest of the processing is completed at the center," including "identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content.  The text then undergoes a text to synthesized speech transformation and the speech is sent as an analog content to the normally hearing person." (*Id.*, 6:53-59.)  These same computers in the hearing user's device, the central processing center, and the deaf user's cellular phone work together to enable communication in the reverse direction as well. (*Id.*, 5:14-19; Ex. PA-DEC, ¶ 76.)  The hearing person's speech is sent to the processing center for conversion to text (or reduced identifiers, depending on the transmission line and relative computer capabilities), and the text (or set of reduced identifiers) is sent to the deaf user's cellular phone for conversion into signing animation, which appears on the phone display. (Ex. PA-1, 5:14-19.)  Thus, a POSITA would have understood that the deaf user's FIG. 6 cellular phone (and its internal computer) and the central computer processing facility together perform "[a] computer implemented method" for sign detection to allow deaf users to communicate with hearing users through an electronic communication system. (Ex. PA-DEC, ¶ 77.)

To the extent the claimed "computer implemented method" is read to require a method implemented by a single computer and that *Liebermann* is read to not disclose a "computer" implemented method performed by the cellular phone, a POSITA would have found it obvious to configure *Liebermann*'s cellular phone to include a computer that performs the operations and processing steps disclosed by *Liebermann*, including the initial processing and the gesture recognition processing described herein, locally within a cellular telephone computer in order to provide an integrated phone and to conserve bandwidth. (*Id.*, ¶ 78.)  *See In re Yufa*, 452 F. App'x. 998, 1001 (Fed. Cir. 2012) (citing *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)) (affirming obviousness because the prior art disclosed "every element of the claims except" the

location for "the processing of" data, which was "nothing more than a reconfiguration of a known system"). Indeed, *Liebermann* contemplates adjustments to where processing may occur based on the processing power of the user's device and the bandwidth of the transmission line. (Ex. PA-1, 5:25-30 (disclosing modifications to portions of the speech-to-sign processing based on the strength of "the transmission line and computer capability of the deaf person's location"); Ex. PA-DEC, ¶ 79.) *Liebermann* also discloses that the choice to perform the initial processing (conversion of signs to an intermediate set of fixed identifiers) in the cellular phone and the remaining processing (conversion of identifiers to text, and text to speech) in the central processing facility is a design choice driven by economics. (Ex. PA-1, 6:10-12.) Furthermore, *Liebermann* discloses that the disclosed device can function as "an **on-site** translator" rather than just a telephone for the deaf. (*Id.*, 13:37-39.) Thus, a POSITA would have been motivated to implement such a modification based on the guidance and suggestions in *Liebermann*, and based on the state of the art knowledge that designs for such computer-based systems were known to be adjusted to have distributed or locally performed operations depending on the application, capabilities, and design of the device(s), etc. (Ex. PA-DEC, ¶ 80.) A POSITA would have therefore had reasons to consider and configure the *Liebermann* method such that the disclosed processing takes place in the cellular phone. (*Id.*)

A POSITA would have considered the tradeoffs in designs when contemplating such a modification, including the types of hardware, software programming/coding, and the like to ensure the resulting modified cellular phone was efficiently designed and operated in accordance with *Liebermann*'s functionalities and features as disclosed. (Ex. PA-DEC, ¶ 81.) Such tradeoffs (e.g., additional components and/or costs in design, power considerations, etc.), even if present, would not have deterred such a modification from being implemented, especially considering the benefits that would have been obtained by the implementation (e.g., versatility in obtaining local processing versus distributed operations, etc.) and the skills of a POSITA to design such a modified device for efficient operation. *See, e.g.*, *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983) (finding additional expense associated with a particular combination would not discourage one of ordinary skill in the art from seeking the benefit expected therefrom). Indeed, a POSITA would have been motivated to make such a modification because an integrated cellular phone device that performs processing of signs to text and speech locally, on the cellular phone's computer, would have desirably conserved bandwidth, and beneficially enabled the cellular phone device to perform

its functions independently, where, for example, communication with the central processing facility is interrupted or otherwise unavailable. (Ex. PA-DEC, ¶ 82.) A POSITA would have also been motivated to make the proposed modification as it would have provided additional features and applications to the cellular phone device. (*Id.*) Furthermore, as a POSITA would have understood, the proposed modification would have reduced network communication demands because the modified cellular telephone would communicate with the hearing user's device directly instead of through an intermediate network computer. (*Id.*) Such a modification would have improved device performance because it would not require communication with a remote processing center, which requires additional telecommunication bandwidth. (*Id.*) Thus, a POSITA would have understood from *Liebermann*'s disclosures that the cellular phone device could be advantageously modified so that the "identification of the letters, numbers and words" is fully performed by the cellular phone's computer (that is, the entire gesture recognition method would be performed by the cellular phone's computer, rather than splitting the computer implemented method across the local and network computers). (Ex. PA-1, 6:42-52; Ex. PA-DEC, ¶ 83.)

A POSITA would have had a reasonable expectation of success in implementing this modification because it would have involved modifying the *Liebermann* communication system in a manner that *Liebermann* suggests is feasible—adapting which portions of the processing occur in the cellular phone. (Ex. PA-DEC, ¶ 84.) A POSITA would have also had the skill to implement, and expectation of success in achieving such a modification, because it would have involved applying known technologies (e.g., known gesture detection technology (*Liebermann*)) according to known methods (e.g., adapting the processing so that some of the processing responsibilities of a processing center are instead given to the local device (*Liebermann*)) to yield the predictable result of a cellular phone that performs the entire computer implemented method of *Liebermann*. (*Id.*) *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

### b.    [1.b] providing a light source adapted to direct illumination through a work volume above the light source;

*Liebermann* discloses or suggests this limitation. (Ex. PA-DEC, ¶¶ 85-89.) While *Liebermann* does not expressly disclose that the cellular phone provides a light source adapted to direct illumination through a work volume above the light source, a POSITA would have found it

obvious to implement such a feature in view of *Liebermann*'s disclosures and the knowledge of the state of the art. (*Id.*, ¶ 86.)

A POSITA would have understood from *Liebermann*'s disclosures that adequate lighting of the deaf user's gestures is critical. (*Id.*, ¶ 87.) In a public telephone kiosk embodiment—which operates in substantially the same way as the cellular phone—the kiosk features "lamps 48 to ensure adequate lighting of the user's hands, face and body." (Ex. PA-1, 5:57-59, FIG. 5C (reproduced below).)



FIG. 5C

(*Id.*, FIG. 5C (annotated to show lamps 48 on sides of display 46).) A POSITA would have understood that in this kiosk, the lamps are collectively a light source and are adapted to, or *designed for* (*see* Section IV.J), direct illumination through the work volume of the kiosk. (Ex. PA-DEC, ¶ 87.) *Liebermann* discloses that the lamps of the public telephone kiosk are used "to ensure adequate lighting of the user's hands, face and body"— the parts of the deaf user's body that are used to sign. (Ex. PA-1, 5:57-59.) Accordingly, a POSITA would have recognized that these lamps are designed to directly illuminate, or transmit light directly onto (*see* Section IV.A), *the deaf user's gestures* in the work volume. (*Id.*, ¶ 87.) As discussed in Sections IV.E-G, under Requester's proposed construction, the "work volume" of the '079 patent is the "volume of space . . . visible to the camera within which gestures are performed," or under the district court's construction order, the "space . . . wherein gestures can be performed and detected." (Sections IV.E-G.) Under either construction, the user's hands, face, and body that perform gestures are

*within* the work volume. (Ex. PA-DEC, ¶ 87.) Thus, a POSITA would have understood that because the kiosk lights are adapted to (or designed for) direct illumination of the user's hands, face, and body, which are *within* the work volume, the lamps directly illuminate (or transmit light directly) *through* the work volume. (*Id.*)

A POSITA would have been motivated to install a similar light source in the cellular phone device adapted to direct illumination of the work volume. (*Id.*, ¶ 88.) A POSITA would have recognized that the cellular phone detects gestures in much the same way as the kiosk and has similar lighting needs in order to adequately illuminate the gestures. (*Id.*) Furthermore, a POSITA would have understood that a cellular phone would desirably be functional in low ambient light settings, and that the cellular phone does not disclose a light source in the cellular phone that would allow for full functionality in low ambient light situations. (*Id.*) Thus, a POSITA would have understood the benefits of modifying the *Liebermann* cellular phone in order to incorporate a light source for directly illuminating the user's gestures performed within the work volume. (*Id.*) A POSITA would have also understood that in order to directly illuminate the work volume of a cellular phone in a similar way as described above for the work volume of a kiosk, the light source modification would comprise a series of lights on each side of the display. (*Id.*; *see also* Ex. PA-1, FIG. 5C (reproduced above and showing a series of lights on each side of the display), FIG. 6 (reproduced below).)



*FIG. 6*

(Ex. PA-1, FIG. 6 (annotated to show the location of the series of lights comprising the "light source" in the proposed modification).)  A POSITA would have understood that based on the upward angle of the camera in the cellular phone device that the work volume (the volume of space visible to the camera within which gestures are performed, or alternatively the space wherein gestures can be performed and detected) would be *above* the light source in the base portion of the phone. (Ex. PA-DEC, ¶ 88; Sections IV.E-G.)  Thus, the proposed light source modification would be "adapted to direct illumination through a work volume above the light source." (Ex. PA-DEC, ¶ 88.)

A POSITA would have also had a reasonable expectation of success in implementing this modification because, as noted above, the modification would have merely involved incorporating known lighting components in the *Liebermann* cellular phone, similar to as taught in *Liebermann*'s public kiosk embodiment, which a POSITA would have understood uses similar hardware and processor components to implement the same gesture detection and communication method.  (*Id.*, ¶ 89.)  Indeed, integrating a light into a cellular phone was well known at the time of the invention. (*Id.*; Ex. PA-12, Abstract (disclosing a "portable telephone with flashlight"), 1:10-65 (describing how "[n]umerous innovations for illuminated telephones have been provided in the prior art," where each described illuminated telephone incorporates a light into the portable phone).)  Moreover, a POSITA would have had the skill to implement, and expectation of success in achieving such a modification because it would have involved applying known technologies (e.g., known gesture detection technology (*Liebermann* cellular phone)) and materials (e.g., known light sources (*Liebermann* public telephone kiosk)) according to known methods (e.g., known light-aided gesture detection techniques) to yield the predictable result of a performing operations of providing a light source via a cellular phone implemented with a separate light source to directly illuminate through a work volume above the light source.  (Ex. PA-DEC, ¶ 89.)  *See KSR*, 550 U.S. at 416.

Accordingly, *Liebermann* discloses or suggests this limitation under the Requester's proposed constructions, the interpretations proposed by PO, and those found by the district court, such as those regarding "light source adapted to direct illumination through a work volume above the light source," "work volume above the light source," "adapted to," or the plain meaning of such terms.  (*See* Sections IV.A, IV.E, IV.J.)

c.  **[1.c] providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and**

*Liebermann* discloses or suggests this limitation.  (Ex. PA-DEC, ¶¶ 90-92.)  *Liebermann* discloses that the cellular phone of FIG. 6 "contains a video camera, the lens 10 of which is disposed in the upright portion 12" and that "[i]n the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions."  (Ex. PA-1, 5:62-67.)  As described in Section V.A.2.b and pictured in the image below, a POSITA would have found it obvious in view of *Liebermann*'s disclosures to implement a light source as a series of lights on each side of the display in the base portion of the phone.  (Section V.A.2.b.)  *Liebermann* discloses in FIG. 6 that the cellular phone embodiment is a single unit, so that the upright portion 12 and the base portion 13 are in fixed relationship to one another.  (Ex. PA-1, FIG. 6.)  A POSITA would have understood that in this fixed construction, the camera lens 10 is fixed relative to the light source pictured on each side of display 14.  (Ex. PA-DEC, ¶ 91.)  Thus, *Liebermann* discloses "providing a camera . . . the camera being fixed relative to the light source."



(Ex. PA-1, FIG. 6 (annotated to show the camera 10 and light source (alongside display 14) fixed relative to each other).)

Furthermore, *Liebermann* discloses that this camera is "oriented to observe a gesture performed in the work volume."  *Liebermann* discloses that in all devices that implement the

claimed communication method, "[t]he deaf person uses sign language in front of the transmitter/receiver device containing the camera." (*Id.*, 6:42-44.)  In the cellular phone of FIG. 6, "the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions." (*Id.*, 6:2-6.)  *Liebermann* refers to such signing movements as gestures on numerous occasions.  (*Id.*, 7:15, 12:25, 12:35, 12:67, 13:1, claim 21, FIG. 1, FIGS. 9-11.)  A POSITA would have understood that forming a sequence of signs and signing movements as part of a sign language involves performing "a sequence of positions that conveys a meaning" (i.e., a gesture under Requester's proposed construction) as well as "movement of hands or other body parts that conveys meaning." (Ex. PA-DEC, ¶ 92; Section IV.D.)  As discussed in Sections IV.E-G, the "work volume" of the '079 patent is the volume of space visible to the camera within which gestures are performed, or alternatively, the space wherein gestures can be performed and detected.  (Sections IV.E-G.)  For the cellular phone embodiment, a POSITA would have understood that the work volume area where gestures are performed is the area both above and in front of the camera lens 10 in which a user makes hand, face, and body gestures.  (Ex. PA-DEC, ¶ 92.)  *Liebermann* discloses that the communication method allows "[t]he deaf person [to] use[] sign language ***in front of*** the transmitter/receiver device containing the camera." (Ex. PA-1, 6:42-44.)  *Liebermann* further discloses that the cellular phone of FIG. 6 is "supported in a stable position," which a POSITA would have understood to mean that the device is placed on a flat surface, such as a table in the ordinary situation where two-handed signing motions are conveyed, or occasionally in the palm of a stable hand when the other hand is signing into the device.  (Ex. PA-1, 6:2-6, FIG. 6; Ex. PA-DEC, ¶ 92.)  When the device is shown in this stable position, as displayed in FIG. 6, the upright portion 12 is sloped at an angle upwards, so that the camera lens 10 captures the area both in front of the camera and above the camera. (Ex. PA-1, FIG. 6.)  Thus, *Liebermann* discloses "providing a camera oriented to observe a gesture performed in the work volume," where the gestures are signed movements and the work volume is the space simultaneously *above* and *in front of* the camera.

Accordingly, *Liebermann* discloses or suggests this limitation under the Requester's proposed construction, the interpretations proposed by PO, and those found by the district court, such as those regarding "gesture" and "work volume above the light source," or the plain meaning of such terms.  (*See* Sections IV.D-E.)

### d.    [1.d] determining, using the camera, the gesture performed in the work volume and illuminated by the light source.

*Liebermann* discloses or suggests this limitation.  (Ex. PA-DEC, ¶¶ 93-96.)  As discussed in Section V.A.2.c, the signing gestures are performed in the "work volume" as construed in Section IV.E-G.  (Section V.A.2.c.)  As discussed in Section V.A.2.b, a POSITA would have found it obvious to include a light source comprising lights on each side of the display to provide illumination of the gestures.  (Section V.A.2.b.)  Thus, *Liebermann* discloses or suggests determining "the gesture performed in the work volume and illuminated by the light source." (Ex. PA-DEC, ¶ 94.)

*Liebermann* also discloses determining the gesture "using the camera" because the electronic communication method uses the camera's recorded gesture output as the input for the translation process which determines the meaning of gestures.  (*Id.*, ¶ 95.)  When using the *Liebermann*'s cellular phone, shown in FIG. 6, "[t]he device is supported in a stable position and the deaf person is positioned so that the ***camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions***.  The ***signing motions captured by the camera are converted into digital data for processing by the translation software***, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences." (Ex. PA-1, 6:2-10.)  This translation process involves initial processing, where "each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers," as well as additional processing at the central processing center, where the identifiers are interpreted as "letters, numbers and words" and converted to "standard sign language" and then to "spoken language which results in the equivalent text of the signed content." (*Id.*, 6:42-63.)  Thus, a POSITA would have understood that the entire translation process to determine the meaning of signed gestures relies on the camera recording signed movements where frames with captured sign images can be isolated and analyzed.  (Ex. PA-DEC, ¶ 96.)

### 3.    Claim 4

#### a.    The method according to claim 1 wherein detecting a gesture includes analyzing sequential images of the camera.

*Liebermann* discloses or suggests the limitations recited in claim 4. (Ex. PA-DEC, ¶¶ 97-101.) As discussed in Section V.A.2.d, *Liebermann* discloses detecting or determining a gesture using the camera of the cellular phone in FIG. 6.[4] (Section V.A.2.d.) *Liebermann* discloses that as part of the translation process, "[t]he **images captured by the camera at 20-30 frames/second** are processed by a digital device which does initial and extended image processing." (Ex. PA-1, 4:61-64.) These "images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions"—that is, the motions that a POSITA would have understood to be gestures. (*Id.*, 6:43-47; Ex. PA-DEC, ¶ 98.) Then "**each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers**" as part of an initial processing step, and the remaining translation processing of these identifiers takes place after the data is sent to the central processing center. (Ex. PA-1, 6:42-63.) Thus, a POSITA would have understood that for the *Liebermann* method, "detecting a gesture includes analyzing sequential images of the camera" because the internal cellular phone processing takes in sequential camera images (at 20-30 frames/second) and analyzes them to form a reduced set of identifiers. (Ex. PA-DEC, ¶ 98.)

To the extent this limitation is read to require that detection of a *single* gesture includes analyzing sequential images of the camera, *Liebermann* also discloses or suggests this limitation. (*Id.*, ¶ 99.) A POSITA would have understood from *Liebermann*'s disclosures that ASL signs often incorporate motion, so that multiple sequential images captured by the camera must be analyzed together in order to interpret a single sign. (Ex. PA-1, 12:3-6 (disclosing an "**ASL to English translation algorithm**" as shown in FIG. 16 to translate a deaf user's signs to a hearing user), 10:59-67 (disclosing that when signing in ASL, "[a]t any particular instant, one has to combine information about the handshape (Stokoe's dez), **the motion (Stokoe's sig)** and the spatial location of the hands relative to the rest of the body (Stokoe's tab)."), 10:54-56 (disclosing that implementing the *Liebermann* ASL to English translation method would require "linguistic analysis beyond what was recognized by William Stokoe in [Semiotics] and Human Sign Language, Mouton (197[2])" (*see* Ex. PA-8) ); Ex. PA-8, 23 (providing an example of the "sig"

---

[4] There is no antecedent basis in claim 1 of the '079 patent for "detecting" a gesture in claim 4. However, claim 1 discloses "determining" a gesture. For purposes of this *ex parte* reexamination request, Requester assumes that "detecting" and "determining" have the same meaning and are used interchangeably in the context of the '079 patent.

(motion component) of a sign, noting that "the sig of the sign for [letter] *z* is a movement which traces a *z* with the fingertip"), 37 (providing a table of "sig" symbols, including for example "upward movement" and "downward movement").)  Thus, a POSITA would have understood that *Liebermann* discloses "detecting a gesture includes analyzing sequential images of the camera" because sequential captured images (as described above) may need to be analyzed in conjunction with one another in order to fully understand the meaning and context of signed gestures (i.e., the "sig" of the sign).  (Ex. PA-DEC, ¶ 100.)

At a minimum, in view of the disclosures of *Liebermann* and the knowledge of a POSITA (e.g., as reflected in the publications discussed above), it would have been obvious to a POSITA to analyze sequential captured images in conjunction with one another in order to fully understand the meaning and context of signed gestures.  (Ex. PA-DEC, ¶ 101.)  As discussed above, taking sequential captured images into account was a well-known, and indeed necessary, aspect of interpreting ASL signs.  (*Id.*)  As such, in order to implement *Liebermann*'s disclosure as to the interpretation of ASL signs, discussed above, a POSITA would have recognized that it would have been desirable, and indeed necessary, to analyze sequential captured images in conjunction with one another in order to fully understand the meaning and context of signed gestures, for substantially the same reasons discussed above.  (*Id.*)  As such, a POSITA would have been motivated to take such sequential images into account.  (*Id.*)  A POSITA would have had a reasonable expectation of success in implementing this modification because, as discussed above, this was a routine way of interpreting ASL signs, and a POSITA would have appreciated that the computer architecture of *Liebermann* would have allowed multiple images to be analyzed.  (*See supra* Section V.A.2.a (discussing the computer architecture of *Liebermann*).)  A POSITA would have had the skill to implement, and expectation of success in achieving such a modification because it would have involved applying known technologies (e.g., known gesture detection technology (*Liebermann* cellular phone)) and elements (e.g., known ASL signs requiring a sequence of movements) according to known methods (e.g., known gesture and finger spelling detection techniques (*Liebermann*)) to yield the predictable result of a cellular phone analyzing sequential captured images in conjunction with one another in order to fully understand the meaning and context of signed gestures.  (Ex. PA-DEC, ¶ 101.)  *See KSR*, 550 U.S. at 416.

4.    **Claim 5**

> **a.** **The method according to claim 1 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.**

*Liebermann* discloses or suggests the limitations recited in claim 5. (Ex. PA-DEC, ¶¶ 102-108.) *Liebermann* not only discloses detecting "***at least one*** of a pinch gesture, a pointing gesture, and a grip gesture," but discloses detection of all three types of gestures. In particular, *Liebermann* discloses that "another significant aspect of the invention is the ***requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized*** once artificial intelligence procedures are invoked." (Ex. PA-1, 12:30-33.) *Liebermann* further discloses the "identification of the ***letters***, numbers and words" that have been signed, and discloses in FIG. 11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Thus, a POSITA would have understood that the invention in *Liebermann* must be capable of detecting the full range of a signed alphabet in order to achieve the required finger spelling detection. (Ex. PA-DEC, ¶ 103.)

*Liebermann* further discloses detection of ASL signs via an "ASL to English translation algorithm," and notes that implementing the disclosed ASL to English translation method requires "linguistic analysis beyond what was recognized by William Stokoe in [Semiotics] and Human Sign Language, Mouton (197[2]), and Sign Language Structure, Linstok Press (1978)." (Ex. PA-1, 10:54-56, 12:3-6; *see also* Exs. PA-8, PA-9.) Thus, a POSITA would have understood that implementing the disclosed *Liebermann* method in the cellular phone—including the finger spelling as discussed above—required consulting Stokoe's sign language publications (or similar sources of such information) to ensure that, at a minimum, the cellular phone performs the disclosed *Liebermann* method to the full extent of the features described in such publications. For example, in both *Semiotics and Human Sign Language* and *Sign Language Structure*, Stokoe includes a diagram showing the letters of the American Manual Alphabet which are used in conjunction with ASL. (Ex. PA-8, 22; Ex. PA-9.) As pictured below, the American Manual Alphabet includes pinch, pointing, and grip gestures, and thus detection of finger spelling requires detection of a pinch gesture, a pointing gesture, and a grip gesture. (Ex. PA-8, 22; Ex. PA-9, 28; Ex. PA-DEC, ¶ 104.) For example, letters F and O each represent variations on a pinch gesture, where the thumb and index finger pinch together; letters D and G each represent pointing gestures

in different directions; and letters A and S represent variations on a grip gesture.  (Ex. PA-9, 28; Ex. PA-DEC, ¶ 104.)



(Ex. PA-9, 28 (FIG. 1 (annotated to show pinch, pointing, and grip gestures used for finger spelling)).)

A POSITA would have understood that performing such signs would reflect "gestures" under Requester's interpretation because a user's hand would have to move from a previous sign or resting state and through a "sequence of positions" (*see* Section IV.D) to form the final hand shape representing each letter, where each letter has a distinct meaning.  (Ex. PA-DEC, ¶ 105.) Likewise, a POSITA would have understood that such signs reflect "gestures" under the district court's construction order because the movement of a hand and fingers through a sequence of

positions to convey meaning is "movement of hands or other body parts that conveys meaning." (Section IV.D.)

To the extent each of the above signs disclose a singular position rather than "a sequence of positions that conveys a meaning" or "movement of hands or other body parts that conveys meaning" (i.e., a gesture, as explained in Section IV.D), *Liebermann* alternatively discloses such gestures through the incorporated Stokoe publications. (*Id.*) Stokoe states that a signing person can convey the meaning of a word by spelling that word via finger spelling. (Ex. PA-9, 3 ("The fingerspelled English word is a series of manual displays that stand in a one-to-one relationship with the letters of the English alphabet . . . Though the deaf person may never have heard a sound, such is the power of semiotic systems and the human mind, that this person may still have acquired the ability to use the written or fingerspelled word with as much symbolic force as any speaker of English can achieve.").) Stokoe also discloses that finger spelling can be used to sign "[p]ersonal and place names." (Ex. PA-8, 23.) From these disclosures, a POSITA would have understood that finger spelling would be used to sign abbreviations, and that to implement detection of this finger spelling in the *Liebermann* method, the system/process would need to be able to detect combinations of letters *in any order*. (Ex. PA-DEC, ¶ 106.) For example, Stokoe shows that letter B, shown above to the right of letter A in the table of American Manual alphabet letters, is a flat open hand. (Ex. PA-9, 28 (FIG. 1), 45 (describing the "b-hand of fingerspelling" as a "flat open hand").) A POSITA would have understood that conveying meanings "B-F" and "B-O" (e.g., as in an abbreviation) would require moving the hand and fingers through a sequence of positions in a pinching motion—that is, signing "B-F" and "B-O" each represent variations on a pinch gesture, where the thumb and index finger pinch together. (Ex. PA-9, 28; Ex. PA-DEC, ¶ 106.) Similarly, signing "B-D" and "B-G" each represent pointing gestures in different directions, and signing "B-A" and "B-S" each represent variations on a grip gesture. (Ex. PA-9, 28; Ex. PA-DEC, ¶ 106.) Thus, in this additional and alternative way, *Liebermann* also discloses through the incorporated Stokoe publications "a sequence of positions that conveys a meaning" and "movement of hands or other body parts that conveys meaning." (Section IV.D, Ex. PA-DEC, ¶ 1-6.)

To the extent *Liebermann* is read to not disclose detecting gestures as explained above based on the incorporated publications, a POSITA would have found it obvious to modify the *Liebermann* method such that it detects gestures including a sequence of positions that convey a meaning or movement of hands or other body parts that conveys meaning, like that recited in claim

5.  (Ex. PA-DEC, ¶ 107.)  For example, as explained above, *Liebermann* discusses (and incorporates the disclosures of) *Semiotics and Human Sign Language* and *Sign Language Structure* by William Stokoe.  (*See* Exs. PA-8, PA-9.)  Thus, a POSITA would have been motivated to implement such features (including detection of gestures in the form of the American Manual Alphabet) with the *Liebermann* method because, as described above, (i) *Liebermann* discloses that detection of finger spelling is necessary, (ii) *Liebermann* discloses detection of ASL as a preferred sign language, and (iii) Stokoe's publications disclose that the American Manual Alphabet is the alphabet used to accomplish finger spelling in ASL.  (Ex. PA-DEC, ¶ 107.)  A POSITA would have appreciated the benefits of such an implementation because it would have allowed *Liebermann*'s process and system to detect gestures in the form of known hand/finger based communications.  (*Id.*)  A POSITA would have had a reasonable expectation of success in implementing such a modification because it would have involved the implementation of known computer-based design skills and technologies (e.g., programming, etc.) to detect additional signs (gestures) based on established and known techniques for recognizing similar signs.  (*Id.*, ¶ 108.)  Indeed, a POSITA would have had the skill to implement, and expectation of success in achieving such a modification because it would have involved applying known technologies (e.g., known gesture detection technology (*Liebermann* cellular phone)) according to known methods  (e.g., known gesture and finger spelling detection techniques (*Liebermann*) and known ASL signs for finger spelling (Stokoe, incorporated in *Liebermann*))) to yield the predictable result of a cellular phone implemented to detect the American Manual Alphabet in order to effect finger spelling translation as part of an electronic sign language communication system.  (*Id.*)  *See KSR* 550 U.S. at 416.

### 5.    Claim 6

#### a.    The method according to claim 1 further including determining the pointing direction of a finger in the work volume.

*Liebermann* discloses or suggests the limitations recited in claim 6.  (Ex. PA-DEC, ¶¶ 109-110.)  As discussed above in Section V.A.4 pertaining to claim 5, *Liebermann* discloses that the electronic communication method must be able to detect the signs that are used in finger spelling.  (Section V.A.4.)  Section V.A.4 also discusses how a POSITA would have understood from *Liebermann*'s disclosures the importance of consulting Stokoe's publications in order to

implement the *Liebermann* ASL detection method, and how these publications provide diagrams showing the letters of the American Manual Alphabet which are used to perform finger spelling in conjunction with ASL. (*Id.*) As pictured below, it was known that the American Manual Alphabet included a variety of gestures with fingers pointing in various directions. (Ex. PA-9, 28; *see also* Ex. PA-8, 22.) For example, letter D involves pointing upwards; letter G involves pointing left (if signing with a right hand); letter P involves pointing upwards at an angle; and letter Q involves pointing downwards at an angle. (Ex. PA-9, 28; Ex. PA-DEC, ¶ 110.)



(Ex. PA-9, 28 (FIG. 1 (annotated to show pointing signs in different directions used for finger spelling)).) A POSITA would have recognized that in order to clearly distinguish between the finger spelling of these letters, the disclosed method of *Liebermann* would need to be able to

determine which direction the finger points in the work volume.  (Ex. PA-DEC, ¶ 110.)  To the extent that *Liebermann* does not disclose these signs found in the incorporated publications, a POSITA would have found it obvious to modify the *Liebermann* method in view of *Liebermann*'s disclosures regarding these fundamental sign language texts for the same reasons as discussed for claim 5.  (Section V.A.4.)

      6.      **Claim 7**

            a.      **The method according to claim 1 further including providing a target positioned on a user that is viewable in the work volume.**

     *Liebermann* discloses or suggests the limitations recited in claim 7.  (Ex. PA-DEC, ¶¶ 111-113.)  *Liebermann* discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked."  (Ex. PA-1, 12:30-33.)  *Liebermann* discloses that because "[t]his task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing person, and clothes," it is advantageous to use "***special gloves which allow discrimination of the hands from the background*** for the image processing system."  (*Id.*, 12:34-39.)  FIGS. 13 and 14 illustrate "the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language."  (*Id.*, 12:40-43, FIGS. 13-14.)  *Liebermann* discloses an example where "the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue," and each glove may have "a third color (typically red) for left and right palm areas," which "allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away."  (*Id.*, 12:46-52.)  FIG. 13A illustrates a front view of these gloves and is reproduced below.



FIG. 13A

(*Id.*, FIG. 13A; Ex. PA-DEC, ¶ 112.)  A POSITA would have understood that this glove and its specially marked colors to aid in the detection of signs are targets as contemplated by the '079 patent, which describes targets as "special colors or shapes" or "retro-reflective materials and other materials to augment the contrast of objects used in the application."  (Ex. PAT-A, 3:18-20, 3:63-65; Ex. PA-DEC, ¶ 113.)   Thus, *Liebermann* discloses "a target positioned on a user that is viewable in the work volume."  (Ex. PA-DEC, ¶ 113.)

> **7.    Claim 8**
>
> > **a.    The method according to claim 1 further including determining the three-dimensional position of a point on a user.**

*Liebermann* discloses or suggests the limitations recited in claim 8.  (Ex. PA-DEC, ¶¶ 114-118.)  *Liebermann* discloses that the electronic communication method must determine the location or position of points on a user.  Because "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the ***spatial location of the hands*** relative to the rest of the body (Stokoe's 'tab')."  (Ex. PA-1, 10:59-64 (internal quotations added).)  As shown in FIG. 9 (reproduced below), which displays "a schematic representation of the modules of the artificial intelligence for converting signing into speech," the disclosed method requires "***calculating centers of gravity for both hands,***" which involves finding

an "***FFT [fast Fourier transform] of paths of the hands***" as well as performing an "***explicit path analysis***" of the hands.  (*Id.*, 4:31-32, FIG. 9.)  FIG. 9 discloses in other portions of the conversion process that a "***2 hand FFT and their location***" are determined by the static gesture manager, and a "***right hand FFT***" is determined by the spelling mode manager.  (*Id.*, FIG. 9.)  A POSITA would have understood that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis all require determining the position of a point on the user's hand, which is a "point on a user."  (Ex. PA-DEC, ¶ 115.)  Furthermore, *Liebermann* discloses or suggests in numerous places that coordinates of the hands and other body parts are determined. (Ex. PA-1, 13:22-23 (suggesting that "coordinates" of signs are determined), 7:44-9:27 (disclosing an algorithm for feature tracking, which detects the location of various parts of the head, torso, arms, and legs).)



*FIG. 9*

(*Id.*, FIG. 9 (annotated to show the portions of the sign to speech conversion, each of which involve determining points on a user, as discussed above).)

While *Liebermann* does not explicitly disclose "determining the **three-dimensional** position of a point on a user," a POSITA would have found it obvious to modify the *Liebermann* position detection in view of *Liebermann*'s other disclosures to further determine three-dimensional position points on a user. (Ex. PA-DEC, ¶ 116.) *Liebermann* discloses that "**three dimensional video cameras** have been developed" and "[t]he use of such devices may facilitate recognition of signing motions by enhancing spatial differences." (Ex. PA-1, 13:29-31.) Three-dimensional video cameras were well known at the time of the invention, and a POSITA would have understood that these cameras detect three-dimensional position data. (*See, e.g.*, Ex. PA-10, Title ("Optical System for Single Camera Stereo Video"), Abstract ("Alternatively, the images can be interrogated by a computer system for generating **three dimensional position data**."); Ex. PA-DEC, ¶ 117.) A POSITA would have been motivated to implement a three-dimensional camera that captures three-dimensional position data in light of *Liebermann*'s disclosure that these cameras may beneficially "enhance[] spatial differences," as well as *Liebermann*'s reference to sign language publications by William Stokoe (*see* Section V.A.3) that provide additional information on the "sig" (motion) component of signs. (Ex. PA-1, 13:29-31; Ex. PA-DEC, ¶ 117; *see also* Section V.A.3 (describing Stokoe's table of "sig" movements).) In particular, Stokoe notes that a particular sign may involve "upward movement," "downward movement," "rightward movement," "leftward movement," "movement toward signer," or "movement away from signer," which a POSITA would have understood to be the *x*, *y*, and *z* directions. (Ex. PA-8, 37.) Thus, a POSITA would have understood the benefit of modifying *Liebermann*'s position detection and path analysis (as described above) by implementing a three-dimensional camera in the cellular phone to capture this three-dimensional position and movement data (and more specifically, position and movement data defined with respect to three perpendicular axes *x*, *y*, and *z* (*see* Section IV.I)). (Ex. PA-DEC, ¶ 117.)

A POSITA would have had a reasonable expectation of success in implementing this modification in the *Liebermann* cellular phone because *Liebermann* discloses that such a modification would have been both possible and beneficial. (Ex. PA-1, 13:29-31; Ex. PA-DEC, ¶ 118.) Moreover, a POSITA would have had the skill to implement, and expectation of success in achieving such a modification because it would have involved applying known technologies (e.g.,

known gesture detection technology) and materials (e.g., known three-dimensional cameras) according to known methods (e.g., known position detection techniques) to yield the predictable result of a cellular phone with a three-dimensional camera that uses the *Liebermann* position detection method to determine three-dimensional positions of a point on the user in the course of sign detection.  (Ex. PA-DEC, ¶ 118.)  *See KSR* 550 U.S. at 416.

Accordingly, *Liebermann* discloses or suggests this limitation under both the Requester's proposed construction, and the plain meaning proposed by PO and found by the district court for the claimed "three-dimensional position" term.  (*See* Section IV.I.)

8.    **Claim 9**

a.    **The method according to claim 1 wherein the camera and the light source are positioned in fixed relation relative to a keypad.**

*Liebermann* discloses or suggests the limitations recited in claim 9.  (Ex. PA-DEC, ¶¶ 119-120.)  As discussed in Section V.A.2.b, a POSITA would have found it obvious to include a light source comprising lights on each side of the display in the base portion of the phone.  (Section V.A.2.b.)  *Liebermann* also discloses that the key pad 16 is also in the base portion 13, while the camera lens 10 is in the upright portion 12 of the cellular phone.  (Ex. PA-1, 5:62-67, FIG. 6.)  As discussed in Section V.A.2.c, a POSITA would have understood from the disclosed diagram of FIG. 6 that *Liebermann*'s cellular phone embodiment has a fixed, single unit construction.  (Section V.A.2.c.)  Thus, a POSITA would have understood that *Liebermann*'s cellular phone (as modified above) would have been configured such that that "the camera and the light source are positioned in fixed relation relative to a keypad."  (Ex. PA-DEC, ¶ 120.)  FIG. 6 is reproduced below illustrates this fixed relationship that would have been applicable to the modified *Liebermann* phone.



(Ex. PA-1, FIG. 6 (annotated to show the components of the base and upright portions).)

### 9.    Claim 11

*Liebermann* discloses or suggests the limitations recited in claim 11.  (Ex. PA-DEC, ¶¶ 121-130.)

#### a.    [11.a] A computer apparatus comprising:

*Liebermann* discloses or suggests this preamble to the extent limiting.  (Ex. PA-DEC, ¶¶ 121-122.)  *Liebermann* discloses a "portable transmitter/receiver," as shown in FIG. 6, that is in the "form of a cellular telephone."  (Ex. PA-1, 4:21-22, 5:62-63.)  For the reasons discussed for claim 1.a in Section V.A.2.a, a POSITA would have understood that this cellular phone contains a computer within the cellular phone frame and is therefore a "computer apparatus."  (Section V.A.2.a; Ex. PA-DEC, ¶ 122.)  The cellular phone has a video camera, an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network."  (Ex. PA-1, 5:62-6:2.)  Through this wireless connection, the cellular phone performs local computer processing in conjunction with a remote "dedicated central computer facility" to "provide a novel electronic communication system for use by deaf persons to enable them to communicate by signing" with hearing persons.  (*Id.*, 3:11-13, 5:62-6:14.)

b.    **[11.b] a light source adapted to illuminate
a human body part within a work volume
generally above the light source;**

*Liebermann* discloses or suggests this limitation. (Ex. PA-DEC, ¶¶ 123-125.) *Liebermann* discloses or suggests this limitation for similar reasons as those explained for claim 1.b in Section V.A.2.b. (Section V.A.2.b.) While claim 11.b additionally recites that the light source is adapted to illuminate a "human body part," the explanation provided in Section V.A.2.b describes how the light source (a modification to include a separate light source comprising lights along each side of the display) is adapted to and *designed for* illumination of a user's hands, face, and body (which perform gestures within a work volume) by transmitting light directly onto these body parts. (*Id.*; *see also* Sections IV.B, IV.J; Ex. PA-DEC, ¶ 124.) Thus, a POSITA would have understood that the "light source [is] adapted to illuminate a human body part within a work volume." (Ex. PA-DEC, ¶ 125.) Claim 1.b recites that the illumination of the work volume is "above the light source," while claim 11.b recites that the work volume is "generally above the light source," but a POSITA would have understood that if *Liebermann* discloses a work volume above a light source, it also discloses a work volume *generally* above a light source. (Section V.A.2.b; Ex. PA-DEC, ¶ 125.) Accordingly, *Liebermann* discloses or suggests this limitation under the Requester's proposed constructions, the interpretations proposed by PO, and those found by the district court, such as those regarding "light source adapted to illuminate a human body part generally above the light source," "work volume generally above the light source," and "adapted to," or the plain meaning of such terms. (*See* Sections IV.B, IV.F.)

c.    **[11.c] a camera in fixed relation relative
to the light source and oriented to observe
a gesture performed by the human body
part in the work volume; and**

*Liebermann* discloses or suggests this limitation. (Ex. PA-DEC, ¶¶ 126-127.) *Liebermann* discloses or suggests this limitation for similar reasons as those explained for claim 1.c in Section V.A.2.c. (Section V.A.2.c.) While claim 11.c additionally recites that the gesture performed in the work volume is "performed by the human body part," the explanation provided for claim 1.c in Section V.A.2.c describes how the gesture is performed by a human body part. (Section V.A.2.c.)

> **d.    [11.d] a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output.**

*Liebermann* discloses or suggests this limitation. (Ex. PA-DEC, ¶¶ 128-130.) *Liebermann* discloses or suggests this limitation for similar reasons as those explained for claims 1.a and 1.d in Sections V.A.2.a and V.A.2.d. (Sections V.A.2.a, V.A.2.d.) Section V.A.2.d explains how the *Liebermann* electronic communication method "determine[s] the gesture performed in the work volume and illuminated by the light source based on the camera output." (Section V.A.2.d.) Section V.A.2.a explains how a POSITA would have found it obvious to implement the entire *Liebermann* method in the internal computer of the cellular phone. (Section V.A.2.a.) A POSITA would have recognized that such a computer would have included "a processor" to perform the processing operations as discussed and claimed (e.g., the gesture determination (*see* Section IV.J)), perform the processing as known in the art. (Ex. PA-11, 1:6-11 (disclosing state of the art knowledge of a mobile telephone that has a "controller unit 250 [which] includes a program memory 251 which provides instructions to a central processor unit (CPU) 252 for controlling the various [phone] operating features and functions," where the phone's processing functions may be "programmed in the program memory 251" and the "CPU 252 is a microprocessor"); Ex. PA-DEC, ¶ 129.) Thus, for the reasons discussed here and in Sections V.A.2.a and V.A.2.d, a POSITA would have found it obvious to implement the computer apparatus (cellular phone) with a processor adapted to, or programmed to, "determine[s] the gesture performed in the work volume and illuminated by the light source based on the camera output." (Sections V.A.2.a, V.A.2.d; Ex. PA-DEC, ¶ 129.)

As explained, when this limitation is construed under 35 U.S.C. § 112, ¶ 6, *Liebermann* also discloses software running on a processor in order to perform this gesture determination function. (Section IV.H; Ex. PA-DEC, ¶ 130.) In particular, a POSITA would have understood that the processor would be adapted to, or programmed to, perform the required gesture determination processing by running known software that *Liebermann* discloses. (Ex. PA-1, 4:6-9 (disclosing "computer software for . . . translating functions"), 6:6-10 ("The signing motions captured by the camera are converted into digital data for processing by the translation software . . . to produce data representing numbers, words and phrases which are then combined into coherent sentences."), 7:14-17, 7:45-49 ("Software presently used for [translation of the signing into and

from digital text] is appended hereto and is utilized with Borland C++."); Ex. PA-DEC, ¶ 130.) Accordingly, *Liebermann* discloses or suggests this limitation under both the Requester's proposed construction and the plain meaning proposed by PO and found by the district court for the claimed "processor . . . ." (*See* Section IV.H.)

### 10.    Claim 12

> a.    **The computer apparatus of claim 11 further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display.**

*Liebermann* discloses or suggests the limitations recited in claim 12. (Ex. PA-DEC, ¶¶ 131-132.) *Liebermann* discloses that the cellular phone apparatus includes a display 14 and a keyboard (key pad) 16. (Ex. PA-1, FIG. 6, 5:62-67.) Because of the shape of the cellular phone of FIG. 6 when placed in a stable position, a POSITA would have understood that the work volume of FIG. 6 is "above the keyboard and in front of the display." (Ex. PA-DEC, ¶ 132.) The image below more clearly depicts the cellular phone elements.



(Ex. PA-1, FIG. 6 (annotated to depict the relationship between the keypad 16, display 14, and camera 10).) *Liebermann* discloses that both the base portion 13 and the upright portion 12 slope

upwards at an angle.  (Ex. PA-1, FIG. 6.)  In order for the device to be able to detect a signing user's gestures, a POSITA would have understood that the signing user would have to gesture *above* the base portion, *above* the upright portion (because of the relatively short height of the upright portion), but also *in front of* the upright portion (so that the gestures may be detected by the camera lens 10) and *in front of* the base portion (because of the relatively shallow distance between the near end of the base portion and the camera, which does not allow enough space to sign.)  (Ex. PA-DEC, ¶ 132.)  Thus, a POSITA would have recognized that in the FIG. 6 cellular phone as disclosed by *Liebermann*, "the work volume is above the keyboard and in front of the display," but also in front of the keyboard and above the display, as the work volume must be both above and in front of all components of the stable cellular phone in order to effectively communicate via sign language.  (*Id.*, ¶ 132.)

### 11.    Claim 17

#### a.    The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume.

*Liebermann* discloses or suggests the limitations recited in claim 17 for the same reasons as those explained for claim 7 and claim 12.  (Ex. PA-DEC, ¶¶ 133-134; Sections V.A.6, V.A.10.)  While claim 7 recites that the target is "viewable in the work volume," claim 17 recites that the target is "viewable *by the camera when* in the work volume."  (Ex. PAT-A, claims 7, 17.)  The analysis above for claim 7 explains how *Liebermann*'s glove with specially marked colors are targets viewable in the work volume as contemplated by the '079 patent, which describes targets as "special colors or shapes" or "retro-reflective materials and other materials to augment the contrast of objects used in the application."  (Section V.A.6; Ex. PAT-A, 3:18-20, 3:63-65; Ex. PA-DEC, ¶ 134.)  A POSITA would have understood that if *Liebermann* discloses a target on a user that is viewable in the work volume, it also discloses a target on a user that is viewable by the camera when in the work volume, as the work volume is the area where gestures are performed within the camera's view.  (Ex. PA-DEC, ¶ 134; *see also* Section V.A.10.)

### 12.    Claim 18

a.      **The computer apparatus of claim 11
wherein the determined gesture includes
a pinch gesture.**

*Liebermann* discloses or suggests the limitations recited in claim 18.  (Ex. PA-DEC, ¶ 135.) *Liebermann* discloses or suggests these limitations for similar reasons to those explained for claim 5.  (Section V.A.4.)  In particular, Section V.A.4 explains how *Liebermann* discloses that "the detected gesture includes . . . a pinch gesture."  (*Id.*)  The same reasoning explained for claim 5 is applicable here.  (*Id.*)

### 13.      Claim 19

a.      **The computer apparatus of claim 11
wherein the determined gesture includes
a pointing gesture.**

*Liebermann* discloses or suggests the limitations recited in claim 19.  (Ex. PA-DEC, ¶ 136.) *Liebermann* discloses or suggests these limitations for similar reasons to those explained for claim 5.  (Section V.A.4.)  In particular, Section V.A.4 explains how *Liebermann* discloses that "the detected gesture includes . . . a pointing gesture."  (*Id.*)  The same reasoning explained for claim 5 is applicable here.  (*Id.*)

### 14.      Claim 20

a.      **The computer apparatus of claim 11
wherein the determined gesture includes
a grip gesture.**

*Liebermann* discloses or suggests the limitations recited in claim 20.  (Ex. PA-DEC, ¶ 137.) *Liebermann* discloses or suggests these limitations for similar reasons to those explained for claim 5.  (Section V.A.4.)  In particular, Section V.A.4 explains how *Liebermann* discloses that "the detected gesture includes . . . a grip gesture."  (*Id.*)  The same reasoning explained for claim 5 is applicable here.  (*Id.*)

### 15.      Claim 21

*Liebermann* discloses or suggests the limitations recited in claim 21.  (Ex. PA-DEC, ¶¶ 138-144.)

a.    **[21.a] A computer implemented method comprising:**

*Liebermann* discloses or suggests this preamble to the extent limiting for the same reasons as explained for claim 1.a in Section V.A.2.a.  (Ex. PA-DEC, ¶ 138; Section V.A.2.a.)

b.    **[21.b] providing a camera oriented to observe a gesture performed in a work volume above the camera;**

*Liebermann* discloses or suggests this limitation.  (Ex. PA-DEC, ¶¶ 139-140.)  *Liebermann* discloses or suggests this limitation for similar reasons as those explained for claim 1.c in Section V.A.2.c.  (Section V.A.2.c.)  In particular, Section V.A.2.c. describes how *Liebermann* discloses "providing a camera oriented to observe a gesture performed in a work volume."  (*Id.*)  While claim 1.c does not recite that the "work volume [is] above the camera," the explanation provided in Section V.A.2.c clearly describes how the camera is oriented so that the work volume is the space simultaneously *above* and *in front of* the camera.  (*Id.*)  Thus, a POSITA would have understood that *Liebermann* discloses or suggests the limitations recited in claim 21.b for the reasons explained for claim 1.c in Section V.A.2.c.  (*Id.*; Ex. PA-DEC, ¶ 140.)  Accordingly, *Liebermann* discloses or suggests this limitation under the Requester's proposed constructions, the plain meanings proposed by PO, and those constructions found by the district court for the claimed "gesture" and "work volume above the camera."  (*See* Sections IV.D, IV.G.)

c.    **[21.c] providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and**

*Liebermann* discloses or suggests this limitation.  (Ex. PA-DEC, ¶¶ 141-142.)  *Liebermann* discloses or suggests this limitation for similar reasons as those provided for claims 1.b and 1.c in Sections V.A.2.b and V.A.2.c.  (Sections V.A.2.b, V.A.2.c.)  For the reasons explained for claim 1.b in Section V.A.2.b, a POSITA would have found it obvious to modify the *Liebermann* cellular phone to "provid[e] a light source . . . adapted to direct illumination through the work volume." (Section V.A.2.b; *see also* Sections IV.A, IV.C.)  For the reasons explained for claim 1.c in Section V.A.2.c, *Liebermann* discloses or suggests that this "light source [is] in fixed relation relative to the camera."  (Section V.A.2.c.)  Thus, a POSITA would have understood that *Liebermann*

discloses or suggests the limitations recited in claim 21.c for the same reasons as those explained for claims 1.b and 1.c in Sections V.A.2.b and V.A.2.c.  (Sections V.A.2.b, V.A.2.c.; Ex. PA-DEC, ¶ 142.)  Accordingly, *Liebermann* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meanings proposed by PO and found by the district court, for the claimed "light source . . ." and "adapted to."  (*See* Sections IV.C, IV.J.)

> **d.**    **[21.d] detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume.**

*Liebermann* discloses or suggests this limitation.  (Ex. PA-DEC, ¶¶ 143-144.)  *Liebermann* discloses or suggests this limitation for the same reasons as those provided for claim 1.d in Section V.A.2.d.  (Section V.A.2.d.)  While claim 21.d additionally recites that the "gesture [is] performed by at least one of a user's fingers and a user's hand," a POSITA would have understood that the detected gestures in Section V.A.2.d encompass signs that are performed by a user's fingers and hands, as well as facial gestures, body gestures, and the like.  (*Id.*; Ex. PA-DEC, ¶ 144.)  Thus, *Liebermann* discloses or suggests this limitation because it recites detection of a subset of the gestures disclosed in claim 1.d and explained in Section V.A.2.d.  (Section V.A.2.d; Ex. PA-DEC, ¶ 144.)

> **16.**    **Claim 24**

> > **a.**    **The method according to claim 21 wherein detecting a gesture includes analyzing sequential images of the camera.**

*Liebermann* discloses or suggests the limitations recited in claim 24.  (Ex. PA-DEC, ¶ 145.) *Liebermann* discloses or suggests these limitations for the reasons explained for claim 4.  (Section V.A.3.)

> **17.**    **Claim 25**

> > **a.**    **The method according to claim 21 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.**

*Liebermann* discloses or suggests the limitations recited in claim 25.  (Ex. PA-DEC, ¶ 146.)
*Liebermann* discloses or suggests these limitations for the reasons explained for claim 5.  (Section
V.A.4.)

> ### 18.    Claim 26
>
> > a.    **The method according to claim 21 further
> > including determining the pointing
> > direction of one of the user's fingers using
> > the first and second cameras.**

*Liebermann* discloses or suggests the limitations recited in claim 26.  (Ex. PA-DEC, ¶¶
147-148.)   *Liebermann* discloses or suggests these limitations for similar reasons to those
explained for claim 6.  (Section V.A.5.)  While claim 6 of the '079 patent recites "determining the
pointing direction of ***a finger*** in the work volume," claim 26 recites "determining the pointing
direction of ***one of the user's fingers using the first and second cameras***."[5]  (Ex. PAT-A, claims
6, 26.)  The explanation for claim 6 describes how *Liebermann* discloses "determining the pointing
direction of one of the user's fingers."  (Section V.A.5.)  *Liebermann* also discloses determining
the pointing direction "using the first and second cameras," noting that "[t]he illustrated
embodiments all utilize a single video camera[]," but "[i]t may be desirable to utilize more than
one camera to allow the signing person 'free' movement in his or her environment to track down
spatial positions in that environment."  (Ex. PA-1, 13:4-8.)  While the *Liebermann* cellular phone
does not contain two cameras, a POSITA would have found it obvious to modify the cellular phone
so that it has at least "first and second cameras" in light of *Liebermann*'s disclosures about the
benefits of such an arrangement.  (Ex. PA-DEC, ¶ 148.)  A POSITA would have had a reasonable
expectation of success in implementing this modification because it would have involved
modifying the *Liebermann* cellular phone in a manner that *Liebermann* prescribes.   (*Id.*)
Moreover, a POSITA would have had the skill to implement, and expectation of success in
achieving such a modification because it would have involved applying known technologies (e.g.,
known gesture detection technology (*Liebermann* cellular phone)) and materials (e.g., known
multiple cameras (*Liebermann*)) according to known methods (e.g., known multi-camera gesture

---

[5] Claim 26 lacks an antecedent basis for the "second camera[]."  For purpose of this request only,
Requester construes Claim 26 to require at least two cameras.

detection techniques) to yield the predictable result of a cellular phone implemented with multiple cameras for use in an electronic communication system. (*Id.*) *See KSR* 550 U.S. at 416.

### 19.    Claim 27

a.    **The method according to claim 21 further including providing a target positioned on the user that is viewable by the camera.**

*Liebermann* discloses or suggests the limitations recited in claim 27. (Ex. PA-DEC, ¶¶ 149-150.) *Liebermann* discloses or suggests these limitations for the same reasons as those explained for claim 7. (Section V.A.6.) While claim 7 recites that the target is "viewable in the work volume," claim 27 recites that the target is "viewable by the camera." (Ex. PAT-A, claims 7, 27.) However, a POSITA would have understood that if *Liebermann* discloses a target on a user that is viewable in the work volume, it also discloses a target on a user that is viewable by the camera, as the work volume is the area where gestures are performed within the camera's view. (Ex. PA-DEC, ¶ 150.)

### 20.    Claim 28

a.    **The method according to claim 21 further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers.**

*Liebermann* discloses or suggests the limitations recited in claim 28. (Ex. PA-DEC, ¶¶ 151-152.) *Liebermann* discloses or suggests these limitations for the reasons explained for claim 8. (Section V.A.7.) While claim 8 recites "determining the three-dimensional position of a point *on a user*" and claim 28 recites "determining the three-dimensional position of a point *on at least one of the user's hand and the user's fingers*," the explanation for claim 8 in Section V.A.7 explains how *Liebermann* discloses both of these limitations. (Ex. PA-DEC, ¶ 152.)

### 21.    Claim 30

a.    **The method according to claim 21 wherein the camera and the light source are positioned in fixed relation relative to a keypad.**

*Liebermann* discloses or suggests the limitations recited in claim 30.  (Ex. PA-DEC, ¶ 153.) *Liebermann* discloses or suggests these limitations for the reasons explained for claim 9.  (Section V.A.8.)

**B.    SNQ2: *Liebermann* in view of *Harakawa***

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* in view of *Harakawa* discloses or suggests the limitations of claims 6 and 26 of the '079 patent.  (Ex. PA-DEC, ¶¶ 51-58, 154-159.)

**1.    Overview of *Harakawa***

*Harakawa* discloses "a large-screen display 12 [that] is built into a wall surface in a place at which an information inputting person 10 . . . arrives.  (Ex. PA-2, 15:11-14.)  The display, which may be "a liquid crystal display (LCD), a plasma display, a cathode ray tube (CRT) [or] an optical fiber display," connects to an information processor "composed of a personal computer or the like."  (*Id.*, 15:14-19.)  "[T]he information inputting person 10 arrives at the place (information input space) shown in FIG. 1 in front of the display 12," and then "points to a position on the display surface of the display 12."  (*Id.*, 15:23-27.)  By making "a click motion," the information inputting person may "give[] various instructions to the information processor" which "allows various types of processing to be executed."  (*Id.*, 15:28-31.)  *Harakawa* further discloses that the invention includes a "plurality of near-infrared light illuminators 32A and 32B" and a "plurality of video cameras 36A and 36B," each of which is oriented to illuminate or capture the information inputting person in the information input space.  (*Id.*, 15:42-16:30.)  Many of these elements are illustrated in FIG. 1 of *Harakawa*, which is reproduced below.

Request for *Ex Parte* Reexamination
U.S. Patent No. 8,553,079

# F I G. 1



(*Id.*, FIG. 1.)

In a series of lattice point initialization steps, the three-dimensional coordinates (x, y, z) in the information input space are mapped to the two-dimensional positions of the images A and B, which are the areas captured by cameras 36A and 36B, respectively. (*Id.*, 16:52-17:59.) This initialization is accomplished by moving a transparent mark plate 40 with an equally spaced matrix of marks 40A through the information input space, and at each step (i) calculating the three-

dimensional coordinates of marks 40A at the mark plate 40's current position, and (ii) extracting the two-dimensional positions of the marks 40A in each of image A and B. (*Id.*) As the mark plate is moved to cover the information input space, the result is that "the multiplicity of marks 40A recorded on the mark plate 40 are moved to the positions corresponding to the multiplicity of lattice points (corresponding to virtual points) which are uniformly [sic] spaced in a lattice arrangement in the information input space." (*Id.*, 17:33-38.) This "correspondence between the three-dimensional coordinates of the lattice points in the information space and the positions thereof" on images A and B is stored in memory as the lattice point position information of each video camera. (*Id.*, 17:38-47.) FIG. 4 of *Harakawa* illustrates the movement of the mark plate within the information input space, and is reproduced below.



(*Id.*, FIG. 4.)

*Harakawa* discloses that after initialization processes are complete, "a full-length image of the information inputting person 10 [is] extracted from the images A and B." (*Id.*, 19:47-49.) Then, "the three-dimensional coordinates, $(x_0, y_0, z_0)$ of a reference point $P_0$ of the information

inputting person 10" are determined using the captured images, where " the point . . . corresponding to the back of the information inputting person 10 or the like can be used as the reference point $P_0$." (*Id.*, 20:44-47.) "[W]hen the information inputting person 10 changes his/her attitude from an upright standing attitude . . . into an attitude of pointing with the hand to the display 12 . . . the determination that the information inputting person 10 is making a pointing motion is determined." (*Id.*, 21:4-9.) "[A] feature point $P_X$ of the information inputting person 10 in the image A is extracted . . . and the position ($X_A$, $Y_A$) of the feature point $P_X$ on the image A is calculated. The point corresponding to the fingertip pointing to the display 12 or the like can be used as the feature point $P_X$ of the information inputting person 10." (*Id.*, 21:13-20.) The same feature point extraction is performed with image B. (*Id.*, 21:55-67.) "[T]he three-dimensional coordinates ($X_X$, $Y_X$, $Z_X$) of the feature point $P_X$ are calculated on the basis of the three-dimensional coordinates of the common lattice points extracted from the images A and B." (*Id.*, 22:33-37.) "[B]ased on the three-dimensional coordinates of the reference point $P_0$ of the information inputting person . . . and the three-dimensional coordinates of the feature point $P_X$ . . . the direction of an extended virtual line (see virtual line 54 in FIG. 11) connecting the reference point and the feature point is determined as the direction pointed to by the information inputting person 10, and the coordinates (plane coordinate) of the intersection point (see point S in FIG. 11) of the plane, including the display surface of the large-screen display 12, and the virtual line are calculated in order to determine the position pointed to by the information inputting person 10." (*Id.*, 22:38-50.) After calculation of the pointing direction and pointing coordinates, "whether or not the information inputting person 10 makes the click motion is determined," where "the click motion is defined as any motion of the hand of the information inputting person (for example, bending and turning a wrist, bending and extending a finger or the like.)" (*Id.*, 22:66-23:3.) Using these steps, a user may interact with a display (e.g., a map installed in a building) by pointing and clicking. (*Id.*, 24:1-22.) FIG. 11A of *Harakawa*, which illustrates an aerial view of the pointing direction determination, is reproduced below.

# F I G . 1 1 A



(*Id.*, FIG. 11A.)

Because *Harakawa* relates to optical sensing of human inputs using a personal computing device, *Harakawa* is in the same or similar technical field as *Liebermann* and the '079 patent, and a POSITA would have had reason to consider the teachings of *Harakawa* when implementing the *Liebermann* system. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 55-58.) To the extent *Harakawa* is not within the field of endeavor of the '079 patent, *Harakawa* is reasonably pertinent to problems associated with accurate determination of the orientation of objects in optical sensing systems, problems with which the inventor was involved. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 55-58.)

### 2.    Claim 6

a.    **The method according to claim 1 further including determining the pointing direction of a finger in the work volume.**

*Liebermann* in view of *Harakawa* discloses or suggests the limitations recited in claim 6. (Ex. PA-DEC, ¶¶ 155-158.)  As discussed in Section V.A.5, *Liebermann* discloses or suggests these limitations recited in claim 6.  (Section V.A.5.)  To the extent "determining the pointing direction of a finger in the work volume" in claim 6 is read to require a vector determination, a POSITA would have found it obvious to modify *Liebermann* in view of *Harakawa*.  (Ex. PA-DEC, ¶ 155.)

As discussed in Section V.A.7, *Liebermann* discloses determining a three-dimensional point on the signing user's hands.  (Section V.A.7; Ex. PA-DEC, ¶ 156.)  *Harakawa* discloses using the three-dimensional coordinates of a point on the user's hands and a reference point on the user's body in order to determine a pointing vector towards the display.  (Section V.B.1; Ex. PA-DEC, ¶ 156.)  In particular, "the three-dimensional coordinates, $(x_0, y_0, z_0)$ of a reference point $P_0$ of the information inputting person 10" are determined, where " the point . . . corresponding to the back of the information inputting person 10 or the like can be used as the reference point $P_0$."  (Ex. PA-2, 20:44-47.)  In addition, "the three-dimensional coordinates $(X_X, Y_X, Z_X)$ of the feature point $P_X$ are calculated," where the feature point may be "[t]he point corresponding to the fingertip pointing to the display 12 or the like."  (*Id.*, 21:13-20, 22:23-37.)  "[B]ased on the three-dimensional coordinates of the reference point $P_0$ of the information inputting person . . . and the three-dimensional coordinates of the feature point $P_X$ . . . *the direction of an extended virtual line . . . connecting the reference point and the feature point is determined as the direction pointed to by the information inputting person 10*, and the coordinates (plane coordinate) of the intersection point . . . of the plane, including the display surface of the large-screen display 12, and the virtual line are calculated in order to determine the position pointed to by the information inputting person 10."  (*Id.*, 22:38-50.)  *Harakawa* discloses that these determinations allow the user to make a clicking motion, such as "bending and turning a wrist, bending and extending a finger or the like," in order to interactively communicate with a display.  (*Id.*, 22:66-23:3.)

A POSITA would have found it obvious to modify the *Liebermann* method to calculate a pointing vector as in *Harakawa*.  (Ex. PA-DEC, ¶ 157.)  Because *Liebermann* already discloses or suggests determining three-dimensional coordinates of a hand (*see* Section V.A.7) *and* discloses capturing images of nearly the full signing user's body, a POSITA would have understood that the existing methods from *Liebermann* could be used to determine three-dimensional coordinates of both a reference point (such as the user's back) and a feature point (such as a fingertip on the user's

hand.)  (Section V.A.7; Ex. PA-DEC, ¶ 157.)  Then, the "direction of an extended virtual line" (i.e., a vector) could be determined using the three-dimensional coordinates of the reference and feature points.  (Ex. PA-DEC, ¶ 157; Ex. PA-2, 22:38-50.)  A POSITA would have been motivated to combine *Liebermann* and *Harakawa* for use in two potential circumstances.  (Ex. PA-DEC, ¶ 157.)  **First**, a POSITA would have understood that implementing the vector determination would be beneficial in distinguishing between similar signs.  (*Id.*)  As explained in Section V.A.5, various signs involve pointing in different directions, such that two signs may resemble each other in all ways except the direction of pointing.  (Section V.A.5.)  Thus, a POSITA would have understood that implementing a more precise vector determination in the *Liebermann* method would help quickly and accurately distinguish between similar looking signs that involve pointing in different directions.  (Ex. PA-DEC, ¶ 157.)  **Second**, a POSITA would have understood that the pointing vector determination and corresponding clicking motion of *Harakawa* would be beneficial in controlling the display of the *Liebermann* device.  (*Id.*)  *Liebermann* discloses that the visual display of the deaf user's device may include "***touchless function buttons***, system status indicators, alarms, a printed translation, and a playback of the image being recorded, as well as the signing images and text of the hearing person's responses."  (Ex. PA-1, 6:31-36, FIG. 8 (disclosing a "function select tool bar").)  A POSITA would have understood that a touchless method for clicking buttons or other areas on a display, such as the pointing vector and clicking method from *Harakawa*, would be ideal for implementing the touchless function buttons of *Liebermann*.  (Ex. PA-DEC, ¶ 157.)

A POSITA would have had a reasonable expectation of success in implementing either of these modifications given that the modifications merely involve implementing the algorithm taught by *Harakawa* in *Liebermann*'s device according to well-known computer programming principles. (*Id.*, ¶ 158.)  Moreover, a POSITA would have had the skill to implement, and expectation of success in achieving, such modifications because they would have involved a combination of known technologies (e.g., coordinate-based gesture detection systems (*Liebermann*)) according to known methods (e.g., methods of determining a gesture based on three-dimensional coordinates (*Harawaka*)) to yield the predictable result of a process as discussed above to produce accurate gesture detection for pointing signs, as well as touchless button functionality.  (*Id.*)  *See KSR* 550 U.S. at 416.

3.    **Claim 26**

a.    **The method according to claim 21 further including determining the pointing direction of one of the user's fingers using the first and second cameras.**

*Liebermann* in view of *Harakawa* discloses or suggests the limitations recited in claim 26. (Ex. PA-DEC, ¶ 159.)  *Liebermann* in view of *Harakawa* discloses or suggests these limitations for similar reasons to those explained for claim 6.  (Section V.B.2.)  While claim 6 of the '079 patent recites "determining the pointing direction of ***a finger*** in the work volume," claim 26 recites "determining the pointing direction of ***one of the user's fingers using the first and second cameras***."  (Ex. PAT-A, claims 6, 26.)  The explanation for claim 6 describes how *Liebermann* in view of *Harakawa* discloses "determining the pointing direction of one of the user's fingers." (Section V.B.2.)  However, *Liebermann* in view of *Harakawa* also discloses determining the pointing direction "using the first and second cameras."  Section V.B.1 explains how *Harakawa* discloses using two video cameras to determine three-dimensional coordinates of points on the user, which a POSITA would have understood accomplishes similar three-dimensional position determination as the three-dimensional camera described in Section V.A.7.  (Section V.B.1; Ex. PA-DEC, ¶ 159.)  Furthermore, *Liebermann* discloses the feasibility of using multiple cameras in the cellular phone device.  (Section V.A.18.)  Thus, for the reasons discussed in Section V.A.7 and Section V.A.18, a POSITA would have found it obvious to implement the two-camera *Harakawa* method in a two-camera version of the *Liebermann* cellular phone in order to determine the pointing direction of one of the user's fingers.  (Ex. PA-DEC, ¶ 159.)

C.    **SNQ3: *Liebermann* in view of *Mack***

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* in view of *Mack* discloses or suggests the limitations of claims 7, 16, 17, 27, and 29 of the '079 patent.  (Ex. PA-DEC, ¶¶ 51-54, 59-61, 160-170.)

1.    **Overview of *Mack***

*Mack* discloses "a method and apparatus for navigating 3-D worlds" that uses stereo imaging to capture the 3-D information of a marker on the user hand."  (Ex. PA-3, 2:19-22.)  "The 3-D coordinates of the marker," which may include the hand marker but also facial expressions,

head movements, and eye movements, "are computed using 3-D camera geometry." (*Id.*, 2:22-26.) *Mack* discloses that "[t]he computer 110 is loaded with a 3-D processing program such as 3-D animation, game, education, and visualization." (*Id.*, 2:41-43.) The computer may connect to "one or more input/output (I/O) devices such as display monitor 120, keyboard 130, mouse, and tablet digitizer," as well as "input unit 150 for receiving 3-D information." (*Id.*, 2:45-50.) "The display monitor 120 displays the 3-D graphic or image data as processed by the computer 110," while "[t]he input unit 150 provides a housing for the 3-D input system which provides a work area for the user hand 160." (*Id.*, 2:51-59.) The input unit 150 may include "a stereo camera system to determine the 3-D coordinates of a marker manipulated by the user. (*Id.*, 2:58-62.) In addition, the marker, which "can be conveniently worn on the user's finger," is illuminated by a light source and imaged by the stereo cameras. (*Id.*, 2:67-3:2.) The two cameras can be any cameras "that can capture images of a moving object in real-time," but they must be positioned so that the "stereo imaging geometry allows the computation of the 3-D coordinates of the object." (*Id.*, 3:38-49.) *Mack*'s FIG. 1 is reproduced below and illustrates these components.



## FIG. 1

(*Id.*, FIG. 1.)

*Mack* further discloses that "[t]he marker 240 is any convenient object that is used to facilitate the detection of the movement of the user's hand or finger." (*Id.*, 3:64-66.) For example, the marker may be "a specially designed object that can be worn at the tip of the user's finger." (*Id.*, 3:66-4:1.) The marker ideally has unique features, including color, shape, or type of material, "so that the processing of the images captured by the two cameras 220 and 230 can be performed quickly to identify the marker 240." (*Id.*, 4:1-5.) Multiple markers can even be used, so that each marker has "different unique features to facilitate the detection." (*Id.*, 6:53-59.) "[T]he 3-D coordinates of the marker 240 are determined by solving equations of the lines 245 and 247." (*Id.*, 4:9-12.) Various arrangements of finger movements and marker placements may be used to create different 3-D input patterns, which "may correspond to a specific command or may correspond to the exact 3-D movement that the user wants to navigate in the 3-D world" as displayed on the 3-D display. (*Id.*, 6:38-67.) FIG. 2 of *Mack* illustrates the use of the marker and is reproduced below.



*FIG. 2*

(*Id.*, FIG. 2.)

Because *Mack* relates to display and enhanced detection techniques for use with optical sensing of human inputs, *Mack* is in the same or similar technical field as *Liebermann* and the '079 patent, and a POSITA would have had reason to consider the teachings of *Mack* when implementing the *Liebermann* system. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 59-61.) To the extent *Mack* is not within the field of endeavor of the '079 patent, *Mack* is reasonably pertinent to problems associated with implementing optical sensing and image analysis systems and displaying related information, as well as problems associated with enhanced detection of human inputs using targets, both problems with which the inventor was involved. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 59-61.)

    **2.**    **Claim 7**

        **a.**    **The method according to claim 1 further
including providing a target positioned on**

**a user that is viewable in the work
volume.**

*Liebermann* in view of *Mack* discloses or suggests the limitations recited in claim 7.  (Ex. PA-DEC, ¶¶ 161-164.)  As discussed in Section V.A.6, *Liebermann* discloses or suggests these limitations.  (Section V.A.6.)  To the extent that "providing a target positioned on a user" in claim 7 is read to require a smaller finger target, and since *Liebermann* does not expressly disclose such features, a POSITA would have found it obvious to modify the method in *Liebermann* in view of *Mack*.  (Ex. PA-DEC, ¶ 161.)

*Mack* discloses a marker that is "any convenient object that is used to facilitate the detection of the movement of the user's hand or finger," such as "***a specially designed object that can be worn at the tip of the user's finger***."  (Ex. PA-3, 3:64-4:1.)  The marker ideally has unique features, including color, shape, or type of material, "so that the processing of the images captured by the two cameras 220 and 230 can be performed quickly to identify the marker 240."  (*Id.*, 4:1-5.)  Multiple markers can even be used, so that each marker has "different unique features to facilitate the detection."  (*Id.*, 6:53-59.)  A POSITA would have understood that this *marker* functions as a small finger *target* positioned on a user's finger, which enhances a camera's ability to detect the finger as gestures are made.  (Ex. PA-DEC, ¶ 162.)  Because *Liebermann* discloses a special glove with similar detection features as the target/marker in *Mack*, a POSITA would have been motivated to combine *Liebermann* with *Mack* to implement a smaller finger target with the same unique features as those in *Liebermann*'s glove.  (Section V.A.6; Ex. PA-DEC, ¶ 162.)

A POSITA would have understood that this combination would be beneficial for two reasons.  (Ex. PA-DEC, ¶ 163.)  **First**, a POSITA would have recognized that such a combination would be beneficial in aiding detection of signs where dynamic articulations and free range of motion of the hand are important.  (*Id.*)  *Liebermann* discloses that ASL requires "simultaneous, multiple, dynamic articulations," combining information about the handshape, motion, and spatial location of the hands, which a POSITA would have understood requires a flexible range of motion in the signing user's hands.  (Ex. PA-1, 10:59-64; Ex. PA-DEC, ¶ 163.)  A POSITA would have recognized that the smaller target from *Mack* would be less bulky than a glove from *Liebermann* and would enable the signing user to gesture more easily.  (Ex. PA-DEC, ¶ 163.)  **Second**, a POSITA would have understood that the target from *Mack* would be ideally suited for use with the three-dimensional detection of *Liebermann*.  (*Id.*)  As discussed in Section V.A.7, *Liebermann*

discloses or suggests using a three-dimensional camera with the cellular phone, and as discussed in Section V.A.18, *Liebermann* discloses or suggests using multiple cameras with the cellular phone as well.  (Section V.A.7.)  It was well known at the time of the invention that multiple cameras could be arranged in stereo to accomplish the same goals as a single three-dimensional camera.  (Ex. PA-10, 1:25-42 (describing numerous methods and mechanisms in the prior art that "employ[] two independent cameras" in a stereo arrangement in order to gather three-dimensional video), Abstract (disclosing similar three-dimensional video gathering using a single three-dimensional camera).)  Similarly, *Mack* discloses that the marker/target is designed for detection by stereo cameras so that the marker/target can convey 3-D input data to the disclosed device.  (Ex. PA-3, 3:64-4:5, 6:38-67.)  Thus, a POSITA would have understood that a smaller finger target as in *Mack* would be ideally suited for detection of signs in *Liebermann* when camera(s) are either three-dimensional or arranged in a stereo arrangement on the cellular device.  (Ex. PA-DEC, ¶ 163.)

A POSITA would have had a reasonable expectation of success in implementing this modification because detection of targets with three-dimensional or stereo cameras was known.  (*Id.*, ¶ 164.)  Moreover, a POSITA would have had the skill to implement, and expectation of success in achieving, such a modification because they would have involved applying known technologies (e.g., known gesture and target detection technology (*Liebermann*)) and materials (e.g., finger targets to aid in gesture detection (*Mack*)) according to known methods (e.g., known three-dimensional and stereo camera techniques) to yield the predictable result of a small target implemented in a sign language detection system as discussed above.  (*Id.*)  *See KSR* 550 U.S. at 416.

### 3.    Claim 16

#### a.    The computer apparatus of claim 12 wherein the display includes a three-dimensional display.

*Liebermann* in view of *Mack* discloses or suggests the limitations recited in claim 16.  (Ex. PA-DEC, ¶¶ 165-167.)  *Liebermann* does not disclose that "the display includes a three-dimensional display."  However, *Mack* discloses that "[t]he display monitor 120 displays the 3-D graphic or image data as processed by the computer 110," and "provides a means for user to navigate the 3-D world as processed by the computer."  (Ex. PA-3, 2:25-26, 2:51-52.)  "The

computer 110 is loaded with a 3-D processing program such as 3-D animation, game, education, and visualization" and may be "based on a high performance microprocessor, such as any type of Intel® microprocessor architecture." (*Id.*, 2:41-45.) *Mack* notes that such "[t]hree-dimensional (3-D) graphic and imaging systems" were well-known and popular, as were "[h]igh performance processors with 3-D capabilities [that had] been developed for 3-D applications such as animation, visualization, games, and education." (*Id.*, 1:11-15.) *Mack* further discloses that the display monitor that "displays the 3-D graphic or image data" may be "any monitor, including cathode ray tube (CRT), a flat panel display, etc." (*Id.*, 2:51-54.) By using these known 3-D graphics, processor, and display components—all "commercially off-the-shelf hardware"—*Mack* discloses a method "for navigation in 3-D world" by which a three-dimensional display may be implemented to provide a "simple and efficient 3-D vision system." (*Id.*, 6:63-67; Ex. PA-DEC, ¶ 165.)

*Liebermann* discloses that when a hearing person responds to the signing user's communication, the speech is translated back to signs. (Ex. PA-1, 5:14-34.) "The sign images then appear on the screen of a monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person." (*Id.*, 5:30-34.) A POSITA would have been motivated to combine the screen animation of *Liebermann* with the three-dimensional display of *Mack* in order to enhance both the user experience and the amount of information that may be conveyed through animation. (Ex. PA-DEC, ¶ 166.) *Liebermann* discloses that ASL incorporates "information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab.)" (Ex. PA-1, 10:60-64.) A POSITA would have understood that because the motion (Stokoe's sig) of a sign can involve a hand moving in the depth direction (i.e., from the signing user towards the cellular phone display), the ability to convey depth through a three-dimensional display would be beneficial. (Ex. PA-DEC, ¶ 166.) Furthermore, a POSITA would have understood that the *Mack* 3-D detection technology and three-dimensional display could be combined with *Liebermann*'s disclosure of touchless function buttons to enable a signing user to interact with the three-dimensional display. (*Id.*; Ex. PA-1, 6:31-36.) *Mack* discloses using 3-D inputs from the hands to signal commands to the three-dimensional display, which a POSITA would have recognized is an ideal method to incorporate into the cellular phone of *Liebermann* to enable use of the touchless function buttons. (Ex. PA-3, 6:38-67; Ex. PA-DEC, ¶ 166.)

A POSITA would have had a reasonable expectation of success in implementing this modification because, as described in the preceding paragraph, the modification involves implementing *Mack*'s three-dimensional display, which uses known, commercially available hardware, processor, and 3-D graphics components, in the *Liebermann* cellular phone, which a POSITA would have understood contains similar hardware and processor components. (Ex. PA-DEC, ¶ 167.) Moreover, a POSITA would have had the skill to implement, and expectation of success in achieving, such a modification because it would have involved applying known technologies (e.g., known gesture detection technology (*Liebermann*)) and materials (e.g., known three-dimensional displays (*Mack*)) according to known methods (e.g., known three-dimensional gesture detection techniques) to yield the predictable result of a three-dimensional display implemented within a sign language detection and communication system. (*Id.*) *See KSR* 550 U.S. at 416.

### 4.    Claim 17

##### a.    The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume.

*Liebermann* in view of *Mack* discloses or suggests the limitations recited in claim 17. (Ex. PA-DEC, ¶ 168.) *Liebermann* in view of *Mack* discloses or suggests these limitations for the same reasons as those explained for claim 7. (Section V.C.2.) While claim 7 recites that the target is "viewable in the work volume," claim 17 recites that the target is "viewable by the camera when in the work volume." (Ex. PAT-A, claims 7, 17.) However, a POSITA would have understood that if *Liebermann* in view of *Mack* discloses a target on a user that is viewable in the work volume, it also discloses a target on a user that is viewable by the camera when in the work volume, as the work volume is the area where gestures are performed within the camera's view. (Ex. PA-DEC, ¶ 168.)

### 5.    Claim 27

##### a.    The method according to claim 21 further including providing a target positioned on the user that is viewable by the camera.

*Liebermann* in view of *Mack* discloses or suggests the limitations recited in claim 27. (Ex. PA-DEC, ¶ 169.) *Liebermann* in view of *Mack* discloses or suggests these limitations for the same reasons as those explained for claim 7. (Section V.C.2.) While claim 7 recites that the target is "viewable in the work volume," claim 27 recites that the target is "viewable by the camera." (Ex. PAT-A, claims 7, 27.) However, a POSITA would have understood that if *Liebermann* in view of *Mack* discloses a target on a user that is viewable in the work volume, it also discloses a target on a user that is viewable by the camera, as the work volume is the area where gestures are performed within the camera's view. (Ex. PA-DEC, ¶ 169.)

### 6. Claim 29

#### a. The method according to claim 21 further including a three-dimensional display viewable by the user.

*Liebermann* in view of *Mack* discloses or suggests the limitations recited in claim 29. (Ex. PA-DEC, ¶ 170.) *Liebermann* in view of *Mack* discloses or suggests these limitations for the same reason as those explained for claim 16. (Section V.C.3.) While claim 16 does not recite that the three-dimensional display is "viewable by the user," the explanation for claim 16 is sufficient to show how *Liebermann* in view of *Mack* discloses this additional limitation because the display is always operated within the user's view. (Ex. PA-DEC, ¶ 170.)

### D. SNQ4: *Liebermann* in view of *Bushnag*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* in view of *Bushnag* discloses or suggests the limitations of claim 10 of the '079 patent. (Ex. PA-DEC, ¶¶ 51-54, 62-64, 171-175.)

### 1. Overview of *Bushnag*

*Bushnag* discloses "[a]n eye-controlled command system (10) using the human eye to control the operation of a selected device or devices." (Ex. PA-4, 31:2-4.) The system "includes a digital camera (12) to follow the movement of one eye (42), and the opening and closing of that eyelid," as well as "[a]nother digital camera (14) . . . for monitoring the opening and closing of the other eye (42)." (*Id.*, 31:4-9.) A scanning device (24) enables the digitizer screen (20) to display the "images detected by each camera (12, 14)." (*Id.*, 31:10-12.) "The scanning device (24)

delivers output to a control unit (26), that output including the color within each pixel (22) of the detected images." (*Id.*, 31:12-15.) Using this output, the control unit (26) is able to "compare[] the location of the eye (42) with respect to a command template (16)," such that a user may perform an initiating sequence with their eyes (42) in order to signal a command to the device. (*Id.*, 31:15-21.)

In a relevant embodiment, as shown in FIG. 9 (reproduced below), "a conventional laptop computer 70, or notebook computer, is provided with two digital cameras 12, 14, one being disposed at either corner in the upper region of the screen area 20." (*Id.*, 22:15-20.) In addition, "[a] microphone 36 and a speaker 72 are provided for audible communication between the control system 10 and the user." (*Id.*, 22:20-23.) *Bushnag* discloses that "[t]his type of system 10 is particularly practical" for "allow[ing] a multitude of persons in distant areas to simultaneously communicate both audibly and visually . . . [from] remote locations." (*Id.*, 22:23-30.) While the FIG. 9 embodiment discloses a laptop, *Bushnag* notes that the system may incorporate "conventional equipment such as cellular telephone technology and other internal computer components." (*Id.*, 22:30-23:2.)



(*Id.*, FIG. 9.)

Because *Bushnag* relates to optical sensing of human inputs using a personal computing device, *Bushnag* is in the same or similar technical field as *Liebermann* and the '079 patent, and a POSITA would have had reason to consider the teachings of *Bushnag* when implementing the *Liebermann* system. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 62-64.) To the extent *Bushnag* is not within the field of endeavor of the '079 patent, *Bushnag* is reasonably pertinent to problems associated with personal computing device configurations for optical sensing systems, problems with which the inventor was involved. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 62-64.)

## 2.    Claim 10

a.    **The method according to claim 9 the camera, the light source and the keypad form part of a laptop computer.**

*Liebermann* in view of *Bushnag* discloses or suggests the limitations recited in claim 10. (Ex. PA-DEC, ¶¶ 172-175.)  As discussed in Section V.A.2, *Liebermann* discloses a camera and a keypad, and a POSITA would have found it obvious to implement a light source, but *Liebermann* does not disclose that these components form part of a laptop computer.  (Section V.A.2.)  *Bushnag* discloses that a gesture detection system (specifically, for eye gestures) is implemented in a laptop embodiment with cameras 12 and 14, display 20, and a keyboard as shown in FIG. 9.  (Ex. PA-4, FIG. 9, 22:15-20.)  A POSITA would have been motivated to combine the *Liebermann* cellular phone device teachings with the *Bushnag* laptop teachings and suggestions in order to consider and configure a laptop version of the *Liebermann* device.  (Ex. PA-DEC, ¶ 172.)  A POSITA would have had reasons to consider *Bushnag* and its suggestions and teachings when contemplating the design and implementation of *Liebermann*'s gesture based processes, especially in light of *Liebermann* disclosures of a desktop computer embodiment (FIG. 5*a*) having very similar functionality to the cellular phone device, where "the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34."  (Ex. PA-1, 5:53-55, FIG. 5*a*.)  Thus, a POSITA would have understood that a portable laptop device of intermediate size (between that of a cellular phone and desktop computer) would be advantageous.  (Ex. PA-DEC, ¶ 172.)  Furthermore, *Bushnag* discloses that the laptop embodiment is advantageous for communication systems, which a POSITA would have recognized would be ideal for the *Liebermann* communication and gesture detection system.  (*Id.*; Ex. PA-4, 22:30-23:2.)

A POSITA would have had a reasonable expectation of success in implementing this modification because laptop-based gesture detection systems were known and because *Liebermann* describes implementations involving various computer configurations (e.g., kiosk, set-top box, desktop, cellular phone (Ex. PA-1, FIGS. 5A-5C, 6)), which provided guidance to a POSITA that variations of similar systems/devices were capable of operating successfully.  (Ex. PA-DEC, ¶ 173.)  Moreover, a POSITA would have had the skill to implement, and expectation of success in achieving, such a modification because it would have involved applying known technologies (e.g., known gesture detection technology (*Liebermann*)) and materials (e.g., known laptop embodiments for gesture recognition processing (*Bushnag*)) according to known methods (e.g., known gesture recognition techniques) to yield the predictable result of a laptop-based sign language detection device.  (*Id.*)  *See KSR* 550 U.S. at 416.

A POSITA also would have understood that, as required by independent claim limitation 1.b. and therefore dependent claim 10, the work volume remains above the light source. (Ex. PA-DEC, ¶ 174.) As discussed in Section V.A.2.b, a POSITA would have found it obvious to modify the cellular phone to include a light source comprising a series of lights on each side of the display. (Section V.A.2.b.) *Liebermann* discloses that the cameras of the sign detection method capture portions of the head, torso, arms, and legs (i.e., most of the body), so a POSITA would have understood that the device may be placed in a stable position so that it captures a *standing* user. (Ex. PA-1, 7:44-9:27; Ex. PA-DEC, ¶ 174.) Thus, a POSITA would have recognized that when a laptop embodiment is placed in a stable position and the camera is oriented so as to capture the majority of the signing user's body, the work volume still extends *above* the level of the light source because the user would be standing above the stable location of the device (e.g., table or other surface.) (Ex. PA-DEC, ¶ 174.)

A POSITA would have also understood that, as required by claim 9 and therefore dependent claim 10, the camera and light source remain "positioned in fixed relation relative to a keypad." (Ex. PA-DEC, ¶ 175.) The '079 patent suggests that "fixed" elements are elements that do not rotate with respect to each other and have "fixed fields of view." (Ex. PAT-A, 9:41-48.) Thus, elements that can be repositioned may still be "fixed" according to the '079 patent, as long as there is not continuous movement. (*Id.*; Ex. PA-DEC, ¶ 175.) Thus, a POSITA would have understood that the camera and light source (incorporated on the sides of the display) in the upper portion of the *Liebermann-Bushnag* laptop could still be fixed relative to the keypad in the base portion the laptop, even with the presence of a typical laptop "hinge" in between the two panes. (Ex. PA-DEC, ¶ 175.) A POSITA would have recognized that when the laptop is opened, the panes remain fixed relative to each other until repositioned, consistent with the understanding of "fixed" in the '079 patent. (*Id.*)

### E.    SNQ5: *Liebermann* in view of *Meins*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* in view of *Meins* discloses or suggests the limitations of claim 13 of the '079 patent. (Ex. PA-DEC, ¶¶ 51-54, 65-68, 176-180.)

1.    **Overview of *Meins***

*Meins* "relates generally to portable radiotelephones for use in a wireless communication system." (Ex. PA-5, 1:13-16.)  In particular, *Meins* discloses that "the personal communicator 100 has two main portions, a body portion 101 and a flip element 121" which are "connected by a hinge 131." (*Id.*, 3:42-45.)  "A keypad 103 is provided on the body portion 101." (*Id.*, 3:53.) "When the flip element 121 is open as shown in FIG. 1 [reproduced below], a built-in display 123 is visible to a user of the personal communicator 100." (*Id.*, 4:5-7.)  "The display 123 advantageously provides various types of visual information to the user of the personal communicator 100, such as alphanumeric text, or graphic or video images." (*Id.*, 4:9-12.)



(*Id.*, FIG. 1.)

*Meins* shows in FIG. 6, reproduced below, "the configuration of . . . the personal communicator[] 100 . . . when the flip element 121 . . . is folded inward to meet with the body portion 101." (*Id.*, 9:50-53.)  *Meins* discloses that this method of closing the personal communicator allows for transformation to "a compact state for easy storage" and "advantageously serves to protect the display 123." (*Id.*, 9:53-56.)  In addition, "[t]he display 123 is maintained in an off state when the flip element 121 is closed, to conserve power." (*Id.*, 6:31-33.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 8,553,079



(*Id.*, FIG. 6.)

*Meins* discloses that compared to prior art flip phone devices, which featured the display in the body portion and therefore could only present "a small amount of information . . . at a time," the disclosed personal communicator has a "larger visual display with enhanced features, and the capability to send, receive, and store non-voice information." (*Id.*, 1:52-2:3.)

Because *Meins* relates to configurations for personal computing devices, *Meins* is in the same or similar technical field as *Liebermann* and the '079 patent, and a POSITA would have had reason to consider the teachings of *Meins* when implementing the *Liebermann* system. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 65-68.) To the extent *Meins* is not within the field of endeavor of the '079 patent, *Meins* is reasonably pertinent to problems associated with personal computing device configurations and display techniques for computing systems, problems with which the inventor was involved. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 65-68.)

### 2.    Claim 13

#### a.    The computer apparatus of claim 12 wherein the display is pivotable relative to the keyboard.

*Liebermann* in view of *Meins* discloses or suggests the limitations recited in claim 13. (Ex. PA-DEC, ¶¶ 177-180.) *Liebermann* discloses that the FIG. 6 embodiment is a cellular phone, but does not disclose that the cellular phone display is pivotable relative to the keyboard (keypad). (Ex. PA-1, FIG. 6, 4:20-21; Ex. PA-DEC, ¶ 177.) *Meins* discloses a "personal communicator 100

[which] has two main portions, a body portion 101 and a flip element 121" that are "connected by a hinge 131." (Ex. PA-5, 3:42-45.)  This personal communicator, which is a cellular phone, has a "keypad 103 [which] is provided on the body portion 101." (*Id.*, 3:53.)  "When the flip element 121 is open . . . , a built-in display 123 is visible to a user of the personal communicator 100." (*Id.*, 4:5-7.)  *Meins* further discloses that "when the flip element 121 . . . is folded inward to meet with the body portion 101," the personal communicator allows for transformation to "a compact state for easy storage" and "advantageously serves to protect the display 123." (*Id.*, 9:50-56.)  In addition, "[t]he display 123 is maintained in an off state when the flip element 121 is closed, to conserve power." (*Id.*, 6:31-33.)  *Meins* discloses that compared to prior art flip phone devices, which featured the display in the body portion and therefore could only present "a small amount of information . . . at a time," the disclosed personal communicator has a "larger visual display with enhanced features, and the capability to send, receive, and store non-voice information." (*Id.*, 1:52-2:3.)

A POSITA would have found it obvious to modify the *Liebermann* cellular phone so that it has a pivotable structure (e.g., a flip structure or similar types of pivotable configurations, similar to the *Meins* personal communicator). (Ex. PA-DEC, ¶ 178.)  In particular, a POSITA would have been motivated to make such a modification in light of the benefits disclosed in *Meins* regarding compact storage, power conservation, and larger display capabilities. (*Id.*)  A POSITA would have understood that the *Liebermann* cellular phone—which would have power needs in order to perform the required gesture recognition processing and video display features—would benefit from the ability to close and turn off the display when not in use so that power can be conserved. (*Id.*)  Furthermore, a POSITA would have recognized that a user would find the compact, portable nature of a flip phone to be desirable in order to more easily transport the device. (*Id.*)  Because the *Liebermann* cellular phone display provides text, animation, touchless function buttons, and video playback, a POSITA would have also understood how a flip phone design could advantageously allow for integration of a larger display. (*Id.*)

Configuring *Liebermann*'s cellular phone to have a flip phone configuration similar to that described by *Meins* would have resulted in the phone's display being "pivotable" relative to the keyboard of the device. (*Id.*, ¶ 179.)  Indeed, a flip phone device with similar hinge arrangements is consistent with how the '079 patent describes such "pivotable" features. (Ex. PAT-A, FIGS. 1-3 (displaying a portable device with hinged upper and base portions); Ex. PA-DEC, ¶ 179.)  A

POSITA would have understood that the modified cellular phone device could be opened to the full extension of the hinge and placed in a "stable position" as contemplated by *Liebermann*, so that the cellular phone device still provides similar functionality like the device in FIG. 6.  (Ex. PA-DEC, ¶ 179; Ex. PA-1, FIG. 6, 6:2-6.)  Thus, even with the addition of a hinge that allows the display to be pivotable relative to the keyboard, a POSITA would have understood that the work volume associated with such a modified device would have still been arranged like that recited in claims 11 and 12—generally above the light source (incorporated as a modification on each side of the display), but also in front of the display and above the keyboard.  (Ex. PA-DEC, ¶ 179; Sections V.A.9.b, V.A.10.)   This is because the hinged device would have had a similar configuration/shape as the device discussed with respect to claims 11.b and 12.  (Ex. PA-DEC, ¶ 179; Sections V.A.9.b, V.A.10 (applicable and incorporated here).)  Thus, *Liebermann* in view of *Meins* discloses or suggests a "display . . . pivotable relative to the keyboard."

A POSITA would have had the skills and motivation to implement such a modification, and would have had a reasonable expectation of success in achieving it, because it would have involved applying known technologies (e.g., known gesture detection cellular phone technology (*Liebermann*) and pivotable configurations for cellular phones (*Meins*)) according to known methods (e.g., known cellular phone-based gesture recognition techniques and cellular phone design techniques) to yield the predictable result of providing a flip display-based cellular phone that maintained *Liebermann*'s sign language detection functionalities.  (Ex. PA-DEC, ¶ 180.)  *See KSR* 550 U.S. at 416.

### F.    SNQ6: *Liebermann* in view of *Auten*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* in view of *Auten* discloses or suggests the limitations of claims 2, 3, 14, 15, 22, and 23 of the '079 patent.  (Ex. PA-DEC, ¶¶ 51-54, 69-70, 181-189.)

### 1.    Overview of *Auten*

*Auten* discloses a cellular telephone with "an aperture or lens, 42, which is sufficiently transparent or translucent to allow light generated from a light source contained inside the housing of the cellular telephone to pass through and provide illumination.  The lens may be produced from glass or plastic and may be clear or colored.  The cellular telephone may further include a switch, 44, in electrical communication with the electrical circuit which includes the light source, to permit

the light source to be switched on and off." (Ex. PA-6, 6:14-23.) The light source incorporated into the cellular phone may "include a light bulb, including but not limited to conventional incandescent bulbs comprising a wire filament including krypton, tungsten, mercury vapor, hollow cathode, argon, tridium lightbulbs; a light emitting diode (LED); neon lightbulbs; and [fluorescent] bulbs." (*Id.*, 4:66-5:3, 6:55-57.) In particular, "[t]he source should be of sufficient lumens to provide . . . sufficient illumination to allow a user of the communications device to illuminate at least a portion of the area surrounding the device." (*Id.*, 5:3-7.) FIG. 2a below displays the *Auten* cellular phone with light 42.



Figure 2a

(*Id.*, FIG. 2a.)

Because *Auten* relates to illuminating the area surrounding a personal computing device in order to view objects, *Auten* is in the same or similar technical field as *Liebermann* and the '079 patent, and a POSITA would have had reason to consider the teachings of *Auten* when implementing the *Liebermann* system. (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 69-70.) To the extent *Auten* is not within the field of endeavor of the '079 patent, *Auten* is reasonably pertinent to problems associated with effectively illuminating the area surrounding personal computing

devices, problems with which the inventor was involved.  (*Supra* Sections III.A, V.A.1; Ex. PA-DEC, ¶¶ 69-70.)

### 2.    Claim 2

#### a.    The method according to claim 1 wherein the light source includes a light emitting diode.

*Liebermann* in view of *Auten* discloses or suggests the limitations recited in claim 2.  (Ex. PA-DEC, ¶¶ 182-184.)  As discussed in Section V.A.2.b, a POSITA would have been motivated to modify the *Liebermann* cellular phone to have a separate light source comprising lights on each side of the display, as depicted in the related *Liebermann* kiosk.  (Section V.A.2.b.)  However, *Liebermann* does not disclose or suggest that this separate light source "includes a light emitting diode."  A POSITA would have found it obvious in view of *Auten* to implement the light source so that it "includes a light emitting diode." (Ex. PA-DEC, ¶ 182.)

*Auten* discloses that an incorporated light source in the cellular phone may "include . . . a light emitting diode (LED)."  (Ex. PA-6, 4:66-5:3, 6:55-57.)  A POSITA would have been motivated to modify the *Liebermann* cellular phone to incorporate the *Auten* LED light source in the *Liebermann* cellular phone.  (Ex. PA-DEC, ¶ 183.)  In particular, a POSITA would have recognized that the incorporated light source of the modified *Liebermann* cellular phone (*see* Section V.A.2.b) desirably serves the same function as the incorporated light source of the *Liebermann* kiosk—providing adequate lighting to the work volume where gestures are performed—but may have different hardware needs because of the structural differences between a cellular phone and a larger public telephone kiosk.  (Ex. PA-DEC, ¶ 183; *see also* Section V.A.2.b.)  Therefore, a POSITA would have recognized the need to consider specific types of lights (rather than the kiosk "lamps") that would be well-suited to cellular phones but would also provide adequate lighting to the area around the device. (Ex. PA-DEC, ¶ 183.)  A POSITA would have understood that the *Auten* LED would be ideal because *Auten* discloses a cellular phone with an incorporated LED that provides "sufficient illumination to allow a user of the communications device to illuminate at least a portion of the area surrounding the device"—that is, the area roughly corresponding to the work volume in the *Liebermann* device.  (Ex. PA-6, 5:3-7; *see also* Section V.A.2.b.)  Thus, a POSITA would have been motivated to implement the *Auten* LED as the chosen light source in the modified *Liebermann* cellular phone, with multiple LED lights positioned on

each side of the display (collectively comprising a "light source") as described in Section V.A.2.b. (Ex. PA-DEC, ¶ 183; Section V.A.2.b.)

A POSITA would have had a reasonable expectation of success in implementing this modification because the combination of LEDs and cellular phone was well known.  (Ex. PA-DEC, ¶ 184.)  Additionally, a POSITA would have had the skill to implement, and expectation of success in achieving, such a modification because it would have involved a combination of known technologies (e.g., cellular phone-based gesture detection technology (*Liebermann*)) according to known methods (e.g., using an LED to light the area around the cellular phone (*Auten*)) to yield the predictable result of a cellular phone as discussed above that uses incorporated LEDs to adequately light the work volume of the cellular phone.  (*Id.*)  *See KSR* 550 U.S. at 416.

### 3.    Claim 3

#### a.    The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

*Liebermann* in view of *Auten* discloses or suggests the limitations recited in claim 3.  (Ex. PA-DEC, ¶ 185.)  *Liebermann* in view of *Auten* discloses or suggests these limitations for the reasons explained for claim 2, which explains how multiple (a plurality of) light emitting diodes may be incorporated in the *Liebermann-Auten* cellular phone.  (Section V.F.2.)

### 4.    Claim 14

#### a.    The computer apparatus of claim 11 wherein the light source includes a light emitting diode.

*Liebermann* in view of *Auten* discloses or suggests the limitations recited in claim 14.  (Ex. PA-DEC, ¶ 186.)  *Liebermann* in view of *Auten* discloses or suggests these limitations for the reasons explained for claim 2.  (Section V.F.2.)

### 5.    Claim 15

#### a.    The computer apparatus of claim 11 wherein the light source includes a plurality of light emitting diodes.

*Liebermann* in view of *Auten* discloses or suggests the limitations recited in claim 15. (Ex. PA-DEC, ¶ 187.) *Liebermann* in view of *Auten* discloses or suggests these limitations for the reasons explained for claim 2, which explains how multiple (a plurality of) light emitting diodes may be incorporated in the *Liebermann-Auten* cellular phone. (Section V.F.2.)

### 6.    Claim 22

> **a.    The method according to claim 21 wherein the light source includes a light emitting diode.**

*Liebermann* in view of *Auten* discloses or suggests the limitations recited in claim 22. (Ex. PA-DEC, ¶ 188.) *Liebermann* in view of *Auten* discloses or suggests these limitations for the reasons explained for claim 2. (Section V.F.2.)

### 7.    Claim 23

> **a.    The method according to claim 21 wherein the light source includes a plurality of light emitting diodes.**

*Liebermann* in view of *Auten* discloses or suggests the limitations recited in claim 23. (Ex. PA-DEC, ¶ 189.) *Liebermann* in view of *Auten* discloses or suggests these limitations for the reasons explained for claim 2, which explains how multiple (a plurality of) light emitting diodes may be incorporated in the *Liebermann-Auten* cellular phone. (Section V.F.2.)

## VI.    Detailed Explanation of the Pertinence and Manner of Applying the Prior Art to the Claims

### A.    Bases for Proposed Rejections of the Claims

The following is a quotation of pre-AIA 35 U.S.C. § 102 that forms the basis for all of the identified prior art:

> A person shall be entitled to a patent unless...
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States … .

The following is a quotation of pre-AIA 35 U.S.C. § 103(a) that forms the basis of all of the following obviousness rejections:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negative by the manner in which the invention was made.

The question under 35 U.S.C. § 103 is whether the claimed invention would have been obvious to one of ordinary skill in the art at the time of the invention. In *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Court mandated that an obviousness analysis allow for "common sense" and "ordinary creativity," while at the same time not requiring "precise teachings directed to the specific subject matter of the challenged claim[s]." *KSR Int'l Co.*, 550 U.S. at 418, 420-421. According to the Court, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. In particular, the Court emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art." *Id.* at 401. The Court also stated that "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417.

The Office has provided further guidance regarding the application of *KSR* to obviousness questions before the Office.

> If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

MPEP § 2141(1) (quoting *KSR* at 417.)

The MPEP identifies many exemplary rationales from *KSR* that may support a conclusion of obviousness. Some examples that may apply to this reexamination include:

- Combining prior art elements according to known methods to yield predictable results;

- Simple substitution of one known element for another to obtain predictable results;

- Use of a known technique to improve similar devices in the same way;

- Applying a known technique to improve devices in the same way;

> - Choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success ("obvious to try")

MPEP § 2141(III).

In addition, the Office has published *Post-KSR* Examination Guideline Updates. *See* Fed. Reg. Vol. 75, 53464 (the "Guideline Updates".)  The Guideline Updates discuss developments after *KSR* and provide teaching points from recent Federal Circuit decisions on obviousness. Some examples are listed below:

> A claimed invention is likely to be obvious if it is a combination of known prior art elements that would reasonably have been expected to maintain their respective properties or functions after they have been combined.

*Id.* at 53646.

> A combination of known elements would have been prima facie obvious if an ordinary skilled artisan would have recognized an apparent reason to combine those elements and would have known how to do so.

*Id.* at 53648.

> Common sense may be used to support a legal conclusion of obviousness so long as it is explained with sufficient reasoning.

*Id.*

**B.    Proposed Rejections**

Pursuant to 37 C.F.R. § 1.510(b)(2), Requester identifies claims 1-30 as the claims for which reexamination is requested.  The proposed rejections below, in conjunction with the analysis in Sections IV-V above and the attached declaration of Dr. Abowd (Ex. PA-DEC), provide a detailed explanation of the pertinence and manner of applying the prior art to each of claims 1-30.

**1.    Proposed Rejection #1**

Claims 1, 4-9, 11-12, 17-21, 24-28, and 30 are obvious over *Liebermann* under 35 U.S.C. § 103(a), as shown by the discussion of *Liebermann* above in Section V.A and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

**2.    Proposed Rejection #2**

Claims 6 and 26 are obvious over *Liebermann* in view of *Harakawa* under 35 U.S.C. § 103(a), as shown by the discussion of *Liebermann* and *Harakawa* above in Section V.B and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 3. Proposed Rejection #3

Claims 7, 16, 17, 27, and 29 are obvious over *Liebermann* in view of *Mack* under 35 U.S.C. § 103(a), as shown by the discussion of *Liebermann* and *Mack* above in Section V.C and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 4. Proposed Rejection #4

Claim 10 is obvious over *Liebermann* in view of *Bushnag* under 35 U.S.C. § 103(a), as shown by the discussion of *Liebermann* and *Bushnag* above in Section V.D and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 5. Proposed Rejection #5

Claim 13 is obvious over *Liebermann* in view of *Meins* under 35 U.S.C. § 103(a), as shown by the discussion of *Liebermann* and *Meins* above in Section V.E and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 6. Proposed Rejection #6

Claims 2, 3, 14, 15, 22, and 23 are obvious over *Liebermann* in view of *Auten* under 35 U.S.C. § 103(a), as shown by the discussion of *Liebermann* and *Auten* above in Section V.F and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

## VII. Conclusion

For the reasons set forth above, the Requester has established at least one substantial new question of patentability with respect to claims 1-30 of the '079 patent. The analysis provided in this Request and in the declaration of Dr. Abowd (Ex. PA-DEC) demonstrates the invalidity of claims 1-30 in view of prior art that was not substantively considered by the Patent Office. Therefore, it is requested that this request for reexamination be granted and claims 1-30 be cancelled.

Request for <em>Ex Parte</em> Reexamination<br>
U.S. Patent No. 8,553,079

As identified in the attached Certificate of Service and in accordance with 37 C.F.R. §§ 1.33(c) and 1.510(b)(5), a copy of this Request has been served, in its entirety, to the address of the attorney of record.

Respectfully submitted,

PAUL HASTINGS LLP

Dated: November 11, 2021                    By:  /Joseph E. Palys/
                                                 Joseph E. Palys
                                                 Reg. No. 46,508

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036          7590          12/20/2021
Williams Simons & Landis PLLC/ GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/20/2021 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. _90/014,900_ .

PATENT UNDER REEXAMINATION _8553079_ .

ART UNIT _3992_ .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Order Granting Request For Ex Parte Reexamination* | Control No. 90/014,900 | Patent Under Reexamination 8553079 |
| | Examiner MARK A SAGER | Art Unit 3992 | AIA (FITF) Status No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 11/11/2021 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐   PTO-892,   b)☑   PTO/SB/08,   c)☐   Other: _____

1. ☑   The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

| /Mark Sager/ Primary Examiner, Art Unit 3992 | | |

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471G(Rev. 01-13)          **Office Action in *Ex Parte* Reexamination**          Part of Paper No. 20211206

APPX0285

## Order Determination

Third Party Requester submitted a request for reexamination with a filing date of

November 11, 2021, requesting ex parte reexamination of claims 1-30 of expired U.S. Patent No.

8,553,079 (hereinafter also referred to as '079).  A substantial new question of patentability

affecting claims 1-30 of U.S. Patent No. 8,553,079 in effect at this time is raised by the request

for *ex parte* reexamination.  Accordingly, claims 1-30 will be reexamined.  For reference,

numbered pages 5-6 discuss prosecution history; while, numbered pages 9-17 discuss the SNQs

herein.

## Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)).  Extension of time in *ex parte*

reexamination proceedings are provided for in 37 CFR 1.550(c).

## Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 8,553,079 throughout the course of this reexamination proceeding.  See MPEP §§

2207, 2282 and 2286.

## Amendment in Reexamination Proceedings

Patent owner is notified that any proposed amendment to the specification and/or claims

in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c).

## Submissions

In order to insure full consideration of any amendments, affidavits or declarations or

other documents as evidence of patentability, such documents must be submitted in response to

the first Office action on the merits (which does not result in a close of prosecution).

Submissions after the second Office action on the merits, which is intended to be a final action,

will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33

after appeal, which will be strictly enforced.

## Waiver of Right to File Patent Owner Statement

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530

to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner

waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in

the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third

party requester, see 37 C.F.R 1.550(f). The Patent Owner may consider using the following

statement in a document waiving the right to file a Patent Owner Statement:

WAIVER OF RIGHT TO FILE PATENT OWNER STATEMENT

Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement.

## References Asserted as Raising a Substantial New Question

The asserted substantial new question of patentability (SNQP) in Request regarding

claims 1-30 of the '079 Patent is based upon the following references:

| U.S. Patent No. 5,982,853 to Liebermann ("*Liebermann*") | Ex. PA-1 |
|---|---|
| U.S. Patent No. 6,385,331 to Harakawa et al. ("*Harakawa*') | Ex. PA-2 |
| U.S. Patent No. 6,198,485 to Mack et al. ("*Mack*") | Ex. PA-3 |
| Canadian Patent No. 2,175,288 to Bushnag ("*Bushnag*') | Ex. PA-4 |
| U.S. Patent No. 6,587,700 to Meins et al. ("*Meins*"') | Ex. PA-5 |
| U.S. Patent No. 6,912,410 to Auten et al. ("*Auten*") | Ex. PA-6 |

## **Availability of Asserted References as Prior Art**

For purposes of this determination that does not preclude review in an action on the merits, claims 1-30 are entitled to the filing date of Provisional application No. 60/107,652, identified on the cover of the '079 patent, which is November 9, 1998, listed on the cover of the '079 patent. (Ex. PAT-A, Cover.)

*Liebermann* was filed on May 23, 1996 and issued on Nov. 09, 1999. Ex. PA-1, Liebermann at (22), (63). Liebermann was not cited during the prosecution of the '079 Patent. For completeness the following is also provided. *Harakawa* issued on May 7, 2002, from Application No. 09/040,436 filed March 18, 1998; Mack issued on March 6, 2001, from Application No. 09/123,965 filed July 29, 1998; *Meins* issued on July 1, 2003, from Application No. 08/979,110 filed November 26, 1997; and *Auten* issued on June 28, 2005, from Application No. 09/138,920 filed August 24, 1998. Thus, *Liebermann*, *Harakawa*, *Mack*, *Meins*, and *Auten* qualify as prior art at least under pre-AIA 35 U.S.C. § 102(e).

*Bushnag* is a publication of a patent application laid "Open to Public Insp[ection]" (i.e., publicly accessible as a printed publication) by the Canadian Intellectual Property Office on October 30, 1997. See *eBay v. MoneyCat*, CBM2014-00092, Paper 12 at 12 (P.T.A.B. Sep. 24,

2014) (crediting "Open to Public Insp." date as establishing Canadian laid-open patent

application as publicly accessible printed publication) (citing *In re Wyer*, 055 F.2d 221 (C.C.P.A.

1981)); *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981); *Bruckelmyer v. Ground Heaters, Inc.*, 445

F.3d 1374 (Fed. Cir. 2006) (determining a Canadian patent application was publicly accessible

and thus a printed publication); see also Ex. PA-4, 1 (listing an October 30, 1997 date); Ex. PA-7

(listing the open to public inspection date of the *Bushnag* reference as October 30, 1997). Thus,

*Bushnag* qualifies as prior art at least under pre-AIA 35 U.S.C. § 102(b).

Each of the references listed in Request, as copied in Table above, is a publication, article

or patent published prior to the earliest effective filing date of Nov. 9, 1998 of the '079 patent,

see Request pages 7-8, and thus each cited reference is available as prior art under at least 35

USC 102(a), 102 (b) 102( e ) and/or 35 USC 103.


### *Declaration*

The Declaration (PA-DEC) by Dr. Gregory Abowd, filed Nov. 11, 2021 (signed Nov. 11,

2021) has not been considered herein due to failing to address whether cited references therein

present a significant new question of patentability relevant to an Order Decision under 35 USC

304.  See MPEP 2209.  Review of its statements will be addressed in first action.


### Summary of Prosecution History

U.S. Application 13/714,748 ('748 application) was filed on December 14, 2012

(hereinafter also referred to as '748 or the '748 application), now U.S. Pat. 8553079, which is a

continuation of application 12/700055, filed on Feb. 4, 2010, which is a continuation of

application 10/866191, filed on June 14, 2004, that is a continuation of application 09/433297,

filed on Nov. 3, 2009, now U.S. Pat. 6750848, that claims priority to provisional application

60/107652, filed Nov. 9, 1998.  The '748 application included a specification, twenty claims,

abstract and seven drawing sheets.  Claims 1-7 were directed to a computer implemented

method, claims 8-14 were directed to a computer apparatus; while, claims 15-20 were directed to

keyboard apparatus.  Below are the pertinent Examiner's findings of fact relevant to this

decision:

### '748 Application

On June 19, 2013, a preliminary amendment was filed that cancelled claims 1-20 and

added new claims 21-50 where claims 21-29 were directed to a computer implemented method,

30-39 were directed to a computer apparatus; while, claims 40-50 were directed to a computer

implemented method.  A first action notice of allowance was mailed by USPTO on July 24, 2013

with the reasons for allowance stating the following:

> The closest prior arts of record issued to Naoi et al. (US 5459793 A), Platzker et al. (US
> 5528263 A), Sellers (US 5864334 A) and Fukushima et al. (US 6346929 B1) fail to teach
> or suggest the limitation combination of "a computer implemented method comprising:
> providing a light source adapted to direct illumination through a work volume above the
> light source; providing a camera oriented to observe a gesture performed in the work
> volume, the camera being fixed relative to the light source; and determining, using the
> camera, the gesture performed in the work volume and illuminated by the light source" in
> combination with all the elements of each independent claim. Examiner has reviewed the
> cited references per IDS received on 04/05/2013. Examiner has searched in EAST, eDAN
> and Google prior arts on the limitation combination as recited in the currently claimed
> invention. Naoi, Platzker, Sellers and Fukushima are a combination of closest prior arts to
> the claimed invention as presented by Applicant. Each of Naoi, Platzker, Sellers and
> Fukushima touches upon specific elements as presented in the independent claims.
> However, it is not obvious to combine Naoi, Platzker, Sellers and Fukushima in
> formulating a reasonable rejection against the independent claim language as presented
> with the consideration of Applicant's written description. Independent claims 21, 31 and
> 41 are thus to be allowed.
> The dependent claims further limit the independent claims and are considered allowable
> on the same basis as the independent claims as well as for the further limitations set forth.

The application issued as U.S. Patent No. 8,553,079 on Oct. 8, 2013.

## Related Proceedings

The Request lists the following court proceedings involving U.S. Patent No. 8,553,079 that have

yet to reach a final decision or settlement.

- *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd*., Case No. 2:21-cv-00040 (EDTX)
- *Gesture Technology Partners, LLC v. Samsung Electronics Co., Ltd*., Case No. 2:21-cv-00041 (EDTX) (consolidated with Case No. 2:21-cv-0040 for all pretrial issues).
- *Gesture Technology Partners, LLC v. Apple Inc*., Case No. 6:21-cv-00121 (WDTX).
- *Gesture Technology Partners, LLC v. Lenovo Group Ltd*., Case No. 6:21-cv-00122 (WDTX).
- *Gesture Technology Partners, LLC v. LG Electronics, Inc*., Case No. 6:21-cv-00123 (WDTX). The LG case was transferred to *Gesture Technology Partners, LLC v. LG Electronics Inc*., Case No. 2-21-cv-19234 (DNJ).

Also, the following two proceedings regarding U.S. Patent No. 8,553,079 have yet to reach a

decision on their respective petitions; however, Request states, regarding cited art, "these

references are not cited and will not be considered in the pending IPRs."

*Apple Inc. v. Gesture Technology Partners LLC*, IPR2021-00922 (filed May 18, 2021).
*LG Electronics, Inc. et al. v. Gesture Technology Partners LLC*, IPR2022-00090 (filed
November 5, 2021).

## Claim Construction

For the purposes of reexamination, the claim terms of an expired patent are accorded their plain

and ordinary meaning under the Phillips standard. Manual of Patent Examining Procedure

§ 2258(I)(G).  In a reexamination proceeding involving claims of an expired patent, claim

construction pursuant to the principle set forth by the court in *Phillips v. AWH Corp*., 415 F.3d

1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a claim "are generally given their

ordinary and customary meaning" as understood by a person of ordinary skill in the art in

question at the time of the invention) should be applied since the expired claim[s] are not subject

to amendment. MPEP § 2258 L(G) (citing *Ex parte Papst-Motoren*, 1 USPQ2d 1655 (Bd. Pat.

App. & Inter. 1986)). The °079 patent, which lists November, 3, 1999, as the date of the earliest

related continuation but which also claims priority to a provisional application, filed November

9, 1998, and does not list any term extensions or adjustments, has expired. (See Ex. PAT-A,

Cover.) Therefore, the claim interpretations submitted or implied herein for the purpose of this

reexamination adhere to the Phillips standard. See *In re CSB-System Int'l, Inc.*, 832 F.3d 1335,

1340-42 (Fed. Cir. 2016)."  Furthermore, where there is related litigation and a federal court has

made a judicial interpretation of a disputed claim term, the examiner in a reexamination should

assess whether the judicial interpretation is consistent with the applied claim construction

standard. See *id*. (discussing the application of the "broadest reasonable interpretation" standard).

As noted above, the '079 Patent is the subject of such related litigation, the relevant

constructions from those Litigation as set forth in the Request as discussed in the Claim

Construction, section IV therein, are accorded their plain and ordinary meaning under the

*Phillips* standard herein.

### The SNQ Requirement

A printed publication raises a SNQ where there is a substantial likelihood that a

reasonable examiner would consider the printed publication important in deciding whether or not

the claim is patentable, unless the same SNQ has already been decided as to the claim in a final

holding of invalidity by the Federal court system or by the Office in a previous examination.

MPEP § 2242.

It is not sufficient that a request for reexamination merely proposes one or more

rejections of a patent claim or claims as a basis for reexamination. It must first be demonstrated

that a patent or printed publication that is relied upon in a proposed rejection presents a new,

non-cumulative technological teaching that was not previously considered and discussed on the

record during the prosecution of the application that resulted in the patent for which

reexamination is requested, and during the prosecution of any other prior proceeding involving

the patent for which reexamination is requested.  MPEP § 2216.

The substantial new question of patentability may be based on art previously considered

by the Office if the reference is presented in a new light or a different way that escaped review

during earlier examination.  MPEP § 2216.


*** Claim Limitations Important to Patentability ***

In view of the prosecution history discussed above, the following steps/limitations from

representative claim 1 (claims 11 and 21 contain similar limitations, although claim 11 regards

an apparatus reciting similar structures performing similar functions) are deemed important to

patentability:

Claim 1.  A computer implemented method comprising:
providing a light source adapted to direct illumination through a work volume above the
light source;
providing a camera oriented to observe a gesture performed in the work volume, the
camera being fixed relative to the light source; and
determining, using the camera, the gesture performed in the work volume and illuminated
by the light source.


**SNQP/Reference Analysis**

Attention is directed to MPEP 2216, i.e.:

Under 35 U.S.C. 304, the Office must determine whether "a substantial new
question of patentability" affecting any claim of the patent has been raised.
37 CFR 1.510(b)(1) requires that a request for ex parte reexamination include "a
statement pointing out each substantial new question of patentability based on
prior patents and printed publications."  If such a new question is found, an order
for ex parte reexamination of the patent is issued. **It is therefore important that
the request clearly set forth in detail what the requester considers the
"substantial new question of patentability" to be in view of prior patents and
printed publications. The request must point out how any questions of**

**patentability raised are substantially different from those raised in the previous examination of the patent before the Office.**

It is not sufficient that a request for reexamination merely proposes one or more rejections of a patent claim or claims as a basis for reexamination. It must first be demonstrated that a patent or printed publication that is relied upon in a proposed rejection presents **a new, non-cumulative technological teaching** that was **not previously considered and discussed on the record during the prosecution of the application** that resulted in the patent for which reexamination is requested, **and during the prosecution of any other prior proceeding involving the patent for which reexamination is requested.**  See also MPEP § 2242.

The legal standard for ordering ex parte reexamination, as set forth in 35 U.S.C.303(a), requires a substantial new question of patentability. The substantial new question of patentability may be based on art previously considered by the Office **if** the reference is presented in a **new light or a different way that escaped review during earlier examination**.

….

After the enactment of the Patent and Trademark Office Authorization Act of 2002 ("the 2002 Act"), a substantial new question of patentability can be raised by patents and printed publications "previously cited by or to the Office or considered by the Office" ("old art"). The 2002 Act did not negate the statutory requirement for a substantial new question of patentability that requires raising new questions about pre-existing technology.  In the implementation of the 2002 Act, MPEP § 2242, subsection II.A. was revised. The revision permits raising a substantial new question of patentability based solely on old art, **but only if** the old art is "**presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation presented in the request**." Thus, a request may properly raise a substantial new question of patentability by raising a material new analysis of previously considered reference(s) under the rationales authorized by KSR.

**Questions relating to grounds of rejection other than those based on prior art patents or printed publications should not be included in the request and will not be considered by the examiner if included.** Examples of such questions that will not be considered are public use, on sale, and conduct by parties. (Emphasis added.)

Attention is also invited to MPEP 2242, I., i.e.:

The presence or absence of "a substantial new question of patentability" determines whether or not reexamination is ordered. The meaning and scope of the term "a substantial new question of patentability" is not defined in the statute

and must be developed to some extent on a case-by-case basis, using the case law to provide guidance as will be discussed in this section.

If the prior art patents and printed publications raise a substantial question of patentability of at least one claim of the patent, then a substantial new question of patentability is present, **unless the same question of patentability has already been decided** by (A) a final holding of invalidity, after all appeals, or (B) by the Office in a previous examination or pending reexamination of the patent. A "previous examination" of the patent is: (A) the original examination of the application which matured into the patent; (B) the examination of the patent in a reissue application that has resulted in a reissue of the patent; or (C) the examination of the patent in an earlier pending or concluded reexamination. ….

A prior art patent or printed publication raises a substantial question of patentability where there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not the claim is patentable. If the prior art patents and/or publications would be considered important, then the examiner should find "a substantial new question of patentability" **unless the same question of patentability has already been decided as to the claim** in a final holding of invalidity by the Federal court system or **by the Office in a previous examination.** For example, the same question of patentability may have already been decided by the Office where the examiner finds the additional (newly provided) prior art patents or printed publications *are merely cumulative to **similar** prior art* already fully considered by the Office in a previous examination of the claim.

For "a substantial new question of patentability" to be present, it is only necessary that: (A) the prior art patents and/or printed publications raise a substantial question of patentability regarding at least one claim, i.e., the teaching of the (prior art) patents and printed publications is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; **and** (B) the same question of patentability as to the claim has not been decided by the Office in a previous examination or pending reexamination of the patent or in a final holding of invalidity by the Federal Courts in a decision on the merits involving the claim. It is not necessary that a "prima facie" case of unpatentability exist as to the claim in order for "a substantial new question of patentability" to be present as to the claim….
(Emphasis added.)

Attention is also invited to 2258.01:

…For purposes of reexamination, a cumulative reference that is repetitive is one that substantially reiterates verbatim the teachings of a reference that was either previously relied upon or discussed in a prior Office proceeding even though the title or the citation of the reference may be different….

Finally, see also MPEP 2247.


### *SNQP Raised in this Request*

Requester, on page 2 of "**REQUEST FOR EX PARTE REEXAMINATION**

**TRANSMITTAL FORM** ," asserts the following:

> "it is certified that the statutory estoppel provisions of 35 U.S.C. 3715(e)(1) or 35 U.S.C. 328(e)(1) de not prohibit requester from filing this ex parte reexamination request. 37 CFR 1.570(b)(6)."

Based on facts in the Request, Patent Owner amendment/remarks in '748 application, the

Examiner statement for reasons for allowance in '748 application, the distinguishing/patentable

limitations over applied art regard "a computer implemented method comprising:

providing a light source adapted to direct illumination through a work volume above the light

source; providing a camera oriented to observe a gesture performed in the work volume, the

camera being fixed relative to the light source; and determining, using the camera, the gesture

performed in the work volume and illuminated by the light source."  In this instance, a SNQP

regards prior art that describes any of the steps "providing a light source", "providing a camera"

or "determining, using the camera, the gesture" as particularly recited in claims 1 and 21.  Also,

a SNQP regards a prior art than describes any of "a light source adapted to illuminate a human

body part within a work volume generally above the light source", "a camera in fixed relation

relative to the light source and oriented to observe a gesture performed by the human body part

in the work volume" and "a processor adapted to determine the gesture performed in the work

volume and illuminated by the light source based on the camera output" as recited in claim 11.

**SNQP 1:  Proposed SNQP Based on Liebermann**

Based on facts noted herein, a reasonable patent examiner would consider the teachings

of U.S. Patent No. 5982553 to *Liebermann* to be important regarding any of the recited steps of

"a computer implemented method," such as: "**providing a light source** adapted to direct

illumination through a work volume above the light source,"  "**providing a camera oriented to**

**observe a gesture** performed in the work volume, the camera being fixed relative to the light

source" and "**determining, using the camera, the gesture** performed in the work volume and

illuminated by the light source." Ex. PA-1, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's

station comprises a personal computer 30 including the monitor 32 and a video camera 34. In

FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set

40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a

video monitor 46, and lamps 48 to ensure adequate lighting of the user's hands, face and body"),

at 5:61-6:14 ("the deaf person is positioned so that the camera lens 10 will record the signing

movement of the hands and fingers and body and facial motions and expressions. The signing

motions captured by the camera are converted into digital data for processing by the translation

software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases

which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics

of the system software modules for converting signing to speech and speech to animation,

including system training methods."). see *Id*., Figs. 5A-5C, 6 and 9-12.

Likewise, based on facts noted herein, a reasonable patent examiner would consider the

teachings of U.S. Patent No. 5982553 to *Liebermann* to be important regarding any of the recited

devices of "a computer apparatus," such as: "**a light source adapted to illuminate a human**

**body part** within a work volume generally above the light source," "**a camera in fixed relation**

**relative to the light source and oriented to observe a gesture** performed by the human body

part in the work volume" and "**a processor adapted to determine the gesture** performed in the

work volume and illuminated by the light source based on the camera output." Ex. PA-1,

*Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30

including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video

camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a

public kiosk 42 has built into it, a video camera 44, a video monitor 46, and lamps 48 to ensure

adequate lighting of the user's hands, face and body"), at 5:61-6:14 ("the deaf person is

positioned so that the camera lens 10 will record the signing movement of the hands and fingers

and body and facial motions and expressions. The signing motions captured by the camera are

converted into digital data for processing by the translation software, (i.e., artificial intelligence)

to produce data representing numbers, words and phrases which are then combined into coherent

sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for

converting signing to speech and speech to animation, including system training methods."). *Id.*,

see Figs. 6, 5A-5C, and 9.



*FIG. 6*



PC VERSION

FIG. 5A

SET-TOP BOX

FIG. 5B

KIOSK VERSION FOR PUBLIC ACCESS

FIG. 5C

FIG. 9

Cited facts in Liebermann would be important to a reasonable examiner because the described

process performed via software modules read by a computer for a deaf person to use a telephone

appear to perform recited steps of "**providing a light source** adapted to direct illumination

through a work volume above the light source," "**providing a camera oriented to observe a**

**gesture** performed in the work volume, the camera being fixed relative to the light source" and

"**determining, using the camera, the gesture** performed in the work volume and illuminated by

the light source" and appear to show the recited structures performing recited functions of "**a**

**light source adapted to illuminate a human body part** within a work volume generally above

the light source," "**a camera in fixed relation relative to the light source and oriented to**

**observe a gesture** performed by the human body part in the work volume" and "**a processor**

**adapted to determine the gesture** performed in the work volume and illuminated by the light

source based on the camera output" which regard the presumed patentable distinction in '748

application based on the reasons for allowance.  Thus, a reasonable examiner would consider

Liebermann to be important regarding the claim elements of "providing a light source adapted to

direct illumination through a work volume above the light source," "providing a camera oriented

to observe a gesture performed in the work volume, the camera being fixed relative to the light

source" and "determining, using the camera, the gesture performed in the work volume and

illuminated by the light source," as recited in claim 1 of '079 and as similarly recited in claims

11 and 21 of '079.  The examiner asserted these elements were not found in four cited references

considered in the '748 application.  Liebermann was not applied/so combined during a prior

examination of '079 Patent, and the claims at issue are not the subject of a final holding by a

Federal Court.  Finally, Liebermann was not cited or applied in the two pending petitions in

IPR2021-00922 and 2022-00090 with regard to claims 1, 11 and 21.  Claims 2-10, 12-20 and 22-

30 depend from claims 1, 11 and 21 and thus include the recited steps and structures of their

respective independent claim.  Thus, based on facts noted herein regarding Liebermann for

claims 1, 11 and 21, Liebermann is interpreted to similarly raise SNQP for claims 2-10, 12-20

and 22-30 based on their respective dependency.

### *Conclusion*

Accordingly, as the findings above show that a substantial new question of patentability

is present, reexamination is granted, see MPEP 2242.  Claims 1-30 **will be** reexamined.

### Correspondence

**All** correspondence relating to this ex parte reexamination proceeding should be directed:

| | |
|---|---|
| By Mail to: | Mail Stop *Ex Parte* Reexam<br>Central Reexamination Unit<br>Commissioner for Patents<br>United States Patent & Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 |
| By FAX to: | (571) 273-9900<br>Central Reexamination Unit |
| By hand: | Customer Service Window<br>Randolph Building<br>401 Dulany Street<br>Alexandria, VA 22314 |

Registered users of EFS-Web may alternatively submit such correspondence via the

electronic filing system EFS-Web, at https://efs.uspto.gov/efile/my portal/efs-registered. EFS-

Web offers the benefit of quick submission to the particular area of the Office that needs to act

on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically

uploaded) directly into the official file for the reexamination proceeding, which offers parties the

opportunity to review the content of their submissions after the "soft scanning" process is

complete.

Any inquiry concerning this communication should be directed to the Central

Reexamination Unit at telephone number 571-272-7705.

Other useful telephone numbers:

Reexamination Practice (571) 272-7703

Reexamination Facsimile Transmission No. (571) 273-9900

/Mark Sager/
Patent Reexamination Specialist, CRU
Art Unit 3992

Conferees:
/FRED O FERRIS III/
Reexamination Specialist, Art Unit 3992

/ALEXANDER J KOSOWSKI/
Supervisory Patent Examiner, Art Unit 3992

US005982853A

# United States Patent [19]

## Liebermann

[11] **Patent Number:** **5,982,853**

[45] **Date of Patent:** **Nov. 9, 1999**

[54] **TELEPHONE FOR THE DEAF AND METHOD OF USING SAME**

[76] Inventor: **Raanan Liebermann**, 79 Bayard Ave., North Haven, Conn. 06473

[21] Appl. No.: **08/653,732**

[22] Filed: **May 23, 1996**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/396,554, Mar. 1, 1995, abandoned.

[51] **Int. Cl.$^6$** .................................................. **H04M 11/00**

[52] **U.S. Cl.** ........................... **379/52**; 704/271; 704/3; 379/93.15

[58] **Field of Search** ........................... 379/93.14, 93.15, 379/93.17, 52, 53; 348/14, 17; 395/751–757, 924; 704/2, 3, 271, 260, 235

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,546,383 | 10/1985 | Abramatic et al. | 379/52 |
| 5,163,081 | 11/1992 | Wycherley et al. | 379/52 |
| 5,283,833 | 2/1994 | Church et al. | 379/52 |
| 5,313,522 | 5/1994 | Slager | 379/52 |
| 5,473,705 | 12/1995 | Abe et al. | 704/271 |
| 5,481,454 | 1/1996 | Inoue et al. | 395/753 |
| 5,544,050 | 8/1996 | Abe et al. | 395/753 |
| 5,659,764 | 8/1997 | Sakiyama et al. | 395/753 |
| 5,689,575 | 11/1997 | Sako et al. | 382/118 |
| 5,734,794 | 3/1998 | White | 704/260 |

### OTHER PUBLICATIONS

The article "Application of Artificial Neural Networks IV" by Steven K. Rogers, pp. 587–599, Apr. 1993.

The article "Bidirectional Translation Between Sign Language and Japanese for Communication with Deaf–Mute People" by Kuwokawa, pp. 1109–1114, 1993.

*Primary Examiner*—Stella Woo

[57] **ABSTRACT**

An electronic communications system for the deaf includes a video apparatus for observing and digitizing the facial, body and hand and finger signing motions of a deaf person, an electronic translator for translating the digitized signing motions into words and phrases, and an electronic output for the words and phrases. The video apparatus desirably includes both a video camera and a video display which will display signing motions provided by translating spoken words of a hearing person into digitized images. The system may function as a translator by outputting the translated words and phrases as synthetic speech at the deaf person's location for another person at that location, and that person's speech may be picked up, translated, and displayed as signing motions on a display in the video apparatus.

**32 Claims, 16 Drawing Sheets**





FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 4*



FIG. 5A

FIG. 5B

FIG. 5C



CELLULAR
TELEPHONE
VERSION

*FIG. 6*



FIG. 7



TELEPHONE FOR THE DEAF VIDEO MONITOR SCREEN LAYOUT

*FIG. 8*



*FIG. 9*



FIG. 10



FIG. 11



*FIG. 12*



*FIG. 13A*



*FIG. 13B*



SIGN FOR LETTER "K"
FULL IMAGE

*FIG. 14A*



SIGN FOR LETTER "V"
FULL IMAGE

*FIG. 14B*



THE SIGN FOR LETTER "K"
BINARY IMAGE

*FIG. 14C*



THE SIGN FOR LETTER "V"
BINARY IMAGE

*FIG. 14D*



FIG. 15



FIG. 16

5,982,853

## 1

### TELEPHONE FOR THE DEAF AND METHOD OF USING SAME

#### CROSS REFERENCE TO RELATED APPLICATION

The present application is a continuation-in-part of our application Ser. No. 08/396,554 filed Mar. 1, 1995, now abandoned.

#### BACKGROUND OF THE INVENTION

The present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language.

Deaf people are employed in almost every occupational field. They drive cars, get married, buy homes, and have children, much like everyone else. Because of many inherent communication difficulties, most deaf people are more comfortable when associating with other deaf people. They tend to marry deaf people whom they have met at schools for the deaf or through deaf clubs. Most deaf couples have hearing children who learn sign language early in life to communicate with their parents. Many deaf people tend to have special electronics and telecommunications equipment in their homes. Captioning decoders may be on their televisions, and electrical hook-ups may flash lights to indicate when the baby is crying, the doorbell is ringing, or the alarm clock is going off.

However, deaf persons have substantial difficulties in communicating with persons at remote locations. One technique which is employed utilizes a teletype machine for use by the deaf person to transmit his message and also to receive messages, and the person with whom the deaf person is communicating also has such a teletype machine so that there is an effective connection directly between them. In another method, the deaf person utilizes a teletype machine, but the person who is communicating with the deaf person is in contact with a communications center where a person reads the transmission to the hearing person over the telephone and receives the telephone message from the hearing person and transmits that information on the teletype machine to the deaf person. Obviously, this teletype based system is limited and requires the deaf person to be able to manipulate a teletype machine and to understand effectively the written information which he or she receives on the teletype machine. Processing rapidly received written information is not always effective with those who have been profoundly deaf for extended periods of time. Moreover, a system based upon such teletype transmissions is generally relatively slow.

The widespread availability of personal computers and modems, has enabled direct communication with and between deaf persons having such computers. However, it is still required that the deaf person be able to type effectively and to readily comprehend the written message being received.

Deaf persons generally are well schooled in the use of finger and hand signing to express themselves, and this signing may be coupled with facial expression and/or body motion to modify the words and phrases which are being signed by the hands and to convey emotion. As used herein, "signing motions" include finger and hand motions, body motions, and facial motions and expressions to convey emotions or to modify expressions generated by finger and hand motions. A written message being received on a teletype machine or computer may not convey any emo-

## 2

tional content that may have been present in the voice of the person conveying the message.

Profoundly deaf people communicate among themselves by this sign language on a face to face basis, and utilize a Tele-Typewriter (TTY) for telephone communication. The TTY itself leaves much to be desired, since their sign language is a modified syntax of the spoken language, resulting in a smaller vocabulary and lessened ease of reading printed text as a whole (e.g. definite and indefinite articles ["the", "a", "an"] are omitted most of the time and possessives and plurals are not usually distinguished).

When it comes to communication of profoundly deaf persons and normally hearing persons, the problem intensifies. Only a negligible percentage of the non-deaf population is versed in sign language. Thus, some deaf people read lips and utter words similar enough in their vocal resemblance to enable them to be understood. Beyond this tedious and taxing effort, there is virtually no form for such communication except exchanging some written notes or having an interpreter involved.

A number of methods as to how to achieve sign recognition have been proposed in the literature. However, in spite of the apparent detail of such articles, they do not go beyond general suggestions, which fail when tested against the development of enabling technology. Major problems have been impeding the success of such enabling technology.

The Kurokawa et al article entitled "Bi-Directional Transmission Between Sign Language And Japanese For Communication With Deaf-Mute People" Proceedings of the 5th International Conference on Human Computer Interaction, 2, 1109 (1993) described how limited recognition can be achieved of static gestures utilizing electromechanical gloves which are sensor based and Kurokawa digitizes the electromechanical output of sensors. Capturing images with a camera is a well known art, but interpreting such images in a consistent way without relying on the human brain for direct interpretation (i.e., machine interpreted images) has alluded researches. The Rogers article entitled "Proceedings SPIE-The International Society For Optical Engineering: Applications of Artificial Neural Networks", IV, 589 (1993), suggests various approaches which cannot work when tested in a real life situation, such as utilizing infrared for signal interpretation. Unfortunately, one cannot combine the technology of Rogers and Kurokawa to solve the problem because the technologies employed are mutually exclusive. If one uses images as Rogers proposes, one cannot obtain from them the information provided by the sensors of the data gloves of Kurokawa; if one uses Kurokawa's gloves, one cannot utilize the camera images to provide any intelligence, knowledge or information beyond what the sensors in the DataGloves provide. Therefore, a fresh approach to the problem is necessary.

Displaying signed motions presents another challenge. A simple database of all possible signed motions which is an intuitive approach is rather problematic. To create a lucid signing stream, one needs a smooth movement from one word or phrase to another. Otherwise, the signing is jerky at best if not totally unintelligible. Although there may have been suggestions for such a database of signing images, this is not a realistic resolution due to the fact that, for every signed image in the database, one will need to have an enormous amount of connecting movements to other potential gestures, increasing dramatically the size of the database. To select a signing stream, inclusive of all the proper intermediary connecting gestures between previous and current images needed for lucid signing presentation, from such

5,982,853

**3**

an enormous database puts search algorithms to an unrealistic challenge.

Attempts have also been made to transmit digitized signing motions to a central station as disclosed in Jean-Francois Abramatic et al, U.S. Pat. No. 4,546,383. Even when images are transmitted as proposed by Abramatic et al, the edge detection performed fails to enunciate detail of overlapping hands, or to differentiate between finger spelling and signed motions. All such attempts are restricted by available bandwidth which curtails wide use of such methods.

It is an object of the present invention to provide a novel electronic communication system for use by deaf persons to enable them to communicate by signing.

It is also an object to provide such an electronic communication system wherein the deaf person and the person communicating with the deaf person do so through a central facility containing a translating means for processing elements of digitized image data.

Another object is to provide such a system in which a hearing person may have his speech converted into digitized signing motions which are displayed to the deaf person.

A further object is to provide a unique method utilizing such an electronic communication system to enable communication by and to deaf persons.

### SUMMARY OF THE INVENTION

It has now been found that the foregoing and related objects may be readily attained in an electronic communications system for the deaf comprising a video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases. Also included are means for outputting the words and phrases in a comprehensible form to another hearing person, generally as artificial speech.

In a telephone type system, the other person is at a remote location, although the system may also be used as a translator for communication with a person in the immediate vicinity. Generally, the video apparatus is a video camera.

From cost and portability standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means.

In addition to use of a database of words and phrases corresponding to digitized motions, the translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences.

The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases in written form.

To enable communication of the deaf person, the system includes means for the other or hearing person to transmit words and phrases. The translating means is effective to translate said words and phrases into digitized signing motions, and the video apparatus includes a display screen which provides an output of the digitized signing motions on the display screen for viewing by the deaf person.

There is included means for translating speech into digital data representing words and phrases and such digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf person. The video apparatus also includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

**4**

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic presentation of the steps performed in an electronic communication system embodying the present invention;

FIG. **2** is a schematic representation of a method for connecting an incoming call on the deaf person's telephone to a processing center providing the computer software for the translating functions of the present invention;

FIG. **3** is a schematic representation of the functions when utilizing such a processing center;

FIG. **4** is a schematic presentation of the several steps in the intervention and operation of the processing center when a call is received by the deaf person's telephone;

FIGS. **5**a–**5**c are perspective views of a deaf person's receiver/transmitter installation embodying the present invention in three different forms using a personal computer and video camera, using a television set with a video camera, and as a public telephone kiosk;

FIG. **6** is a perspective view of the present invention in the form of a cellular telephone;

FIG. **7** is a schematic representation of artificial intelligence used to determine and translate the emotional content in the speech of a hearing person communicating with a deaf person;

FIG. **8** is a diagrammatic representation of the manner in which the screen of a display unit may be divided into sections presenting elements of information in addition to signing motions;

FIG. **9** is a schematic representation of the modules of the artificial intelligence for converting signing into speech;

FIG. **10** is a schematic representation of the modules for creating multiple neural networks and collecting the necessary examples for training these networks;

FIG. **11** is a schematic representation of the modules for controlling the conversion of text to signing animation;

FIG. **12** is a schematic representation of the modules for capturing and compressing the images to be used during the playback of sign language animation;

FIGS. **13** illustrates a user of the device wearing special gloves to enhance the ability of the system to identify the signing of the deaf person;

FIGS. **14**a–**14**d illustrate the manner in which the unique shape of the glove makes it possible to recognize the differences between two very similar signs;

FIG. **15** is a schematic representation of the steps to effect translation of English text to American Sign Language (ASL); and

FIG. **16** is a schematic representation of the steps to effect translation of American Sign Language to English text.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Turning first to FIG. **1** of the attached drawings, therein illustrated schematically is an electronic communications system embodying the present invention.

Generally, the deaf person uses sign language in front of a device containing a video camera. The images captured by the camera at 20–30 frames/second are processed by a digital device which does initial and extended image processing. In the processing, each of the frames containing a captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the

5,982,853

**5**

normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center. Subsequently, syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications.

On the other end of the telephone line, the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line (in whatever method of transport is utilized by the telephone carrier) to the Center where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation. Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. The sign images then appear on the screen of a monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

In view of the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications are conducted through this center. As seen in FIG. **2**, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. **3** wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

To avoid excessive costs for a hearing caller, the telephone installation of the deaf person receiving a call may automatically call the center and switch the incoming call to a routing through the center as is illustrated in FIG. **4**.

In FIG. **5a**, the deaf person's station comprises a personal computer **30** including the monitor **32** and a video camera **34**. In FIG. **5b**, a computer unit **36** and a video camera **38** is utilized on top of a standard television set **40** so as to be at hand level. In FIG. **5c**, a public kiosk **42** has built into it, a video camera **44**, a video monitor **46**, and lamps **48** to ensure adequate lighting of the user's hands, face and body. To place the call, there is a keypad **50**, and a credit card reader may be combined therewith.

A portable transmitter/receiver generally designated by the numeral **8** for use by a deaf person is shown in FIG. **6** and it contains a video camera, the lens **10** of which is disposed in the upright portion **12**. In the base portion **13** are an LCD display panel **14** and a key pad **16** for dialing and other functions. Also seen is an antenna **18** for the device so

**6**

that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned so that the camera lens **10** will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences. As previously indicated, such translation is most economically effected in a dedicated central computer facility. The translated message is then conveyed to the "listener" in either verbal or written form.

The other party may speak into a telephone receiver (not shown) and the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel **14**.

Since the emotional content of the speech of the other party is not conveyed by signs, the artificial intelligence in the system may provide an analysis of the emotional content of the speech and convey this to the LCD display panel as a separate output. Indicative of the functions of the artificial intelligence software for doing so is the diagrammatic presentation in FIG. **7**.

This is portrayed to the deaf either as a separate image in a corner of the screen which he or she is watching or incorporated into facial expressions of animated signing figures.

Turning next to FIG. **8**, therein illustrated is a layout for the visual display to present multiple information to the deaf person such as touchless function buttons, system status indicators, alarms, a printed translation, and a playback of the image being recorded, as well as the signing images and text of the hearing person's responses.

FIGS. **9–12** are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods.

The overall operation of a preferred electronic communications system is set forth hereinafter.

The deaf person uses sign language in front of the transmitter/receiver device containing the camera. The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions captured by a digital device which does initial processing. In the initial processing, each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers. At the end of the initial processing, the resulting information is sent as data on a regular and designated phone line using an internal modem in the device to the data processing center.

The rest of the processing is completed at the center. This includes identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content. The text then undergoes a text to synthesized speech transformation and the speech is sent as an analog content to the normally hearing person. The voice content may leave the center as data if packet switching (64 kb or 56 Kb service) is utilized directly from the center. Processing in the center utilizes artificial intelligence such as neural networks trained for the specific applications of the device.

The normally hearing person who calls a deaf person dials the deaf person's phone number. However, at the deaf person's station, his or her call is connected to the center on a single line which is the deaf person's designated line to the

5,982,853

**7**

center. The deaf person's device arranges for switching and enables both the caller and his or her station to be on line as a "party call". The deaf person's station also arranges for the simultaneous transmission of both voice and data on the dedicated line. Thus, the line between the normally hearing person and the deaf person is analog for voice content only, while the line between the deaf person (and now the normally hearing person too) is analog but transfers both voice and data.

The normally hearing person's voice undergoes speech recognition in the center and is transformed into the equivalent signing content and then into textual material. The text is sent from the center to the deaf person's device via telephone lines. Software in the device converts the text into reduced identifying pointers for each gesture, which are then converted into animated images which portray in sign language the content of the speech processed in the center.

In a cellular phone, the operation is much the same in its operation as the hard wired telephone. The camera in the cellular phone transmits the image for initial processing in the cellular phone. From there the reduced data is transmitted to the center for processing. The same switching occurs here as well, and voice/data is sent to the center on the dedicated line assigned for the deaf person. However, in this case the cellular phone maintains two cellular connections on line, one to the center (voice/data) and one to the caller. The deaf person sees the content of the call to him by viewing the display LCD on his cellular phone unit.

When the phone for the deaf is equipped with a microphone and a speaker instead of, or in addition to a second telephone channel, it may be turned into a communicator. Obviously, one can opt to have both of these options to double the usefulness of the device. The communicator enables the deaf person to conduct a "conversation" with any normally hearing person in the close proximity. The signing motion of the deaf person are processed by the center and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person. His or her speech in turn, is picked up by the microphone and sent to the center for processing. The result is an animated content on the LCD of the communicator which portrays in sign language the spoken content of the normally hearing person.

The modules for the software effect translation of the signing into and from digital text are set forth in FIGS. **9** and **10** and those to recognize animation are set forth in FIGS. **11** and **12**. Software presently used for this purpose is appended hereto and is utilized with Borland C++.

A person engaging in the development of other software should consider the following with respect to figure tracking:

A. The groups listed below are captured in separate forms, then added to integrated forms. The integrated forms are then integrated into a single observable signing (i.e. our normalized signing with a single camera), while location information are kept in a separate log. The separate log can have various usages which may not be in their entirety related to signing on the phone. Such can be the case of activating an ATM machine or food billboard in a drive-in situation.

a. Definitions:

L(h):=Left hand
L(a):=Left arm
R(h):=Right hand
R(a):=Right arm
L(H):=Left side of the head

**8**

R(H):=Right side of the head
L(T):=Left side of torso
R(T):=Right side of torso
L(T):=Left side of torso
R(f):=Right femur
L(f):=Left femur
R(t):=Right tibia
L(t):=Left tibia

B. Section addition with recognition takes place:

b.1.A=L(h)+L(a)
B=R(h)+R(a)
C=L(H)+R(H)
D=L(T)+R(T)
E=L(t)+L(f)
G=R(t)+R(f)

c. Signing content (Sc):

S=A+B

d. Emotional content (Ec):

Ec=C+D

e. Pointing and activation (PA):

PA=A+B

f. Location in space (Ls):

Ls=E+G+(C+D+A+B)

In seeking to have the software recognize emotional content in the signing or in the speech, the following should be considered:

Our emotional content is divided into two separate segments:

A. The hearing person segment
B. The hearing challenged segment

A. The hearing person segment.

In this segment we analyze in the speech four distinct elements:

A.1. Changes in various speech output elements.
A.2. Duration of changes recognized in A.1.
A.3. Frequency of the changes appearing in A.1.
A.4. Frequency of the duration of changes appearing in A.2.

The elements that are analyzed by A.1., through A.4. are:

a. Pitch
b. Volume
c. Non words elements for which the system is trained (e.g., gasps of air, emitting the word "ah, chuckle, crying, etc.)
d. Repetitions of words and/or word parts (indicating stuttering).

B. The hearing challenged person segment.

This segment analyzes combination of intrafacial positions, where the system utilizes the training similar to signing, but with different attributes and meanings.

a. Definitions and variables status;

U(l):=Upper lip [showing=1, not showing=0]
LL(1):=Lower lip [showing=1, not showing=0] (m):=Left part of mouth [compressed=1, uncompressed=0]
R(m):=Right part of mouth [compressed=1, uncompressed=0]
M( ):=Complete mouth as a unit [Opened wide=1, closed=0;
compressed and drawn in=4;
compressed and downward=5;
stretched flat=6;
opened with teeth showing=7]
U(t):=Upper front teeth [showing=1; not showing=0]

5,982,853

**9**

LL.(t):=Lower front teeth [showing=1; not showing=0]

t(t):=Frontal teeth as a whole [shown=1; not shown=0]

R(n):=Right nostril [expanded=1; unexpanded=0]

L(n):=Left nostril [expanded=1; unexpanded=0]

L(cb):=Left cheek bone [raised=1; unraised=0]

R(cb):=Right cheek bone [raised=1; unraised=0]

LO(e):=Left Open eye as a whole [distance above pupil= 1; no distance above pupil=0]

RO(e):=Right Open eye as a whole [distance above pupil=1; no distance above pupil=0]

LC(e):=Left closed eye

RC(e):=Right closed eye

LN(e):=Left eye narrowed

RN(e):=Right eye narrowed

R(b):=Right eye brow [raised=1; not raised=0]

L(b):=Left eye brow [raised=1; not raised=0]

N(b):=Nose bridge [two states: compressed=1; uncompressed=0]

F(f):=Frontal forehead [compressed=1; uncompressed=0]

In addition to the emotional content variable Ec, we analyze various combinations as they pertain to emotional expressions of a cultural group. For example:

The state of (i.e, showing of) to=1 and n(b)=1

means "anger".

Computer software for speech recognition and conversion to digital data presently exists and may be modified and enhanced for use in the communications system. Exemplary of such software is that of International Business Machines designated "IBM Continuous Speech Recognition Program". Similarly, commercial software may be used to convert digital data into artificial speech.

Because commercial speech recognition software is not completely accurate, it may be desirable to develop a corrective addon to increase the accuracy as set forth hereinafter:

Algorithmic Steps

a. Duplicate each incoming analog stream to provide two segments:

1. An untouched segment (Segment A).

2. A processed segment (Segment B).

b. Tag each segment with respect to position in the incoming stream.

c. Each segment (Segment A) can have variable length.

d. Digitize incoming analog stream.

e. operate speech recognition kernel on Segment B.

e.1. Speech recognition kernel.

e.2. Spell checker for word.

e.3. Grammatic checks.

e.4. If recognized and proper tag as Ra

If unrecognized or improper tag as Ua

f. Tag each fully (i.e., 100%) recognized word as to its position in Segment B.

g. Deduct the recognized words of Segment B in their appropriate position in Segment B from Segment A. The result is Segment C.

g.1. Segment C is tagged to identify its position in Segment A (Position 1).

h. Segment C is inserted into a prepared digitized speech section (which contains a message to the speech originator)

i. Digital to Analog conversion takes place.

j. The resulting analog speech segment is sent to the speech originator.

**10**

k. Return from speech originator is digitized (Segment D).

l. Segment D is inserted in position 1 in Segment A.

m. Segment A is declared 100% recognized segment and is moved to signing dispatch.

Corrective Measures

Corrective measures fall into the following.

A. Topic Assisted/using Trap words

B. Intermediary Agent Assisted

C. Speaker Assisted.

D. Spell Checker assistance.

E. Grammatic Assistance.

A. Topic Assisted

1. Invoking the most common nine words to decide:

1.a. Accent/Country/Location

1.b. Channel to subgroup section [divided into geographic and demographic (cultural) groups

2. Invoke Trap words to locate area of discussion

3. Utilize B-tree [C++,V4+] for list of words possibly matching word in question.

First Level of Assistance

1. This level utilizes trap words in order to determine personal speech patterns.

2 Big Nine words are evaluated in 4 tiers: Word [i.j.k.l] i=l, . . . ,n; n=n(a)+n(b) where n(a)=6, and n(b)=6.

Values of n(a) or n(b) can be modified per specific situation.

i determines the group most appropriate to determine any of the nine words.

S=Total number of words

$$S = \sum_{i=1}^{9} \text{Word } [i] = 9$$

Second Level of Assistance

1. This level traps words to determine area of discussion.

j=1, . . . ,10 i.e. Ten words for each area of concentration

k=1, . . . ,12 i.e. Twelve areas of concentration

$$S(j, k) = \sum_{j=1}^{10} \sum_{K=1}^{12} \text{Word } [j, k] = 120$$

Third Level of Assistance

1. This level compares unrecognized words against groups of 20 words describing each of the 12 areas.

$$S(i, j, k, l) =$$

$$\sum_{i=1}^{9} \sum_{j=1}^{10} \sum_{K=1}^{12} \sum_{L=1}^{20} \text{Word } [i, j, k, l] = 9 \times 10 \cdot 12 \cdot 20 = 21,600 \text{ words}$$

If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language Structure, Linstok Press (1978).

ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring attention to detail.

5,982,853

**11**

Repetition of words indicates plurality, vibrations signify intensity, and relative spatial distance between cooperating hands specifies magnitude. Further grammatical delineation is contributed by facial expressions. Some of the facial cues are intuitive to human emotions and simplify such correlation. For example, the eyebrows when raised indicate surprise but when drawn down in a frown like manner signify negation or suspicion. Other facial expressions have no such immediate and intuitive affect. Such as the case of utilizing tongue position. A protruding tongue synchronized with the sign "late" turns the meaning into "not yet".

Isolated grammatical similarities exist between the two languages, although their utilization in translation differs. Utilizing a number system with its siblings of ordinal numbers, age, or time as well as compounds are examples of such similarities.

Translation of compound words in a spoken language is benefited by its written presentation as a single unit, or when spoken, presentation in a continuous utterance, guarantees a unique interpretation which begets a correct translation. "Homework", "businessman", "classroom", "babysitter" are all in daily usage as independent words.

Compounds in ASL are no different than their spoken counterparts, albeit the fact that no manual dexterity is required in rapid concatenation of the components. However, in the absence of external cues accorded the spoken compound in its rapid utterance, a machine translation of ASL compound word requires a resolving algorithm.

Other routines are mandatory for quality translation involving ASL. For example, word order in the context of a spoken language should be observed. It is set by rules which are consistently applied as a way to achieve unambiguous meaning. Such a strict rule set does not exist in ASL. However, the appearance that ASL is more lax and forgiving in its scrutiny for order and thus leading to ambiguity in the resulting meaning is misleading. There are rules in ASL for breaking the rules. In fact, a particular word order rule is a corollary of a prevailing situation conveyed by the signer. Hence, there is a rule for selecting the rule of a particular word order, which together employ supplemental meaning to the sentence, while enabling a shorter exposition. The economy of exposition achieved contributes to a more efficient communication for the signing parties. Subtle but clear message is conveyed by such order. Sentences with classifiers indicating locations appear with the order of Object, Subject, Verb, while Subject preceding Object which precedes Verb singularly indicates inflected verbs. Translation algorithms which treat even the most subtle of ASL idiosyncrasies as rules, emanated from and borne out of a need to improve efficient and economic communication will attain a higher level of comprehensive quality.

The software in FIGS. **15** and **16** handles various translation issues which need resolution before an acceptable translation can follow. Issues or word order in ASL, such as the word order just discussed, are germane to the language itself.

Cultural issues require attention right from the outset. The ASL finger spelled letter "T" viewed in Europe, or ASL signs spatially located relative to the person's midsection viewed in China, will be locally construed a pejorative. Hence, identification of the expression in the context of the intended recipient, may cause the format of delivery to undergo an appropriate substitution. Therefore, the algorithms as related to telephone communication, try to identify the recipient's cultural base or geography prior to dispatch, so that the algorithmic routines for appropriate adjustments can be invoked.

**12**

Notwithstanding such efforts, the advanced group of algorithms is far from being complete, and represents only the first step in a much deserving subject. FIG. **15** shows the essential components of an English to ASL translation algorithm, while FIG. **16** shown the ASL to English translation algorithm.

As will be appreciated, there is a substantial problem in effectuating real time transmission of the data as to images because of the need for compression even after discarding superfluous information. If we consider a video camera with 640 horizontal pixels and 480 lines, this means that a single frame amounts to 307,200 Bytes or 2.4576 Mbits. When considering a real time operation of 30-frames/sec, this would require 73.728 Mbits/Sec. Obviously, a bottleneck will result in the transfer to and from any acceptable storage media. Furthermore, to utilize telephone lines in a meaningful way, such as at 56 kilobits/second or even at 64 kilobits/second, it would take close to 20 minutes to transfer one second of video data. Using compression would mean a compression rate of over 1,000:1. Even resorting to compressing the data by utilizing wavelets, the level of resulting quality would be questionable. The other alternative is typically to transmit fewer frames per second, but this is an unacceptable method as it results in jerky motions and becomes difficult to interpret visual signing gestures.

In the present invention, the preferred approach is to avoid the conventional approach of trying to force some compression scheme on the data, and instead bring the data down from the frame level to a Reduced Data Set (RDS).

It will be appreciated that another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process,and still be recognized once artificial intelligence procedures are invoked. This task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing person, and clothes. Preferably, the system uses special gloves which allow discrimination of the hands from the background for the image processing system.

Turning now to FIGS. **13** and **14**, therein illustrated is the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language. Many times the hands are overlapping or touching each other. Video separation of left from right is accomplished by color separation using different saturated colors for each hand. For example, the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue. In addition, each glove has a third color (typically red) for left and right palm areas. This allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away.

The same type of RDS is utilized in recreating images, frame by frame, in real time, which will be displayed on the deaf person's monitor. These images will appear as smooth, continuous animation which will be easy to recognize. This is because the recreation of this animation is a result of actual frame by frame information which has been captured from a live subject and put into memory. The RDS takes up minimal memory and yet is completely on demand, interactive, and operates at real time speed.

At the end of the speech recognition, from the hearing persons' voice and text building procedure, the various words will be assembled into their counterpart animated signing gestures, starting with the table of data generated from the text that was transmitted from the center doing the frame by frame recreation for each gesture, employing

5,982,853

**13**

special algorithms for transitional frames between gestures and then displaying them in sequence on the deaf persons' monitor.

The illustrated embodiments all utilize a single video cameras. It may be desirable to utilize more than one camera to allow the signing person "free" movement in his or her environment to track down spatial positions in that environment.

In such a case, the installation should follow the following criteria:

1. Each camera is covering a separate angle.

2. Each camera operates independently of the other(s).

3. Angle overlap may or may not be permitted according to the pre-signing calibration.

4. Integration of input from multiple camera is performed

5. A defined figure with signing motions (where applicable) is rendered in conformity with allowable images (for persons). The same technique is useful in defining any objects or, alive, stationary or moving entities, such as animals.

6. Movements without signing are classified as null figures (coordinates are preserved).

7. The animated form of the signing figure can be shown in an "abbreviated" form when the person is not signing. That is, a figure not well defined with specific locations of fingers, etc. Such animated figures an occur for all null figures.

Recently, three dimensional video cameras have been developed. The use of such devices may facilitate recognition of signing motions by enhancing spatial differences.

Thus, it can be seen that the electronic communications system of the present invention provides an effective means for translating signing motions to speech or text for a hearing party using only a normal telephone at the hearing party's end of the line, and for translating speech to signing motions which are conveyed to the deaf party. The system may function as a telephone for the deaf, or as an on-site translator.

Having thus described the invention, what is claimed is:

**1**. An electronic communications system for the deaf comprising:

(a) a video apparatus for visually observing the images of facial and hand and finger signing motions of a deaf person and converting the observed signing motions into digital identifiers;

(b) means for translating said digital identifiers of said observed signing motions into words and phrases;

(c) means for outputting said words and phrases generated by the visual observation of said signing motions in a comprehensible form to another person;

(d) a receiver for receiving spoken words and phrases of another person and transmitting them;

(e) means for translating said spoken words and phrases into a visual form which may be observed by the deaf person; and

(f) means for outputting visual form of said spoken words and phrases on said video apparatus for viewing by the deaf person.

**2**. The electronic communications system in accordance with claim **1** wherein said another person is at a remote location.

**3**. The electronic communications system in accordance with claim **1** wherein said video apparatus includes a video camera and image capture and processing hardware and software.

**14**

**4**. The electronic communications system in accordance with claim **1** wherein said translating means is located at a central station with which said video apparatus and said receiver and outputting means are in communication.

**5**. The electronic communications system in accordance with claim **1** wherein said translating means also includes artificial intelligence for interpreting and converting the translated signing motions into words and phrases and into coherent sentences.

**6**. The electronic communications system in accordance with claim **5** wherein said outputting means converts said coherent sentences into synthetic speech.

**7**. The electronic communications system in accordance with claim **1** wherein said outputting means converts said spoken words and phrases into written form.

**8**. The electronic communications system in accordance with claim **1** wherein said video apparatus includes a display screen.

**9**. The electronic communications system in accordance with claim **8** wherein said video apparatus provides an output of said spoken words and phrases as signing motions on said display screen for viewing by the deaf person.

**10**. The electronic communications system in accordance with claim **1** wherein said video apparatus includes a display screen to provide an output of said spoken words and phrases as signing motions on said display screen for viewing by the deaf person, and wherein said video apparatus includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

**11**. The electronic communications system in accordance with claim **10** wherein said translating means is located at a central station with which said video apparatus and said receiver and outputting means are in communication.

**12**. In a method for electronic communication for the deaf comprising:

(a) visually observing the images of facial and hand and finger signing motions of a deaf person and converting the observed signing motions into digital identifiers;

(b) translating said digital identifiers of said observed signing motions into words and phrases;

(c) outputting said words and phrases in a comprehensible form to another person;

(d) receiving speech from said another person;

(e) translating said speech of said another person into signing motions; and

(f) displaying said signing motions representing said speech to said deaf person.

**13**. The electronic communications method in accordance with claim **12** wherein said another person is at a remote location.

**14**. The electronic communication method in accordance with claim **13** wherein said step of outputting at a remote location is effected by transmission of said translated words and phrases to a communications device receiver at said remote location.

**15**. The electronic communication method in accordance with claim **12** wherein said step of observing and converting the signing motions is effected by a video camera.

**16**. The electronic communication method in accordance with claim **12** including the step of transmitting said digital identifiers of said motions and said speech electronically to a central station where said translating steps are performed.

**17**. The electronic communication method in accordance with claim **12** wherein said outputting step provides such words and phrases as synthetic speech.

5,982,853

15

**18**. The electronic communication method in accordance with claim **12** wherein said outputting step provides said words and phrases in written form to said another person.

**19**. The electronic communication method in accordance with claim **12** wherein said displaying step provides said words and phrases in written form.

**20**. The electronic communication method in accordance with claim **12** wherein said translating step utilizes artificial intelligence.

**21**. The electronic communication method and software in accordance with claim **20** wherein said intelligence is developed with the use of multiple neural networks automatically created and assigned by gesture type.

**22**. The electronic communication method in accordance with claim **12** wherein said another person and said displaying step are at the same location as said deaf person and wherein said visually observing and converting step utilizes a video apparatus.

**23**. The electronic communication method in accordance with claim **22** wherein said receiver and outputting steps are conducted by components of an installation including said video apparatus.

**24**. The electronic communication method in accordance with claim **12** wherein said translating steps are conducted at a remote center.

**25**. The electronic communication method in accordance with claim **12** wherein said translating steps are conducted at a remote center.

**26**. An electronic communications system for the deaf comprising:

(a) a video apparatus for visually observing the images of facial and hand and finger signing motions of a deaf person and converting the observed signing motions into digital identifiers;

(b) means for translating said digital identifiers of said observed signing motions into words and phrases;

(c) means for outputting said words and phrases generated by the visual observations of said signing motions in a comprehensible form to another person;

16

(d) a receiver for receiving spoken words and phrases of another person and transmitting them;

(e) means for translating said spoken words and phrases into signing motions which may be observed by the deaf person; and

(f) means for outputting said signing motions on said video apparatus for viewing by the deaf person, said translating means being located at a central station with which said video apparatus and receiver are in communication.

**27**. An electronic communications system for the deaf in accordance with claim **26** wherein said another person is at a remote location.

**28**. An electronic communications system for the deaf in accordance with claim **26** wherein said video apparatus includes a video camera and image capture and processing hardware and software.

**29**. An electronic communications system for the deaf in accordance with claim **26** wherein said translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases into coherent sentences.

**30**. An electronic communications system for the deaf in accordance with claim **28** wherein said outputting means converts said coherent sentences into synthetic speech.

**31**. An electronic communications system for the deaf in accordance with claim **26** wherein said video apparatus includes a display screen.

**32**. An electronic communications system for the deaf in accordance with claim **26** wherein said video apparatus includes a display screen to provide an output of said spoken words and phrases as signing motions on said display screen for viewing by the deaf person, and wherein said video apparatus includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

\*  \*  \*  \*  \*

US006115482A

# United States Patent [19]

## Sears et al.

[11] **Patent Number:** 6,115,482

[45] **Date of Patent:** Sep. 5, 2000

[54] **VOICE-OUTPUT READING SYSTEM WITH GESTURE-BASED NAVIGATION**

[75] Inventors: **James T. Sears; David A. Goldberg**, both of Boulder, Colo.

[73] Assignee: **Ascent Technology, Inc.**, Boulder, Colo.

[21] Appl. No.: **09/176,999**

[22] Filed: **Oct. 22, 1998**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/930,156, filed as application No. PCT/US97/02079, Feb. 11, 1997, abandoned.

[60] Provisional application No. 60/063,135, Oct. 22, 1997, provisional application No. 60/068,713, Dec. 29, 1997, and provisional application No. 60/011,561, Feb. 13, 1996.

[51] Int. Cl.[7] ..................................................... **G06K 9/00**

[52] U.S. Cl. ......................... **382/114**; 382/103; 382/173; 348/62

[58] Field of Search ..................................... 382/103, 173, 382/177, 114; 348/62; 235/472; 345/173, 157

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 287,021 | 12/1986 | Johnson | D16/1 |
| 3,676,938 | 7/1972 | Trehub | 35/35 A |
| 4,520,501 | 5/1985 | DuBrucq | 381/48 |
| 4,793,812 | 12/1988 | Sussman et al. | 434/116 |
| 4,972,501 | 11/1990 | Horyu | 382/53 |
| 5,091,865 | 2/1992 | Yamada et al. | 395/153 |
| 5,165,897 | 11/1992 | Johnson | 434/113 |
| 5,168,531 | 12/1992 | Sigel | 382/48 |
| 5,186,629 | 2/1993 | Rohen | 434/114 |
| 5,222,160 | 6/1993 | Sakai et al. | 382/57 |
| 5,223,828 | 6/1993 | McKiel, Jr. | 340/825.19 |
| 5,233,333 | 8/1993 | Borsuk | 340/731 |
| 5,287,102 | 2/1994 | McKiel, Jr. | 340/825.19 |
| 5,306,152 | 4/1994 | Shimoda | 434/114 |
| 5,374,924 | 12/1994 | McKiel, Jr. | 340/825.19 |
| 5,438,630 | 8/1995 | Chen et al. | 382/159 |
| 5,461,416 | 10/1995 | Bettinardi | 348/62 |
| 5,475,399 | 12/1995 | Borsuk | 345/130 |
| 5,633,674 | 5/1997 | Trulaske et al. | 348/63 |
| 5,687,333 | 11/1997 | Dobashi et al. | 395/336 |
| 5,736,978 | 4/1998 | Hasser et al. | 345/173 |
| 5,875,428 | 2/1999 | Kurzweil et al. | 704/260 |

#### OTHER PUBLICATIONS

Linvill, "A Direct Translation Reading Aid for the Blind", Proceedings of the IEEE, Jan. 1966, pp. 40–52.

Vanderheiden, Boyd, Mendenhall, Jr., & Ford, "Development of a Multisensory Nonvisual Interface to Computers for Blind Users", Proceedings of the Human Factors Society 35th Annual Meeting—1991, pp. 315–318.

Converso & Hocek, "Optical Character Recognition", Journal of Visual Impairment & Blindness, Dec. 1990, pp. 507–509.

Optacon II System Brochure, Date Unknown.

*Primary Examiner*—Matthew Bella
*Attorney, Agent, or Firm*—Robert G. Crouch; Holland & Hart LLP

[57] **ABSTRACT**

An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which the user performs finger- and hand-based gestural commands, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. Multiple cameras of the same or different field of view can improve performance. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses.

**33 Claims, 6 Drawing Sheets**





*Fig. 1b*

*Fig. 1a*

APPX0331



*Fig. 2*

APPX0332



Fig. 3

APPX0333

*Fig. 4*



Fig. 5c



Fig. 5d



Fig. 5a

Fig. 5b

APPX0335

*Fig. 6*



APPX0336

6,115,482

**1**

# VOICE-OUTPUT READING SYSTEM WITH GESTURE-BASED NAVIGATION

## CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is related to and claims priority from U.S. Provisional patent application Ser. No. 60/063,135, filed Oct. 22, 1997, titled "Voice-Output Reading System with Gesture-Based Navigation," and from U.S. Provisional patent application Ser. No. 60/068,713, filed Dec. 29, 1997, titled "Voice-Output Reading System with Gesture-Based Navigation," the contents of each which are incorporated herein by reference. This application is also a Continuation-in-Part of co-pending U.S. patent application Ser. No. 08/930,156, filed Oct. 9, 1997, titled "Tactilely-Guided, Voice-Output Reading Device", which is incorporated herein by reference, which claims priority from U.S. Provisional patent application Ser. No. 60/011,561, filed Feb. 13, 1996, which is a 371 of PCT application Ser. No. PCT/US97/02079, filed Feb. 11, 1997.

## TECHNICAL FIELD

The present invention relates to an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people, as well as others that have difficulty reading printed text, and more particularly relates to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.

## BACKGROUND ART

Our daily lives are filled with the need for reading printed material at any time and in any place. Utility bills and mail at home, food labels at the supermarket, clothes labels at the department store, textbooks at school, manuals and reports at work, and menus at restaurants are but a few examples. Nearly 10 million people in the United States have visual impairments which prevent them from reading books or the newspaper, even with the assistance of reading glasses, contacts or magnifiers, and millions more have mental and learning disabilities that severely limit their reading. To these people, their inability to read these materials in the places they are encountered puts them at a severe disadvantage.

Electronic reading machines using computer-based optical character recognition (OCR) have been used since the late 1980's to assist these reading-impaired people. In general, electronic reading machines have comprised personal computers outfitted with computer scanners, optical character recognition software, and computerized text-to-voice hardware or software. Currently, machines are sold by a variety of companies, including Telesensory of Mountain View, Calif., Arkenstone of Sunnyvale, Calif., and Kurzweil Educational Systems of Waltham, Mass. In general, the operation of these systems involves placing text on a scanner and obtaining a pixel bitmap of the page to be read, converting that image to text using an OCR program in the personal computer to which the scanner is attached, and generating speech output of the interpreted text using a text-to-voice software program. In order to navigate through the text on the page, the user either presses keys on the computer keyboard or keys on a special keypad in order to skip forward or backward by word, sentence or paragraph, repeat a section, or otherwise move through the formatted text.

These reading machine systems, unfortunately, suffer from a variety of operational insufficiencies that limit their

**2**

effectiveness. For instance, before the reading machine can begin to read a page, the user must typically wait over a minute. This delay is due primarily to three causes. Firstly, scanning a page is a mechanical action that takes time to move the electro-optical components over the page. Secondly, the large amounts of information in the scanned image require time to be transmitted to the computer. Thirdly, optical character recognition of an entire page can take considerable time. Thus, if a user wanted to scan through a newspaper or a magazine, considerable time would be needed simply to wait for the each page or scanned sections of text to process to the extent that it could begin audibly reading the text.

Another insufficiency of conventional reading machines is that scanners are limited in the size of page they can process, and reading a newspaper page would require multiple passes through the scanner. Furthermore, the keypad navigation of current reading machines requires that the user move through the text in the same order in which the computer organizes the data. At best, the user can skip over some paragraphs quickly, but the way in which the user is forced to apprehend the data is in the same linear fashion that the computer stores the information. This difficulty is less important in most books, in which the information is largely along a single narrative track, but can be quite limiting with highly formatted text such as newspapers, magazines, scientific journals, bus schedules, utility bills, and advertisements.

The majority of vision-impaired individuals have some residual vision, and many of these people use electronic magnifiers instead of OCR-based electronic reading machines. These magnifying systems generally consist of an electronic video capture system (usually with a CCD camera) connected to a video display. The book to be read is placed on a mechanical tracking mechanism beneath the video capture system, and assists the user in moving the book horizontally so as to keep the current line of text within the field of view of the camera. Means are generally provided to the user to adjust the contrast of the image, invert the colors of the image, and adjust the focus through manual controls on the face of the magnifying systems.

Because people with residual vision feel empowered using their remaining vision, and because they can use the magnifying systems to see information that is outside the scope of reading machines (e.g. seeing graphics on a page), and because they are generally less expensive than electronic reading machines, magnifying systems currently enjoy a far larger market than electronic reading machines. The are a large number of such magnifying systems currently available, including ones from Telesensory of Mountain View, Calif., Magnisight of Colorado Springs, Colo., and Optelec of Westford, Mass. However, conventional magnifying systems suffer from a number of problems.

For example, the mechanisms for tracking lines of text are often difficult to use, since they are manually-guided mechanical systems that require relatively precise and steady hand movements to guide the movement.

This requirement is difficult for certain people, especially the elderly who have fine motor problems, but also because it involves cognitive feedback control at the same time that considerable effort is being devoted to interpreting the images on the screen. Furthermore, when short columns of text are being read, the user must engage in frequent control of both vertical and horizontal mechanical guiding systems. Also, because of the small field of view of the camera and the limited movement of the mechanical system, the page

6,115,482

**3**

must often be repositioned on the mechanical guides. Because of the small field of view of these systems, it is difficult for the user to understand the overall structure of text and graphics on a complexly formatted page. In addition, the system depends entirely on the user's vision, even though this vision may be adequate only for very slow reading. Yet furthermore, the image manipulations afforded by these systems (e.g. contrast, brightness, zoom and focus) are generally limited, since they depend on mechanical systems and analog electronics, rather than the much greater range of possible effects of a digital system.

It was our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems, that gave rise to the current invention.

### SUMMARY OF THE INVENTION

It is an object of this invention to provide a system to permit users to designate text to be read and to specify control system parameters through manual gestures.

It is also an object of the present invention to provide a system with both magnification and reading capabilities.

It is in addition an object of the present invention to provide a system that is affordable.

It is another object of the present invention to provide a system that allows a user to easily and rapidly select for reading text sequences that are distributed across widely separated regions of the current page.

It is additionally an object of the present invention to provide a system that allows a user to read from highly formatted pages of text.

It is still another object of the present invention to provide a system that reads text very shortly after the text is placed in the view of the system.

It is further an object of the present invention to provide a system that can be easily used from a seated position.

It is also an object of the present invention to provide a system that allows a user to read text from a large page, such as that a newspaper.

It is still further an object of the present invention to provide a system that is easy to learn to operate.

It is yet another object of the present invention to provide a system that can be used by people with difficulties in fine motor control.

It is additionally an object of the present invention to provide a system that can read text printed in a wide variety of formats on a wide variety of substrates, including medicine bottles, food packaging, and informative signs, as well as paper.

It is a yet further object of the invention to provide a device that can have many applications in daily life, including enabling reading-disabled people to read, helping children learn to read, and as a data input device for home and office.

Additional objects, advantages and novel features of this invention shall be set forth in part in the description that follows, and will become apparent to those skilled in the art upon examination of the following specification or may be learned through the practice of the invention. The objects and advantages of the invention may be realized and attained by means of the instrumentalities, combinations, and methods particularly pointed out in the appended claims.

To achieve the foregoing and other objects and in accordance with the purposes of the present invention, as embod-

**4**

ied and broadly described therein, the present invention is directed to a method for electronically reading text under interactive control by a user. The method includes obtaining a digital image that includes text to be read, performing symbology recognition on the digital image, determining a command signal from a sequence of user-generated spatial configurations of at least one pointer, choosing a subset of the recognized symbology to read on the basis of the determined command signals, and converting the chosen subset of recognized symbology into a humanly perceptible version.

The present invention is also directed to an electronic reading apparatus for converting text to spoken words for a user. The apparatus includes a digital imaging device that converts text to a digital imaging signal, and a character recognizer receptive of the digital imaging signal, the recognizer generating a recognized character signal comprising the symbolic identity of the recognized text and the location of the recognized text relative to the digital imaging signal. The apparatus also includes a pointer that is operated by the user to indicate commands, wherein commands are encoded in the location and movement of the pointer, and a pointer tracker receptive of the pointer location and movement, the tracker generating a pointer location and movement signal. The apparatus further includes a command interpreter receptive of the pointer location and movement signal and the recognized character signal, the interpreter generating a command signal, and a controller receptive of the command signal and the recognized character signal, the controller generating an output signal representative of at least portions of the text recognized. In addition, the apparatus includes a transducer receptive of the output signal for converting the output signal to a humanly-perceptible form.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1*a* is a perspective view of a device incorporating the first embodiment of the present invention.

FIG. 1*b* is a perspective view from below of the camera mount depicted in FIG. 1*a*.

FIG. 2 is a flow diagram of the steps of information processing of the device of FIG. 1*a*.

FIG. 3 is a perspective view of a device incorporating the second embodiment of the present invention.

FIG. 4 is a perspective view of a device incorporating the third embodiment of the present invention.

FIG. 5*a* is a side view of a device incorporating the fourth embodiment of the present invention.

FIG. 5*b* is a side view of the device of FIG. 5*a*, with the finger in a different configuration.

FIG. 5*c* is a front view of the device of FIG. 5*a*.

FIG. 5*d* is a side view of a variation of the device of FIG. 5*a*, with a cut-away view of the lens system.

FIG. 6 is a flow diagram of the steps of pointer tracking, as used in the flow diagram of FIG. 2.

### BEST MODE FOR CARRYING-OUT THE INVENTION

#### Overview of the First Preferred Embodiment

FIG. 1*a* is a perspective diagram of the first preferred embodiment of the present invention. The electronic reading machine **29** is mounted on top of a video monitor **31** with the field of view onto the surface below on which printed material **33** is placed. The printed material **33** can be text in a variety of formats on a variety of substrates, including

6,115,482

5

books, magazines, newspapers, food packaging, medicine bottles, bus schedules, utility bills, or CD-ROM labels. The electronic reading machine **29** comprises a main system **35**, from which a camera mount **33** protrudes. The camera mount **37** comprises one or more electronic imaging devices (such as CCD or CMOS **35** cameras).

A view of the camera mount **37** from the underside is shown in FIG. 1*b*, a perspective diagram. A camera **39**, which may comprise a CCD or CMOS imaging sensor **41** along with an attached lens **43**, is angled away from the main system **35**, so that it is directed towards the printed material **33**.

Optionally, the camera mount **37** may incorporate one or more illumination sources, so as to provide constant illumination over the field of view. In FIG. 1*b*, such illumination is provided by two rows of illumination sources **45** along the lateral edges of the mount **37**. These illumination sources **45** may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources. Optionally, these illumination sources **45** may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material **33**. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the arrangement of illumination sources need not be in rows, as shown in FIG. 1*b*, but may also comprise point sources or sources located in varied arrangements around the camera **39**. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly.

The image or images obtained by the camera **39** are transmitted to an electronic computing device located within the main system **35**. The device may comprise either a general-purpose personal computer, or an embedded computer optimized for use in the reading system. The computing device processes the images in order to optimize the contrast and brightness of the image, and then further processes the image in order to extract textual information (e.g. by optical character recognition (OCR)) or to interpret graphical information.

FIG. 2 is a flow diagram that depicts the use of the system described in FIGS. 1*a* and 1*b* for reading text on the printed material **33**. The user places printed information into the field of view of the camera assembly, comprising the image sensor **41** and lens **43**. During an image capture step **51**, the image is read by the image sensor **41**, and is then converted to a digital signal and processed during video digitizing **53**. The output digital image, consisting of a two-dimensional array of pixel values (generally either 8-bit gray-scale or 24-bit color) is then sent to a digital computer where the image is analyzed in at least two modes. In the first mode, the image is converted into its text representation in an optical character recognition step **55**, whereas in the second mode, the image is analyzed for the presence, orientation and movement of a pointer object (e.g. a finger **34**, shown in FIG. 1) which is under the influence of the user and which is located on top of the printed material **33**, in a pointer tracking step **57**. It should be understood that the pointer that is being tracked in the tracking step **57** may alternatively comprise an object attached to a finger or hand, such as a colored dot or a blinking light, or may be an object held by the user, such as a wooden, plastic or metal rod, which may have passive or active markings to make it more easily tracked.

6

The combined results of optical character recognition **55** and pointer tracking **57** is both a text representation of the printer material **33**, as well as an indication of the text to be read from the pointer tracker **57**. As to be described below, the user indicates the text to be read through pointer gestures, that might include presenting his finger **34** in a particular orientation, forming a distinctive shape with two or more fingers **34**, waving his finger **34** back and forth, or tapping his finger **34** at a location. During pointer tracking **57**, the movements of the pointer are interpreted, and the text that is indicated to be read is determined.

This text to be read is converted to speech during speech synthesis **63**. In general there will be a prior or concurrent step of speech rate adjustment **61**, during which time the rate of speech will be adjusted according parameters such as pointer movements detected during pointer tracking **57**, user preferences, the difference in the location of the pointer and the location of the text currently being read, and other parameters.

In addition to determining the text to be read, pointer tracking **57** also supplies input to a step of feedback generation **65** through a step of feedback transduction **69**, which is used to indicate to the user information other than the vocalized text on the page supplied through the steps of text selection **59**, speech rate adjustment **61**, and speech synthesis **63**. This feedback comes in a variety of different forms. For instance, sounds could be used to indicate whether the printed material **33** was oriented properly, whether the paper **33** needed to be moved in order to place additional text within the field of view of the image sensor **41**, or the manner in which the pointer **34** is aligned with respect to existing text (e.g. whether it is pointing at text or not).

Many users of the system will have residual vision that can be used to supplement the synthetic speech output from speech synthesis **63** and feedback transduction **69**. The images captured during image capture **51** are fed through image enhancement **73**, which can improve image readability using analog or digital enhancement techniques such as increasing contrast, changing the image brightness, emphasizing edges, inverting color polarity (e.g. from black on white to white on black), changing the bit-depth (e.g. from gray-scale to black and white through binarization), or the like. This image may be combined in a step of video mixing **67** with an overlay of feedback information, which could include placing a box around the text currently being vocalized. The combined signals are presented then to the user in a step of video display **71**.

Detailed Description of the First Preferred Embodiment

The step of image capture **51** can involve either color or black and white images. The advantage of color images is balanced by the higher data throughput required to transmit the image to the computing device present within the main system **35**. Either CMOS or CCD sensors may be used for the image sensor **41**, and are selected on the basis of cost, pixel density, noise and other variables. The image sensor may communicate through various means with the main system **35** computer, including parallel, universal serial bus (USB), IEEE 1394, or 16-bit (PCMCIA) or 32-bit (CardBus) connections, or through a special frame grabber which integrates directly with the system bus, preferably with a direct memory access (DMA) interface (e.g. Matrox Meteor cards from Matrox, Montreal, Canada). The choice of communications interface is made on the basis of cost, throughput, and DMA capabilities.

6,115,482

7

The main system **35** computer should be of sufficient power to perform the remaining steps of the process. In general, any Intel Pentium or compatible chip of 150 MHz speed will be sufficient, although a faster speed will provide improved results. In addition, other non-Intel processors, such as those that are used in Windows CE systems, will suffice if they are of a similar performance. While Windows 98 and Windows NT 4.0 operating systems are suitable for system operation, other operating systems such as Windows CE are also suitable, if support programs for functions such as optical character recognition and speech synthesis are available.

It should be understood that the computer of the main system **35** may be part of a separate system, such as an office or home desktop computer. The use of such a general purpose computer greatly reduces the cost of a system of the present invention. Thus, only the imaging system and certain feedback output systems to be discussed later need to be provided to the user, and the main computing functions of the desktop computer (processor, power supply, mother-board functions, etc.), as well as input from microphones and output from speakers and video displays integrated with the computer can be used.

The number of pixels to be obtained during image capture **51** is determined by the size of the area to be read, and the requirements of the optical character recognition (OCR) program. In general, the higher the pixel density, the better the accuracy of the OCR. It is preferred to have a pixel density of 125 pixels per inch (dpi), which is slightly less than most facsimile (FAX) machines, although pixel densities of 300 dpi or better provide even better OCR accuracy. In order to reach this pixel density, the image sensor **41** must have a sufficient number of pixels, and the optics of the lens **43** must allow a small FOV at short operating distances.

The DVC-323 digital camera from Kodak (Rochester, N.Y.) has minimal but sufficient operating characteristics for the present invention. The camera operates in "still" mode, capturing images of 640 by 480 pixels with a "macro" image size of 4.7 by 3.5 inches, translating to about 140 dpi with the standard lens. The camera transfers the image to the host computer via a USB connection. It should also be noted, and will be discussed later, that the DVC-323 may also be operated in a video mode wherein the pixel density is lowered to 320 by 240 pixels, or less, in order to facilitate faster transfer of images through the USB connection.

Video digitizing **53** includes analog-to-digital conversion, if it is not an integral part of the image sensor **41** (many CMOS sensors include integral analog-to-digital converters). Once the image is transferred to the main system **35**, it can be digitally manipulated to make the input more appropriate for subsequent interpretation. For example, the signal may be converted from a color image to a gray-scale or binarized black-and-white image, since many OCR programs operate most effectively on such images. In addition, the image may be gain adjusted, despeckled, and otherwise manipulated to improve the image for subsequent processing.

The optical character recognition step **55** is carried out in the main system **35** using standard OCR algorithms, such as those employed by the Tiger program of Cognitive Technology of Corte Madera, Calif. These programs not only convert the image to its text representation, but also identify the location of particular letters, the font sizes and styles used, and basic text formatting such as indenting and paragraph margins.

The pointer tracking step **57** operates using commonly used tracking algorithms. While many pointers may be used,

8

it is most convenient for the pointer object to be part of the users hand, since it is always available, it is easily placed in the vicinity of the printer material **33**, and fingers and hands are naturally used to point at objects, and have ranges of both large scale and small scale motion appropriate for that task. More specifically, for purposes of this description, the use of one or more fingers of the user's hand will be used as illustration of pointer tracking and basic gesture-based navigational commands, as shown using the finger **34** of FIG. **1**.

Since, for the most part, the printed material will be roughly stationary, changes in the image will be linked to movement of the finger **34**. These changes can be easily identified using means of comparing without the finger **34**, and with the finger **34** present. In general, as the printed material **33** is placed under the camera mount **37**, the printed material **33** can be seen free from the presence of the finger **34**. To assist in this, the user may be verbally instructed to keep their fingers and hands from the area under the camera mount **37** until an identifying sound (e.g. a "beep" emitted from a speaker **47** on the main system **35**) indicates that they may place their hands within the field of view of the image sensor **41**. Then, when a new image is subtracted from the original image of the printed material **33**, most of the difference image will be blank, except for the presence of finger **34**.

FIG. **6** is a flow diagram of the steps of an alternative method of pointer tracking **57**, in this case for tracking a finger. The input to a step of edge detection **161** is the digitized video image from video digitizing **53**. Edge detection finds large positional changes in pixel value, which may be performed by convolving the image using multipoint edge enhancement operators, or by simpler arithmetic manipulation of adjacent pixels. This edge enhanced image is then subtracted from a similarly edge enhanced image of the sheet without the finger, taken before the finger is placed into the field of view, in a step of image subtraction **163**. This image should have small amounts of noise due to changes in illumination and movement of the printed material **33** that occurs between the time that the two images were taken. Therefore noise, determined by both the magnitude of the residual pixel information, as well as its degree of localization, is removed in a thresholding and signal extraction step **165**. In addition, the continuous values present until this point are converted into binary (black versus white) values through thresholding. Individual pixels are now grouped together into lines in an edge chaining step **167**, using an algorithm that looks for increasing variance of points around a line, until the variance exceeds a predetermined threshold. This groups all of the pixels into a smaller number of discrete lines, which are easier to handle in later steps. Because thicker lines are resolved by edge detection **161** into parallel lines along each edge, an edge thinning step **169** looks for such parallel and closely spaced lines, and resolves them into a single line, generally at the midpoint.

Now the image has been reduced to lines representing the current position of the pointer, and in a step **177**, these lines can be compared with biometric information **177**, which indicates norms for finger length, width, and the like. From these comparisons, finger position and orientation can be established. The current finger information is stored in a finger database **175**, sorted on the basis of time. In particular, while the index finger **34** may be inserted to varying degrees within the field of view of the image sensor **41**, its width should be roughly between 12 and 25 mm in width, whereas two fingers **34** should be between 30 and 50 mm in width (it should be noted that these widths ranges do not overlap). Thus, it is possible to easily distinguish between one and two

6,115,482

**9**

fingers **34** placed on the printed material **33**, and by extension, between two fingers **34** and an entire flat hand on the page.

The current finger information is then compared with past finger position and orientation in a finger motion detection step **173**, in order to determine the motion of the finger over time. For example, if the finger travels first in one direction and then the other direction over a period of one-half a second, a wagging motion of 2 hertz would be returned.

If a color camera **39** is employed, the finger **34** could be identified on the basis of its color in distinction with the color of the background-printed material **33**. This would still require an initial detection of the finger in order to determine the skin color for later use, but this could happen in a calibration stage where the finger **34** is brought in front of a white background. In operation, the pointer tracking **57** could look for colors with the known hue of the finger, and use this to determine the location of the finger **34**.

It should be appreciated that there are many algorithms that may be employed for the detection of the presence, location, orientation and movement of the finger **34**, and the algorithm of FIG. **6** is only an indication of a method that will provide the necessary information. Other algorithms may be more accurate or consume less computing resources or have other advantages over the method given.

Tapping motions by fingers **34** can be readily detected by a variety of means. For instance, the apparent width of the finger **34** slightly increases as it is raised, and then decreases as it is lowered. In a subtraction of successive images, this is seen as an outline difference of the finger **34**, especially since the finger **34** will not be moving in general directly in the direction of the image sensor **41**. In addition or alternatively, as the finger **34** is raised, depending on the orientation of illumination sources, it casts a shadow on the paper that is visible as a darkened area. Also, in addition or alternatively, as the finger **34** is raised and lowered, while the overall shape of the finger **34** is retained, the detailed distribution of skin features and nail position will move a large amount relative to their size making it easy to see.

On any sheet or object containing textual information, there is considerable content to be read. The user selects the textual components to be read by the system by pointing with his hand at the text to be read. The position and movement of the pointer finger **34** is combined with the location and presence of the text on the printed material **33** in order to select specific text to be read in the text selector step **59**. The finger **34** locator defines a "reading window" comprising text that is contextually related. For instance, text within a paragraph is more closely related than text in a prior or succeeding paragraph. Text in the same column generally has (except for tables) a closer relationship than text in adjacent columns.

When the pointer is to text, the text within the reading window, determined by the text selector **59** through input from the OCR step **55** and the pointer tracking step **57**, comprises that text to be immediately read, and is linked to text to be successively read. The user indicates through gestural movements the manner in which the text is to be read. For example, text may be read continuously, either at a fast or slow rate, single lines or paragraphs of text may be read, words may be spelled out, paragraphs may be skipped, etc. The gestural movements interpreted by the text selector **59** allows the user fine control over the reading behavior.

For example, moving one finger **34** back and forth side-ways over text may indicate that the text should be read continuously. Tapping on the text may indicate that only a

**10**

single line of text should be read. Curling the finger up (bringing the fingernail vertically under the hand) could indicate that a paragraph of text should be skipped. The placement of two fingers on the page without movement could indicate that reading should temporarily halt.

It may be useful to read individual text elements, such as words or numbers, when the user cannot understand these elements as spoken by the reading system, when the user wishes to repetitively vocalize certain speech, or when the user wishes to vocalize individual text elements (such as page numbers). In such cases, the user may make a short horizontal stroke rightward along the text underneath the element to be vocalized. The lack of continuous horizontal or vertical motion would indicate to the system that an individual element is to be vocalized.

It should be understood that the gestural movements could be used not only to select the text to be read, but also the manner in which the text output should be generated, or other parameters of the electronic reading process. For instance, the speed with which the single finger **34** moves back and forth across the page, as described above, could be used to determine the rate at which synthesized speed is read. Alternatively, or in addition to this speech rate control, the user could move his finger **34** down the page through the text, and the system would adjust speech rate in order that the current speech output would be approximately at the text which is in front of the finger **34**. Spreading two fingers apart (e.g. the index finger and thumb) could be used to set the auditory volume of speech output. A closed fist could be used to direct the electronic reader to shut itself off.

Using gestural methods such as these, the step of speech rate adjustment **61** sets a rate of speech output. In addition to the gestural inputs described above, the system will also use other information, such as a predetermined default rate, generally chosen from the range of 80–160 words per minute, which may be user selected, as well as range limits beyond which speech recognition by the user will be challenging.

A set of gestural movements along with the command interpretations constitutes a gestural user interface. One such interface would comprise the following gestures and commands. One or more fingers moving back and forth would constitute a clear command, stopping any current reading. To read the whole page, 4 fingers would be laid on the printed material **33** until reading begins, where such reading could be stopped with the clear command as described above. To magnify a section of text, the user would put his thumb and index finger together to form a "C". The section between the fingers defines the location and field of view of the image obtained by the camera **39**. Moving a single finger horizontally across a page reads the text in the line above the finger at a rate such that the vocalized texts keeps pace with the movement of the finger; moving the finger vertically reads the single word in each line closest to the finger as the line is passed by the finger. Moving a double finger (two fingers extended side-by-side) vertically through the text reads the text at a rate whose speed is roughly proportional to the speed of the hand, but which has lower and higher predetermined rates which may not be exceeded. Moving a triple finger (three fingers extended side-by-side) vertically through the text reads the text at a rate "without limits", reading at the speed that the fingers move. If the speech synthesis cannot keep up with the rate of finger movement, words or lines are skipped and replaced by short beeps or clicks to indicate that information was skipped.

In the preceding discussion, we have described a number of gestural movements that can be distinguished by process-

6,115,482

**11**

ing of visual images by a computer (e.g. one, two or more fingers placed flat, wiggling one or more fingers left to right, tapping a finger, curling a finger inwards, making a fist, etc.), as well as commands which the user wishes to make with these gestures (e.g. read the text above the finger, move to the next block of text, read the text faster, read more loudly, stop reading, remember this text). The particular linkage of a gesture with a command may be cognitively linked—e.g. a flat hand, like a "stop" motion, may be used to stop reading. However, many different gestures may be linked with different commands within the spirit of the present invention. Furthermore, the gesture-based commands may be supplemented with physical controls (such as buttons, knobs, sliders and keyboards) to allow other modes of input.

In step **63**, the speech selected in text selection **59** will be synthesized at a rate determined by speech rate adjustment **61**. The means of synthesizing speech may include both software and hardware components. A preferred method of speech generation would use software programs such as Lernhout & Hauspie's Text-to-Speech (Burlington, Mass.). The output speech is encoded by the speech synthesis software in an appropriate format, such as 16-bit linear PCM encoding, and then output through a speaker **47** (see FIG. **1**) located on the main system **35**. If the user wishes for more privacy when operating the system, a jack **46** is provided into which headphones may be inserted.

It is important for the user to know where text is located on the page. This not only allows the user to knowledgeably select which text to be read, but in addition, by perceiving the spatial layout of textual information, thereby gain information about the type of textual content on the page. For example, listings, tables, graphics, utility bills, restaurant menus, and other textual information commonly encountered in daily living have characteristic layouts with important encoded information.

The locational information is provided to the user by way of feedback means, which may comprise tactile, audio and visual feedback, or a combination of these different modalities.

Tactile—The tactile feedback mechanism may comprise a worn, held or sub-surface (below the printed material **33**) transducer that vibrates in response to the presence of textual information within the reading window. In the case of a worn transducer, the transducer may be attached or clipped to the tip of the finger. Vibrating pins or rotating eccentrics would generate the skin deflection associated with a tactile feeling. The held transducer may be cupped or grasped within the user's hand that is directing the reading process (i.e. on which the finger locator is based), and includes similar vibration means as for the worn device described above. The sub-surface transducer comprises one or more vibratory transducers which is located beneath the surface of the textual information. For instance, a raised reading platform could be placed within the field of view, delimiting the extent of the field of view, and additionally incorporate tactile feedback means that transmits tactile feedback through the reading material. The tactile feedback means incorporates movement transducers that may be cam-based, eccentric-based, magnetic-based, electro-rheologically based, or other such mechanisms that can provide different vibration vectors (e.g. shear vibrations in different directions, pressure vibrations or physical displacement).

Information is provided by the tactile means through the presence or absence of vibration, the intensity of vibration, the frequency of vibration, the periodic timing of vibrations, and the direction of vibration. Combinations and variations

**12**

of the vibrational characteristics can thereby convey information about the density of text (e.g. lines per inch), the size of the text font, closeness of the locator finger to the text direction of the closest text outside of the reading window, alignment of the text relative to the horizontal of the camera assembly image, and other such information as is useful to navigate through textual information. For instance, if there is no text within the reading window, a characteristic pulsing vibration would indicate nearby text, and the frequency and intensity of this pulsing vibration would guide the user to the text. In addition, characteristic vibratory patterns can indicate when the reading window is positioned over graphics. The use of tactile information to guide the user in reading is also described in PCT patent application PCT/US97/02079 to Sears, titled "Tactilely-Guided, Voice-Output Reading Device," which is incorporated herein by reference.

Alternatively, or in addition to tactile feedback through vibration, a finger-mounted tactile unit may produce displacement of a movable member underneath the tip of the finger locator, giving the perception to the user that their finger is moving over a topologically elevated text. Thus, as the finger moved over a line, the member would push up on the finger from below, raising the finger, and giving the impression that the line of text was raised relative to the surrounding surface. Thus, by moving their finger over the entire surface, the user would receive rapid, intuitive and spatially encoded information about the distribution of text element over the page. In addition to encoding text location by perceived elevation only, the mechanical actuator may also provide physical tilt to the perceived elevated component. For example, the physical actuator may have two vertical actuator elements beneath an inflexible, relatively horizontal cross-member. As the height of the two vertical actuator elements changes, the slope of the joining cross-member will change, resulting in the perception of slope. This reinforces the perception described previously in this paragraph of traversing up and over an elevated line of text, which in actuality is flat.

If a tactile feedback mechanism is attached to the user's finger **34**, this provides a convenient platform for means to locate and track the finger. For example, a blinking LED facing upwards towards the image sensor **41** may be placed on the tactile transducer housing, wherein the blinking is synchronized with image capture **51** such that during successive image captures, the LED is on and then off. By comparing the two successive images, the location of the finger can be easily tracked.

Audible—The audible feedback means includes the generation of sounds of various volumes, frequencies, timbres, repetition frequency and directional source location (with the use of multiple speakers and techniques to produce three-dimensional holographic sound, such as that provided from SRS 3D Sound from SRS Labs of Santa Ana, Calif.) that conveys information such as that described for tactile feedback means. For instance, if there is no textual information within the reading window, the frequency and/or intensity of a sound can increase as the finger locator is brought closer to readable text. In addition, spoken information may be used to guide or inform the user. For example, the word "graphic" can be enunciated to indicate the presence of graphical information. Simultaneously, perceptually distinctive background sounds can indicate the density of graphical information (e.g. keyed to the spatial frequencies within the graphic or the distribution of color densities).

Visual—Many potential users of this system have complete vision, yet have trouble reading (e.g. the learning

6,115,482

**13**

disabled, dyslexic, or alexic), or have low vision where acuity is insufficient for reading common printed text sizes. In such cases, the residual vision may be well employed to guide the user through the text information. In such cases, the system would incorporate either a monitor (such as a computer display or television screen) or alternatively, a visual display that might comprise a bank of LEDs, a liquid crystal display or scanned laser beams projected onto the printed material **33**.

In the case of a high-resolution monitor, the image of the printed material is presented to the user. This image may be enhanced by affecting the brightness and contrast of the image. In addition, a magnified view of the image around the reading window may be called upon through a signal input by the user. This signal may be input either by a pressure-sensitive button attached under the tip of the finger locator, or alternatively, may be a visual gestural cue interpretable by the computer. For instance, the thumb and index finger may be spread apart to indicate the desired horizontal or diagonal extent of the field of view in the magnified image. In the case of closely spaced text, that text which is currently within the reading window may be indicated through changing the text color or by highlighting the text which comprises the reading window. The image displayed on the screen need not be real-time captured by the camera assembly, including the finger locator, but may be derived from a previously captured image in which the finger is not present, so that a clean image of just the source reading material is displayed. Alternatively, the image of the user's finger may be replaced with an icon representing the finger locator, a box representing the reading window, or a muted image of the finger locator that allows viewing of the image beneath the finger.

If the visual feedback means is a visual display that does not directly project pixel images from the camera input, then that display may be located on the directing finger or hand, or may be at a fixed location, such as being incorporated into the camera assembly housing. Location on the directing hand allows the user to simultaneously view the material being read, as well as the visual feedback information. A preferred embodiment of this form of visual feedback means would be a pair of rows of LEDs, operating similarly to the tactile display pins and lights described in PCT patent application PCT/US97/02079 to Sears titled "Tactilely-guided voice-output reading apparatus." However, instead of the LEDs being pointed back towards user, as in the patent application referenced above, the lights would preferably by pointing forwards, illuminating the text currently in the field of view that is to be vocalized.

Control for this feedback is provided in a feedback generation step **65**, which accepts input from pointer tracking **57** and text selection **59**, which contain information about the position and movement of the finger **34**, as well as the location of text elements on the printed material **33** and the text elements being read. The feedback so generated is provided through feedback transduction **69**, via either tactile, audible or visual signals as previously described. In addition, output may be through a step of video display **71**, in forms of visual feedback as previously described, such as the highlighting of certain text. In general, this video feedback is performed in conjunction with display of images from the step of image capture **51**, and thus may require a step of video mixing **67** of the original video images with the images of feedback generation **65**. Alternatively, the digitized video images from the digitizing **53** may be digitally altered in the feedback generation **65**, and then provided as digital images for video display **71**.

It should be noted that an important and challenging feedback is to allow the user to follow a single line of text.

**14**

That is, if the finger locator were to move diagonally across the page, and the reading window were to follow closely, a single contiguous line of text would not be read. Thus, it is important to either give feedback information to the user, to allow their finger locator to track a contiguous line of text, or to incorporate user input that directs the reading system to automatically track text parsed into sentences and paragraphs. This is accomplished according to the present invention in two different ways.

Firstly, the feedback device, whether tactile, audible or visual, or a combination of these, can direct the user how to move their finger locator along the text line of which the current reading window is a part, which we will call here the "track line." With such means, feedback is given to the user to indicate when the finger locator is moving off of the track line. For instance, the intensity and/or frequency of tactile or audible feedback can peak when the finger locator is located precisely below the track line, and drop off in intensity and/or frequency in rough perceptual proportion to the distance from the current track line. With a visual feedback means, the icon representing the finger locator may change in color, size or intensity depending on the distance of the finger locator from the track line. In these ways, the user can be directed to maintain the same track line as their finger traverses horizontally, instead of skipping to a new line.

Alternatively, or in addition to the feedback described in the preceding paragraph, the user may direct the reading system to read according to parsed textual content. That is, that the reading system will read blocks of contiguous text at a preset rate until some selection delimiter is reached. This selection delimiter may either be intrinsic to the text (such as the end of a paragraph), or it may be bounded by a cue provided by the user. For instance, the user may direct the system to provide continuous speech through the use of two fingers instead of one, and stroke the fingers vertically along the section of the text to be read. When the reading system reaches the end of the delimited section, an audible cue (such as a beep) indicates that the user should further instruct the system as to the next section.

In addition to the hand-position and movement signals mentioned above, there are numerous input signals that may be required from the user. For example, as mentioned above, input from the user may be obtained from pressure-sensitive buttons located beneath the tip of the locator finger. Alternatively, or in addition, buttons may be available in a unit accessible to the free hand on which the finger locator is not located. This keyboard may include positional navigation keys (such as arrow keys), contextual navigation keys (e.g. "next word" or "previous paragraph" keys) or mode selection keys (e.g. "read continuously" or "check spelling" keys). Alternatively, or in addition, a microphone on the main system **35** may be positioned so as to receive vocal input from the user, which allows the user to select different modes of action or to navigate through the computer interpreted text using spoken commands.

It should be noted that electronic cameras have limited resolution, set by the number of pixel capture elements and by the communications bandwidth for transmitting images from the image sensor **41** to the main system **35**. Because of the large area of most pages of text, the resolution of the imaging device may be less than optimal for interpretation of the image by a conventional optical character recognition software program. There are other limitations of these OCR programs and images input to these programs, including lighting, contrast, tilted text, page distortion (e.g. page buckling as the user runs their hand over the page), smudges on the text, colored text or background, and more. It is useful

6,115,482

**15**

for multiple images of the reading material to be obtained and interpreted by the OCR program. For instance, images can be obtained under different exposures, which alter the thickness of lines in the text. In addition, given the distance of the image sensor **41** from the text, vibrations on the surface on which the reading machines or the printed material **33** are placed will cause very slight changes in the placement of text within the pixel image, which will generate different OCR solutions. Such multiple images allow the OCR program to sample the text under slightly different conditions, some of which will aid in improving the accuracy of text interpretation by the OCR program of at least some subset of the text. Letters interpreted from different images of the same text selection may be compared on the basis of confidence factors generated by the OCR program, by spelling programs, or by context analysis (e.g. grammatical checkers). Successive analyses using these factors can be incorporated into increasingly accurate interpretations of every portion of the reading material in the field of view, even before it is called on by the user to be vocalized. This allows the reading system to operate with camera resolutions and inadequacies in reading material quality that would otherwise not be able to be tolerated.

In order to provide systems with large fields of view, using inexpensive cameras of small size, multiple cameras with partial overlap may be used. For example, with the DVC-323 camera previously mentioned, the field of view in macro mode is 4.7 by 3.5 inches, providing a resolution near the lowest possible for optical character recognition. Four cameras arranged in a rectangular arrangement with minimal 0.2 inch overlap in their fields of view would provide a composite field of view of 9.0 by 6.6 inches, which is adequate to cover a standard 8.5 by 11 page with 1 inch margins. Additional cameras or cameras with higher pixel counts could cover even larger fields of view.

It is understood that this invention could also be used for machine translation of text from one language to another. Thus, when presented with a book in a foreign language, the apparatus and methods of the present invention would allow a person to hear the text in their native language. Language translation would occur after the OCR program interpretation of the captured image into text input. Because the entire image from the reading material is input prior to vocalization, the computer may correct for syntax and other language construction differences in order to create proper speech in the native language of the user (this is opposed, for instance, to word-by-word translation, which would be a separate option). In addition, or alternatively, the text and images captured by the system of the present invention can be used to input the text and images for storage and use on the main system **35** computer. This might be used, for instance, as a low-resolution scanner and text input mechanism for general application by users who may or may not have a disability.

For example, home or business users can make manual gestures to copy portions of letters, bills, and advertisements into computer storage files the designate. The advantages over existing scanner systems such as PaperPort system produced by Visioneer (Fremont, Calif.) is that localized portions of pages may be classified independently, that valuable desktop surface is not consumed with a bulky scanner, the system of the present invention may be used while sitting at a work desk, and that the time required for scanning is not required. The user, for example, can open the letter, visually scan it for pertinent data, manually gesture for the data to keep, speak into a computer voice recognition system to indicate the disposition of the data, and then dispose of the letter.

**16**

Furthermore, for a portable system of the present invention, to be described later, a user in a warehouse could point to a bar code to read. The system, using a digital image instead of a conventional laser scanning bar code reader to obtain printed information, would then read the one-dimensional or two-dimensional bar code, and enter it into the system. Because the user would not need to hold a bar code scanner in his hand, this would permit more efficient two-handed movement under the inventory system, and thereby permit increased speeds of data input.

*An Alternative Embodiment of the Present Invention*

FIG. **3** is a perspective diagram of a reading machine that incorporates two cameras. A multiplicity of legs **83** supports a platform **85** over the printed material **33** to be read. A low-magnification wide-angle FOV camera **87** is used to track command gestures. This camera **87** may be fixed in its orientation, provided that the field of view is sufficiently large to capture images from the entire printed material of interest. In order to provide a sufficient FOV, the camera **87** may be outfitted with a wide-angle lens that may have a constant non-linear distortion (e.g. a barrel or fish-eye effect). In this case, software within the computer would be required to remove this constant distortion. In the figure, the extent of the field of view of the fixed wide-angle camera encompasses the entire printed material **33**. This range may be large enough to allow an entire unfolded page of newspaper to be read without repositioning of the paper.

In this embodiment, a pan-tilt camera **89** is provided with a generally smaller FOV than the wide-angle camera **87** previously mentioned. This camera **89** may or may not be outfitted with zoom capability, and if the camera **89** does have zoom capability, the range of magnifications needed will be more limited than in a single camera embodiment, since many low-magnification requirements are satisfied by the low-magnification wide-angle FOV camera used to track command gestures. In the figure, the extent of the field of view of the pan-tilt camera is shown by the area **91** on the printed material **33**. This area is of such a size that the pixel density on the imaging sensor of the camera **89** allows for accurate optical character recognition of text in the field of view.

Optionally, a laser scanning mechanism **95** can be mounted in such a way as to be able to illuminate small sections of all printed material to be read. The purpose of the laser scanner **95** is to highlight the words being read and spoken, providing feedback to partially-sighted users as to what is currently being read. The scanning mechanism **95** is controlled to produce an illuminated box **93** around or fully including the current word being read. In this way, the user can ensure that the process is detecting the proper words for reading. In order that the scanning illumination not interfere with optical character recognition, the laser scanning may be timed so as not to overlap in time with the exposure of the cameras **87** and **89**. It should be understood that instead of highlighting single words, larger sections of text representing sentences or paragraphs may alternatively be highlighted. In addition, the word or words of interest may be shown on a display screen, as described previously for other embodiments of the present invention, in order to provide feedback to users. It should be understood that this laser scanning mechanism **95** could also be used other reading systems such as that of FIG. **1**.

Furthermore, the laser scanner **95** may have the additional function of highlighting text that is searched for under

6,115,482

**17**

direction from the user. For example, the user may direct the system to search for a specific word such as "pay" or for classes of words or text, such as those dealing with currency (e.g. text preceded by a currency symbol such as 'S', which involves a number with two decimal digits, or which contains the word "dollars", or alternatively to scan for non-text symbology such as a bar code or location encoded data such as the page number, which is located in generally predictable locations on a page). When the system successfully detects the search text, then the text could be illuminated by the laser scanning mechanism **95**.

In order to limit the range of motion or illumination required by the laser scanner **95**, it may be affixed to the pan-tilt mechanism of the high-resolution camera **89**, so that the laser is always pointing roughly in the direction of the camera **89** field of view. In this way, the laser scanner **95** will need a smaller range of motion.

Additional illumination of the text to be read is provided by a wide-field illuminator **97**, which is mounted on the platform **85** near to the location of the cameras, and pointed in such a direction as to illuminate text beneath the platform **85**. The range of the illuminator **97** is such as to provide light that is incident on the widest physical range accessible by both the wide-field and pan-tilt cameras **87** and **89**. In FIG. 3, the wide-field illuminator **97** is a fluorescent lamp with reflector and optics to spread the light roughly evenly over the largest field of view of the wide-field camera **87**.

The pan-tilt mechanism of the camera **89** should preferably be oriented so that movement along either the pan or the tilt axis scans horizontally across the printed material, roughly following a text line, while movement in the other axis scans roughly vertically across the page. While this orientation of the camera **89** is not required, it will generally reduce the amount of complex combined pan-tilt movement as text in a line is read. It should also be understood that the mechanism pointing the camera may be served by gimbal mechanisms different from pan-tilt mechanisms, as long as accurate control in two-dimensions is available, and that a sufficient range of motion is provided. Instead of moving the camera **89**, it is also within the spirit of the present invention to rotate one or more mirrors, while the camera **89** remains fixed in location and orientation.

It should be emphasized that the two cameras **87** and **89** may be replaced by a single camera with zoom capabilities. In reading text newly placed under the camera, the camera may be in low magnification zoom, where large areas of the page can be observed within a frame. In this low magnification mode, the camera can scan the observed page for control signals in the form of user hand signals or motion. During this time before the user has indicated a command, the camera may scan both horizontally and vertically over the area of the page looking for the presence of the user's hand.

Once the user's hand or finger is identified using algorithms previously described, the hand can be tracked until a command is received, either through hand movement, finger orientation or position, or other input modality. At this point, the magnification of the camera is increased to an extent that allows the text to be reliably interpreted by the OCR program. Thus, the zoom mechanism will magnify large font headline text to a lesser extent than small fonts, for example in a footnote.

As the magnification of the camera increased, the amount of light reaching the image sensor **41** will be decreased. A light mounted on the camera assembly, which is oriented in the direction of the camera field of view, may provide

**18**

additional illumination whose intensity can be variably increased as the magnification of the zoom element of the camera increases. The actual control of the illumination source intensity is through feedback involving analysis of the images captured by the camera. Alternatively, the exposure time of the camera can be increased in response to changes in the magnification in order to compensate for the available light at different magnifications.

It should be noted that the coordinated action of the cameras **87** and **89**, as well as the laser scanner **95** are preferably controlled by the computer located in the main system **35** that is engaged in the analysis of images from the camera. Thus, all of these elements are generally, though not necessarily, connected electronically to the main system **35**, which may be located on the platform **85**. Additionally, instead of being separately mounted on the platform **85**, as shown in the figure, the elements will likely be placed within a common housing.

The zoom camera is particularly valuable if the image captured by the camera is projected on a computer screen, since the hardware zoom can present a magnification with full pixel information to the user, without need for variable software magnification, which may be of lower quality due to the use of smaller numbers of pixels.

It should be noted that the operation of the system with multiple cameras could admit many different sequences of optical character recognition (OCR) **55** and pointer tracking **57**. For example, when printed material **33** is placed within the field of view of the image capture **51** means, OCR **55** may begin immediately, before gestural input from the user has begun. Image capture **51**, video digitizing **53** and OCR **55** may proceed opportunistically given text within the field of view, and if the gestural command directs the system to read text already interpreted, vocalization of the text through speech synthesis **63** can begin almost immediately. If the text to be read is not among that already interpreted, then image capture **51** of the indicated text using high pixel densities suitable for OCR **55** can begin. This mixing of optical character recognition **55** and pointer tracking **57** can be performed by a single camera with zoom capabilities, changing rapidly from narrow to wide field in order to both capture text and gestural commands, but the use of two cameras allows high resolution text capture to occur simultaneous with low resolution, wide field image capture **51**.

In addition, because images of the text to be read may be already captured before gestural commands are interpreted, the reading system can read text that is obscured by the user's hand during gestural commands. For instance, if the system has begun reading a passage, and the user inadvertently covers some of the text to be read with his hand, the information under his hand may already be stored. Thus, not only can text vocalization continue, but also images of the text where the user's hand is currently placed can be shown in video display **71**, even though current unobscured images of the text are not available.

Optionally, the user may view the text on a video display, similar to that used in the first embodiment. FIG. 3 shows the use of a touch-screen video display **32**, which may be alternatively used. With the touch screen display **32**, instead of making the gesture-based navigational commands within the field of view of the imaging system, the commands are placed directly via finger **34** movements on a touch-sensitive surface **50** of the touch-screen video display **32**. The touch-sensitive surface **50** can use capacitive, resistive, surface acoustic wave or other techniques to determine the presence and motion of fingers on the screen, such as resistive digital

6,115,482

**19**

touch screens manufactured by Jayco of Orange, Calif. While these surfaces **50** generally allow feedback of a single point, and are therefore generally incapable of interpreting the differences between a single finger and multiple fingers used gesture-based commands, even the use of a single point allows the system to distinguish left-right versus up-down motion, tapping motions, and even back-and-forth motions from moving, lifting, returning, and moving motions. This provides a vocabulary of motions that can be used in commanding the system. Instead of having to interpret images for gesture-based commands, the system must interpret only the presence or absence of touch contact, and the motion of this point of contact. In the future, when touch screens are able to completely describe multiple points of contact, then the use of more complex gesture-based commands involving multiple fingers and even the orientation of repose may be used with such a system.

When using the touch-screen display **32**, the text within the system field of view is presented on the touch screen **32**, and the user indicates by gesture-based commands not only the text to read, but the manner and speed of reading, as well. Because the user interacts with an image, rather than the actual printed material **33**, only a single view is permitted at a time. This encourages the use of a single camera with pan, tilt and zoom capabilities, rather than the multiple cameras shown in FIG. **3**. The user can control the pan and tilt by appropriate command gestures on the touch screen **32** (e.g. dragging a finger in the direction of panning, or "drawing" a circle of smaller or larger radius to increase or decrease the zoom), or the system can automatically track lines of text through OCR-based motion control. It should be noted that the image shown on the screen need not necessarily be the current field of view of the currently active camera, but may be instead a stored image, allowing the cameras **87** and **89** to be capturing images of the printed material **33** for later reading.

Using a touch screen display **32**, the user may interact with text that is modified in the step of image enhancement **73**, which may render it more visible to users with residual vision than the printed material **33** from which the text comes. This enhancement may include, as previously discussed, contrast and brightness control, and the image may be further modified by highlighting certain text (such as the text or text line currently being read).

It should be noted that operation using a touch screen display **32** even allows for the use of a flat-bed scanner to obtain images of the printed material **33**, with the user providing gesture-based commands through the touch screen display **32**. This mode of operation has the virtue of using inexpensive flatbed scanners, but suffers from the difficulty of using scanners described in the background section above. Most importantly, scanners require up to a minute or more to scan a standard page of text, whereas image capture using digital cameras supports near immediate reading once the printed material **33** is placed in the field of view of the system.

Another enhancement of this embodiment of the present invention is to import images for optical character reading directly from the screen image buffer of the computer of the main system **35**. Consider, for example, that the computer of the main system **35** is connected to the World Wide Web graphic interface to the Internet (hereinafter referred to simply as the Web). Much of the text interface to the Web is graphic in nature—that is, is presented as pixel images of text, rather than as text which is displayed through Hypertext Markup Language (HTML) text primitives. Web interface software (e.g. Web browsers) typically are unable to provide

**20**

access to this graphics based, non-HTML text to vision-impaired or blind users.

It is within the teachings of the present invention to access a screen image buffer of the computer of the main system **35**, which contains a pixel image of the screen, as the equivalent of the digitized image output of video digitizing **53**, for use in optical character recognition **55**. This allows text to be read both from normal HTML text primitives, as well as from graphics images downloaded from the Web, making all text accessible to vision-impaired users in spoken form. In order to adjust the pixel density of the images for use in OCR **55**, the settings of the video display in the graphics memory of the computer could be variably set, using user-adjustable controls such as is found in the Display settings of the Control Panel in the Settings menu in the Windows 98 operating system from Microsoft Corporation of Redmond, Wash.

The system preferentially operates in hybrid mode, where text displayed in HTML-code is directly interpreted from the code, whereas text displayed as graphics is interpreted through OCR **55** of the present invention. The reason for this is to avoid the need to OCR-interpret text whose symbology is already known to the system.

The user could input gestures for navigating through this text in many ways. One method would be to use a touch screen display **32**, in which the position touched by the user is directly mapped onto the pixels beneath the user's finger. The effect then becomes directly comparable to that of the user making gestural commands on printed material **33**, except that the text is present on a screen rather than paper. An alternative method of interfacing with the screen-based text is to use the cameras **87** and **89** to record gestural movements made within their field of view, without respect to material beneath the gestures. That is, there may or may not be printed material **33** within the field of view of the cameras **87** and **89**, and what is there is ignored by the system. Instead, the system maps the position of the user's fingers within the field of view, and maps the location of the hand and fingers relative to the field of view to the relative positions of recognized text from the screen image in the field of view. Thus, if the user's index fingertip is about 12% from the left of the field of view, and 47% from the top of the field of view of the wide-angle camera **87**, the system would treat it as if it were on top of whatever text was 12% from the left of the screen and 47% from the top of the screen of the displayed text, irrespective of the printed material (if any) beneath the user's hand. This latter method has the advantage of being able to interpret a wider range of gestures (e.g. those involving multiple fingers, or the orientation of fingers) than can be interpreted by most conventional touch screen displays.

This embodiment of the present invention may also be used as a reading device for children, both for its entertainment effects as well as educational value. A child user who could not currently read would bring their favorite children's book to the system of the present invention, and place it in the field of view of the system. The system could not only read the book for the child, but also highlight words as they are being spoken through use of the laser scanner **95**, thereby providing feedback to the child useful for gaining the ability to read.

A Third Embodiment of the Present Invention

Smaller versions of this embodiment may be created to scan single book pages, still within the spirit of the present invention. A smaller reader would be particularly useful for

6,115,482

21

a portable version of the device. In this case, the platform **85** may be supported on collapsible or hinged legs, or may even be available in forms without leg supports, and be worn by the user. For example, the cameras, illuminators and scanners, or some subset of these, may be worn on a head-mount, such as on a pair of glasses, telephone headset, headphones, or cap.

An example of such a worn reading machine is shown in FIG. **4**, a perspective diagram of an eyeglass reading machine **100**. An eyeglass frame **101** provides the basic platform for the reading machine. A wide-field camera **103** on one eyeglass earpiece provides functionality similar to that of the wide-field camera **87** of FIG. **3**, and a narrower field camera **105** provides functionality similar to that of the pan-tilt camera **89**. Suitable cameras for this embodiment of the present invention include the DXC-LS1 lipstick camera from Sony (Japan).

On each earpiece, more proximal to the ears, is a speaker **107** which provides audible feedback to the user, which may be stereo encoded. For instance, to direct the user to turn their head to the right thereby repainting the cameras **103** and **105** fields of view, a noise may be fed through the right speaker. This audible feedback is supplemented or replaced by tactile feedback transducer **109** that vibrates one or more pins **111** on the inside surface of the earpiece, against the bones above the ear. The power and communications are brought to this reading machine **100** through a pair of cords **113** that feed along the earpiece. These cords can be incorporated into an eyeglass support (not shown) that lies along the back of the user's neck, preventing the eyeglass reading apparatus from dropping. The cords **113** lead to a computer that may be carried in various means, including backpacks, hip packs, shoulder bags or an article of clothing such as a vest.

The major functional difference between this embodiment and that described in FIG. **3** above is that the narrow-field camera **105** does not require a pan or tilt capability, and thus the user must point the camera at the proper area on the page in order for the field of view of the camera to be properly placed. This requires continuous and rapid feedback from the system, either through audible feedback from the speakers **107**, or tactile feedback through the tactile transducers **109**. Optionally, these feedback means may be supplemented by a laser pointer on the eyeglass oriented so that its light falls near to or directly on the center of the field of view of the narrow field camera **105**. This will allow users with residual vision to identify the field of view of this camera **105**, and thus track lines of text. If combined with a pan and tilt mechanism, this laser could also be used to highlight text on the page in the manner of the laser scanner **95** in FIG. **3** above.

It should be noted that this embodiment of the present invention leaves the hands of the user free to hold and manipulate the text, and also to perform the gestural commands described above. Also, because of the portability of the device of FIG. **4**, it may also be used to interpret text not located on printed material brought to the system, but rather may also include text on public signage, computer screens, directions affixed to a wall, or book covers on a library shelf, to which the reading apparatus has been brought. The ability to read such text will be conditioned by either a variable focussing means or through use of a camera with a very great depth of field (e.g. a "pinhole" camera), so that text at various distances can be read.

A Fourth Embodiment of the Present Invention

An alternative embodiment of the present invention is to have the camera assembly mounted on the user's hand, as in

22

a portable system. In the previous embodiments of the present invention, the camera or cameras capturing the images of text to be read are either at a fixed location, or located relatively distantly from the text (e.g. mounted on the user's head or chest). Furthermore, in these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.

FIG. **5***a* and FIG. **5***b* presents side views of a fourth embodiment of the present invention, and FIG. **5***c* presents a frontal view of the device. In this embodiment, a camera is mounted directly on the user's fingertip **121** in a finger housing **123**. When the finger **121** is pointed at text to be read, the camera in the finger housing **123** is naturally pointing in the same direction. Images are then transferred by a cable **125** connecting the finger housing to a general-purpose or special purpose computer, such as contained in the main system **35**, as in the previous embodiments. The following paragraphs describe the structure and function of the finger housing **123**, as well as the special algorithms used to interpret images and commands from this embodiment of the present invention.

The finger housing **123** is strapped onto the user's index finger **121** with two straps, a medial strap **127** encircling the middle segment of the index finger, and a distal strap **129** which encircles the distal segment of the index finger. The medial strap **127** is longer in the longitudinal finger direction, and is the primary structural stabilizer of the finger housing **123** on the index finger **121**. The medial strap **127** is conveniently fabricated from fabric or plastic. The finger-housing **123** rests on top of the finger **121**, with a lens **131** above the distal-most segment, and points along the axis of the finger **121**, roughly in the same direction as the user perceives the finger to point. The camera that is part of the finger-housing **123** does not necessarily point directly in the same direction as the finger tip, but may be inclined so that the image taken by the camera is directed more vertically (i.e. with the lens pointing somewhat downward). Optionally, a supporting member **139**, made of a less flexible material, connects the medial and distal straps **127** and **129**, so as to provide support for the distal strap **129**, as well as to maintain a fixed distance between the two straps. In order to aid in slipping the device over the finger, as well as provide a more stylish exterior, a Spandex or other fabric sheath may be placed around the finger housing **123** and associated straps **127** and **129** and supporting member **139**.

Illumination is provided for the camera by illuminators **133** around the periphery of the camera, pointing the same direction as the camera, as can be seen in FIG. **5***c*. The illuminators **133** are conveniently light-emitting diodes (LEDs), and may be of different colors to aid in the discrimination of different colored text, or text on different colored backgrounds. In the case of different colored LEDs, the LEDs **133** would be turned on in sequence or in combination to provide illumination with the greatest contrast of text to its background. One such arrangement of LEDs is shown in FIG. **5***c*, although a smaller number or different topological arrangement of LEDs is within the spirit of the present invention. Depending on the aperture of the camera lens **131**, the sensitivity of the camera, and the amount of ambient light expected, ambient illumination may be sufficient to provide images of the text without additional illumination from the device.

The user's finger **121** will generally be inclined to the page at an angle of greater than 45 degrees, as shown in FIG. **5***a*. However, because the camera is angled to the text, the captured image will not be square and will appear distorted

6,115,482

**23**

if compensation is not made either in the optical hardware, the camera positioning or image capture software. Thus, the optical path within the finger housing 123 may include either tilted mirrors or prisms to remove some or most of the optical distortion caused by the non-orthogonal camera angle. However, these methods cannot entirely remove the non-orthogonal image, since the angle with which the user positions the camera cannot be entirely controlled or predicted, and small amounts of distortion may remain.

This final distortion may be somewhat compensated for by image processing software within the computer, which may detect the angle of the camera position by assessing various features of the image. For example, in general, the lighting from the illuminators, described above, can be known and calibrated for a vertical camera arrangement. If the camera is angled, that portion of the image that is divergent will generally also have less reflected light, since the incident light from the illuminators is spread over a larger area. Thus, the variation in illumination intensity can be used to detect spreading of the image, and provide the information necessary to remove the distortion. In order to assist in the compensation for camera tilt, a miniature tilt sensor, such as those that use a fluid sensing device, may be used to detect camera tilt. With knowledge of the tilt, the image processing software within the computer may remove the effects of tilt. Alternatively, or in conjunction with the means described above, a circular beam of light of known spread may be projected during certain image captures, and the tilt and distance of the surface can be unambiguously determined from the size and shape of the beam captured in the images. Using this method, the illumination spread angle must be different and preferably smaller than the camera field-of-view in order to distinguish distance.

Other means of determining the angle of camera tilt can include looking at the divergence of angle in vertical parts of letters, such as the vertical bars on "h", "l", "b", "K", and many other letters. If the camera is not orthogonal to the text, the angle of the vertical bars will vary within different parts of the image.

For larger text, the user may want to pull the camera away from the printed text in order to increase the field of view of the camera. Because the lens system of the camera will generally operate with a very short focal length, it is generally hard to allow the lens to accommodate a very large range of focal depth. In part, this can be accomplished by using a very small lens aperture, creating a pinhole camera with large depth of field. This strategy, however, is limited by the reduced light capturing of such a pinhole lens system, and the need to compensate for this effect with higher illumination than may be available.

Alternatively, the camera can be outfitted with a movable lens system, which provides variable focus. One example of such an apparatus can be seen FIGS. 5a through 5c, where the user changes the camera focus naturally by flexing his finger away from the text. As mentioned above, the finger housing 123 is primarily positioned and stabilized on the middle segment of the index finger 121 by the medial strap 127. As the hand is pulled away from the page and the finger 121 flexes, curling the finger into the hand, the strap 129 on the distal segment pulls a stiff actuator 135 which is attached tangentially to the camera lens 131, and thus rotates the lens 131 which is attached to the camera by a screw mechanism. Thus, the distance from the lens 131 to the camera is adjusted, thereby changing the focal point of the camera assembly.

It should be noted that a number of different mechanisms for varying the focus of the camera lens 131 are allowed

**24**

within the present invention. For instance, an actuator may extend from the bottom of the lens 131 and rest on the distal finger 121 segment under the influence of spring pressure. As the finger 121 flexes, the actuator would move downward to rest on the new position of the finger 121, changing the focus.

Unlike the previous embodiments of the present invention, the camera does not capture images containing the user's finger or hand, and so images of user hand or finger gestures cannot be used directly to communicate commands to the computer. Instead, three different methods, used in isolation or in combination, are used to allow the user to issue hand-based commands to the computer. In the first case, a small button 137 may be placed on the distal strap 129 on the finger housing 123, located in such a way that when the user taps his finger 121 on the surface of the printed material, the button 137 is actuated. The electrical connections for this button may be transmitted through wires placed within the distal and medial straps 127 and 129, and the support member 139. The button 137 permits both single and double "clicking" as command inputs. For example, the user may click once to activate reading, and a second click would stop reading. Double clicking could command activation of voice input, change lighting, or indicate another function.

Alternatively, the sequences of images from the camera can indicate special finger gestures as command inputs. For example, by analyzing images captured from the camera, the camera can detect changes in illumination, and by detecting offsets of common image elements from frame to frame, determine direction and speed of finger movement. For example, if the user's finger 121 is above the page, and then brought down rapidly in a tapping motion, the illumination intensity on the page from the LEDs 133 will increase rapidly, as the lights are brought closer to the paper. Then, as the finger 121 is brought into contact with the surface of the reading material, the increase in illumination will abruptly stop.

Sideways motion can be detected by comparing contiguous image frames, comparing the locations of like elements within the frames, and then by computing the offset, compute the linear motion and direction across the page. Complex gestures could be interpreted from sequences of different finger moves. For example, consider a double-click followed by rapid movement in one direction followed by a slow return movement. If the rapid motion were in the direction of text lines, this could command the device to increase the rate of speech, whereas rapid movement in the opposite direction could command the device to decrease the rate of speech.

Accelerometers located within or on the finger housing 123 can detect and communicate the direction and magnitude of acceleration. Thus a tapping motion down would be detected as a moderate acceleration downwards, followed by a very sharp, impulsive upwards acceleration as the finger strikes the page surface and stops. Such accelerometer devices are widely available in piezoelectric, piezoresistive and variable capacitor form from companies such as Endevco of San Juan Capistrano, Calif. The use of the button, or image analysis, and of accelerometer information, or other methods of determining finger position and movement, may all be used to determine and interpret finger gestures for user input of commands to the system.

In many instances, it is useful to have an accurate method for determining the distance from the lens 131 to the printed material, in the direction of camera pointing. As mentioned

6,115,482

25

above, this information may be used to determine the location and movement of the hand, for interpreting hand gestural commands to the computer. Additionally, this information might be used for an automatic focusing mechanism, in which either the camera or the lens were moved according to the dictates of the object distance. By varying the distance from the lens to the camera imaging sensor, different focal points may be accommodated.

A convenient method for determining the distance from the camera face to the reading material is the common triangulation technique used in industrial photoelectric sensors and handheld cameras. In this method, a roughly collimated beam that is co-aligned with the camera line of sight, but offset by a small distance, is projected onto the printed material. Depending on the object distance, the location of the beam contact with the printed material within the camera image will vary predictably. By measuring the location of the projected beam within the image, the distance from the camera to the printed material may be computed. In order to reliably detect the beam within a relatively complex image, the beam may be switched on and off between successive camera frames, and through the process of image subtraction, the location of the beam within the image will be easily identified.

In order to conveniently create a collimated beam, two methods are preferred. In the first, a diode laser with a collimating lens is placed within the finger housing. Alternatively, a narrow-output beam LED can be placed within a hole in the finger housing, such that a roughly collimated beam emerges from the hole. The diode laser has the advantage of a longer working distance, although the LED system has the advantage of cost and size in its favor.

It should be noted that multiple beams measuring distance, the beams being located at different radial offsets form the line of sight, can be used to additionally determine tilt and curvature of the images surface.

It should be noted that other means of communicating commands to the computer are useful, most notably verbal commands that are input to the computer using a microphone and interpreted by a voice recognition program. This microphone will generally be integrated near, on, or in the computer system to which the system is connected by cord 125. Other input may be available through one or more buttons 141 located on the exterior of the finger housing 123. These buttons may be used to "wake up" the system, when the system is in a sleep or power-saving mode, turn the system off, alert the system that audible input from the microphone is to be entered by the user, or other such commands.

This embodiment of the present invention allows most or all of the audible, visual and tactile feedback modalities described above in reference to the embodiments of the present invention described previously. Thus, for example, a tactile interface 143 could be included in the finger housing for this embodiment, and the audible and visual feedbacks can be handled by the computer in the same manner as the previous embodiments. The tactile feedback stimulators 143 on the device may be located at a number of positions within the spirit of the present invention. For example, one or more stimulators 143 may be located on the inside surface of the straps 127 and 129 used to attached the finger housing to the user's index finger. Alternatively, the tactile stimulators 143 may be located on the underside of the finger housing 123, against the dorsal surface of the finger 121. It should be understood that the sensitivity of the finger 121 varies substantially with position, and the highest sensitivity occurs

26

on the ventral surface of the distal segment of the finger, which is the optimal location for the positioning of the tactile sensors, although other locations may suffice. For users with fall or residual vision, colored LEDs on the rear surface of the finger housing may also provide feedback information to the user.

It should be appreciated that the feedback mechanisms described here are very similar to those described for tactile feedback of the first embodiment of the present invention. Thus, the mechanisms for tactile feedback described here can be used for the first embodiment, and visa versa. For example, the function of the laser scanner 95 can be replaced with a laser scanner mounted on the finger housing 123, and highlight the words being spoken in a manner similar to that of other embodiments of the present invention.

While the finger housing 123 in FIG. 5a through FIG. 5c is shown resting primarily on the dorsal surface of the finger 121, it is within the spirit of the present invention for the finger housing 123 to be both more substantial in size, as well as encompass a wider range of circumference around the finger 121. In this case, the user's finger would insert in a hole in the device, and electronics would be placed around the finger 121. Tactile stimulators 143 would face in through the radial dimension of this device to contact the user's finger 121.

Furthermore, within the spirit of the present invention, the finger housing 123 may be located on any segment of the finger, and may be conveniently located not on the middle segment, as shown in FIG. 51 through 5c, but rather on the proximal segment, closer to the knuckle, with the finger 121 held in an orientation similar to that of FIG. 5a. FIG. 5d presents a side view of this embodiment of the present invention, in which the optics of the camera are presented in schematic cross-section. The finger housing 123 is located on the proximal finger 121 segment, secured to the finger via a housing strap 145. In the optical path of the camera located within the housing 123 is a bellows arrangement 151 (shown in cross-section) which holds a prism 147 and a lens 149. The prism 147 redirects the light from a field of view 155 near the tip of the finger to the input path to the finger housing 123. The bellows is secured to the medial strap 127 by a bellows attachment 153, so that as the finger 121 flexes, it extends and wraps the bellows 151 around the finger, rotating the lens 149 and the prism 147 so as to maintain the light path to the finger housing 123. It should be noted that the prism 147 may alternatively be a fluid-filled prism, so that as the finger 121 moves, instead of moving the prism 147, it changes the relative angle of the faces of the prism, thereby adjusting the optics in the required manner.

The placement of elements shown in FIG. 5d has a number of advantages, including a larger field of view, given the larger distance to the printed material, a larger depth of field, greater comfort (since the weight of the device is closer to the point of rotation at the knuckle, and therefore presents less torque around the knuckle), and some of the weight of the device may be carried not on the finger but over the knuckle.

### Benefits and Advantages of the Present Invention

In light of these and other examples of prior art, the present invention provides a number of advantages relative to magnifying and electronic reading devices practiced in the prior art, including:

The systems may be used with general-purpose computers, which are becoming ubiquitous in office and home environments. These computer systems pro-

6,115,482

**27**

vide both the computing power necessary, as well as ancillary input and output devices, including video displays and audio feedback. Thus, the price of the system for the end-user who already has a suitable computer will be very inexpensive. Furthermore, as the power of these consumer and business computers rise, the performance of the reading systems will correspondingly improve.

The systems use natural gestures to control the reading machine. For instance, when children are first learning, it is natural for them to use their fingers to follow the text, and this is the same movement used in Braille text reading. The use of finger pointing and hand movements, being so common and natural, makes learning to use the system rapid. This contrasts with current reading devices, which require the user to learn and become comfortable with specialized keypads or keyboard sequences. These control gestures make the system particularly useful for teaching young children to read, since it uses gestures that are naturally used by children.

The use of pointing allows very fine control by the user of the text to be read, and allows reading of highly formatted text, such as in bills, menus, technical literature, and more. Current magnification devices require physically moving text into the field of view of the camera. This is both physically challenging to some users, and further may be difficult to do when the user can see only a small amount of the formatted text. Because the computer of the main system is generally high performance, this allows considerable "intelligence" to reside in the software program for tracking text, rather than requiring the user to track it manually.

Because the system does not need to read in an entire page before OCR and speech synthesis, as are required by current systems, text reading can begin before the system is able to obtain high density pixel images of the entire field of view. Instead, low resolution, wide field images are used to interpret gestural commands, indicating the text to be read, and the system then needs only to maintain image capture and OCR rates faster than the text can be spoken, which is generally available with systems of even relatively modest performance (for example, a 166 MHz Pentium MMX system will generally meet this criterion). Thus, instead of waiting 60 or more seconds before the first line of text can be read, as is found with most current electronic reading systems, the present invention can begin reading almost as soon as the page is placed in front of the device. Consider, for example, trying to find a particular page in a book or newspaper. With the current device, the page can be placed in front of the system, and almost instantly, the user can point to the place where the page number is always located, and know the number of the page.

The system of the present invention can be used from a sitting position, as the printed material need be placed only on the desktop, rather than in a raised scanner of current reading machines. In addition, the third (eyeglass) and fourth (fingertip) embodiments of the present invention are easily made portable, so that reading can be performed wherever and whenever printed material is encountered, whether at school, at work, at the store or at a restaurant.

Current reading machines are limited to conventional scanners, which often can scan legal-sized paper.

**28**

Larger printed material, such as both pages of an opened magazine or a single newspaper page, can not be read without repeated and complex repositioning. This is particularly annoying to many users, since frequently, the entire contents of a page must be scanned when only a single article is to be read. The present invention, on the other hand, can accommodate large pieces of paper, and only that text which needs to be read is scanned. Even for systems of the present invention with a smaller field of view, in order to bring text into the field of view, it simply must be slipped into the field of view, and may be nearly instantly read.

Systems of the present invention have both magnification and reading capabilities. Because the images are dealt with digitally, as opposed to current magnification systems that generally deal with only analog signals, the signals may be enhanced and sent directly to the video display of the attached computer. Thus, for users with residual vision, they can have for prices similar or less than current magnification systems, systems that provide both magnification and electronic reading. Furthermore, the possibilities of digital enhancement of the image are far greater than the enhancement currently available with analog magnification devices.

It should be apparent to one skilled in the art that the above-mentioned embodiments are merely illustrations of a few of the many possible specific embodiments of the present invention. Numerous and varied other arrangements can be readily devised by those skilled in the art without departing from the spirit and scope of the invention.

What is claimed is:

**1**. A method for electronically reading text under interactive control by a user, the method comprising:

obtaining a first digital image of at least a portion of the text to be read;

performing symbology recognition on the first digital image;

capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;

determining a command signal from the temporal sequence of digital images;

choosing a subset of the recognized symbology to read at a spatial location on the text to be read on the basis of the determined command signal;

feeding back to the user the spatial location of the chosen subset to be read and the spatial location of at least one pointer relative to the recognized text, wherein the spatial location of the chosen subset and the pointer aids the user in selecting the text to be read; and

converting the chosen subset of recognized symbology into a humanly understandable version.

**2**. A method as defined in claim **1**, wherein the pointer is comprised of a finger on the user's hand.

**3**. A method as defined in claim **1**, wherein a portion of the spatial configurations are comprised of the relative locations and orientations of two or more pointers.

**4**. A method as defined in claim **1**, wherein a portion of the spatial configurations are comprised of the locations of the pointer relative to the text.

**5**. A method as defined in claim **1**, wherein the pointer is attached to the user's hand.

**6**. A method as defined in claim **1**, wherein the spatial configurations of the pointer are determined from the digital image.

**7**. A method as defined in claim **1**, wherein the digital image is obtained from a means attached to the user's hand.

6,115,482

29

**8**. A method as defined in claim **7**, wherein determining command signals comprises analyzing the relative location of text within the digital image from successive frames in order to determine the location and motion of the means of obtaining the digital image relative to the text.

**9**. A method as defined in claim **1**, wherein a camera is used to obtain digital images and a second camera is used to capture temporal sequences of digital images.

**10**. A method as defined in claim **9**, wherein the cameras have substantially different sized fields of view.

**11**. A method as defined in claim **1**, wherein a single camera is used to both obtain the first digital image and to capture the temporal sequence of digital images.

**12**. A method as defined in claim **1**, wherein the operation of feeding back includes providing feedback directly on the text to be read.

**13**. A method as defined in claim **1**, wherein the operation of feeding back includes providing feedback through an electronic display of at least a portion of the digital image.

**14**. A method as defined in claim **1**, wherein a flatbed scanner is used to obtain digital images.

**15**. A method as defined in claim **1**, wherein digital images are obtained from an internal computer video buffer of a screen image.

**16**. A method as defined in claim **1**, wherein the spatial configurations of the pointer are determined from the interaction of a proximity-sensitive display with the pointer.

**17**. A method as defined in claim **1**, wherein the act of obtaining digital images can be accomplished via an imaging device worn by the user.

**18**. A method as defined in claim **17**, wherein the imaging device is incorporated into glasses worn by the user.

**19**. A method as defined in claim **1**, including additionally displaying enhanced images of the text to the user.

**20**. A method as defined in claim **19**, wherein the degree of enhancement is controlled by the user.

**21**. A method as defined in claim **20**, wherein the degree of image enhancement is controlled by the command signal.

**22**. A method as defined in claim **19**, wherein the image enhancement is a magnification of the text.

**23**. A method as defined in claim **1**, wherein the image enhancement comprises affecting a property of the image chosen from the group consisting of: contrast, brightness, bit-depth, and color polarity.

**24**. A method as defined in claim **1**, including additionally providing the user feedback information about the layout of text within the digital image.

**25**. A method as defined in claim **1**, wherein the spatial information is fed back via tactile information.

**26**. A method as defined in claim **25**, wherein the tactile information is transduced by vibrating pins.

**27**. A method as defined in claim **25**, wherein the tactile information is transduced by a force-feedback mouse.

**28**. A method as defined in claim **1**, wherein the spatial information is fed back via visual information.

**29**. A method as defined in claim **28**, wherein the visual information is displayed on the text using a laser scanner.

**30**. A method as defined in claim **1**, wherein the spatial information is fed back via audible information.

**31**. An electronic reading apparatus for converting text to spoken words for a user, comprising:

a pointer that is operated by the user to indicate commands, wherein commands are encoded in the location and movement of the pointer relative to the text;

30

a digital imaging device that converts text to a digital imaging signal and which additionally captures a temporal sequence of digital images of the pointer, wherein the temporal sequence of images contains information about the location and movement of the pointer relative to the text;

a character recognizer receptive of the digital imaging signal, the recognizer generating a recognized character signal comprising the symbolic identity of the recognized text and the location of the recognized text relative to the digital imaging signal;

a pointer tracker that determines the pointer location and movement, the tracker generating a pointer location and movement signal relative to the text;

a command interpreter receptive of the pointer location and movement signal and the recognized character signal, the interpreter generating a command signal indicating the text to be converted to spoken words;

a feedback device receptive of the command signal, and providing feedback to the user about the location of the text to be converted to spoken words and the location of the pointer relative to recognized text;

a controller receptive of the command signal and the recognized character signal, the controller generating an output signal representative of at least portions of the text recognized; and

a transducer receptive of the output signal for converting the output signal to speech.

**32**. A device as defined in claim **31**, wherein the feedback device is additionally receptive of the recognized character signal and provides feedback to the user about the location of recognized text.

**33**. A method for electronically reading aloud text under interactive control by a user with a computer-based system, the method comprising:

obtaining a first image of at least a portion of the text and converting the image to a first signal representative thereof;

capturing a temporal sequence of images of at least one pointer under the control of the user and converting the temporal sequence of images to a second signal representative thereof;

supplying the first and second signals to the computer-based system;

performing symbology recognition on the first signal;

determining the position and movement of the pointer relative to the text from the first and second signals;

choosing a subset of the recognized symbology to read aloud on the basis of the determined position and movement of the pointer relative to the text and generating a command signal;

converting the chosen subset of recognized symbology into speech, additionally including providing feedback to the user of the particular subset of recognized symbology chosen and of the location of the pointer relative to the recognized symbology.

\* \* \* \* \*

# Sign
# Language
# Structure

# William C. Stokoe

The First Linguistic Analysis of
AMERICAN SIGN LANGUAGE
Newly Revised

APPX0353

SIGN LANGUAGE STRUCTURE

## TABLE OF CONTENTS

1    INTRODUCTION                                                    1

    History                                                    2
    The Abbé de l'Épée                                         4
    Natural signs                                              5
    Sign Language in America                                    8
    Sign language theory                                      10
    French writers on Signs                                   12

2    THE LINGUISTIC COMMUNITY                                       16
    The Sign-Linguistic community                            18
    The deaf child's early years                             20
    Educational differences                                   22
    Psychosocial conclusions (Lunde)                          24
    The CHEREME (cáre-eém)                                    26
    Chart of handshapes used in American fingerspelling       28

3    CHEROLOGY [PHONOLOGY]                                          29

    Signs vs. fingerspelled words                             30
    Finger counting, manual numeration                        32
    Table of manual numeration                                34
    Feature analysis of manual numeration                     36
    The Three ASPECTS of a sign                               38
    Convention of sign notation                               40
    TABS located on the body in ASL                           42
    Sign language phonetics                                   44
    DEZ and manual TAB handshapes                             46

4    CHEROLOGY (continued): SIG/Action                             51

    Linear SIG action                                         52
    Other conventions in notation                             54

APPX0354

Table of Contents (continued)                                    v

5   MORPHOCHEREMICS                                          55

    Stylistic differences                                56
    Double DEZ relationships                             58
    Possible causes for sign change                      60
    Compound signs in ASL                                62
    Classes of color terms in ASL                        64
    Signs with initial letter DEZ                        66

6   MORPHOLOGY                                               69

    Questions and answers in ASL                         70
    Headshake as a signed negative                       74
    ASL syntax                                           76
    Bilingualism and diglossia in deaf communities       78
    A broader definition of language                     80

7   AFTERWORD                                                81

    The THREE aspects of a sign                          82
    Handshape & attitude in the DEZ                      84
    General and special theories of language             86


    REFERENCES & INDEX OF NAMES                          87


    TABLE OF SYMBOLS USED FOR WRITING SIGNS      vi & 68
       (Also inside back cover)

# Sign
# Language
# Structure

# William C.
# Stokoe

The First Linguistic Analysis of
AMERICAN SIGN LANGUAGE
Newly Revised

Linstok Press, Incorporated
9306 Mintwood Street
Silver Spring, MD
20901

Copyright © 1978 by William C. Stokoe

All rights reserved. No part of this publication may be
reproduced or transmitted in any form by any means
electronic or mechanical, including photocopy, or
in any information storage and retrieval system,
without permission in writing from the publisher.

Printed in the United States of America



Sign Language Structure originally appeared as
Occasional Paper 8 of the occasional papers series of
Studies in Linguistics, edited by George L. Trager,
and published at the University of Buffalo in 1960.




Library of Congress Catalog Card Number:

International Standard Book Number: 0-932130-03-8




Revised edition

The English verb <u>second</u> in a parliamentary context is
signed by moving forward the upright forearm, thumb and
index finger upraised from the fist. This sign has an inter-
esting antonym in American Sign Language: The same configu-
ration swung back (even until the thumb touches the signer's
chest or shoulder in some instances) signifies 'I'm next' or
'I want to follow you.'

Manual spelling and numbering as shown in this section
operate in part by static presentation of visibly different con-
figurations of the hand and fingers, also in part by motion. In
general the static mode of manual symbolizing seems to be
used to denote other symbols themselves fixed, as letters and
numerals are; while the symbolization of relationships, such
as the ideas expressed by the sense of <u>second</u> just discussed,
tends to find expression in motion.

Essentials    In a sign language proper, the signs always
of a sign.    have a component of motion. In fact the struc-
              ture of signs is identical with that of the two
exceptional symbolizations in the manual alphabet, <u>j</u> and <u>z</u>.
The nature of the symbolization, that is, the relationship of
the sign to what is signified, and the nature of the signified
itself are radically different. The essential features of finger-
spelled <u>z</u> are that the hand having a certain configuration makes
a certain motion in a certain place. In the context of other alpha-
betical symbols, this action will symbolize simply the letter
'z'. But when the same configuration, in the same position, is
moved in a way only slightly different if not identically, the
whole display signifies not a letter but the idea expressed in
English by the word <u>where</u>—if the context is not letters but
sign language.

Thus the sign clearly is a morpheme, the smallest
unit of a language to which meaning attaches. As the example
just given shows, the significance rests not in the configur-
ation, the position, or the movement, but in the unique compo-
sition of all three. The sign morpheme, however, unlike the
morpheme or word of a spoken language, is seen as simultaneously
not sequentially produced. Analysis of the sign morpheme then
cannot be segmentation in time but must be aspectual. The as-
pects of a sign that appear to have the same order of importance
and the same part in language structure as the segmental
phonemes of speech are the aspects of configuration, place,
and action.

Other features of sign language appear to operate
with these three basic aspects (configuration or handshape,
position or location, and motion or action) in some such way
as do pitch, stress, and juncture with the segmental phon-
emes in a spoken language like English. One of the other
features is clearly facial expression already mentioned above.
It seems likely that behavior of the kind classified as <u>kinesic</u>
when it accompanies speech (Trager 1958) may have a more
central function in a signed language. The same activity that
is kinesic with respect to spoken American English may be an
integral part of the formation of the signs and phrases and
sentences in American Sign Language. But analysis of these
features presents many difficulties, and if the assumption of
the writer and his research associates is correct, this anal-
ysis will be much more feasible after the analysis of the basic
aspects of a sign morpheme.

[Time has confirmed the correctness of this surmise.
Recent research has shown the great importance, both in sign
formation (i.e. the denotation of a particular meaning in single
signs) and in sign syntax (i.e. the particular meaning of similar
but contrasting sentences) of non-manual behaviors in signing.
See especially the work of Supalla and Newport and of Bellugi
and Pedersen on modulations of individual signs, Liddell on the
separation of compound and complex sentence structures by
facial and head activity, as well as the work of Baker
and Padden on eye movement, and functions of five channels
of sign activity.]

Like consonant and vowel, the <u>aspects</u> position, con-
figuration, and action may only be described in terms of contrast
with each other. Position may be signalled by proximity of the
active hand to a part of the signer's body; e.g. a fist moved
at the chest, chin, and forehead makes not one but three dis-
tinct signs: SORRY, ICE-CREAM, SWEDEN. [Many American
signers have stopped using the last of these signs, substi-
tuting the one Swedish deaf people themselves prefer, made
by action of one hand on the wrist of the other.] But when the
position marker is the non-moving or inactive hand, position
is signalled by the configuration of that hand. For example,
let the configuration of the active hand be the index hand, the
g hand of fingerspelling. If the motion is brushing the index
tip across the fingertips of the spread inactive hand, the sign
so made is WHAT (To make the meaning 'what?' a particular

facial expression is essential.) But if the motion is brushing
the index of the active hand across only the upraised little
finger of the inactive hand, the sign is LAST (for some signers;
others use the little finger extension on both hands). Here
then configuration is a distinctive characteristic of both the
moving and the marking hand, but it is serving as the aspect
of configuration in the active hand and as the aspect of location
in the inactive hand.

Similarly, the aspect of motion, or more generally
action, may be observed to be only a change in hand configu-
ration in some signs. But this change in handshape will still
be action as determined by the formational rules of this signed
language, because it has the same function structurally as
does movement through space.

**Three aspects
of any sign.**    The aspects of the (submorphemic) struc-
ture of a sign need more convenient terms
than position, configuration, and motion;
and it will be as well to avoid the suggestion of mutual exclu-
sivity  that these words have in their ordinary senses. Tab,
dez, and sig are shortened forms of the terms tabula, desig-
nator, and signation. Tabula, like the others is a latinate
word meaning among other things,'the place where something
is written,' and so it has been used to name the aspect of
position or location in sign structure. Designator means 'that
which points out' and refers to the aspect of configuration.
Signation stands for 'the action of making a sign' and so
serves well enough for the name of the aspect of motion.

[The old practice of using Latin-derived terms for
concepts found in new areas of investigation seems to have
been misunderstood or actually confusing to sign language
students since 1960. Besides the writer did not make clear
enough the distinction between how any gestural sign is
made (alphabetical, sign language, other) and how the signs
of American Sign Language are made—to linguists, the dis-
tinction between phonetic  and phonemic aspects. Here in
simpler terminology is the joint definition of tab, dez, and sig:

TAB is where sign activity occurs (or what marks it there)
DEZ is what acts
SIG is the action

The <u>dez</u> as what acts is recognized both by its configuration and by its attitude (sometimes called orientation or direction). The <u>sig</u> as action or sign activity is recognized as significant motion in space, or as a change in configuration, or as a change in attitude; e.g. in the sign meaning 'in the future' hand and forearm move outward and forward from the signer; in the sign meaning 'lose' the hand in S-shape opens to 5-shape; in the sign meaning 'other' the hand changes attitude or orientation from almost full pronation (palm side down) to full supination. Note that in the second of these three examples it is not sufficient to specify that what acts is the hand forming an S; what acts in the sign LOSE is the S-hand, pronated, forearm near horizontal—only thus will the action of opening the hand to spread configuration (5) signify 'lose'.

[The original analysis, especially in these sections, presented dez, sig, and tab as <u>aspects</u>, that is as ways of looking at sign activity that is almost all simultaneously in vision. In analysis it is possible to focus attention on the aspect of the appearance of what acts, or to focus on the action itself, or to focus on where this occurs or what makes the place distinctive. To suppose that the three aspects are independent parameters is to mistake the nature of sign activity or to confuse it with the sequential way that segments of sound in speaking follow one another to build a morpheme or word. To separate such details as the angle of the elbow and the amount of rotation of the forearm into orientation and treat them as different essentially from such details as which fingers are extended is possible of course, by a similar aspectual analysis. Nevertheless, the initial analysis of a sign into <u>what acts</u>, <u>action</u>, and <u>location</u> is not refined but lost when it is supposed that configuration and orientation are other than more detailed description of what acts.]

Sign notation.  The order of treating, and writing down in graphic symbols, sign aspects used in this study [and in the 1965 (rev. 1976) dictionary] is <u>tab</u> - <u>dez</u> - <u>sig</u>. This order corresponds to no sequence in sign phenomena; it is arbitrary; but it permits some economy in notation. Like the hundreds, tens, and units of decimal numeration, the tab, dez, and sig places permit the same symbol to have more than one meaning in the notation. When a hand is not acting but serving to mark where the action is, its shape and attitude may

be identical to the shape and attitude of a hand acting; thus
a symbol for what acts used in the tab position—to the left
of the dez position of the written notation—can be the same
symbol, but will now identify the tab.

Sig symbols written in sig position indicate of
course what the action is, but with a three-place notation
convention the sig symbols used as subscript to configuration
symbols conveniently indicate the attitude of what acts or
of what serves to mark location. One significant action,
for example, is the action of rotating the forearm in pronation.
When this rotation is the action aspect of a sign, the symbol
is written in the third place of the three place notation. But
one often significant feature of the attitude of what acts or
of what marks location is holding the hand and forearm rotated
in pronation. Therefore the same symbol used as subscript to
a tab or dez handshape symbol will mean of course that the
tab or dez hand is held palm down (if the arm is horizontal),
or palm outward (if the forearm is upright).

The TABS      Location in a number of signs is marked by the
of ASL.       contact what acts makes with a part of the
              signer's body (i.e. dez touches tab). Likewise
location may be marked by the nearness of the dez, without
actual contact, to a body part. Forehead, temple, cheek, ear,
eyebrow, eyes, nose, lips, teeth, chin, neck, shoulder, or
trunk may be touched or approached by the dez in its sign
activity. However, examination of many pairs of similar signs
for minimal contrast reveals that some of these points on the
signer's body are not distinctly different (not tab cheremes)
but occur in complementary distribution (thus are allochers,
just as the English phoneme /p/ has an allophone with a
puff of air in pot and an allophone without the puff in spot).
To take an example from American Sign Language: The index
finger of the dez hand which looks like g or d of the manual
alphabet brushes the tip of the nose (tab) in its action (sig)
in the sign MOUSE. But when the sig is motion outward from
near the same place, for instance in the sign SEE, the signer
and the viewer of the sign tend to think of the place as the
signer's eyes. However, no significant difference attaches
to a contrast only between nose and eyes, these can be ana-
lyzed as allochers of one tab chereme, mid-face. Whether
the nose or the eyes are used depends on the action and
what acts—on the sig and dez of each sign.

DEZ / TAB A , Å    In the American manual alphabet a̲, s̲, and
h a n d s h a p e s .    t̲ are all represented by contrast in configu-
            ration, handshape difference alone. All use
a closed hand, but for a̲ the thumb is held pressed against the
index-finger edge of the hand; for s̲ the thumb is opposed and
clasps the folded-in fingers; for t̲ the thumb is protruded between
the index and middle finger. In American Sign Language these
handshape differences are not used for significant contrast.
Instead the users of ASL contrast the closed, fist-like, hand
with other handshapes. Hands looking like the a, s, and t
hands of fingerspelling (but in attitudes and actions that can
not be used for fingerspelling) may be observed if a signer's
activity is closely observed. These handshapes will be found
to pattern, however, in allocheric ways. For example, the tab
and sig in the sign SORRY usually constrain the signer to use
an s-hand—striking the forehead with the knuckle of the thumb
can be painful—so that the sign STUPID is usually made with
the closed hand in a̲ configuration; and some signers use as
dez the hand in the configuration for spelling 't' in the sign
TRY. The closed-hand chereme, with its three alphabetic-like
allochers, has been given the symbol A. It does contrast with
the hand that has the thumb alone extended, given the symbol Å.
It also may be written with a subscript if the specification of
the particular form of it is needed; thus $A_s$ or $A_t$.

/B/ & /5/ as    The flat open hand is the next chereme to be
t a b   o r   d e z .    considered here. The b-hand of fingerspelling
            is flat and open and has the thumb opposed;
that is, folded into the palm. The B-hand of signing ASL does
not necessarily keep the thumb in but can have it adducted,
alongside the edge, and may be bent more than would be toler-
ated in fingerspelling. It may also allow the fingers to be
slightly spread apart, but it does contrast with the spread or 5-
hand, which is like the hand used to denote the numeral '5' but
with a tension in the muscles that draws back all five digits
as well as spreading them fully.

/C/ & /5̈/    The curved hand chereme is allowed much more
h a n d s .    variation than the c-hand of fingerspelling. The
            allocheric forms it may take might be described
as the shape the hand would assume in grasping balls of assor-
ted sizes. Its thumb is usually opposite fingers, as in finger-

Linear SIG Action

being respectively toward the signer and away. But both senses
of the linear direction may be used in the sig of signs, as in
EXPLAIN in which the dez moves alternately out and in, in fact
in this sign both hands constitute what acts and one is moving
in while the other moves out.

| | |
|---|---|
| Vertical s i g , | Each of the three linear directions of sig |
| Lateral s i g , | action requires a symbol, one for motion in |
| To-fro s i g . | one direction only, one for the opposite |
| | direction, and one for the combination of |

the two directions on the same general line. The symbols have
been chosen to be as self-explanatory as possible when put
on two-dimensional display; but those used for to-and-fro
motion may be confusing unless one remembers that the 'T'-
like symbol means motion <u>toward</u> the signer, <u>inward</u>; and so
the inverted '⊥' indicates the opposite, motion away.
In symbols:

| | |
|---|---|
| ^ | *Motion upward* |
| v | *Motion downward* |
| N | *Up & down motion* |
| > | *Motion to signer's right* |
| < | *Motion to signer's left* |
| z | *Side to side motion* |
| T | *Motion toward signer* |
| ⊥ | *Motion away from signer* |
| I | *To & fro motion* |

Rotation s i g s . A similar three-way use of <u>sense</u> in the word's
geometrical and analytical meaning is charac-
teristic of the rotation sigs made by the muscles controlling the
forearm. The action of supination (rotating the right forearm
clockwise so that the palm is up if the arm is horizontal) is given
the symbol of a lower case italic $^a$ . The opposite action, pronation,
turns the hand "face", that is palm down, and has been given the
same symbol turned face down: $^p$ . The combination of both these
rotating movements of the forearm produces oscillation or twisting
rapidly changing from one direction to the other, symbolized $^\omega$ .



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036        7590        06/27/2022

Williams Simons & Landis PLLC/ GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/27/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. _90/014,900_ .

PATENT UNDER REEXAMINATION  _8553079_ .

ART UNIT _3992_ .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

### *Notice of Pre-AIA or AIA Status*

1.      The present application is being examined under the pre-AIA first to invent provisions.

2.      This action responds to Patent Owner reply, filed 5/16/2022, to first non-final action, mailed 4/14/2022, in ex parte reexamination of challenged claims 1-30 of expired U.S. Patent No. 8,553,079 (hereinafter referred to as '079) as granted in Order Decision mailed Dec. 20, 2021.

### **Extensions of Time**

3.      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extension of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

### **Notification of Concurrent Proceedings**

4.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 8,553,079 throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

### **Amendment in Reexamination Proceedings**

5.      Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c).

### Submissions

6.      In order to insure full consideration of any amendments, affidavits or declarations or

other documents as evidence of patentability, such documents must be submitted in response to

the first Office action on the merits (which does not result in a close of prosecution).

Submissions after the second Office action on the merits, which is intended to be a final action,

will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33

after appeal, which will be strictly enforced.

### *Claim Construction*

7.      For the purposes of reexamination, the claim terms of an expired patent are accorded

their plain and ordinary meaning under the Phillips standard. Manual of Patent Examining

Procedure § 2258(I)(G).  In a reexamination proceeding involving claims of an expired patent,

claim construction pursuant to the principle set forth by the court in *Phillips v. AWH Corp*., 415

F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a claim "are generally given

their ordinary and customary meaning" as understood by a person of ordinary skill in the art in

question at the time of the invention) should be applied since the expired claim[s] are not subject

to amendment. MPEP § 2258 L(G) (citing *Ex parte Papst-Motoren*, 1 USPQ2d 1655 (Bd. Pat.

App. & Inter. 1986)). The '079 patent, which lists November, 3, 1999, as the date of the earliest

related continuation but which also claims priority to a provisional application, filed November

9, 1998, and does not list any term extensions or adjustments, has expired. (See Ex. PAT-A,

Cover.) Therefore, the claim interpretations submitted or implied herein for the purpose of this

reexamination adhere to the Phillips standard. See *In re CSB-System Int'l, Inc*., 832 F.3d 1335,

1340-42 (Fed. Cir. 2016)."  Furthermore, where there is related litigation and a federal court has

made a judicial interpretation of a disputed claim term, the examiner in a reexamination should

assess whether the judicial interpretation is consistent with the applied claim construction

standard. See *id*. (discussing the application of the "broadest reasonable interpretation" standard).

As noted in Order Grant, the '079 Patent is the subject of such related litigation, the relevant

constructions from those Litigation as set forth in the Request as discussed in the Claim

Construction, section IV therein, are accorded their plain and ordinary meaning under the

*Phillips* standard herein.

### *Declaration*

8.     **The Declaration (PA-DEC) by Dr. Gregory Abowd, filed Nov. 11, 2021 (signed Nov.**

**11, 2021) has been reviewed and considered**.  Declarant states he was compensated for his

opinion testimony (paragraph 002) to provide expert testimony based on his qualifications

(paragraph 003-011 and PA-DEC CV) where he declares his compensation is not contingent on

"on the nature of my findings, the presentation of my findings in testimony, or the outcome of

this or any other proceeding. I have no other interest in this proceeding".  The declaration has

been considered for expert opinion regarding level of ordinary skill (paragraph 020), technology

background (paragraphs 021-031), claim construction (037-050) and interpretation of what

Liebermann (paragraphs 051-054), Harakawa (paragraphs 055-058), Mack (059-061), Bushnag

(062-064), Meins (065-068) and Auten (069-070) references describe/teach to an artisan. This is

indicating that examiner has reviewed/considered the Declarant's testimony. His opinion

regarding interpretation of cited art is relied on herein to extent specifically stated in a rejection.


### *Response to Arguments*

9.     Applicant's arguments filed 5/16/2022 have been fully considered but they are not

persuasive.

I.     Patent Owner alleges, "**The USPTO Has No Jurisdiction Over Expired Patents**"

On pages 1-2, Patent Owner states the following:

> When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, the USPTO has nothing in its authority to cancel or amend. Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

> The '079 Patent issued in October 2013 and expired in November 2019, long before the ex parte reexamination request was filed in November 2021. With the expiration of the 079 Patent in November 2019, the USPTO ceased to have jurisdiction over the 079 Patent, and the order granting reexamination should be vacated as a result.

In summary, Patent Owners allege that since the patent under reexamination expired in November 2019, the USPTO ceased to have jurisdiction over the '079 Patent due to lacking authority regarding the claims of their patent.  Patent Owner is incorrect per MPEP 2211 as copied next (emphasis added).

> Under 37 CFR 1.510(a), any person may, at any time **during the period of enforceability of a patent**, file a request for *ex parte* reexamination. This period was set by rule, since the Office considered that Congress could not have intended expending Office resources on deciding patent validity questions in patents which cannot be enforced. See *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 225 USPQ 243, 249 (Fed. Cir. 1985). The **period of enforceability is generally determined by adding 6 years to the date on which the patent expires** but the period may be extended if there is pending litigation.

In this case, the '079 Patent expired in November 2019 where, it continues within its period of enforceability.  Thus, contrary to Patent Owner opinion, it was within USPTO jurisdiction to exercise their authority to grant the Order and then treat the merits of the claims of '079 Patent under applicable statutes for applied art in the first non-final action.

II.     **Anticipation**

A.  Patent Owner alleges, "*Liebermann* does not anticipate independent claim 1 because *Liebermann* fails to disclose claim element 1[c]."

   1.  Patent Owner alleges "*Liebermann* does not disclose the determining step is executed by the same computer that provides the light source and the camera, as required by claim element 1[c]."

Regarding claim element 1[c] of '079, on pages 3-6, Patent Owner states,

*Liebermann* does not disclose claim element 1[c] because the "preamble of claim 1 requires that each step is performed within "[a] computer implemented method." As a result, the step recited in this claim element is executed by the same computer that provides both the "light source" and the "camera" in claim elements 1[a] and 1[b], respectively. Those requirements of claim 1 are fundamentally different than the distributed architecture of *Liebermann*.

…

*Liebermann* discloses the "central processing facility" is the computing device with the artificial intelligence, translation software, and vocabulary database that identifies the words in the sign language performed by the deaf person. Because *Liebermann* discloses the "public kiosk" is connected by "normal telephone lines" to the "central processing facility," id. at 5:1, the "public kiosk" and the "central processing facility" are not the same computing device. To the contrary, *Liebermann* describes a distributed architecture in which different components are separated by substantial physical distance.

The Examiner mapped at least the bottom most lamp in *Liebermann's* "public kiosk" to the claimed "light source." Action, pp. 7-8. And the Examiner mapped "camera 44" in *Liebermann's* "public kiosk" to the claimed "camera." Action, p. 12. But the functions executed by *Liebermann's* "central processing facility" (e.g., identification of words in sign language performed by the deaf person) were mapped to the "determining" step of claim element 1[c]. *Id.* at pp. 13-14. This is contrary to the requirements of claim element 1[c] because the "determining" step must be executed by the same computer that provides the claimed "light source" and the claimed "camera." Accordingly, *Liebermann* fails to disclose claim element 1[c]. Withdrawal of this rejection is respectfully requested.

In reply, the examiner disagrees that the computer implemented method of challenged claim 1 of '079 Patent requires to execute the steps recited in claim 1 of '079 by the same computer, or relatedly "only one" computer where the Patent Owner fails to point to specific claim language that recites a "same" computer or, similarly "only one" computer. Also, Patent Owner fails to direct attention within '079 that explicitly requires a same computer or that explicitly precludes different/multiple computers in their apparatus performing their method to support their contention of a same computer being required. Discussion in '079 that a computer apparatus includes structures recited in challenged claims and a computer implemented method performing functions/steps as recited in challenged claims is not evidence in '079 that a same computer is required. Instead, such disclosure as present in '079 is merely evidence that a computer is necessary not that only one computer is required. Contrary to Patent Owner remark that the "determining" step must be executed by the same computer that provides the claimed "light source" and the claimed "camera", the computer implemented method of challenged claim 1 of '079 does not limit the method of claim 1 to the "same" (or relatedly, "only one") computer as alleged by Patent Owner. In response to Patent Owner's argument that the references fail to

show certain features of applicant's invention, it is noted that the features upon which applicant

relies (i.e., the "same" computer or, relatedly "only one" computer) are not recited in the rejected

claim(s).  Although the claims are interpreted in light of the specification, limitations from the

specification are not read into the claims.  See *In re Van Geuns*, 988 F.2d 1181, 26

USPQ2d 1057 (Fed. Cir. 1993).  In this case, Patent Owner is improperly incorporating features

of '079 into the claims that are not recited in the challenged claims of '079.  For instance, the

computer implemented method of challenged claim 1 in '079 merely requires there to be a

computer rather than there to be the "same" computer or "only one" computer as alleged by

Patent Owner.  Also, the Patent Owner statement, on page 5, that "*Liebermann* discloses the

"public kiosk" is connected by "normal telephone lines" to the "central processing facility," id. at

5:1, the "public kiosk" and the "central processing facility" are <u>not</u> the same computing device"

is an acknowledgement by Patent Owner that the "central processing facility" and "public kiosk"

in Liebermann each include a computing device or computer.  Therefore, the facts in rejection

relied on herein taken with Patent Owner acknowledgements (i.e., that the "central processing

facility" and "public kiosk" in Liebermann each include a computing device) show the computer

of the "public kiosk" and the computer of the "central processing facility" in Liebermann

operate/function together in a computer implemented method of Liebermann for "*providing a*

*light source to direct illumination through a work volume above the light source, providing a*

*camera oriented to observe a gesture n the work volume, the camera being fixed relative to the*

*light source, and determining, using the camera, the gesture performed in the work volume and*

*illuminated by the light source*" as recited in challenged claim 1 of '079 where the gesture is

captured by the camera.  Hence, facts show Liebermann describes the computer implemented

method of challenged claim 1 of '079 Patent where the computer implemented method includes

or fails to preclude different or multiple computers in a distributed architecture as described in

Liebermann regarding a computer implemented method including claim element 1[c] of

**"determining, using the camera, the gesture performed in the work volume and illuminated**

**by the light source**."

        2.   Patent Owner alleges, "*Liebermann* does not disclose determining the gesture
            using the camera as required by claim element 1[c]."

Regarding claim element 1[c] of '079, on pages 6-7, Patent Owner states,

> Claim element 1[c] recites "determining, using the camera, the gesture." As discussed above, the Examiner
> mapped *Liebermann's* "camera 44" of the "public kiosk" to the claimed "camera," and mapped the functions
> executed by *Liebermann's* "central processing facility" (e.g., identification of words in sign language performed
> by the deaf person) to the "determining" step of claim element 1[c]. But *Liebermann's* "central processing
> facility" does not have access to Liebermann's "camera 44." Nor does it use the images output by *Liebermann's*
> "camera 44.
> …
> *Liebermann's* "central processing facility" executes its functions based on "identifiers," not the "images"
> themselves. The "images" from *Liebermann's* "camera 44" are not even transmitted to the "central processing
> facility." *Id*. Thus, *Liebermann's* "central processing facility" is not using *Liebermann's* "camera 44" (i.e., the
> Examiner identified "camera") to determine the gesture. This is contrary to the requirements of claim element
> 1[c]. Accordingly, *Liebermann* fails to disclose claim element 1[c].

In reply, the examiner disagrees and reiterates prior discussion above regarding Patent Owner

contention for the same computer.  Further, the limitation of claim element 1[c] recites

**"determining, using the camera, the gesture performed in the work volume and illuminated**

**by the light source**." Thus, the limitation does not recite or require "access to a camera",

"images themselves" or "images are not transmitted" and the limitation of claim element 1[c]

includes or fails to preclude Liebermann's converting images captured by Liebermann's camera

to digital data for processing by translation software at Liebermann's "central processing

facility."  In response to Patent Owner's argument that the references fail to show certain features

of applicant's invention, it is noted that the features upon which applicant relies (i.e., "access to a

camera", "images themselves" or "images are not transmitted") are not recited in the rejected

claim(s).  Although the claims are interpreted in light of the specification, limitations from the

specification are not read into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057

(Fed. Cir. 1993). In this case, Patent Owner is improperly incorporating features of '079 into the

claims that are not recited in the challenged claims of '079. Although not required by the

language in challenged claim 1 since images themselves is not recited, contrary to Patent Owner

remark, facts in record show Liebermann uses the images captured by Liebermann's camera of

the gestures in the work volume. For instance, Liebermann uses the signing motion images

captured by Liebermann's camera that are converted into digital data by the computer of the

public kiosk, which then transmits that digital data over telephone lines to the central processing

facility and then processed by the translation software at the "central processing facility"

computer since *Liebermann* at 5:61-6:14 ("the deaf person is positioned so that the **camera lens**

**10 will record the signing movement of the hands and fingers and body and facial motions**

**and expressions. The signing motions captured by the camera are converted into digital**

**data for processing by the translation software, (i.e., artificial intelligence) to produce data**

**representing numbers, words and phrases which are then combined into coherent**

**sentences**.") and at 6:36-38 ("FIGS. 9-12 are **schematics of the system software modules for**

**converting signing to speech and speech to animation,** including system training methods.").

Relatedly, Patent Owner acknowledged in statements on page 5 that Liebermann discloses the

"public kiosk" is connected by "normal telephone lines" to the "central processing facility," id. at

5:1. Thus, *Liebermann's* camera captures images themselves of the signing movement of the

hands and fingers and body and facial motions and expressions where those captured images are

converted into digital data by the "public kiosk" computing device, where that digital data of the

captured gesture images is transmitted to the central processing facility for further processing by

the translation software at the "central processing facility" computing device. Patent Owner

remark (i.e., "Nor does it use the images output by *Liebermann's* "camera 44.") obscures computer implemented method by Liebermann since facts herein show Liebermann uses the images captured by the camera in "**determining, using the camera, the gesture performed in the work volume and illuminated by the light source**."  Contrary to Patent Owner remarks on pages 6-7, facts show Liebermann describes the computer implemented method of challenged claim 1 of '079 Patent including claim element 1[c], "**determining, using the camera, the gesture performed in the work volume and illuminated by the light source**."

      B.  Patent Owner alleges, "*Liebermann* does not anticipate independent claim 11 because *Liebermann* fails to disclose claim element 11[c]."

            1.  Patent Owner alleges, "*Liebermann* fails to disclose a computer apparatus comprising a processor, camera, and light source, as required by claim element 11[c]."

Regarding claim element 11[c] of '079, on pages 7-8, Patent Owner states,

> The claimed "processor," "camera," and "light source" are all components of the same "computer apparatus." *Compare* the preamble of claim 11 ("A computer apparatus comprising") *with* claim elements 11[a], 11[b], and 11[c]. As discussed above, the Examiner mapped at least *Liebermann's* bottom most lamp of the "public kiosk" to the claimed "light source," and mapped *Liebermann's* "camera 44" of the "public kiosk" to the claimed "camera." Action, p. 33. But the Examiner mapped *Liebermann's* "central processing facility," which is located at a different physical location, executing "translation software, (i.e., artificial intelligence) to produce data representing numbers, words, and phrases which are then combined into coherent sentences" to the claimed "processor." Action p. 37. That mapping is contrary to the requirements of claim element 11[c] because the "processor" must belong to the same "computer apparatus" as the "camera" and "light source." As discussed above regarding claim element 1[c], *Liebermann's* "central processing facility" (1.e., the Examiner identified "processor") and "public kiosk" (having the Examiner identified "camera" and "light source") are <u>different</u> computing devices, located at different physical locations. Accordingly, Liebermann fails to disclose claim element 11[c]. Withdrawal of this rejection is respectfully requested.

In reply, the examiner disagrees for same reasons stated above regarding similar Patent Owner argument for the <u>same</u> computer for claim element 1[c] applies to claim element 11[c] relied on herein where Patent Owner, similarly to claim 1, contends the distributed architecture of *Liebermann* fails to disclose the "computer apparatus" as recited in challenged claim 11 because the "processor" must belong to the same "computer apparatus" as the "camera" and "light

source." For same reasons noted above for claim element 1[c] that remain applicable to claim

element 11[c] is relied on herein, the examiner disagrees that the computer apparatus of

challenged claim 11 of '079 Patent requires the same (or relatedly "only one") computer

apparatus. The preamble is a "computer apparatus" that does not recite the same" (or "only

one") computer and the "computer apparatus" of challenged claim 11 does not preclude a

"different" (or "multiple) computers of a distributed architecture as present in Liebermann. In

response to Patent Owner's argument that the references fail to show certain features of

applicant's invention, it is noted that the features upon which applicant relies (i.e., the "same" or

"only one" computer) are not recited in the rejected claim(s). Although the claims are

interpreted in light of the specification, limitations from the specification are not read into the

claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). In this case,

Patent Owner is improperly incorporating features of '079 into the claims that are not recited in

the challenged claims of '079. For instance, the "same" (or, only one) computer is not recited in

the computer apparatus of challenged claim 11 of '079; instead, the computer apparatus of '079

merely require a computer which Patent Owner has in effect acknowledged Liebermann

discloses for its distributed architecture of a computer apparatus in statements noted above

regarding claim 1 and next. The Patent Owner statement, (i.e., on page 8, "As discussed above

regarding claim element 1[c], *Liebermann's* "central processing facility", (i.e., the Examiner

identified "processor') and "public kiosk" (having the Examiner identified "camera" and "light

source') are different computing devices, located at different physical locations" is an

acknowledgement by Patent Owner that Liebermann's public kiosk and central processing

facility each include a computing device. Also, the Patent Owner statement on page 5 that,

"Liebermann discloses the "central processing facility" is the computing device with the artificial

intelligence, translation software, and vocabulary database that identifies the words in the sign language performed by the deaf person" is Patent Owner acknowledgement that Liebermann's central processing facility includes a computing device that determines a gesture. Therefore, the facts in rejection relied on herein and discussion above show the computer of the "public kiosk" and the computer of the "central processing facility" in Liebermann operate together as a computer apparatus of Liebermann that includes "*a light source adapted to illuminate a human body part within a work volume generally above the light source; a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output*" as recited in challenged claim 11 of '079 where the gesture is captured by the camera. Hence, facts show Liebermann describes the computer apparatus of challenged claim 11 of '079 Patent since the apparatus in Liebermann includes a computer including claim element 11[c] of "**a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output**."

2. Patent Owner alleges, "Liebermann fails to disclose a processor adapted to determine the gesture based on the camera output, as required by claim element 11[c]."

Regarding claim element 11[c] of '079, on pages 8-9, Patent Owner states,

> Claim element 11[c] requires "a processor adapted to determine the gesture . . . based on the camera output." As discussed above, the Examiner mapped Liebermann's "camera 44" to the claimed "camera," and mapped Liebermann's "central processing facility" to the claimed "processor."
>
> The output of Liebermann's "camera 44" is one or more "images." But *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") executes its functions based on "identifiers," not the "images" themselves. In fact, the "images" are not even transmitted to the "central processing facility." *Id.* Thus, *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is <u>not</u> determining anything based on *Liebermann's* "images" (i.e., the Examiner identified "camera output"). Accordingly, *Liebermann* fails to disclose claim element 11[c].

In reply, the examiner disagrees for same reasons noted above for claim element 1[c] remain

applicable herein for claim element 11[c] relied on herein since the limitation of claim element

11[c] recites "**a processor adapted to determine the gesture performed in the work volume**

**and illuminated by the light source based on the camera output**," that does not recite or

require "images" themselves or "images are not transmitted" and the limitation does not preclude

Liebermann's converting captured images to digital data for processing by translation software at

the central processing facility.  In reply to Patent' Owners argument that the references fail to

show certain features of applicant's invention, it is noted that the features upon which applicant

relies (i.e., "images" themselves or "images are not transmitted") are not recited in the rejected

claim(s).  Although the claims are interpreted in light of the specification, limitations from the

specification are not read into the claims.  See *In re Van Geuns*, 988 F.2d 1181, 26

USPQ2d 1057 (Fed. Cir. 1993).  In this case, Patent Owner is improperly incorporating features

of '079 into the claims that are not recited in the challenged claims of '079.  For instance, the

claims do not recite "images" themselves or "images are not transmitted" as argued by Patent

Owner.  Instead, challenged claim 11 recites "*A computer apparatus comprising: a light source*

*adapted to illuminate a human body part within a work volume generally above the light source;*

*a camera in fixed relation relative to the light source and oriented to observe a gesture*

*performed by the human body part in the work volume; and a processor adapted to determine*

*the gesture performed in the work volume and illuminated by the light source based on the*

*camera output*" that does not recite "images" themselves or "images are not transmitted" and

does not preclude "different" (or "multiple") computers performing the recited functions/steps as

described by Liebermann.  Also, the Patent Owner statement on page 9 of their reply (i.e.,

"*Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is <u>not</u>

determining anything based on *Liebermann's* "images" (i.e., the Examiner identified "camera

output')") obfuscates record since facts show Liebermann uses camera captured images of the

gestures in the work volume.  For instance, contrary to aforementioned Patent Owner statement,

Liebermann uses the signing motion <u>images captured by the camera</u> that are converted into

digital data by the public kiosk computer.  After which the converted image data as digital data is

transmitted to and further processed by the translation software at the "central processing

facility" computer since *Liebermann* at 5:61-6:14 ("the deaf person is positioned so that the

**<u>camera lens 10 will record the signing movement of the hands and fingers and body and</u>**

**<u>facial motions and expressions. The signing motions captured by the camera are converted</u>**

**<u>into digital data for processing by the translation software, (i.e., artificial intelligence) to</u>**

**<u>produce data representing numbers, words and phrases which are then combined into</u>**

**<u>coherent sentences</u>**.") and at 6:36-38 ("FIGS. 9-12 are **schematics of the system software**

**modules for <u>converting signing to speech and speech to animation,</u>** including system training

methods.").  Therefore, to restate, *Liebermann's* camera captures the signing movement of the

hands and fingers and body and facial motions and expressions (i.e., gestures) where those

captured images are converted into digital data [by the "public kiosk" computing device] which

is then transmitted to the "central processing facility" for processing by the translation software

[at the "central processing facility" computing device].  Thus, facts show Liebermann describes a

computer apparatus of challenged claim 11 of '079 Patent including claim element 11[c], "**a**

**processor adapted to determine the gesture performed in the work volume and illuminated**

**by the light source based on the camera output**."


     C.  Patent Owner alleges "Liebermann does not anticipate dependent claims 4-9, 12, and 17-
        20."

On page 9, Patent Owner states, "*Liebermann* does not anticipate claims 1, 4-9, 11, 12, and 17-

20, and withdrawal of this anticipation rejection is respectfully requested." The examiner

disagrees for facts and reasons noted above and in rejection relied on herein.


### III.   **Obviousness**

  A.  Obviousness Rejections of Claims 2, 3, 14, and 15

    1.  Patent Owner alleges "The Examiner has failed to establish that *Sears* is
       analogous art."

Regarding claims 2, 3, 14 and 15, on page 10, Patent Owner states the following.

> The Examiner has failed to establish that *Sears* is analogous art and thus Sears cannot be used in an obviousness
> rejection of any claims in the '079 Patent. A reference qualifies as prior art for an obviousness determination
> only when it is analogous to the claimed invention. See *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two
> separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor,
> regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor,
> whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.
> *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020). When addressing
> whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory, the
> problems to which both relate must be identified and compared. *Id.*" The Patent Owner then proffered their two
> step analysis on pages 10-11 with their conclusion that "*Sears* is non-analogous art and cannot be used in any
> obviousness rejection. Withdrawal of this rejection is respectfully requested.

In reply, the examiner disagrees with Patent Owner analysis that ignores the two step analysis as

applied for the pertinent features of challenged claims to which Sears was considered for cited

dependent claims. In this case, the pertinent features of challenged claims to which Sears was

considered is the "light source includes a *light emitting diode*" or "a *plurality of light emitting*

*diodes*." Sears was not relied on for any step or element in independent claim 1 or 11, but

instead Sears was relied on with regards to the specific element in cited dependent claims. For

record to be complete, Sears is maintained from determination in office action as being relevant

prior art due to either being in the same field of endeavor or being reasonably pertinent to the

particular problem with which the Applicant was faced. In this case, Sears (See Sears, Abstract,

5:13-35, and FIG. 1b, copied below) is within field of endeavor of '079 that in the case of the

pertinent challenged claims at issue with respect to consideration of Sears regards challenged

claims 2, 3, 14 and 15 of a computer implemented method comprising *providing a light source*

*where the light source includes a light emitting diode* or a computer apparatus comprising *a light*

*source where the light source includes a plurality of light emitting diodes.*

> An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which **the user performs finger- and hand-based gestural commands, are input to a computer**, which decodes the text images into their symbolic meanings through optical character recognition, and **further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning**. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance**. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses. (Sears, Abstract, Emphasis added).

> Optionally, the **camera mount 37 may incorporate one or more illumination sources, so as to provide constant illumination over the field of view**. In FIG. 1b, such **illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37. These illumination sources 45 may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources**. Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the arrangement of illumination sources need not be in rows, as shown in FIG. 1b, but may also comprise point sources or sources located in varied arrangements around the camera 39. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly. (Sears, 5:13-35, Emphasis added).

Alternatively, Sears is reasonably pertinent to the particular problem with which the inventor was

faced <u>for the pertinent challenged claims at issue with respect to consideration of Sears</u> (5:13-35,

FIG. 1b) regards challenged claims 2, 3, 14 and 15 that recite *a light source includes a light*

*emitting diode* or *a light source includes a plurality of light emitting diodes.* Thus, for same

rationale in first action, Sears is maintained as relevant prior art herein since Sears is within

inventors field of endeavor or, in the alternative, is reasonably pertinent to the particular problem

with which the Applicant was faced which in this case of the pertinent challenged claims at issue

is a light source includes a LED or a plurality of LEDs with respect to consideration of Sears for

challenged claims 2, 3, 14 and 15 that recite a light source includes LEDs or a plurality of LEDs.

An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which **the user performs finger- and hand-based gestural commands, are input to a computer**, which decodes the text images into their symbolic meanings through optical character recognition, and **further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning**. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance**. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses. (Sears, Abstract, Emphasis added).

Optionally, the **camera mount 37 may incorporate one or more illumination sources, so as to provide constant illumination over the field of view**. In FIG. 1b, such **illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37**. **These illumination sources 45 may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources**. Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the arrangement of illumination sources need not be in rows, as shown in FIG. 1b, but may also comprise point sources or sources located in varied arrangements around the camera 39. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly. (Sears, 5:13-35, Emphasis added).

## *Fig. 1b*



2.   Patent Owner alleges "The combination of *Liebermann* and *Sears* does not render dependent claims 2, 3, 14, and 15 unpatentable."

Regarding claims 2, 3, 14 and 15, on pages 11-12, Patent Owner states the following.

> Claims 2, 3, 14, and 15 depend from, and add limitations to, independent claims 1 or 11. As discussed above, *Liebermann* fails to teach or suggest each and every limitation of independent claims 1 and 11. *Sears* does not cure the deficiencies of *Liebermann*. Thus, the combination of *Liebermann* and *Sears* does not render claims 1 and 11 unpatentable. By virtue of their dependencies from independent claims 1 or 11, the combination of *Liebermann* and *Sears* also does not render dependent claims 2, 3, 14, and 15 unpatentable.

In reply, the examiner disagrees. First, in reply to Patent Owner remark "*Liebermann* fails to teach or suggest each and every limitation of independent claims 1 and 11", the examiner disagrees for facts noted above and in rejection relied on herein. Second, regarding Patent Owner remark "*Sears* does not cure the deficiencies of *Liebermann*," in response to Patent Owner's arguments against the references individually, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986). Sears is not relied on for any element of independent claims 1 or 11 since facts show Liebermann describes those features as stated above and in rejection relied on herein. Third, in reply to Patent Owner remark "By virtue of their depending from independent clams 1 or 11, the combination of *Liebermann* and *Sears* also does not render dependent claims 2, 3, 14, and 15 unpatentable," the examiner disagrees since the facts in record show the features of challenged claims 2, 3, 14, and 15 are obvious over the combination of Liebermann in view of Sears for substitution of a known light source for another when taken as a whole at a time prior to the invention for what the combination suggests to an artisan a computer implemented method comprising providing a light source or a computer apparatus comprising a light source where the particular light source being a LED or a plurality of LEDs fails to critically distinguish over the combination in this case for facts herein. Especially when considered that it is known property (i.e., design incentive consideration) that a LED provides more intense light more efficiently than lamps. In this case, a light emitting diode (LED)

provides more intense light and is more efficient light source that lamps since a LED provides

more intense visible light as compared to lamps that emits light in both visible and non-visible

spectrum such that lamps is less efficient than a LED (e.g., see Numazaki, PA-19, 14:44-56,

"Also, a LED can be used as the light source, where the *LED has a property that it can emit*

*more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller* (that is,

when the pulse interval is longer compared with a single pulse width), so that it is possible to

*utilize the lighting power efficiently*"). Emphasis added. Hence, the property of LED of being a

more intense and more efficient light source as a design incentive would cause an artisan to

substitute one light source of a LED or a plurality of LEDs as used in Sears for another to

produce the expected result of a computer implemented method or computer apparatus

comprising providing a light source where the light source includes a LED or a plurality of LEDs

to provide more intense light more efficiently.


Also, regarding claims 2, 3, 14 and 15, on pages 12-13, Patent Owner further states the

following.

> Claim 2 recites "wherein the light source includes a light emitting diode." Claim 14 is similar to claim 2. Claim 3 recites "wherein the light source includes a plurality of light emitting diodes." Claim 15 is similar to claim 3. The Examiner concedes that *Liebermann* does not disclose light emitting diodes (LEDs). Action, pp. 47-48. The Examiner attempts to address this shortcoming in *Liebermann* by combining it with *Sears*. *Id.* Patent Owner asserts that the Examiner's *prima facie* case of obviousness lacks articulated reasoning and rational underpinnings and is thus improper. "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); see also MPEP §§ 2141, 2143.01.

> *Sears* discloses "the camera mount 37 may incorporate one or more illumination sources, so as to provide constant illumination over the field of view . . . These illumination sources 45 may comprise rows of LEDs." *Sears*, 5:13-19. To meet the requirements of claims 2,3, 14, and 15, the Examiner proposes substituting *Liebermann's* "lamps 48" (i.e., the Examiner identified "light source") with *Sears'* "LEDs." Action, p. 48. The Examiner contends that "it would have been obvious to an artisan to substitute .. . to ensure adequate lighting of the user's hands, face and body" and "to provide constant illumination over the field of view." *Id.* But *Liebermann* discloses that "lamps 48" already "ensure adequate lighting of the user's hands, face and body" in front of "camera 44." *Liebermann*, 5:53-59. Further, the Examiner has failed to demonstrate that *Liebermann's* "lamps 48" do not already provide constant illumination over "camera 44's" field of view. The Examiner has simply not explained why *Sears'* "LEDs" are superior to or an improvement over *Liebermann's* "lamps 48" and thus why the proposed substitution would take place.

The Examiner alludes to "design incentives or other markets forces" as a motivation for executing the substitution. *Id*. But again, the Examiner fails to identify or articulate any details regarding these alleged "incentives" or "forces." This is improper. MPEP §2143 ("The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit.'').

For these reasons, the combination of *Liebermann* and *Sears* do not render claims 2,3, 14, and 15 unpatentable, and withdrawal of this rejection is respectfully requested.

In reply to Patent Owner remark "Patent Owner asserts that the Examiner's *prima facie* case of obviousness lacks articulated reasoning and rational underpinnings and is thus improper," the examiner disagrees for reasons in rejection and above relied on herein where the features of challenged claims 2, 3, 14, and 15 are obvious over the combination of Liebermann in view of Sears when taken as a whole at a time prior to the invention for what the combination suggests to an artisan for mere substitution of one known light source for another especially in this case where a property of LED provides more intense light more efficiently than lamps. In this case, a light emitting diode (LED) provides more intense light and is more efficient light source than lamps since a LED provides more intense visible light as compared to lamps that emits light in both visible and non-visible spectrum such that lamps is less efficient than a LED (e.g., see Numazaki, PA-19, 14:44-56, "Also, a LED can be used as the light source, where the *LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller* (that is, when the pulse interval is longer compared with a single pulse width), so that it is possible to *utilize the lighting power efficiently*"). Emphasis added. Hence, the property of LED providing more intense light and being more efficient light source than lamps as a design incentive would cause an artisan to substitute one known light source of a LED or a plurality of LEDs as used in Sears for another to produce the expected result of a computer implemented method or computer apparatus comprising providing a light source that provides a more intense light and is a more efficient light source.

### B. Obviousness Rejection of claim 16

On page 14, Patent Owner states the following.

> Claim 16 stands rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being unpatentable over *Liebermann* in view of U.S. Patent No. 6,198,485 ("*Mack*"). For the reasons set forth below, this rejection is respectfully traversed.
>
> Claim 16 depends from, and add limitations to, independent claim 11. As discussed above, *Liebermann* fails to teach or suggest each and every limitation of independent claim 11. *Mack* does not cure the deficiencies of *Liebermann*. Thus, the combination of *Liebermann* and *Mack* does not render claim 11 unpatentable. By virtue of its dependency from independent claim 11, the combination of *Liebermann* and *Mack* also does not render dependent claim 16 unpatentable. Withdrawal of this rejection is respectfully requested.

In reply, the examiner disagrees. First, in reply to Patent Owner remark that Liebermann does not anticipate claim 11, Liebermann is maintained as anticipating claim 11 for reason above and facts in rejection relied on herein. Second, Mack was not relied on to cure an alleged deficiency of Liebermann since facts noted above and in rejection show Liebermann anticipates claim 11. Third, in reply to Patent Owner remark that claims 16 is patentable based on their dependency from independent claim 11, the examiner disagrees since facts in rejection relied on herein show the claim is obvious over the combination of Liebermann with Mack when taken as a whole at a time prior to the invention for what the combination suggests to an artisan.

### C. Obviousness Rejections of claims 21, 24-28 and 30

On page 14, Patent Owner states the following that includes footnote 1 regarding Sako.

> Claims 21, 24-28, and 30 stand rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being unpatentable over *Liebermann* in view of and U.S. Patent No. 5,689,575 ("*Sako*") For the reasons set forth below, this rejection is respectfully traversed.
>
> Patent Owner believes the Examiner inadvertently omitted *Sako* in the header of the rejection, see Action at p. 51, because the Examiner relies extensively on *Sako* in the obviousness analysis. See id. at pp. 53-54.
>
> 1. Patent Owner alleges, "The combination of *Liebermann* and *Sako* does not render independent claim 21 obvious because the combination fails to teach or suggest claim element 21[c]."

On page 15, Patent Owner states the following.

Claim element 21[c] recites "detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume." To meet claim element 21[c], the Examiner cites to the mappings and arguments presented in the Action for independent claims 1 and 11. See Action, p. 52 (the facts "cited above for challenge[d] claim[s] 1 and 11 relied on herein show *Liebermann* describes a computer implemented method comprising . . . detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand."). As discussed above, however, Liebermann fails to teach claim element 1[c] and claim element 11[c], which are similar to claim element 21[c]. Accordingly, *Liebermann* fails to teach claim element 21[c] for at least the same reasons as those discussed above for claim elements 1[c] and 11[c]. The Examiner does not contend that *Sako* cures the deficiencies of *Liebermann*. Action, pp. 52-54. Thus, the combination of *Liebermann* and *Sako* fails to teach or suggest claim element 21[c].

In view of the above, the combination of *Liebermann* and *Sako* fails to render independent claim 21 unpatentable. Accordingly, withdrawal of this rejection is respectfully requested.

The examiner disagrees for same reason stated above for claims 1 and 11 that are relied on herein as applying to claim 21 in that the computer implemented method of challenged claim 21, like the method of challenge claim 1, does not require the same (or "only one") computer. It appears based on aforementioned argument that Patent Owner is improperly incorporating features of '079 into the claims that are not recited in the challenged claims of '079.

In response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e., the "same" or relatedly "only one" computer) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). In this case, the computer implemented method of challenged claim 21, like the method of challenge claim 1, does not require the same (or "only one") computer. Instead, the computer implemented method of challenge claim 21, for same reason as discussed for claim 1 above relied on herein, merely requires there to be a computer such that, like for claims 1 and 11 above, claim 21 includes and does not preclude "different" or "multiple" computers such as in a distributed architecture described in Liebermann. Also, it is reiterated from discussion above for claim 1 for this same issue, Patent Owner acknowledged in discussing this issue for claims 1 and 11 on pages 5 of their reply that Liebermann includes a computer for each "public kiosk" and "central processing

facility." Specifically, the Patent Owner statement, on page 5, that "*Liebermann* discloses the

"public kiosk" is connected by "normal telephone lines" to the "central processing facility," id. at

5:1, the "public kiosk" and the "central processing facility" are <u>not</u> the same computing device"

is an acknowledgement by Patent Owner that both the "central processing facility" and "public

kiosk" in Liebermann have a computing device or computer. Therefore, the facts above and in

rejection relied on herein taken with aforementioned Patent Owner acknowledgement (i.e., that

the "central processing facility" and "public kiosk" in Liebermann each include a computing

device) show the computer of the "public kiosk" and the computer of the "central processing

facility" in Liebermann operate/function together in a computer implemented method of

Liebermann as recited in challenged claim 21 of '079. Hence, Liebermann describes the

computer implemented method of challenged claim 21 of '079 Patent since the method in

Liebermann includes a computer to perform the method including claim element 21 of

"**providing a camera oriented to observe a gesture performed in a work volume above the**

**camera**", "**providing a light source in fixed relation relative to the camera and adapted to**

**direct illumination through the work volume**" and "**detecting, using the camera, a gesture**

**performed by at least one of a user's fingers and a user's hand in the work volume**."


Further, in reply to Patent Owner remark on page 15, "As discussed above, however,

*Liebermann* fails to teach claim element 1[c] and claim element 11[c], which are similar to claim

element 21[c]. Accordingly, *Liebermann* fails to teach claim element 21[c] for at least the same

reasons as those discussed above for claim elements 1[c] and 11[c].", the examiner disagrees for

facts noted above regarding claims 1[c] and 11[c] and for facts in rejection relied on herein.

Second, regarding Patent Owner remark on page 15, that "*Sako* does not cure the deficiencies of

*Liebermann,*" to the extent this remark regards the their prior remark that the computer

implemented method requires the "same" computer, the discussion above is relied on herein

since it is maintained that the recited computer implemented method of claim 21, for same

reason stated above for claims 1 and 11, merely requires there is a computer such that the claim

includes or fails to preclude multiple or different computers operating together to perform the

steps as described in Liebermann.  In the alternative, to the extent this noted remark (i.e., "*Sako*

does not cure the deficiencies of *Liebermann,*") regards the feature (e.g., "work volume above

the camera") for which Sako was cited as additional support, the rejection in prior action cited

judicial decision, *In re Japikse,* 181 F.2d 1019, 86 USPQ 70 (CCPA 1950), as basis that it was

known to have been obvious to an artisan to rearrange the location of parts when the change in

location of its parts does not alter or modify the operation of its elements/parts.  Sako is cited in

record as further evidence in consideration of decision of *In re Japikse* to rearrange the location

of parts where Sako was cited as further evidence that the particular arrangement of "work

volume above the camera" was a known arrangement prior to the invention.  The facts in this

case indicate, as stated in rejection, there is no change in operation of the camera, light source or

work volume in this case when the elements in Liebermann are rearranged to be "work volume

above the camera" since, lacking evidence to the contrary, the provided camera continues to

observe a gesture in the work volume, the provided light source continues to direct illumination

through the work volume and the method continues detecting, using a camera, a gesture

performed by one of a user's fingers and a user's hand in the work volume.  Thus, in this case, in

consideration of judicial decision to be obvious to an artisan to rearrange the location of parts

from judicial decision of *In re Japikse* with further evidence of particular arrangement of parts

"work volume above the camera" is shown to have been known prior to the invention by Sako,

the computer implemented method of claim 21 is obvious over Liebermann for rearranging the

location of parts since in this instance lacking evidence to the contrary, there is no change in the

operation of its elements/parts.  Also, in response to Patent Owner's arguments against the

references individually, one cannot show nonobviousness by attacking references individually

where the rejections are based on combinations of references.  See *In re Keller*, 642 F.2d 413,

208 USPQ 871 (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir.

1986).  In this case, it is maintained as obvious to rearrange the location of elements/parts of

Liebermann per judicial decision in *In re Japikse* where there is no change in operation of its

elements/parts in this case and with further support that the particular arrangement of "work

volume <u>above</u> the camera" was known as shown by Sako.  Sako is merely cited as additional

evidence that the particular arrangement of "work volume <u>above</u> the camera" was known prior to

the invention.  Finally, there does not appear to be a disclosed benefit described in ''079 patent

provided by the particular arrangements of "*work volume <u>above</u> the light source*" as recited in

claim element 1[c], "*work volume generally <u>above</u> the light source*" as recited in claim element

11[c], or "*work volume <u>above</u> the camera*" as recited in claim element 21[c].


    2.   Patent Owner alleges "The combination of *Liebermann* and *Sako* does not render
          claims 24-28 and 30 obvious."

On page 16, Patent Owner states the following.

> Claims 24-28 and 30 depend from, and add limitations to, independent claim 21. As discussed above, the
> combination of *Liebermann* and *Sako* does not render claim 21 unpatentable. By virtue of their dependencies
> from independent claim 21, the combination of *Liebermann* and *Sako* also does not render dependent claims 24-
> 28 and 30 unpatentable. Withdrawal of this rejection 1s respectively requested.

In reply, the examiner disagrees for facts cited above and in rejection relied on herein show that

claim 21 is obvious over Liebermann in light of judicial decision in *In re Japikse* to be obvious

to rearrange location of parts/elements when the rearrangement does not alter the operation of its

parts/elements and further, in this case, the particular arrangement of "*work volume <u>above</u> the*

*camera*" was a known arrangement prior to the invention as further evidence by Sako when

taken as a whole at a time prior to the invention for what the combination suggests to an artisan.

Also, in reply to Patent Owner remark (i.e., "By virtue of their dependencies from independent

claim 21, the combination of Liebermann and Sako also does not render dependent claims 24-28

and 30 unpatentable"), the examiner disagrees since facts above and in rejection show

Liebermann teaches these elements (that are similar to elements recited in dependent claims 4-9

and 17-20 also relied on herein).

 

    D.  Patent Owner alleges, "The combination of *Liebermann*, *Sako*, and *Sears* does not
       render claims 22 and 23 obvious."

      1.  Patent Owner alleges, "*Sears* is non-analogous art."

On page 16, Patent Owner states the following including a footnote 2 for Sako.

> As discussed above in reference to claims 2, 3, 14, and 15, the Examiner has not established that *Sears* is analogous art, and thus *Sears* cannot be cited in an obviousness rejection of any claim in the 079 Patent. Accordingly, withdrawal of this rejection is respectfully requested.

> Patent Owner believes the Examiner inadvertently omitted *Sako* in the header of the rejection, see Action at p. 55, because the Examiner later mentions *Sako* in the obviousness analysis. See id. at pp. 56-57 ("Since *Liebermann*, *Sako* and *Sears* each regard a method and apparatus for processing images . . .") (emphasis added).

In reply the examiner disagrees since Sears is analogous art for same reasons noted above

regarding claims 2, 3, 14 and 15 relied on herein for claims 22 and 23.  The examiner also

continues to disagree with Patent Owner analysis that ignores the two step analysis as applied for

the <u>pertinent features of challenged claims to which Sears was considered</u> for cited dependent

claims.  In this case, the pertinent features of challenged claims 22 and 23 to which Sears was

considered is the *light source comprises a light emitting diode* (LED) or a *plurality of light*

*emitting diodes*.  Sears was not relied on for any step or element in independent claim 1, 11 or

21, but instead Sears was relied on with regards to specific element in cited dependent claims of

a LED. The two-step analysis determination in action states "Sears is deemed as relevant prior

art due to either being in the same field of endeavor or being reasonably pertinent to the

particular problem with which the Applicant was faced. See *In re Oetiker*, 977 F.2d 1443, 24

USPQ2d 1443 (Fed. Cir. 1992)." More specifically, for record to be complete, Sears is

maintained as relevant prior art due to either being in the same field of endeavor or being

reasonably pertinent to the particular problem with which the Applicant was faced." For

instance, Sears (e.g., See Sears, Abstract and 5:13-35, FIG. 1b, copied above in discussion of

claims 2, 3, 14 and 15 relied on herein) is within field of endeavor of '079 or is reasonably

pertinent to the particular problem with which the Applicant was faced that for this case regards

the pertinent challenged claims at issue with respect to consideration of Sears as the challenged

claims 22 and 23, of light source includes a *light emitting diode* (LED) or *a plurality of LEDs*.


Further, as discussed above for claim 21 relied on herein, Sako was cited as further evidence of

particular arrangement of location of parts of "*a work volume above a camera*" in support of it is

deemed obvious to rearrange the location of parts when the rearrangement of parts does not alter

the operation of the elements as in cited judicial decision of *In re Japikse* which is the case here.

Thus, in this case, facts in the rejection and discussion above show the combination of

Liebermann with Sears when taken as a whole at a time prior to the invention for what the

combination suggests to an artisan, the combination suggests a computer implemented method as

recited in claim 21, wherein "*a light source comprises a light emitting diode*" or "*a plurality of

light emitting diodes*" as suggested by Sears.


     2.  Patent Owner alleges, "The combination of *Liebermann*, *Sako*, and *Sears* does not
        render claims 22 and 23 obvious.

On page 17, Patent Owner states the following.

> Claim 22 recites "wherein the light source includes a light emitting diode." Claim 23 recites "wherein the light source includes a plurality of light emitting diodes." Claims 22 and 23 are similar to claims 2 and 3, respectively. As discussed above, the combination of *Liebermann* and *Sears* does not render claims 2 and 3 unpatentable. Accordingly, the combination of *Liebermann* and *Sears* also does not render claims 22 and 23 unpatentable for the same reasons. *Sako* does cure the deficiencies of *Liebermann* and *Sears*. Accordingly, claims 22 and 23 are patentable over *Liebermann*, *Sako*, and *Sears*. Accordingly, withdrawal of this rejection is respectfully requested.

In reply, the examiner disagrees since contrary to Patent Owner remarks, for same reasons discussed above for claims 2, 3, 14 and 15 and for facts in rejection relied on herein, claims 22 and 23 are obvious over the combination of Liebermann with Sears when taken as a whole for what the combination suggests to an artisan where Sako was cited as further evidence that a particular arrangement of location of parts of "*a work volume above a camera*" was known for reasons noted above and in rejection and where Sako was not relied on to cure an alleged deficiency of Liebermann or Sears.  Sears is relied on regarding "*a light source comprises a light emitting diode*" or "*a plurality of light emitting diodes*" as recited in claims 22 and 23 of '079. The facts noted above and in rejection show Sears describes a light source includes a light emitting diode (LED) or a plurality of LEDs.  It is maintained to have been obvious to an artisan over the combination of Liebermann in view of Sears when taken as a whole at a time prior to the invention for what the combination suggests to an artisan for mere substitution of a known light source where a light emitting diode provides more intense light more efficiently than lamps. In this case, a light emitting diode (LED) provides more intense light and is more efficient light source than lamps since a LED provides more intense visible light as compared to lamps that emits light in both visible and non-visible spectrum where thereby lamps is less efficient than a LED (e.g., see PA-19, Numazaki, 14:44-56, "Also, a LED can be used as the light source, where the *LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller* (that is, when the pulse interval is longer compared with a single

pulse width), so that it is possible to *utilize the lighting power efficiently*").  Emphasis added.

Hence, the property of LED providing more intense light and being a more efficient light source

as a design incentive would cause an artisan to substitute one known light source of a LED or a

plurality of LEDs as used in Sears for another to produce the expected result of a computer

implemented method or computer apparatus comprising providing a light source where the light

source includes a LED or a plurality of LEDs where Sako was only cited as further evidence of a

known prior arrangement of parts of a "*work volume <u>above</u> the camera.*"


E.  Obviousness of claim 29

On pages 17-18, Patent Owner states the following that also includes a footnote 3 (omitted

herein) for Sako.

> Claim 29 stands rejected under pre-AIA 35 U.S.C. § 103(a) as being unpatentable over *Liebermann*, in view of *Sako*, and in view of *Mack*. For the reasons set forth below, this rejection is respectfully traversed.

> Claim 29 depends from, and add limitations to, independent claim 21. As discussed above, the combination of *Liebermann* and *Sako* does not render claim 21 unpatentable. Mack does not cure the deficiencies of *Liebermann* and *Sako*. Thus, the combination of *Liebermann*, *Sako*, and *Mack* also does not render claim 21 unpatentable. By virtue of its dependency from independent claim 21, the combination of *Liebermann*, *Sako*, and *Mack* also does not render dependent claim 29 unpatentable. Accordingly, withdrawal of this rejection is respectfully requested.

The examiner disagrees.  First, the examiner disagrees with Patent Owner statement that

Liebermann does not render claim 21 unpatentable for reasons stated above relied on herein

regarding claim 16 and that it is maintained to be obvious to rearrange the location of parts as

decided in judicial decision in *In re Japikse* with additional support of known arrangement by

Sako.  Second, Mack was not relied on to cure any alleged deficiency of Liebermann or Sako

since facts noted above and in rejection show Liebermann describes the computer implemented

method of claim 21 where it is maintained to be obvious to rearrange the location of parts per

judicial decision in *In re Japikse* where the particular arrangement of "work volume <u>above</u> the

camera" was a known arrangement as shown by Sako .  Third, in reply to Patent Owner remark

that claims 29 (like claim 16 relied on herein) is patentable based on their dependency from

independent claim 21, the examiner disagrees since facts in rejection relied on herein show the

claim is obvious over the combination of Liebermann with Mack when taken as a whole at a

time prior to the invention for what the combination suggests to an artisan.

IV.    **Patent Owner alleges "No Substantial New Question (SNQ) of Patentability Exists"**

On pages 18-19, Patent Owner states the following.

> Patent Owner respectfully asserts that no SNQs of patentability exist and requests reconsideration of the SNQ issue by the Examiner
>
> In the order dated December 20, 2021 ("Reexam Order") granting the request for ex parte reexamination of the °079 Patent, the Office asserts that Liebermann raises a SNQ of patentability because Liebermann appears to teach all the claim elements, and these claim elements were missing from the art cited during the original prosecution. Reexam Order, pp. 16-17. Patent Owner disagrees. As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c]. In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent. Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and *Liebermann* does not raise a SNQ of patentability. The order for ex parte reexamination should be vacated.
>
> The order for ex parte reexamination of the '079 Patent should be vacated because the USPTO has no jurisdiction over expired patents and/or there is no SNQ of patentability. Additionally, or alternatively, the cited art fails to render claims 1- 9,11, 12, and 14-30 unpatentable.

The examiner disagrees for reasons stated in the Order Grant decision mailed 12/20/2021, stated

above in response to arguments and stated in rejections herein each incorporated herein that

contrary to Patent Owner opinion, facts show Liebermann describes the computer implemented

method as recited in challenged claims 1 and 4-9, the computer apparatus as recited in

challenged claim 11, 12 and 17-20 and is maintained as obvious to rearrange the location of parts

of the computer implemented method recited in challenged claims 21, 24-28 and 30 per judicial

decision in *In re Japikse* with additional support that the particular arrangement of "*work volume*

*above* the camera" was a known prior to the invention as shown by Sako.  Further based on

response to arguments above and facts in rejections relied on herein, the combination of

Liebermann in view of Sears renders the computer implemented method as recited in claims 2, 3,

22 and 23 and the computer apparatus as recited in claims 14 and 15 unpatentable when taken as

a whole at a time prior to the invention for what the combination suggests to an artisan with

consideration of known property of LEDs as stated by Numazaki.  Also, based on response to

arguments above and facts in rejections relied on herein, the combination of Liebermann in view

of Mack renders the computer implemented method as recited in claim 29 and the computer

apparatus as recited in claims 16 unpatentable when taken as a whole at a time prior to the

invention for what the combination suggests to an artisan.  Based on above noted facts as stated

in response to arguments, in Order Decision and in rejection, it is maintained that the Order

Grant Decision is proper for showing the SNQs noted therein with further facts in support

thereof noted above and in rejections herein.  Patent Owner improper interpretation of scope of

their claimed invention and teachings of prior art does not provide evidence there is no SNQs

shown in record.


Further, on page 18, Patent Owner states, "the Office asserts that *Liebermann* raises a SNQ of

patentability because *Liebermann* appears to teach all the claim elements, and these claim

elements were missing from the art cited during the original prosecution. Reexam Order, pp. 16-

17." This is an incorrect interpretation of the basis in the Order Grant decision since contrary to

Patent Owner statement the Order states "a SNQP regards prior art that describes any of the steps

"providing a light source", "providing a camera" or "determining, using the camera, the gesture"

as particularly recited in claims 1 and 21.  Also, a SNQP regards a prior art that describes any of

"a light source adapted to illuminate a human body part within a work volume generally above

the light source", "a camera in fixed relation relative to the light source and oriented to observe a

gesture performed by the human body part in the work volume" and "a processor adapted to

determine the gesture performed in the work volume and illuminated by the light source based

on the camera output" as recited in claim 11." Reexam Order, p. 12.  Thus, in this reexam, any of

the recited steps or any of the recited structures shown by prior art, alone or in combination,

raises a SNQP.  The following Patent Owner remarks noted above are reiterated in reply to

Patent Owner contention of "No SNQs Exists."

On pages 5 and 6, regarding claim 1,  Patent Owner states,

> *Liebermann* discloses the "public kiosk" is connected by "normal telephone lines" to the
> "central processing facility," id. at 5:1,  the "public kiosk" and the "central processing
> facility" are not the same computing device", "The Examiner mapped at least the bottom
> most lamp in *Liebermann's* "public kiosk" to the claimed "light source." Action, pp. 7-8.
> And the Examiner mapped "camera 44" in *Liebermann's* "public kiosk" to the claimed
> "camera." Action, p. 12. But the functions executed by *Liebermann's* "central processing
> facility" (e.g., identification of words in sign language performed by the deaf person)
> were mapped to the "determining" step of claim element 1[c]. *Id*. at pp. 13-14.

On page 6, regarding claim 11, Patent Owner states,

> Claim element 1[c] recites "determining, using the camera, the gesture." As discussed
> above, the Examiner mapped *Liebermann's* "camera 44" of the "public kiosk" to the
> claimed "camera," and mapped the functions executed by Liebermann's "central
> processing facility" (e.g., identification of words in sign language performed by the deaf
> person) to the "determining" step of claim element 1[c].

On pages 7-8, Patent Owner states,

> As discussed above, the Examiner mapped at least *Liebermann's* bottom most lamp of
> the "public kiosk" to the claimed "light source," and mapped *Liebermann's* "camera 44"
> of the "public kiosk" to the claimed "camera." Action, p. 33. But the Examiner mapped
> *Liebermann's* "central processing facility," which is located at a different physical
> location, executing "translation software, (i.e., artificial intelligence) to produce data
> representing numbers, words, and phrases which are then combined into coherent
> sentences" to the claimed "processor." Action p. 37.

Based on aforementioned Patent Owner statements, Patent Owner appears to acknowledge by

fiat that Liebermann raises an SNQP for at least each of the respective steps of a computer

implemented method for a computing device in the public kiosk (i.e., cited Patent Owner

statements above acknowledge the public kiosk includes a computing device/computer and this

same computer performs steps of at least claim elements 1[a] and 1[b]) performing "**providing a**

**light source**," and "**providing a camera oriented to observe a gesture**" as recited in claim 1

and 21 and those Patent Owner statements appear to acknowledge by fiat that Liebermann raises

an SNQP for at least each of the of the respective elements of a computer apparatus [as the

computing device in the public kiosk] (i.e., cited Patent Owner statements above acknowledge

the public kiosk includes a computing device/computer and this same computer performs

includes at least the structures in claim elements 11[a] and 11[b]) includes a "**a light source**

**adapted to illuminate a human body part**," and "**a camera in fixed relation relative to the**

**light source and oriented to observe a gesture**" as recited in claim 11.  The examiner

maintains based on facts in Reexam Order, mailed 12/20/2021, that Liebermann also raises a

SNQP for the claim element 1[c}, 11[c] and 21[c], as well as facts cited in the rejections in office

action mailed 4/14/2022 and response to arguments above herein since the claimed computer

implemented method in claims 1 and 21 and the computer apparatus of claim 11 is not limited to

the same computer as alleged by Patent Owner but instead merely requires a computer since the

preamble includes and fails to preclude different or multiple computers operating together such

as in the distributed architecture in Liebermann.  Finally, it is noted that the specification and

prosecution history of the '079 patent includes no express definition or disavowal of claim scope

that supports limiting the term "computer"' implemented method to require the same computer

to perform the recited steps and the '079 patent includes no express definition or disavowal of

claim scope that supports limiting the term "computer" apparatus to require the same computer

to include recited structures. There is no declaratory statement in record that only one computer

performs recited steps of the method or only one computer that includes the recited structures of

the apparatus such that there is no indication in the record that precludes multiple computers

functioning together to perform the recited steps of the method and no indication in the record

that precludes multiple computers including the recited structures of the apparatus. For all of the

above facts and reasons the Reexam Order was proper for raising the SNQPs identified on pages

12 and 16-17 therein.


### *Claim Rejections - 35 USC § 102*

10.     The text of those sections of Title 35, U.S. Code not included in this action can be found

in a prior Office action.

11.     **Claims 1, 4-9, 11-12, 17-21, 24-28 and 30 are rejected under pre-AIA 35 U.S.C.**

**102(e) as being anticipated by U.S. Patent No. 5,982,853 to Liebermann (PA-1, hereafter**

**"*Liebermann*")**.  The response to Patent Owner arguments above is incorporated herein.

Regarding claim 1, where the claim terms of an expired patent are accorded their plain

and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein

show Liebermann describes **a computer implemented method** as recited in challenge claim 1.

a.     **A computer implemented method comprising:**

For instance, Liebermann discloses a "portable transmitter/receiver," as shown in FIG. 6,

that is in the "form of a cellular telephone" (Ex. PA-1, 4:21-22, 5:62-63).   In particular,

Liebermann discloses that the cellular telephone includes hardware that works with the camera to

view and obtain images of hand gestures, performs related "initial processing," and populates a

phone display, among other things (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.)   Liebermann states

"computer processing requirements".   The Liebermann cellular phone also has a video camera,

an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and

communicate as a wireless remote or through a cellular telephone network." (*Id.*, 5:62-6:2.)

Through this wireless connection, the cellular phone works in conjunction with "a dedicated

central computer facility" to "provide a novel electronic communication system for use by deaf

persons to enable them to communicate by signing" as well as "a unique method utilizing such

an electronic communication system to enable communication by and to deaf persons." (*Id.*,

3:11-13, and 3:22-67, 5:62-6:14.)

> A **portable transmitter/receiv**er generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6 and it **contains a video camera**, the lens 10 of which is disposed in the upright portion 12. In the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions. Also seen is an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned **so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.**

PA-1, 5:62-6:10, emphasis added.

> The other party may speak into a telephone receiver (not shown) and **the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14.**

*Id.*, 6:15-18, emphasis added.

> FIGS. 9-12 are schematics of the **system software modules for converting signing to speech and speech to animation, including system training methods**.

*Id.*, 6:36-38, emphasis added.

> Generally, **the deaf person uses sign language in front of a device containing a video camera**. The **images captured by the camera** at 20-30 frames/second are **processed by a digital device** which does initial and extended image processing. In the processing, each of the frames containing a **captured image undergoes a process whereby the image is transformed into manageable identifiers**. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). **These identifiers**, and not the images themselves, **are then correlated with a database of vocabulary and grammar by using artificial intelligence** at the Center. Subsequently, **syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications**.

*Id.*,4:60-5:13, emphasis added.

> On the other end of the telephone line, **the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line** (in

whatever method of transport is utilized by the telephone carrier) to the Center **where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation.** Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. **The sign images then appear on the screen of a monitor viewed by the deaf person,** resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

*Id.*, 5:14-34, emphasis added.

In view of **the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications** are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. 3 wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

*Id.*, 5:35-47, emphasis added.

A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a computer, processor or similar component for performing various disclosed computer/processor implemented functions, including, but not limited to, controlling cameras, driving a display, transmitting information, receiving information, video/image capture and processing, calling/communication circuitry/processing, processing data, translating sign gesture(s) to speech/audio and/or text, translating speech to sign gestures and/or text etc. (*Id.*, 5:62-6:47, FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of ordinary skill in the art to describe a variety of devices with varying degrees of complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994).

### a.  providing a light source adapted to direct illumination through a work volume above the light source

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann

describes **providing a light source adapted to direct illumination through a work volume above the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a video monitor 46, and **lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). *Id.*, see FIGS. 6, 5A-5C, and 9 copied below. The recited "work volume" is the space in the point of view of Liebermann camera/lens that captures image of signing/gesture where in Liebermann lamps 48 direct illumination through a work space to ensure adequate lighting of user's hands, face and body. The "work volume" (work space) in Lieberman is above the lamps (light source) in FIG. 5C that is in camera field of view in so far as the bottom most lamp is below the work space where a user signs, by happenstance of use for a deaf person signing. Liebermann describes a method having a light source to illuminate a work volume above the light source of challenged claim 1.



CELLULAR
TELEPHONE
VERSION

*FIG. 6*

PC VERSION

*FIG. 5A*

KIOSK VERSION FOR
PUBLIC ACCESS

SET-TOP BOX

*FIG. 5B*

*FIG. 5C*



*FIG. 9*



*FIG. 10*



*FIG. 11*



*FIG. 12*

At least the apparatus/system in FIG. 5C of Liebermann provides a method **providing a light source adapted to direct illumination through a work volume above the light source** since the lamps 48 direct light to ensure adequate lighting of the user's hands, face and body.

> **b.** **providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a method comprising **providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that **the camera lens 10** will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by **the camera** are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). see *Id*., FIGS. 5A-5C, 6 and 9-12 copied above. Liebermann describes a method providing a camera to observe a gesture performed in the work volume with the camera

fixed relative to the light source of challenged claim 1 where the recited gesture includes signing

such as American Sign Language (ASL) by a person in the work volume.

> It has now been found that the foregoing and related objects may be readily attained in an electronic communications system for the deaf comprising a **video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases**. Also included are **means for outputting the words and phrases in a comprehensible form to another hearing person**, generally as artificial speech.
>
> In a telephone type system, the other person is at a remote location, although the system may also be used as a translator for communication with a person in the immediate vicinity. Generally, **the video apparatus is a video camera**.
>
> From cost and portability standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means.
>
> In addition to use of a **database of words and phrases corresponding to digitized motions, the translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences**.
>
> The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases in written form.
>
> To enable communication of the deaf person, the system includes means for the other or hearing person to transmit words and phrases. The **translating means is effective to translate said words and phrases into digitized signing motions**, and the video apparatus includes a display screen which provides an output of the digitized signing motions on the display screen for viewing by the deaf person.
>
> There is included **means for translating speech into digital data representing words and phrases and such digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf person**. The video apparatus also includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

PA-1, 3:26-67 (emphasis added).

> If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language Structure, Linstok Press (1978).
>
> ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring attention to detail.

*Id.*, 10:54-67.

At least the apparatus/system with camera 44 in FIG. 5C of Liebermann provides a

method **providing a camera oriented to observe a gesture performed in the work volume,**

**the camera being fixed relative to the light source** since the camera 44 is directed toward the

work volume to observe and capture gesture(s) where the lamps are directed to ensure adequate

lighting of the user's hands, face and body, as stated by Liebermann.

    c.  **and determining, using the camera, the gesture performed in the work volume and illuminated by the light source**.

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a method comprising **determining, using the camera, the gesture performed in the work volume and illuminated by the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.**") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods.**"). see *Id*., FIGS. 5A-5C, 6 and 9-12 copied above.

At least the video camera 44, and lamps 48 to ensure adequate lighting of the user's hands, face and body with "processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a method

determining, using the camera, the gesture performed in the work volume and illuminated by the

light source since the camera 44 is directed toward the work volume to observe and capture

gesture(s) to ensure adequate lighting of the user's hands, face and body and for translating

means also includes artificial intelligence for interpreting and converting the translated motions

into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38,

FIGS. 5S-5C, 6, and 9-12, copied above).

 

 

      d.   **The method according to claim 1 wherein detecting a gesture includes analyzing
sequential images of the camera**.

Regarding challenge claim 4, where the claim terms of an expired patent are accorded

their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary,

facts herein show Liebermann describes **a computer implemented method comprising**

**detecting a gesture includes analyzing sequential images of the camera**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a

personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer

unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand

level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and**

**lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the**

**deaf person is positioned so that the camera lens 10 will record the signing movement of the**

**hands and fingers and body and facial motions and expressions. The signing motions**

**captured by the camera are converted into digital data for processing by the translation**

**software, (i.e., artificial intelligence) to produce data representing numbers, words and**

**phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are**

**schematics of the system software modules for converting signing to speech and speech to**

**animation, including system training methods**."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above.

At least the video camera 44, and lamps 48 to ensure adequate lighting of the user's hands, face and body with "the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a method **detecting a gesture includes analyzing sequential images of the camera** since the camera 44 is directed toward the work volume to observe and capture gesture(s) to ensure adequate lighting of the user's hands, face and body and for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38, FIGS. 5A-5C, 6, and 9-12, copied above).

    e.   **The method according to claim 1 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture** and **The method according to claim 1 further including determining the pointing direction of a finger in the work volume**

Regarding challenge claims 5 and 6, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method comprising wherein the detected gesture includes at least one of a pinch gesture, a pointing**

**gesture, and a grip gesture** and **further including determining the pointing direction of a finger in the work volume**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above.   Liebermann describes a method where the recited gesture includes deaf person signing such as via American Sign Language (ASL).  See *Id.*, 10:54-12:6, FIGS. 16 and 17.  Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (*Id.*, 12:30-33.)  Liebermann further discloses the "identification of the letters, numbers and words" that have been signed, and discloses in FIG. 11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Liebermann not only discloses detecting "at least one of a pinch gesture, a pointing gesture, and

a grip gesture," but discloses detection of all three types of gestures and further including

determining the pointing direction of a finger in the work volume.  In particular, Liebermann

discloses that "another significant aspect of the invention is the requirement that finger spelling

be captured by the camera, undergo the RDS process, and still be recognized once artificial

intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the

"identification of the Jeffers, numbers and words" that have been signed, and discloses in FIG.

11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a

spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Thus,

the system and method of Liebermann must be capable of detecting the full range of a signed

alphabet in order to achieve the required finger spelling detection.

Liebermann further discloses detection of ASL signs via an "ASL to English translation

algorithm," and notes that implementing the disclosed ASL to English translation method

requires "linguistic analysis beyond what was recognized by William Stokoe in [Semiotics] and

Human Sign Language, Mouton (197[2]), and Sign Language Structure, Linstok Press (1978)."

(*Id.*, 10:54-56, 12:3-6; see also Exs. PA-8, PA-9 both as knowledge of an artisan that is relied on

only in so far as Liebermann describes deaf person signing ASL and the method and system of

Liebermann captures and translates their signing into verbal/text for communicating with hearing

persons at remote locations; thus, ASL signs as depicted in PA-8, PA-9 are implicitly included in

Liebermann.) Thus, method in Liebermann --including the finger spelling as discussed above--

required consulting Stokoe's sign language publications (or similar sources of such information)

to ensure that, at a minimum, the system performs the disclosed Liebermann method to the full

extent of the features described in such publications. For example, in both Semiotics and Human

Sign Language and Sign Language Structure, Stokoe includes a diagram showing the letters of

the American Manual Alphabet which are used in conjunction with ASL. (Ex. PA-8, 22; Ex. PA-9 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) As pictured below, the American Manual Alphabet includes pinch, pointing, and grip gestures, and thus detection of finger spelling requires detection of a pinch gesture, a pointing gesture, and a grip gesture and determining the pointing direction of a finger in the work volume. (Ex. PA-8, 22; Ex. PA-9, 28 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.)  For example, letters F and O each represent variations on a pinch gesture, where the thumb and index finger pinch together; letters D and G each represent pointing gestures and letters A and S represent variations on a grip gesture. (Ex. PA-9, 28)



(Ex. PA-9, 28 (FIG  1 (annotated to show pinch, pointing, and grip gestures used for finger spelling)).)

Further, Liebermann discloses that the electronic communication method must be able to detect the signs that are used in finger spelling. Liebermann's discloses the importance of consulting Stokoe's publications in order to implement the Liebermann ASL detection method, and how these publications provide diagrams showing the letters of the American Manual Alphabet which are used to perform finger spelling in conjunction with ASL. (*Id.*) As pictured below, it was known that the American Manual Alphabet included a variety of gestures with fingers pointing in various directions. (Ex. PA-9, 28; see also Ex. PA-8, 22.) For example, letter D involves pointing upwards; letter G involves pointing left (if signing with a right hand); letter P involves pointing upwards at an angle; and letter Q involves pointing downwards at an angle. (Ex. PA-9, 28.)



Ex. PA-9, 28 (FIG. 1 annotated to show pointing signs in different directions used for finger spelling) as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL thereby implicitly including determining direction of finger pointing and the

method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing person at remote locations.)

At least the particular signing movement of the hands and fingers and body and facial motions and expressions by a deaf person where the signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a method **wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture** and **further including determining the pointing direction of a finger in the work volume** for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id*., 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38 and 53-57, 10:54-56, 12:3-6 and 30-33, FIGS. 5S-5C, 6, and 9-12, copied above).  Also, see *Id*., FIGS. 15 and 16.

    f.   **The method according to claim 1 further including providing a target positioned on a user that is viewable in the work volume**.

Regarding challenge claim 7, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method further including providing a target positioned on a user that is viewable in the work volume**. For instance, Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (Ex. PA-1, 12:30-33.)

Liebermann discloses that because "[t]his task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing person, and clothes," it is advantageous to use "**special gloves which allow discrimination of the hands from the background for the image processing system**." (*Id.*, 12:34-39.) FIGS. 13 and 14 illustrate "the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language." (*Id.*, 12:40-43, FIGS. 13-14.) Liebermann discloses an example where "the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue," and each glove may have "a third color (typically red) for left and right palm areas," which "allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away." (*Id.*, 12:46-52.) FIG. 13A illustrates a front view of these gloves; while, FIG. 13B illustrates a back view of these gloves and each is reproduced below.





*FIG. 13B*

At least the use of special gloves of Liebermann regards a method **further including**

**providing a target positioned on a user that is viewable in the work volume** since the

"special gloves which allow discrimination of the hands from the background for the image

processing system" and "the benefit in using special gloves to enhance the ability of the system

to recognize important detail of the hand shapes during the actual gesturing of sign language."

(*Id.*, 12:40-43, FIGS. 13-14.)


    g.   **The method according to claim 1 further including determining the three-dimensional position of a point on a user**.

Regarding challenge claim 8, where the claim terms of an expired patent are accorded

their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary,

facts herein show Liebermann describes **a computer implemented method comprising further**

**including determining the three-dimensional position of a point on a user**.

For instance, Liebermann discloses that the electronic communication method must

determine the location or position of points on a user. Because "ASL is a visual-spatial language

requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to

combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the

**spatial location of the hands relative to the rest of the body** (Stokoe's 'tab')." (Ex. PA-1,

10:59-64 (internal quotations added).) As shown in Liebermann, FIG. 9 (reproduced below with

annotations added for emphasis), which displays "a schematic representation of the modules of

the artificial intelligence for converting signing into speech," the disclosed method requires

"**calculating centers of gravity for both hands**," which involves finding an "**FFT [fast Fourier**

**transform] of paths of the hands**" as well as performing an "**explicit path analysis**" of the

hands. (*Id.*, 4:31-32, FIG. 9.) FIG. 9 discloses in other portions of the conversion process that a

"**2 hand FFT and their location**" are determined by the static gesture manager, and a "**right**

**hand FFT**" is determined by the spelling mode manager. (*Id.*, FIG. 9.) Knowledge of a POSITA

would understand that calculating the center of gravity of a hand, performing a fast Fourier

transform, and conducting path analysis as discussed in Liebermann includes determining the

position of a point on the user's hand, which is a "point on a user." Also, the use of "**special**

**gloves which allow discrimination of the hands from the background for the image**

**processing system**" and determining direction of a pointing finger by a deaf person signing as

described in Liebermann explicitly/necessarily includes coordinates (i.e., three-dimensional

position of a point of a user) of the hands and other body parts are determined. (*Id.*, 13:22-23

(suggesting that "coordinates" of signs are determined), 7:44-9:27 (disclosing an algorithm for

feature tracking, which detects the location of various parts of the head, torso, arms, and legs).)

Further, Liebermann describes using **three dimensional video cameras** to "facilitate recognition

of signing motions by enhancing spatial differences." (*Id.*, 13:29-31.)



*FIG. 9*

At least the use of special gloves, "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands, determining "2 hand FFT and their location" by the static gesture manager, and a "right hand FFT" is determined by the spelling mode manager of Liebermann in conjunction with use of three dimensional video cameras regards a method **further including determining the three-dimensional position of a point on a user** to "facilitate recognition of signing motions by enhancing spatial differences."

h.   **The method according to claim 1 further including determining the three-dimensional position of a point on a user**.

Regarding challenge claim 9, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method comprising**

**wherein the camera and the light source are positioned in fixed relation relative to a keypad**.

For instance, Liebermann states at 5:52-60 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**. To place the call, there is **a keypad 50**".)



At least the public kiosk 42 in FIG. 5C with the kiosk including **a video camera 44, lamps 48 to ensure adequate lighting of the user's hands, face and body**, and **a keypad 50** as described in Liebermann provides a method **wherein the camera and the light source are positioned in fixed relation relative to a keypad** in so far as each of the camera 44 and lamps 48 are built into a kiosk so they are not free to move separately or independently and thus are "in

fixed relative to a keypad that is in distinction to system in FIG. 5A of Liebermann where the

camera 34 is movable separately from any light source and keypad.


Regarding claim 11, same facts cited for claim 1 are relied on herein, where the claim

terms of an expired patent are accorded their plain and ordinary meaning under the Phillips

standard, lacking evidence to the contrary, facts noted herein show Liebermann describes **a**

**computer apparatus**, as recited in challenge claim 11.

a. **A computer apparatus comprising:**.

For instance, Liebermann discloses a "portable transmitter/receiver," as shown in FIG. 6,

that is in the "form of a cellular telephone" (Ex. PA-1, 4:21-22, 5:62-63). In particular,

Liebermann discloses that the cellular telephone includes hardware that works with the camera to

view and obtain images of hand gestures, performs related "initial processing," and populates a

phone display, among other things (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.) Liebermann states

"computer processing requirements". The Liebermann cellular phone also has a video camera,

an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and

communicate as a wireless remote or through a cellular telephone network." (*Id.*, 5:62-6:2.)

Through this wireless connection, the cellular phone works in conjunction with "a dedicated

central computer facility" to "provide a novel electronic communication system for use by deaf

persons to enable them to communicate by signing" as well as "a unique method utilizing such

an electronic communication system to enable communication by and to deaf persons." (*Id.*,

3:11-13, and 3:22-24, 5:62-6:14.) Liebermann describes a computer apparatus containing same

structure performing same functions for same purpose as recited in '079 (3:26-67).

A **portable transmitter/receiver** generally designated by the numeral 8 for use by a deaf person is shown in
FIG. 6 and it **contains a video camera**, the lens 10 of which is disposed in the upright portion 12. In the base
portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions. Also seen is an antenna

18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned **so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions.** The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.

PA-1, 5:62-6:10, emphasis added.

The other party may speak into a telephone receiver (not shown) and **the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14**.

*Id.*, 6:15-18, emphasis added.

FIGS. 9-12 are schematics of the **system software modules for converting signing to speech and speech to animation, including system training methods**.

*Id.*, 6:36-38, emphasis added.

Generally, **the deaf person uses sign language in front of a device containing a video camera**. The **images captured by the camera** at 20-30 frames/second are **processed by a digital device** which does initial and extended image processing. In the processing, each of the frames containing a **captured image undergoes a process whereby the image is transformed into manageable identifiers**. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). **These identifiers**, and not the images themselves, **are then correlated with a database of vocabulary and grammar by using artificial intelligence** at the Center. Subsequently, **syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications**.

*Id.*, 4:60-5:13, emphasis added.

On the other end of the telephone line, **the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line** (in whatever method of transport is utilized by the telephone carrier) to the Center **where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation**. Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. **The sign images then appear on the screen of a monitor viewed by the deaf person**, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

*Id.*, 5:14-34, emphasis added.

In view of **the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications** are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. 3 wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

*Id.*, 5:35-47, emphasis added.

A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal

computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a

computer, processor or similar component for performing various disclosed computer/processor

implemented functions, including, but not limited to, controlling cameras, driving a display,

transmitting information, receiving information, processing data, translating sign gesture(s) to

speech/audio and/or text, translating speech to sign gestures and/or text etc. (*Id.*, 5:62-6:47,

FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of

ordinary skill in the art to describe a variety of devices with varying degrees of complexity and

capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994).

Patent Owner is reminded that an apparatus recites what a device is rather than what a device

does.

> "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1528 (Fed. Cir. 1990) (emphasis in original). A claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the claim. *Ex parte Masham*, 2 USPQ2d 1647 (Bd. Pat. App. & Inter. 1987) (The preamble of claim 1 recited that the apparatus was "for mixing flowing developer material" and the body of the claim recited "means for mixing .... said mixing means being stationary and completely submerged in the developer material." The claim was rejected over a reference which taught all the structural limitations of the claim for the intended use of mixing flowing developer. However, the mixer was only partially submerged in the developer material. The Board held that the amount of submersion is immaterial to the structure of the mixer and thus the claim was properly rejected.).

MPEP 2114 II.

In this instance regarding challenge claim 11, where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

herein show Liebermann describes a **computer apparatus comprising a light source** to

illuminate a human body part in a work space above the light, **a camera** in fixed relation relative

to the light source and oriented to observe a gesture performed by a human in the space **and a**

**processor** to determine the gesture performed in the space and illuminated by the light source

based on the computer output.  Essentially, under the Phillips standard, Liebermann describes

each of the elements of apparatus of challenge claim 11.  See MPEP 2114 II.

    b.  **a light source adapted to illumination a human body part within a work volume above the light source;**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a light source adapted to illuminate a human body part within a work volume generally above the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a video monitor 46, and **lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). *Id*., see Figs. 6, 5A-5C, and 9 copied below. The recited "work volume" is the space in the point of view of Liebermann camera/lens that captures image of signing/gesture by deaf person where in Liebermann lamps 48 direct illumination through a work space to ensure adequate lighting of user's hands, face and body. The "work volume" in Liebermann is above the lamps (light source) in so far as the bottom most lamp is below the space a user signs. A distinction to the contrary would solely regard difference in a user's body build. Liebermann

describes a system performing the method having a light source to illuminate a work volume

above the light source of challenged claim 1.



FIG. 6

FIG. 5A

FIG. 5B

FIG. 5C



*FIG. 9*



*FIG. 10*



FIG. 11



FIG. 12

At least the kiosk with lamps 48 in FIG. 5C of Liebermann is a computer apparatus comprising **a light source adapted to illuminate a human body part within a work volume generally above the light source** since the lamps 48 direct light to ensure adequate lighting of the user's hands, face and body, as stated by Liebermann.

> b.   **a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume;**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a computer apparatus comprising **a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above.  Liebermann describes a

computer apparatus providing a camera to observe a gesture performed in the work volume with

the camera fixed relative to the light source of challenged claim 11 where the recited gesture

includes person signing such as American Sign Language (ASL) in the work volume.

> It has now been found that the foregoing and related objects may be readily attained in an electronic communications system for the deaf comprising a **video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases.** Also included are **means for outputting the words and phrases in a comprehensible form to another hearing person,** generally as artificial speech.
>
> In a telephone type system, the other person is at a remote location, although the system may also be used as a translator for communication with a person in the immediate vicinity. Generally, **the video apparatus is a video camera.**
>
> From cost and portability standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means.
>
> In addition to use of a **database of words and phrases corresponding to digitized motions, the translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences.**
>
> The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases in written form.
>
> To enable communication of the deaf person, the system includes means for the other or hearing person to transmit words and phrases. The **translating means is effective to translate said words and phrases into digitized signing motions,** and the video apparatus includes a display screen which provides an output of the digitized signing motions on the display screen for viewing by the deaf person.
>
> There is included **means for translating speech into digital data representing words and phrases and such digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf person.** The video apparatus also includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

PA-1, 3:26-67 (emphasis added).

> If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language Structure, Linstok Press (1978).
>
> ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring attention to detail.

*Id.,* 10:54-67.

At least the kiosk with camera 44 in FIG. 5C of Liebermann regards a computer

apparatus comprising **a camera in fixed relation relative to the light source and oriented to**

**observe a gesture performed by the human body part in the work volume** since the camera

44 is directed toward the work volume to observe and capture gesture(s) to ensure adequate

lighting of the user's hands, face and body, as stated by Liebermann.

    c.  **and a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output**.

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a computer apparatus comprising **a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above.

A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a **computer**, **processor or similar component** for performing various disclosed

computer/processor implemented functions, including, but not limited to, controlling cameras,

driving a display, transmitting information, receiving information, processing data, translating

sign gesture(s) to speech/audio and/or text, translating speech to sign gestures and/or text etc.

(*Id.*, 5:62-6:47, FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood

by one of ordinary skill in the art to describe a variety of devices with varying degrees of

complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed.

Cir. 1994). Patent Owner is reminded that an apparatus recites what a device is rather than what

a device does.

> "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1528 (Fed. Cir. 1990) (emphasis in original). A claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the claim. *Ex parte Masham*, 2 USPQ2d 1647 (Bd. Pat. App. & Inter. 1987) (The preamble of claim 1 recited that the apparatus was "for mixing flowing developer material" and the body of the claim recited "means for mixing ..., said mixing means being stationary and completely submerged in the developer material." The claim was rejected over a reference which taught all the structural limitations of the claim for the intended use of mixing flowing developer. However, the mixer was only partially submerged in the developer material. The Board held that the amount of submersion is immaterial to the structure of the mixer and thus the claim was properly rejected.).

MPEP 2114 II.

In this instance regarding challenge claim 11, where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

herein show Liebermann describes a **computer apparatus comprising a light source** to

illuminate a human body part in a work space above the light, **a camera** in fixed relation relative

to the light source and oriented to observe a gesture performed by a human in the space **and a**

**processor** to determine the gesture performed in the space and illuminated by the light source

based on the computer output. Essentially, under the Phillips standard, Liebermann describes

each of the elements of apparatus of challenge claim 11. See MPEP 2114 II.

At least the kiosk with video camera 44, and lamps 48 to ensure adequate lighting of the user's hands, face and body with "**processing by the translation software**, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "**schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**" of Liebermann regards a computer apparatus comprising a processor to determine the gesture performed in the work volume and illuminated by the light source based on the camera output since the camera 44 is directed toward the work volume to observe and capture gesture(s) as stated by Liebermann to ensure adequate lighting of the user's hands, face and body and for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38, FIGS. 5A-5C, 6, and 9-12, copied above).

    d.   **The computer apparatus of claim 11 further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display**.

Regarding challenge claim 12, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts herein show Liebermann describes **a computer apparatus comprising further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display**.

For instance, Liebermann states at 5:52-60 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, **a video**

**monitor 46**, and lamps 48 to ensure adequate lighting of the user's hands, face and body. To

place the call, there is **a keypad 50**".)



FIG. 5C

At least the public kiosk 42 in FIG. 5C with the kiosk including a video camera 44, a

**video monitor 46**, lamps 48 to ensure adequate lighting of the user's hands, face and body, and **a**

**keypad 50** as described in Liebermann regards an computer apparatus comprising **wherein the**

**work volume is above the keyboard and in front of the display** in so far as at least a portion

of the work volume is above the keypad 50 and in front of the monitor 46 and where each of the

camera 44 and lamps 48 are built into a kiosk so they not free to move separately and thus are "in

fixed relative to a keypad" (i.e., in distinction to apparatus in FIG. 5A of Liebermann where the

camera 34 is transportable separate from any light source and keypad).   In this instance

regarding challenge claim 12, where the claim terms of an expired patent are accorded their plain

and ordinary meaning under the Phillips standard and where apparatus claims cover what a

device is, not what a device does, lacking evidence to the contrary, facts above show Liebermann

describes a **computer apparatus comprising a display and a keypad, wherein the work**

**volume is above the keyboard and in front of the display**.  Essentially, under the Phillips

standard, Liebermann describes the apparatus of challenge claim 12.  See MPEP 2114 II.

     e.  **The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume**.

Regarding challenge claim 17, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts herein show Liebermann describes **a computer apparatus comprising: further including a target that is viewable by the camera when in the work volume**.

For instance, for same facts recited above for challenge claim 7 relied on herein, Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (Ex. PA-1, 12:30-33.) Liebermann discloses that because "[t]his task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing person, and clothes," it is advantageous to use "**special gloves which allow discrimination of the hands from the background for the image processing system**." (*Id.*, 12:34-39.) FIGS. 13 and 14 illustrate "the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language." (*Id.*, 12:40-43, FIGS. 13-14.) Liebermann discloses an example where "the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue," and each glove may have "a third color (typically red) for left and right palm areas," which "allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away." (*Id.*, 12:46-52.) FIG. 13A illustrates a front view of these gloves; while, FIG. 13B illustrates a back view of these gloves and each is reproduced below.



FIG. 13A



FIG. 13B

At least the system with use of special gloves on hands of person signing in Liebermann regards a computer apparatus **further including providing a target positioned on a user that is viewable in the work volume** since the "special gloves which allow discrimination of the hands from the background for the image processing system."   In this instance regarding challenge claim 17, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts above show Liebermann describes a **computer apparatus further including a target that is viewable by the camera when in the work volume**.  Essentially, under the Phillips standard, Liebermann describes the apparatus of challenge claim 17.  See MPEP 2114 II.

      f.   **The computer apparatus of claim 11 wherein the determined gesture includes a pinch gesture, wherein the determined gesture includes a pointing gesture** and **wherein the determined gesture includes a grip gesture**.

Regarding challenge claims 18-20, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts herein show Liebermann describes **a computer apparatus comprising: a pinch gesture, a pointing gesture** and **a grip gesture**.

For instance, for same facts relied on above for challenge claims 5 and 6, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above.   Liebermann describes an apparatus performing the recited gesture by a deaf person signing such as via American Sign Language (ASL).  See *Id.*, 10:54-12:6, FIGS. 16 and 17. Liebermann discloses that "another significant aspect of the invention is the requirement that

finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the "identification of the letters, numbers and words" that have been signed, and discloses in FIG. 11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Liebermann not only discloses detecting "at least one of a pinch gesture, a pointing gesture, and a grip gesture," but discloses detection of all three types of gestures and further including determining the pointing direction of a finger in the work volume. In particular, Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the "identification of the Jeffers, numbers and words" that have been signed, and discloses in FIG. 11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Thus, the apparatus and method of Liebermann is capable of detecting the full range of a signed alphabet in order to achieve the required finger spelling detection.

Liebermann further discloses detection of ASL signs via an "ASL to English translation algorithm," and notes that implementing the disclosed ASL to English translation method requires "linguistic analysis beyond what was recognized by William Stokoe in [Semiotics] and Human Sign Language, Mouton (197[2]), and Sign Language Structure, Linstok Press (1978)." (*Id.*, 10:54-56, 12:3-6; see also Exs. PA-8, PA-9 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and apparatus of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at

remote locations.) Thus, apparatus and method in Liebermann --including the finger spelling as discussed above-- required consulting Stokoe's sign language publications (or similar sources of such information) to ensure that, at a minimum, the apparatus performs the disclosed Liebermann method to the full extent of the features described in such publications. For example, in both Semiotics and Human Sign Language and Sign Language Structure, Stokoe includes a diagram showing the letters of the American Manual Alphabet which are used in conjunction with ASL. (Ex. PA-8, 22; Ex. PA-9 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the apparatus of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) As pictured below, the American Manual Alphabet includes pinch, pointing, and grip gestures, and thus detection of finger spelling requires detection of a pinch gesture, a pointing gesture, and a grip gesture and determining the pointing direction of a finger in the work volume. (Ex. PA-8, 22; Ex. PA-9, 28 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the apparatus of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.)  For example, letters F and O each represent variations on a pinch gesture, where the thumb and index finger pinch together; letters D and G each represent pointing gestures and letters A and S represent variations on a grip gesture. (Ex. PA-9, 28.)



(Ex. PA-9, 28 (FIG. 1 (annotated to show pinch, pointing, and grip gestures used for finger spelling).)

Further, Liebermann discloses that the electronic communication method must be able to detect the signs that are used in finger spelling. Liebermann's discloses the importance of consulting Stokoe's publications in order to implement the Liebermann ASL detection method, and how these publications provide diagrams showing the letters of the American Manual Alphabet which are used to perform finger spelling in conjunction with ASL. (*Id.*) As pictured below, it was known that the American Manual Alphabet included a variety of gestures with fingers pointing in various directions. (Ex. PA-9, 28; see also Ex. PA-8, 22.) For example, letter D involves pointing upwards; letter G involves pointing left (if signing with a right hand); letter P involves pointing upwards at an angle; and letter Q involves pointing downwards at an angle. (Ex. PA-9, 28.)



Ex. PA-9, 28 (FIG. 1 annotated to show pointing signs in different directions used for finger spelling) as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL thereby implicitly including determining direction of finger pointing and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing person at remote locations.)

At least the signing movement of the hands and fingers and body and facial motions and expressions by a deaf person where the signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a computer apparatus **comprising: a pinch gesture, a pointing gesture** and **a grip gesture** for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38 and 53-57, 10:54-56, 12:3-6 and 30-33, FIGS. 5S-5C, 6, and 9-12, copied above). Also, see *Id.*, FIGS. 15 and 16. In this instance regarding challenge claim 17, where the claim terms of an expired patent

are accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

above show Liebermann describes a **computer apparatus further including a pinch gesture, a**

**pointing gesture** and **a grip gesture**.  The pinch, pointing and grip gesture each respectively

regard a functional motion/gesture that does not regard a structural difference from Liebermann

where teaching in Liebermann performs same function by same structure for same purpose.

Essentially, under the Phillips standard, Liebermann describes the apparatus of challenge claims

18-20.  See MPEP 2114 II.


### *Claim Rejections - 35 USC § 103*

12.     **Claims 2, 3, 14 and 15 are rejected under pre-AIA 35 U.S.C. 103(a) as being**

**unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No.**

**6115482, hereafter Sears (PA-14)**.  The response to Patent Owner arguments above is

incorporated herein.  Where the claim terms of an expired patent are accorded their plain and

ordinary meaning under the Phillips standard, where apparatus claims cover what a device is, not

what a device does, lacking evidence to the contrary, facts cited above relied on herein regarding

claims 1 and 11 show Liebermann describes a computer implemented method and computer

apparatus comprising recited elements including a camera, a light source as lamps, a keypad and

a display (FIGS. 5a-5c, 6).  However, to the extent an artisan interprets that Liebermann lacks

wherein the light source includes "**a light emitting diode**" as recited in claims 2 and 14, and

wherein the light source includes "**a plurality of light emitting diodes**" as recited in claims 3

and 15; in a related reference, Sears describes a gesture based method and apparatus including a

camera oriented to observe a work volume wherein the light source includes "**a light emitting**

diode" as recited in claims  2 and 14, and wherein the light source includes "**a plurality of light**

**emitting diodes**" as recited in claims 3 and 15.

An optical-input print reading device with voice output for people with impaired or no vision in which **the user provides input to the system from hand gestures.** Images of the text to be read, on which the user performs **finger- and hand-based gestural commands**, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further **tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning.** In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance.** In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses.

PA-14, Abstract, emphasis added.

Optionally, the camera mount 37 may incorporate **one or more illumination sources,** so as **to provide constant illumination over the field of view.** In FIG. 1b, **such illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37.** These **illumination sources 45 may comprise rows of LEDs,** thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources. Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the **arrangement of illumination sources need not be in rows, as shown in FIG. 1b,** but may also comprise point sources or sources located in varied arrangements around the **camera 39.** In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly.

*Id.*, 5:13-35.

## Fig. 1b



*Id.*, FIG. 1b.

Sears is deemed as relevant prior art due to either being in the same field of endeavor or being reasonably pertinent to the particular problem with which the Applicant was faced. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992). The level of ordinary skill in the art is shown by the applied art herein. Since Liebermann and Sears each regard a method and apparatus for three dimensional input entry including gestures, in consideration consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art', in this case, it would have been obvious to an artisan to substitute one light source for the other to provide a light source such as "**a light emitting diode**", and "**a plurality of light emitting diodes**" so as **to direct illumination through a work volume**, **to ensure adequate lighting of the user's hands, face and body** (PA-1, 5:52-58), and "**to provide constant illumination over the field of view**" (PA-14, 5:13-35). Essentially, the recited light source in challenge claims 2, 3, 14 and 15 fails to critically distinguish in this case over applied references for same structure performing same function for same purpose.


13.     **Claim 16 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No. 6198485, hereafter Mack**. The response to Patent Owner arguments above is incorporated herein. Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts cited above relied on herein regarding claims 1 and 11 show Liebermann describes a computer implemented method and computer apparatus comprising

recited elements including a display (FIGS. 5a-5c, 6); however, to the extent an artisan interprets

that Liebermann lacks "**a three-dimensional display**" as recited in challenge claim 16; in a

related reference Mack describes "a method and apparatus for navigating 3-D worlds" that uses

stereo imaging to capture the 3-D information of a marker on the user hand." (Ex. PA-3, 2:19-

22.) "The 3-D coordinates of the marker," which may include the hand marker but also facial

expressions, head movements, and eye movements, "are computed using 3-D camera geometry."

(*Id.*, 2:22- 26.) Mack discloses that "[t]he computer 110 is loaded with a 3-D processing program

such as 3-D animation, game, education, and visualization." (*Id.*, 2:41-43.) The computer may

connect to "one or more input/output (I/O) devices such as display monitor 120, keyboard 130,

mouse, and tablet digitizer," as well as "input unit 150 for receiving 3-D information." (*Id.*, 2:45-

50.) "The display monitor 120 displays the 3-D graphic or image data as processed by the

computer 110," while "[t]he input unit 150 provides a housing for the 3-D input system which

provides a work area for the user hand 160." (*Id*, 2:51-59.) The input unit 150 may include "a

stereo camera system to determine the 3-D coordinates of a marker manipulated by the user. (*Id.*,

2:58-62.) In addition, the marker, which "can be conveniently worn on the user's finger," is

illuminated by a light source and imaged by the stereo cameras. (*Id.*, 2:67-3:2.) The two cameras

can be any cameras "that can capture images of a moving object in real-time," but they must be

positioned so that the "stereo imaging geometry allows the computation of the 3-D coordinates

of the object." (*Id.*, 3:38-49.) Mack's FIG. 1 is reproduced below and illustrates these

components.



PA-3, FIG. 1.

Further, Mack discloses that "[t]he display monitor 120 displays the 3-D graphic or image data as processed by the computer 110," and "provides a means for user to navigate the 3-D world as processed by the computer." (Ex. PA-3, 2:25-26, 2:51-52.) "The computer 110 is loaded with a 3-D processing program such as 3-D animation, game, education, and visualization" and may be "based on a high performance microprocessor, such as any type of Intel® microprocessor architecture." (*Id.*, 2:41-45.) Mack notes that such "[t]hree-dimensional (3-D) graphic and imaging systems" were well-known and popular, as were "[h]igh performance processors with 3-D capabilities [that had] been developed for 3-D applications such as animation, visualization, games, and education." (*Id.*, 1:11-15.) Mack further discloses that the display monitor that "displays the 3-D graphic or image data" may be "any monitor, including cathode ray tube (CRT), a flat panel display, etc." (*Id.*, 2:51-54.) By using these known 3-D graphics, processor, and display components --all "commercially off-the-shelf hardware"-- Mack discloses a method and apparatus "for navigation in 3-D world" by which a three-dimensional display may be implemented to provide a "simple and efficient 3-D vision system." (*Id.*, 6:63-67.) Liebermann discloses that when a hearing person responds to the signing user's communication, the speech is

translated back to signs. (Ex. PA-1, 5:14-34.) "The sign images then appear on the screen of a

monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign

language motions which portray the content of the spoken language uttered as speech by the

normally hearing person." (*Id.*, 5:30-34.)  Mack is deemed as relevant prior art due to either

being in the same field of endeavor or being reasonably pertinent to the particular problem with

which the Applicant was faced.  See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir.

1992).  The level of ordinary skill in the art is shown by the applied art herein.  Since

Liebermann and Mack each regard a method and apparatus for three dimensional input entry, in

consideration consistent with US Supreme Court decision in KSR that 'known work in one field

of endeavor may prompt variations of it for use in either the same field or a different one based

on design incentives or other market forces if the variations are predictable to one of ordinary

skill in the art', in this case, it would have been obvious to an artisan to substitute one display for

the other to provide a "**three-dimensional display**" as recited in challenged claim 16.

Essentially, the recited display in challenge claims 16 fails to critically distinguish in this case

over applied references for same structure performing same function for same purpose.


14.      **Claims 21, 24-28 and 30 are rejected under pre-AIA 35 U.S.C. 103(a) as being**

**unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann**.  The response to Patent

Owner arguments above is incorporated herein.  Where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the

contrary, for similar steps of a computer implemented method, the facts cited above for challenge

claim 1 and 11 relied on herein show Liebermann describes a **computer implemented method**

**comprising: providing a camera oriented to observe a gesture performed in a work**

**volume; providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume**.

However, to the extent Liebermann lacks the work volume being "**above**" the camera since the kiosk embodiment appears to show the work volume "below" the camera. However, it is well settled in case law to be within the skill of an artisan to rearrange or shifting location of parts when the operation is not modified.

> *In re Japikse*, 181 F.2d 1019, 86 USPQ 70 (CCPA 1950) (Claims to a hydraulic power press which read on the prior art except with regard to the position of the starting switch were held unpatentable because shifting the position of the starting switch would not have modified the operation of the device.); *In re Kuhle*, 526 F.2d 553, 188 USPQ 7 (CCPA 1975) (the particular placement of a contact in a conductivity measuring device was held to be an obvious matter of design choice).

In this case, the rearrangement of location of the camera to be located so the work volume is "**above**" the camera (e.g., locate camera below the work volume such as at or below the bottom lamps) rather than below the work volume as in the kiosk of Liebermann is within the skill of an artisan and the rearrangement of the location of the work volume "above the camera" does not alter or modify the operation since the apparatus and method including a camera continues to be **oriented to observe a gesture performed in a work volume** while the method and apparatus continue determining a gesture performed in the work volume and illuminated by the light source and/or detecting a gesture includes analyzing sequential images of the camera. In this case, the arrangement or location of the work volume is "above" the camera provides no benefit or improved operation over the location of work volume and camera as present in Liebermann. For example, the work volume in '079 patent may be "**above**" the camera [and keyboard] ('079, 2:39-53, ref. 100, 101, 108, 109) or "below" the camera (*Id.*, FIG. 1, ref. 105, 106) but still above the keyboard. The '079 does not allege any improved or benefit in operation for locating the

work volume "above" the camera as recited, rather than locating the work volume "below" the

camera.

> A laptop (or other) computer keyboard based embodiment is shown in FIG. 1. In this case, a stereo pair of **cameras 100 and 101 located on each side of the keyboard are used**, desirably having cover windows 103 and 104 mounted flush with the keyboard surface 102. The cameras are preferably pointed obliquely inward at angles .PHI. toward the center of the desired work volume 170 above the keyboard. In the case of **cameras mounted at the rear of the keyboard** (toward the display screen), these cameras are also inclined to point toward the user at an angle as well.

'079, 2:39-48.

> Alternate camera locations may be used such as the **positions of cameras 105 and 106, on upper corners of screen housing 107 looking down at the top of the fingers (or hands, or objects in hand or in front of the cameras), or of cameras 108 and 109 shown**.

*Id.*, 2:49-53, emphasis added.



*Id.*, FIG. 1.

As further evidence by a related reference, Sako (US Pat. No. 5689575, 3:12-26, FIG. 1(b), "The

system 1 comprises a video camera 2 connected to an image processing device 3 controlling a

video screen 4. The device 3 is connected to a workstation 5 having processing circuits to assist

in decision-making in the system 1. The primary purpose of the system 1 is **to monitor

movement of facial parts and to provide information on the proximity of a person's

fingertips to facial parts**. These are important **aspects of sign language**. A sample screen

display 6 is shown in FIG. 1(a). FIG. 1(b) shows an **effective arrangement for the camera 2 whereby it is mounted on a frame 7 next to a light source 8 at a lower level than the subject's face and is directed upwardly in the direction of the line A. This ensures that the face is always in the field of view, even when the subject's head has been lowered**") describes a method and apparatus for processing images that includes a light source, a camera and a work volume where the work volume is **above** the camera. A skilled artisan would understand that the location of a work volume in relation to a camera and/or a light source does not alter or modify the operation of the apparatus and method, in this case, for determining a gesture performed in the work volume and illuminated by the light source and/or detecting a gesture includes analyzing sequential images of the camera.

Challenge claims 24-28 and 30 recite same limitations as recited in challenge claims 4-9. Thus, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts cited above regarding challenge claims 4-9 are relied on herein for challenge claims 24-28 and 30, the above facts show Liebermann describes "[t]he method according to claim 21 wherein detecting a gesture includes analyzing sequential images of the camera", "[t]he method according to claim 21 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture", "[t]he method according to claim 21 further including determining the pointing direction of one of the user's fingers using the first and second cameras", "[t]he method according to claim 21 further including providing a target positioned on the user that is viewable by the camera", "[t]he method according to claim 21 further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers" and

"[t]he method according to claim 21 wherein the camera and the light source are positioned in fixed relation relative to a keypad."  It is also noted regarding "using the first and second cameras" as recited in challenge claim 26, Liebermann describes using more than one camera (e.g., see, PA-1, 13:4-8; "It may be desirable to utilize **more than one camera** to allow the signing person "free" movement in his or her environment to track down spatial positions in that environment.").

15.     **Claims 22 and 23 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No. 6,115,482, hereafter Sears**.  The response to Patent Owner arguments above is incorporated herein.  Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts cited above relied on herein regarding claims 1, 11 and 21 show Liebermann combined with Sako describes a computer implemented method and computer apparatus comprising recited elements including a camera, a light source as lamps, a keypad and a display (FIGS. 5a-5c, 6).  However, to the extent an artisan interprets that Liebermann lacks wherein the light source includes "**a light emitting diode**" as recited in claims 2, and wherein the light source includes "**a plurality of light emitting diodes**" as recited in claims 23; in a related reference, Sears describes a gesture based method and apparatus including a camera oriented to observe a work volume wherein the light source includes "**a light emitting diode**" as recited in claims  2 and 14, and wherein the light source includes "**a plurality of light emitting diodes**" as recited in claims 3 and 15.

An optical-input print reading device with voice output for people with impaired or no vision in which **the user provides input to the system from hand gestures**. Images of the text to be read, on which the user performs **finger- and hand-based gestural commands**, are input to a computer, which decodes the text images into their

symbolic meanings through optical character recognition, and further **tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning**. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance**. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses.

PA-14, Abstract, emphasis added.

Optionally, the camera mount 37 may incorporate **one or more illumination sources**, so as **to provide constant illumination over the field of view**. In FIG. 1b, **such illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37**. These **illumination sources 45 may comprise rows of LEDs**, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources. Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the **arrangement of illumination sources need not be in rows, as shown in FIG. 1b**, but may also comprise point sources or sources located in varied arrangements around the **camera 39**. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly.

*Id.*, 5:13-35, emphasis added.

## Fig. 1b



*Id.*, FIG. 1b.

Sears is deemed as relevant prior art due to either being in the same field of endeavor or being

reasonably pertinent to the particular problem with which the Applicant was faced.  See *In re*

*Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992).  The level of ordinary skill in the art

is shown by the applied art herein.  Since Liebermann, Sako and Sears each regard a method and

apparatus for processing images captured in a work volume to include gestures, in consideration

consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor

may prompt variations of it for use in either the same field or a different one based on design

incentives or other market forces if the variations are predictable to one of ordinary skill in the

art', in this case, it would have been obvious to an artisan to substitute one light source for the

other to provide a light source such as "**a light emitting diode**", and "**a plurality of light

emitting diodes**" so as **to direct illumination through a work volume**, **to ensure adequate

lighting of the user's hands, face and body** (PA-1, 5:52-58), and "**to provide constant

illumination over the field of view**"  (PA-14, 5:13-35).  Essentially, the recited light source in

challenge claims 22 and 23 fails to critically distinguish in this case over applied references for

same structure performing same function for same purpose.


16.     **Claim 29 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No. 6,198,485, hereafter

Mack**.  The response to Patent Owner arguments above is incorporated herein.  Where the claim

terms of an expired patent are accorded their plain and ordinary meaning under the Phillips

standard, lacking evidence to the contrary, facts cited above relied on herein regarding claims 1,

11, 21 and 16 show Liebermann describes a computer implemented method and computer

apparatus comprising recited elements including a display (FIGS. 5a-5c, and 6).  However, to the

extent an artisan interprets that Liebermann lacks "**a three-dimensional display**" as recited in

challenge claim 29; in a related reference Mack describes "a method and apparatus for

navigating 3-D worlds" that uses stereo imaging to capture the 3-D information of a marker on

the user hand." (Ex. PA-3, 2:19-22.) "The 3-D coordinates of the marker," which may include

the hand marker but also facial expressions, head movements, and eye movements, "are

computed using 3-D camera geometry." (*Id.*, 2:22- 26.) Mack discloses that "[t]he computer 110

is loaded with a 3-D processing program such as 3-D animation, game, education, and

visualization." (*Id.*, 2:41-43.) The computer may connect to "one or more input/output (I/O)

devices such as display monitor 120, keyboard 130, mouse, and tablet digitizer," as well as

"input unit 150 for receiving 3-D information." (*Id.*, 2:45-50.) "The display monitor 120 displays

the 3-D graphic or image data as processed by the computer 110," while "[t]he input unit 150

provides a housing for the 3-D input system which provides a work area for the user hand 160."

(*Id*, 2:51-59.) The input unit 150 may include "a stereo camera system to determine the 3-D

coordinates of a marker manipulated by the user. (*Id.*, 2:58-62.) In addition, the marker, which

"can be conveniently worn on the user's finger," is illuminated by a light source and imaged by

the stereo cameras. (*Id.*, 2:67-3:2.) The two cameras can be any cameras "that can capture

images of a moving object in real-time," but they must be positioned so that the "stereo imaging

geometry allows the computation of the 3-D coordinates of the object." (*Id.*, 3:38-49.) Mack's

FIG. 1 is reproduced below and illustrates these components.



*Id.*, FIG. 1.

Further, Mack discloses that "[t]he display monitor 120 displays the 3-D graphic or image data as processed by the computer 110," and "provides a means for user to navigate the 3-D world as processed by the computer." (Ex. PA-3, 2:25-26, 2:51-52.) "The computer 110 is loaded with a 3-D processing program such as 3-D animation, game, education, and visualization" and may be "based on a high performance microprocessor, such as any type of Intel® microprocessor architecture." (*Id.*, 2:41-45.) Mack notes that such "[t]hree-dimensional (3-D) graphic and imaging systems" were well-known and popular, as were "[h]igh performance processors with 3-D capabilities [that had] been developed for 3-D applications such as animation, visualization, games, and education." (*Id.*, 1:11-15.) Mack further discloses that the display monitor that "displays the 3-D graphic or image data" may be "any monitor, including cathode ray tube (CRT), a flat panel display, etc." (*Id.*, 2:51-54.) By using these known 3-D graphics, processor, and display components --all "commercially off-the-shelf hardware"-- Mack discloses a method and apparatus "for navigation in 3-D world" by which a three-dimensional display may be implemented to provide a "simple and efficient 3-D vision system." (*Id.*, 6:63-67.) Liebermann discloses that when a hearing person responds to the signing user's communication, the speech is translated back to signs. (Ex. PA-1, 5:14-34.) "The sign images then appear on the screen of a monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person." (*Id.*, 5:30-34.)   Mack is deemed as relevant prior art due to either being in the same field of endeavor or being reasonably pertinent to the particular problem with which the Applicant was faced.  See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992).  The level of ordinary skill in the art is shown by the applied art herein.  Since Liebermann, Sako and Mack each regard a method and apparatus for three dimensional input

entry, in consideration consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art', in this case, it would have been obvious to an artisan to substitute one display for the other to provide a "**three-dimensional display**" as particularly recited in challenged claim 16.  Essentially, the recited display in challenge claim 29 fails to critically distinguish in this case over display in applied references for same structure performing same function for same purpose.

**STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION**

17.     The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding: the combination of steps and structures as particularly recited "the camera, the light source and the keypad form part of a laptop computer" as recited in claim 10 and "wherein the display is pivotable relative to the keyboard" as recited in claim 13 where although a "laptop computer" and "wherein the display is pivotable relative to the keyboard" regards a well-known computer implemented apparatus, but the references in record fail to teach and/or suggest the particular arrangement performing steps/functions as recited.

Essentially, the closest prior art regards Liebermann showing a kiosk (FIG. 5c) with a camera, a light source, a keypad and a display performing steps to observe a gesture where although Liebermann describes alternative examples including using a personal computer (FIG 5a) and a cellular phone (FIG. 6), there is insufficient evidence in record to suggest steps performed by elements as particularly recited in challenged claims 10 and 13.

Any comments considered necessary by PATENT OWNER regarding the above statement must be submitted promptly to avoid processing delays. Such submission by the patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or Confirmation" and will be placed in the reexamination file.

18.    **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire two (2) month from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination proceedings.** The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR 1.550(c).** A request for extension of time must specify the requested period of extension and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g). Any request for an extension in a third party requested ex parte reexamination must be filed on or before the day on which action by the patent owner is due, and the mere filing of a request will not effect any extension of time. A request for an extension of time in a third party requested ex parte reexamination will be granted only for sufficient cause, and for a reasonable time specified. Any request for extension in a patent owner requested ex parte reexamination (including reexamination ordered under 35 U.S.C. 257) for up to two months from the time period set in the Office action must be filed no later than two months from the expiration of the time period set in the Office action. A request for an extension in a patent owner requested ex parte reexamination

for more than two months from the time period set in the Office action must be filed on or before

the day on which action by the patent owner is due, and the mere filing of a request for an

extension for more than two months will not effect the extension.  The time for taking action in a

patent owner requested ex parte reexamination will not be extended for more than two months

from the time period set in the Office action in the absence of sufficient cause or for more than a

reasonable time.

The filing of a timely first response to this final rejection will be construed as including a

request to extend the shortened statutory period for an additional two months. In no event,

however, will the statutory period for response expire later than SIX MONTHS from the mailing

date of the final action. See MPEP § 2265.

19.    All correspondence relating to this ex parte reexamination proceeding should be directed:

By Mail to:

Mail Stop Ex Parte Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to:

(571) 273-9900
Central Reexamination Unit

By hand:

Customer Service Window
Randolph Building
401 Dulany Street
Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except

for a request for reexamination and a corrected or replacement request for reexamination) will be

considered timely filed if (a) it is transmitted via the Office's electronic filing system in

accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of

correspondence stating the data of transmission, which is prior to the expiration of the set period

of time in the Office action.


Any inquiry by the patent owner concerning this communication or earlier communications from

the Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the

Central Reexamination Unit at telephone number (571) 272-7705.


/MARK SAGER/
Reexamination Specialist, Art Unit 3992

Conferee:

/FRED O FERRIS III/
Reexamination Specialist, Art Unit 3992

/ALEXANDER J KOSOWSKI/
Supervisory Patent Examiner, Art Unit 3992

PTO/AIA/31 (05-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NOTICE OF APPEAL** FROM THE EXAMINER TO<br>THE PATENT TRIAL AND APPEAL BOARD | Docket Number (Optional) |
|---|---|

| I hereby certify that this correspondence is being facsimile transmitted to the USPTO, transmitted via the USPTO's patent electronic filing system, or deposited with the United States Postal Service with sufficient postage in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)] on August 29, 2022 | First Named Inventor<br>Timothy Pryor | |
|---|---|---|
| | Application Number<br>90/014,900 | Filed<br>November 11, 2021 |
| Signature /Mark McCarthy/ | For<br>MORE USEFUL MAN MACHINE INTERFACES AND APPLICATIONS | |
| Typed or printed name   Mark McCarthy | Art Unit<br>3992 | Examiner<br>Mark Alan Sager |

Applicant hereby **appeals** to the Patent Trial and Appeal Board from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1))    $ 840.00

☐ Applicant asserts small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by 50%, and the resulting fee is:    $ _____

☐ Applicant certifies micro entity status. See 37 CFR 1.29. Therefore, the fee shown above is reduced by 75%, and the resulting fee is:    $ _____
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. 604293 .

☑ Payment made via USPTO's patent electronic filing system (Patent Center or EFS-Web).

☐ A petition for an extension of time under 37 CFR 1.136(a) (PTO/AIA/22 or equivalent) is enclosed.
For extensions of time in reexamination proceedings, see 37 CFR 1.550.

**WARNING:  Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant    ☑ attorney or agent of record    ☐ attorney or agent acting under 37 CFR 1.34
           Registration number 69,575              Registration number _____

Signature /Mark McCarthy/

Typed or printed name   Mark McCarthy

Telephone Number (512) 717-6583

Date August 29, 2022

NOTE: This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☐ * Total of _____ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO:  Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Reexam of Patent No. 8,553,079
Control No. 90/014,900

## UNITED STATES PATENT AND TRADEMARK OFFICE
_____

*In re* Reexam of: U.S. Patent No. 8,553,079

Control No.: 90/014,900

Confirmation No.: 6522; Art Group 3992

Filed: November 11, 2021

Title: MORE USEFUL MAN MACHINE INTERFACES AND APPLICATIONS

**APPEAL BRIEF UNDER 37 C.F.R. § 41.37**

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
601 Congress Avenue, Suite 600
Austin, TX 78701

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

# TABLE OF CONTENTS

I.      REAL PARTY IN INTEREST..........................................................................1

II.     RELATED APPEALS, INTERFERENCES, AND TRIALS.........................2

III.    SUMMARY OF THE CLAIMED SUBJECT MATTER.............................4

IV.     ARGUMENT...............................................................................................6

    A.  Ground 1 — U.S. Patent No. 5,982,853 ("*Liebermann*") Does Not
        Anticipate Claims 1, 4-9, 11, 12, and 17-20. ........................................6

        1.  *Liebermann* does not anticipate independent claim 11...............6

            a.  *Liebermann* fails to disclose a computer apparatus
                comprising a processor, camera, and light source, as
                required by claim element 11[c]....................................6

                i. The claimed "computer apparatus" does not cover a
                physically distributed system. .......................................10

                ii. *Liebermann* does not disclose claim element
                11[c]...................................................................................12

        2.  *Liebermann* does not anticipate independent claim 1...............15

            a.  *Liebermann* fails to disclose the determining step is
                executed by the same computing device that provides the
                light source and the camera, as required by claim element
                1[c] ...................................................................................15

            b.  *Liebermann* fails to disclose determining the gesture
                using the camera as required by claim element 1[c]. .....17

        3.  *Liebermann* does not anticipate dependent claim 8..................19

        4.  *Liebermann* does not anticipate dependent claims 4-7,
            9, 12, and 17-20........................................................................20

    B.  Ground 2 — The Combination of *Liebermann* and U.S. Patent No.
        6,115,482 ("*Sears*") Does Not Render Obvious Claims 2, 3, 14,
        and 15. ...............................................................................................20

i

Reexam of Patent No. 8,553,079
Control No. 90/014,900

1. *Sears* is non-analogous art and cannot be cited in any obviousness rejection of claims 2, 3, 14, and 15 ....................23

2. The combination of *Liebermann* and *Sears* does not render dependent claims 2 and 14 unpatentable. .....................23

3. The combination of *Liebermann* and *Sears* does not render dependent claims 3 and 15 unpatentable. .....................26

C. Ground 3 — The Combination of *Liebermann* and U.S. Patent No. 6,198,485 ("*Mack*") Does Not Render Obvious Claim 16. ...............28

D. Ground 4 — The Combination of *Liebermann* and U.S. Patent No. 5,689,575 ("*Sako*") Does Not Render Obvious Claims 21, 24-28, and 30 .....................................................................................29

1. The combination of *Liebermann* and *Sako* does not render independent claim 21 obvious because the combination fails to teach or suggest claim element 21[c] .......................................................................30

2. The combination of *Liebermann* and *Sako* does not render dependent claim 28 obvious. ........................................30

3. The combination of *Liebermann* and *Sako* does not render dependent claims 24-27 and 30 obvious. .....................31

E. Ground 5 — The Combination of *Liebermann*, *Sako*, and *Sears* Does Not Render Obvious Claims 22 and 23. ....................31

1. *Sears* is non-analogous art .......................................32

2. The combination of *Liebermann*, *Sako*, and *Sears* does not render claim 22 obvious. .............................32

3. The combination of *Liebermann*, *Sako*, and *Sears* does not render claim 23 obvious. .............................32

F. Ground 6 — The Combination of *Liebermann*, *Sako*, and *Mack* Does Not Render Obvious Claim 29 .................................33

G. The USPTO Has No Jurisdiction Over Expired Patents .....................33

ii

V.    NO SUBSTANTIAL NEW QUESTION (SNQ) OF PATENTABILITY
      EXISTS ....................................................................................36

VI.   CONCLUSION ........................................................................37

VII.  CLAIMS APPENDIX ..............................................................38

iii

Reexam of Patent No. 8,553,079
Control No. 90/014,900

# TABLE OF AUTHORITIES

**Cases**

*Donner Technology, LLC v. Pro Stage Gear, LLC,*
   979 F.3d 1353 (Fed. Cir. 2020) ........................................................ 20 , 21 , 22

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,*
   909 F.2d 1464 (Fed. Cir. 1990) ......................................................... 11

*In re Kahn,*
   441 F.3d 977 (Fed. Cir. 2006) ............................................................ 25

*In re Klein,*
   647 F.3d 1343 (Fed. Cir. 2011) .......................................................... 20

*KSR Int'l Co. v Teleflex Inc.,*
   550 U.S. 398 (2007) ...................................................................... 25, 27

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
   138 S. Ct. 1365 (2018) ..................................................................... 33

**Statutes**

35 U.S.C. § 103 ................................................................................. 28
35 U.S.C. § 112 ................................................................................. 23

**Other Authorities**

MPEP § 2141 ................................................................................... 25
MPEP § 2143 ................................................................................... 28
MPEP § 2143.01 .............................................................................. 25

iv

## I.    REAL PARTY IN INTEREST

Gesture Technology Partners, LLC ("Patent Owner") is the sole owner of U.S.

Patent No. 8,553,079 ("the '079 Patent").  Patent Owner is the real party in interest.

1

Reexam of Patent No. 8,553,079
Control No. 90/014,900

## II.    RELATED APPEALS, INTERFERENCES, AND TRIALS

The following matters may be related to, directly affect, or be directly affected by or have a bearing on the Board's decision in the pending appeal:

*Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, 2:21-cv-00040, in the United States District Court for the Eastern District of Texas.

*Gesture Technology Partners, LLC v. Samsung Electronics Co., Ltd.*, 2:21-cv-00041, in the United States District Court for the Eastern District of Texas

*Gesture Technology Partners, LLC v. Apple Inc.*, 6:21-cv-00121, in the United States District Court for the Western District of Texas.

*Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, 6:21-cv-00122, in the United States District Court for the Western District of Texas.

*Gesture Technology Partners, LLC v. LG Electronics, Inc.*, 6:21-cv-00123, in the United States District Court for the Western District of Texas.

*Gesture Technology Partners, LLC v. Motorola Mobility LLC*, 1:22-cv-03535, in the Northern District of Illinois Eastern Division.

*Gesture Technology Partners, LLC v. Katherine K. Vidal*, in her official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark office, C.A. No. 1:22-cv-622, in the United States District Court for the Eastern District of Virginia.

2

Reexam of Patent No. 8,553,079
Control No. 90/014,900

*Gesture Technology Partners, LLC v. Unified Patents, LLC*, No. IPR2021-00917, before the Patent and Trial Appeal Board (institution granted November 22, 2021; Paper 11)

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00920, before the Patent and Trial Appeal Board (institution granted December 6, 2021; Paper 12)

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00921, before the Patent and Trial Appeal Board (institution granted December 13, 2021; Paper 8).

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00922, before the Patent and Trial Appeal Board (institution granted November 29, 2021; Paper 10).

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00923, before the Patent and Trial Appeal Board (institution granted December 6, 2021; Paper 10).

*Ex Parte* Reexamination No. 90/014,901 of U.S. Patent No. 7,933,431, before the United States Patent and Trademark Office (reexam ordered January 11, 2022).

*Ex Parte* Reexamination No. 90/014,902 of U.S. Patent No. 8,194,924, before the United States Patent and Trademark Office (reexam ordered December 2, 2021).

*Ex Parte* Reexamination No. 90/014,903 of U.S. Patent No. 8,878,949, before the United States Patent and Trademark Office (reexam ordered December 2, 2021).

3

## III.    SUMMARY OF THE CLAIMED SUBJECT MATTER

Independent claim 1 is directed to a method implemented by a computing device.  *See, e.g.,* '079 Patent, 2:39-40, 3:59-61, Fig. 1, Fig. 6 (element 901).  The method includes providing a light source adapted to direct illumination through a work volume above the light source, and providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source.  *See, e.g., id.* at 2:40-59, 2:65-3:8, 3:59-61, 10:23-25, Fig. 1 (elements 122, 100, 101, 170), Fig. 6 (elements 902, 930).    The method further includes determining, using the camera, the gesture performed in the work volume and illuminated by the light source.  *See, e.g., id.* at 2:40-59, 2:65-3:8, 3:59-61, 10:23-25.

Independent claim 11 is directed to a computing device.  *See, e.g.,* '079 Patent, 2:39-40, 3:59-61, Fig. 1, Fig. 6 (element 901).  The computing device comprises:  a light source adapted to illuminate a human body part within a work volume generally above the light source, and a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume.  *See, e.g., id.* at 2:40-59, 2:65-3:8, 3:59-61, 10:23-25, Fig. 1 (elements 122, 100, 101, 170), Fig. 6 (elements 902, 930).    The computing device further comprises a processor adapted to determine the gesture performed in the work volume and

4

illuminated by the light source based on the camera output. *See, e.g., id.* at 2:40-59, 2:65-3:8, 3:59-61, 10:23-25.

Independent claim 21 is directed to a method implemented by a computing device. *See, e.g.,* '079 Patent, 2:39-40, 3:59-61, Fig. 1, Fig. 6 (element 901). The method includes providing a camera oriented to observe a gesture performed in a work volume above the camera, and providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume. *See, e.g., id.* at 2:40-59, 2:65-3:8, 3:59-61, 10:23-25, Fig. 1 (elements 122, 100, 101, 170), Fig. 6 (elements 902, 930). The method further includes detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume. *See, e.g., id.* at 2:40-59, 2:65-3:8, 3:59-61, 10:23-25.

## IV.   ARGUMENT

### A.   Ground 1 — U.S. Patent No. 5,982,853 ("*Liebermann*") Does Not Anticipate Claims 1, 4-9, 11, 12, and 17-20.

*Liebermann* does not anticipate claims 1, 4-9, 11, 12, and 17-20.

#### 1.   *Liebermann* does not anticipate independent claim 11.

##### a.   *Liebermann* fails to disclose a computer apparatus comprising a processor, camera, and light source, as required by claim element 11[c].

The fundamental disagreement between Patent Owner and the Examiner is whether a distributed system (i.e., *Liebermann*)[1] anticipates the claimed invention, which is contained within the same computer apparatus. Claim 11 recites a "computer <u>apparatus</u>," not a system, with three claim elements (i.e., a specifically configured light source, camera, and processor). Claim 11 is consistent with the specification that describes the claimed components as being disposed within the same computer apparatus. *See* '079 Patent, 2:39-40 ("A <u>laptop (or other)</u> computer keyboard based embodiment is shown in FIG. 1") (emphasis added), 2:19-20 ("FIG. 2 illustrates another keyboard embodiment using special datums or light sources such as LEDs."), 2:21-22 ("FIG. 3 illustrates a further finger detection system for laptop or other computer input."), 2:28-31 ("FIG. 6 illustrates an improved handheld

---

[1] The Examiner concedes that *Liebermann* is a "distributed architecture." *See, e.g.*, Action, p. 11.

6

computer embodiment of the invention . . . .").  Figure 1 of the '079 Patent is reproduced below:



*FIG. 1*

'079 Patent, Fig. 1 (annotated).  As shown, for example, in Figure 1, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus.

*Liebermann* is fundamentally different because it is a distributed system in which the processing occurs in a physically separate, "central processing facility" or "center."  Figures 2 and 3 of *Liebermann* are reproduced below:

7



*Liebermann*, Fig. 2 (annotated).



*Liebermann*, Fig. 3 (annotated).  As explained by *Liebermann*,

8

> [A] preferred form of the present invention includes a processing <u>center</u> containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating <u>through such a center</u>. The method of employment of the <u>center</u> is illustrated in FIG. 3 wherein the <u>center receives</u> the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the <u>center provides</u> a video output to the video device of the deaf person.

*Liebermann*, 5:35-48 (emphasis added).

The Examiner acknowledges the structural difference of *Liebermann*, but maintains the anticipation rejection because the Examiner "disagrees that the <u>computer apparatus</u> of challenged claim 11 of [the] '079 Patent requires <u>the same (or relatedly 'only one') computer apparatus</u>." Final Office Action dated June 27, 2022 ("Action"), p. 11 (emphasis added). The Examiner also contends that "the 'computer apparatus' of challenged claim 11 does not preclude a '<u>different</u>' (or 'multiple') computers of a distributed architecture." Action, p. 11 (cleaned up) (emphasis in original). In other words, the Examiner contends that it is proper to interpret the "computer apparatus" of claim 11 as being composed of multiple computing devices. *See* Action, p. 12 ("the computer of the 'public kiosk' and the computer of the 'central processing facility' in Liebermann <u>operate together as a computer apparatus</u>") (emphasis added). The Examiner, however, provides no basis

9

to interpret claim 11 such that it is proper to rely on separate computer apparatuses to show anticipation.

Claim 11 is directed to a computer apparatus containing all of the claimed components (e.g., "processor," "camera," "light source"), not a physically distributed system. Accordingly, *Liebermann* does not anticipate claim 11.

### i.    The claimed "computer apparatus" does not cover a physically distributed system.

One need look no further than the plain language of claim 11 to determine that the claim does not cover a physically distributed system. The preamble of claim 11 requires "a computer apparatus." That is why the claimed computer apparatus must include the claim elements that follow the preamble.

The same holds true for the specification. In every disclosed embodiment of the '079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture, those components are located within the same computing device (e.g., laptop computer, handheld computer, etc.). *See* '079 Patent, 2:39-40 ("A laptop (or other) computer keyboard based embodiment is shown in FIG. 1") (emphasis added), 2:65-3:2 ("cameras such as 100/101 are used to simply look at the tip of a finger 201 (or thumb) of the user . . . central light 122 can be used to illuminate the finger") (emphasis added), 3:56-61 ("The cameras can also see one's fingers directly, to allow typing as now, but without the physical keys . . . This is

10

useful for those applications where the keyboard of conventional style is too big (e.g., the hand held computer of FIG. 6)") (emphasis added), 2:58-59 ("finger position data can be used to determine gestures") (emphasis added), Fig. 1, Fig. 6.

Each element of independent claim 11 includes the term "work volume." The '079 Patent specification uses the term "work volume" in reference to Figure 1, which as discussed above, discloses each element located in the same computing device (e.g., a laptop computer, handheld computer, etc.). *See* '079 Patent, 2:39-40 ("A laptop (or other) computer keyboard based embodiment is shown in FIG. 1"), 2:44-45 ("toward the center of the desired work volume 170 above the keyboard") (emphasis added), 3:4-6 ("illumination is directed or concentrated in an area where the finger is typically located such as in work volume 170") (emphasis added), Fig. 1. Accordingly, after reading the entire '079 Patent, a POSITA would interpret the "computer apparatus" in the preamble of independent claim 11 as including all the recited components. The Examiner even acknowledges that "an apparatus [claim] recites what a device is rather than what a device does." Action, p. 58 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis added)). Accordingly, independent claim 11 requires that the claimed "processor," "camera," and "light source" all be components of the same computing device.

### ii. *Liebermann* does not disclose claim element 11[c].

Claim element 11[c] requires "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" located in the same "computer apparatus" as the "camera" and "light source." But those requirements of claim 11 are fundamentally different than the distributed architecture of *Liebermann*.

*Liebermann* discloses a "public kiosk 42" having a "camera 44" and "lamps 48." *See id*., 5:57-58, Fig. 5c. The deaf person performs sign language in front of "camera 44." *See id.,* 4:60-61, 6:42-43. Each "captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center)." *Id.*, 4:60-5:2. Accordingly, *Liebermann* discloses that the "central processing facility" or "Center" is physically separate from "public kiosk 42." *Id*. *Liebermann* also discloses that it is the physically separate "Center" that then processes the received "identifiers" to determine the words being signed:

> These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using <u>artificial intelligence at the Center</u>. Subsequently, syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content.

*Liebermann*, 5:2-7 (emphasis added).    Accordingly, after "public kiosk 44" transforms the captured images to "identifiers" and transmits the "identifiers" to the "Center," the "rest of the <u>processing is completed at the center</u>.  This includes <u>identification of the letters, numbers and words</u>, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content." *Id*. at 6:53-57 (emphasis added).

In other words, *Liebermann* discloses the "central processing facility" is the computing device with the artificial intelligence, translation software, and vocabulary database that identifies the words in the sign language performed by the deaf person.  Because *Liebermann* discloses the "public kiosk" is connected by "normal telephone lines" to the "central processing facility," *id.* at 5:1, the "public kiosk" and the "central processing facility" are <u>not</u> the same computing device.  To the contrary, *Liebermann* describes a distributed architecture in which different components are separated by substantial physical distance.

The Examiner mapped *Liebermann's* "bottom most lamp" of the "public kiosk 42" to the claimed "light source," and mapped *Liebermann's* "camera 44" of the "public kiosk 42" to the claimed "camera."  Action, pp. 59, 63.  But the Examiner mapped *Liebermann's* "central processing facility," which is located at a different physical location, executing "translation software, (i.e., artificial intelligence) to produce data representing numbers, words, and phrases which are then combined

13

into coherent sentences" to the claimed "processor." Action pp. 65-67. That mapping is contrary to the requirements of claim element 11[c] because, as discussed above, the "processor" must belong to the same "computer apparatus" (i.e., same computing device) as the "camera" and "light source." *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") and *Liebermann's* "public kiosk 42" (having the Examiner identified "camera" and "light source") are different computing devices, located at different physical locations. Accordingly, *Liebermann* fails to disclose claim element 11[c], and thus does not anticipate independent claim 11.

> **a.** ***Liebermann* fails to disclose a processor adapted to determine the gesture based on the camera output, as required by claim element 11[c].**

Claim element 11[c] requires "a processor adapted to determine the gesture . . . based on the camera output." As discussed above, the Examiner mapped *Liebermann's* "camera 44" to the claimed "camera," and mapped *Liebermann's* "central processing facility" (i.e., the "Center") to the claimed "processor." Action pp. 63, 65-67. *Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center).

14

> These identifiers, <u>and not the images themselves</u>, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:5 (emphasis added). The output of *Liebermann's* "camera 44" is one or more "images." But *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") executes its functions based on "identifiers," <u>not</u> the "images" themselves. *Id*. That is because the "images" are not transmitted to the "central processing facility." *Id*. Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id*. Thus, *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is <u>not</u> determining anything based on *Liebermann's* "images" (i.e., the Examiner identified "camera output"). Accordingly, *Liebermann* fails to disclose claim element 11[c].

In view of the above, *Liebermann* fails to disclose claim element 11[c], and thus fails to anticipate claim 11.

### 2.   *Liebermann* does not anticipate independent claim 1.

#### a.   *Liebermann* fails to disclose the determining step is executed by the same computing device that provides the light source and the camera, as required by claim element 1[c].

Similar to independent claim 11, the fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann's* distributed system anticipates the claimed process, which is executed in a computer, not a distributed

15

system.  Claim 1 recites a "computer implemented method" with three claim elements (i.e., a step that provides a specifically configured light source, a step that provides a specifically configured camera, and a step that determines, using the camera, a gesture illuminated by the light source).  As discussed above in reference to independent claim 11, in the '079 Patent, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus.  Accordingly, the same computer must perform each step of independent claim 1.

The Examiner "disagrees that the computer implemented method of challenged claim 1 of [the] '079 Patent requires to execute the steps recited in claim 1 of '079 by the same computer, or relatedly 'only one' computer."  Action, p. 6.  Here again, the Examiner provides no basis to interpret claim 1 such that the claimed steps (i.e., "providing a light source" "providing a camera," "determining, using the camera, the gesture") are not performed by the same computing device.

As discussed above, *Liebermann* discloses the "central processing facility" (i.e., the "Center") is the computing device with the artificial intelligence, translation software, and vocabulary database that identifies the words in the sign language performed by the deaf person.  Because *Liebermann* discloses the "public kiosk" is connected by "normal telephone lines" to the "central processing facility," *Liebermann* at 5:1, the "public kiosk" and the "central processing facility" are <u>not</u>

16

the same computing device. To the contrary, *Liebermann* describes a distributed architecture in which different computers are separated by substantial physical distance.

The Examiner mapped the "bottom most lamp" in *Liebermann's* "public kiosk 42" to the claimed "light source," and "camera 44" in *Liebermann's* "public kiosk 42" to the claimed "camera." Action, pp. 37, 41. But the functions executed by *Liebermann's* "central processing facility" (e.g., identification of words in sign language performed by the deaf person) were mapped to the "determining" step of claim element 1[c]. *Id.* at pp. 43-44. This is contrary to the requirements of claim element 1[c] because the "determining" step must be executed by the same computer that provides the claimed "light source" and the claimed "camera." Accordingly, *Liebermann* fails to disclose claim element 1[c].

### b.    *Liebermann* fails to disclose determining the gesture using the camera as required by claim element 1[c].

Claim element 1[c] requires "determining, using the camera, the gesture performed in the work volume and illuminated by the light source." As discussed above, the Examiner mapped *Liebermann's* "camera 44" of the "public kiosk" to the claimed "camera," and mapped the functions executed by *Liebermann's* "central processing facility" (i.e., the "Center") to the "determining" step of claim element 1[c]. Action, pp. 41, 43-44. But *Liebermann's* "central processing facility" does

17

not have access to *Liebermann's* "camera 44." *Liebermann* discloses that the Center

does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby the image is transformed into manageable identifiers. <u>It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center).</u> These identifiers, <u>and not the images themselves</u>, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:2 (emphasis added).  In other words, *Liebermann's* "central

processing facility" executes its functions based on "identifiers," <u>not</u> the "images"

themselves.  *Id*.  That is because the "images" from *Liebermann's* "camera 44" are

not transmitted to the "central processing facility."  *Id*.  Only the "identifiers"

generated at the public kiosk "travel[] the normal telephone lines to the central

processing facility (i.e., the Center)."  *Id*.  Thus, *Liebermann's* "central processing

facility" is <u>not</u> using *Liebermann's* "camera 44" (i.e., the Examiner identified

"camera") to determine the gesture.  This is contrary to the requirements of claim

element 1[c].  Accordingly, *Liebermann* fails to disclose claim element 1[c].

In view of the above, *Liebermann* fails to disclose claim element 1[c], and

thus fails to anticipate claim 1.

### 3.    *Liebermann* does not anticipate dependent claim 8.

Claim 8 recites "determining the three-dimensional position of a point on a user."   The Examiner contends that *Liebermann* anticipates claim 8 because *Liebermann* "describes using three dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'"  Action, p. 53 (citing *Liebermann*, 13:29-31).   But "enhancing spatial differences" does <u>not</u> necessarily mean "determining the three-dimensional position of a point on a user," as required by claim 8.  The Examiner also contends that *Liebermann's* "method requires 'calculating centers of gravity for both hands,' which involves finding an 'FFT [fast Fourier transform] of paths of the hands' as well as performing an 'explicit path analysis' of the hands."   Action, p. 53 (citing *Liebermann*, 4:31-32, FIG. 9).  Notably, *Liebermann* does not characterize its calculation as "calculating centers of gravity for both hands."  Putting that aside, *Liebermann* is silent regarding any of these analyses/calculations "determining the <u>three-dimensional</u> position of a point on a user," as required by claim 8.  Performing a "path analysis" of hands does not necessarily implicate three-dimensions.  For example, hands moving left to right follow a one- or two-dimensional path.  Thus, *Liebermann* does not anticipate claim 8.

19

### 4.    *Liebermann* does not anticipate dependent claims 4-7, 9, 12, and 17-20.

Claims 4-7, 9, 12, and 17-20 depend from, and add limitations to, independent claims 1 or 11.  As discussed above, *Liebermann* fails to anticipate independent claims 1 and 11.  Accordingly, *Liebermann* fails to anticipate dependent claims 4-7, 9, 12, and 17-20 for at least the same reasons.

### B.    Ground 2 — The Combination of *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") Does Not Render Obvious Claims 2, 3, 14, and 15.

The combination of *Liebermann* and *Sears* does not render obvious claims 2, 3, 14, and 15.

### 1.    *Sears* is non-analogous art and cannot be cited in any obviousness rejection of claims 2, 3, 14, and 15.

*Sears* is non-analogous art and thus *Sears* cannot be used in an obviousness rejection of any claim in the '079 Patent.  A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention.  *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011).  Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.  *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

Regarding the first test for analogous art, *Sears* describes itself as relating to "an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text." *Sears*, 1:23-29. In contrast, the '079 Patent is directed to computing devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing object or human positions and/or orientations." '079 Patent, 1:54-57, Fig. 1, Fig. 6. These "human positions and/or orientations" include "gestures comprising a sequence of finger movements," and may "allow [for] typing as now, but without the physical keys." *Id.*, 3:48-60, 10:23-25. Accordingly, *Sears* and the '079 Patent are <u>not</u> from the same field of endeavor, and *Sears* fails the first test for analogous art.

When addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory (i.e., the second test for analogous art), the problems to which both relate must be identified and compared. *Donner*, 979 F.3d at 1359. The problem being solved cannot be one that the patent or prior art identifies as being known: "As the '023 patent readily discloses, guitar effects had <u>already</u> been mounted on a pedalboard . . . Thus, that <u>could not possibly</u> be a relevant purpose of the invention." *Donner*, 979 F.3d at 1360 (emphasis added).

The Examiner states that *Sears* "is reasonably pertinent to the particular problem with which the inventor was faced <u>for the pertinent challenged claims at issue with respect to consideration of Sears</u> (5:13-35, FIG. lb) regards challenged claims 2, 3, 14 and 15 that recite *a light source includes a light emitting diode or a light source includes a plurality of light emitting diodes*."  Action, p. 16 (emphasis in original).  The Examiner-identified problem to which *Sears* relates is unclear from that statement.  To the extent that the Examiner is alleging the problem to which *Sears* relates is the use of one or more LEDs for illumination, this cannot be correct.  *Sears* discloses "[t]hese <u>illumination sources</u> 45 may comprise rows of <u>LEDs</u>, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources."  *Sears*, 5:16-20 (emphasis added).  The '079 Patent discloses "FIG. 2 illustrates another keyboard embodiment using special datums or <u>light sources such as LEDs.</u>" '079 Patent, 2:19-20 (emphasis added).  These passages from *Sears* and the '079 Patent imply light emitting diodes were known.  Further, considering these passages both use the acronym "LEDs" without first spelling it out only reinforces that light emitting diodes were well-known.  Accordingly, in view of the *Donner* decision, the use of one or more LEDs for illumination cannot be the purpose of *Sears* or the '079 Patent with respect to the analogous-art analysis.  Thus, in view of the Examiner's statements, *Sears* fails the second test for analogous art.

22

Further, as part of the analogous art analysis, the Examiner states that "Sears was not relied on for any step or element in independent claim 1 or 11, but instead Sears was relied on with regards to the specific element in cited dependent claims." Action, p. 15. But a "claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112(d). Accordingly, it is improper to ignore the independent claims while evaluating the analogous art test for a prior art reference, even if the prior art reference is not being cited against the independent claims.

Thus, *Sears* is non-analogous art and cannot be used in any obviousness rejection.

**2.    The combination of *Liebermann* and *Sears* does not render dependent claims 2 and 14 unpatentable.**

Claims 2 and 14 depend from, and add limitations to, independent claims 1 or 11. As discussed above, *Liebermann* fails to teach or suggest each and every limitation of independent claims 1 and 11. *Sears* does not cure the deficiencies of *Liebermann*. Thus, the combination of *Liebermann* and *Sears* does not render claims 1 and 11 unpatentable. By virtue of their dependencies from independent claims 1 or 11, the combination of *Liebermann* and *Sears* also does not render dependent claims 2 and 14 unpatentable.

23

Further, claim 2 recites, in part, "wherein the light source includes a light emitting diode." Claim 14 also recites, in part, "wherein the light source includes a light emitting diode." The Examiner mapped *Liebermann's* "bottom most lamp" of the "public kiosk 42" to the claimed "light source." Action, pp. 37, 59. But the Examiner concedes that *Liebermann* does not disclose light emitting diodes (LEDs). Action, pp. 76-77. *Sears* discloses "[t]hese illumination sources 45 may comprise rows of LEDs." *Sears*, 5:17-19. To meet the requirements of claims 2 and 14, the Examiner proposes substituting *Liebermann's* "bottom most lamp" of the "public kiosk 42" (i.e., the Examiner identified "light source") with *Sears*' "LED." Action, pp. 76-78.

According to the Examiner, an LED "provides <u>more</u> intense light and is [a] <u>more</u> efficient light source [than *Liebermann's*] lamps." Action, p. 19 (emphasis added). This serves as the motivation for the Examiner's substitution. *See* Action, pp. 18-21. But the Examiner provides no evidence that *Sears'* LEDs actually have these superior properties compared to *Liebermann's* lamps. Indeed, the Examiner does not compare the intensity and the efficiency of *Liebermann's* lamps with the intensity and the efficiency of *Sears'* LEDs. Nor does the Examiner evaluate any of the downsides to using LEDs (e.g., cost) that would have been material at the time of the claimed invention. Accordingly, the Examiner's proposed motivation for the substitution is defective.

24

Further, the Examiner contends that "it would have been obvious to an artisan to substitute [a lamp for an LED]. . . to ensure adequate lighting of the user's hands, face and body" and "to provide constant illumination over the field of view." Action, p. 78. But *Liebermann* expressly discloses that "lamps 48" <u>already</u> "ensure adequate lighting of the user's hands, face and body" in front of "camera 44." *Liebermann*, 5:53-59. The Examiner presents no evidence to the contrary. *See* Action, pp. 18-21, 76-78. Further, the Examiner has failed to (1) demonstrate that *Liebermann's* "lamps 48" do not already provide constant illumination over "camera 44's" field of view, or (2) explain why only an LED can provide constant illumination over "camera 44's" field of view. Again, the Examiner's proposed motivation for the substitution is defective.

In view of the above, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *see also* MPEP §§ 2141, 2143.01. Accordingly, the combination of *Liebermann* and *Sears* does not render dependent claims 2 and 14 unpatentable.

### 3.    The combination of *Liebermann* and *Sears* does not render dependent claims 3 and 15 unpatentable.

Claims 3 and 15 depend from, and add limitations to, independent claims 1 or 11.   As discussed above, *Liebermann* fails to teach or suggest each and every limitation of independent claims 1 and 11.   *Sears* does not cure the deficiencies of *Liebermann*.   Thus, the combination of *Liebermann* and *Sears* does not render claims 1 and 11 unpatentable.   By virtue of their dependencies from independent claims 1 or 11, the combination of *Liebermann* and *Sears* also does not render dependent claims 3 and 15 unpatentable.

Further, claim 3 recites, in part, "wherein the light source includes a plurality of light emitting diodes."   Claim 15 also recites, in part, "wherein the light source includes a plurality of light emitting diodes."   As discussed above, the Examiner mapped *Liebermann's* "bottom most lamp" of the "public kiosk 42" to the claimed "light source."   Action, pp. 37, 59.   But the Examiner concedes that *Liebermann* does not disclose light emitting diodes (LEDs).   Action, pp. 76-77.   *Sears* discloses "[t]hese illumination sources 45 may comprise rows of LEDs."   *Sears*, 5:17-19.   As discussed above, to meet the requirements of claims 3 and 15, the Examiner proposes substituting *Liebermann's* "bottom most lamp" of the "public kiosk 42" (i.e., the Examiner identified "light source") with *Sears'* multiple "LEDs."   Action, pp. 76-78.

26

As a threshold matter, the Examiner's proposed motivation for the substitution is defective for the same reasons discussed above in reference to claims 2 and 14. Further, according to the Examiner, an LED "provides more intense light and is [a] more efficient light source [than *Liebermann's*] lamps." Action, p. 19. Even if this is true, and Patent Owner does <u>not</u> concede that it is true, the Examiner still fails to explain why a POSITA would replace the "bottom most lamp" of *Liebermann's* "public kiosk 42" with <u>multiple</u> LEDs, as required by claims 3 and 15. Again, according to the Examiner, a single LED allegedly provides more intense visible light and is more efficient than *Liebermann's* lamps. Thus, based on the Examiner's statements, substituting the "bottom most lamp" of *Liebermann's* "public kiosk 42" with a <u>single</u> LED would already provide more intense light compared to the light that was available before. Substituting the "bottom most lamp" of *Liebermann's* "public kiosk 42" with <u>multiple</u> LEDs, as proposed by the Examiner, is unnecessary and only increases the circuit complexity with little return. Accordingly, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. *See KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007).

Further, the Examiner alludes to "markets forces" as a motivation for executing the substitution. Action, p. 78. But again, the Examiner fails to identify or articulate any details regarding these alleged "market forces" that would drive

substitution of *Liebermann's* "bottom most lamp" in "public kiosk 42" with multiple LEDs. This is improper. MPEP § 2143 ("The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit.").

For these reasons, the combination of *Liebermann* and *Sears* does not render dependent claims 3 and 15 unpatentable.

### C. Ground 3 — The Combination of *Liebermann* and U.S. Patent No. 6,198,485 ("*Mack*") Does Not Render Obvious Claim 16.

Claim 16 depends from, and add limitations to, independent claim 11. As discussed above, *Liebermann* fails to teach or suggest each and every limitation of independent claim 11. *Mack* does not cure the deficiencies of *Liebermann*. Thus, the combination of *Liebermann* and *Mack* does not render claim 11 unpatentable. By virtue of its dependency from independent claim 11, the combination of *Liebermann* and *Mack* also does not render dependent claim 16 unpatentable.

**D.    Ground 4 — The Combination of *Lieberman*n and U.S. Patent No. 5,689,575 ("*Sako*") Does Not Render Obvious Claims 21, 24-28, and 30**

The combination of *Liebermann* and *Sako*[2] does not render obvious claims 21,

24-28, and 30.

> **1.    The combination of *Liebermann* and *Sako* does not render independent claim 21 obvious because the combination fails to teach or suggest claim element 21[c].**

As with independent claims 1 and 11, the fundamental disagreement between

Patent Owner and the Examiner is whether *Liebermann's* distributed system renders

obvious the claimed process, which is executed  in a computer, not a distributed

system.   Claim 21 recites a "computer implemented method" with three claim

elements (i.e., a step that provides a specifically configured camera, a step that

provides a specifically configured light source, and a step that determines, using the

camera, a gesture).  As discussed above in reference to independent claims 1 and 11,

in the '079 Patent, all of the components necessary to illuminate, capture, and

determine a gesture are disposed within the same computer apparatus.  Accordingly,

the same computer must perform each step of independent claim 21.

Claim element 21[c] recites "detecting, using the camera, a gesture performed

by at least one of a user's fingers and a user's hand in the work volume."  To meet

---

[2] Patent Owner believes the Examiner inadvertently omitted *Sako* in the header of the rejection, *see* Action at p. 81, because the Examiner relies extensively on *Sako* in the obviousness analysis.  *See id.* at pp. 83-84.

claim element 21[c], the Examiner cites to the mappings and arguments presented in the Action for independent claims 1 and 11. *See* Action, pp. 81-82 (the facts "cited above for challenge[d] claim[s] 1 and 11 relied on herein show *Liebermann* describes a computer implemented method comprising . . . detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand."). As discussed above, however, *Liebermann* fails to teach claim element 1[c] and claim element 11[c], which are similar to claim element 21[c]. Accordingly, *Liebermann* fails to teach claim element 21[c] for at least the same reasons as those discussed above for claim elements 1[c] and 11[c]. The Examiner does not contend that *Sako* cures the deficiencies of *Liebermann*. Action, pp. 83-84. Thus, the combination of *Liebermann* and *Sako* fails to teach or suggest claim element 21[c].

In view of the above, the combination of *Liebermann* and *Sako* fails to render independent claim 21 unpatentable.

### 2. The combination of *Liebermann* and *Sako* does not render dependent claim 28 obvious.

Claim 28 recites "determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers." According to the Examiner, "claims 24-28 and 30 recite [the] same limitations as recited in challenge[d] claims 4-9 . . . facts cited above regarding challenge[d] claims 4-9 are relied on herein for challenge[d] claims 24-28 and 30." Action, p. 84. Claim 28 is similar to claim 8.

Accordingly, the cited art fails to render claim 28 unpatentable for all the reasons discussed above in reference to claim 8.

### 3. The combination of *Liebermann* and *Sako* does not render dependent claims 24-27 and 30 obvious.

Claims 24-27 and 30 depend from, and add limitations to, independent claim 21. As discussed above, the combination of *Liebermann* and *Sako* does not render claim 21 unpatentable. By virtue of their dependencies from independent claim 21, the combination of *Liebermann* and *Sako* also does not render dependent claims 24-27 and 30 unpatentable.

### E. Ground 5 — The Combination of *Liebermann*, *Sako*, and *Sears* Does Not Render Obvious Claims 22 and 23.

The combination of *Liebermann*, *Sako*,[3] and *Sears* does not render claims 22 and 23 unpatentable.

### 1. *Sears* is non-analogous art.

As discussed above in reference to claims 2, 3, 14, and 15, *Sears* is non-analogous art, and thus *Sears* cannot be cited in an obviousness rejection of any claim in the '079 Patent.

---

[3]Patent Owner believes the Examiner inadvertently omitted *Sako* in the header of the rejection, *see* Action at p. 85, because the Examiner later mentions *Sako* in the obviousness analysis. *See id.* at pp. 86-87 ("Since Liebermann, <u>Sako</u> and Sears each regard a method and apparatus for processing images . . .") (emphasis added).

31

**2.    The combination of *Liebermann*, *Sako*, and *Sears* does not render claim 22 obvious.**

Claim 22 recites "wherein the light source includes a light emitting diode." Claim 22 is similar to claim 2.  As discussed above, the combination of *Liebermann* and *Sears* does not render claim 2 unpatentable.  Accordingly, the combination of *Liebermann* and *Sears* also does not render claim 22 unpatentable for the same reasons.  *Sako* does cure the deficiencies of *Liebermann* and *Sears*.  Accordingly, claim 22 is patentable over the combination of *Liebermann*, *Sako*, and *Sears*.

**3.    The combination of *Liebermann*, *Sako*, and *Sears* does not render claim 23 obvious.**

Claim 23 recites "wherein the light source includes a plurality of light emitting diodes."  Claim 23 is similar to claim 3.  As discussed above, the combination of *Liebermann* and *Sears* does not render claim 3 unpatentable.  Accordingly, the combination of *Liebermann* and *Sears* also does not render claim 23 unpatentable for the same reasons.  *Sako* does cure the deficiencies of *Liebermann* and *Sears*. Accordingly, claim 23 is patentable over *Liebermann*, *Sako*, and *Sears*.

32

### F.     Ground 6 — The Combination of *Liebermann*, *Sako*, and *Mack* Does Not Render Obvious Claim 29

The combination of *Liebermann*, *Sako*,[4] and *Mack* does not render claim 29

obvious.  Claim 29 depends from, and add limitations to, independent claim 21.  As

discussed above, the combination of *Liebermann* and *Sako* does not render claim 21

unpatentable.  *Mack* does not cure the deficiencies of *Liebermann* and *Sako*.  Thus,

the combination of *Liebermann*, *Sako*, and *Mack* also does not render claim 21

unpatentable.  By virtue of its dependency from independent claim 21, the

combination of *Liebermann*, *Sako*, and *Mack* also does not render dependent claim

29 unpatentable.  Accordingly, withdrawal of this rejection is respectfully requested.

### G.     The USPTO Has No Jurisdiction Over Expired Patents

In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent

is a matter involving public rights—specifically, the grant of a public franchise." *Oil*

*States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373

(2018) (emphasis in original).  "Specifically, patents are public franchises that the

Government grants to the inventors of new and useful improvements." *Id*. (internal

quotation marks omitted).  The Court explained that "Congress [has] significant

---

[4]Patent Owner believes the Examiner inadvertently omitted *Sako* in the header of the rejection, *see* Action, p.8, because claim 29 depends from claim 21, and *Sako* is cited in the rejection of claim 21.

latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id*. at 1368.  In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine— and perhaps cancel—a patent claim in an inter partes review."  *Id*. at 1368, 1374 (internal quotation marks omitted).  Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others.  At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court.  But because the public franchise no longer exists, the USPTO has nothing in its authority to cancel or amend.  Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages.  If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '079 Patent issued in October 2013 and expired in November 2019, long before the *ex parte* reexamination request was filed in November 2021.  With the

expiration of the '079 Patent in November 2019, the USPTO ceased to have

jurisdiction over the '079 Patent, and the order granting reexamination should be

vacated as a result.

## V.    NO SUBSTANTIAL NEW QUESTION (SNQ) OF PATENTABILITY EXISTS

Patent Owner respectfully asserts that no SNQs of patentability exist and thus the reexamination order should be vacated.  Patent Owner previously requested reconsideration of the SNQ issue by the Examiner in the Reply under 37 C.F.R. § 1.111 filed on May 16, 2022.

In the order dated December 20, 2021 ("Reexam Order") granting the request for *ex parte* reexamination of the '079 Patent, the Office asserted that *Liebermann* raised a SNQ of patentability because *Liebermann* appeared to teach all the claim elements, and these claim elements were missing from the art cited during the original prosecution.  Reexam Order, pp. 16-17.  Patent Owner disagrees.  As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c].  In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent.  Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and *Liebermann* does not raise a SNQ of patentability.  The order for *ex parte* reexamination should be vacated.

## VI.    CONCLUSION

The order for *ex parte* reexamination of the '079 Patent should be vacated

because the USPTO has no jurisdiction over expired patents and/or there is no SNQ

of patentability.  Additionally, or alternatively, the cited art fails to render claims 1-

9, 11, 12, and 14-30 unpatentable.


DATED:  October 31, 2022                    Respectfully submitted,


                                            By: /Todd E. Landis/
                                            Todd E. Landis
                                            Registration No. 44,200
                                            Counsel for Patent Owner

Reexam of Patent No. 8,553,079
Control No. 90/014,900

## VII.   CLAIMS APPENDIX

The following claims are involved in the appeal of the '079 Patent:

1. A computer implemented method comprising:

>   providing a light source adapted to direct illumination through a work volume above the light source;

>   providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

>   determining, using the camera, the gesture performed in the work volume and illuminated by the light source.

2. The method according to claim 1 wherein the light source includes a light emitting diode.

3. The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

4. The method according to claim 1 wherein detecting a gesture includes analyzing sequential images of the camera.

5. The method according to claim 1 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

6. The method according to claim 1 further including determining the pointing direction of a finger in the work volume.

7. The method according to claim 1 further including providing a target positioned on a user that is viewable in the work volume.

8. The method according to claim 1 further including determining the three-dimensional position of a point on a user.

9. The method according to claim 1 wherein the camera and the light source are positioned in fixed relation relative to a keypad.

11. A computer apparatus comprising:

a light source adapted to illuminate a human body part within a work volume generally above the light source;

a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output.

12. The computer apparatus of claim 11 further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display.

14. The computer apparatus of claim 11 wherein the light source includes a light emitting diode.

15. The computer apparatus of claim 11 wherein the light source includes a plurality of light emitting diodes.

39

16. The computer apparatus of claim 12 wherein the display includes a three-dimensional display.

17. The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume.

18. The computer apparatus of claim 11 wherein the determined gesture includes a pinch gesture.

19. The computer apparatus of claim 11 wherein the determined gesture includes a pointing gesture.

20. The computer apparatus of claim 11 wherein the determined gesture includes a grip gesture.

21. A computer implemented method comprising:

provising a camera oriented to observe a gesture performed in a work volume above the camera;

providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and

detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume.

22. The method according to claim 21 wherein the light source includes a light emitting diode.

Reexam of Patent No. 8,553,079
Control No. 90/014,900

23. The method according to claim 21 wherein the light source includes a plurality of light emitting diodes.

24. The method according to claim 21 wherein detecting a gesture includes analyzing sequential images of the camera.

25. The method according to claim 21 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.

26. The method according to claim 21 further including determining the pointing direction of one of the user's fingers using the first and second cameras.

27. The method according to claim 21 further including providing a target positioned on the user that is viewable by the camera.

28. The method according to claim 21 further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers.

29. The method according to claim 21 further including providing a three-dimensional display viewable by the user.

30. The method according to claim 21 wherein the camera and the light source are positioned in fixed relation relative to a keypad.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036          7590          12/12/2022
Williams Simons & Landis PLLC/ GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/12/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. _90/014,900_ .

PATENT UNDER REEXAMINATION _8553079_ .

ART UNIT _3992_ .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

Application Number: 90/014,900
Filing Date: 11 Nov 2021
Appellant(s): Gesture Technology Partners, LLC

_____

Todd E. Landis (Reg. No. 44,200)
For Appellant

**EXAMINER'S ANSWER**

This is in response to the appeal brief filed Oct. 31, 2022.

**(1) Grounds of Rejection to be Reviewed on Appeal**

Every ground of rejection set forth in the Office action dated 6/27/2022 from which the

appeal is taken is being maintained by the examiner except for the grounds of rejection (if any)

listed under the subheading "WITHDRAWN REJECTIONS." New grounds of rejection (if any)

are provided under the subheading "NEW GROUNDS OF REJECTION."

**(2) Restatement of Rejection**

The following ground(s) of rejection are applicable to the appealed claims.

**Claims 1, 4-9, 11-12, 17-21, 24-28 and 30 are rejected under pre-AIA 35 U.S.C.**

**102(e) as being anticipated by U.S. Patent No. 5,982,853 to Liebermann (PA-1, hereafter**

**"*Liebermann*").** The response to Appellant arguments below is incorporated herein.

Regarding claim 1, where the claim terms of an expired patent are accorded their plain

and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein

show Liebermann describes **a computer implemented method** as recited in challenge claim 1.

1. **A computer implemented method comprising:**

For instance, Liebermann discloses a "portable transmitter/receiver," as shown in FIG. 6,

that is in the "form of a cellular telephone" (Ex. PA-1, 4:21-22, 5:62-63). In particular,

Liebermann discloses that the cellular telephone includes hardware that works with the camera to

view and obtain images of hand gestures, performs related "initial processing," and populates a

phone display, among other things (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.) Liebermann states

"computer processing requirements". The Liebermann cellular phone also has a video camera,

an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and

communicate as a wireless remote or through a cellular telephone network." (*Id.*, 5:62-6:2.)

Through this wireless connection, the cellular phone works in conjunction with "a dedicated

central computer facility" to "provide a novel electronic communication system for use by deaf

persons to enable them to communicate by signing" as well as "a unique method utilizing such

an electronic communication system to enable communication by and to deaf persons." (*Id.*,

3:11-13, and 3:22-67, 5:62-6:14.)

A **portable transmitter/receiver** generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6 and it **contains a video camera**, the lens 10 of which is disposed in the upright portion 12. In the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions. Also seen is an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned **so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions.** The **signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.

PA-1, 5:62-6:10, emphasis added.

The other party may speak into a telephone receiver (not shown) and **the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14**.

*Id.*, 6:15-18, emphasis added.

FIGS. 9-12 are schematics of the **system software modules for converting signing to speech and speech to animation, including system training methods**.

*Id.*, 6:36-38, emphasis added.

Generally, **the deaf person uses sign language in front of a device containing a video camera**. The **images captured by the camera** at 20-30 frames/second are **processed by a digital device** which does initial and extended image processing. In the processing, each of the frames containing a **captured image undergoes a process whereby the image is transformed into manageable identifiers**. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). **These identifiers**, and not the images themselves, **are then correlated with a database of vocabulary and grammar by using artificial intelligence** at the Center. Subsequently, **syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications**.

*Id.*, 4:60-5:13, emphasis added.

On the other end of the telephone line, **the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line** (in whatever method of transport is utilized by the telephone carrier) to the Center **where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation**. Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. **The sign images then appear on the screen of a monitor viewed by the deaf person**, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

*Id.*, 5:14-34, emphasis added.

In view of **the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications** are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. 3 wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

*Id.*, 5:35-47, emphasis added.

A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a computer, processor or similar component for performing various disclosed computer/processor implemented functions, including, but not limited to, controlling cameras, driving a display, transmitting information, receiving information, video/image capture and processing, calling/communication circuitry/processing, processing data, translating sign gesture(s) to speech/audio and/or text, translating speech to sign gestures and/or text etc. (*Id.*, 5:62-6:47, FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of ordinary skill in the art to describe a variety of devices with varying degrees of complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994).

a. **providing a light source adapted to direct illumination through a work volume above the light source**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **providing a light source adapted to direct illumination through a work volume above the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand

level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a video monitor 46, and **lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). *Id.*, see FIGS. 6, 5A-5C, and 9 copied below. The recited "work volume" is the space in the point of view of Liebermann camera/lens that captures image of signing/gesture where in Liebermann lamps 48 direct illumination through a work space to ensure adequate lighting of user's hands, face and body. The "work volume" (work space) in Lieberman is above the lamps (light source) in FIG. 5C that is in camera field of view in so far as the bottom most lamp is below the work space where a user signs, by happenstance of use for a deaf person signing. Liebermann describes a method having a light source to illuminate a work volume above the light source of challenged claim 1.



CELLULAR TELEPHONE VERSION

*FIG. 6*



PC VERSION

*FIG. 5A*

SET-TOP BOX

*FIG. 5B*



KIOSK VERSION FOR PUBLIC ACCESS

*FIG. 5C*



*FIG. 9*



*FIG. 10*



*FIG. 11*



*FIG. 12*

At least the apparatus/system in FIG. 5C of Liebermann provides a method **providing a light source adapted to direct illumination through a work volume above the light source** since the lamps 48 direct light to ensure adequate lighting of the user's hands, face and body.

 

      b.   **providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a method comprising **providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that **the camera lens 10** will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by **the camera** are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above. Liebermann describes a method providing a camera to observe a gesture performed in the work volume with the camera

fixed relative to the light source of challenged claim 1 where the recited gesture includes signing

such as American Sign Language (ASL) by a person in the work volume.

> It has now been found that the foregoing and related objects may be readily attained in an electronic communications system for the deaf comprising a **video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases**. Also included are **means for outputting the words and phrases in a comprehensible form to another hearing person**, generally as artificial speech.
>
> In a telephone type system, the other person is at a remote location, although the system may also be used as a translator for communication with a person in the immediate vicinity. Generally, **the video apparatus is a video camera**.
>
> From cost and portability standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means.
>
> In addition to use of a **database of words and phrases corresponding to digitized motions, the translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences**.
>
> The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases in written form.
>
> To enable communication of the deaf person, the system includes means for the other or hearing person to transmit words and phrases. The **translating means is effective to translate said words and phrases into digitized signing motions**, and the video apparatus includes a display screen which provides an output of the digitized signing motions on the display screen for viewing by the deaf person.
>
> There is included **means for translating speech into digital data representing words and phrases and such digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf person**. The video apparatus also includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

PA-1, 3:26-67 (emphasis added).

> If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language Structure, Linstok Press (1978).
>
> ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring attention to detail.

*Id.*, 10:54-67.

At least the apparatus/system with camera 44 in FIG. 5C of Liebermann provides a

method **providing a camera oriented to observe a gesture performed in the work volume,**

**the camera being fixed relative to the light source** since the camera 44 is directed toward the

work volume to observe and capture gesture(s) where the lamps are directed to ensure adequate

lighting of the user's hands, face and body, as stated by Liebermann.

     c. **and determining, using the camera, the gesture performed in the work volume and illuminated by the light source**.

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a method comprising **determining, using the camera, the gesture performed in the work volume and illuminated by the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above.

At least the video camera 44, and lamps 48 to ensure adequate lighting of the user's hands, face and body with "processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a method

determining, using the camera, the gesture performed in the work volume and illuminated by the

light source since the camera 44 is directed toward the work volume to observe and capture

gesture(s) to ensure adequate lighting of the user's hands, face and body and for translating

means also includes artificial intelligence for interpreting and converting the translated motions

into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38,

FIGS. 5S-5C, 6, and 9-12, copied above).


   4.  **The method according to claim 1 wherein detecting a gesture includes
       analyzing sequential images of the camera**.

Regarding challenge claim 4, where the claim terms of an expired patent are accorded their plain

and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein

show Liebermann describes **a computer implemented method comprising detecting a gesture

includes analyzing sequential images of the camera**.

   For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a

personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer

unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand

level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and

lamps 48 to ensure adequate lighting of the user's hands, face and body**") at 5:61-6:14 ("**the

deaf person is positioned so that the camera lens 10 will record the signing movement of the

hands and fingers and body and facial motions and expressions. The signing motions

captured by the camera are converted into digital data for processing by the translation

software, (i.e., artificial intelligence) to produce data representing numbers, words and

phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are

schematics of the system software modules for converting signing to speech and speech to**

**animation, including system training methods**.”). see *Id*., FIGS. 5A-5C, 6 and 9-12 copied above.

At least the video camera 44, and lamps 48 to ensure adequate lighting of the user's hands, face and body with “the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences” and “schematics of the system software modules for converting signing to speech and speech to animation, including system training methods” of Liebermann regards a method **detecting a gesture includes analyzing sequential images of the camera** since the camera 44 is directed toward the work volume to observe and capture gesture(s) to ensure adequate lighting of the user's hands, face and body and for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id*., 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38, FIGS. 5A-5C, 6, and 9-12, copied above).

> 5. **The method according to claim 1 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture.**
> 6. **The method according to claim 1 further including determining the pointing direction of a finger in the work volume**

Regarding challenge claims 5 and 6, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method comprising wherein the detected gesture includes at least one of a pinch gesture, a pointing**

**gesture, and a grip gesture** and **further including determining the pointing direction of a finger in the work volume**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above. Liebermann describes a method where the recited gesture includes deaf person signing such as via American Sign Language (ASL). See *Id.*, 10:54-12:6, FIGS. 16 and 17. Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the "identification of the letters, numbers and words" that have been signed, and discloses in FIG. 11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Liebermann not only discloses detecting "at least one of a pinch gesture, a pointing gesture, and

a grip gesture," but discloses detection of all three types of gestures and further including

determining the pointing direction of a finger in the work volume. In particular, Liebermann

discloses that "another significant aspect of the invention is the requirement that finger spelling

be captured by the camera, undergo the RDS process, and still be recognized once artificial

intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the

"identification of the Jeffers, numbers and words" that have been signed, and discloses in FIG.

11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a

spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Thus,

the system and method of Liebermann must be capable of detecting the full range of a signed

alphabet in order to achieve the required finger spelling detection.

Liebermann further discloses detection of ASL signs via an "ASL to English translation

algorithm," and notes that implementing the disclosed ASL to English translation method

requires "linguistic analysis beyond what was recognized by William Stokoe in [Semiotics] and

Human Sign Language, Mouton (197[2]), and Sign Language Structure, Linstok Press (1978)."

(*Id.*, 10:54-56, 12:3-6; see also Exs. PA-8, PA-9 both as knowledge of an artisan that is relied on

only in so far as Liebermann describes deaf person signing ASL and the method and system of

Liebermann captures and translates their signing into verbal/text for communicating with hearing

persons at remote locations; thus, ASL signs as depicted in PA-8, PA-9 are implicitly included in

Liebermann.) Thus, method in Liebermann --including the finger spelling as discussed above--

required consulting Stokoe's sign language publications (or similar sources of such information)

to ensure that, at a minimum, the system performs the disclosed Liebermann method to the full

extent of the features described in such publications. For example, in both Semiotics and Human

Sign Language and Sign Language Structure, Stokoe includes a diagram showing the letters of

the American Manual Alphabet which are used in conjunction with ASL. (Ex. PA-8, 22; Ex. PA-9 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) As pictured below, the American Manual Alphabet includes pinch, pointing, and grip gestures, and thus detection of finger spelling requires detection of a pinch gesture, a pointing gesture, and a grip gesture and determining the pointing direction of a finger in the work volume. (Ex. PA-8, 22; Ex. PA-9, 28 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) For example, letters F and O each represent variations on a pinch gesture, where the thumb and index finger pinch together; letters D and G each represent pointing gestures and letters A and S represent variations on a grip gesture. (Ex. PA-9, 28)



(Ex. PA-9, 28 (FIG 1 (annotated to show pinch, pointing, and grip gestures used for finger spelling)).)

Further, Liebermann discloses that the electronic communication method must be able to detect the signs that are used in finger spelling. Liebermann's discloses the importance of consulting Stokoe's publications in order to implement the Liebermann ASL detection method, and how these publications provide diagrams showing the letters of the American Manual Alphabet which are used to perform finger spelling in conjunction with ASL. (*Id.*) As pictured below, it was known that the American Manual Alphabet included a variety of gestures with fingers pointing in various directions. (Ex. PA-9, 28; see also Ex. PA-8, 22.) For example, letter D involves pointing upwards; letter G involves pointing left (if signing with a right hand); letter P involves pointing upwards at an angle; and letter Q involves pointing downwards at an angle. (Ex. PA-9, 28.)



Ex. PA-9, 28 (FIG. 1 annotated to show pointing signs in different directions used for finger spelling) as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL thereby implicitly including determining direction of finger pointing and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing person at remote locations.)

At least the particular signing movement of the hands and fingers and body and facial motions and expressions by a deaf person where the signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a method **wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture** and **further including determining the pointing direction of a finger in the work volume** for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38 and 53-57, 10:54-56, 12:3-6 and 30-33, FIGS. 5S-5C, 6, and 9-12, copied above). Also, see *Id.*, FIGS. 15 and 16.

### 7. **The method according to claim 1 further including providing a target positioned on a user that is viewable in the work volume.**

Regarding challenge claim 7, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method further including providing a target positioned on a user that is viewable in the work volume.** For instance, Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (Ex. PA-1, 12:30-33.) Liebermann discloses that because "[t]his task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing

person, and clothes," it is advantageous to use "**special gloves which allow discrimination of the hands from the background for the image processing system**." (*Id.*, 12:34-39.) FIGS. 13 and 14 illustrate "the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language." (*Id.*, 12:40-43, FIGS. 13-14.) Liebermann discloses an example where "the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue," and each glove may have "a third color (typically red) for left and right palm areas," which "allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away." (*Id.*, 12:46-52.) FIG. 13A illustrates a front view of these gloves; while, FIG. 13B illustrates a back view of these gloves and each is reproduced below.



FIG. 13A



FIG. 13B

At least the use of special gloves of Liebermann regards a method **further including providing a target positioned on a user that is viewable in the work volume** since the "special gloves which allow discrimination of the hands from the background for the image processing system" and "the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language." (*Id.*, 12:40-43, FIGS. 13-14.)

8. **The method according to claim 1 further including determining the three-dimensional position of a point on a user**.

Regarding challenge claim 8, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method comprising further including determining the three-dimensional position of a point on a user**.

For instance, Liebermann discloses that the electronic communication method must determine the location or position of points on a user. Because "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the **spatial location of the hands relative to the rest of the body** (Stokoe's 'tab')." (Ex. PA-1, 10:59-64 (internal quotations added).) As shown in Liebermann, FIG. 9 (reproduced below with annotations added for emphasis), which displays "a schematic representation of the modules of the artificial intelligence for converting signing into speech," the disclosed method requires "**calculating centers of gravity for both hands**," which involves finding an "**FFT [fast Fourier transform] of paths of the hands**" as well as performing an "**explicit path analysis**" of the hands. (*Id.*, 4:31-32, FIG. 9.) FIG. 9 discloses in other portions of the conversion process that a

"**2 hand FFT and their location**" are determined by the static gesture manager, and a "**right hand FFT**" is determined by the spelling mode manager. (*Id.*, FIG. 9.) Knowledge of a POSITA would understand that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed in Liebermann includes determining the position of a point on the user's hand, which is a "point on a user." Also, the use of "**special gloves which allow discrimination of the hands from the background for the image processing system**" and determining direction of a pointing finger by a deaf person signing as described in Liebermann explicitly/necessarily includes coordinates (i.e., three-dimensional position of a point of a user) of the hands and other body parts are determined. (*Id.*, 13:22-23 (suggesting that "coordinates" of signs are determined), 7:44-9:27 (disclosing an algorithm for feature tracking, which detects the location of various parts of the head, torso, arms, and legs).) Further, Liebermann describes using **three dimensional video cameras** to "facilitate recognition of signing motions by enhancing spatial differences." (*Id.*, 13:29-31.)



*FIG. 9*

At least the use of special gloves, "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands, determining "2 hand FFT and their location" by the static gesture manager, and a "right hand FFT" is determined by the spelling mode manager of Liebermann in conjunction with use of three dimensional video cameras regards a method **further including determining the three-dimensional position of a point on a user** to "facilitate recognition of signing motions by enhancing spatial differences."

    9.   **The method according to claim 1 further including determining the three-dimensional position of a point on a user.**

Regarding challenge claim 9, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes **a computer implemented method comprising wherein the camera and the light source are positioned in fixed relation relative to a keypad.**

For instance, Liebermann states at 5:52-60 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**. To place the call, there is **a keypad 50**".)



FIG. 5C

At least the public kiosk 42 in FIG. 5C with the kiosk including **a video camera 44,**
**lamps 48 to ensure adequate lighting of the user's hands, face and body**, and **a keypad 50** as
described in Liebermann provides a method **wherein the camera and the light source are**
**positioned in fixed relation relative to a keypad** in so far as each of the camera 44 and lamps
48 are built into a kiosk so they are not free to move separately or independently and thus are "in
fixed relative to a keypad that is in distinction to system in FIG. 5A of Liebermann where the
camera 34 is movable separately from any light source and keypad.


Regarding claim 11, same facts cited for claim 1 are relied on herein, where the claim
terms of an expired patent are accorded their plain and ordinary meaning under the Phillips
standard, lacking evidence to the contrary, facts noted herein show Liebermann describes **a**
**computer apparatus**, as recited in challenge claim 11.

11. **A computer apparatus comprising:**

For instance, Liebermann discloses a "portable transmitter/receiver," as shown in FIG. 6, that is in the "form of a cellular telephone" (Ex. PA-1, 4:21-22, 5:62-63). In particular, Liebermann discloses that the cellular telephone includes hardware that works with the camera to view and obtain images of hand gestures, performs related "initial processing," and populates a phone display, among other things (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.) Liebermann states "computer processing requirements". The Liebermann cellular phone also has a video camera, an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network." (*Id.*, 5:62-6:2.) Through this wireless connection, the cellular phone works in conjunction with "a dedicated central computer facility" to "provide a novel electronic communication system for use by deaf persons to enable them to communicate by signing" as well as "a unique method utilizing such an electronic communication system to enable communication by and to deaf persons." (*Id.*, 3:11-13, and 3:22-24, 5:62-6:14.) Liebermann describes a computer apparatus containing same structure performing same functions for same purpose as recited in '079 (3:26-67).

A **portable transmitter/receiv**er generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6 and it **contains a video camera**, the lens 10 of which is disposed in the upright portion 12. In the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions. Also seen is an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned **so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions**. The **signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.

PA-1, 5:62-6:10, emphasis added.

The other party may speak into a telephone receiver (not shown) and **the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14**.

*Id.*, 6:15-18, emphasis added.

FIGS. 9-12 are schematics of the **system software modules for converting signing to speech and speech to animation, including system training methods**.

*Id.*, 6:36-38, emphasis added.

Generally, **the deaf person uses sign language in front of a device containing a video camera**. The **images captured by the camera** at 20-30 frames/second are **processed by a digital device** which does initial and extended image processing. In the processing, each of the frames containing a **captured image undergoes a**

> process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). **These identifiers**, and not the images themselves, **are then correlated with a database of vocabulary and grammar by using artificial intelligence** at the Center. Subsequently, **syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications**.

*Id.*,4:60-5:13, emphasis added.

> On the other end of the telephone line, **the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line** (in whatever method of transport is utilized by the telephone carrier) to the Center **where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation**. Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. **The sign images then appear on the screen of a monitor viewed by the deaf person**, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

*Id.*, 5:14-34, emphasis added.

> In view of **the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications** are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. 3 wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

*Id.*, 5:35-47, emphasis added.

A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a computer, processor or similar component for performing various disclosed computer/processor implemented functions, including, but not limited to, controlling cameras, driving a display, transmitting information, receiving information, processing data, translating sign gesture(s) to speech/audio and/or text, translating speech to sign gestures and/or text etc. (*Id.*, 5:62-6:47, FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of ordinary skill in the art to describe a variety of devices with varying degrees of complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994).

Patent Owner is reminded that an apparatus recites what a device is rather than what a device

does.

> "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1528 (Fed. Cir. 1990) (emphasis in original). A claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the claim. *Ex parte Masham*, 2 USPQ2d 1647 (Bd. Pat. App. & Inter. 1987) (The preamble of claim 1 recited that the apparatus was "for mixing flowing developer material" and the body of the claim recited "means for mixing ..., said mixing means being stationary and completely submerged in the developer material." The claim was rejected over a reference which taught all the structural limitations of the claim for the intended use of mixing flowing developer. However, the mixer was only partially submerged in the developer material. The Board held that the amount of submersion is immaterial to the structure of the mixer and thus the claim was properly rejected.).

MPEP 2114 II.

In this instance regarding challenge claim 11, where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

herein show Liebermann describes a **computer apparatus comprising a light source** to

illuminate a human body part in a work space above the light, **a camera** in fixed relation relative

to the light source and oriented to observe a gesture performed by a human in the space **and a**

**processor** to determine the gesture performed in the space and illuminated by the light source

based on the computer output. Essentially, under the Phillips standard, Liebermann describes

each of the elements of apparatus of challenge claim 11. See MPEP 2114 II.

   a. **a light source adapted to illumination a human body part within a work volume**
      **above the light source;**

   Where the claim terms of an expired patent are accorded their plain and ordinary meaning

under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann

describes **a light source adapted to illuminate a human body part within a work volume**

**generally above the light source**.

   For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a

personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer

unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand

level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a video monitor 46, and

**lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the

deaf person is positioned so that the camera lens 10 will record the signing movement of the

hands and fingers and body and facial motions and expressions. The signing motions captured by

the camera are converted into digital data for processing by the translation software, (i.e.,

artificial intelligence) to produce data representing numbers, words and phrases which are then

combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system

software modules for converting signing to speech and speech to animation, including system

training methods."). *Id*., see Figs. 6, 5A-5C, and 9 copied below. The recited "work volume" is

the space in the point of view of Liebermann camera/lens that captures image of signing/gesture

by deaf person where in Liebermann lamps 48 direct illumination through a work space to ensure

adequate lighting of user's hands, face and body. The "work volume" in Liebermann is above

the lamps (light source) in so far as the bottom most lamp is below the space a user signs. A

distinction to the contrary would solely regard difference in a user's body build. Liebermann

describes a system performing the method having a light source to illuminate a work volume

above the light source of challenged claim 1.



CELLULAR
TELEPHONE
VERSION

FIG. 6



PC VERSION

FIG. 5A

SET-TOP BOX

FIG. 5B

KIOSK VERSION FOR
PUBLIC ACCESS

FIG. 5C



*FIG. 9*



*FIG. 10*



*FIG. 11*



*FIG. 12*

At least the kiosk with lamps 48 in FIG. 5C of Liebermann is a computer apparatus comprising **a light source adapted to illuminate a human body part within a work volume generally above the light source** since the lamps 48 direct light to ensure adequate lighting of the user's hands, face and body, as stated by Liebermann.

 

    **b.  a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume;**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a computer apparatus comprising **a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied above. Liebermann describes a

computer apparatus providing a camera to observe a gesture performed in the work volume with
the camera fixed relative to the light source of challenged claim 11 where the recited gesture
includes person signing such as American Sign Language (ASL) in the work volume.

> It has now been found that the foregoing and related objects may be readily attained in an electronic
> communications system for the deaf comprising a **video apparatus for observing and digitizing the signing
> motions, and means for translating the digitized motions into words and phrases**. Also included are **means
> for outputting the words and phrases in a comprehensible form to another hearing person**, generally as
> artificial speech.
> In a telephone type system, the other person is at a remote location, although the system may also be used as a
> translator for communication with a person in the immediate vicinity. Generally, **the video apparatus is a video
> camera**.
> From cost and portability standpoints, the translating means is at a remote location or central station and there is
> included transmission means for transmitting the digitized signing motions or their digital identifiers to the
> translating means.
> In addition to use of a **database of words and phrases corresponding to digitized motions, the translating
> means also includes artificial intelligence for interpreting and converting the translated motions into
> words and phrases and into coherent sentences**.
> The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases
> in written form.
> To enable communication of the deaf person, the system includes means for the other or hearing person to
> transmit words and phrases. The **translating means is effective to translate said words and phrases into
> digitized signing motions**, and the video apparatus includes a display screen which provides an output of the
> digitized signing motions on the display screen for viewing by the deaf person.
> There is included **means for translating speech into digital data representing words and phrases and such
> digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to
> provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf
> person**. The video apparatus also includes a microphone and speaker whereby a deaf person may communicate
> with another person in the immediate vicinity.

PA-1, 3:26-67 (emphasis added).

> If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was
> recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language
> Structure, Linstok Press (1978).
> ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular
> instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the
> spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and
> by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring
> attention to detail.

*Id.*, 10:54-67.

At least the kiosk with camera 44 in FIG. 5C of Liebermann regards a computer
apparatus comprising **a camera in fixed relation relative to the light source and oriented to
observe a gesture performed by the human body part in the work volume** since the camera
44 is directed toward the work volume to observe and capture gesture(s) to ensure adequate
lighting of the user's hands, face and body, as stated by Liebermann.

      c.  **and a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output**.

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a computer apparatus comprising **a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.**") and at 6:36-38 ("**FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**."). see *Id*., FIGS. 5A-5C, 6 and 9-12 copied above.


A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a **computer, processor or similar component** for performing various disclosed

computer/processor implemented functions, including, but not limited to, controlling cameras,

driving a display, transmitting information, receiving information, processing data, translating

sign gesture(s) to speech/audio and/or text, translating speech to sign gestures and/or text etc.

(*Id.*, 5:62-6:47, FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood

by one of ordinary skill in the art to describe a variety of devices with varying degrees of

complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed.

Cir. 1994). Patent Owner is reminded that an apparatus recites what a device is rather than what

a device does.

> "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1528 (Fed. Cir. 1990) (emphasis in original). A claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the claim. *Ex parte Masham,* 2 USPQ2d 1647 (Bd. Pat. App. & Inter. 1987) (The preamble of claim 1 recited that the apparatus was "for mixing flowing developer material" and the body of the claim recited "means for mixing ..., said mixing means being stationary and completely submerged in the developer material." The claim was rejected over a reference which taught all the structural limitations of the claim for the intended use of mixing flowing developer. However, the mixer was only partially submerged in the developer material. The Board held that the amount of submersion is immaterial to the structure of the mixer and thus the claim was properly rejected.).

MPEP 2114 II.

In this instance regarding challenge claim 11, where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

herein show Liebermann describes a **computer apparatus comprising a light source** to

illuminate a human body part in a work space above the light, **a camera** in fixed relation relative

to the light source and oriented to observe a gesture performed by a human in the space **and a**

**processor** to determine the gesture performed in the space and illuminated by the light source

based on the computer output. Essentially, under the Phillips standard, Liebermann describes

each of the elements of apparatus of challenge claim 11. See MPEP 2114 II.

At least the kiosk with video camera 44, and lamps 48 to ensure adequate lighting of the user's hands, face and body with "**processing by the translation software**, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "**schematics of the system software modules for converting signing to speech and speech to animation, including system training methods**" of Liebermann regards a computer apparatus comprising a processor to determine the gesture performed in the work volume and illuminated by the light source based on the camera output since the camera 44 is directed toward the work volume to observe and capture gesture(s) as stated by Liebermann to ensure adequate lighting of the user's hands, face and body and for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38, FIGS. 5A-5C, 6, and 9-12, copied above).

12. **The computer apparatus of claim 11 further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display**.

Regarding challenge claim 12, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts herein show Liebermann describes **a computer apparatus comprising further including a display and a keyboard, wherein the work volume is above the keyboard and in front of the display**.

For instance, Liebermann states at 5:52-60 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to

be at hand level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, **a video monitor 46**, and lamps 48 to ensure adequate lighting of the user's hands, face and body. To place the call, there is **a keypad 50**".)



At least the public kiosk 42 in FIG. 5C with the kiosk including a video camera 44, a **video monitor 46**, lamps 48 to ensure adequate lighting of the user's hands, face and body, and **a keypad 50** as described in Liebermann regards an computer apparatus comprising **wherein the work volume is above the keyboard and in front of the display** in so far as at least a portion of the work volume is above the keypad 50 and in front of the monitor 46 and where each of the camera 44 and lamps 48 are built into a kiosk so they not free to move separately and thus are "in fixed relative to a keypad" (i.e., in distinction to apparatus in FIG. 5A of Liebermann where the camera 34 is transportable separate from any light source and keypad). In this instance regarding challenge claim 12, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts above show Liebermann describes a **computer apparatus comprising a display and a keypad, wherein the work**

**volume is above the keyboard and in front of the display**. Essentially, under the Phillips standard, Liebermann describes the apparatus of challenge claim 12. See MPEP 2114 II.

> 17. **The computer apparatus of claim 11 further including a target that is viewable by the camera when in the work volume**.

Regarding challenge claim 17, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard and where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts herein show Liebermann describes **a computer apparatus comprising: further including a target that is viewable by the camera when in the work volume**.

For instance, for same facts recited above for challenge claim 7 relied on herein, Liebermann discloses that "another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked." (Ex. PA-1, 12:30-33.) Liebermann discloses that because "[t]his task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing person, and clothes," it is advantageous to use "**special gloves which allow discrimination of the hands from the background for the image processing system**." (*Id.*, 12:34-39.) FIGS. 13 and 14 illustrate "the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language." (*Id.*, 12:40-43, FIGS. 13-14.) Liebermann discloses an example where "the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue," and each glove may have "a third color (typically red) for left and right palm areas," which "allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs.

palm away." (*Id.*, 12:46-52.) FIG. 13A illustrates a front view of these gloves; while, FIG. 13B

illustrates a back view of these gloves and each is reproduced below.



*FIG. 13A*



*FIG. 13B*

At least the system with use of special gloves on hands of person signing in Liebermann

regards a computer apparatus **further including providing a target positioned on a user that is**

**viewable in the work volume** since the "special gloves which allow discrimination of the hands

from the background for the image processing system." In this instance regarding challenge

claim 17, where the claim terms of an expired patent are accorded their plain and ordinary

meaning under the Phillips standard and where apparatus claims cover what a device is, not what

a device does, lacking evidence to the contrary, facts above show Liebermann describes a

**computer apparatus further including a target that is viewable by the camera when in the**

**work volume**. Essentially, under the Phillips standard, Liebermann describes the apparatus of

challenge claim 17. See MPEP 2114 II.

       18. **The computer apparatus of claim 11 wherein the determined gesture includes a pinch gesture.**
       19. **The computer apparatus of claim 11 wherein the determined gesture includes a pointing gesture.**
       20. **The computer apparatus of claim 11 wherein the determined gesture includes a grip gesture.**

Regarding challenge claims 18-20, where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

herein show Liebermann describes **a computer apparatus comprising: a pinch gesture, a**

**pointing gesture** and **a grip gesture**.

For instance, for same facts relied on above for challenge claims 5 and 6, *Liebermann* at

5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the

monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is

utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk

42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate**

**lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so**

**that the camera lens 10 will record the signing movement of the hands and fingers and**

**body and facial motions and expressions. The signing motions captured by the camera are**

**converted into digital data for processing by the translation software, (i.e., artificial**

**intelligence) to produce data representing numbers, words and phrases which are then**

**combined into coherent sentences**.") and at 6:36-38 ("**FIGS. 9-12 are schematics of the**

**system software modules for converting signing to speech and speech to animation,**

including system training methods.*"). see *Id.*, FIGS. 5A-5C, 6 and 9-12 copied

above. Liebermann describes an apparatus performing the recited gesture by a deaf person

signing such as via American Sign Language (ASL). See *Id.*, 10:54-12:6, FIGS. 16 and 17.

Liebermann discloses that "another significant aspect of the invention is the requirement that

finger spelling be captured by the camera, undergo the RDS process, and still be recognized once

artificial intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the

"identification of the letters, numbers and words" that have been signed, and discloses in FIG. 11

that if a signed word is not found in the signing dictionary, then letters are retrieved from a

spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.)

Liebermann not only discloses detecting "at least one of a pinch gesture, a pointing gesture, and

a grip gesture," but discloses detection of all three types of gestures and further including

determining the pointing direction of a finger in the work volume. In particular, Liebermann

discloses that "another significant aspect of the invention is the requirement that finger spelling

be captured by the camera, undergo the RDS process, and still be recognized once artificial

intelligence procedures are invoked." (*Id.*, 12:30-33.) Liebermann further discloses the

"identification of the Jeffers, numbers and words" that have been signed, and discloses in FIG.

11 that if a signed word is not found in the signing dictionary, then letters are retrieved from a

spelling dictionary to determine if the deaf user is finger spelling. (*Id.*, 6:53-57, FIG. 11.) Thus,

the apparatus and method of Liebermann is capable of detecting the full range of a signed

alphabet in order to achieve the required finger spelling detection.

Liebermann further discloses detection of ASL signs via an "ASL to English translation

algorithm," and notes that implementing the disclosed ASL to English translation method

requires "linguistic analysis beyond what was recognized by William Stokoe in [Semiotics] and

Human Sign Language, Mouton (197[2]), and Sign Language Structure, Linstok Press (1978)."

(*Id.*, 10:54-56, 12:3-6; see also Exs. PA-8, PA-9 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and apparatus of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) Thus, apparatus and method in Liebermann --including the finger spelling as discussed above-- required consulting Stokoe's sign language publications (or similar sources of such information) to ensure that, at a minimum, the apparatus performs the disclosed Liebermann method to the full extent of the features described in such publications. For example, in both Semiotics and Human Sign Language and Sign Language Structure, Stokoe includes a diagram showing the letters of the American Manual Alphabet which are used in conjunction with ASL. (Ex. PA-8, 22; Ex. PA-9 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the apparatus of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) As pictured below, the American Manual Alphabet includes pinch, pointing, and grip gestures, and thus detection of finger spelling requires detection of a pinch gesture, a pointing gesture, and a grip gesture and determining the pointing direction of a finger in the work volume. (Ex. PA-8, 22; Ex. PA-9, 28 both as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL and the apparatus of Liebermann captures and translates their signing into verbal/text for communicating with hearing persons at remote locations.) For example, letters F and O each represent variations on a pinch gesture, where the thumb and index finger pinch together; letters D and G each represent pointing gestures and letters A and S represent variations on a grip gesture. (Ex. PA-9, 28.)



(Ex. PA-9, 28 (FIG. 1 (annotated to show pinch, pointing, and grip gestures used for finger spelling))

Further, Liebermann discloses that the electronic communication method must be able to detect the signs that are used in finger spelling. Liebermann's discloses the importance of consulting Stokoe's publications in order to implement the Liebermann ASL detection method, and how these publications provide diagrams showing the letters of the American Manual Alphabet which are used to perform finger spelling in conjunction with ASL. (*Id.*) As pictured below, it was known that the American Manual Alphabet included a variety of gestures with fingers pointing in various directions. (Ex. PA-9, 28; see also Ex. PA-8, 22.) For example, letter D involves pointing upwards; letter G involves pointing left (if signing with a right hand); letter P involves pointing upwards at an angle; and letter Q involves pointing downwards at an angle. (Ex. PA-9, 28.)



Ex. PA-9, 28 (FIG. 1 annotated to show pointing signs in different directions used for finger spelling) as knowledge of an artisan that is relied on only in so far as Liebermann describes deaf person signing ASL thereby implicitly including determining direction of finger pointing and the method and system of Liebermann captures and translates their signing into verbal/text for communicating with hearing person at remote locations.)

At least the signing movement of the hands and fingers and body and facial motions and expressions by a deaf person where the signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences" and "schematics of the system software modules for converting signing to speech and speech to animation, including system training methods" of Liebermann regards a computer apparatus **comprising: a pinch gesture, a pointing gesture** and **a grip gesture** for translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences (*Id.*, 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38 and 53-57, 10:54-56, 12:3-6 and 30-33, FIGS. 5S-5C, 6, and 9-12, copied above). Also, see *Id.*, FIGS. 15 and 16. In this instance regarding challenge claim 17, where the claim terms of an expired patent

are accorded their plain and ordinary meaning under the Phillips standard and where apparatus

claims cover what a device is, not what a device does, lacking evidence to the contrary, facts

above show Liebermann describes a **computer apparatus further including a pinch gesture, a**

**pointing gesture** and **a grip gesture**. The pinch, pointing and grip gesture each respectively

regard a functional motion/gesture that does not regard a structural difference from Liebermann

where teaching in Liebermann performs same function by same structure for same purpose.

Essentially, under the Phillips standard, Liebermann describes the apparatus of challenge claims

18-20. See MPEP 2114 II.


**Claims 2, 3, 14 and 15 are rejected under pre-AIA 35 U.S.C. 103(a) as being**

**unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No.**

**6115482, hereafter Sears (PA-14)**. The response to Appellant arguments below is incorporated

herein. Where the claim terms of an expired patent are accorded their plain and ordinary

meaning under the Phillips standard, where apparatus claims cover what a device is, not what a

device does, lacking evidence to the contrary, facts cited above relied on herein regarding claims

1 and 11 show Liebermann describes a computer implemented method and computer apparatus

comprising recited elements including a camera, a light source as lamps, a keypad and a display

(FIGS. 5a-5c, 6). However, to the extent an artisan interprets that Liebermann lacks wherein the

light source includes "**a light emitting diode**" as recited in claims 2 and 14, and wherein the

light source includes "a **plurality of light emitting diodes**" as recited in claims 3 and 15; in a

related reference, Sears describes a gesture based method and apparatus including a camera

oriented to observe a work volume wherein the light source includes "**a light emitting diode**" as

recited in claims 2 and 14, and wherein the light source includes "**a plurality of light emitting**

**diodes**" as recited in claims 3 and 15.

> An optical-input print reading device with voice output for people with impaired or no vision in which **the user provides input to the system from hand gestures**. Images of the text to be read, on which the user performs **finger- and hand-based gestural commands**, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further **tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning**. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance**. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses.

PA-14, Abstract, emphasis added.

> Optionally, the camera mount 37 may incorporate **one or more illumination sources**, so as **to provide constant illumination over the field of view**. In FIG. 1b, **such illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37**. These **illumination sources 45 may comprise rows of LEDs**, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources. Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the **arrangement of illumination sources need not be in rows, as shown in FIG. 1b**, but may also comprise point sources or sources located in varied arrangements around the **camera 39**. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly.

*Id*., 5:13-35.



*Id*., FIG. 1b.

Sears is deemed as relevant prior art due to either being in the same field of endeavor or being reasonably pertinent to the particular problem with which the Applicant was faced. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992). The level of ordinary skill in the art is shown by the applied art herein. Since Liebermann and Sears each regard a method and apparatus for three dimensional input entry including gestures, in consideration consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art', in this case, it would have been obvious to an artisan to substitute one light source for the other to provide a light source such as "**a light emitting diode**", and "**a plurality of light emitting diodes**" so as **to direct illumination through a work volume, to ensure adequate lighting of the user's hands, face and body** (PA-1, 5:52-58), and "**to provide constant illumination over the field of view**" (PA-14, 5:13-35). Essentially, the recited light source in challenge claims 2, 3, 14 and 15 fails to critically distinguish in this case over applied references for same structure performing same function for same purpose.

**Claim 16 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No. 6198485, hereafter Mack**. The response to Appellant arguments below is incorporated herein. Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts cited above relied on herein regarding claims 1 and 11 show Liebermann describes a computer implemented method and computer apparatus comprising

recited elements including a display (FIGS. 5a-5c, 6); however, to the extent an artisan interprets

that Liebermann lacks "**a three-dimensional display**" as recited in challenge claim 16; in a

related reference Mack describes "a method and apparatus for navigating 3-D worlds" that uses

stereo imaging to capture the 3-D information of a marker on the user hand." (Ex. PA-3, 2:19-

22.) "The 3-D coordinates of the marker," which may include the hand marker but also facial

expressions, head movements, and eye movements, "are computed using 3-D camera geometry."

(*Id.*, 2:22- 26.) Mack discloses that "[t]he computer 110 is loaded with a 3-D processing program

such as 3-D animation, game, education, and visualization." (*Id.*, 2:41-43.) The computer may

connect to "one or more input/output (I/O) devices such as display monitor 120, keyboard 130,

mouse, and tablet digitizer," as well as "input unit 150 for receiving 3-D information." (*Id.*, 2:45-

50.) "The display monitor 120 displays the 3-D graphic or image data as processed by the

computer 110," while "[t]he input unit 150 provides a housing for the 3-D input system which

provides a work area for the user hand 160." (*Id*, 2:51-59.) The input unit 150 may include "a

stereo camera system to determine the 3-D coordinates of a marker manipulated by the user. (*Id.*,

2:58-62.) In addition, the marker, which "can be conveniently worn on the user's finger," is

illuminated by a light source and imaged by the stereo cameras. (*Id.*, 2:67-3:2.) The two cameras

can be any cameras "that can capture images of a moving object in real-time," but they must be

positioned so that the "stereo imaging geometry allows the computation of the 3-D coordinates

of the object." (*Id.*, 3:38-49.) Mack's FIG. 1 is reproduced below and illustrates these

components.



PA-3, FIG. 1.

Further, Mack discloses that "[t]he display monitor 120 displays the 3-D graphic or image data as processed by the computer 110," and "provides a means for user to navigate the 3-D world as processed by the computer." (Ex. PA-3, 2:25-26, 2:51-52.) "The computer 110 is loaded with a 3-D processing program such as 3-D animation, game, education, and visualization" and may be "based on a high performance microprocessor, such as any type of Intel® microprocessor architecture." (*Id.*, 2:41-45.) Mack notes that such "[t]hree-dimensional (3-D) graphic and imaging systems" were well-known and popular, as were "[h]igh performance processors with 3-D capabilities [that had] been developed for 3-D applications such as animation, visualization, games, and education." (*Id.*, 1:11-15.) Mack further discloses that the display monitor that "displays the 3-D graphic or image data" may be "any monitor, including cathode ray tube (CRT), a flat panel display, etc." (*Id.*, 2:51-54.) By using these known 3-D graphics, processor, and display components --all "commercially off-the-shelf hardware"-- Mack discloses a method and apparatus "for navigation in 3-D world" by which a three-dimensional display may be implemented to provide a "simple and efficient 3-D vision system." (*Id.*, 6:63-67.) Liebermann discloses that when a hearing person responds to the signing user's communication, the speech is

translated back to signs. (Ex. PA-1, 5:14-34.) "The sign images then appear on the screen of a

monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign

language motions which portray the content of the spoken language uttered as speech by the

normally hearing person." (*Id*., 5:30-34.) Mack is deemed as relevant prior art due to either

being in the same field of endeavor or being reasonably pertinent to the particular problem with

which the Applicant was faced. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir.

1992). The level of ordinary skill in the art is shown by the applied art herein. Since

Liebermann and Mack each regard a method and apparatus for three dimensional input entry, in

consideration consistent with US Supreme Court decision in KSR that 'known work in one field

of endeavor may prompt variations of it for use in either the same field or a different one based

on design incentives or other market forces if the variations are predictable to one of ordinary

skill in the art', in this case, it would have been obvious to an artisan to substitute one display for

the other to provide a "**three-dimensional display**" as recited in challenged claim 16.

Essentially, the recited display in challenge claims 16 fails to critically distinguish in this case

over applied references for same structure performing same function for same purpose.


**Claims 21, 24-28 and 30 are rejected under pre-AIA 35 U.S.C. 103(a) as being**

**unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann**. The response to Appellant

arguments below is incorporated herein. Where the claim terms of an expired patent are

accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the

contrary, for similar steps of a computer implemented method, the facts cited above for challenge

claim 1 and 11 relied on herein show Liebermann describes a **computer implemented method**

**comprising: providing a camera oriented to observe a gesture performed in a work**

**volume; providing a light source in fixed relation relative to the camera and adapted to direct illumination through the work volume; and detecting, using the camera, a gesture performed by at least one of a user's fingers and a user's hand in the work volume**.

However, in the alternative, to the extent Liebermann lacks the work volume being "**above**" the camera since the kiosk embodiment appears to show the work volume "below" the camera. However, it is well settled in case law to be within the skill of an artisan to rearrange or shifting location of parts when the operation is not modified.

> *In re Japikse*, 181 F.2d 1019, 86 USPQ 70 (CCPA 1950) (Claims to a hydraulic power press which read on the prior art except with regard to the position of the starting switch were held unpatentable because shifting the position of the starting switch would not have modified the operation of the device.); *In re Kuhle*, 526 F.2d 553, 188 USPQ 7 (CCPA 1975) (the particular placement of a contact in a conductivity measuring device was held to be an obvious matter of design choice).

In this case, the rearrangement of location of the camera to be located so the work volume is "**above**" the camera (e.g., locate camera below the work volume such as at or below the bottom lamps) rather than below the work volume as in the kiosk of Liebermann is within the skill of an artisan and the rearrangement of the location of the work volume "above the camera" does not alter or modify the operation since the apparatus and method including a camera continues to be **oriented to observe a gesture performed in a work volume** while the method and apparatus continue determining a gesture performed in the work volume and illuminated by the light source and/or detecting a gesture includes analyzing sequential images of the camera. In this case, the arrangement or location of the work volume is "above" the camera provides no benefit or improved operation over the location of work volume and camera as present in Liebermann. For example, the work volume in '079 patent may be "**above**" the camera [and keyboard] ('079, 2:39-53, ref. 100, 101, 108, 109) or "below" the camera (*Id.*, FIG. 1, ref. 105, 106) but still above the keyboard. The '079 does not allege any improved or benefit in operation for locating the

work volume "above" the camera as recited, rather than locating the work volume "below" the

camera.

> A laptop (or other) computer keyboard based embodiment is shown in FIG. 1. In this case, a stereo pair of **cameras 100 and 101 located on each side of the keyboard are used**, desirably having cover windows 103 and 104 mounted flush with the keyboard surface 102. The cameras are preferably pointed obliquely inward at angles .PHI. toward the center of the desired work volume 170 above the keyboard. In the case of **cameras mounted at the rear of the keyboard** (toward the display screen), these cameras are also inclined to point toward the user at an angle as well.

'079, 2:39-48.

> Alternate camera locations may be used such as the **positions of cameras 105 and 106, on upper corners of screen housing 107 looking down at the top of the fingers (or hands, or objects in hand or in front of the cameras), or of cameras 108 and 109 shown.**

*Id*., 2:49-53, emphasis added.



*Id*., FIG. 1.

As further evidence by a related reference, Sako (US Pat. No. 5689575, 3:12-26, FIG. 1(b), "The

system 1 comprises a video camera 2 connected to an image processing device 3 controlling a

video screen 4. The device 3 is connected to a workstation 5 having processing circuits to assist

in decision-making in the system 1. The primary purpose of the system 1 is **to monitor**

**movement of facial parts and to provide information on the proximity of a person's**

**fingertips to facial parts**. These are important **aspects of sign language**. A sample screen

display 6 is shown in FIG. 1(a). FIG. 1(b) shows an **effective arrangement for the camera 2 whereby it is mounted on a frame 7 next to a light source 8 at a lower level than the subject's face and is directed upwardly in the direction of the line A. This ensures that the face is always in the field of view, even when the subject's head has been lowered**")

describes a method and apparatus for processing images that includes a light source, a camera and a work volume where the work volume is **above** the camera. A skilled artisan would understand that the location of a work volume in relation to a camera and/or a light source does not alter or modify the operation of the apparatus and method, in this case, for determining a gesture performed in the work volume and illuminated by the light source and/or detecting a gesture includes analyzing sequential images of the camera.

Challenge claims 24-28 and 30 recite same limitations as recited in challenge claims 4-9. Thus, where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts cited above regarding challenge claims 4-9 are relied on herein for challenge claims 24-28 and 30, the above facts show Liebermann describes "[t]he method according to claim 21 wherein detecting a gesture includes analyzing sequential images of the camera", "[t]he method according to claim 21 wherein the detected gesture includes at least one of a pinch gesture, a pointing gesture, and a grip gesture", "[t]he method according to claim 21 further including determining the pointing direction of one of the user's fingers using the first and second cameras", "[t]he method according to claim 21 further including providing a target positioned on the user that is viewable by the camera", "[t]he method according to claim 21 further including determining the three-dimensional position of a point on at least one of the user's hand and the user's fingers" and

"[t]he method according to claim 21 wherein the camera and the light source are positioned in fixed relation relative to a keypad." It is also noted regarding "using the first and second cameras" as recited in challenge claim 26, Liebermann describes using more than one camera (e.g., see, PA-1, 13:4-8; "It may be desirable to utilize **more than one camera** to allow the signing person "free" movement in his or her environment to track down spatial positions in that environment.").

**Claims 22 and 23 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No. 6,115,482, hereafter Sears**. The response to Appellant arguments below is incorporated herein. Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, where apparatus claims cover what a device is, not what a device does, lacking evidence to the contrary, facts cited above relied on herein regarding claims 1, 11 and 21 show Liebermann combined with Sako describes a computer implemented method and computer apparatus comprising recited elements including a camera, a light source as lamps, a keypad and a display (FIGS. 5a-5c, 6). However, to the extent an artisan interprets that Liebermann lacks wherein the light source includes "**a light emitting diode**" as recited in claim 22, and wherein the light source includes "**a plurality of light emitting diodes**" as recited in claim 23; in a related reference, Sears describes a gesture based method and apparatus including a camera oriented to observe a work volume wherein the light source includes "**a light emitting diode**", and wherein the light source includes "**a plurality of light emitting diodes**."

An optical-input print reading device with voice output for people with impaired or no vision in which **the user provides input to the system from hand gestures**. Images of the text to be read, on which the user performs **finger- and hand-based gestural commands**, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further **tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning**. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and

tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance**. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses.

PA-14, Abstract, emphasis added.

Optionally, the camera mount 37 may incorporate **one or more illumination sources**, so as **to provide constant illumination over the field of view**. In FIG. 1b, **such illumination is provided by two rows of illumination sources 45 along the lateral edges of the mount 37**. These **illumination sources 45 may comprise rows of LEDs**, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources. Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the **arrangement of illumination sources need not be in rows, as shown in FIG. 1b**, but may also comprise point sources or sources located in varied arrangements around the **camera 39**. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly.

*Id*., 5:13-35, emphasis added.



Fig. 1b

*Id*., FIG. 1b.

Sears is deemed as relevant prior art due to either being in the same field of endeavor or being reasonably pertinent to the particular problem with which the Applicant was faced. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992). The level of ordinary skill in the art is shown by the applied art herein. Since Liebermann, Sako and Sears each regard a method and apparatus for processing images captured in a work volume to include gestures, in consideration consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor

may prompt variations of it for use in either the same field or a different one based on design

incentives or other market forces if the variations are predictable to one of ordinary skill in the

art', in this case, it would have been obvious to an artisan to substitute one light source for the

other to provide a light source such as "**a light emitting diode**", and "**a plurality of light**

**emitting diodes**" so as **to direct illumination through a work volume, to ensure adequate**

**lighting of the user's hands, face and body** (PA-1, 5:52-58), and "**to provide constant**

**illumination over the field of view**" (PA-14, 5:13-35). Essentially, the recited light source in

challenge claims 22 and 23 fails to critically distinguish in this case over applied references for

same structure performing same function for same purpose.


**Claim 29 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over**

**U.S. Pat. No. 5982853, hereafter Liebermann, in view of U.S. Pat. No. 6,198,485, hereafter**

**Mack**. The response to Appellant arguments below is incorporated herein. Where the claim

terms of an expired patent are accorded their plain and ordinary meaning under the Phillips

standard, lacking evidence to the contrary, facts cited above relied on herein regarding claims 1,

11, 21 and 16 show Liebermann describes a computer implemented method and computer

apparatus comprising recited elements including a display (FIGS. 5a-5c, and 6). However, to the

extent an artisan interprets that Liebermann lacks "**a three-dimensional display**" as recited in

challenge claim 29; in a related reference Mack describes "a method and apparatus for

navigating 3-D worlds" that uses stereo imaging to capture the 3-D information of a marker on

the user hand." (Ex. PA-3, 2:19-22.) "The 3-D coordinates of the marker," which may include

the hand marker but also facial expressions, head movements, and eye movements, "are

computed using 3-D camera geometry." (*Id*., 2:22- 26.) Mack discloses that "[t]he computer 110

is loaded with a 3-D processing program such as 3-D animation, game, education, and

visualization." (*Id.*, 2:41-43.) The computer may connect to "one or more input/output (I/O)

devices such as display monitor 120, keyboard 130, mouse, and tablet digitizer," as well as

"input unit 150 for receiving 3-D information." (*Id.*, 2:45-50.) "The display monitor 120 displays

the 3-D graphic or image data as processed by the computer 110," while "[t]he input unit 150

provides a housing for the 3-D input system which provides a work area for the user hand 160."

(*Id*, 2:51-59.) The input unit 150 may include "a stereo camera system to determine the 3-D

coordinates of a marker manipulated by the user. (*Id.*, 2:58-62.) In addition, the marker, which

"can be conveniently worn on the user's finger," is illuminated by a light source and imaged by

the stereo cameras. (*Id.*, 2:67-3:2.) The two cameras can be any cameras "that can capture

images of a moving object in real-time," but they must be positioned so that the "stereo imaging

geometry allows the computation of the 3-D coordinates of the object." (*Id.*, 3:38-49.) Mack's

FIG. 1 is reproduced below and illustrates these components.



*Id.*, FIG. 1.

Further, Mack discloses that "[t]he display monitor 120 displays the 3-D graphic or image data

as processed by the computer 110," and "provides a means for user to navigate the 3-D world as

processed by the computer." (Ex. PA-3, 2:25-26, 2:51-52.) "The computer 110 is loaded with a

3-D processing program such as 3-D animation, game, education, and visualization" and may be

"based on a high performance microprocessor, such as any type of Intel® microprocessor

architecture." (*Id*., 2:41-45.) Mack notes that such "[t]hree-dimensional (3-D) graphic and

imaging systems" were well-known and popular, as were "[h]igh performance processors with 3-

D capabilities [that had] been developed for 3-D applications such as animation, visualization,

games, and education." (*Id*., 1:11-15.) Mack further discloses that the display monitor that

"displays the 3-D graphic or image data" may be "any monitor, including cathode ray tube

(CRT), a flat panel display, etc." (*Id*., 2:51-54.) By using these known 3-D graphics, processor,

and display components --all "commercially off-the-shelf hardware"-- Mack discloses a method

and apparatus "for navigation in 3-D world" by which a three-dimensional display may be

implemented to provide a "simple and efficient 3-D vision system." (*Id*., 6:63-67.) Liebermann

discloses that when a hearing person responds to the signing user's communication, the speech is

translated back to signs. (Ex. PA-1, 5:14-34.) "The sign images then appear on the screen of a

monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign

language motions which portray the content of the spoken language uttered as speech by the

normally hearing person." (*Id*., 5:30-34.)    Mack is deemed as relevant prior art due to either

being in the same field of endeavor or being reasonably pertinent to the particular problem with

which the Applicant was faced. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir.

1992). The level of ordinary skill in the art is shown by the applied art herein. Since

Liebermann, Sako and Mack each regard a method and apparatus for three dimensional input

entry, in consideration consistent with US Supreme Court decision in KSR that 'known work in

one field of endeavor may prompt variations of it for use in either the same field or a different

one based on design incentives or other market forces if the variations are predictable to one of

ordinary skill in the art', in this case, it would have been obvious to an artisan to substitute one

display for the other to provide a "**three-dimensional display**" as particularly recited in

challenged claim 16. Essentially, the recited display in challenge claim 29 fails to critically

distinguish in this case over display in applied references for same structure performing same

function for same purpose.


### (2) Response to Argument

On pages 6-15 of their Appeal Brief, Appellant argues in summary that the claimed

invention requires a "*same*" or "*only one*" computer while the applied primary reference (i.e.,

Liebermann, PA-1) relies on multiple computers in a distributed computer apparatus where the

Appellant asserts the light source, camera and processor are "contained within the same

computer apparatus," but the term "*same*" (or relatedly "*only one*") is not recited in claim 11.

The "computer apparatus" as recited in claim 11 is not limited to: 1) a "*same*" computer that

precludes multiple/different computers of a computer apparatus, and 2) the elements of a light

source, a camera and a processor being disposed within a "*same*" computer of a computer

apparatus as alleged by Appellant, as copied next.

> Claim 11 recites a "computer apparatus," not a system, with three claim elements (1.e., a
> specifically configured light source, camera, and processor). Claim 11 is consistent with
> the specification that describes the claimed components as being disposed within the
> same computer apparatus. See '079 Patent, 2:39-40 ("A laptop (or other) computer
> keyboard based embodiment is shown in FIG. 1") (emphasis added), 2:19-20 ("FIG. 2
> illustrates another keyboard embodiment using special datums or light sources such as
> LEDs."), 2:21-22 ("FIG. 3 illustrates a further finger detection system for laptop or other
> computer input."'), 2:28-31 (FIG. 6 illustrates an improved handheld computer
> embodiment of the invention ...."). Figure 1 of the '079 Patent is reproduced below:



079 Patent, Fig. 1 (annotated). As shown, for example, in Figure 1, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus.

Relatedly, on pages 10-11 of Appeal Brief, Appellant argues the claimed "compute apparatus" does not cover a distributed system, as copied next.

> One need look no further than the plain language of claim 11 to determine that the claim does not cover a physically distributed system. The preamble of claim 11 requires "a computer apparatus." That is why the claimed computer apparatus must include the claim elements that follow the preamble.

> The same holds true for the specification. In every disclosed embodiment of the °079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture, those components are located within the same computing device (e.g., laptop computer, handheld computer, etc.). See '079 Patent, 2:39-40 ("A laptop (or other) computer keyboard based embodiment is shown in FIG. 1") (emphasis added), 2:65-3:2 ("cameras such as 100/101 are used to simply look at the tip of a finger 201 (or thumb) of the user . . . central light 122 can be used to illuminate the finger") (emphasis added), 3:56-61 ("The cameras can also see one's fingers directly, to allow typing as now, but without the physical keys . . . This is useful for those applications where the keyboard of

conventional style is too big (e.g., the hand held computer of FIG. 6)') (emphasis added),
2:58-59 ('finger position data can be used to determine gestures') (emphasis added), Fig.
1, Fig. 6.

Each element of independent claim 11 includes the term "work volume." The '079 Patent
specification uses the term "work volume" in reference to Figure 1, which as discussed
above, discloses each element located in the same computing device (e.g., a laptop
computer, handheld computer, etc.). See '079 Patent, 2:39-40 ("A laptop (or other)
computer keyboard based embodiment is shown in FIG. 1"), 2:44-45 ("toward the center
of the desired work volume 170 above the keyboard") (emphasis added), 3:4-6
("illumination is directed or concentrated in an area where the finger is typically located
such as in work volume 170") (emphasis added), Fig. 1. Accordingly, after reading the
entire '079 Patent, a POSITA would interpret the "computer apparatus" in the preamble
of independent claim 11 as including all the recited components. The Examiner even
acknowledges that "an apparatus [claim] recites what a device is rather than what a
device does." Action, p. 58 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc*., 909 F.2d
1464, 1469 (Fed. Cir. 1990) (emphasis added)). Accordingly, independent claim 11
requires that the claimed "processor," "camera," and "light source" all be components of
the same computing device.

Relatedly, on pages 12-15 of Appeal Brief, Appellant similarly argues a *same* computer is

required by arguing: "[c]laim element 11[c] requires "'a processor adapted to determine the

gesture performed in the work volume and illuminated by the light source based on the camera

output' located in the same "computer apparatus" as the "camera" and "light source." But those

requirements of claim 11 are fundamentally different than the distributed architecture of

Liebermann", where Appellant further argues:

> The Examiner mapped Liebermann's "bottom most lamp" of the "public kiosk 42" to the
> claimed "light source," and mapped Liebermann's "camera 44" of the "public kiosk 42"
> to the claimed "camera." Action, pp. 59,63. But the Examiner mapped Liebermann's
> "central processing facility," which is located at a different physical location, executing
> "translation software, (1.e., artificial intelligence) to produce data representing numbers,
> words, and phrases which are then combined into coherent sentences" to the claimed
> "processor." Action pp. 65-67. That mapping is contrary to the requirements of claim
> element 11[c] because, as discussed above, the "processor" must belong to the same
> "computer apparatus" (1.e., same computing device) as the "camera" and "light source."
> Liebermann's "central processing facility" (i.e., the Examiner identified "processor") and
> Liebermann's "public kiosk 42" (having the Examiner identified "camera" and "light
> source") are different computing devices, located at different physical locations.
> Accordingly, Liebermann fails to disclose claim element 11[c], and thus does not
> anticipate independent claim 11.

In reply to Appellant argument that a *same* computer is required where a *same* computer includes a light source, a camera and a processor to determine a gesture, the examiner disagrees a *same* computer is required for the reasons stated above for claim 11 with the following also noted. The examiner maintains the facts relied on in rejection above show Liebermann discloses the recited computer apparatus comprising a "light source," a "camera," and a "processor" to determine a gesture based on the camera output where those components are located within a same computing apparatus in a distributed architecture such that the processor of computer of the Liebermann's kiosk and the processor of computer of the Liebermann's central processing facility or "Center" perform processing to determine a gesture for each "captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center)." Liebermann, 4:60-5:2. Accordingly, after "public kiosk 44" transforms the captured images to "identifiers" and transmits the "identifiers" to the "Center," the "rest of the processing is completed at the center. This includes identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content." *Id*. at 6:53-57. Where the processor of computer in Liebermann's kiosk operates in conjunction with processor of computer in distributed architecture in Liebermann's central processing facility or "Center" to determine a gesture such that after "public kiosk 44" processes/transforms the captured images to "identifiers" and transmits the "identifiers" to the "Center," the "rest of the processing is completed at the center. This includes identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content." *Id*. at 6:53-57. For instance, Liebermann uses the signing

motion images captured by Liebermann's camera that are converted into digital data by the

computer of the public kiosk, which then transmits that digital data over telephone lines to the

central processing facility and then processed by the translation software at the "central

processing facility" computer since *Liebermann* at 5:61-6:14 ("the deaf person is positioned so

that the **camera lens 10 will record the signing movement of the hands and fingers and body**

**and facial motions and expressions. The signing motions captured by the camera are**

**converted into digital data for processing by the translation software, (i.e., artificial**

**intelligence) to produce data representing numbers, words and phrases which are then**

**combined into coherent sentences**.") and at 6:36-38 ("FIGS. 9-12 are **schematics of the**

**system software modules for** <u>**converting signing to speech and speech to animation,**</u>

including system training methods.").

It is noted that the Appellant does not state where their allegedly required "*same*" or similar

phrase of "*only one*" is <u>recited in the preamble or anywhere else in the challenged claims</u>. The

Appellant does not state where the recited "computer apparatus" does not cover (i.e., excludes) a

distributed apparatus in '079 and the Appellant does not state where the three elements of a light

source, a camera and a processor are required to be disposed within a "*same*" computer is recited

in claim 11. Thus, Appellant is improperly importing a limitation "*same*" or relatedly "*only one*"

of <u>non-limiting</u> embodiments in '079 into the claim that is not recited in the challenged claims.

The examiner maintains the computer apparatus comprising a light source, a camera and a

processor as recited in challenge claim 11 includes so as to fail to preclude a distributed

computer apparatus for facts noted above in the copied final rejection relied on herein and

reasons next. For example, the preamble recites a "computer apparatus" that does not recite a

"*same*" (or similar "*only one*"), the preamble does not recite the claimed elements of a light

source, a camera and a processor as being only disposed within a "*same*" or "*only one*"

computer.  Contrary to Appellant remarks on pages 6-15, the "computer apparatus" of

challenged claim 11 includes so as to fail to preclude "different" or "multiple" computers in a

distributed architecture as a **computer apparatus** as present in Liebermann.  Further, Appellant

fails to direct attention within '079 that explicitly requires a *same* computer or *only one* computer

and fails to direct attention within '079 that explicitly precludes different/multiple computers in

their computer apparatus to support their contention of a *same* (or *only one*) computer.  At best,

Appellant directs attention (Brief, pp. 6-15) to <u>non-limiting examples</u> within '079 that do not

explicitly require a "*same*" or "*only one*" computer apparatus or the <u>non-limiting examples</u>

within '079 do not explicitly exclude multiple computers, such as in a distributed architecture of

a computer apparatus.  Relatedly, the specification and prosecution history of the '079 patent

includes no express definition or disavowal of claim scope that supports limiting the term

"computer" implemented method to require a *same* computer to perform the recited steps and the

'079 patent includes no express definition or disavowal of claim scope that supports limiting the

term "computer" apparatus to require a *same* or *only one* computer to dispose the three recited

elements (i.e., light, camera and processor) within.  There is no declaratory statement in the

record that "*only one*" computer performs recited steps of the method or "*only one*" computer

that disposes the recited structures within the apparatus such that there is no indication in the

record that precludes multiple computers functioning together to perform the recited steps of the

method and no indication in the record that precludes multiple computers including the recited

structures of the apparatus.  Therefore, in response to Appellant's argument that the references

fail to show certain features of appellant's invention, it is noted that the features upon which

Appellant relies (i.e., the "*same*" or "*only one*" computer, "disposed within the *same* computer

apparatus", "does not cover distributed architecture" or similar "excludes multiple computers")

are not recited in the rejected claim(s).  Although the claims are interpreted in light of the

specification, limitations from the specification are not read into the claims.  See *In re Van*

*Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).  In this case, Appellant is improperly

incorporating features of '079 into the claims that are not recited in the challenged claims of '079

where the Appellant cited portions of '079 regard non-limiting examples.  For instance, the term

"*same*" (or, *only one*) computer and disposed within a "*same*" computer apparatus are not recited

in the challenged claim 11 (also claims 1 and 16 as well) of '079.  Also, "*same*" and "*only one*

computer, "exclude" multiple or "exclude distributed architecture" are not stated in '079.

Instead, claim 11 of '079 requires a computer apparatus which Liebermann discloses for its

distributed architecture as a computer apparatus.  Liebermann's processor determines a gesture

"**based on** the camera output" as recited since the processor in computer apparatus of

Liebermann's Center relies on the captured images of the camera of the kiosk that are

transformed into identifiers by the processor of computer apparatus of kiosk which identifiers are

transmitted to the Center and relied on by the Center to determine the gesture so as to be "**based**

**on** the camera output" for facts noted above.


On pages 15-18, Appellant makes similar arguments for claim 1 as presented for claim 11

regarding that a "*same*" or "*only one*" computer is required, that the recited steps are performed

by a *same* computer apparatus rather than a distributed system and that "determining, using the

camera, the gesture" step is executed by a same computer that provides the light source and

camera.  For same facts and reasons relied on above for claim 11 is relied on herein for claim 1.

On pages 19 and 30-31 of their Appeal Brief, Appellant argues the following regarding

"determining the three-dimensional position of a point on a user" as recited in claims 8 and 28:

> But "enhancing spatial differences" does not necessarily mean "determining the three-dimensional position of a point on a user," as required by claim 8. The Examiner also contends that Liebermann's "method requires 'calculating centers of gravity for both hands,' which involves finding an 'FFT [fast Fourier transform] of paths of the hands' as well as performing an 'explicit path analysis' of the hands." Action, p. 53 (citing Liebermann, 4:31-32, FIG. 9). Notably, Liebermann does not characterize its calculation as "calculating centers of gravity for both hands." Putting that aside, Liebermann is silent regarding any of these analyses/calculations "determining the three-dimensional position of a point on a user," as required by claim 8. Performing a "path analysis" of hands does not necessarily implicate three-dimensions. For example, hands moving left to right follow a one- or two-dimensional path. Thus, Liebermann does not anticipate claim 8.

As a factual matter, contrary to Appellant opine, Liebermann characterizes its calculation as

"**calculating centers of gravity for both hands**" as shown in flowchart of FIG. 9, copied below,

that, in this case when taken as a whole, supports Liebermann performs "determining the three-

dimensional position of a point on a user," as required by claim 8 and 28 when taken in

consideration of Liebermann's use of special gloves to assist in "determining the three-

dimensional position of a point on a user." For facts noted above in rejection repeated next,

Liebermann's disclosed method requires "**calculating centers of gravity for both hands**,"

which involves finding an "**FFT [fast Fourier transform] of paths of the hands**" as well as

performing an "**explicit path analysis**" of the hands. (*Id*., 4:31-32, FIG. 9.) FIG. 9 discloses in

other portions of the conversion process that a "**2 hand FFT and their location**" are determined

by the static gesture manager, and a "**right hand FFT**" is determined by the spelling mode

manager. (*Id*., FIG. 9.) Knowledge of a POSITA would understand that calculating the center of

gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed

in Liebermann includes determining the position of a point on the user's hand, which is a "point

on a user." Also, the use of "**special gloves which allow discrimination of the hands from the**

**background for the image processing system**" and determining direction of a pointing finger

by a deaf person signing as described in Liebermann explicitly/necessarily includes coordinates

(i.e., three-dimensional position of a point of a user) of the hands and other body parts are

determined. (*Id.*, 13:22-23 (suggesting that "coordinates" of signs are determined), 7:44-9:27

(disclosing an algorithm for feature tracking, which detects the location of various parts of the

head, torso, arms, and legs).) Further, Liebermann describes using **three dimensional video**

**cameras** to "facilitate recognition of signing motions by enhancing spatial differences." (*Id.*,

13:29-31.)



*FIG. 9*

Liebermann discloses that because "[t]his task can be difficult because the frame grabber has to

capture the signed gesture against the ambient surroundings, other body parts of the signing

person, and clothes," it is advantageous to use "**special gloves which allow discrimination of**

**the hands from the background for the image processing system**." (*Id.*, 12:34-39.) FIGS. 13

and 14 illustrate "the benefit in using special gloves to enhance the ability of the system to

recognize important detail of the hand shapes during the actual gesturing of sign language." (*Id.*,

12:40-43, FIGS. 13-14.) Liebermann discloses an example where "the fingers of the right hand

can be distinctly green and the fingers of the left hand are distinctly blue," and each glove may

have "a third color (typically red) for left and right palm areas," which "allows hand shape and

finger details to be seen whenever the hand is closed vs. opened and when palm is disposed

toward the camera vs. palm away." (*Id.*, 12:46-52.) FIG. 13A illustrates a front view of these

gloves; while, FIG. 13B illustrates a back view of these gloves and each is reproduced below.



*FIG. 13A*



*FIG. 13B*

At least the system with use of special gloves on hands of person signing in Liebermann regards
a computer apparatus **further including providing a target positioned on a user that is
viewable in the work volume** since the "special gloves which allow discrimination of the hands
from the background for the image processing system."

At least the use of special gloves, "calculating centers of gravity for both hands," which involves

finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit

path analysis" of the hands, determining "2 hand FFT and their location" by the static gesture

manager, and a "right hand FFT" is determined by the spelling mode manager of Liebermann in

conjunction with use of three dimensional video cameras regards a computer implemented

method **further including determining the three-dimensional position of a point on a user** to

"facilitate recognition of signing motions by enhancing spatial differences." For at least these

facts, the examiner maintains Liebermann describes "determining the three-dimensional position

of a point on a user" as would be interpreted by an artisan (i.e., POSITA).


On page 20 of their Appeal Brief, Appellant argues that since Liebermann fails to anticipate

independent claims 1 and 11 that for claims 4-7, 9, 12, and 17-20 that depend from, and add

limitations to, independent claims 1 or 11, Liebermann also fails to anticipate dependent claims

4-7, 9, 12, and 17-20 for at least the same reasons as stated above for claims 1 and 11. The

examiner disagrees for same facts and reasons as stated above for claims 1 and 11 is relied on

herein for claims 4-7, 9, 12, and 17-20.


On pages 20-23 of their Appeal Brief, Appellant argues Sears is non-analogous art where

Appellant cites decision in *Donner Technology, LLC v. Pro Stage Gear*, LLC, 979 F.3d 1353,

1359 (Fed. Cir. 2020). On page 21, Appellant states "the '079 Patent is directed to computing

devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing

object or human positions and/or orientations." '079 Patent, 1:54-57, Fig. 1, Fig. 6. These

"human positions and/or orientations" include "gestures comprising a sequence of finger

movements," and may "allow [for] typing as now, but without the physical keys." *Id.*, 3:48-60,

10:23-25." So as to restate for clarity, the field of endeavor for '079 is a computer device or

computer method to optically sense object or human positions/orientations as a gesture.

Contrary to Appellant opine, the examiner maintains Sears is analogous/relevant prior art due to

either being in the same field of endeavor or being reasonably pertinent to the particular problem

with which the Applicant was faced. In this case, Sears (See Sears, Title, Abstract, 5:13-35, and

FIG. 1b, copied below) is within field of endeavor of '079 that in the case includes Sears device

to provide hand gestures that **tracks the location and movement of the hand and fingers in**

**order to interpret the gestural movements into their command meaning** where Sears uses a

camera and illumination source to track location and movement of a hand and fingers.

Relatedly, with regard to the Appellant cited Donner decision, the facts in this case do not align

with facts in *Donner* decision in that Sears in this case is not the same situation as Mullen in the

*Donner* decision since Mullen was determined to not be from same field of endeavor; while,

Sears is maintained to be within the same field of endeavor of a device that optically senses to

determine a gesture as the field of endeavor stated by Appellant. Sears is analogous art under at

least the first test. See *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011).

Voice-Output Reading System with **Gesture Based Navigation**. (Sears, Title, Emphasis added).

An **optical**-input print reading **device** with voice output for people with impaired or no vision in which the user **provides input to the system from hand gestures**. Images of the text to be read, on which **the user performs finger- and hand-based gestural commands, are input to a computer**, which decodes the text images into their symbolic meanings through optical character recognition, and **further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning**. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. **Multiple cameras of the same or different field of view can improve performance**. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses. (Sears, Abstract, Emphasis added).

Optionally, the **camera mount 37 may incorporate one or more illumination sources, so as to provide constant illumination over the field of view**. In FIG. 1b, such **illumination is provided by two rows of**

**illumination sources 45 along the lateral edges of the mount 37. These illumination sources 45 may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources.** Optionally, these illumination sources 45 may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material 33. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the arrangement of illumination sources need not be in rows, as shown in FIG. 1b, but may also comprise point sources or sources located in varied arrangements around the camera 39. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly. (Sears, 5:13-35, Emphasis added).

## Fig. 1b



Alternatively, under the second test, Sears is reasonably pertinent to the particular problem with which the inventor was faced <u>for the pertinent challenged claims at issue with respect to consideration of Sears</u> (Title, Abstract, 5:13-35, FIG. 1b) regards challenged claims 2, 3, 14 and 15 that recite *a light source includes a light emitting diode* or *a light source includes a plurality of light emitting diodes*. Thus, for same rationale in first action, Sears is maintained as relevant prior art herein since Sears is within inventors field of endeavor or, in the alternative, is reasonably pertinent to the particular problem with which the Applicant was faced which in this case of the pertinent challenged claims at issue is a light source includes a light emitting diode (LED) or a plurality of LEDs to illuminate a human body part within a work volume in a computer apparatus or in a computer implemented method with respect to consideration of Sears

for challenged claims 2, 3, 14 and 15 that recite a light source includes LEDs or a plurality of

LEDs. In this case, the facts in record show the features of challenged claims 2, 3, 14, and 15 are

obvious over the combination of Liebermann in view of Sears for simple substitution of a known

light source for another when taken as a whole at a time prior to the invention for what the

combination suggests to an artisan a computer implemented method comprising providing a light

source to direct illumination through a work volume or a computer apparatus comprising a light

source to illuminate a human body part within a work volume where the particular light source

being a LED or a plurality of LEDs fails to critically distinguish over the combination in this

case for facts herein. Especially when considered that it is known property (i.e., design incentive

consideration) that generally known that a LED provides more intense light more efficiently than

lamps. In this case, a light emitting diode (LED) provides more intense light and is more

efficient light source than lamps since a LED provides more intense visible light due to it emits

light in visible spectrum but do not emit in non-visible spectrum as compared to lamps that emit

light in both visible and non-visible spectrum such that lamps is less efficient than a LED (e.g.,

see Numazaki, PA-19, 14:44-56, "Also, a LED can be used as the light source, where the *LED*

*has a property that it can emit more intense light instantaneously when the DUTY ratio of the*

*lighting pulse is smaller* (that is, when the pulse interval is longer compared with a single pulse

width), so that it is possible to *utilize the lighting power efficiently*"). Emphasis added. Hence,

the property of LED of being a more intense and more efficient light source as a design incentive

would cause an artisan to substitute one light source of a LED or a plurality of LEDs as used in

Sears for another to produce the expected result of a computer implemented method comprising

providing a light source to direct illumination through a work volume or a computer apparatus

comprising a light source to illuminate a human body part within a work volume where the light

source includes a LED or a plurality of LEDs to provide more intense light more efficiently.

Further, with regard to the Appellant cited *Donner* decision with regard to the second test since the facts in this case do not align with facts in *Donner* decision in that Sears in this case is not the same situation as Mullen in the *Donner* decision since the purpose of or problem to be solved of a light source is a LED or a plurality of LEDs as recited by claims 2, 3, 14 and 15 in '079 is not so intertwined with the patents field of endeavor (i.e., above noted field of endeavor being "a computer device or computer method to optically sense object or human positions/orientations as a gesture"). The Supreme Court in *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 415-421, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham.* The key to supporting any rejection under 35 USC 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. See MPEP 2143. Contrary to Appellant remark regarding *Donner*, the *Donner* decision does not comport with fact pattern in *KSR. Donner* decision does not preclude simple substitution of one known element for another. In this case, in consideration consistent with US Supreme Court decision in *KSR* that 'known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art', it is maintained that it would have been obvious to an artisan to substitute one light source for the other to provide a light source such as "**a light emitting diode**", and "**a plurality of light emitting diodes**" so as **to direct illumination through a work volume, to ensure adequate lighting of the user's hands, face and body** (PA-1, 5:52-58), and "**to provide constant illumination over the field of view**" (PA-14, 5:13-35). Essentially, the recited light source in challenge claims 2, 3, 14 and 15 fails to

critically distinguish in this case over applied references for same structure performing same function for same purpose where the simple substitution of one light source such as a LED or a plurality of LEDs for another light source to yield the expected result of a computer implemented method providing a light source comprising providing a light source to direct illumination through a work volume or a computer apparatus comprising a light source to illuminate a human body part within a work volume where the particular light source being a LED or a plurality of LEDs, especially in light where Sears and Numazaki provide further evidence for an artisan to substitute one light source of a LED or a plurality of LEDs for the lamps in Liebermann to provide more intense illumination as a more efficient light source. Alternatively, since on page 22 of their Appeal Brief, Appellant concedes "light emitting diodes" and "a plurality of light emitting diodes" is a well-known light source (Brief, p 22, "These passages from Sears and the '079 Patent imply light emitting diodes were known.") that is further shown in evidence by Sears and Numazaki. Thus, in consideration consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art', in this case, it would have been obvious to an artisan to try a light emitting diode (LED) or a plurality of LEDs as a well-known light source as conceded by Appellant in their Brief and as further evidence by Sears and Numazaki to Liebermann's apparatus and method to provide more intense illumination and a more efficient light source.

Relatedly, on pages 23-28 of their Appeal Brief, Appellant argues the combination of Liebermann and Sears does not render claims 2-3 and 14-15 unpatentable since Liebermann does

not anticipate claims 1 or 11 and Sears does not cure the deficiency of Liebermann. The examiner disagrees based on facts/reasons discussed above for claims 1 and 11 relied on herein for claims 2-3 and 14-15. Also, Appellant argues on pages 24-28 there is no articulated reasoning to combine Sears teachings to Liebermann. The examiner disagrees since facts noted in rejection relied on herein and reiterated in response to arguments above included that a light emitting diode (LED) provides more intense light and is more efficient light source than lamps since a LED provides more intense visible light due to LED emits light in visible spectrum but not in the non-visible spectrum as compared to lamps that emit light in both visible and non-visible spectrum such that lamps is less efficient than a LED such that for same power of a LED and a lamp as a light source there is more intense illumination from LED since the illumination of LED is directed entirely to visible light, while a lamp is directed to both visible and non-visible so a lamp is less efficient and less intense (e.g., see Numazaki, PA-19, 14:44-56, "Also, a LED can be used as the light source, where the *LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller* (that is, when the pulse interval is longer compared with a single pulse width), so that it is possible to *utilize the lighting power efficiently*"). Emphasis added. Hence, the property of a LED of being a more intense and more efficient light source than a lamp as a design incentive would cause an artisan to substitute one light source of a LED or a plurality of LEDs as used in Sears for another to produce the expected result of a computer implemented method comprising providing a light source to direct illumination through a work volume or a computer apparatus comprising a light source to illuminate a human body part within a work volume, where the particular light source includes a LED or a plurality of LEDs to provide more intense light more efficiently as noted by Numazaki. Further, contrary to Appellant suggestion on pages 27-28 for claims 3 and 15, in this

case the simple substitution of one light source for another would regard a row of LEDs in Sears

for a row of lamps in Lieberman rather than the substitution of a row of LEDs in Sears for a

singular (bottom most) lamp in Liebermann.


On page 28 of their Appeal Brief, Appellant argues the combination of Liebermann and Mack

does not render claim 16 unpatentable regarding "the display includes a three-dimensional

display" since Liebermann does not anticipate claim 11 and Mack does not cure the deficiency of

Liebermann. The examiner disagrees based on facts/reasons discussed above for claims 1 and 11

relied on herein for claim 16.


On pages 29-30 of their Appeal Brief, Appellant argues the combination of Liebermann and

Sako does not render obvious claims 21, 24-28 and 30 since Liebermann does not anticipate

claims 1 or 11 and Sako does not cure the deficiency of Liebermann. As an initial matter,

Footnotes 2-4 on pages 29, 31 and 33 assert Sako was omitted in header of rejection, this is

incorrect since instead Sako is noted only as further evidence of the particular arrangement of

parts is known where Sako is not relied on in the rejection and thus is not cited in header of

rejection. In this case, the particular arrangement of parts recited in challenge claims is a known

arrangement of parts as noted in the rejection in final action which cites judicial decision, *In

re Japikse,* 181 F.2d 1019, 86 USPQ 70 (CCPA 1950), as basis that it was known to have been

obvious to an artisan to rearrange the location of parts when the change in location of its parts

(i.e., rearrangement) does not alter or modify the operation of its elements/parts. While, Sako is

cited in record only as further evidence in consideration of decision of *In re Japikse* to rearrange

the location of parts where Sako was cited only as *further evidence that the particular*

*arrangement of* recited work volume **above** the camera was a known arrangement prior to the

invention.   As part of the determination to rearrange parts under *In re Japikse*, in this case it is

deemed there is no change in operation of the camera, light source or work volume in this case

when the elements in Liebermann are rearranged to be "work volume above the camera" since,

lacking evidence to the contrary, the provided camera continues to observe a gesture in the work

volume, the provided light source continues to direct illumination through the work volume and

the method continues detecting, using the camera, a gesture performed by one of a user's fingers

and a user's hand in the work volume.   Appellant submitted no factual evidence or argument that

the operation of the light source and/or camera in the method and the light source, camera and

processor in the apparatus is altered or modified resultant to the change in location of the recited

parts. Thus, in this case, in consideration of judicial decision to be obvious to an artisan to

rearrange the location of parts based on legal precedent in judicial decision of *In re Japikse* with

further evidence of the particular arrangement of parts "work volume **above** the camera" is

shown to have been known prior to the invention by Sako, the computer implemented method of

claim 21 is obvious over Liebermann for rearranging the location of parts where in this instance

lacking evidence to the contrary, there is no change in the operation of its elements/parts.  The

examiner disagrees with Appellant assertion that claims 21, 24-28 and 30 are not obvious for

same facts/reasons discussed above for claims 1 and 11 that similarly apply to claims 21, 24-28

and 30 as discussed regarding *"same'* or *"only one"* computer is not recited in claims, the recited

steps are not recited to be performed by a *"same"* computer, the recited computer implemented

method includes and fails to preclude a distributed architecture, the "detecting, by the camera, a

gesture" step in claim 21 is not recited to be executed by a *same* computer that provides the light

source and the camera and the portions of '079 cited by Appellant discussing embodiments of

the disclosed invention are non-limiting examples where the Appellant is <u>improperly importing</u>

<u>disclosed elements into the claims</u> that are not recited in the challenged claims.  For same facts

and reasons relied on above for claim 1 and 11 is relied on herein for claim 21.

On pages 30-31 of their Appeal Brief, Appellant argues the combination of Liebermann and

Sako regarding "determining the three-dimensional position of a point on a user" as recited in

claim 28 does not render obvious claim 28 since Liebermann does not anticipate claims 1 or 11

and Sako does not cure the deficiency of Liebermann.  The examiner disagrees for same

reasons/facts discussed above for claims 1, 11 and 21 relied on herein and same reason regarding

claim 8 that also recites "determining the three-dimensional position of a point on a user."

On page 31 of their Appeal Brief, Appellant argues the combination of Liebermann and Sako

does not render obvious claims 24-27 and 30 since Liebermann does not anticipate claims 1 or

11 and Sako does not cure the deficiency of Liebermann.  The examiner disagrees with

Appellant assertion that claims 24-27 and 30 are not obvious for same facts/reasons discussed

above relied on herein.

On pages 31-32 of their Appeal Brief, Appellant argues the combination of Liebermann, Sako

and Sears does not render obvious claims 22 and 23 since Liebermann does not anticipate claims

1 or 11, Sako and Sears do not cure the deficiency of Liebermann and Sears is non-analogous art

as similarly argued by Appellant for claims 2, 3, 14 and 15 above.  The examiner disagrees for

same reasons/facts discussed above relied on herein.

On page 33 of their Appeal Brief, Appellant argues the combination of Liebermann, Sako and

Mack does not render obvious claim 29 regarding "providing a three-dimensional display

viewable by the user" since Liebermann and Sako do not render claims 21 obvious and Mack

does not cure the deficiency of Liebermann as similarly argued by Appellant for claims 1, 21 and

16 above. The examiner disagrees for reasons/facts above relied on herein for claim 29.

On pages 33-35 of their Appeal Brief, Appellant argues the "The USPTO Has No Jurisdiction

Over Expired Patents" as follows:

> In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter
> involving public rights—specifically, the grant of a public franchise." *Oil States Energy
> Servs., LLC v. Greene's Energy Grp.*, LLC, 138 S. Ct. 1365, 1373 (2018) (emphasis in
> original). "Specifically, patents are public franchises that the Government grants to the
> inventors of new and useful improvements." *Id*. (internal quotation marks omitted). The
> Court explained that "Congress [has] significant latitude to assign [the] adjudication of
> public rights to entities other than Article III courts." *Id*. at 1368. In exercising its
> "significant latitude," Congress grants public franchises "subject to the qualification that
> the PTO has the authority to reexamine—and perhaps cancel—a patent claim in an inter
> partes review." *Id*. at 1368, 1374 (internal quotation marks omitted). Accordingly, so
> long as the public franchise exists, the PTO may have jurisdiction to amend and cancel
> the claims of the patent (e.g., via ex parte reexamination).

> When a patent expires, however, the public franchise ceases to exist and the franchisee
> (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee
> may be entitled to collect damages from the public franchise that formerly existed
> through an infringement action in district court. But because the public franchise no
> longer exists, the USPTO has nothing in its authority to cancel or amend. Expiration
> removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of
> the Article III courts, which have exclusive authority to govern claims for damages. If
> this were not so, the USPTO would purport to have authority to retroactively modify a
> public franchise that no longer exists, in a setting where the expired public franchise does
> not enjoy any presumption of validity and in which amendment of claims is no longer
> permitted.

> The '079 Patent issued in October 2013 and expired in November 2019, long before the
> ex parte reexamination request was filed in November 2021. With the expiration of the
> 079 Patent in November 2019, the USPTO ceased to have jurisdiction over the '079
> Patent, and the order granting reexamination should be vacated as a result.

In summary, Appellant allege that since the patent under reexamination expired in November

2019, the USPTO ceased to have jurisdiction over the '079 Patent due to lacking authority

regarding the claims of their patent. Appellant is incorrect per MPEP 2211 as copied next

(emphasis added).

> Under 37 CFR 1.510(a), any person may, at any time **during the period of enforceability of a patent**, file a
> request for *ex parte* reexamination. This period was set by rule, since the Office considered that Congress could
> not have intended expending Office resources on deciding patent validity questions in patents which cannot be
> enforced. See *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 225 USPQ 243, 249 (Fed. Cir. 1985). The **period of
> enforceability is generally determined by adding 6 years to the date on which the patent expires** but the
> period may be extended if there is pending litigation.

In this case, the '079 Patent expired in November 2019 where, it continues within its period of

enforceability. Thus, contrary to Appellant opinion, it was within USPTO jurisdiction to

exercise their authority to grant the Order and then treat the merits of the claims of '079 Patent

under applicable statutes for applied art in the first non-final and final actions.

On page 36 of their Appeal Brief, Appellant argues the "No Substantial New Question (SNQ) of

Patentability Exists" and thus the reexamination should be vacated as follows:

> In the order dated December 20, 2021 ("Reexam Order") granting the request for ex parte
> reexamination of the '079 Patent, the Office asserted that Liebermann raised a SNQ of
> patentability because Liebermann appeared to teach all the claim elements, and these
> claim elements were missing from the art cited during the original prosecution. Reexam
> Order, pp. 16-17. Patent Owner disagrees. As discussed above, Liebermann does not
> teach at least claim elements 1[c], 11[c], and 21[c]. In other words, Liebermann does not
> provide the teachings that were missing from the art during the original prosecution of the
> '079 Patent. Thus, a reasonable examiner would not consider Liebermann to be important
> in deciding whether one or more claims of the '079 Patent are patentable, and
> Liebermann does not raise a SNQ of patentability. The order for ex parte reexamination
> should be vacated.

The examiner disagrees for reasons stated in the Order Grant decision mailed 12/20/2021 that

show a SNQP is raised by Liebermann relied on herein, stated above in response to arguments

and stated in rejections herein each incorporated herein that contrary to Appellant opinion, facts

show Liebermann describes the computer implemented method as recited in challenged claims 1

and 4-9, the computer apparatus as recited in challenged claim 11, 12 and 17-20 and is maintained as obvious to rearrange the location of parts of the computer implemented method recited in challenged claims 21, 24-28 and 30 per judicial decision in *In re Japikse* with additional support that the particular arrangement of *"work volume above the camera"* was a known prior to the invention as shown by Sako. Further based on response to arguments above and facts in rejections relied on herein, the combination of Liebermann in view of Sears renders the computer implemented method as recited in claims 2, 3, 22 and 23 and the computer apparatus as recited in claims 14 and 15 unpatentable when taken as a whole at a time prior to the invention for what the combination suggests to an artisan with consideration of additional evidence of known property of LEDs as stated by Numazaki. Also, based on response to arguments above and facts in rejections relied on herein, the combination of Liebermann in view of Mack renders the computer implemented method as recited in claim 29 and the computer apparatus as recited in claims 16 unpatentable when taken as a whole at a time prior to the invention for what the combination suggests to an artisan. Based on above noted facts as stated in response to arguments, in Order Decision and in rejection, it is maintained that the Order Grant Decision is proper for showing the SNQs noted therein with further facts in support thereof noted above and in rejections herein. Appellant improper interpretation of scope of their claimed invention and teachings of applied art does not provide evidence there is no SNQs raised by art shown in record.


        For the above reasons, it is believed that the rejections should be sustained.

Respectfully submitted,

/MARK SAGER/
Patent Reexamination Specialist, Art Unit 3992

Conferees:

/FRED O FERRIS III/
Reexamination Specialist, Art Unit 3992

/ALEXANDER J KOSOWSKI/
Supervisory Patent Examiner, Art Unit 3992

**Requirement to pay appeal forwarding fee.** In order to avoid dismissal of the instant appeal in

any application or ex parte reexamination proceeding, 37 CFR 41.45 requires payment of an

appeal forwarding fee within the time permitted by 37 CFR 41.45(a), unless appellant had timely

paid the fee for filing a brief required by 37 CFR 41.20(b) in effect on March 18, 2013.

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————————

*In re* Reexam of: U.S. Patent No. 8,553,079 (Control No. 90/014,900)

Filed: November 11, 2021

Appellant: Gesture Technology Partners, LLC

Art Group: 3992

Examiner: M. A. Sager

Title: More Useful Man Machine Interfaces and Applications

## <u>REPLY BRIEF UNDER 37 C.F.R. § 41.41</u>

Mail Stop Appeal Brief – Patents
Commission for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

# TABLE OF CONTENTS

I.    ARGUMENTS................................................................................1

    A.    *Liebermann* fails to anticipate independent claim 11......................1

    B.    *Liebermann* fails to anticipate independent claim 1.......................3

    C.    *Liebermann* fails to anticipate dependent claim 8. .........................3

    D.    *Sears* is non-analogous art...............................................................5

    E.    The combination of *Liebermann* and *Sears* does not render dependent claims 2, 3, 14, and 15 unpatentable. ................................. 8

    F.    The combination of *Liebermann* and *Sako* does not render independent claim 21 unpatentable. ........................................................ 10

II.    CONCLUSION ............................................................................ 11

i

Reexam of U.S. Patent No.: 8,553,079
Control No.: 90/014,900

# TABLE OF AUTHORITIES

### Cases

*Airbus S.A.S. v. Firepass Corp.*,
 941 F.3d 1374 (Fed. Cir. 2019) ...................................................................6

*Donner Technology, LLC v. Pro Stage Gear, LLC*,
 979 F.3d 1353 (Fed. Cir. 2020) ...................................................................7

*In re Bigio*,
 381 F.3d 1320 (Fed. Cir. 2004) ...................................................................8

*In re Van Geuns*,
 988 F.2d 1181 (Fed. Cir. 1993) ...................................................................2

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................1

*Storage Tech. Corp. v. Cisco Sys.*,
 329 F.3d 823 (Fed. Cir. 2003) .....................................................................3

*Verdegaal Bros. v. Union Oil Co. of California*,
 814 F.2d 628 (Fed. Cir. 1987) .....................................................................4

### Other Authorities

MPEP § 2141.01 .............................................................................................8

ii

## I.     ARGUMENTS

In the *ex parte* reexamination of U.S. Patent No. 8,553,079 ("'079 Patent"), Gesture Technology Partners, LLC ("Patent Owner") presents the following arguments in reply to the Examiner's Answer dated December 12, 2022 ("Answer").

### A.     *Liebermann* fails to anticipate independent claim 11.

The Examiner continues to assert that the proper interpretation of "computer apparatus" in the preamble of independent claim 11 includes multiple computing devices (e.g., *Liebermann's* "kiosk" and "central processing facility") connected by "normal telephone lines." *See* Answer, pp. 62-63. Patent Owner disagrees. Both Patent Owner and the Examiner agree, however, that the claims of the '079 Patent must be construed according to the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* Answer, p. 3 ("the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard") (emphasis added). The "'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321 (emphasis added). But the Examiner still presents zero evidence that a person of ordinary skill in the art ("POSITA"), after reading the entire '079 Patent, would understand the "computer apparatus" of independent claim 11 to mean multiple separate computing devices connected by telephone lines. The Examiner's lack of evidence is unsurprising considering in every disclosed embodiment of the

1

'079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture (i.e., the components of independent claim 11), those components are located within the same computing device (e.g., a laptop computer, a handheld computer). *See, e.g.,* '079 Patent, 2:39-40, 2:65-3:2, 3:56-61, Fig. 1, Fig. 6. Accordingly, after reading the entire '079 Patent, a POSITA would understand the "computer apparatus" in the preamble of claim 11 to mean a single computing device. This is how the claimed "computer apparatus" should be construed under the *Phillips* standard. With this proper claim construction, the distributed architecture of *Liebermann* fails to anticipate independent claim 11.

Further, the Examiner's reliance on *In re Van Geuns*, 988 F.2d 1181 (Fed. Cir. 1993) is misplaced. *See* Answer, p. 65. As a threshold matter, that case uses the "broadest reasonable interpretation" standard for claim construction, <u>not</u> the *Phillips* standard. *See In re Van Geuns*, 988 F.2d at 1184 ("In the patentability context, claims are to be given their broadest reasonable interpretations."). More importantly, in that case, the applicant attempted to narrow claim scope to a Nuclear Magnetic Resonance (NMR) or Magnetic Resonance Imaging (MRI) apparatus disclosed in the specification, even though the claim was not expressly limited to a NMR or MRI apparatus. *See id*. In other words, the patent applicant attempted to add a limitation to the claim.

2

In the present case, Patent Owner is <u>not</u> attempting to read limitations from the specification into the claims.  Instead, Patent Owner is relying on the specification of the '079 Patent to interpret the term "computer apparatus," which is expressly recited by independent claim 11.  As explained by the Federal Circuit, "interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation," only the later of which "is improper."  *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 831 (Fed. Cir. 2003) (cleaned up).  Accordingly, *In re Van Geuns* is inapposite to the present situation.

For these reasons, *Liebermann* fails to anticipate independent claim 11.

### B.     *Liebermann* **fails to anticipate independent claim 1.**

In the Answer, the Examiner states "[f]or same facts and reasons relied on above for claim 11 is relied on herein for claim 1."  Answer, p. 65.  As discussed above, *Liebermann* fails to anticipate independent claim 11.  Accordingly, *Liebermann* fails to anticipate claim 1 for at least the same reasons.

### C.     *Liebermann* **fails to anticipate dependent claim 8.**

Regarding the anticipation rejection of dependent claim 8, the Examiner states

the use of "<u>special gloves which allow discrimination</u> of the hands from the background for the image processing system" and <u>determining direction of a pointing finger by a deaf person signing</u> as described in Liebermann explicitly/necessarily includes coordinates (i.e., three-dimensional position of a point of a user) of the hands and other body parts are determined. (*Id*., 13:22-23 (<u>suggesting</u> that "coordinates" of signs are determined), 7:44-9:27

3

(disclosing an algorithm for feature tracking, which detects the location of various parts of the head, torso, arms, and legs).)

Answer, pp. 66-67 (emphasis added). The Examiner also states "[f]or at least these facts, the examiner maintains Liebermann describes 'determining the three-dimensional position of a point on a user' as would be <u>interpreted</u> by an artisan (i.e., POSITA)." Answer, p. 69 (emphasis added). The Examiner's position is flawed for multiple reasons.

First, and most important, the Examiner now admits that the Examiner must "interpret" *Liebermann* or rely on what *Liebermann* "suggests" to find anticipation. But anticipation requires express teachings, not "interpretation" or "suggestions." A claim "is anticipated only if each and every element as set forth in the claim is found, either <u>expressly or inherently described</u>, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) (emphasis added). Accordingly, *Liebermann* does not anticipate claim 8.

Next, although not entirely clear, the Examiner contends that (1) because *Liebermann* discloses the use of special gloves which allow for discrimination of the hands from the background in an image, or (2) because *Liebermann* determines the direction of a pointing finger by a deaf person signing, *Liebermann* explicitly/necessarily determines the three-dimensional position of a point of a user. Neither (1) nor (2) is true.

4

Regarding (1), each of the special gloves in *Liebermann* has a "different saturated color[]." *Liebermann*, 12:37-52. *Liebermann* uses "color separation" to easily identify each hand when the user is wearing the special gloves. *Id.* *Liebermann* is silent on the use of coordinates, much less three-dimensional coordinates, to distinguish the hands from the background when the user is wearing the special gloves. Accordingly, *Liebermann* does not disclose determining the three-dimensional position of a point of the user, as claim 8 requires.

Regarding (2), even if *Liebermann* determines the direction of a pointing finger by a deaf person signing, *Liebermann* is silent on that determination involving coordinates, much less three-dimension coordinates. In fact, *Liebermann* only discloses two-dimensional images of users with one or more pointed fingers. *See Liebermann*, Figs. 13A, 13B, 14A, 14B, 14C, 14D. Accordingly, *Liebermann* does not disclose determining the three-dimensional position of a point of the user, as claim 8 requires.

For these reasons, *Liebermann* does not anticipate claim 8.

**D.    *Sears* is non-analogous art.**

The Examiner contends that *Sears* "is within field of endeavor of '079 that in the case includes Sears device to provide hand gestures that tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning where Sears uses a camera and illumination source to track

location and movement of a hand and fingers." Answer, p. 70. The Examiner also

contends that *Sears* "is maintained to be within the same field of endeavor of a device

that optically senses to determine a gesture as the field of endeavor stated by

Appellant." *Id.* The Examiner-identified field of endeavor for *Sears* is difficult to

ascertain from those statements. It is clear, however, that "electronic reading

machines" are absent from the Examiner-identified field of endeavor for *Sears*. This

is improper. *Sears'* Title, Abstract, Technical Field section, Background Art section,

Summary of the Invention section, and independent claims all disclose or reference

electronic reading machines. *See Sears* at Title, Abstract, 1:23-29, 3:12-15, 4:12-

19, independent claims 1, 31, and 33. Accordingly, *Sears'* field of endeavor

necessarily includes electronic reading machines. *See Airbus S.A.S. v. Firepass

Corp.*, 941 F.3d 1374, 1380-81 (Fed. Cir. 2019) (the court finding the PTAB's

reliance on the title, specification, and claims of a prior art reference to determine

the reference's field of endeavor reasonable).

In contrast, Patent Owner maintains the '079 Patent is directed to computing

devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically

sensing object or human positions and/or orientations." '079 Patent, 1:54-57, Fig.

1, Fig. 6. These "human positions and/or orientations" include "gestures comprising

a sequence of finger movements," and "allow [for] typing as now, but without the

physical keys." *Id.*, 3:48-60, 10:23-25. In other words, the field of endeavor for the

'079 Patent is <u>not</u> electronic reading machines. Accordingly, *Sears* and the '079 Patent are <u>not</u> from the same field of endeavor, and *Sears* fails the first test for analogous art.

In regard to the second test for analogous art, the Examiner contends that *Sears* is "reasonably pertinent to the particular problem with which the Applicant was faced which in this case of the pertinent challenged claims at issue is a light source includes a light emitting diode (LED) or a plurality of LEDs to illuminate a human body part within a work volume in a computer apparatus or in a computer implemented method with respect to consideration of Sears for challenged claims 2, 3, 14 and 15 that recite a light source includes LEDs or a plurality of LEDs." Answer, pp. 71-72. Again, it is difficult to ascertain the Examiner-identified problem to which *Sears* relates from this statement. As discussed in the Appeal Brief dated October 31, 2022 ("Appeal Brief"), to the extent that the Examiner is alleging the problem to which *Sears* relates is the use of one or more LEDs for illumination, this cannot be correct in view of *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353 (Fed. Cir. 2020). *See* Appeal Brief, pp. 21-22.

The Examiner takes the remarkable position that "the *Donner* decision does not comport with fact pattern in *KSR*. *Donner* decision does not preclude simple substitution of one known element for another." Answer, p. 73. The Examiner is misguided. "In order for a reference to be <u>proper for use</u> in an obviousness rejection

under 35 U.S.C. 103, the reference must be analogous art to the claimed invention."

MPEP § 2141.01(a)(I) (citing *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004))

(emphasis added).  In other words, whether a cited reference is "analogous" to the

claimed subject matter (and thus qualifies as prior art under 35 U.S.C. § 103) is a

threshold inquiry.  Once it is determined that a reference is analogous art, <u>only then</u>

can the reference be relied upon to support an obviousness rejection, including an

obviousness rejection based on one or more of the rationales set forth in *KSR*.  Patent

Owner maintains that *Sears* also fails the second test for analogous art.  Accordingly,

*Sears* is non-analogous art and cannot be relied upon (i.e., does <u>not</u> qualify as prior

art) for any obviousness rejection.

**E.    The combination of *Liebermann* and *Sears* does not render dependent claims 2, 3, 14, and 15 unpatentable.**

Regarding claims 2, 3, 14, and 15, the Examiner asserts that

a light emitting diode (LED) provides more intense light and is more
efficient light source than lamps since a LED provides more intense
visible light due to <u>LED emits light in visible spectrum but not in the
non-visible spectrum</u> as compared to lamps that emit light in both
visible and non-visible spectrum such that lamps is less efficient than a
LED such that for same power of a LED and a lamp as a light source
there is more intense illumination from LED <u>since the illumination of
LED is directed entirely to visible light</u>, while a lamp is directed to both
visible and non-visible so a lamp is less efficient and less intense.

Answer, p. 75 (emphasis added).  This is simply not true.  The Examiner relies on

U.S. Patent No. 6,144,366 ("*Numazaki*") for support.  *See* Answer, p. 75.  But

*Numazaki* discloses "a LED for emitting lights with the wavelength in the <u>infrared</u> <u>range</u> can be used." *Numazaki*, 54:35-36 (emphasis added). In other words, contrary to the Examiner's contentions, the Examiner's cited evidence discloses LEDs can and do emit light in the non-visible spectrum (e.g., infrared). Accordingly, the Examiner's proposed motivation for the substitution is defective.

Further, the Examiner argues that "the property of a LED of being a more intense and more efficient light source than a lamp as a design incentive would cause an artisan to" execute the proposed substitution. Answer, p. 75. Again, the Examiner is unable to present any evidence that a LED in *Sears* is "more intense and more efficient" than a lamp in *Liebermann*. As noted by the Examiner, *Numazaki* discloses "the LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller . . . so that it is possible to <u>utilize the lighting power efficiently</u>." Answer, p. 75 (quoting *Numazaki*, 14:44-56) (emphasis added). But the Examiner fails to explain how this means the LED in *Sears* utilizes lighting power <u>more</u> efficiently than the lamp in *Liebermann*. Again, the Examiner's proposed motivation for the substitution is defective.

Regarding claims 3 and 15, the Examiner states "in this case the simple substitution of one light source for another would regard a row of LEDs in Sears for a row of lamps in Lieberman <u>rather than</u> the substitution of a row of LEDs in Sears for a singular (bottom most) lamp in Liebermann." Answer, pp. 75-76 (emphasis

9

added). This new clarification exposes additional flaws in the Examiner's proposed combination. Specifically, the Examiner mapped *Liebermann's* "bottom most lamp" of "public kiosk 42" to the claimed "light source." Answer, pp. 6, 28. To meet claims 3 and 15, the Examiner's proposed combination would need to, at a minimum, replace *Liebermann's* "bottom most lamp" (the Examiner-identified "light source") with multiple LEDs. Yet the Examiner concedes the proposed combination does not make this required replacement. Patent Owner asserts replacing a row of lamps with a row of LEDs is <u>not</u> the same as replacing a single lamp (i.e., *Liebermann's* bottom most lamp) with multiple LEDs. Accordingly, the Examiner's rejection is flawed and should be reversed.

### F. The combination of *Liebermann* and *Sako* does not render independent claim 21 unpatentable.

In the Answer, the Examiner states "[f]or same facts and reasons relied on above for claim 1 and 11 is relied on herein for claim 21." Answer, p. 78. As discussed above, the cited art fails to anticipate or render obvious independent claims 1 and 11. Accordingly, *Liebermann* fails to anticipate claim 1 for at least the same reasons.

10

Reexam of U.S. Patent No.: 8,553,079
Control No.: 90/014,900

## II.    CONCLUSION

For the aforementioned reasons, and all the reasons mentioned in the Appeal Brief, the cited art fails to anticipate or render obvious the claims under reexamination.

Dated: February 13, 2023                    Respectfully submitted,

                                            By: /Todd E. Landis/
                                            Todd E. Landis
                                            Registration No. 44,200
                                            Counsel for Patent Owner

11

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

*In re* Reexam of: U.S. Patent No. 8,553,079 (Control No. 90/014,900)

Appeal No.: 2023-001713

Reexam Request Filed: November 11, 2021

Appellant/Patent Owner: Gesture Technology Partners, LLC

Art Group: 3992

Examiner: M. A. Sager

Title: More Useful Man Machine Interfaces and Applications

## <u>PATENT OWNER'S NOTICE OF APPEAL<br>TO THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT</u>

Mail Stop *Ex Parte* Reexam
Commission for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite 125, #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Reexam of U.S. Patent No.: 8,553,079 (Control No.: 90/014,900)
Appeal No.: 2023-001713

Pursuant to 35 U.S.C. §§ 141 and 142 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Patent Trial and Appeal Board's "Decision on Appeal" dated August 8, 2023, in the *ex parte* reexamination of U.S. Patent No. 8,553,079 (Control No. 90/014,900; Appeal No. 2023-001713).

Patent Owner's issues on appeal include at least (i) the Board's affirmation of the Examiner's rejections under 35 U.S.C. §§ 102 and 103, (ii) the USPTO's jurisdiction over expired patents, (iii) the existence of a substantial new question of patentability, and (iv) any finding or determination supporting or related to the aforementioned issues, including claim constructions, that are adverse to Patent Owner.

Copies of Patent Owner's Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent and Trial Appeal Board, and the United States Court of Appeals for the Federal Circuit.

Dated: October 6, 2023　　　　　　　Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

1

Reexam of U.S. Patent No.: 8,553,079 (Control No.: 90/014,900)
Appeal No.: 2023-001713

## CERTIFICATE OF SERVICE

The undersigned certifies that, in addition to being electronically filed and served through EFS-Web, a true and correct copy of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express with the Director of the United States Patent and Trademark Office at the following address:

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
Post Office Box 1450
Alexandria, VA 22313-1450

The undersigned also certifies that a true and correct copy of this Notice of Appeal was filed electronically with the Clerk's Office of the United States Court of Appeals for the Federal Circuit, as well as sent via U.S.P.S. Priority Mail Express to the following address:

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

2

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036     7590     08/08/2023
Williams Simons & Landis PLLC/GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/08/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

———————————

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2
Technology Center 3900

———————————

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.


DECISION ON APPEAL

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology
Partners, LLC (Appellant)[1] appeals from the final rejection of claims 1–9,
11, 12, and 14–30.  Appeal Br. 6–33.  Patent claims 10 and 13 have been
confirmed by the Examiner, and thus are not at issue.  Final Act. 90.  We
have jurisdiction under 35 U.S.C. § 6(b).

We affirm.

———————————

[1] Appellant identifies the real party in interest as Gesture Technology
Partners, LLC.  Appeal Br. 1.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## CLAIMED SUBJECT MATTER

Claims 1–3, 8, and 11 are illustrative of the claimed subject matter (emphasis, formatting, and bracketed material added):

1. A computer implemented method comprising:

    [1.A.] providing a light source adapted to direct illumination through a work volume above the light source;

    [1.B.] providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

    [1.C.] determining, *using* the camera, the gesture performed in the work volume and illuminated by the light source.

2. The method according to claim 1 wherein the light source includes a light emitting diode.

3. The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

8. The method according to claim 1 further including determining the *three-dimensional position* of a point on a user.

11. A computer *apparatus* comprising:

    [11.A.] a light source adapted to illuminate a human body part within a work volume generally above the light source;

    [11.B.] a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

    [11.C.] a processor adapted to determine the gesture performed in the work volume and illuminated by the light source *based on* the camera output.

2

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## REFERENCES[2]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Sako | US 5,689,575 | Nov. 18, 1997 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Sears | US 6,115,482 | Sept. 5, 2000 |
| Mack | US 6,198,485 B1 | Mar. 6, 2001 |

## REJECTIONS[3]

### A.[4]

The Examiner rejects claims 1, 4–9, 11, 12, and 17–20, under 35 U.S.C. § 102 as being anticipated by Liebermann. Final Act. 34–76.

Appellant presents arguments for claims 1, 8, and 11. Appeal Br. 6–20. Appellant does not present separate arguments for claims 4–7, 9, 12, and 17–20. We select claim 1 as the representative claim for the § 102 rejection of claims 4–7 and 9; and we select claim 11 as the representative claim for the § 102 rejection of claims 12 and 17–20. Except for our ultimate decision, we do not address the merits of this § 102 rejection of claims 4–7, 9, 12, and 17–20 further herein.

---

[2] All citations herein are by the first named inventor.

[3] For simplicity herein, we refer to the Examiner's rejection under § 102(e) as a rejection under § 102; and we refer to the Examiner's rejections under § 103(a) as rejections under § 103.

[4] Although the heading for this rejection also lists claims 21, 24–28, and 30 (Final Act. 34), these claims are not discussed in the § 102 rejection that follows the heading. Instead, these claims are separately rejected under § 103 as discussed *infra*.

3

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## B.

The Examiner rejects claims 2, 3, 14, and 15 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sears. Final Act. 76–78.

Appellant presents separate arguments for claims 2 and 3. Appeal Br. 20–28. Appeal Br. 6–20. Appellant does not present separate arguments for claims 14 and 15. We select claim 2 as the representative claim for the § 103 rejection of claim 14; and we select claim 3 as the representative claim for the § 103 rejection of claim 15. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 14 and 15 further herein.

## C.

The Examiner rejects claim 16 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Mack. Final Act. 78–81.

To the extent that Appellant discusses this rejection of claim 16, Appellant merely references (or repeats) the argument directed to claim 11. Appeal Br. 28. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 16. Therefore, this rejection of claim 16 turns on our decision as to the rejection of claim 11. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 16 further herein.

4

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.

The Examiner rejects claims 21, 24–28, and 30 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sako.  Final Act. 81–85.

To the extent that Appellant discusses this rejection of claims 21, 24–28, and 30, Appellant merely references (or repeats) the arguments directed to claims 1, 8, and/or 11.  Appeal Br. 29–31.  Such a referenced (or repeated) argument is not an argument for "separate patentability."  Thus, Appellant does not present separate arguments for this rejection of claims 21, 24–28, and 30.  Therefore, this rejection of claims 21, 24–28, and 30 turns on our decision as to the rejection of claims 1, 8, and/or 11.  Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 21, 24–28, and 30 further herein.

### E.

The Examiner rejects claims 22 and 23 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Sears, and Sako. Final Act. 85–87.

To the extent that Appellant discusses this rejection of claims 22 and 23, Appellant merely references (or repeats) the arguments directed to claims 2 and/or 3.  Appeal Br. 32.  Such a referenced (or repeated) argument is not an argument for "separate patentability."  Thus, Appellant does not present separate arguments for this rejection of claims 22 and 23.  Therefore, this rejection of claims 22 and 23 turns on our decision as to the rejection of claims 2 and/or 3.  Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 22 and 23 further herein.

5

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## F.

The Examiner rejects claim 29 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Mack, and Sako. Final Act. 87–90.

To the extent that Appellant discusses this rejection of claim 29, Appellant merely references (or repeats) the argument directed to claim 21. Appeal Br. 33. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 29. Therefore, this rejection of claim 29 turns on our decision as to the rejection of claim 21. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 29 further herein.

## PRINCIPLES OF LAW – CLAIM CONSTRUCTION
### A.[5]

During examination of a patent application, a claim is given its broadest reasonable construction consistent with the specification. *In re Prater*, 415 F.2d 1393, 1404–1405 (CCPA 1969). However, "[w]hen a patent expires during a reexamination proceeding, the PTO should thereafter apply the *Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)] standard for claim construction." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016).

---

[5] The subject patent of this appeal expired on November 3, 2019 before the filing of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 34 (last two lines). The Examiner acknowledges "the [']079 Patent expired in November 2019." Final Act. 5; Ans. 80.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

### B.

"Claims must be read in view of the specification, of which they are a part." *Markman v. Westview Insts., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). However, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)).

### OPINION

We have reviewed the Examiner's rejections in light of Appellant's arguments (Appeal Brief) that the Examiner has erred. We disagree with Appellant's conclusions. Except as noted below, we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer in response to Appellant's Appeal Brief.

### A. Claim 11 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 11 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 6–15.

7

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.1. Claim 11 – First Argument

#### A.1.a. Claim 11 – First Argument – Appellant's Contentions

Appellant argues:

> One need look no further than the plain language of claim 11 to determine that the claim ***does not cover a physically distributed system***. The preamble of claim 11 requires "a computer apparatus." That is why the claimed computer apparatus must include the claim elements that follow the preamble.
>
> The same holds true for the specification. In every disclosed embodiment of the '079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture, those components are located within the ***same computing device*** (e.g., laptop computer, handheld computer, etc.).

Appeal Br. 10 (emphasis added).

> The Examiner even acknowledges that "<u>an apparatus</u> [claim] recites what <u>a device</u> is rather than what <u>a device</u> does." Action, p. 58 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis added)). Accordingly, independent claim 11 requires that the claimed "processor," "camera," and "light source" all be components of the same computing device.

Appeal Br. 11.

> Claim element 11[c] requires "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" located in the same "computer apparatus" as the "camera" and "light source." But those requirements of claim 11 are fundamentally different than the distributed architecture of *Liebermann.*

Appeal Br. 12.

> In the present case, Patent Owner is not attempting to read limitations from the specification into the claims. Instead, Patent Owner is relying on the specification of the '079 Patent to

8

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> interpret the term "computer apparatus," which is expressly recited by independent claim 11.

Reply Br. 3.

### A.1.b. Claim 11 – First Argument – Panel's Analysis

We are not persuaded by Appellant's argument. First, the term "apparatus" is not explicitly listed among the patent eligible subject matter in the statute. Rather, the term "machine" is listed.

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101.

> A machine is a "concrete thing, consisting of parts, or of certain devices and combination of devices." *Digitech* [*Image Techs., LLC v. Electronics for Imaging, Inc.*], 758 F.3d [1344,] 1348–49 [(Fed. Cir. 2014)] (quoting *Burr v. Duryee*, 68 U.S. 531, 570 . . . (1863)). This category "includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." [*In re*] *Nuijten*, 500 F.3d [1346,] 1355[ (Fed. Cir. 2007)] (quoting *Corning v. Burden*, 56 U.S. 252, 267 . . . (1854)).

MPEP § 2106.03 I. Thus, the case law construes the statutory term "machine" to include either a singular device or a combination of devices (e.g., a system). We see no distinction between a 'machine' (as in the statute) and an 'apparatus' (as claimed here). We therefore construe the claim term "apparatus" to include either a singular device or a combination of devices.

Second, we do not find where appellant cites either a reference (e.g., dictionary) or case law that actually requires Appellant's restrictive reading

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

of "apparatus." Rather, the general definition[6] of the term "apparatus" (a noun) is:

> 1. a collection of instruments, machines, tools, parts, or other equipment used for a particular purpose[.]
>
> 2. a machine having a specific function: *breathing apparatus.*

These definitions of "apparatus" include both a singular machine as well as a collection of machines. The definitions do not support Appellant's argument.

Third, our analysis of claim 11 finds nothing in the claim that precludes a distributed system. Although the particular same computer embodiment advocated by Appellant is well-supported in the Specification, and we do not read claim 11 to be so limited. Therefore, Appellant's narrow claim construction is improperly predicated on reading in a limitation from the Specification.

> "[L]imitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee[-]Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (emphasis and parallel citation omitted).

---

[6] Dictionary.com, https://www.dictionary.com/browse/apparatus. Definitions numbers 1 and 2. (Accessed July 28, 2023). Based on Collins English Dictionary - Complete & Unabridged 2012 Digital Edition © William Collins Sons & CO. LTD. 1979, 1986 © Harpercollins Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2. Claim 11 − Second Argument

A.2.a. Claim 11 − Second Argument – Appellant's Contentions

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:5 (emphasis added). The output of *Liebermann's* "camera 44" is one or more "images." But *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.* Thus, *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is ***not determining anything based on*** *Liebermann's* "images" (i.e., the Examiner identified "camera output"). Accordingly, *Liebermann* fails to disclose claim element 11[c].

Appeal Br. 14−15 (Appellant emphasis omitted; Panel emphasis added).

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2.b. Claim 11 – Second Argument – Panel's Analysis

We are not persuaded by Appellant's argument. As Appellant acknowledges, Liebermann's captured image is transformed into manageable identifiers and Liebermann's system executes (i.e., determines) its functions based on these identifiers. Since these identifiers are themselves based on the captured image, the executed functions are therefore also determined based on the captured image. Contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "based on" the captured image.

### B. Claim 1 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 1 under 35 U.S.C. § 102 as being anticipated.

### B.1. Claim 1 – First Argument

> Similar to independent claim 11, the fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann's **distributed system*** anticipates the claimed process, which is executed in a computer, not a distributed system. . . . As discussed above in reference to independent claim 11, in the '079 Patent, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus. Accordingly, the same computer must perform each step of independent claim 1.

Appeal Br. 15–16.

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.1.a. above for claim 11, and we reach the same result as in section A.1.b. above for claim 11.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## B.2. Claim 1 – Second Argument

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:[5] (emphasis added).  In other words, *Liebermann's* "central processing facility" executes its functions based on "identifiers," not the "images" themselves. *Id.*  That is because the "images" from *Liebermann's* "camera 44" are not transmitted to the "central processing facility." *Id.*  Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.*  Thus, *Liebermann's* "central processing facility" is ***not using** Liebermann's **"camera 44"*** (i.e., the Examiner identified "camera") ***to determine the gesture***.  This is contrary to the requirements of claim element 1[c].  Accordingly, *Liebermann* fails to disclose claim element 1[c].

Appeal Br. 18 (Appellant emphasis omitted; Panel emphasis added).

We are not persuaded by Appellant's argument.  Appellant repeats the same argument as in section A.2.a. above for claim 11, and we reach the same result as in section A.2.b. above for claim 11.  As above, contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "using" the captured image.

13

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### C. Claim 8 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 8 under 35 U.S.C. § 102 as being anticipated.

> The Examiner contends that Liebermann anticipates claim 8 because *Liebermann* "describes using three[-]dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'" Action, p. 53 (citing *Liebermann*, 13:29-31). But "enhancing spatial differences" does <u>not</u> necessarily mean "determining the three-dimensional position of a point on a user," as required by claim 8. The Examiner also contends that *Liebermann's*
>
> > method requires "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands.
>
> Action, p. 53 (citing *Liebermann*, 4:31-32, FIG. 9). Notably, *Liebermann **does not characterize*** its calculation as "calculating centers of gravity for both hands." Putting that aside, *Liebermann **is silent*** regarding any of these analyses/calculations "determining the <u>three-dimensional</u> position of a point on a user," as required by claim 8. Performing a "path analysis" of hands does not necessarily implicate three-dimensions. For example, hands moving left to right follow a one- or two-dimensional path. Thus, *Liebermann* does not anticipate claim 8.

Appeal Br. 19 (emphasis and formatting added).

> [T]he Examiner now admits that the Examiner must "interpret" *Liebermann* or rely on what *Liebermann* "suggests" to find anticipation. But anticipation requires express teachings, not "interpretation" or "suggestions."

Reply Br. 4.

14

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We are not persuaded by Appellant's arguments. First, contrary to Appellant's argument, Liebermann ***does*** characterize its calculation as "calculating centers of gravity for both hands" at Figure 9 on the left side at the fifth box down in the figure.

Second, although we agree with Appellant that the Examiner's discussion of Liebermann, column 13, lines 22–23, by using the term "suggesting" (Final Act. 53; Ans. 67) does not support the anticipation rejection of claim 8, we find this Examiner error to be harmless in light of the Examiner's remaining reasoning at pages 52–53 of the Final Action. We agree with the Examiner's remaining reasoning and adopt it as our own. The remaining reasoning is by itself sufficient to support the anticipation rejection of claim 8. Particularly, as the Examiner finds:

> "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the **spatial location of the hands relative to the rest of the body** (Stokoe's 'tab')." [Liebermann,] 10:59-64 (internal quotations added). . . . FIG. 9 discloses in other portions of the conversion process that a "**2 hand FFT and their location**" are determined by the static gesture manager[.] . . . [A] POSITA would understand that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed in Liebermann includes determining the position of a point on the user's hand, which is a "point on a user."

Final Act. 52–53.

Third, contrary to Appellant's argument, we find no error in the Examiner's use of the term "interpreted" at page 69 of the Answer because, in this context, it is a reasonable substitute for an alternative term such as "understood."

15

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D. Claims 2 and 3 – Section 103 – Liebermann and Sears

Claims 2 and 3 depend from claim 1 and further recite "the light source includes" either "a light emitting diode" (claim 2) or "a plurality of light emitting diodes" (claim 3). The Examiner concludes:

> [I]t would have been obvious to an artisan to **substitute** one light source for the other to provide a light source such as "a light emitting diode", and "a plurality of light emitting diodes" so as to direct illumination through a work volume, to ["]ensure adequate lighting of the user's hands, face and body["] ([Liebermann], 5:52-58), and "to provide constant illumination over the field of view" ([Sears], 5:13-35).

Final Act. 78 (Examiner's emphasis omitted; Panel emphasis added).

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 2 and 3 under 35 U.S.C. § 103 over the combination of Liebermann and Sears. Appeal Br. 20–28.

### D.1. Analogous Art

Appellant correctly states:

> A reference qualifies as prior art for an obviousness determination *only when it is analogous to the claimed invention*. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear*, LLC, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

Appeal Br. 20 (emphasis added).

16

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.1.a. Analogous Art – First Test

As to claims 2 and 3, Appellant argues:

> Regarding the first test for analogous art, *Sears* describes itself as relating to
>
>> an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.
>
> *Sears*, 1:23–29. In contrast, the '079 Patent is directed to computing devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing object or human positions and/or orientations." '079 Patent, 1:54–57, Fig. 1, Fig. 6. These "human positions and/or orientations" include "gestures comprising a sequence of finger movements," and may "allow [for] typing as now, but without the physical keys." *Id.*, 3:48–60, 10:23–25. Accordingly, *Sears* and the '079 Patent are <u>not</u> from the same field of endeavor, and Sears fails the first test for analogous art.

Appeal Br. 21 (formatting added).

> It is clear . . . that "electronic reading machines" are absent from the Examiner-identified field of endeavor for *Sears*. This is improper. *Sears'* Title, Abstract, Technical Field section, Background Art section, Summary of the Invention section, and independent claims all disclose or reference electronic reading machines. See *Sears* at Title, Abstract, 1:23–29, 3:12–15, 4:12–19, independent claims 1, 31, and 33. Accordingly, *Sears'* field of endeavor necessarily includes electronic reading machines.

Reply Br. 6.

We are not persuaded by Appellant's argument. Firstly, Appellant starts from the wrong perspective—the field of endeavor of Sears—and then

17

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

looking to see if the '079 Patent is in that field.  As Appellant notes in its
citation of the law, the focus of the first test is whether Sears is "within the
field of the inventor's endeavor," not the other way around.  Appeal Br. 20;
*see also In re Klein*, 647 F.3d at 1348 (citing *In re Bigio,* 381 F.3d 1320,
1325 (Fed.Cir.2004); *In re Clay,* 966 F.2d 656, 658 (Fed.Cir.1992)).  Thus,
even if Sears is focused on a subset of the field of endeavor of the '079
Patent, it can still be within the same field of the '079 Patent.

The '079 Patent states:

1. Field of the Invention

***The invention relates to simple input devices for
computers***, particularly, but not necessarily, intended for use
with 3-D graphically intensive activities, ***and operating by
optically sensing object or human positions and/or
orientations***.

'079 Patent, 1:53−57 (emphasis added).

Appellant too narrowly interprets Sears' field of endeavor to limit it to
be "an electronic reading system."  Appeal Br. 21.  Like the '079 Patent,
Sears points out that "[i]t is an object of the invention . . . ***to specify control
system parameters through manual gestures***."  Sears, 3:19−21. (emphasis
added).  Also, Sears' title states his invention's concern with "Gesture-Based
Navigation."  Further, Sears' states:

An optical-input print reading device with voice output for
people with impaired or no vision in which the user provides
input to the system from hand gestures.  Images of the text to be
read, on which the user performs finger- and hand-based gestural
commands, are input to a computer, which decodes the text
images into their symbolic meanings through optical character
recognition, and further tracks the location and movement of the
hand and fingers in order to interpret the gestural movements into
their command meaning.

18

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Sears, Abstract. Furthermore, Sears at column 4, lines 3−7, states, "[t]he method includes . . . determining a command signal from a sequence of user-generated spatial configurations of at least one pointer[.]" Also further, Sears claims:

> capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;
>
> determining a command signal from the temporal sequence of digital images;

Sears claim 1, 28:39−42.

Thus, consistent with the Examiner's findings (Ans. 69–70), we conclude that Sears is within the field of endeavor of the claimed invention and thus analogous art.

### D.1.b. Analogous Art – Second Test

Turning to the second test for analogous art, Appellant also argues as follows:

> When addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory (i.e., the second test for analogous art), the **problems** to which both relate must be identified and compared. *Donner*, 979 F.3d at 1359. The problem being solved cannot be one that the patent or prior art identifies as being known: "As the '023 patent readily discloses, guitar effects had already been mounted on a pedalboard[.] . . . Thus, that could not possibly be a **relevant purpose of the invention**." *Donner*, 979 F.3d at 1360 (emphasis added).
>
>     . . . .
>
> *Sears* discloses
>
>> [t]hese illumination sources 45 may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on

19

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> portable computers), or may be other sources
> including incandescent sources.

*Sears*, 5:16-20 (emphasis added). The '079 Patent discloses

> FIG. 2 illustrates another keyboard embodiment
> using special datums or <u>light sources such as LEDs</u>.

'079 Patent, 2:19-20 (emphasis added). These passages from *Sears* and the '079 Patent imply light emitting diodes were known. Further, considering these passages both use the acronym "LEDs" without first spelling it out only reinforces that light emitting diodes were well-known. Accordingly, in view of the *Donner* decision, the use of one or more LEDs for illumination ***cannot be the purpose*** of *Sears* or the '079 Patent ***with respect to the analogous-art analysis***.

Appeal Br. 21–22 (formatting and emphasis added).

We are not persuaded by Appellant's argument. Essentially, Appellant is arguing that "the use of one or more LEDs for illumination cannot be the purpose of Sears or the '079 Patent with respect to the analogous-art analysis" in this situation where claims 2 and 3 are directed to the purpose of using a "light source includ[ing] a light emitting diode(s)."

We determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved" because Appellant's claims define the particular problem of these dependent claims as selecting a light source. Even if we limit the inventor's particular problem to selecting a light source for a gesture-based environment, we still determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved."

Appellant's citation to *Donner* is inapposite. In that case, the Federal Circuit held that the Board defined the field of endeavor too "narrowly," not too broadly. *Donner*, 979 F.3d at 1360. The analysis of "[t]he problems to

20

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

which the claimed invention and reference at issue relate" "must be carried out from the vantage point of a PHOSITA who is considering turning to the teachings of references outside her field of endeavor" and therefore must not "rule out all such art" that is "outside her field of endeavor." *Id.* Contrary to Appellant's argument, the Federal Circuit held that "if the two references have 'pertinent similarities' such that [the prior art reference] is reasonably pertinent to one or more of the problems to which the [patent-in-suit] pertains, then [the prior art reference] is analogous art." *Id.* at 1361. Such is the case here with Sears.

Therefore, we again conclude that Sears is analogous art.

### D.2. Claim 2

As to claim 2, Appellant further argues "*Sears* does not cure the deficiencies of *Liebermann.*" Appeal Br. 23.

> According to the Examiner, an LED "provides <u>more</u> intense light and is [a] <u>more</u> efficient light source [than *Liebermann's*] lamps." Action, p. 19 (emphasis added). This serves as the motivation for the Examiner's **substitution**. *See* Action, pp. 18-21. But the Examiner provides no evidence that *Sears'* LEDs actually have these superior properties compared to *Liebermann's* lamps. . . . Accordingly, the Examiner's proposed motivation for the substitution is defective.
>
> . . . .
>
> In view of the above, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

21

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Appeal Br. 24–25 (emphasis added).

> *Numazaki* discloses "a LED for emitting lights with the wavelength in the <u>infrared range</u> can be used." *Numazaki*, 54:35-36 (emphasis added). In other words, contrary to the Examiner's contentions, the Examiner's cited evidence discloses LEDs can and do emit light in the non-visible spectrum (e.g., infrared). Accordingly, the Examiner's proposed motivation for the substitution is defective.

Reply Br. 9.

We are not persuaded by Appellant's arguments. First, Federal Circuit precedent "does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away." *PAR Pharma., Inc. v. TWi Pharma., Inc.*, 773 F.3d 1186, 1197–1198 (Fed. Cir. 2014).

Second, as discussed above, Sears teaches a known light source technique for a gesture-based environment.

> And if there's a known technique to address a known problem using "prior art elements according to their established functions," then there is a motivation to combine.

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023).

> [I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 550 U.S. at 417.

Third, although Numazaki is cited by the Examiner in the responses to Appellant's arguments, it is Sears that is relied upon in the rejection, and we find Sears sufficient for this rejection without any reliance on Numazaki.

22

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We conclude the Examiner has set forth a proper articulated reasoning
with a rational underpinning to support the legal conclusion of obviousness.

### D.3. Claim 3

As to claim 3, Appellant further argues "*Sears* does not cure the
deficiencies of *Liebermann.*" Appeal Br. 26.

> [T]he Examiner . . . fails to explain why a POSITA would
> replace the "bottom most lamp" of *Liebermann's* "public kiosk
> 42" with <u>multiple</u> LEDs, as required by claims 3 and 15. . . .
> Substituting the "bottom most lamp" of *Liebermann's* "public
> kiosk 42" with <u>multiple</u> LEDs, as proposed by the Examiner, is
> unnecessary and only increases the circuit complexity with little
> return.    Accordingly, the Examiner's *prima facie* case of
> obviousness is improper because it lacks articulated reasoning
> and rational underpinnings. *See KSR*[, 550 U.S. at 418].

Appeal Br. 27.

> Patent Owner asserts replacing a row of lamps with a row of
> LEDs is <u>not</u> the same as replacing a single lamp (i.e.,
> *Liebermann's* bottom most lamp) with multiple LEDs.

Reply Br. 10.

We are not persuaded by Appellant's argument.   First, for the reasons
already set forth above, we again conclude the Examiner has set forth a
proper articulated reasoning with a rational underpinning to support the legal
conclusion of obviousness.

Second, we conclude the premise of Appellant's argument is contrary
to our reviewing courts' guidance.   To the extent that Appellant argues an
artisan would not use Sears' LED teaching to "replac[e] a single lamp (i.e.,
*Liebermann's* bottom most lamp) with multiple LEDs" (Reply Br. 10),
Appellant is arguing that the artisan is an automaton capable of only rote
application of the teachings of the references and incapable of using plural

23

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

LEDs as set forth in the proposed combination. To the contrary, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. The Examiner here proposes a "simple substitution of one light source for another," i.e., "a row of lamps in Lieberman[n]" (such as seen in Figure 5C) with a "a row of LEDs in Sears." Ans. 76. Appellant limits this to "substituting the 'bottom most lamp' of Liebermann's 'public kiosk 42' with a <u>single</u> LED," i.e., rote replacement of a single LED for each lamp in Liebermann. Appeal Br. 27 (emphasis omitted). That is not a fair substitution, nor does it accurately reflect the Examiner's combination or the knowledge of a person of ordinary skill in the art, including how small the typical LED is. Regardless of whether each lamp in Liebermann is replaced by a single LED light bulb (i.e., *multiple* individual LEDs) or a row of LEDs with enough individual LEDs to achieve the same brightness as Liebermann's lamp, the combination of Liebermann and Sears renders this claim obvious.

### E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending that the Examiner erred in granting the reexamination request filed in November 2021 on a patent that expired in November 2019. Appeal Br. 34.

> In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights-specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id.* (internal quotation marks omitted). The Court explained that "Congress [has] significant

24

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> latitude to assign [the] adjudication of public rights to entities
> other than Article III courts." *Id.* at 1368[, 1373]. In exercising
> its "significant latitude," Congress grants public franchises
> "subject to the qualification that the PTO has the authority to
> reexamine and perhaps cancel–a patent claim in an inter partes
> review." *Id.* at 1368, 1374 (internal quotation marks omitted).
> Accordingly, so long as the public franchise exists, the PTO may
> have jurisdiction to amend and cancel the claims of the patent
> (e.g., via *ex parte* reexamination).

> When a patent expires, however, ***the public franchise
> ceases to exist*** and the franchisee (e.g., the patent owner) no
> longer has the right to exclude others. At most, the franchisee
> may be entitled to collect damages from the public franchise that
> formerly existed through an infringement action in district court.
> But because the public franchise no longer exists, ***the USPTO
> has nothing in its authority to cancel or amend***. Expiration
> removes the patent from the USPTO's jurisdiction and returns it
> to the sole jurisdiction of the Article III courts, which have
> exclusive authority to govern claims for damages. If this were
> not so, the USPTO would purport to have authority to
> retroactively modify a public franchise that no longer exists, in a
> setting where the expired public franchise does not enjoy any
> presumption of validity and in which amendment of claims is no
> longer permitted.

Appeal Br. 33–34 (emphasis added).

We are not persuaded by Appellant's argument. First, the statute
authorizing reexamination does not limit the timing of a reexamination in the
manner argued by Appellant. To the contrary, the statute states:

> Any person ***at any time*** may file a request for reexamination by
> the Office of any claim of a patent on the basis of any prior art
> cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added).

Second, we disagree that Appellant has no rights under the expired
patent.

25

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> It is well-established that [the Federal Circuit's] decision (and the Board's decision on remand) would have a consequence on any infringement that occurred during the life of the . . . patent. *See Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the patentee has fewer rights to transfer when the patent has expired," the owner of an expired patent can license the rights or transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an expired patent . . . includes more than merely the right to recover damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

Third, our reviewing court regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision. In none of these cases has the Federal Circuit found a lack of jurisdiction before the United States Patent and Trademark Office (USPTO). *See, e.g., In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an *inter partes* reexamination of expired U.S. patent 6,034,918)[7]; *see also CSB-Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the reexamination.").

We conclude the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent.

---

[7] The Board noted in a related *ex parte* reexamination appeal that "[t]he '918 patent term expired during the reexamination proceedings." *Ex parte Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12, 2011).

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

### F.1.

> As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c]. In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent. Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and *Liebermann* does not raise a SNQ of patentability. The order for *ex parte* reexamination should be vacated.

Appeal Br. 36.

We are not persuaded by Appellant's argument. For the reasons already set forth above in section A.1., we determine that Liebermann does provide the teachings that were missing from the art during the original prosecution of the '079 Patent, and thus, does raise a SNQ of patentability.

### CONCLUSIONS

The Examiner has not erred in rejecting claims 1, 4−9, 11, 12, and 17−20 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 2, 3, 14−16, and 21−30 as being unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejection of claims 1, 4−9, 11, 12, and 17−20 as being anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejections of claims 2, 3, 14−16, and 21−30 as being unpatentable under 35 U.S.C. § 103.

27

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1, 4–9, 11, 12, 17–20 | 102(e) | Liebermann | 1, 4–9, 11, 12, 17–20 | |
| 2, 3, 14, 15 | 103(a) | Liebermann, Sears | 2, 3, 14, 15 | |
| 16 | 103(a) | Liebermann, Mack | 16 | |
| 21, 24–28, 30 | 103(a) | Liebermann, Sako | 21, 24–28, 30 | |
| 22, 23 | 103(a) | Liebermann, Sears, Sako | 22, 23 | |
| 29 | 103(a) | Liebermann, Mack, Sako | 29 | |
| **Overall Outcome** | | | 1–9, 11, 12, 14–30 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

28

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX  78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

29

(e) the invention was described in (1) an application for patent, published under section 122(b), by
another filed in the United States before the invention by the applicant for patent or (2) a patent granted
on an application for patent by another filed in the United States before the invention by the applicant
for patent, except that an international application filed under the treaty defined in section 351(a) shall
have the effects for purposes of this subsection of an application filed in the United States only if the
international application designated the United States and was published under Article 21(2) of such
treaty in the English language.

10.     **Claims 1, 4-9, 11-12, 17-21, 24-28 and 30 are rejected under pre-AIA 35 U.S.C.
102(e) as being anticipated by U.S. Patent No. 5,982,853 to Liebermann (PA-1, hereafter
"*Liebermann*").**

Regarding claim 1, where the claim terms of an expired patent are accorded their plain
and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein
show Liebermann describes **a computer implemented method** as recited in challenge claim 1.

a.          **A computer implemented method comprising:**

For instance, Liebermann discloses a "portable transmitter/receiver," as shown in FIG. 6,
that is in the "form of a cellular telephone" (Ex. PA-1, 4:21-22, 5:62-63).   In particular,
Liebermann discloses that the cellular telephone includes hardware that works with the camera to
view and obtain images of hand gestures, performs related "initial processing," and populates a
phone display, among other things (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.)   Liebermann states
"computer processing requirements".   The Liebermann cellular phone also has a video camera,
an LCD display, a key pad, and "an antenna 18 for the device so that it may be transported and
communicate as a wireless remote or through a cellular telephone network." (*Id.*, 5:62-6:2.)
Through this wireless connection, the cellular phone works in conjunction with "a dedicated
central computer facility" to "provide a novel electronic communication system for use by deaf
persons to enable them to communicate by signing" as well as "a unique method utilizing such
an electronic communication system to enable communication by and to deaf persons." (*Id.*,
3:11-13, and 3:22-67, 5:62-6:14.)

A **portable transmitter/receive**r generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6 and it **contains a video camera**, the lens 10 of which is disposed in the upright portion 12. In the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions. Also seen is an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned **so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions.** The **signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences**.

PA-1, 5:62-6:10, emphasis added.

The other party may speak into a telephone receiver (not shown) and **the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14**.

*Id*., 6:15-18, emphasis added.

FIGS. 9-12 are schematics of the **system software modules for converting signing to speech and speech to animation, including system training methods**.

*Id*., 6:36-38, emphasis added.

Generally, **the deaf person uses sign language in front of a device containing a video camera**. The **images captured by the camera** at 20-30 frames/second are **processed by a digital device** which does initial and extended image processing. In the processing, each of the frames containing a **captured image undergoes a process whereby the image is transformed into manageable identifiers**. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). **These identifiers**, and not the images themselves, **are then correlated with a database of vocabulary and grammar by using artificial intelligence** at the Center. Subsequently, **syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications**.

*Id*.,4:60-5:13, emphasis added.

On the other end of the telephone line, **the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line** (in whatever method of transport is utilized by the telephone carrier) to the Center **where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation**. Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. **The sign images then appear on the screen of a monitor viewed by the deaf person**, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

*Id*., 5:14-34, emphasis added.

In view of **the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications** are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. 3 wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

*Id*., 5:35-47, emphasis added.

A POSITA would have understood that the Liebermann cellular telephone, kiosk and personal

computer systems (FIGS. 5A-5C and 6) as well as the call center each necessarily includes a

computer, processor or similar component for performing various disclosed computer/processor

implemented functions, including, but not limited to, controlling cameras, driving a display,

transmitting information, receiving information, video/image capture and processing,

calling/communication circuitry/processing, processing data, translating sign gesture(s) to

speech/audio and/or text, translating speech to sign gestures and/or text etc. (*Id.*, 5:62-6:47,

FIGS. 1, 8.) See MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of

ordinary skill in the art to describe a variety of devices with varying degrees of complexity and

capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994).

   a.  **providing a light source adapted to direct illumination through a work volume
       above the light source**

   Where the claim terms of an expired patent are accorded their plain and ordinary meaning

under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann

describes **providing a light source adapted to direct illumination through a work volume**

**above the light source**.

   For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a

personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer

unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand

level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a video monitor 46, and

**lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the

deaf person is positioned so that the camera lens 10 will record the signing movement of the

hands and fingers and body and facial motions and expressions. The signing motions captured by

the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods."). *Id.*, see FIGS. 6, 5A-5C, and 9 copied below. The recited "work volume" is the space in the point of view of Liebermann camera/lens that captures image of signing/gesture where in Liebermann lamps 48 direct illumination through a work space to ensure adequate lighting of user's hands, face and body. The "work volume" (work space) in Lieberman is above the lamps (light source) in FIG. 5C that is in camera field of view in so far as the bottom most lamp is below the work space where a user signs, by happenstance of use for a deaf person signing. Liebermann describes a method having a light source to illuminate a work volume above the light source of challenged claim 1.



FIG. 6



FIG. 5A

FIG. 5B

FIG. 5C

FIG. 9



*FIG. 10*



*FIG. 11*



*FIG. 12*

At least the apparatus/system in FIG. 5C of Liebermann provides a method **providing a**

**light source adapted to direct illumination through a work volume above the light source**

since the lamps 48 direct light to ensure adequate lighting of the user's hands, face and body.

    b.  **providing a camera oriented to observe a gesture performed in the work volume,**
        **the camera being fixed relative to the light source**

Where the claim terms of an expired patent are accorded their plain and ordinary meaning

under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann

describes a method comprising **providing a camera oriented to observe a gesture performed**

**in the work volume, the camera being fixed relative to the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a

personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer

unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand

level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and**

**lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("the

deaf person is positioned so that **the camera lens 10** will record the signing movement of the

hands and fingers and body and facial motions and expressions. The signing motions captured by

**the camera** are converted into digital data for processing by the translation software, (i.e.,

artificial intelligence) to produce data representing numbers, words and phrases which are then

combined into coherent sentences.") and at 6:36-38 ("FIGS. 9-12 are schematics of the system

software modules for converting signing to speech and speech to animation, including system

training methods."). see *Id*., FIGS. 5A-5C, 6 and 9-12 copied above.  Liebermann describes a

method providing a camera to observe a gesture performed in the work volume with the camera

fixed relative to the light source of challenged claim 1 where the recited gesture includes signing

such as American Sign Language (ASL) by a person in the work volume.

> It has now been found that the foregoing and related objects may be readily attained in an electronic
> communications system for the deaf comprising a **video apparatus for observing and digitizing the signing**
> **motions, and means for translating the digitized motions into words and phrases**. Also included are **means**
> **for outputting the words and phrases in a comprehensible form to another hearing person**, generally as
> artificial speech.
> In a telephone type system, the other person is at a remote location, although the system may also be used as a
> translator for communication with a person in the immediate vicinity. Generally, **the video apparatus is a video**
> **camera**.
> From cost and portability standpoints, the translating means is at a remote location or central station and there is
> included transmission means for transmitting the digitized signing motions or their digital identifiers to the
> translating means.
> In addition to use of a **database of words and phrases corresponding to digitized motions, the translating**
> **means also includes artificial intelligence for interpreting and converting the translated motions into**
> **words and phrases and into coherent sentences**.
> The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases
> in written form.
> To enable communication of the deaf person, the system includes means for the other or hearing person to
> transmit words and phrases. The **translating means is effective to translate said words and phrases into**
> **digitized signing motions**, and the video apparatus includes a display screen which provides an output of the
> digitized signing motions on the display screen for viewing by the deaf person.
> There is included **means for translating speech into digital data representing words and phrases and such**
> **digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to**
> **provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf**
> **person**. The video apparatus also includes a microphone and speaker whereby a deaf person may communicate
> with another person in the immediate vicinity.

PA-1, 3:26-67 (emphasis added).

> If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language Structure, Linstok Press (1978).
> ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring attention to detail.

*Id.*, 10:54-67.

At least the apparatus/system with camera 44 in FIG. 5C of Liebermann provides a method **providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source** since the camera 44 is directed toward the work volume to observe and capture gesture(s) where the lamps are directed to ensure adequate lighting of the user's hands, face and body, as stated by Liebermann.

    **c.  and determining, using the camera, the gesture performed in the work volume and illuminated by the light source**.

Where the claim terms of an expired patent are accorded their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary, facts herein show Liebermann describes a method comprising **determining, using the camera, the gesture performed in the work volume and illuminated by the light source**.

For instance, *Liebermann* at 5:52-58 ("In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, **a video camera 44**, a video monitor 46, **and lamps 48 to ensure adequate lighting of the user's hands, face and body**"), at 5:61-6:14 ("**the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions**

captured by the camera are converted into digital data for processing by the translation

software, (i.e., artificial intelligence) to produce data representing numbers, words and

phrases which are then combined into coherent sentences.") and at 6:36-38 ("**FIGS. 9-12 are**

**schematics of the system software modules for converting signing to speech and speech to**

**animation, including system training methods**."). see *Id*., FIGS. 5A-5C, 6 and 9-12 copied

above.

At least the video camera 44, and lamps 48 to ensure adequate lighting of the user's

hands, face and body with "processing by the translation software, (i.e., artificial intelligence) to

produce data representing numbers, words and phrases which are then combined into coherent

sentences" and "schematics of the system software modules for converting signing to speech and

speech to animation, including system training methods" of Liebermann regards a method

determining, using the camera, the gesture performed in the work volume and illuminated by the

light source since the camera 44 is directed toward the work volume to observe and capture

gesture(s) to ensure adequate lighting of the user's hands, face and body and for translating

means also includes artificial intelligence for interpreting and converting the translated motions

into words and phrases and into coherent sentences (*Id*., 3:26-67, 4:60-5:47, 5:52-6:14, 6:36-38,

FIGS. 5S-5C, 6, and 9-12, copied above).

 

 

d. **The method according to claim 1 wherein detecting a gesture includes analyzing**
   **sequential images of the camera**.

Regarding challenge claim 4, where the claim terms of an expired patent are accorded

their plain and ordinary meaning under the Phillips standard, lacking evidence to the contrary,

facts herein show Liebermann describes **a computer implemented method comprising**

**detecting a gesture includes analyzing sequential images of the camera**.

facts herein show Liebermann describes **a computer implemented method comprising further including determining the three-dimensional position of a point on a user**.

For instance, Liebermann discloses that the electronic communication method must determine the location or position of points on a user. Because "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the **spatial location of the hands relative to the rest of the body** (Stokoe's 'tab')." (Ex. PA-1, 10:59-64 (internal quotations added).) As shown in Liebermann, FIG. 9 (reproduced below with annotations added for emphasis), which displays "a schematic representation of the modules of the artificial intelligence for converting signing into speech," the disclosed method requires "**calculating centers of gravity for both hands**," which involves finding an "**FFT [fast Fourier transform] of paths of the hands**" as well as performing an "**explicit path analysis**" of the hands. (*Id.*, 4:31-32, FIG. 9.) FIG. 9 discloses in other portions of the conversion process that a "**2 hand FFT and their location**" are determined by the static gesture manager, and a "**right hand FFT**" is determined by the spelling mode manager. (*Id.*, FIG. 9.) Knowledge of a POSITA would understand that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed in Liebermann includes determining the position of a point on the user's hand, which is a "point on a user." Also, the use of "**special gloves which allow discrimination of the hands from the background for the image processing system**" and determining direction of a pointing finger by a deaf person signing as described in Liebermann explicitly/necessarily includes coordinates (i.e., three-dimensional position of a point of a user) of the hands and other body parts are determined. (*Id.*, 13:22-23 (suggesting that "coordinates" of signs are determined), 7:44-9:27 (disclosing an algorithm for

feature tracking, which detects the location of various parts of the head, torso, arms, and legs).)

Further, Liebermann describes using **three dimensional video cameras** to "facilitate recognition of signing motions by enhancing spatial differences." (*Id.*, 13:29-31.)



*FIG. 9*

At least the use of special gloves, "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands, determining "2 hand FFT and their location" by the static gesture manager, and a "right hand FFT" is determined by the spelling mode manager of Liebermann in conjunction with use of three dimensional video cameras regards a method **further including determining the three-dimensional position of a point on a user** to "facilitate recognition of signing motions by enhancing spatial differences."

    h.  **The method according to claim 1 further including determining the three-dimensional position of a point on a user**.

### Fig. 1b



*Id.*, FIG. 1b.

Sears is deemed as relevant prior art due to either being in the same field of endeavor or being reasonably pertinent to the particular problem with which the Applicant was faced.  See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992).  The level of ordinary skill in the art is shown by the applied art herein.  Since Liebermann and Sears each regard a method and apparatus for three dimensional input entry including gestures, in consideration consistent with US Supreme Court decision in KSR that 'known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art', in this case, it would have been obvious to an artisan to substitute one light source for the other to provide a light source such as "**a light emitting diode**", and "**a plurality of light emitting diodes**" so as **to direct illumination through a work volume**, **to ensure adequate lighting of the user's hands, face and body** (PA-1, 5:52-58), and "**to provide constant illumination over the field of view**"  (PA-14, 5:13-35).  Essentially, the recited light source in challenge claims 2, 3, 14 and 15 fails to critically distinguish in this case over applied references for same structure performing same function for same purpose.



US006144366A

# United States Patent [19]

**Numazaki et al.**

[11] **Patent Number:** 6,144,366

[45] **Date of Patent:** Nov. 7, 2000

[54] **METHOD AND APPARATUS FOR GENERATING INFORMATION INPUT USING REFLECTED LIGHT IMAGE OF TARGET OBJECT**

[75] Inventors: **Shunichi Numazaki; Miwako Doi**, both of Kanagawa; **Akira Morishita**, Tokyo; **Naoko Umeki; Hiroki Miura**, both of Kanagawa, all of Japan

[73] Assignee: **Kabushiki Kaisha Toshiba**, Kawasaki, Japan

[21] Appl. No.: **08/953,667**

[22] Filed: **Oct. 17, 1997**

[30] **Foreign Application Priority Data**

Oct. 18, 1996 [JP] Japan .................................. 8-275949
Jan. 31, 1997 [JP] Japan .................................. 9-019397
Feb. 12, 1997 [JP] Japan .................................. 9-027752

[51] Int. Cl.[7] .................................................. **G09G 5/08**
[52] U.S. Cl. .......................... **345/156**; 345/157; 345/158
[58] Field of Search .................................. 345/158, 157, 345/156, 419, 425; 463/31, 32, 33, 36, 37; 250/200, 206.1, 208.1, 214 R

[56] **References Cited**

U.S. PATENT DOCUMENTS

4,320,292  3/1982  Oikawa et al. ......................... 250/227
4,516,020  5/1985  Simpson et al. ................... 250/214 L
4,839,685  6/1989  Ishiguro et al. ..................... 354/403
4,841,349  6/1989  Nakano ................................. 357/30
4,956,794  9/1990  Zeevi et al. ........................ 364/559
5,243,182  9/1993  Murata et al. ...................... 250/222.1

5,297,061  3/1994  Dementhon et al. ................. 364/559
5,323,174  6/1994  Klapman et al. ..................... 345/156
5,353,042  10/1994  Klapman et al. .................... 345/156
5,423,554  6/1995  Davis .................................... 273/437
5,481,622  1/1996  Gerhardt et al. ..................... 382/103
5,627,565  5/1997  Morishita ............................. 345/158
5,686,942  11/1997  Ball .................................... 345/158
5,703,356  12/1997  Bidiville et al. .................... 250/221
5,729,475  3/1998  Romanik, Jr. ....................... 364/559
5,801,704  9/1998  Oohara et al. ...................... 345/358
5,819,206  10/1998  Horton et al. ...................... 702/150
5,900,863  5/1999  Numazaki ............................. 345/158

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Marthe Y. Marc-Coleman
*Attorney, Agent, or Firm*—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

[57] **ABSTRACT**

A method and an apparatus for generating information input which are capable of realizing a direct command type information input scheme by which the gesture or the motion can be inputted easily. The apparatus has a timing signal generation unit for generating a timing signal; a lighting unit for emitting a light whose intensity vary in time, according to the timing signal generated by the timing signal generation unit; and a reflected light extraction unit having a sensor array for detecting a reflected light from a target object resulting from the light emitted by the lighting unit, in synchronization with the timing signal generated by the timing signal generation unit, so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object.

**96 Claims, 101 Drawing Sheets**



# FIG.1



FIG.2

FIG.3



FIG.4

# FIG.5





FIG.6

# FIG.7



# FIG.8



210

211

212

# FIG.9





FIG.10

APPX0731

# FIG.11A



FINGER TIP MOVEMENT

CENTER OF GRAVITY MOVEMENT

(a)     (b)

# FIG.11B



FINGER TIP MOVEMENT

CENTER OF GRAVITY MOVEMENT

(c)     (d)

# FIG.12



CALCULATED
X-COORDINATE OF
CENTER OF GRAVITY
DOES NOT CHANGE

FINGER TIP
MOVEMENT

APPX0733

## FIG.13

PREPARE SEVERAL STRUCTURE ELEMENTS FOR STORING STICK SHAPED OBJECT CANDIDATES infoStick[n]

— 220

221

ANY PIXEL SEQUENCE HAVING NO MORE THAN c CONSECUTIVE PIXELS WITH PIXEL VALUES ABOVE p FOUND BY HORIZONTAL LINE SCAN ?

NO (ONE LINE FINISHED)

— 222

DELETE STICK SHAPED OBJECT CANDIDATE NOT UPDATED BY THIS ONE LINE

infoStick[n].status→NOSTICK

— 223

GO TO NEXT LINE

YES

224 —

IS IT CONNECTED WITH ANY OF STICK SHAPED OBJECT CANDIDATES UP TO PREVIOUS LINE?

YES

226 —

UPDATE DATA OF THAT CANDIDATE

infoStick[n].xstart[i]
→X-COORDINATE OF START OF PIXEL SEQUENCE

infoStick[n].xend[i]
→X-COORDINATE OF END OF PIXEL SEQUENCE

infoStick[n].length→+1
infoStick[n].status→EXTENDED

NO

225 —

227 —

REGISTER NEW STICK SHAPED OBJECT CANDIDATE

infoStick[n].xstart[0]
→X-COORDINATE OF START OF PIXEL SEQUENCE

infoStick[n].xend[0]
→X-COORDINATE OF END OF PIXEL SEQUENCE

infoStick[n].length→1
infoStick[n].status→EXTENDED

LENGTH OF UPDATED STICK SHAPED OBJECT REACHED PRESCRIBED LENGTH?

infoStick[n].length≧d

NO

YES

228 — (A)

# FIG.14



(A) ~ 229

CALCULATE TH
$TH=(sum/max)^2 \times max$
  sum:MEAN OF PIXEL VALUE SUMS PER LINE FOR
  1ST & 2ND LINES FROM TOP OF STICK SHAPED
  OBJECT (TOPMOST IS 0-TH LINE)
  max:MAXIMUM PIXEL VALUE IN 1ST & 2ND LINES
  ~ 230

OBTAIN k & a $(0<a\leqq1)$ THAT SATISFY:
$$TH= \sum_{i=0}^{k-1} xsum[i]+a \cdot xsum[k]$$
WHERE xsum[i] IS PIXEL VALUE SUM OF
PARTIAL PIXEL SEQUENCE FOR i-TH LINE
OF STICK SHAPED OBJECT
  ~ 231

MULTIPLY a WITH EACH PIXEL VALUE OF PARTIAL
PIXEL SEQUENCE FOR k-TH LINE
  ~ 232

OBTAIN CENTER OF GRAVITY (xx, yy)
$$yy=\left[\sum_{i=0}^{k} xsum[i](infoStick[n].ystart+i)\right]\Big/TH$$

$$xx=\left[\sum_{i=0}^{k} xpsum[i]\right]\Big/TH$$

$$xpsum[i]=\sum_{j=infoStick[n].xstart[i]}^{infoStick[n],xend[i]} j \cdot P(j,infoStick[n].ystart+i)$$
  ~ 233

APPX0735

# FIG.15

AFTER FINDING PARTIAL PIXEL IN y=3 LINE &
REGISTERING IT AS NEW STICK SHAPED OBJECT
CANDIDATE

236

infoStick[0].ystart=3
infoStick[0].xstart[0]=6
infoStick[0].xend[0]=6
infoStick[0].length=1
infoStick[0].status=EXTENDED

AFTER SCAN IS FINISHED UP TO y=4 LINE

237

infoStick[0].ystart=3
infoStick[0].xstart[0]=6
infoStick[0].xstart[1]=5
infoStick[0].xend[0]=6
infoStick[0].xend[1]=7
infoStick[0].length=2
infoStick[0].status=EXTENDED

AFTER PARTIAL PIXEL IN MIDDLE OF y=5 LINE IS
CONNECTED TO STICK SHAPED OBJECT CANDIDATE

235

238

infoStick[0].ystart=3
infoStick[0].xstart[0]=6
infoStick[0].xstart[1]=5
infoStick[0].xstart[2]=5
infoStick[0].xend[0]=6
infoStick[0].xend[1]=7
infoStick[0].xend[2]=7
infoStick[0].length=3
infoStick[0].status=EXTENDED

x  0 1 2 3 4 5 6 7 8 9 10 11

y  0
   1
   2
   3
   4
   5
   6
   7
   8
   9
  10
  11

234

infoStick[n].ystart
    Y-COORDINATE (LINE) AT WHICH
    STICK SHAPED OBJECT START

infoStick[n].xstart[i]
    START OF X-COORDINATE IN i-TH LINE
    FROM TOP OF STICK SHAPED OBJECT

infoStick[n].xend[i]
    END OF X-COORDINATE

infoStick[n].length
    CURRENT NUMBER OF LINES
    (LENGTH IN VERTICAL DIRECTION)

infoStick[n].status
    STICK:IT IS STICK SHAPED OBJECT CANDIDATE
    NOSTICK:IT IS NOT STICK SHAPED OBJECT CANDIDATE
    EXTENDED:IT IS UPDATED (EXTENDED) BY NEW LINE

# FIG.16

AFTER SCAN OF y=2 LINE IS FINISHED
infoStick[0].ystart=2
infoStick[0].xstart[0]=3
infoStick[0].xend[0]=3
infoStick[0].length=1
infoStick[0].status=EXTENDED

241

AFTER SCAN OF y=3 LINE IS FINISHED
infoStick[0].ystart=2
infoStick[0].xstart[0]=3
infoStick[0].xend[0]=3
infoStick[0].length=1
infoStick[0].status=NOSTICK

242

infoStick[1].ystart=3
infoStick[1].xstart[0]=6
infoStick[1].xend[0]=6
infoStick[1].length=1
infoStick[1].status=EXTENDED

243

239

x
0 1 2 3 4 5 6 7 8 9 10 11

y 0 1 2 3 4 5 6 7 8 9 10 11

240

# FIG.17



# FIG.18





FIG.19



APPX0741



FIG.21



FIG.22



FIG.23



FIG.24

# FIG.25



# FIG.26

SHAPE INTERPRETATION RULES FOR POINTING

```
RULE -1:ONE RECTANGLE→POINTING
RULE -2:TWO RECTANGLES→TWO FINGER OPERATION
RULE -3:OTHERS→MOTION INPUT
              .
              .
              .

POINTING RULE
 VERTICAL & HORIZONTAL CHECK
  VERTICAL/HORIZONTAL≈1→OBJECT SELECT/MOVE FORWARD
  VERTICAL/HORIZONTAL<1→SLOPE CHECK-1
  VERTICAL/HORIZONTAL>1→SLOPE CHECK-2
 SLOPE CHECK-1
  SLOPE≈0 & CENTER OF GRAVITY RIGHT→ROTATION TO RIGHT
  SLOPE≈0 & CENTER OF GRAVITY LEFT→ROTATION TO LEFT
              .
              .
              .

 SLOPE CHECK-2
  SLOPE≈0 & CENTER OF GRAVITY UPPER→TURNING UPWARD
  SLOPE≈0 & CENTER OF GRAVITY LOWER
                              →TURNING DOWNWARD
              .
              .
              .
```





FIG.28

# FIG.29

SHAPE  INTERPRETATION  RULES  FOR  POWER  ON/OFF

RULE -1:ONE RECTANGLE→POINTING
RULE -2:TWO RECTANGLES→TWO FINGERS
RULE -3:FIVE RECTANGLES→FIVE FINGERS
.
.
.
POINTING RULE
   AREA CHECK
     AREA>> $\alpha$ →FIST
     AREA≦ $\alpha$ →NULL
.
.
COMMAND GENERATION
  FIVE FINGERS, FIST, TWO FINGERS→POWER OFF
  TWO FINGERS, FIST, FIVE FINGERS→POWER ON

# FIG.30



FIG.31



b)VIEWPOINT-2



a)VIEWPOINT-1



c)VIEWPOINT-3



FIG.32

# FIG.33

SHAPE INTERPRETATION RULES FOR
MOVING OBJECT PARALLAX

RULE -1:TWO RECTANGLES→FACE CHECK
RULE -2:OTHERS→NULL

FACE CHECK
  DISTANCE TO LARGER RECTANGLE>DISTANCE TO SMALLER
  RECTANGLE→VIEWPOINT CHECK
  OTHERS→NULL
VIEWPOINT CHECK
  L≠0→VIEWPOINT DIRECTION=arcsin((L-R)/L)
  L=0→VIEWPOINT DIRECTION=-90°



FIG.34

# FIG.35

342 — COMPARISON POSITION MEMORY UNIT

343 — IMAGE CHANGE EXTRACTION UNIT

MOTION VECTOR
(SWINGING RANGE)
(SPEED)
(ANGLE)

DISTANCE MATRIX

RANGE IMAGE MEMORY UNIT

331

LIGHT INTENSITY

TIMING

# FIG.36



# FIG.37



$$v=[(Xn,Yn)-(Xn-1,Yn-1)]/M\cdot 30$$

# FIG.38



SWINGING RANGE(Xn-Xn-1)/M·30

SPEED(Yn-Yn-1)/M·30

# FIG.39



# FIG.40



# FIG.41



SWINGING
ANGLE  $\alpha$



FIG.42



FIG.43



FIG.44



FIG.45

# FIG.46





FIG.47

# FIG.48

ORIGINAL
IMAGE

MASK









EXTRACTED
IMAGE

FIG.49





FIG.50

# FIG.51

BACKGROUND IMAGE          EXTRACTED IMAGE





COMPOSED IMAGE



FIG.52



FIG.53

# FIG.54



REFLECTED LIGHT EXTRACTION UNIT — 102

REFLECTED LIGHT

RANGE IMAGE MEMORY UNIT — 331

REFLECTION MATRIX

VISIBLE LIGHT PHOTO-DETECTION ARRAY — 351

VISIBLE LIGHT INTENSITY

IMAGE MEMORY UNIT — 352

IMAGE DATA

EXTRACTION UNIT — 353

IMAGE DATA+ Z-VALUES

Z-VALUE IMAGE MEMORY UNIT — 361

DRAWING UNIT — 362



FIG.55

# FIG.56



a)

b)

c)

# FIG.57





FIG.58

# FIG.59



# FIG.60



# FIG.61



# FIG.62



# FIG.63



# FIG.64

| INPUT \ COORDINATE | 0 | 1 | 2 | | 4094 | 4095 |
|---|---|---|---|---|---|---|
| 0 | 255 | 255 | 255 | | 255 | 255 |
| 1 | 255 | 255 | 255 | | 255 | 255 |
| 2 | 255 | 255 | 255 | | 255 | 255 |
| 3 | 255 | 255 | 255 | | 255 | 255 |
| 4 | 255 | 255 | 255 | | 255 | 255 |
| 5 | 255 | 255 | 255 | | 255 | 255 |
| 6 | 255 | 255 | 255 | | 255 | 255 |
| 7 | 255 | 255 | 255 | | 255 | 255 |
| 8 | 255 | 255 | 255 | | 255 | 255 |
| | | | | | | |
| 99 | 39 | 37 | 40 | | 38 | 39 |
| 100 | 38 | 36 | 39 | | 37 | 38 |
| 101 | 38 | 36 | 39 | | 37 | 38 |
| 102 | 37 | 35 | 38 | | 36 | 37 |
| 103 | 37 | 35 | 38 | | 36 | 37 |
| 104 | 36 | 34 | 37 | | 35 | 36 |
| 105 | 36 | 34 | 37 | | 35 | 36 |
| 106 | 35 | 33 | 36 | | 34 | 35 |
| 107 | 35 | 33 | 36 | | 34 | 35 |
| 108 | 34 | 32 | 35 | | 34 | 34 |
| 109 | 34 | 32 | 35 | | 33 | 34 |
| | | | | | | |
| 247 | 1 | 0 | 2 | | 1 | 1 |
| 248 | 1 | 0 | 2 | | 1 | 1 |
| 249 | 1 | 0 | 2 | | 1 | 1 |
| 250 | 1 | 0 | 2 | | 1 | 1 |
| 251 | 1 | 0 | 2 | | 0 | 1 |
| 252 | 0 | 0 | 1 | | 0 | 0 |
| 253 | 0 | 0 | 1 | | 0 | 0 |
| 254 | 0 | 0 | 1 | | 0 | 0 |
| 255 | 0 | 0 | 1 | | 0 | 0 |

# FIG.65



# FIG.66

| INPUT ＼ COORDINATE | 0 | 1 | 2 | | 4094 | 4095 |
|---|---|---|---|---|---|---|
| 0 | 255 | 255 | 255 | | 255 | 255 |
| 8 | 296 | 290 | 293 | | 298 | 296 |
| 16 | 191 | 187 | 188 | | 193 | 191 |
| 24 | 144 | 141 | 141 | | 146 | 144 |
| 32 | 116 | 114 | 113 | | 118 | 116 |
| 40 | 97 | 95 | 94 | | 99 | 97 |
| 48 | 83 | 82 | 80 | | 85 | 83 |
| 56 | 72 | 71 | 69 | | 74 | 72 |
| 64 | 64 | 62 | 61 | | 66 | 64 |
| 72 | 56 | 55 | 53 | | 58 | 56 |
| 80 | 50 | 49 | 47 | | 52 | 50 |
| 88 | 45 | 44 | 42 | | 47 | 45 |
| 96 | 40 | 39 | 37 | | 42 | 40 |
| 104 | 36 | 35 | 33 | | 38 | 36 |
| 112 | 32 | 32 | 29 | | 34 | 32 |
| 120 | 29 | 29 | 26 | | 31 | 29 |
| 128 | 26 | 26 | 23 | | 28 | 26 |
| 136 | 24 | 23 | 21 | | 26 | 24 |
| 144 | 21 | 21 | 18 | | 23 | 21 |
| 152 | 19 | 18 | 16 | | 21 | 19 |
| 160 | 17 | 16 | 14 | | 19 | 17 |
| 168 | 15 | 15 | 12 | | 17 | 15 |
| 176 | 13 | 13 | 10 | | 15 | 13 |
| 184 | 11 | 11 | 8 | | 13 | 11 |
| 192 | 10 | 10 | 7 | | 12 | 10 |
| 200 | 8 | 8 | 5 | | 10 | 8 |
| 208 | 7 | 7 | 4 | | 9 | 7 |
| 216 | 6 | 5 | 3 | | 8 | 6 |
| 224 | 4 | 4 | 1 | | 6 | 4 |
| 232 | 3 | 3 | 0 | | 5 | 3 |
| 240 | 2 | 2 | 0 | | 4 | 2 |
| 248 | 1 | 1 | 0 | | 3 | 1 |
| 255 | 0 | 0 | 0 | | 2 | 0 |

# FIG.67



# FIG.68



# FIG.69



# FIG.70



# FIG.71



PLEASE PLACE  THE REFERENCE
PLATE  AT  DISTANCE  OF  20cm.

CORRECTION DATA PRODUCTION

CANCEL

# FIG.72



# FIG.73



# FIG.74



# FIG.75



# FIG.76





FIG.77

# FIG.78



# FIG.79





FIG.80



FIG.81



FIG.82

ONE FRAME

(a)EXTERNAL LIGHT LEVEL

(b)INTOLERABLE EXTERNAL LIGHT STATE

INTOLERABLE    t1    INTOLERABLE    t2

(c)LIGHTING PULSE

(d)STORING OPERATION

R 1 R 2    R 1 R 2

# FIG.83





FIG.84

# FIG.85

FIG.86

(a)EXTERNAL LIGHT LEVEL

(b)EXTERNAL LIGHT SIGNALS CONVERTED INTO PULSES

(c)LIGHTING PULSE

(d)STORING OPERATION

R　1　R　2

FIG.87

(a)EXTERNAL LIGHT LEVEL

(b)EXTERNAL LIGHT SIGNALS CONVERTED INTO PULSES

(c)LIGHTING PULSE

(d)STORING OPERATION



FIG.88



# FIG.90



# FIG.91



# FIG.92A



# FIG.92B



# FIG.93A



L1      L2                    TIME

# FIG.93B



L11                    L12          TIME



FIG.94

FIG.95



FIG.96

DISTANCE TO HAND VS. OUTPUT VOLTAGE

# FIG.97





FIG.98



FIG.99

(a) "STATE-1"
[a-1]LIGHTING PULSE
[a-2]STORING OPERATION

(b) "STATE-2"
[b-1]LIGHTING PULSE
[b-2]STORING OPERATION

(c) "STATE-3"
[c-1]LIGHTING PULSE
[c-2]STORING OPERATION



FIG.100

(a) "STATE-1"
[a-1]LIGHTING PULSE
[a-2]STORING OPERATION

(b) "STATE-2"
[b-1]LIGHTING PULSE
[b-2]STORING OPERATION

(c) "STATE-3"
[c-1]LIGHTING PULSE
[c-2]STORING OPERATION



FIG.101

## FIG.102



## FIG.103



Case: 24-1037    Document: 23    Page: 601    Filed: 06/25/2024

# FIG.104



# FIG.105
## PRIOR ART



6,144,366

1

## METHOD AND APPARATUS FOR GENERATING INFORMATION INPUT USING REFLECTED LIGHT IMAGE OF TARGET OBJECT

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a method and an apparatus for generating information input in which input information is extracted by obtaining a reflected light image of a target object.

2. Description of the Background Art

There are various input devices for computers, and among them, a mouse is widely used as one of the most popular input devices along with a keyboard. However, the mouse can only carry out manipulations such as a moving of a cursor and a selection from a menu, so that the mouse is only capable of playing a role of a two-dimensional pointing device at best. In other words, the mouse can only handle two-dimensional information, and it is difficult to select a thing with a depth aspect such as an object in a three-dimensional space. Also, in a case of producing the animation by using a computer, for example, it is difficult to give a natural motion to a character by means of manipulation information input operations using the input device like mouse.

Also, in the multi-modal field, there is a demand for a scheme that enables to handle a device in a form close to a natural human communication by inputting manipulation information such as a gesture like a hand action or a body motion and a posture, as a complement to the input information given by the input means such as speech input, keyboard, mouse, track ball, etc.

For this reason, in recent years, the three-dimensional pointing device for enabling the recognition of natural human gestures has been developed as one technique for enabling a variety of input operations in the multi-modal field and others by compensating the difficulties associated with the pointing in the three-dimensional space.

For example, there is a proposition of a three-dimensional pointing device as shown in FIG. 105. This device has a ball shaped operation portion in a middle of its body, and ten keys arranged at a peripheral portion. This device has six degrees of freedom corresponding to six different ways for operating the ball shaped operation portion, that is, pushing a front part of it, pushing a central part of it, pushing a rear part of it, pulling it upward, rotating it to the right, and rotating it to the left.

By assigning appropriate roles to these six degrees of freedom, it is possible to control a position (x, y, z) and an orientation (x-axis, y-axis, z-axis) of a cursor in the three-dimensional space, or a position (x, y, z) and an orientation (x-axis, y-axis, z-axis) of a viewpoint with respect to the three-dimensional space.

However, this three-dimensional pointing device requires a considerable level of skills so that when this device is actually operated it is quite difficult to control a cursor or a viewpoint exactly as desired. For example, when one tries to rotate the ball to the left or right, a front part or a rear part of the ball can be pushed at the same time unintentionally, such that a cursor is moved or a viewpoint is shifted to a totally unexpected direction.

As oppose to such a three-dimensional pointing device, there are also input devices that use a hand action or a body motion, known by the names such as a data glove, a data

2

suit, and a cyber-glove. Among them, the data glove is a glove shaped device which has optical fibers on its surface. These optical fibers are provided up to finger joints so as to utilize a change of a light conduction due to a bending of a finger. By measuring an amount of light conduction, it is made possible to determine how much each finger joint is bent. A position of a hand itself in the three-dimensional space is measured by a magnetic sensor provided on the back of the hand.

As a result, when a command corresponding to a specific hand action is determined in advance, such as a pointing by an index finger indicates a forward move, for example, it is possible to realize an operation (called a walk-through) using the data glove that simulates a motion of walking about while variously changing a viewpoint within the three-dimensional space.

However, such a three-dimensional pointing device is associated with the following problems.

First of all, it is very expensive and therefore not suitable for home use.

Secondly, the recognition error is inevitable as an angle of the finger joint is to be measured. For example, suppose that a state of extending only the index finger while the other fingers are turned in is defined as a forward move command. Here, even when the index finger is extended it is rather unlikely for an angle of the second joint of the index finger to become exactly 180°, so that unless a margin is provided, it would be impossible to recognize this state except when the finger is completely extended.

Thirdly, the operator is required to wear the data glove so that a natural movement can be obstructed, and also it is necessary to calibrate the light conduction state in a state of opening the hand and a state of closing the hand every time the data glove is worn, so that it is not very convenient to use. Moreover, because of the use of the optical fibers, a problem like a broken fiber occurs during the continuous use so that it is very much an article of consumption.

In addition, despite of the fact that it is a very expensive and not easily handlable device, unless the size of the glove perfectly fits, it is difficult to recognize sophisticated hand actions because the light conduction state tends to deviate from the calibrated state during the use.

Because of such numerous problems associated with it, the data glove has not become as popular as originally expected despite of the fact that it was a device that triggered the VR (Virtual Reality) technology, and there is no significant reduction of its price so that there are many problems related to its convenience in use.

For this reason, there are some attempts which try to input a hand action or a body motion without requiring the operator to wear a special device such as the data glove. For example, there is a technique for recognizing a shape of the hand by analyzing dynamic images such as video images. However, to this end, there is a need to develop a technique for extracting a target image from the background image. Namely, in a case of recognizing a hand action, it is necessary to extract the hand alone, but this has turned out to be a technically rather difficult thing to do.

For example, consider a case of extracting a hand portion in an image according to the color information. Since the hand is in the flesh color, it is possible to contemplate a scheme for extracting only those pixel portions that have the flesh color as image information. However, it is impossible to distinguish pixels corresponding to the flesh color of the hand portion alone if beige clothes or walls are present in the background. Also, even if it is made possible to distinguish

6,144,366

3

the beige and the flesh color by some adjustments, the color tone will be changed when the lighting is changed, so that it is still difficult to extract the hand portion stably.

In order to resolve these problems, there is a measure for imposing a limitation on the background image such as the placing of a blue mat on the background so as to make the extraction easy. There is also a measure to paint the finger tips with a color that can be easily extracted from the background, or wear a ring in such a color. However, these limitations are not realistic so that they are utilized for experiments but not for practical use.

On the other hand, as another available technique for recognizing the hand action, it is possible to utilize a device for inputting range images called range finder. Typically, the range finder is based on the principle that a spot light or a slit light is irradiated onto a target object and then a distance is determined by the principle of the triangular survey according to a position at which the reflected light is received. This spot light or slit light is mechanically scanned in order to obtain the two-dimensional distance information.

This range finder is capable of generating the range image in very high precision, but the device requires a very large scale configuration and a high cost. Also, the input is very time-consuming and it is difficult to carry out the real time processing.

There are also devices, some of which are already in practical use, for capturing a shape or a motion of the hand or the body by attaching color markers or light emitting elements to the hand or a part of the body, and detecting these color markers or light emitting elements by using the image.

However, the requirement for mounting some element at every occasion of its operation is a great demerit from a viewpoint of the convenience of the user, and can limit its application range significantly. Moreover, as can be seen in the example of the data glove, a device that requires to mount some element on the movable part such as hand tends to have a problem of the durability.

Now, setting aside the input devices as described above, the conventional art of the camera technique will be described.

In the conventional camera technique, in order to realize the chromakey, that is, a character composition with respect to the background, it has been necessary to take an image of the character with the blue back in advance so as to make it easier to extract the character. For this reason, the location for taking images has been limited to a place like studio where it is possible to take images with the blue back. Else, in order to extract the character from the video image taken without using the blue back, it has been necessary to manually edit the character extraction range scene by scene, which is very time-consuming.

Similarly, in a case of generating the character in the three-dimensional space, the conventional camera technique uses a scheme in which a three-dimensional model is produced in advance and then the texture mapping for attaching a picture of the character thereto is carried out. However, the three-dimensional model production and the texture mapping require considerable time and effort so that this scheme has been almost impractical except for some special case where the great expense is permitted such as the movie production.

As described, conventionally, there has been no input device of a direct command type by which the gesture or the motion can be inputted easily. In particular, there has been no device by which the pointing or the viewpoint change in

4

the three-dimensional space can be carried out easily. Also, it has been impossible to give a natural motion to the animation character by using the gesture or the motion of a user directly. In addition, in the conventional camera technique, it has not been possible to extract a specific character alone or input the depth information on the character easily.

SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide to provide a method and an apparatus for generating information input which are capable of realizing a direct command type information input scheme by which the gesture or the motion can be inputted easily.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of realizing an information input scheme by which the pointing or the viewpoint change in the three-dimensional space can be carried out easily.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of realizing an information input scheme by which it is possible to give a natural motion to the animation character by using the gesture or the motion of a user directly.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of realizing an information input scheme by which a specific character alone can be extracted and the depth information on the character can be inputted easily.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of extracting a specific target object at high precision easily even under an environment incorporating the external light fluctuation.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of extracting an image of a target object in an optimum state even when a distance with respect to the target object is changing.

According to one aspect of the present invention there is provided an information input generation apparatus, comprising: a timing signal generation unit for generating a timing signal; a lighting unit for emitting a light whose intensity vary in time, according to the timing signal generated by the timing signal generation unit; and a reflected light extraction unit having a sensor array for detecting a reflected light from a target object resulting from the light emitted by the lighting unit, in synchronization with the timing signal generated by the timing signal generation unit, so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object.

According to another aspect of the present invention there is provided a method of information input generation, comprising the steps of: (a) generating a timing signal; (b) emitting a light whose intensity vary in time at a lighting unit, according to the timing signal generated by the step (a); and (c) detecting a reflected light from a target object resulting from the light emitted by the step (b), in synchronization with the timing signal generated by the step (a), so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object, at a reflected light extraction unit.

6,144,366

5

Other features and advantages of the present invention will become apparent from the following description taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic block diagram showing an exemplary configuration of an information input generation apparatus according to the first embodiment of the present invention.

FIG. 2 is a detailed block diagram of the information input generation apparatus of FIG. 1.

FIG. 3 is a block diagram showing an exemplary configuration of a reflected light extraction unit in the information input generation apparatus of FIG. 1.

FIG. 4 is a block diagram showing an exemplary configuration of a unit photo-detector cell in the reflected light extraction unit of FIG. 3.

FIG. 5 is a timing chart for control signals used in the information input generation apparatus of FIG. 1.

FIG. 6 is a diagram showing an exemplary reflected light image used in the second embodiment of the present invention.

FIG. 7 is a diagram for explaining a finger tip position extraction operation in the second embodiment of the present invention.

FIG. 8 is another diagram for explaining a finger tip position extraction operation in the second embodiment of the present invention.

FIG. 9 is a block diagram showing one exemplary configuration of a feature data generation unit according to the second embodiment of the present invention.

FIG. 10 is a diagram showing an exemplary reflected light image processed by the feature data generation unit of FIG. 9.

FIGS. 11A and 11B are diagrams for explaining the operation of the feature data generation unit of FIG. 9.

FIG. 12 is another diagram for explaining the operation of the feature data generation unit of FIG. 9.

FIG. 13 is a flow chart for a first half of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 14 is a flow chart for a second half of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 15 is a diagram for explaining the operation of the feature data generation unit of FIG. 9 according to the flow charts of FIG. 13.

FIG. 16 is another diagram for explaining the operation of the feature data generation unit of FIG. 9 according to the flow charts of FIG. 13.

FIG. 17 is a diagram showing another exemplary reflected light image that can be used in the second embodiment of the present invention.

FIG. 18 is a diagram showing another exemplary reflected light image that can be used in the second embodiment of the present invention.

FIG. 19 is a diagram for explaining additional aspect of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 20 is another diagram for explaining additional aspect of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 21 is a block diagram showing another exemplary configuration of a feature data generation unit according to the second embodiment of the present invention.

6

FIG. 22 is a block diagram showing another exemplary configuration of a feature data generation unit according to the second embodiment of the present invention.

FIG. 23 is a schematic block diagram showing an exemplary configuration of a feature data generation unit according to the third embodiment of the present invention.

FIG. 24 is a diagram showing exemplary reflected light images and rectangles extracted therefrom used in the feature data generation unit of FIG. 23.

FIG. 25 is a flow chart for the operation carried out by the feature data generation unit of FIG. 23.

FIG. 26 is a diagram showing an exemplary shape interpretation rule used in the feature data generation unit of FIG. 23.

FIG. 27 is a diagram showing another exemplary reflected light images and rectangles extracted therefrom used in the feature data generation unit of FIG. 23.

FIG. 28 is a diagram showing another exemplary reflected light images and rectangles extracted therefrom used in the feature data generation unit of FIG. 23.

FIG. 29 is a diagram showing another exemplary shape interpretation rule used in the feature data generation unit of FIG. 23.

FIG. 30 is a diagram for explaining a viewpoint extraction operation that can be realized by the feature data generation unit of FIG. 23.

FIG. 31 is a diagram showing exemplary views from three viewpoints indicated in FIG. 30.

FIG. 32 is a diagram showing exemplary reflected light images and rectangles extracted therefrom used in the viewpoint extraction operation by the feature data generation unit of FIG. 23.

FIG. 33 is a diagram showing an exemplary shape interpretation rule used in the viewpoint extraction operation by the feature data generation unit of FIG. 23.

FIG. 34 is a diagram for explaining an alternative way of realizing the viewpoint extraction operation by the feature data generation unit of FIG. 23.

FIG. 35 is a schematic block diagram showing one exemplary configuration of a feature data generation unit according to the fourth embodiment of the present invention.

FIG. 36 is a flow chart for the operation carried out by the feature data generation unit of FIG. 35.

FIG. 37 is a diagram showing an exemplary character motion to be handled by the feature data generation unit of FIG. 35.

FIG. 38 is a diagram showing another exemplary character motion to be handled by the feature data generation unit of FIG. 35.

FIG. 39 is a diagram for explaining the operation of the feature data generation unit of FIG. 35.

FIG. 40 is another diagram for explaining the operation of the feature data generation unit of FIG. 35.

FIG. 41 is another diagram for explaining the operation of the feature data generation unit of FIG. 35.

FIG. 42 is a diagram showing exemplary reflected light images used in the feature data generation unit of FIG. 35.

FIG. 43 is a block diagram showing another exemplary configuration of a feature data generation unit according to the fourth embodiment of the present invention.

FIG. 44 is a diagram showing an exemplary screen display by a graphical user interface used in the feature data generation unit of FIG. 43.

6,144,366

7

FIG. **45** is a diagram showing another exemplary screen display by a graphical user interface used in the feature data generation unit of FIG. **43**.

FIG. **46** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **47** is a diagram showing an exemplary configuration of a photo-detection array that can be used in the information input generation apparatus of FIG. **46**.

FIG. **48** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **46**.

FIG. **49** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **50** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **51** is a diagram for explaining another operation carried out by the information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **52** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **53** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **54** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the sixth embodiment of the present invention.

FIG. **55** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **54**.

FIG. **56** is another diagram for explaining the operation carried out by the information input generation apparatus of FIG. **54**.

FIG. **57** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the sixth embodiment of the present invention.

FIG. **58** is another diagram for explaining the operation carried out by the information input generation apparatus of FIG. **57**.

FIG. **59** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **60** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **61** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **62** is a graph showing an ideal characteristic of a nonlinear conversion used in an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **63** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **64** is a diagram showing an exemplary table data used in a correction table of the information input generation apparatus of FIG. **63**.

8

FIG. **65** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **66** is a diagram showing an exemplary table data used in a correction table of the information input generation apparatus of FIG. **63**.

FIG. **67** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **68** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **69** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **68**.

FIG. **70** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **71** is a diagram showing an exemplary dialogue box used in a user commanding unit of the information input generation apparatus of FIG. **70**.

FIG. **72** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **70**.

FIG. **73** is a flow chart for the operation carried out by the information input generation apparatus of FIG. **70**.

FIG. **74** is a diagram showing an exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **75** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **76** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **77** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **78** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **79** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **80** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the ninth embodiment of the present invention.

FIG. **81** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **80**.

FIG. **82** is another timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **80**.

FIG. **83** is a flow chart for the operation carried out by a reflected light image acquisition unit of the information input generation apparatus of FIG. **80**.

9

FIG. **84** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the ninth embodiment of the present invention.

FIG. **85** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the tenth embodiment of the present invention.

FIG. **86** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **85** in one exemplary case.

FIG. **87** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **85** in another exemplary case.

FIG. **88** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the eleventh embodiment of the present invention.

FIG. **89** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **88**.

FIG. **90** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the twelfth embodiment of the present invention.

FIG. **91** is a flow chart for the operation carried out by a reflected light image acquisition unit of the information input generation apparatus of FIG. **90**.

FIGS. **92A** and **92B** are diagrams for explaining the operation carried out by the information input generation apparatus of FIG. **90** in one exemplary case.

FIGS. **93A** and **93B** are diagrams for explaining the operation carried out by the information input generation apparatus of FIG. **90** in another exemplary case.

FIG. **94** is a block diagram showing another possible configuration of a photo-detection section in an information input generation apparatus according to the twelfth embodiment of the present invention.

FIG. **95** is a timing chart for explaining the operation carried out by the photo-detection section of FIG. **94**.

FIG. **96** is a graph showing a relationship of a distance and a reflected light amount in an information input generation apparatus according to the thirteenth embodiment of the present invention.

FIG. **97** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the thirteenth embodiment of the present invention.

FIG. **98** is a diagram showing a state transition among three stated used in the information input generation apparatus of FIG. **97**.

FIG. **99** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **97** for three states in one exemplary case.

FIG. **100** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **97** for three states in another exemplary case.

FIG. **101** is a graph showing a characteristic of a logarithmic amplifier that can be used in the information input generation apparatus of FIG. **97**.

FIG. **102** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the thirteenth embodiment of the present invention.

FIG. **103** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the fourteenth embodiment of the present invention.

10

FIG. **104** is a flow chart for the operation carried out by the information input generation apparatus of FIG. **103**.

FIG. **105** is a perspective view of a conventional three-dimensional pointing device.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is basically directed to an information input scheme in which the light is irradiated onto a target object from a light source, and the reflected light from this target object is captured as an image, so that information on this target object such as its shape, motion, distance, etc., can be obtained from this reflected light image. In addition, in the present invention, a plurality of operation patterns for the lighting and charge storing operation are provided and selectively used according to the external light state so that the reflected light image can be obtained at high precision regardless of the external light state. In the following, various embodiments of this information input scheme will be described in detail.

<First Embodiment>

FIG. **1** shows an exemplary configuration of an information input generation apparatus according to the first embodiment of the present invention, which comprises a lighting unit **101**, a reflected light extraction unit **102**, a feature data generation unit **103**, and a timing signal generation unit **104**.

The lighting unit **101** emits a light whose intensity varies in time according to the timing signal generated by the timing signal generation unit **104**. This light is irradiated onto a target object located in front of the lighting unit **101**.

The reflected light extraction unit **102** extracts the reflected light from the target object resulting from the light emitted by the lighting unit **101**. Preferably, this reflected light extraction unit **102** extracts the spatial intensity distribution of the reflected light. This spatial intensity distribution of the reflected light can be captured as an image which will be referred to as a reflected light image hereafter.

The reflected light extraction unit **102** has a photo-detection section for detecting a receiving light amount in order to extract the reflected light from the target object. In general, the photo-detection section detects not only the reflected light from the target object resulting from the light emitted by the lighting unit **101** but also the external light such as illumination light or sunlight. For this reason, the reflected light extraction unit **102** takes a difference between a received light amount detected when the lighting unit **101** is emitting the light and a received light amount detected when the lighting unit **101** is not emitting the light, so as to obtain only a component for the reflected light from the target object resulting from the light emitted by the lighting unit **101**. In other words, the reflected light extraction unit **102** is also controlled by the timing signal generation unit **104** which generates the signal for controlling the lighting unit **101**.

The feature data generation unit **103** extracts various feature data from the reflected light image. Many different types of the feature data and their extraction methods can be used in the present invention, as will be described in detail in the later embodiments. When the target object is a hand, it becomes possible to obtain the information regarding a gesture or a pointing according to the feature data extracted from the reflected light image of the hand, for example, and it becomes possible to operate a computer by using this obtained information. It is also possible to extract the 3D information on the target object for further utilization. Note

6,144,366

11

that this feature data generation unit **103** is not an indispensable element of the present invention, and it is also possible to directly input or utilize the reflected light image obtained by the reflected light extraction unit **102**.

Now, the technical improvements incorporated in this information input generation apparatus of the first embodiment will be described in further detail with reference to FIG. 2.

FIG. 2 shows an exemplary detailed configuration of this information input generation apparatus of the first embodiment. In FIG. 2, the light emitted by the lighting unit **101** is reflected by the target object **106**, and an image is formed on a photo-detection plane of the reflected light extraction unit **102** by a photo-detection optics **107**. The reflection light extraction unit **102** detects the intensity distribution of this reflected light, that is, the reflected light image. Here, the reflected light extraction unit **102** has a first photo-detection unit **109**, a second photo-detection unit **110**, and a difference calculation unit **111**.

Each of the first photo-detection unit **109** and the second photo-detection unit **110** detects the optical image formed on the photo-detection plane and converts it into image signals corresponding to the received light amounts. The first photo-detection unit **109** and the second photo-detection unit **110** carry out this photo-detection operation at different timings. A timing control unit **112** (corresponding to the timing signal generation unit **104** of FIG. 1) controls their operation timings such that the lighting unit **101** emits the light when the first photo-detection unit **109** is in a photo-detecting state, whereas the lighting unit **101** does not emit the light when the second photo-detection unit **110** is in a photo-detecting state.

By means of this control, the first photo-detection unit **109** detects the received light amounts by receiving the reflected light from the object resulting from the light emitted by the lighting unit **101** as well as the external light such as illumination light or sunlight.

On the other hand, the second photo-detection unit **110** only receives the external light. Here, the timings at which the first and second photo-detection units **109** and **110** receive the lights are set to be different but close to each other, so that the fluctuation of the external light between these timings is ignorable. Consequently, a difference between the image detected by the first photo-detection unit **109** and the image detected by the second photo-detection unit **110** corresponds to a component for the reflected light from the object resulting from the light emitted by the lighting unit **101**, and therefore it is possible to extract the reflected light image corresponding to the component for the reflected light from the object resulting from the light emitted by the lighting unit **101**.

The difference calculation unit **111** calculates this difference between the images detected by the first photo-detection unit **109** and the second photo-detection unit **110**, and outputs the obtained difference.

The further detail of this reflected light extraction unit **102** will be described below.

The reflected light extraction unit **102** sequentially outputs the reflected light amount for each pixel of the reflected light image. The output from the reflected light extraction unit **102** is then amplified by an amplifier **113**, converted from analog signals into digital signals by an A/D converter **114**, and stored at a memory **115**. Then, at an appropriate timing, the data stored in this memory **115** are read out and processed at the feature data generation unit **103**. The timing control unit **112** controls this overall operation.

12

When the target object to be detected is a human hand, it is preferable to use a device that can emit the near infrared light which is invisible to the human eyes, as the lighting unit **101**. In this case, the light emitted from the lighting unit **101** cannot be seen by the target human being so that the target human being will not sense the glare of the light. Also, when the lighting unit **101** emits the near infrared light, a near infrared light passing filter should preferably be provided at the photo-detection optics **107**. This filter can pass the near infrared light in the emitted wavelength, while blocking the visible light and the far infrared light, so that the most of the external light can be removed by this filter.

Now, the reflected light from the object decreases considerably when a distance to the object increases. In a case where the object surface scatters the light uniformly, the received light amount per each pixel of the reflected light image as seen by the receiving side becomes smaller in counter-proportion to the square of the distance to the object. Consequently, when the target object **106** is placed in front of this multi-dimensional information input generation apparatus of the present invention, the reflected light from the background becomes ignorably small, and therefore it is possible to obtain the reflected light image only from the object. Thus, when the target object **106** in a form of a hand is placed in front of this multi-dimensional information input generation apparatus, it is possible to obtain the reflected light image of the hand alone.

At this point, a value of each pixel of the reflected light image indicates the reflected light amount received by a unit photo-detector cell corresponding to each pixel. The reflected light amount can be affected by the property of the object (that is, whether or not the object totally reflects the light, scatters the light, absorbs the light, etc.), the orientation of the object surface, the distance to the object, etc., and in a case where the object as a whole scatters the light uniformly, the reflected light amount is closely related to the distance to the object.

The hand has such a property, so that the reflected light image of the hand is dependent on the distance to the hand, the leaning of the hand (that causes the partially different distance), etc. Consequently, by extracting these features as the feature data, it is possible to input and generate various information.

In a case where it is desired to extract a 3D shape, it is desirable to obtain the distance information at high precision. In such a case, it is preferable to use a logarithmic amplifier as the amplifier **113**. The received light amount at the photo-detection section is counter-proportional to the square of the distance, but when the logarithmic amplifier is used, the output of the logarithmic amplifier is counter-proportional to the distance, so that it becomes possible to utilize the dynamic range effectively.

Now, with reference to FIG. 3, an exemplary configuration of the reflected light extraction unit **102** will be described in further detail.

The reflected light extraction unit **102** of FIG. 3 has the photo-detection section formed by CMOS sensors, which includes a plurality of unit photo-detector cells, each corresponding to each pixel of the reflected light image, so as to be able to capture the intensity distribution of the reflected light. In FIG. 3, a simplified case of 2×2 pixels is shown for the sake of clarity, where a portion **117** enclosed by a dashed line is a unit photo-detector cell PD for one pixel. Each unit photo-detector cell PD for one pixel has a configuration as shown in FIG. 4.

In relation to FIG. 2 described above, one pixel part of the first photo-detection unit **109** and one pixel part of the

6,144,366

13

second photo-detection unit 110 constitutes a single unit photo-detector cell PD in FIG. 3. As shown in FIG. 4, each unit photo-detector cell PD has one photo-electric conversion unit 118 formed by a photo-diode and two charge storage units 119 and 120 formed by capacitors. Between the photo-electric conversion unit 118 and the charge storage units 119 and 120, several gates (122 and 123 in this example of FIG. 4) are provided, so that the charges generated at the photo-electric conversion unit 118 can be selectively lead to either one of the two charge storage units 119 and 120 by controlling these gates. Here, the control signal for these gates and the lighting control signal for the lighting unit 101 are synchronized.

FIG. 5 shows time changes of the control signals in the photo-detection section, the lighting control signal, and the lighting power.

A lighting control pulse 128 is a signal for controlling the lighting unit 101, for a case of realizing the light pulse emission. The lighting unit 101 emits the light when the lighting control pulse 128 is in "HIGH" level, and does not emit the light when the lighting control pulse 128 is in "LOW" level.

In response to this lighting control signal, the light actually emitted from the lighting unit 101 has a waveform that changes in time as indicated by the lighting power 129 in FIG. 5, which is determined by the time response of the light emitting element used as a light source in the lighting unit 101. The control signals including RESET 130, SAMPLE1 131, SAMPLE2 132, and TRANSFER are also given to the photo-detection section.

The TRANSFER is a signal for controlling a transfer gate 121 that transfers the changes generated at the photo-electric conversion unit 118 to the next stage. When this signal is in "HIGH" level, the charges accumulated at the photo-electric conversion unit 118 are transferred. After the charge storing, at a time of charge transfer to an output gate 125, this transfer gate 121 is closed so that the changes generated at the photo-electric conversion unit 118 do not flow into the output gate 125 which is formed by an amplifying transistor connected with a transistor for selecting this unit photo-detector cell having a gate connected with an address line 127, where the photo-diode of the photo-electric conversion unit 118 is connected with a gate of this amplifying transistor, while each of the capacitors of the two charge storage units 119 and 120 has one electrode connected to this amplifying transistor while another electrode is grounded, as shown in FIG. 4.

The RESET 130 is a reset control signal for controlling a reset gate 124 formed by a reset transistor. While the TRANSFER is "HIGH", when the RESET becomes "HIGH", the reset gate 124 is opened so that the charges accumulated at the photo-electric conversion unit 118 are discharged through the transfer gate 121 and the reset gate 124.

The SAMPLE1 131 and SAMPLE2 132 are control signals for controlling sample gates 122 and 123 in order to lead the changes from the photo-electric conversion unit 118.

Now, the operation of the unit photo-detector cell according these control signals will be described in detail.

In the unit photo-detection cell, the transfer gate 121 is kept open during the charge storing period. First, by opening the reset gate 124, the unnecessary charges accumulated between the photo-electric conversion unit 118 and the sample gates 122 and 123 are discharged. Then, by closing the reset gate 124, the charges obtained by the photo-electric

14

conversion are accumulated between the photo-electric conversion unit 118 and the sample gates 122 and 123.

After a prescribed period of time, the first sample gate 122 is opened so that the accumulated charges are transferred to the first charge storage unit 119. Consequently, the charges obtained by the photo-electric conversion during the "storing period-1" as indicated in FIG. 5 which extends since the RESET 130 becomes "LOW" until the SAMPLE1 131 becomes "LOW" will be stored into the first charge storage unit 119. After the first sample gate 122 is closed, the reset gate 124 is opened again to discharge the unnecessary charges, and then closed. Then, after the prescribed period of time, the second sample gate 123 is opened so that the charges generated by the photo-electric conversion are transferred to the second charge storage unit 120 this time. Consequently, the charges obtained by the photo-electric conversion during the "storing period-2" as indicated in FIG. 5 which extends since the RESET 130 becomes "LOW" until the SAMPLE2 132 becomes "LOW" will be stored into the second charge storage unit 120. Here, the "storing period-1" and the "storing period-2" have the same duration.

Here, the lighting unit 101 emits the light during the charge storing period called "storing period-1" whereas the lighting unit 101 does not emit the light during the charge storing period called "storing period-2".

As a result, the first charge storage unit 119 stores the charges generated from both the reflected light from the object resulting from the light emitted by the lighting unit 101 and the external light such as illumination light or the sunlight, whereas the second charge storage unit 120 stores the charges generated from the external light alone.

Here, the charge storing period called "storing period-1" and the charge storing period called "storing period-2" are close in time, so that the size of the fluctuation of the external light between them can be regarded as sufficiently small. Consequently, a difference between the charge amounts in the first charge storage unit 119 and the second charge storage unit 120 can be regarded as the charge amount generated by the reflected light from the target object 106 resulting from the light emitted by the lighting unit 101.

For the SAMPLE1; SAMPLE2, RESET and TRANSFER as described above, the same signals are given to all the unit photo-detector cells, so that the charge storing is carried out at all the unit photo-detector cells in synchronization. This implies that a single light emission is sufficient in obtaining the one frame of the reflected light image. Consequently, it is possible to reduce the power required for the light emission. Also, a LED can be used as the light source, where the LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller (that is, when the pulse interval is longer compared with a single pulse width), so that it is possible to utilize the lighting power efficiently.

After the charge storage, the charge extraction is carried out. First, a single line is selected by a vertical selectors 135. Then, from the unit photo-detector cells of each selected line, the charges stored in the first charge storage unit 119 and the second charge storage unit 120 are sequentially taken out, and their difference is obtained by a difference circuit 133. The obtained difference is then taken out by selecting a row by a horizontal shift registers 136.

Note that, in this example, at a time of the charge extraction, the extraction cell addresses are specified by the shift registers so that the output order is fixed (to that of the

6,144,366

15

sequential output) but the random access is possible by generating arbitrary address. In such a case, it is possible to extract charges from only a part of the photo-detection section, so that the sensor operation frequency can be lowered or the frame rate of the reflected light image can be increased. For example, in a case of detecting a small object that only occupies a part of the image and tracing its motion, it suffices to search this object in a vicinity of its location in some frame, so that it suffices to extract charges for only a part of the images.

Also, a case of using the near infrared light as the light source has been described, but the present invention is not necessarily limited to this case, and it is also possible to use the visible light under the condition that prevents the human eyes from sensing the glare of the light (such as the condition that the light amount is not too large, or that the light is directed so that it does not enter into the human eye directly, etc.). In addition, the present invention is not necessarily limited to a case of using the light, and it is also possible to use the electromagnetic waves, ultrasonic waves, etc. It is also possible to omit the near infrared light passing filter under the condition that requires no consideration for the influence of the external light.

Note that it is also possible to realize the photo-detection section by using the CCD image sensors for usual imaging purpose instead of the CMOS sensors, but the use of the CMOS sensors is advantageous in view of both the performance and the cost.

Namely, although it is possible to use the CCD image sensors and a light source, the CCD can only image once in every 1/60 second (in unit of field). Consequently, even when the lighting unit **101** is controlled to emit the light in the first 1/60 second and not to emit the light in the next 1/60 second, the external light can fluctuate largely during this 1/60 second interval so that the difference will not be equal to the reflected light amount. The fluorescent light has its intensity fluctuating in a period of 1/100 second, so that this problem can be caused. Even in the usual imaging using the CCD image sensors, it is known that the phenomenon called flickering can occur, where the brightness of the image flickers due to the difference between the imaging period and the fluctuation period of the external light.

In a case of using the CMOS sensors for the photo-detection section as described above, the CMOS sensors have the structural property that it is possible to control the photo-detection (charge storing) and the read out arbitrarily in unit of pixel, and the control time can be as short as about 1/10000 second or less, but it can also be set to any sufficiently long time, so that it is possible to eliminate the influence of the external light fluctuation by selecting the optimum value according to the fluctuation of the external light.

In the imaging using the CCD image sensors, in order to prevent the flickering, there are cases where the charge storing period is set to be 1/100 second so that it matches with the fluctuation period of the fluorescent light. Similarly, in a case of synchronizing this operation with the lighting unit, it is possible to suppress the influence of the external light by setting the charge storing period to be 1/100 second, or by setting one field to be 1/100 second by changing the CCD driving signals. However, in such cases, there arises another problem. Namely, when the target object in a form of a hand is moving, the position of the hand can be slightly displaced between the imaging at a time of the light emission and the imaging at a time of no light emission. When the difference is taken in this state, the reflected light image is largely disturbed at the edge portion of the object (hand) in particular.

16

In addition, there is a significant difference in compactness of the configuration between a case of using the CCD image sensors and a case of using the CMOS sensors. Namely, in a case of using the CCD, it is at least necessary to provide an A/D converter, a memory for storing data for one frame part, and a calculation circuit for obtaining a difference image. Moreover, in a case of using the CCD, it is also necessary to separately provide a driver IC.

In contrast, in a case of using the CMOS sensors in a configuration where a plurality of unit photo-detector cells are arranged two-dimensionally as described above, various circuits can be formed on a base of the CMOS sensors (a substrate on which the CMOS sensors are formed), so that it is possible to contain the driver in the same chip. In addition, the difference between a case of light emission and a case of no light emission can be taken within the sensors so that no difference calculation circuit is necessary. Moreover, it is also possible to contain an A/D converter, a memory, and a control unit in one chip, so that it can be realized at a very low cost.

In the above, the configuration up to the extraction of an image (the reflected light image) of the target object alone has been described. This much of a configuration by itself is sufficiently useful as a commercial product, but in practical use, it is often preferable to use the present invention in a form that matches with the need of a user by applying some processing to the obtained reflected light image.

For example, by inputting the reflected light image of the hand, it is possible to realize the pointing or gesture input. The feature data generation unit **103** extracts the information useful for this purpose from the reflected light image, by extracting the feature quantity, processing the feature quantity, or generating some other information from the feature quantity.

A representative example for the processing of the reflected light image is the distance information extraction and a region extraction. As already described above, when the object has a uniform and homogeneous scattering surface, the reflected light image can be regarded as a range image. Consequently, it is possible to extract a 3D shape of the object. When the object is the hand, it is possible to detect an inclination of the palm of the hand, which appears as a partially different distances. Also, when the hand is moved, the change of the pixel values can be regarded as a change of the distance.

It is also possible to process the reflected light image so as to extract the object property information such as a color information and a material information of the target object.

The extracted distance information and/or the object property information can then be utilized in extracting an object image of at least a part of the target object for the purpose of further processing.

Also, as there is almost no reflected light from remote object such as the background, it is possible to extract the shape of the object easily by the processing for extracting a region with the pixel value over a certain threshold from the reflected light image. For example, when the object is the hand, it is quite easy to extract its silhouette image. Even in a case of using the range image, it is often preferable to extract a region according to a threshold once and then use the distance information within that region.

In this manner, it becomes possible to extract the target object image easily, so that it becomes possible to realize various information input operations or commanding operations using the target object image.

As described, according to this first embodiment, it becomes possible to acquire the reflected light image of the

6,144,366

17            18

object such as the hand, easily in real time. This eliminates the need of an image processing for extracting a target object image which is a type of image processing that is most difficult to realize conventionally and has been a hindrance to the application of the image processing. Consequently, according to this first embodiment, it becomes possible to provide various types of image processing that have been difficult to realize at the practically usable level conventionally, in a form which is easy to realize and stable, and at a low cost, so that it can be a great innovation to the wide ranging fields such as industry, home, and amusement.

<Second Embodiment>

Referring now to FIG. 6 to FIG. 22, the second embodiment of the present invention will be described in detail.

This second embodiment is directed to one exemplary case of the feature data generation unit in the first embodiment.

When the hand is used as the target object, it is possible to capture the information on a position and a shape of the hand without a contact, so that it is possible to utilize the present invention as a means for inputting information from a human being to a machine. The pointing operation (an operation for inputting a position) has been carried out conventionally by using a device called pointing device such as mouse or track ball, but according to this second embodiment, this pointing operation can be realized by the hand action alone without a contact. In the following, a device for realizing this non-contact pointing will be described in detail.

First, an example of the non-contact pointing will be described. According to the present invention, a shape of the hand can be easily detected, so that it is possible to utilize the present invention as the non-contact pointing device, which can be a suitable pointing means for a portable information device and the like.

In this second embodiment, a user extends his hand in front of the input device in a state of extending all the fingers, and then makes the hand action, which is a very natural operation to do for a user. In this case, the reflected light image appears as shown in a left half of FIG. 6. A finger tip position is detected from this reflected light image by means of the image processing and utilized for the pointing operation. The extended finger portion appears as an upward pointing stick shaped object, so that it is not so difficult to obtain the coordinates of this tip end by the image processing. However, by simply obtaining the coordinates of the stick shaped tip end, it is only possible to obtain the finger tip position at the precision corresponding to the resolution of the reflected light image.

In general, the reflected light extraction unit can be manufactured at lower cost when the required number of pixels is smaller. Consequently, if it is possible to obtain the finger tip position at high precision from the rough reflected light image, it becomes possible to manufacture the non-contact pointing device at low cost. To this end, in this second embodiment, the position of a X mark **208** as indicated in FIG. **7** is obtained by the resolution above the pixels rather than the coordinates of the finger tip, and this position is utilized for the pointing as a feature point. This point is a center of gravity of a part of the finger tip (image). The manner for extracting this center of gravity position from the rough reflected light image will now be described in detail.

Consider the pixel values in this reflected light image. It is already mentioned that the pixel value can be converted into the distance information. However, when the resolution

of the reflected light image is rough, this idea is not necessarily applicable to the region surrounding the hand. Now suppose that the relationship between the pixels in the reflected light image and a target space is as shown in FIG. **8**. Here, the reflected light from one block in FIG. **8** corresponds to the pixel value of one pixel in the reflected light image. From this FIG. **8**, it can be seen that the reflected light from a block **211** is about a half of the reflected light from a block **212**. The reflected light amount is changed according to a rate by which the target object occupies each block, even if the target object is located at the same distance. In other words, in this case, the decrease of the reflected light amount indicates a position of the edge of the hand.

Now suppose that the finger position has slightly moved. Then, a rate by which the finger occupies each block changes, so that the pixel values will be slightly changed. Even if the reflected light image is rough, when the pixel values can be obtained at certain precision, it is possible to obtained the pointing position by the resolution above the pixels by using the pixel values. It is experimentally confirmed that a good pointing precision can be achieved when the width of the extended finger covers two to three pixels. A method for obtaining the finger tip position at high precision from the rough image will now be described in detail.

FIG. **9** shows an exemplary configuration of the feature data generation unit according to this second embodiment, which comprises a stick shaped object detection unit **213**, a stick shaped object tip end extraction unit **214**, and a center of gravity detection unit **215**.

The stick shaped object detection unit **213** detects a stick shaped object extending in the vertical direction, that is, an upward extended finger (normally an index finger) of the hand of the operator. Then, the stick shaped object tip end extraction unit **214** extracts an upper tip end of the stick shaped object (index finger) extending in the vertical direction, and then the center of gravity detection unit **215** obtains the center of gravity of that extracted portion.

At this point, if the portion is extracted in pixel units, the pixel value sum of the extracted portion largely fluctuates because the pixels are rough, and the precision of the detected center of gravity would become poor (as will be described in detail below). Consequently, the stick shaped object tip end extraction unit **214** extracts the tip end portion while correcting some pixel values such that the pixel value sum of the extracted portion satisfies a certain condition. Then, the center of gravity detection unit **215** calculates the center of gravity of the tip end portion extracted by the stick shaped object tip end extraction unit **214**, and set this calculates center of gravity as a finger tip position.

More specifically, this feature data generation unit of FIG. **9** operates as follows.

Here, it is assumed that, when a user extends a finger for the purpose of commanding an operation, a commanding finger (normally an index finger) is extended upwards in the reflected light image. Consequently, when the hand is extended in a shape (such as that of a fist) that does not match this assumption, there is a possibly that a correct detection cannot be made.

First, the reflected light image **201** as shown in FIG. **6** is scanned along the horizontal direction from the top. When the finger tip is not present at an upper end of the reflected light image, in the upper part normally, all the pixels in one line have pixel values nearly equal to 0 as indicated by lines **202** to **203** in FIG. **6**. When there is a portion where the pixel

6,144,366

19

value becomes locally large in one line along the horizontal direction as indicated by a line 204 in FIG. 6, this position and this line are memorized. This is repeated for the several lines as indicated in lines 205 to 207 in FIG. 6, and when the portion where the pixel value becomes locally large coincides over several lines, it can be judged that the stick shaped object (index finger, for example) extending in the vertical direction is present there. Then, a region where the extended finger is most likely present is enclosed by a rather large enclosure, and for this partial image, the following processing is carried out by the stick shaped object tip end extraction unit 214.

FIG. 10 shows an original reflected light image 216 in which the finger tip is judged to be present within a partial image 217 by the stick shaped object detection unit 213. In this partial image 217, it is assumed that the upper left corner pixel value is P(1,1), the upper right corner pixel value is P(n,1), the lower left corner pixel value is P(1,n), and the lower right corner pixel value is P(n,n).

Here, a certain threshold TH is set up in advance, and values k and a that satisfy the following equation (1) are obtained.

$$TH = \sum_{x=1}^{n}\sum_{y=1}^{k-1} P(x,y) + a \cdot \sum_{x=1}^{n} P(x,k) \quad (0 < a \le 1) \qquad (1)$$

Then, the pixel values P(1,k) to P(n,k) are corrected by using the obtained value a. Namely, the old pixel values P'(1,k) to P'(n,k) are updated according to the following equation (2).

$$P(x,k) = a \cdot P'(x,k) \ (x=1, 2, \ldots, n) \qquad (2)$$

The pixel values P(1,1) to P(n,k) including the corrected pixel values P(1,k) to P(n,k) constitute the extracted portion 218. The upper three lines of the extracted portion 218 are the same as the upper three lines of the partial image 217, while the fourth line of the extracted portion 218 (enclosed by a bold line) is corrected by multiplying the value a to the respective pixel values of the fourth line of the partial image 217, so that it appears paler in FIG. 10.

Next, at the center of gravity detection unit 215, the center of gravity (xx,yy) is determined by using the obtained pixel values P(1,1) to P(n,k) according to the following equations (3) and (4).

$$xx = \sum_{x=1}^{n}\sum_{y=1}^{k} x \cdot P(x,y) \Big/ \sum_{x=1}^{n}\sum_{y=1}^{k} P(x,y) \qquad (3)$$

$$yy = \sum_{x=1}^{n}\sum_{y=1}^{k} y \cdot P(x,y) \Big/ \sum_{x=1}^{n}\sum_{y=1}^{k} P(x,y) \qquad (4)$$

The center of gravity (xx,yy) obtained here nearly coincides with a center of gravity of an image obtained by extracting a certain length from a top (where a length to be extracted is related to the threshold TH) of the extended finger in the image of FIG. 8. Here, the pixels are rougher than the usual TV image so that the above described correction is made in order to achieve the same effect as maintaining the length to be extracted constant. Note that the precision of the center of gravity (xx,yy) becomes better when the pixel value P(x,y) of each pixel is obtained at the better precision.

20

Here, the reason for correcting the pixel values P(1,k) to P(n,k) as described above will be explained. Namely, what might happens if the center of gravity (xx,yy) is calculated without correcting the pixel values P(1,k) to P(n,k) will be considered with references to FIGS. 11A and 11B.

Suppose that the finger tip position is to be determined by calculating the center of gravity using a shaded region indicated in FIGS. 11A and 11B, which starts from the horizontal line where the pixel value becomes locally large up to three pixels part below. In this case, when the finger moves from a state shown in a part (a) of FIG. 11A to a part (b) of FIG. 11A, the change of the position of the center of gravity (xx,yy) becomes larger than the change of the position of the finger tip. On the other hand, when the finger moves from a state shown in a part (c) of FIG. 11B to a part (d) of FIG. 11B, the change of the position of the center of gravity (xx,yy) becomes smaller than the change of the position of the finger tip. In other words, there is no linearity between the actual finger tip position and the calculated center of gravity (xx,yy) in this case.

In contrast, when the center of gravity is calculated by correcting the pixel values so that the pixel value sum of all the pixels remains constant while calculating the center of gravity as described above, the finger tip movement and the center of gravity movement can be smoothly correlated.

Also, it is mentioned above that the sufficient pointing precision can be achieved when the width of the extended finger covers two to three pixels, and on the contrary, when the width of the finger does not even cover one pixel, the sufficient precision cannot be achieved. This is a case shown in FIG. 12, where the calculated x-coordinate of the center of gravity does not change even when the finger tip is moved slightly. In this case, there is also no linearity between the actual finger tip position and the calculated center of gravity (xx,yy).

Now, the operation of the feature data generation unit of this second embodiment in a case of the digital processing will be described with references to FIG. 13 to FIG. 15. Here, some more details of the operation not described above will also be described. By implementing a program according to these flow charts, it is also possible to realize this operation of the feature data generation unit in a form of software. It is obviously possible to realize a hardware configuration for carrying out this operation, and a configuration using both software and hardware is also possible. In a case of using software, the program may be recorded in a recording medium such as FD so that it can be distributed.

FIG. 13 shows the processing of the stick shaped object detection unit 213. As described above, in this stick shaped object detection unit 213, the reflected light image is scanned along the horizontal direction, and a portion where the pixel value becomes locally large is found. When such a portion appears in several lines at close positions, it is judged that the stick shaped object is present. This portion where the pixel value becomes locally large will be referred to as a partial pixel sequence. Also, a set of a plurality of partial pixel sequences which is not yet judged as a stick shaped object but which has a possibility of being judged as a stick shaped object will be referred to as a stick shaped object candidate. During the scanning along the horizontal direction, the stick shaped object candidates can be found, and as the scanning proceeds the stick shaped object can be detected from them.

More specifically, a plurality of structure elements for storing information of the stick shaped object candidates are prepared (step 220). Here, this structure element is denoted as "infoStick[n]" where [n] is a label for distinguishing the

6,144,366

21

plurality of structure elements. Here, a plurality of structure elements are prepared because there may be more than one stick shaped object candidates.

This structure element has five members, of which two are arrays. As indicated by a reference numeral **235** in FIG. **15**, the members include: "ystart" indicating a y-coordinate of a line at which the stick shaped object started; "xstart[i]" indicating an x-coordinate at which the partial pixel sequence starts on the i-th line (where the uppermost line is the 0-th line) from the top of the stick shaped object candidate; "xend[i]" indicating an x-coordinate at which the partial pixel sequence ends on the i-th line (where the uppermost line is the 0-th line) from the top of the stick shaped object candidate; "length" indicating a length in the vertical direction of the stick shaped object candidate (that is, a number of partial pixel sequences); and "status" indicating a current status (which takes three values of STICK, NOSTICK, and EXTENDED as will be described below). The starting x-coordinate and the ending x-coordinate are to be indicated for each of a plurality of lines, so that they are given in forms of arrays.

Now, this processing of FIG. **13** will be described with reference also to FIG. **15** for the sake of clarity. In FIG. **15**, a reference numeral **234** indicates the reflected light image, where the density of each pixel indicates the size of the pixel value. The numbers on the upper side and the left side indicate the x-coordinate and the y-coordinate, respectively. A reference numeral **235** indicates the structure element described above in outline. A reference numerals **236** to **238** shown in the right half indicate the contents of the structure element during the processing.

While scanning the horizontal line, when a partial pixel sequence that satisfies a given condition (which is assumed to require the partial pixel sequence to have no more than c consecutive pixels with the pixel values above p) is found (step **221**), it is either integrated with the already found stick shaped object candidate (step **226**) or registered as a new stick shaped object candidate (step **225**). The partial pixel sequence that is found first will always be registered as a new stick shaped object candidate.

For example, in FIG. **15**, while the y=3 line is scanned, the partial pixel sequence is found for the first time, and this is registered as a new stick shaped object candidate (as indicated by **236**). Namely, the y-coordinate value "3" of this line is entered into "infoStick[0].ystart". Also, the same value "6" is entered into the "infoStick[0].xstart[0]" and "infoStick[0].xend[0]" because the length of this partial pixel sequence is "1". Also, a value "1" is entered into "infoStick[0].length" and a value "EXTENDED" is entered into "infoStick[0].status" because this is a new stick shaped object candidate. Here, a value "EXTENDED" is also used in a case of registering a new stick shaped objected candidate for the reason explained below.

Next, the partial pixel sequence found by scanning the y=4 line can be connected with the already found stick shaped object candidate. Here, whether it can be connected with the already found stick shaped object candidate or not can be determined from a positional relationship in the x-direction between the partial pixel sequence in the last line of the already found stick shaped object candidate and this new partial pixel sequence. In this case, "infoStick[0].xstart [0]=6" and "infoStick[0].xend[0]=6", while the x-coordinates of the new partial pixel sequence are "5" to "7", so that they are judged as being connected.

Then, the information of the stick shaped object candidate that was judged to be connected with this new partial pixel sequence is updated (as indicated by **237**). Namely, the

22

positions (in the x-direction) of the new partial pixel sequence are entered as "infoStick[0].xstart[1]=5" and "infoStick[0].xend[1]=7" and the length of the stick shaped object candidate is increased by 1 as "infoStick[0].length= 2".

Next, the partial pixel sequence found by scanning the y=5 line is also connected, as indicated by **238**. Here, assuming that a prescribed length d is equal to "3", the condition of the step **227** in FIG. **13** holds, so that the stick shaped object is determined and the processing proceeds to the next step **238**. The above processing is repeated until this condition is satisfied, and when the scan of one image field is finished before this condition is satisfied, it is judged that no stick shaped object was detected.

Now, the use of "infoStick[n].status" will be described in further detail. This takes three values of STICK, NOSTICK, and EXTENDED. NOSTICK indicates that this structure element is not a stick shaped object candidate (so that the "status" member of all the structure elements are initially set to be NOSTICK). STICK indicates that this structure element is a stick shaped object candidate. EXTENDED is also used for a stick shaped object candidate but its usage is somewhat different. Namely, when the scan of a new horizontal line begins, all the stick shaped object candidates have values STICK. Then, a value of a stick shaped object candidate which is connected with a newly found partial pixel sequence during the scan of one line will be changed to EXTENDED. When the scan of this one line is finished, the stick shaped object candidate that still has a value STICK is not connected with any partial pixel sequence on that line, so that it will be regarded as no longer a stick shaped object candidate.

Consequently, when the scan of one line is finished, a value of the stick shaped object candidate which remains to be STICK will be changed to NOSTICK, and a value of the stick shaped object candidate which has been changed to EXTENDED will be changed to STICK again. By this processing, as indicated by **239** in FIG. **16**, the floating partial pixel sequence (that may possibly be noise) will be registered into "infoStick[0]" as the stick shaped object candidate once (as indicated by **241** in FIG. **16**), but when the pixel sequence becomes discontinuous, it is removed from the stick shaped object candidates (actually deleted by the processing of step **222**) (as indicated by **242** in FIG. **16**). The real finger tip portion is registered in "infoStick[1]" as indicated by **243** in FIG. **16**. Here, the "status" is changed to NOSTICK simply for the purpose of removing it from the stick shaped object candidates.

By means of this, at a time of judgement of the step **224** in the next scan, only the structure elements having the value STICK will be referred, and the structure elements having the value NOSTICK will be ignored. Also, in this manner, the once used structure element can be used for a registration of a new stick shaped object candidate again by changing its value to NOSTICK, so that a memory can be saved. By carrying out this processing, it is possible to reduce the influence of the noise.

At the step **224**, the judgement as to whether it can be connected or not is made only for those structure elements which have a value STICK. Also, at a time of registering a new stick shaped object candidate, the structure element having a value NOSTICK is searched and the new information is stored there.

FIG. **14** shows the processing of the stick shaped object tip end extraction unit **214** and the center of gravity detection unit **215**. When the condition of the step **227** of FIG. **13** is satisfied, the processing proceeds to the step **229** of FIG. **14**.

6,144,366

23

At the step 230, a parameter TH for the purpose of extracting the tip end of the stick shaped object is obtained. This threshold may be a fixed one, but it can also be determined according to the size and the pixel values of the tip end portion of the stick shaped object as in the step 230. When the formula shown in the step 230 is used, a difference between the lengths of the extracted tip end portion in the vertical and horizontal directions does not become so large even when the pixel values are changed as a result of different finger thicknesses or different distances. A first ratio of a thickness of a stick (i.e. the pixel value sum in one line, where the 0-th line is excluded from the calculation because it is at the tip end which often has no thickness) and the maximum pixel value for one pixel is obtained, and a second ratio of TH (i.e. the pixel value sum of the extracted portion) and the maximum pixel value is set to be a square of the first ratio. It is also possible to obtain TH by the calculation method other than this.

At the step 231, the value a and k described above are obtained according to the above equation (1) by using TH obtained by the step 230. In the above equation (1), the calculation is made by using a rectangular region, but in the step 231, the calculation is made by using only the partial pixel sequence of each line. In this manner, the influence of the noise at the position unrelated to the stick shaped object within the rectangular region can be reduced. For example, when the finger is pointing to an oblique direction as shown in FIG. 17, the influence of a noise 244 can be avoided.

At the step 232, a value a obtained at the step 231 is multiplied with each pixel value of the k-th line.

These steps 230 to 232 constitute the processing of the stick shaped object tip end extraction unit 214.

Then, at the step 233, the center of gravity is calculated by using the values a and k and the corrected pixel values. In principle, the x-coordinate of the center of gravity is given by a sum of the products of respective pixel values and x-coordinate values in the partial pixel sequences up to the k-th line divided by TH (which is equal to a total sum of the pixel values), and the y-coordinate of the center of gravity is given by a sum of the products of respective pixel values and y-coordinate values in the partial pixel sequences up to the k-th line divided by TH (which is equal to a total sum of the pixel values). Here, xsum[i] is known, so that the y-coordinate of the center of gravity is obtained as a product of this xsum[i] and the y-coordinate (infoStick[n].ystart+i) divided by TH. Here, of course, xsum[k] is re-calculated by the corrected pixel values. xpsum[i] is a sum of products of respective pixel values and x-coordinate values in the partial pixel sequence of the i-th line, and the x-coordinate of the center of gravity is calculated by using this xpsum[i] in the formula shown in FIG. 14.

Up to this point, the processing has been described for a case of dealing with an image in which the finger is extended in the direction perpendicular to the optical axis of the photo-detection sensors. In practice, however, the finger is often also pointed along the direction of the optical axis of the sensors. In the following, the method for obtaining the position of the finger tip which is pointing toward the sensors will be described.

In a case where the finger is extended along the optical axis direction (toward the sensors), the reflected light image appears as shown in FIG. 18, where a portion corresponding to the finger tip has the pixel value that is abruptly increased. In FIG. 18, the blacker pixel indicates the pixel with the larger pixel value. Here, it is possible to merely find the extremum point of the pixel values and use it as the pointing position. The calculation processing in such a case will be

24

very simple. However, in such a method, it is impossible to obtain the finger tip position at the precision better than the resolution of the image. Here, similarly as in a case of extending the finger upwards (toward the direction perpendicular to the optical axis direction), a method for obtaining the finger tip position at the precision better than the resolution of the image will be described.

First, a pixel where the pixel value is the maximum is found. This can be done easily by the comparison of the pixel values. Then, for a surrounding small region $\Gamma$ of this pixel, the coordinate of the finger tip position is determined by the following expression (5).

$$\left( \frac{\sum\limits_{\Gamma} x \cdot P(x, y)}{\sum\limits_{\Gamma} P(x, y)}, \frac{\sum\limits_{\Gamma} y \cdot P(x, y)}{\sum\limits_{\Gamma} P(x, y)} \right) \quad (5)$$

This can be regarded as the center of gravity of the pixels within the small region. As for the surrounding small region $\Gamma$, it is customary to set it to be a rectangular region such as 3×3 or 5×5, but it is not necessarily limited to this, and it can be non-rectangular region. By using this formula, not just the pixel at the maximum point but its surrounding pixels are also taken into account.

For example, consider a case where the finger tip position has slightly changed, as from a state shown in a part (a) of FIG. 19 to a state shown in a part (b) of FIG. 19, where a region enclosed by the bold line is the small region $\Gamma$. Here, the change is so small that the coordinates of the maximum point 246 is unchanged. However, the pixel values of the surrounding pixels are changed, in such a manner that the pixel value of the surrounding pixel 247 on one side become slightly larger while the pixel value of the surrounding pixel 248 on the other side becomes slightly smaller, for example. This change can be taken into account by using the above formula, as shown in FIG. 19 where the center of gravity position indicated by the X mark is slightly changed accordingly.

Thus, it is possible to detect the finger tip position at the precision better than the resolution of the reflected light image in this manner. This calculation can also be realized by the formula other than that of the above expression (5). For example, the following expression (6) may be used instead.

$$\left( \frac{\sum\limits_{\Gamma} x(P(x, y) - Pmin)}{\sum\limits_{\Gamma} (P(x, y) - Pmin)}, \frac{\sum\limits_{\Gamma} y \cdot (P(x, y) - Pmin)}{\sum\limits_{\Gamma} (P(x, y) - Pmin)} \right) \quad (6)$$

where Pmin is the minimum pixel value in the small region $\Gamma$. The effect of using this expression (6) is as follows.

For example, consider a case where the finger tip position has moved so that a portion of the reflected light image has changed as in states shown in parts (a) to (c) of FIG. 20, where a region enclosed by the bold line is the small region $\Gamma$, and the X mark shown in the small region indicates the center of gravity position calculated by the above expression (5).

In the change from a state (a) to a state (b), the finger tip has slightly moved to the right. Accordingly, the value of the pixel 249 is slightly decreased while the value of the pixel 250 is slightly increased. The center of gravity position (X mark) is also moved slightly to the right. In this case, the center of gravity position also changes according to the movement of the finger.

6,144,366

25

In the change from a state (b) to a state (c), the coordinates of the maximum pixel is changed, so that the position of the small region Γ is also changed.

Now, consider states immediately before and after the maximum pixel position change. Immediately before the maximum pixel position change, the values of the pixels **249** and **250** in a state (b) are almost the same. Nevertheless, when the above expression (5) is used, the center of gravity position is displaced from a middle point between the pixels **249** and **250**, toward the left side, because of the weights of the surrounding pixels. On the other hand, immediately after the maximum pixel position change, the values of the pixels **249** and **250** are also almost the same, but the center of gravity position is displaced toward the right side this time, also because of the weights of the surrounding pixels. This implies that the center of gravity position does not move smoothly between immediately before and after the maximum pixel position change. In other words, it is difficult to point a middle point between the pixels **249** and **250** in a case of using the above expression (5).

In contrast, in a case of using the above expression (6), the minimum pixel value within that small region is subtracted from the pixel value sum within the small region, so that the influence due to the surrounding pixels becomes smaller, and the center of gravity position immediately before and after the maximum pixel position change can be located near the middle point between these two pixels.

Which one of these expressions (5) and (6) is to be used in the pointing position calculation can be determined according to the factors such as a relationship between a size of a region occupied by a single pixel and a size of the finger, the required precision for the pointing position, etc. When a region occupied by a single pixel is small (i.e. when the resolution of the reflected light image is relatively high), or when the required precision is low, the requirement on the center of gravity calculation is not severe.

It is also possible to provide the hysteresis characteristic to the pointing positions, so as to realize the satisfactory pointing operation. For example, in a case of obtaining the pointing position in 0.1 pixel unit (with respect to the pixel of the reflected light image) by rounding it to the one decimal, when the coordinate value near 10.05 is obtained, values 10.0 and 10.1 will appear unstably or alternately so that a cursor will be fluttered if a cursor is displayed. In such a case, it is possible to avoid calculating such an unstable pointing coordinate by giving a hysteresis characteristic in which the increase of the coordinate value over 0.07 is rounded to the increase by 0.1 and the decrease of the coordinate value below 0.03 is rounded to the decrease by 0.1 when the change of the calculated coordinate value is small.

In the above described processing, the maximum pixel value within the small region indicates the distance to the finger tip, so that it is possible to carry out the three-dimensional pointing by using it. Also, when the motion of pushing by the finger can be captured as a motion in the depth direction as in the example described above, it is possible to realize the clicking by using it.

In the above, the method for detecting the finger tip position at the precision better than the resolution of the reflected light image has been described for two cases including a case where the finger is extended upwards (along the direction perpendicular to the optical axis of the photo-detection section) and a case where the finger is extended forward (toward the photo-detection section). In the practical use, it is often difficult to determine the direction of the extended finger as either one of these two, because the

26

direction for extending the finger may be different for different users or may be changed by the same user at different occasions. Consequently, by judging the direction to which the finger is currently extended, and using the detection method suitable for the judged direction, it becomes possible to obtain the finger tip position stably regardless of the direction to which the finger is pointing.

Now, by using the finger tip position obtained in the above, the cursor on the screen can be controlled. When the finger tip position is set in correspondence to the cursor position within the screen, the cursor is displayed at the corresponding position when the finger is extended. Also, when the finger is moved, the cursor is also moved. When the finger is withdrawn, the cursor disappears. However, these functions alone cannot provide an equivalent of the mouse button. To this end, instead of pushing the mouse button (clicking), the cursor is set to be stationary in this embodiment.

FIG. 21 shows a configuration for realizing these functions. In FIG. 21, a finger tip position detection unit **251** obtains the finger tip position at the precision higher than the resolution of the reflected light image as explained above.

A cursor position determination unit **252** determines a position to display the cursor according to the finger tip position. The simplest method for this this is to set the finger tip position and the cursor position in one-to-one correspondence. However, the obtained finger tip position may contain noises or minute vibrations of the human hand, so that the cursor would be minutely vibrating if the cursor position is uniquely determined from the finger tip position. It is possible to quantize the cursor positions to such a level that the minute vibrations can be eliminated, but then the precision will be lowered.

These minute vibrations can be suppressed by applying a low pass filter using the finger tip positions over the past several frames. For example, when the latest finger tip position is ($x0$, $y0$) and the finger tip position in n frames earlier time is ($x_n$, $y_n$), the cursor position ($x$, $y$) can be determined by the following equation (7).

$$(x, y) = \left( \sum_{i=0}^{k} a_i \cdot xi, \sum_{i=0}^{k} a_i \cdot yi \right) \tag{7}$$

Here, k indicates the finger tip positions of how many previous frames should be taken into account, and when this is too large, the cursor movement tends to react with delay in response to the finger movement. Also, $a_i$ is a weight for each finger tip position in the past.

It is also possible to consider the processing in which, after the cursor position at some point is determined, the original position is retained stationary until the new position is separated from the original position by more than a prescribed distance. In this manner, even when there are minute vibrations, the cursor position will remain unchanged and the cursor only moves when the finger is moved largely.

It is also possible to utilize the fact that the direction of the movement is unstable in a case of the minute vibrations, such that the cursor is kept stationary until the movements into the same direction are made for more than a prescribed number of times, and the cursor position is updated only when the movements into the same direction are made for more than a prescribed number of times.

A cursor display unit **253** displays the cursor on the screen according to the cursor position determined by the cursor position determination unit **252**.

6,144,366

27

A cursor stationary state detection unit **254** monitors a change in time of the cursor position, and when the cursor is detected to be in the stationary state (or moving little) for over a prescribed period of time, a click signal **255** is generated. Using this configuration, it is possible to move the cursor by the finger, and carry out the click operation by setting the cursor stationary.

In a case of using the mouse, the click operation is carried out explicitly by the operator by pushing the mouse button. However, when the click signal is to be generated by setting the cursor stationary, there can be cases where the click is made without being noticed by the operator, and this may cause some inconvenience in some cases. In this regard, the cursor display unit **253** can monitor the click signal generation and changes the shape of the cursor when the click signal is generated, so that it is possible to provide a feedback to the operator indicating the occurrence of the click.

For example, consider a case of carrying out the operation to select one option from the pull down menu. First, the cursor appears as the finger is extended, so that the operator moves the finger in order to move the cursor to a position of the menu item. When the cursor is set stationary for a prescribed time after it has been moved on that menu item, the pull down menu appears. Then, when the finger is further moved downwards, the cursor moves while reversing the menu display. Then, when the cursor is set stationary at a desired menu option, that menu option command is activated.

Note that this method may seem to introduce many erroneous operations, because when the mouse is used the cursor always remain stationary while the mouse is not operated. However, in this method, the cursor disappears when the finger is not extended, and the finger is extended only purposefully (in order to select some menu option, for example), so that it is highly unlikely for the cursor to be set stationary before the cursor reaches to the target position. Consequently, it is quite natural in this embodiment to replace the usual click operation by the operation to set the cursor stationary.

In the above described example, only the tip end portion is extracted from the image of the finger tip and its center of gravity is obtained. By means of this, it is possible to realize the two-dimensional pointing such as the pointing on the computer screen. By capturing the feature quantity indicating the motion in the depth direction (approaching to or moving away from the photo-detection section) in addition, it also becomes possible to input more than just the two-dimensional information, or the three-dimensional information.

For example, when the motion of "approaching a little and then moving back" is detected, it is possible to generate a signal corresponding to the mouse click. By means of this, it becomes possible to move the cursor by the finger and make a selection from the menu by making an action of "pushing".

Also, although it is not possible to input the distance to the finger rigorously, it is still possible to detect "approaching" or "moving away" in the relative sense, so that it is possible to combine this information with the feedback by the display so as to realize the input of the three-dimensional position information. Namely, in a case where the finger is extended upwards, when the finger moves in the depth direction, the received light amount at the photo-detection element which is photo-detecting the reflected light from the finger increases or decreases. Also, apart from the output of each photo-detection element, a number of pixels occupied by the

28

finger also increases or decreases. When the finger approaches, the width of the extended finger becomes larger, from 1.5 pixel part to 2 pixel part, for example.

In the above described example, in a case of detecting, the stick shaped object by scanning the horizontal lines, the stick shaped object is judged to be present when there are consecutive lines in which the partial pixel sequence appear at the same position. Here, the pixel value sum in the partial pixel sequence on one line can be utilized as a quantity corresponding to the distance. When the finger is extended forward, the pixel value sum in the small region $\Gamma$ described above can be used as a quantity corresponding to the distance.

Also, apart from extracting the distance information, it is also possible to utilize it as an information for determining an appropriate size of the small region. For example, when the finger tip is too large with respect to the small region $\Gamma$, all the pixels within the small region $\Gamma$ have equally high values. In such a case, there are too many candidates for the maximum point and the maximum point position cannot be obtained stably, so that the small region is enlarged. Also, in such a case, instead of simply setting the maximum point at the center of the small region, a center of a group of pixels having pixel values above a certain value can be set at a center of the small region $\Gamma$ and the size of the small region $\Gamma$ can be enlarged such that pixels having pixel values smaller than that certain value will be included at the peripheral portion.

It is also effective to utilize various finger tip gestures as commands, in addition to a case of "pushing" described above. FIG. **22** shows a configuration which can recognize the operator's finger action and utilize it as the input information. For example, when the cursor is moved above some icon, and then the finger action in a form of "=" is made, a command related to that icon can be activated. Also, when the finger action drawing a circle is made, an object within the circle is selected. In FIG. **22**, a cursor or finger tip position movement detection unit **256** monitors the movement of the finger tip or the cursor, and when there is a movement matching with the pre-registered one, a corresponding command or the click signal **257** is outputted.

It is also possible to utilize the cursor position in relation to the button state as the input information. For example, the cursor is moved above some menu option by moving the finger, and then a button is depressed to select that menu option. Also, when the finger is moved while the button is depressed on some icon, the icon can be moved. In this manner, the operations such as click and drag of the mouse can be realized by using the button similarly as the mouse button. Here, the button should preferably be provided at such a position where the operator extending one hand for the purpose of controlling the cursor can conveniently depress the button by another hand. In this manner, it is possible to realize a quicker click operation than a case of setting the finger stationary or a case of making the "pushing" action. It is also possible to give the operator a real impression of having done some operation. This is effective when both hands can be freely used.

In contrast, it is preferable to be able to carry out the click operation by one hand when the cursor is to be operated by one hand with respect to a wrist watch like very compact portable information device worn on another hand, or with respect to a compact portable terminal held by another hand.

As described, according to this second embodiment, it becomes possible to realize the pointing without requiring the user to wear anything special, so that the burden on the user can be reduced significantly.

6,144,366

29

<Third Embodiment>

Referring now to FIG. 23 to FIG. 34, the third embodiment of the present invention will be described in detail.

This third embodiment is directed to another exemplary case of the feature data generation unit of the first embodiment, which realizes a gesture camera for recognizing the hand action easily and its application as a pointing device in the three-dimensional space.

FIG. 23 shows an exemplary configuration of the feature data generation unit according to this third embodiment, which comprises: a range image memory unit **331** for storing the distance information extracted by the reflected light extraction unit in a form of N×N matrix as shown in FIG. **24**, for example; a shape memory unit **332** for storing shape interpretation rules; and a shape interpretation unit **333** for interpreting a shape of the distance matrix stored in the range image memory unit **331** according to the shape interpretation rules stored in the shape memory unit **332**.

FIG. **25** shows the flow chart for the shape recognition processing carried out by this feature data generation unit of FIG. **23**.

First, the range image extracted by the reflected light extraction unit is registered into the range image memory unit **331**, in 256 step gradation, for example (step **401**). The registered range image is then read out to the shape interpretation unit **333** in a form of N×N matrix (where N is 16, for example) as shown in FIG. **24**, for example (step **402**). The shape interpretation unit **333** carries out the processing for extracting only those cells which are reaching to a prescribed threshold, from the distance matrix (step **403**). In addition, the processing necessary for the matching at the step **404** is also carried out here. There are many matching schemes, and accordingly there are many types of processing that can be carried out here, such as a vectorization for extracting a vector from an image, an extraction of a deformation state of a shape according to a shape model, a spectrum analysis based on the distance value on the scanning line, etc.

Here, for the sake of simplicity, a case of using the matching scheme according to a rectangle extracted from the shape will be described. For example, parts (a), (b) and (c) of FIG. **24** show the range images when the index finger is pointed upwards, towards the right, and obliquely upwards, respectively. With respect to each of these range images, a rectangle is formed by joining midpoints of cells with high intensities (the intensity is higher for a darker cell in FIG. **24**). The resulting rectangles for the range images of parts (a), (b) and (c) of FIG. **24** are as shown in parts (d), (e) and (f) of FIG. **24**, respectively. As a result, according to the obtained normalized distance matrices, the rectangles as shown in parts (d), (e) and (f) of FIG. **24** are extracted in this example, and the matching, with the shapes stored in the shape memory unit **332** is carried out (step **404**).

FIG. **26** shows an example of the shape interpretation rules stored in the shape memory unit **332**. For example, for each of the range images of parts (a), (b) and (c) of FIG. **24**, there is only one rectangle so that the first RULE-1 of FIG. **26** is matched. The matching result of this RULE-1 is the pointing, so that next the matching with respect to the pointing rule is made. In the pointing rule, the vertical and horizontal check is carried out first. A part (a) of FIG. **24** matches with a rule that vertical/horizontal ratio is greater than 1, for example. As a result, the slope check-**2** is carried out next. In the slope check-**2**, the slope is nearly equal to 0 and parts at closer distances (darker cells) are present at the upper section, i.e., the center of gravity is located in the upper section in this case, so that the first rule is matched,

30

and therefore the matching result is a command for turning upward. When the matching shape is found, a command corresponding to that shape is outputted (step **405**). If there is no matching shape, the threshold is changed (step **406**), and the matching processing is carried out again.

In a case of utilizing this third embodiment as a pointing device in the three-dimensional space, it is necessary to provide the depth coordinate.

FIG. **27** shows the distance matrices in a case of using the finger as the three-dimensional pointing device. A part (a) of FIG. **27** shows a state in which the index finger is extended and the other fingers are turned in. Parts (a) and (b) of FIG. **27** shows the same hand action but the distance of the closest part is closer in the part (b) than the part (a) of FIG. **27**. According to the shape interpretation rules of FIG. **26**, both parts (a) and (b) of FIG. **27** match with the RULE-1, and in the vertical and horizontal check, the vertical/horizontal ratio is nearly equal to 1 so that the first rule is matched, so that it is an object select/move forward command.

In the two-dimensional space, it is impossible to move forward toward the screen, so that it is an object select command. In the object select, when the transition time from the part (a) to the part (b) of FIG. **27** is over a prescribed time, it is interpreted that an object on which the cursor is located is selected. In a case of the three-dimensional space, it is possible to move forward into the depth direction, so that it is an object select or move forward command.

In a case of the object select, similarly as in the two-dimensional case, the judgement is made according to the transition time from the part (a) to the part (b) of FIG. **27**. On the other hand, in a case of the move forward, the distance becomes closer from the part (a) to the part (b) of FIG. **27**, so that an adjustment to make the moving forward speed faster can be made. Else, the actual moving forward is not made in the state of the part (a) of FIG. **27**, and the moving forward as much as the distance that becomes closer is made when the hand action of the part (b) of FIG. **27** is made.

In this manner, the viewpoint can be controlled as if the viewpoint is actually located at the finger tip, so that the natural operation can be realized.

In this third embodiment, it becomes possible to easily realize the recognition of the hand action, that has not been possible conventionally unless some special device such as the data glove is worn. Also, in the conventional image processing, the recognition has been difficult as the extraction of the hand image has been difficult, but in this third embodiment, there is no need for the extraction, so that the hand action recognition accuracy can be improved and the processing speed can be increased considerably. It is experimentally confirmed that the processing for 30 times per second is actually possible. This is faster than 0.1 second which is the condition for the human interface with the ideal response speed. Consequently, it is possible to carry out the truly natural operations and its effect is enormous.

Note that the shape interpretation rules of FIG. **26** are just an example, and various modifications are possible. Also, for the sake of simplicity, the matching scheme using the rectangular division is described, but this is also just an example. The shape interpretation rules should be changed according to the matching scheme, and the shape interpretation result should be changed according to the intended application. Also, the 16×16 distance matrix is used in the above description, but the present invention is not limited to this arrangement. If the photo-detector elements can be arranged densely, it is also possible to use the arrangement such as 64×64 or 256×256. The matching scheme and the

6,144,366

31                                                                    32

shape interpretation rules obviously should be changed when the precision of the matrix in increased.

Also, this third embodiment has been described for a case of using the hand gesture recognition as the means for inputting the command in the three-dimensional space and the like into the computer, but the present invention is not necessarily limited to this case. For example, it is also possible to utilize this third embodiment as the means for instructing the power ON/OFF of the TV, the lighting equipment, etc.

In such a case, there is a possibility for erroneously recognizing even those gestures which are not intended as commands. In order to prevent an occurrence of such an erroneous commanding, the command input can be given by a combination of a plurality of shapes. For example, the command input is given by alternating the hand opened state and the hand closed state. Parts (a), (b) and (c) of FIG. **28** show exemplary range images of the hand gestures using two fingers, fist, and five fingers, respectively. It is possible to make a setting such that the power is turned ON when the hand gestures of the parts (a), (b) and (c) of FIG. **28** are made in this order, and the power is turned OFF when these hand gestures are made in the reverse order. In this manner, even when the hand or the person moves in front of this device, it is possible to prevent the power from being turned OFF as a result of the erroneous recognition.

The shape interpretation rules to be used by the shape interpretation unit **333** in such a case of giving a command by a combination of a plurality of gestures is as shown in FIG. **29**, for example. Here, the interpretation specialized for a case of the power ON/OFF is considered for the sake of simplicity. It is impossible to judge whether it is a single finger or a fist according to a number of rectangles, so that it is judged as a fist here when the area largely exceeds a threshold α.

By combining a plurality of gestures in such a manner, it is possible to realize the natural operations for the power ON/OFF of the lighting equipment and the like, without the erroneous operation and without requiring any special tool. Apart from the switch ON/OFF for the home electronic appliances such as lighting equipment and TV, it is also possible to apply this third embodiment as an input device for the bank cash dispenser (automatic teller machine), the automatic ticket vending machine at the station, etc.

Also, this third embodiment has been described for a case of interpreting the shape of the hand, but the present invention is not necessarily limited to this case. For example, it is also possible to control the viewpoint information by recognizing the orientation of the face.

FIG. **30** shows a screen and the person facing to this screen along with the three-dimensional objects (cylinder, pyramid, sphere) displayed on this screen, which are viewed from the above, for the purpose of explaining a case where the orientation of the face (that is, the direction of the viewpoint) changes. The viewpoint-**1**, viewpoint-**2** and viewpoint-**3** indicates the orientations of the person's face with respect to the screen. The viewpoint-**1** is a case where the face is oriented straight toward the screen. The viewpoint-**2** is a case where the face is oriented toward the right direction with respect to the screen (an orientation in which the left cheek comes closer to the screen). The viewpoint-**3** is a case where the face is oriented toward the left direction with respect to the screen (an orientation in which the right cheek comes closer to the screen).

The three-dimensional objects actually seen from these three viewpoints are as shown in parts (a), (b) and (c) of FIG. **31**. Namely, in the viewpoint-**1**, all three objects can be seen completely, but in the viewpoint-**2**, a part of the cylinder along the left edge is out of view, whereas in the viewpoint-**3**, the sphere along the right edge is completely out of view.

It is possible to make a change of these viewpoints by using a finger. For example, it is possible to set a state of pointing the finger vertically with respect to the screen (as in a part (a) of FIG. **27**) as a command for the viewpoint-**1**, a state of pointing the finger toward the right with respect to the screen (as in a part (b) of FIG. **24**) as a command for the viewpoint-**2**, and so on.

The problem with this scheme of controlling the viewpoint by the hand is that the handling is largely different from the viewpoint control in the real world. In the real world, the viewpoint is controlled by the orientation of the face (normally unconsciously) in such a manner that the objects present on the right side are viewed by turning toward the right, and the objects present on the left side are viewed by turning toward the left, and the finger is used for the purpose of pointing a specific object among the visible objects, not for changing the viewpoint. In this regard, the data glove or the space mouse utilized in the conventional VR technology are also associated with the problem that the natural handling cannot be realized.

In contrast, according to this third embodiment, the natural handling can be realized as follows. FIG. **32** shows exemplary range images of the face orientations as acquired by the information input generation apparatus of the present invention. A part (a) of FIG. **32** shows a state of the viewpoint-**1** in which the face is oriented straight toward the screen, a part (b) of FIG. **32** shows a state of the viewpoint-**2** in which the face is oriented toward the right direction, and a part (c) of FIG. **32** shows a state of the viewpoint-**3** in which the face is oriented toward the left direction.

Parts (d), (e) and (f) of FIG. **32** shows rectangles extracted from the range images of parts (a), (b) and (c) of FIG. **32**, respectively. Here, in order to extract a rectangle corresponding to the nose, three types of rectangles are extracted from the farthest cells (the palest cells, corresponding to the contour portion of the entire face) and the closest cells (the darkest cells, corresponding to the nose) and the farther cells right above the farthest cells (the paler cells, corresponding to the eyes).

FIG. **33** shows one example of the shape interpretation rule for the moving object parallax. Here, for the sake of simplicity, an exemplary shape interpretation rule specialized for a case of recognizing the face orientation is shown.

The RULE-**1** checks whether two rectangles corresponding to the entire face and the nose are extracted or not. If not, no particular processing is carried out here (NULL) according to the RULE-**2**. When these two rectangles are present, according to the face check rule, whether there is a relationship of having the larger rectangle farther and the smaller rectangle nearer or not is checked. If not, it is interpreted that something other than the face is imaged, so that no particular processing is carried out here (NULL). Only when these two rectangles are in the right relationship, the viewpoint direction calculation is carried out according to the following formula (8).

$$L \gg 0 \rightarrow \text{Viewpoint Direction} = arcsin((L-R)/L)$$

$$L=0 \rightarrow \text{Viewpoint Direction} = -90° \qquad (8)$$

Here, when L=0, it is interpreted that the face is oriented toward the left direction at 90° so that the nose is present along the left edge, and therefore the viewpoint direction becomes −90°. When the face is oriented straight, L and R

6,144,366

33    34

are equal so that the numerator becomes 0 and the viewpoint direction becomes 0°. When L is greater than R, the face is oriented toward the right direction as much. When R=0, the viewpoint direction becomes 90° and the nose is present along the right edge so that the face is oriented toward the right direction completely.

In this example, the viewpoint shift between left and right has been described, but the viewpoint control between the viewpoint for looking down from the above and the viewpoint for looking up from the below can also be realized similarly. In such a case, it suffices to recognize whether the position of the nose is upper side or lower side with respect to the face.

By means of the interpretation as described above, it becomes possible to realize the viewpoint change according to the face orientation, and it is possible to realize the natural operations.

When the information input generation apparatus of the present invention is implemented in a compact size, it can be utilized as an input device for the portable information terminal. In such a case, it is possible to change the position of the portable information terminal with respect to the face, as indicated in FIG. 34. Namely, instead of moving the face, the terminal can be moved by the hands. In this manner, the face orientations in the viewpoint-1 to viewpoint-3 become similar to those shown in FIG. 32, and therefore the viewpoint control similar to a case of FIG. 31 can also be realized. The same also applies to the up and down directions.

In this manner, the true moving object parallax can be realized. In other words, it is possible to realize the truly direct handling for the user as if the large three-dimensional space is seen through a window in a form of the screen of the portable information terminal.

<Fourth Embodiment>

Referring now to FIG. 35 to FIG. 45, the fourth embodiment of the present invention will be described in detail.

The third embodiment described above recognizes a shape and converts it into a command for a computer, which is convenient for such operations as the power ON/OFF, but it is regrettably not suitable for such operations as an operation for giving a motion to a character or changing a speed of the motion in the animation. When such operations are to be handled by the shape recognition alone, it is necessarily in a form of operating a slider and the like for the purpose of adjusting the speed, and it is impossible to manipulate the motion directly. In order to resolve this problem, this fourth embodiment is directed to another exemplary case of the feature data generation unit; of the first embodiment, which realizes a motion input.

FIG. 35 shows an exemplary configuration of the feature data generation unit according to this fourth embodiment, which differs from that of FIG. 23 in that an image change extraction unit 343 is provided in place of the shape interpretation unit 333 of FIG. 23, and a comparison position memory unit 342 is provided in place of the shape memory unit 332 of FIG. 23.

The comparison position memory unit 342 stores positions in the past which are to be compared with current position, such as the positions calculated by the image change extraction unit 343 including the center of gravity position or the closest position for M frames previous case, for the purpose of calculating the motion vector.

The image change extraction unit 343 analyzes the distance matrix and extracts the motion vector from the changes of the center of gravity position, the closest position, etc., for example. As for the calculation of the

center of gravity position, the closest position, etc., the error due to the minute vibration of the hand action is cancelled out by taking an average over M frames. In other words, the center of gravity position (Xn,Yn) in the i-th frame is given by the following equations (9).

$$Xn = \sum_{j=0}^{j=M-1} Xi - j / M \qquad (9)$$

$$Yn = \sum_{j=0}^{j=M-1} Yi - j / M$$

FIG. 36 shows the flow chart for the processing by the feature data generation unit of FIG. 35. First, prior to the processing, the content of the comparison position memory unit 342 is initialized to an empty state at the step 901. Then, the range image is stored into the range image memory unit 331 (step 902). Then, the distance matrix is read out (step 903), and the center of gravity position, for example, is calculated (step 904). The calculation of the center of gravity position is carried out as follows, for example. In the first time, the center of gravity position (Xn−1,Yn−1) is not stored in the comparison position memory unit 342 (step 905 NO) so that it is stored into the comparison position memory unit 342 (step 907).

Next, when the center of gravity position (Xn,Yn) is calculated, (Xn−1,Yn−1) of the M frames previous case is stored in the comparison position memory unit 342, where the time required in changing from (Xn−1,Yn−1) to (Xn,Yn) is M·1/30=M/30 sec. Consequently, the motion vector is given by the changed part ((Xn,Yn)−(Xn−1,Yn−1)) divided by this time. That is, the motion vector v is calculated by the following equation (10) (step 906).

$$v = ((Xn,Yn) - (Xn-1,Yn-1))/M\cdot30 \qquad (10)$$

Now, an exemplary case of giving the motion to the animation by using the extracted motion vector will be described. In a character of a doll as shown in a left side of FIG. 37, when the positions of both hands are moved, this character appears as shown in a right side of FIG. 37. When the value of the motion vector v is large, the motion becomes fast and the movement of the hands of the doll becomes large so that it becomes a violent motion. On the other hand, when the value of the motion vector v is small, the movement becomes slow so that it becomes a gentle motion.

In the above example, a case where the image change extraction unit 343 calculates the motion vector has been described, but the present invention is not necessarily limited to this case, apart from that case, it is also possible to calculate the swinging range alone, or the speed alone, or also the angle, from the motion vector. In these cases, the step 906 in the processing of FIG. 36 should be replaced by the step 908, 909 or 910. For example, it is also possible to extract the change in the X-direction as the swinging range and the motion in the Y-direction as the speed, in such a manner that the position of the doll is controlled by the swinging range while the motion speed of the doll is controlled by the speed as shown in FIG. 38.

Alternatively, it is also possible to control the swinging angle of the head of the doll by the swinging angle of the finger. In this case, the simple calculation of the center of gravity cannot provide an accurate center of gravity. Namely, as shown in a part (a) of FIG. 39, between the finger at time t and the finger at time (t+1) resulting from the swinging of the finger at the time t, the pivotal point of the

6,144,366

35

finger is displaced so that the angle becomes larger than the actual angle. When it is tolerable to have somewhat exaggerated motion than the actual swing of the finger, there is no problem in using this swinging angle directly. However, when it is desired. to give a sophisticated motion, this is inconvenient.

In order to avoid this problem, it is necessary to calculate the center of gravity after the pivotal points of the finger at the time t and at the time (t+1) are set to coincide with each other. More specifically, denoting the pivotal point of the finger at the time t as (Xst,Yst), the center of gravity of the finger at the time t as (Xbt,Ybt), the pivotal point of the finger at the time (t+1) as (Xst+1,Yst+1), and the center of gravity of the finger at the time (t+1) as (Xbt+1,Ybt+1), the pivotal point (X'st+1,Y'st+1) and the center of gravity (X'bt+1,Y'bt+1) of the finger at the time (t+1) as corrected by the pivotal point of the finger at the time t can be given by the following equations (11).

$$X'st+1=Xst+1-Xst$$

$$Y'st+1=Yst+1-Yst$$

$$X'bt+1=Xbt+1-Xst$$

$$Y'bt+1=Ybt+1-Yst$$

By using them, the swinging angle $\alpha$ can be calculated as the following equations (12).

$$\text{Swinging Angle } \alpha=2arcsin(r/2\text{l})$$

$$r=|(X'bt+1,Y'bt+1)-(Xbt,Ybt)|$$

$$\text{l}=|(Xbt,Ybt)-(Xst,Yst)|$$

When the swinging angle so obtained is used, as shown in FIG. 40 for example, it becomes possible to give an arbitrary walking motion by swinging the forearm part and the lower leg part in this swinging angle. Also, as shown in FIG. 41 for example, it becomes possible to give a gasping motion at the mouth of a snake character by moving the mouth of this snake character at this swinging angle. By changing the manner of swinging the finger, it is also easily possible to give a mouth motion in relation to the words so as to make this character looks like talking.

It Is also possible for the user to make the mouth motion by himself and move the mouth of the snake character similarly. For example, parts (a), (b) and (c) of FIG. 42 shows the range images of the mouth motion of the user, where parts (a) and (c) show states in which the mouth is opened, and a part (b) shows a state in which the mouth is closed. The size m by which the mouth is opened is obtained from the range images of FIG. 42. Using an average value for the size of the mouth (denoted as $\beta$), the swinging angle can be obtained by the following equation (13).

$$r=arctan(m/2\beta) \qquad (13)$$

Then, using this swinging angle, the mouth of the snake character can be moved. It is also possible to use the size m of the opened mouth directly for controlling the opening and closing of the mouth of the snake character.

Conventionally, this type of operation has been realized by an indirect operation in which a slider for controlling the motion is operated, so that it has been extremely difficult for the inexperienced user to give a motion exactly as intended.

36

In contrast, according to this fourth embodiment, it is possible to realize the completely direct operation in such a manner that, when the user makes the action while watching the animation character, the character moves according to that action, so that its effect is enormous.

In FIG. 36 described above, the processing has been described for an exemplary case of extracting the center of gravity position, but the present invention is not necessarily limited to this case. It is also possible to use various other positions such as the closest position, the position where the distance is less than a certain distance in the range image and which is the highest in the X-direction, the position which is rightmost in the Y-direction, etc.

Also, instead of extracting only one type of change as described above, the image change extraction unit may extract plural types of changes. For example, the center of gravity position and the area can be extracted. In this case, the area can be obtained from the distance matrix by counting a number of cells above a certain threshold. At that point, in order to reduce the error, an average over M frames should be taken. Then, the center of gravity position can be used to give a displacement to the both hands while the area can be used to specify a size of the character as a whole. In this manner, when the user alternately opens and closes the hand while changing the hand position, it is possible to realize the animation in which the character moves both hands while changing its size.

As described, according to this fourth embodiment it is possible to realize the natural handling at high speed and low cost while improving the recognition accuracy by using the information (such as the area) other than the distance information. By means of this, it is also possible to realize the operations to give plural commands to the character without requiring the user to remember any sort of difficult operational procedures.

In the third and fourth embodiments described above, the operations using the finger, hand, or face have been described, but the present invention is not necessarily limited to these operations. For example, it is also possible to carry out the operate the character by using both hands and assigning the left hand motion to the left hand and the left leg of the character while assigning the right hand motion to the right and and the right leg of the character, in the manner by which the puppeteer gives motions to the puppet. It is also possible to give a motion to the character by the action for forming and moving a shape of a dog in the shadow picture.

Also, in the above, an exemplary case of operating the two-dimensional animation character has been described, but the present invention is not necessarily limited to this case. For example, by obtaining the depth coordinate for the center of gravity position as well, it is also possible to operate the three-dimensional animation character.

Also, when the present invention is utilized for teaching the rhythmical sense to the children, the change in the X-direction alone may be extracted and the head of the character may be moved by this, so that the child can easily check his own rhythm by watching the character. Also, the motion of the hand of the child can be used not only to give a motion to the character so as to visualize the child's hand motion, but also as a parameter for the media other than computer graphics by generating sound accordingly, for example.

Also, in the above, an exemplary case of giving a motion by using the user's action alone has been described, but it is also possible to use this fourth embodiment in combination with the other input device. For example, while the target object is rotated in correspondence to the right hand motion,

6,144,366

37 · 38

it may be desired to stop the motion of the target object temporarily at the current position, reset the right hand motion back, and then rotate the target object from the stopped position further. In such a case, the command for stopping or releasing can be given by pushing a menu button for the stopping or releasing command using the left hand. Else, when some motions are given to the target object, it may be desired to memorize a series of motions, and in such a case, an operation to press the menu button for the storing command can be carried out.

In this manner, the operation for giving motions which cannot be easily realized by the simple menu buttons and the operation that can be easily realized by simply pressing the menu buttons can be carried out in parallel without causing any sense of unnaturalness to the user, so that its effect is enormous.

FIG. 43 shows a modified configuration of the feature data generation unit according to the fourth embodiment.

In the configuration of FIG. 35, only the change of the image such as the motion vector is extracted and used to give a motion to the animation character. On the other hand, in the configuration of FIG. 23, the range image is recognized as a still image, the action is interpreted, and the interpretation result is used as a command. In contrast, the configuration of FIG. 43 is for extracting many parameters from the range image, and mapping them to parameters for controlling complicated character motions.

To this end, the configuration of FIG. 43 includes both the image change extraction unit 343 and the shape interpretation unit 333. Here, of course, it is possible to extract a plurality of parameters by the image change extraction unit 343 alone, so that it is not absolutely necessary to include the shape interpretation unit 333. On the contrary, it is also possible for the shape interpretation unit 333 to extract not only the action interpretation result but also values of area, center of gravity, etc., so that it is possible to extract a plurality of parameters by the shape interpretation unit 333 alone and therefore it is not absolutely necessary to include the image change extraction unit 343.

A parameter mapping control unit 344 determines the mapping of a plurality of parameters extracted by the shape interpretation unit 333 or the image change extraction unit 343 to the character motion control parameters.

A character control unit 345 actually calculates the character motions according to the parameters mapped by the parameter mapping control unit 344. A drawing unit 346 depicts the resulting character with motions.

At the parameter mapping control unit 344, it is possible to control the parameter mapping by using various optimization techniques such as the neural network and GA (Genetic Algorithm), for the purpose of making the user training easier. Else, it is also possible for the parameter mapping control unit 344 to determine the mapping of each parameter in advance. For instance, in an example of the snake character of FIG. 41, it is possible to determine the parameter mapping such that an area corresponds to a size of the snake, a speed corresponds to a speed by which the snake wags its tail, a finger position corresponds to a position of the snake, and so on.

In addition, it is also possible to determine the parameter mapping in advance according to the size of the change of the parameter. Namely, some hand actions are made first, and a parameter for which the change is the largest can be mapped to a speed of the snake's tail, a parameter for which the change is the smallest can be mapped to a size of the snake, and so one. Then, when the hand action is made next, the parameters determined by the initial calibration are used.

In this case, the user can easily learn the operation to give motions to the character by actually moving the finger or the hand while watching the corresponding change in the character, and it becomes possible to give complicated motions to the character.

Also, in the above, the application to the operation for giving motions to an animation character has been mainly described, but the present invention is not necessarily limited to this case. Apart from the animation, it is also possible to apply the present invention to the operation for playing music or the operation for giving special effects to the image. Namely, it is possible to play music by controlling a rhythm by the swinging of the hand, and notes to be played by the gesture of the hand. It is also possible to control the special display effects in the presentation, by controlling a speed for wiping the image by the swinging of the hand, a rotation of letters by the rotation of the hand, etc. As such, the present invention is applicable to a variety of applications, and not limited to the embodiments described herein.

FIG. 44 shows an exemplary screen display by the GUI (Graphical User Interface) in the configuration of FIG. 43. In this GUI, when it is desired to limit gestures, desired gestures to be limited are to be selected from icons arranged below the screen.

For example, the leftmost icon indicates that a motion in the X-direction can be given by moving the finger tip. Similarly, the second icon from the left indicates that a motion in the Y-direction can be given by moving the finger tip, and the third icon from the left indicates that a motion in the Z-direction can be given by moving the finger tip. On the other hand, the second icon from the right shows shapes of the hand in three states, a state of making a fist, a state of extending two fingers, and a state of extending five fingers. This icon indicates that when this icon is selected the rule stored in the shape memory unit 332 is switched so that these three gestures become recognizable and the corresponding interpretations can be made by the shape interpretation unit 333. Similarly, the rightmost icon shows shapes of the hand in two states, a state of making a fist and a state of extending five fingers, so as to indicate that only these two shapes become recognizable.

In FIG. 44, the icons are displayed in a state where these shaped are shown in overlap, but it is not necessary for these icons to have a static display. For instance, shapes of the hand in three states, a state of making a fist, a state of extending two fingers, and a state of extending five fingers, may be displayed sequentially in a form of animation, so as to indicate that these three shapes are recognizable. Also, a finger may be displayed in motion between left and right so as to indicate that the motion in the X-direction is possible.

It is also possible to select more than one of these icons so as to widen the range of limitation. In this case, when some icon is selected and there is another icon which is not compatible with the selected icon, the incompatible icon may be displayed in the fade-out fashion so that it becomes impossible to select this incompatible icon. In FIG. 45, when the second icon from the right is selected, the rightmost icon is incompatible with the selected icon so that it is displayed in the fade-out fashion. Also, in the GUI configuration of FIG. 44, when a user registers a new action, this new action can also be displayed in a form of an icon. In such a case, the icon can display the simplified view of the range image.

In this manner, any other user can also easily try to use the new icon by imitating the action indicated by the new icon upon looking at this icon display. In other words, by means of the GUI of FIG. 44, it becomes possible for the users to

6,144,366

**39**                                          **40**

easily learn and easily share the knowledge for giving a motion easily, so that its effect is enormous.

<Fifth Embodiment>

Referring now to FIG. 46 to FIG. 53, the fifth embodiment of the present invention will be described in detail.

The video image compression technique has been progressing rapidly, but it is still difficult to display the video at the portable terminal device in a satisfactory fashion. If it is possible to transmit and display only the useful information, it becomes possible to lower the communication cost, and the power consumption and cost of the portable terminal device can also be lowered. To this end, in the TV telephone, for example, it is desirable to extract and transmit only the faces of both sides. Also, in the electronic conference record, there may be a desire to carry out the retrieval only in terms of close-up views of the face of the speaking person.

In view of these, this fifth embodiment is directed to another exemplary case of the feature data generation unit in the first embodiment, which realizes the chromakey camera for extracting only a specific target from such an image.

FIG. 46 shows an exemplary configuration of the information input generation apparatus according to this fifth embodiment.

Similarly as in the third and fourth embodiments, the feature data generation unit 103 includes a range image memory unit 331 for storing the reflected light image. Here, however, it is not absolutely necessary to store the range image, and it suffices to store a reflection matrix that can be produced by setting a value of each cell to be "1" when the photo-detection is made or "0" when the photo-detection is not made.

In parallel to this, the configuration of FIG. 46 also includes a visible light photo-detection array 351 which is generally used as a CCD camera for taking video images, and an image memory unit 352 for storing the video images.

The configuration of FIG. 46 also includes an extraction unit 353 for extracting an image of only a specific target by comparing the image information stored in the image memory unit 352 and the range image stored in the range image memory unit 331, and an extracted image memory unit 354 for storing the extracted image.

In FIG. 46, the visible light photo-detection array 351 and the reflected light extraction unit 102 are arranged in parallel, but the practical implementation is not necessarily limited to this arrangement. For example, as shown in FIG. 47, it is quite possible to arrange near infrared photo-detectors and visible light photo-detectors mixedly within the same photo-detection array, and share a photo-detection lens so as to reduce the size and the weight.

FIG. 48 shows an outline of the extraction processing carried out by the extraction unit 353. In FIG. 48, the original image is an image photo-detected by the visible light photo-detection array 351, which is stored in the image memory unit 352. On the other hand, the mask is a reflected light image photo-detected by the reflected light extraction unit 102, which is stored as a reflection matrix in the range image memory unit 331. The extraction unit 353 superposes the original image and the mask, and leaves only the overlapping portion. This extracted image is stored in the extracted image memory unit 354.

When the photo-detection operations by the reflected light extraction unit 102 and the visible light photo-detection array 351 are carried out completely in parallel, the photo-detection can be carried out 30 times per second (while the frame rate of the usual video is 30 frames per second). When the extraction speed at the extraction unit 353 is sufficiently fast, it is possible to update the extracted image 30 times per second. In such a case, it is possible to update the images stored in the image memory unit 352 and the range image memory unit 331 whenever the photo-detection is made, that is, 30 times per second, so that it is sufficient for each of the image memory unit 352 and the range image memory unit 331 to have a small memory capacity.

On the other hand, when the extraction speed at the extraction unit 353 is not sufficiently fast, it is necessary for each of the image memory unit 352 and the range image memory unit 331 to have a buffer for storing the video image or the range image for an immediately previous frame. However, by carrying out the extraction processing with respect to an average of the previous frame part stored in this buffer and the current frame part, it is possible to compensate for the speed and also improve the S/N ratio.

Next, the manner of utilizing the extracted image will be described. For example, in the conference record system for the electronic conference and the like, the conventional scheme requires to record the video images stored in the image memory unit 352 of FIG. 46 on video tapes, or to record them by using the compression technique such as MPEG2. However, in this conventional scheme, the video image information which is not so important as the conference record such as the image of persons other than the speaking person is going to be recorded so that the wasteful recording is involved and it is impossible to realize the efficient playback such as the playback focused on the uttered contents.

In contrast, according to this fifth embodiment, it is possible to extract only a specific target such as the speaking person (the extracted image shown in FIG. 48 corresponds to the speaking person in this context). By recording the extracted image, it is possible to reduce the recording capacity considerably (in an order of one tenth to one hundredth) and it is also possible to realize the wasteless playback. In this case, the apparatus configuration is as shown in FIG. 49, for example, where an extracted image (compression) recording unit 355 records the extracted image either directly as video signals or by compressing it using the MPEG2 encoder and the like.

It is also possible to transfer the extracted image instead of storing it. In this case, the background image that has conventionally been transferred wastefully can be omitted, so that the amount of transfer data can be reduced considerably. In this case, the apparatus configuration is as shown in FIG. 50, for example, where a (compression) transmission unit 356 transmits the extracted image either directly as video signals or by compressing it using the MPEG2 encoder and the like.

By using the extracted image, it is very easy to realize the chromakey for superposing the extracted image with the other background as shown in FIG. 51. In this case, the apparatus configuration is as shown in FIG. 52, for example, where an image composition unit 357 composes the extracted image with the background image such as that of a map as shown in an upper left side of FIG. 51 which is stored in a background image memory unit 358, at a separately specified position as shown in a lower side of FIG. 51, and outputs the composed image. When the background image is stored in a compressed form, the image composition unit 357 carries out the composition after the decoding is carried out. It is also possible to carry out the composition using the extracted image recorded in advance. It is also possible to carry out the composition using a plurality of extracted images.

Conventionally, in order to extract a specific target from the video image, it has been necessary to carry out the

6,144,366

41

manual operation for specifying a target to be extracted so that considerable time and effort have been required. In contrast, according to this fifth embodiment, the mask for a target to be extracted can be easily produced from the reflection matrix, so that the conventionally required time and effort can be reduced considerably and therefore its effect is enormous.

On the other hand, by utilizing this fifth embodiment to the conference record system for the electronic conference and the like which uses the face of the speaking person as an index, it is also possible to considerably reduce the operations for inputting the information necessary for the retrieval.

In the above, the reflected light extraction unit **102** and the visible light photo-detection array **351** are supposed to photo-detect simultaneously, but the present invention is not necessarily limited to this case. For example, as shown in FIG. **53**, it is also possible to carry out the photo-detection switchably according to a switch unit **359**. When the switching period is 60 Hz, each of the visible light and the near infrared light can be photo-detected at 30 Hz.

Also, in FIG. **47**, the near infrared photo-detector array is arranged among the visible light photo-detector array, but the present invention is not necessarily limited to this case. For example, it may become possible in future to develop an element which can be controlled to photo-detect either the visible light or the near infrared light by changing the applied voltage. When such an element is used, it is possible to realize the configuration of FIG. **53** by switching the applied voltage for this element at the switch unit **359**.

Also, at a time of composing the extracted image in the configuration of FIG. **53**, a character to be composed is not limited to a single one as shown in FIG. **51**. For example, it is also possible to superpose a plurality of extracted images which are separately extracted in advance onto the background image. At this point, it is also possible to carry out the composition by giving different depth coordinates (Z-coordinate values) to these plurality of extracted images. In this manner, it becomes possible to produce the video image with the depth easily. Here, in conjunction with the given depth coordinates, (X/Z, Y/Z, 1/Z) which is the transparent conversion (for which the extinction point is located at the infinite point) can be applied. In this manner, the image becomes smaller as the depth becomes deeper, so that it is possible to produce the video image with the depth perspective very easily.

<Sixth Embodiment>

Referring now to FIG. **54** to FIG. **58**, the sixth embodiment of the present invention will be described in detail.

There are several methods for producing the three dimensional model of a character. One method is to produce a model of a character by clay and the like, and to trace the major points on the surface by a device called three dimensional digitizer that inputs the three dimensional coordinates. This method can produce an accurate model so that it is often utilized in the fields of movies and commercial messages that use the non-real time high quality video images. When the three dimensional model of a large target object is to be produced, it is quite cumbersome to input all the points on the surface one by one by using the three dimensional digitizer, so that there are cases where a device called range finder that irradiates the laser beam and measures distances according to the reflection is used instead.

Another method is to produce the model by using the three dimensional CAD. This method is suitable for a case of producing the model of a mechanical structure or a building which involves relatively few curved surfaces.

42

In either method, in order to give the realistic feeling (genuine feeling), the operation called texture mapping for attaching photographs to the produced three dimensional model is required so as to endow the material quality of the character.

The texture mapping is a two-dimensional coordinate conversion for fitting the square pattern (texture) to a (curved) surface of the three-dimensional object. In the often used modelling software, it is required to specify an attaching target surface and the texture to be attached there. This operation is indispensable for providing the realistic sense to the model but it is also quite cumbersome. In particular, this operation required too much burden on an operator and therefore not suitable for such a usage like an entertainment for children to create the animation at home.

In view of these, this sixth embodiment is directed to another exemplary case of the feature data generation unit of the first embodiment which makes it possible to carry out the operation to produce the three dimensional model and attach the textures to the model easily.

FIG. **54** shows an exemplary configuration of the information input generation apparatus according to this sixth embodiment, which differs from that of FIG. **46** in that a Z-value image memory unit **361** for storing the extracted images and the Z-values in correspondence and a drawing unit **362** for carrying out the drawing based on comparison of Z-values are provided instead of the extraction image memory unit **354** of FIG. **46**.

FIG. **55** is for explaining the principle of the drawing based on comparison of Z-values used in this sixth embodiment. In FIG. **55**, parts (a) and (b) show exemplary Z-value images stored in the Z-value image memory unit **361**. This Z-value image is an image obtained by superposing the extracted image as shown in FIG. **48** for example which is stored in the extracted image memory unit **354** in the configuration of FIG. **46** and the range image as shown in a part (a) of FIG. **24** for example which is stored in the range image memory unit **331** in the configuration of FIG. **23**. In other words, the Z-value image has an RGB color information and a depth information given by the Z-value, for each pixel.

The Z-value images shown in FIG. **55** are shown as monochromatic images for the sake of explanation. Also, for the sake of simplicity, it is assumed that the Z-value image shown in a part (a) of FIG. **55** has the uniform Z-value of "1" while the Z-value image shown in a part (b) of FIG. **55** has the uniform Z-value of "2" (FIG. **55** indicates these Z-values by numbers written in the respective image regions for the sake of simplicity). Now, a case of composing the Z-value images of parts (a) and (b) of FIG. **55** will be described. Here, the darker part is assumed to be closer in distance, that is, having a smaller Z-value.

At a time of the composition, the Z-value image of the part (a) is directly drawn first, and then the Z-value image of the part (b) is drawn in superposition. At the pixels (6,6), (6,7), (6,8), (7,6), and (7,7), only the Z-value image of the part (a) exists, so that the Z-value image of the part (a) remains unchanged there. At the pixel (7,8), the Z-value images of the parts (a) and (b) both exist, but the already written Z-value is "1" of the part (a) while the Z-value of the part (b) is "2", which implies that the part (b) is located farther and therefore the part (b) is not drawn there. Hereafter, similarly, the shadowed region is processed by comparing the Z-values and retaining only the image with the smaller Z-value (that is, the image with the smaller distance) at each pixel. By the similar processing, the extracted images can be composed according to the Z-values

6,144,366

43

as shown in FIG. 56, for example, so that the image with the depth perspective can be produced easily.

According to this sixth embodiment, there is no need for the cumbersome operation to input the three dimensional model and specify a surface to which the texture is to be attached as required in the conventional scheme, and it is possible to produce the texture mapped three-dimensional model easily, in a manner similar to that of taking photographs. Consequently, unlike the conventional scheme which allows only the professional operators and the sufficiently skilled users to produce the animation, this sixth embodiment makes it possible for anyone to easily enjoy producing the animation based on the three-dimensional model.

In the above, a case of producing the video image with the depth perspective by drawing images directly according to the Z-values has been described, but the present invention is not necessarily limited to this case. For example, it is also possible to produce the three-dimensional model by generating a polygon with a vertex coordinates (x, y, z), and mapping the extracted images on that model.

In the sixth embodiment as described above, it is rather difficult to extract a plurality of video images. This problem can be resolved by the following modification. In this case, the apparatus configuration is as shown in FIG. 57, where an extraction range determination unit 363 controls a range of the Z-values at a time of extraction, so that a plurality of targets can be extracted. For example, suppose that the obtained range image has a plurality of targets overlapping as shown in a part 8a) of FIG. 58. In this case, the extraction range determination unit 363 determines a plurality of central Z-values for extraction. Namely, the extraction range determination unit 363 obtains a histogram (frequency distribution) of the distances as shown in a part (b) of FIG. 58, from the range image of the part (a) of FIG. 58. Then, according to (peak positions in) this histogram distribution, the central Z-values for extraction are determined. In this case, there are two peaks in the histogram of the part (b) of FIG. 58 so that two central Z-values Zc1 and Zc2 can be determined. Then, the extraction is carried out by providing some width (denoted as $\gamma$) around these central Z-values, that is, in ranges of Zc1±$\gamma$ and Zc2±$\gamma$. The resulting extracted range images in this case are as shown in parts (c) and (d) of FIG. 58. Then, the video images corresponding to these extracted range images are extracted as the extracted images.

In the part (c) of FIG. 58, the extracted region is divided into two parts, so that these two parts are connected by a closed curve as indicated in the part (c) of FIG. 58, to form a single unified target. Here, however, the video image for the connected part (where another target was originally located) is hidden by that another target so that it cannot be extracted. For this reason, the interpolation image is generated according to the already extracted image parts, and the extracted image is compensated by this interpolation image.

With respect to the Z-value images after the extraction, the shadowed region is processed by the drawing according to the respective Z-values similarly as described above, so as to realize the composition with the depth perspective.

In this modified case, it is possible to extract a plurality of targets and produce the video image with the depth perspective easily, so that the children can enjoy producing new video images (arts) at home, and therefore its effect is enormous.

<Seventh Embodiment>

Referring now to FIG. 59 to FIG. 73, the seventh embodiment of the present invention will be described in detail.

44

In the information input generation apparatus of the present invention, each pixel of the reflected light image indicates an intensity of the reflected light, but the intensity of the reflected light is inversely proportional to the square of the distance to the object. Consequently, the range image can be generated from the reflected light image by using a nonlinear conversion. However, the range image obtained here contains some errors, because the objects at the same distance do not necessary return the same reflected lights depending on their surface orientations and reflection characteristics. Yet, it is still possible to obtain the rough range image, so that errors in the range image due to the object property will be ignored here.

When the ideal reflected light image is obtained, it is possible to obtain a good range image by the nonlinear conversion. However, in practice, the ideal reflected light image cannot be obtained for various reasons. As a consequence, it becomes necessary to provide means for correcting the reflected light image correctly, or means for carrying out the nonlinear conversion and the correction together (both of which will be collectively referred to as correction means). This seventh embodiment describes such correction means in detail.

Here, the cause of the reflected light image distortion will be described first.

To begin with, there is an influence of an imaging lens. The imaging lens is used for focusing the reflected light from the object onto the sensor plane, and generally has a characteristic that its brightness changes according to the incident direction of the light. In general, the brightness is high in the optical axis direction, and becomes lower towards the periphery. In other words, even when the same amount of reflected lights are returned from the same direction, the central portion of the image becomes brighter than the peripheral portion.

The error in the range image is also caused by the non-uniformity of the light emission by the lighting unit. The illumination is generally not completely uniform and the illuminance on the irradiated surface is not uniform. This implies that even when the reflected light image is obtained from the light irradiated onto a flat scattering surface, the obtained reflected light image may not indicate a flat surface.

There is also a non-uniformity in the imaging by the imaging sensor for imaging the reflected light image. The imaging sensor generally comprises a two-dimensional array of cells, each having means for converting the light into charges, means for storing charges, means for transferring charges, and means for amplifying if necessary. The characteristics of these cells are not necessarily identical, and there are individual variations. The error in the range image can also be caused by these individual variations of the cells of the imaging sensor.

Due to various causes as described above, the distortion can be caused in the obtained reflected light image, and this in turn causes errors in the reconstructed range image. For this reason, the image correction becomes necessary.

FIG. 59 shows an exemplary configuration for converting the reflected light image into the range image by using the nonlinear conversion.

A reflected light image generation unit 721 operates according to a control signal from a timing control unit 720 and outputs signals corresponding to the reflected light image. The lighting unit is assumed to be contained in this reflected light image generation unit 721. The output signals of this reflected light image generation unit 721 are analog signals.

A nonlinear conversion unit 722 is a nonlinear amplifier whose amplification rate is changed according to the input

6,144,366

45

voltage. Ideally speaking, it is preferable to have the following relationship between the input voltage Vi and the output voltage Vo.

$$Vo = \frac{k}{\sqrt{Vi}} \qquad (14)$$

where k is a constant. In practice, it is difficult to manufacture a nonlinear amplifier having such a characteristic, so that a nonlinear amplifier or a logarithmic amplifier having approximately similar characteristic may be used. A digital range image can be obtained by A/D conversing the signals outputted from the nonlinear amplifier unit 722.

The nonlinear conversion unit 722 may not necessarily apply the analog conversion, and may apply the nonlinear conversion on digital signals after the A/D conversion. FIG. 60 shows an exemplary configuration in such a case.

The signals outputted from the reflected light image generation unit 721 are converted into digital data by an A/D converter 724, and this digital reflected light image is converted into the range image by a correction unit 725.

The correction unit 725 uses different correction parameters according to the coordinates in the image so that the coordinate information is obtained by a coordinate signal supplied from the timing control unit 723. In this case, an arbitrary characteristic can be realized by giving the input to an address signal of a ROM and taking the output as the converted value, so that the characteristic of the above equation (14) can be satisfied. However, the conversion of the above equation (14) ha a poor conversion precision when the input signal is large, so that it is preferable to apply the A/D conversion with a number of bits greater than that of the final output. In a case of applying the nonlinear conversion after the A/D conversion, it is possible to combine the nonlinear conversion unit with a unit for correcting the reflected light image as will be described below.

It is also possible to modify this configuration of FIG. 60 such that the image data after the A/D conversion are stored into a memory once and then the correction unit 725 accesses this memory to carry out the correction operation.

FIG. 61 shows an exemplary configuration for converting the reflected light image into the range image while correcting the distortion of the reflected light image, using two step conversion.

First, the output of the reflected light image generation unit 721 is converted into distance information by a nonlinear conversion unit 726. Then, this range image is A/D converted by an A/D converter 724, and this digital range image is further converted into an accurate range image by a correction unit 727. In order to correct the distortion of the reflected light image, it is necessary to make a correction for a two-dimensional image so that it is preferable to make a correction after the conversion into the digital image.

The use of such a two step conversion has the following advantages.

When the conversion from the reflected light data to the distance data is carried out after the A/D conversion as in a case of FIG. 60, it becomes necessary for an A/D converter to have many number of bits. The ideal characteristic of the nonlinear conversion for converting the reflected light data into the distance data is a curve as shown in FIG. 62. It can be seen that, when such a nonlinear conversion is applied to the A/D converted image, the conversion precision becomes poor when the input signal is large. In order to avoid this problem, it becomes necessary to apply the A/D conversion with a number of bits greater than the eventually necessary number of bits. When this nonlinear conversion to convert

46

the reflected light data into the distance data is applied before the A/D conversion, a required number of bits of the A/D converter can be less.

Also, the nonlinear conversion before the A/D conversion can have only a rough characteristic. In other words, there is no need to satisfy the characteristic of the above equation (14) completely. This is because, at a time of correcting the distortion of the reflected light image after the conversion, it is possible to make such a correction that the errors left out by the nonlinear conversion can be absorbed. No difficulty or cost increase ill be incurred by correcting the errors of the nonlinear conversion simultaneously at a time of correcting the distortion. In fact, it is possible to reduce the cost because a high precision will not be required for the nonlinear conversion at the analog signal level.

Note that this nonlinear conversion can also be realized by modifying the reflected light image generation unit 721 to output the nonlinear output signals in correspondence to the reflected light intensities.

Next, the details of the correction unit in this seventh embodiment will be described. FIG. 63 and FIG. 65 show two exemplary configurations incorporating the correction unit in two specific forms.

FIG. 63 is a case of using a correction table 728 indicating one-to-one correspondences between the input and the output. When the number of pixels used is 64×64=4096 pixels, their coordinates can be expressed by 12 bits. Then, when the output data is 8 bits, the output value corresponding to arbitrary value of arbitrary pixel can be determined by using a memory having 20 bits address input. When the output value is 8 bits, this memory can be realized in form of a 1 MByte memory. FIG. 64 shows exemplary table data in this correction table 728. The coordinates expressed by 12 bits are allocated to rows, and the input values expressed by 8 bits are allocated to columns. An intersection point in this matrix indicates the output value corresponding to particular coordinate and input value.

FIG. 65 is a case of using a correction table 730 for only selected points. FIG. 66 shows exemplary table data in this correction table 730. The input values in the 256 gradation steps are partitioned at every 8 gradation steps, and the output value is indicated only for the partitioning input value in the table form. When an input value not registered in this table is entered, the output value is calculated by the linear interpolation from the two table values for two registered input values close to that input value.

For example, this table of FIG. 66 is defined as follows.

$$f(LOC,IN)=OUT$$

LOC=0, 1, . . . , 4095
IN=8n (n: 0, 1, . . . , 32)
OUT=0, 1, . . . , 255

Then, the input value not registered in this table can be expressed as follows.

$$IN=\{8a+b|a=0, 1, . . . , 31, b=I, 2, . . . , 7\}$$

In this case, the corresponding output value can be calculated as follows.

$$f(LOC,IN)=\frac{1}{8}(8-b)f(LOC,8a)+b \cdot f(LOC,8(a+1)))$$

When this scheme is adopted, the memory capacity required for storing the correction table can be reduced to ⅛ of that required in the configuration of FIG. 63.

6,144,366

47

Note that the correction data for points which are spatially close to each other on the image have close values. Consequently, instead of proving correction data for all coordinates, it is possible to adopt a scheme in which the correction data are provided only for the selected coordinates and the correction data for the other coordinates are obtained by the calculation based on the correction data for nearby points. In this manner, the memory capacity for storing the correction data can be reduced further.

When this correction unit is realized in a form of software, the configuration may be modified slightly. FIG. 67 shows an exemplary configuration in such a case.

An image data storage unit 731 temporarily stores the reflected light image A/D converted by an A/D converter (not shown) without correction.

An image data transfer unit 732 then transfers the image data stored in the image data storage unit 731 to a computer for executing the correction processing. More specifically, this image data transfer unit 732 is an interface circuit provided on a hardware configuration including the reflected light image generation unit 721, or a device driver that functions to received data on a computer.

A correction calculation unit 729 is realized by a software executed on the computer. The correction data are stored in the correction table 730 which is also provided on that computer. In this case, the correction calculation unit 729 receives the image data, but these image data also contains coordinate information, so that it is logically equivalent to receiving the output data along with the coordinate information as in a case of FIG. 65.

Next, the method for producing the correction data in this seventh embodiment will be described.

FIG. 68 shows an exemplary configuration of an apparatus for automatically producing the correction data. Here, the reflected light image generation unit 721 is the same as already described above. A control unit 735 has the function of the timing control unit 723 already described above, as well as a function for controlling a reference object activation unit 733.

The reference object activation unit 733 moves a reference object 734 according to the control signal from the control unit 735. The reference object 734 is in a form of a flat plate which is perpendicular to the optical axis of the imaging lens, and moved to change its distance with respect to the imaging section. In a case of producing the correction data for capturing a shape of the hand, it is preferable for this reference object 734 to have a reflection characteristic similar to that of the hand surface as much as possible.

The control unit 735 also provides the information on the current distance of the reference object 734 to a correction data calculation unit 737, and the coordinate signal to a correction data storage unit 736.

The correction data calculation unit 737 calculates the correction data from the reflected light image and the information on the current distance of the reference object 734. The calculated correction data are stored in the correction data storage unit 736, in correspondence to the coordinate information given from the control unit 735. Else, it is also possible to modify this configuration of FIG. 68 such that the coordinate information is supplied from the control unit 735 to the correction data calculation unit 737, and the correction data calculation unit 737 stores the correction data and the coordinate information in correspondence into the correction data storage unit 736.

Now, the processing in this configuration of FIG. 68 is carried out as follows.

First, the distance range to be inputted is divided into 256 equal parts, and the distance between the reference object

48

734 and the reflected light image generation unit 721 is sequentially changed in these 256 steps.

At each step, several reflected light images are captured, and one reflected light image is produced by averaging them. This operation is repeated at each distance, so as to obtain total 256 sets of the reflected light images. In this way, the relationship between the output and the distance at 256 points for each pixel is obtained.

Then, the correction data are produced according to this relationship. In a case of having the correction values with respect to all the output values (inputs of the correction unit), a table is formed from these data. In a case of having correction values discretely, each partition of the obtained relationship between the output and the distance is approximated by a line segment, and the intersections of the line segments are stored as the correction data.

For example, a curve shown in a part (b) of FIG. 69 is the relationship between the output and the distance as obtained by sequentially moving the reference object 734, and lines shown in a part (a) of FIG. 69 are the approximating line segments, where joints of these lines are the correction data. In such a case of having the correction data discretely, the correction data may be provided at regular intervals or the correction data may be provided at irregular intervals for an ease of the approximation. For example, a narrower interval can be used at sharply curving section and a wider interval can be used at nearly straight section. Note that, in graphs shown in FIG. 69, the output value has a ceiling because the output is assumed to be in 8 bits ($0$ to $255$) so that any farther distance cannot be expressed.

The correction data as described above are preferably produced in advance and offered in a form of being included in a product, but there can be cases where it becomes necessary to produce the correction data again after the product is purchased by the user. For example, it is possible for the correction data to become inappropriate because of the change of the environment under which they are used, the malfunction of LED, the secular change or LED and sensor characteristic, or some other causes. It is also possible to require the user to produce the correction data from the beginning.

In such cases, there is a need to provide a mechanism for producing the correction data by the user operations. FIG. 70 shows an exemplary configuration for realizing this mechanism. Here, the constituent elements other than a user commanding unit 738 are basically similar to those of FIG. 68.

The user commanding unit 738 sequentially commands the user to place a reference object at specified distances. The user only need to carry out the commanded operations according to this command, and the rest of the reference data production processing is carried out automatically. Here the method for producing the correction data is basically the same as described above. Here, however, it is not very appropriate to require the repetitive manual operations to the user too many times at excessively minute intervals. Also, the position and the orientation of the reference object placed by the manual operation are not necessarily very accurate, so that it is important to carry out the calculation by anticipating reasonable errors.

FIG. 71 shows an exemplary dialogue box to be displayed on the screen by the user commanding unit 738.

When the correction data are produced by the user operations, the reliability of the correction data is inevitably lower, because the user places the reference plate at the specified position but the position and the orientation of the placed reference plate are not necessarily accurate. In view

6,144,366

49 50

of this fact, it is also possible to absorb the inaccuracy by limiting the correction targets to only those factors which can be easily modelled.

One of the major causes of the distortion in the range image reconstructed from the reflected light image is the lowering of the peripheral light amount in the imaging lens which causes the lower brightness at positions farther away from the optical axis. In other words, even when a flat plate is placed, the reflected light amount at the peripheral portion is smaller than that at the central portion. In practice, the further amount lowering due to the larger distance for the peripheral portion is also added to this effect.

When the non-uniformity of the sensor sensitivity and the non-uniformity of the light emission are within the tolerable range, it suffices to correct only this light amount lowering (including the lowering due to distance difference) of the lens. Since the specification of the lens is known in advance, the characteristic regarding the extent of this peripheral light amount lowering is also known in advance. Consequently, under the assumption that the optical axis passes through the center of the image sensor, the correction data can be easily obtained by the calculation based on this known characteristic. However, the optical axis may not necessarily pass through the center of the image sensor, mainly because of an error in a mounting position of the image sensor introduced at a time of mounting a sensor chip on a sensor package. Yet, the correct correction is still possible by shifting the correction data obtained under the assumption that the optical axis passes through the center of the image sensor, as much as the displacement of the image sensor.

FIG. 72 shows an exemplary case of such a shift of the correction data, where bar graph indicates the raw data before correction, a curve graph indicates correction data which are assumed to be values to be multiplied to the raw data, and a line graph with markers indicate corrected data. The image data is actually two-dimensional, but only one dimension part (x-direction or y-direction part) is shown in FIG. 72 for the sake of simplicity.

A part (a) of FIG. 72 shows the reflected light image obtained from a flat surface when the optical axis of the lens passes through the center of the sensor, in which the power decreases smoothly from a peak at the center toward the periphery. In this state, when the correction data as indicated by a curve graph are multiplied, the data values becomes uniform as indicated by a line graph with markers, so that the flat surface can be expressed.

A part (b) of FIG. 72 shows a case where the optical axis of the lens is displaced from the center of the sensor. It can be seen that the corrected data obtained by multiplying the correction data do not indicate a flat surface.

A part (c) of FIG. 72 shows a case where the correction data is shifted from a state shown in the part (b) such that the corrected data obtained by multiplying the shifted correction data now correctly indicate a flat surface.

In this manner, when the peripheral light amount lowering of the lens is dominant, it suffices to provide the correction model for a case where the optical axis of the lens passes through the center of the sensor, and sequentially shift these correction data to find out a position where the correction result is closest to the flat.

FIG. 73 shows a flow chart for this operation to produce correct correction data by shifting the correction data. In this operation of FIG. 73, the user is commanded to place the reference plate at the specified distance (step 751) and the reflected light image is acquired (step 752). Then, the correction model is applied so that the position of the correction data is shifted horizontally so that the values after the correction indicate a flat surface as in a part (c) of FIG. 72 (step 753), and after the correction data are produced, the user is commanded to move the reference plate parallel (step 754). By moving the reference plate, the reflected light images of the reference plate at many distances are acquired and the corrected images are produced for these reflected light images, and then whether the correction data are correct or not is judged (step 755). Here, whether the correction data are appropriate or not may be judged automatically, or the corrected range image may be shown to the user and the user may be asked to judge whether it is correctly corrected or not.

Note that a case of requiring the user to produce the correction data has been described here, but it is also effective to use this correction model even in a case of automatically producing the correction data by using the reference object moving means.

<Eighth Embodiment>

Referring now to FIG. 74 to FIG. 79, the eighth embodiment of the present invention will be described in detail.

This eighth embodiment is directed to a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments.

FIG. 74 shows a computer equipped with the information input generation apparatus of the present invention. This computer of FIG. 74 is a portable computer generally called note PC in which a keyboard and a display are integrally provided with the computer body. In this computer of FIG. 74, a lighting unit 701 and a photo-detection sensor unit 702 of the information input generation apparatus are provided at positions beyond the keyboard when viewed from an operator side, and arranged to have the optical axis of the photo-detection sections pointing obliquely upward towards the operator side. In FIG. 74, the entire hand of the operator is illuminated, as can be seen from a dashed line circle indicating a range of illumination.

In this configuration, the operator operating the keyboard can make the pointing or gesture input by slightly raising and moving the index finger. The user's convenience is remarkably improved here because the keyboard input and the pointing or gesture input can be made without hardly any shift of the hand position. It is also possible to provide a button for use in conjunction with the pointing or gesture input. The operations such as click and drag for selecting and moving icons on the screen can be carried out by using this button. It is also convenient to use a button in a case of inputting a timing trigger in the gesture input.

It is also possible to make this information input generation apparatus operable only when the button is depressed. Namely, when it is desired to make the pointing or gesture input, the input is made by moving hand while depressing the button. In this manner, it is possible to prevent an erroneous operation due to an accidental entry of the finger into the operation region without an intention for making the pointing or gesture input. This is particularly effective in a case of pointing, because there is no possibility for making an erroneous pointing operation while using the keyboard. The operation region can be set very close to the home position of the keyboard so that the pointing operation can be made with the minimum movement of the hand (such as the slight upward pointing of the index finger of the right hand). In addition, the lighting unit only emits the light only when the button is depressed so that the power consumption can be saved.

In a case of the note PC, this button can be replaced by a key of the keyboard. For example, in a case of using a space

6,144,366

51

bar, normally this space bar is set to have a function for inputting a space, and when this space bar is depressed while the cursor is displayed by the finger pointing, this space bar is set to have a function for inputting operations such as click and drag.

In a case of using a separate keyboard, a positional relationship between the keyboard and this information input generation apparatus can be an important factor. FIG. 75 shows a keyboard device equipped with the information input generation apparatus of the present invention. Similarly as in a case of the note PC described above, a lighting unit 703 and a photo-detection sensor unit 704 are provided at positions in such a positional relationship with the keyboard that the light is irradiated onto the hand when the hand is raised from the home position of the keyboard. Here, again, a dashed line circle indicates a range of illumination.

Although not always necessary, a key 705 that can be used in conjunction with the pointing or gesture input is also provided in the keyboard device of FIG. 75. By replacing the existing keyboard with this keyboard device of FIG. 75, it is possible to use the keyboard input and the pointing or gesture input together under the comfortable environment. Two keys like the key 705 may be provided at left and side sides of the keyboard in order to make it equally convenient for the left-handed user and the right-handed user.

FIG. 76 shows a display device equipped with the information input generation apparatus of the present invention. This device is convenient when a positional relationship between the operating hand and the screen is important. A lighting unit 706 and a photo-detection sensor unit 707 are provided above the display screen. The orientation of the light and the photo-detection section is set to be slightly downward so that a range indicated by a dashed line circle can be illuminated. This arrangement is adopted because it is easier for a user to make the operations by positioning the hand at roughly the same or slightly lower height as the screen.

In FIG. 76, the information input generation apparatus is arranged at an upper part of the display device, but it is also possible to arrange the information input generation apparatus at a lower part or a side part of the display device. By arranging one information input generation apparatus on the left side and another information input generation apparatus of the right side, it is also possible to create an environment where the input can be made by both hands simultaneously.

FIG. 77 shows a display device embedded on the wall which is equipped with the information input generation apparatus of the present invention. Here, an information input generation apparatus is either attached to or placed nearby an embedding type display 709. The information input generation apparatus may be formed integrally with the embedding type display 709. At least the lighting unit and the photo-detection sensor unit of the information input generation apparatus are provided within a box shaped casing 708 placed above the display 709. The feature data generation unit of the information input generation apparatus may be also provided within this casing 708, or contained inside the display body, or else provided separately. It is preferable for this casing 708 containing the lighting unit and the photo-detection sensor unit to have its orientation adjustable. In FIG. 77, a range indicated by a dashed line circle is illuminated, and an object 711 displayed on the display 709 is operated as an operator moves an hand 710 within this range.

This display device of FIG. 77 is suitable for an information presentation or input terminal at a public location such as a museum or a station. It is also possible to create

52

a preferable environment by using a combination of a compact display embedded on the wall and the information input generation apparatus as an operation unit for the home automation and the like.

FIG. 78 shows a compact portable information device equipped with the information input generation apparatus of the present invention, which is in a size that can be held by one hand. The information input generation apparatus of the present invention only requires to have a window capable of lighting and photo-detecting on an external body, so that a limited space available in this compact portable information device can be utilized efficiently. In FIG. 78, a window 712 is provided for the lighting unit and the photo-detection sensor unit. A position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712. Here, the window 712 is so small that the remaining space can be used as a relatively large display unit 715 despite of an overall compact size of this compact portable information device.

FIG. 79 shows a wrist watch like very compact portable information device equipped with the information input generation apparatus of the present invention. Here, again, a cursor 717 can be controlled by moving a finger 716. Windows 718 and 719 are provided for the lighting unit and the photo-detection sensor unit. When the device body is as small as this one, there is not even a space for installing a pen, so that the convenience of the input operations realized by the information input generation apparatus is evident. Also, by placing the operation space at a position displaced from a line between the eyes and a display device, it is possible to prevent the operating finger from obstructing the view of the display.

In a case of installing the information input generation apparatus of the present invention on a portable device like this, it is necessary to make the device less power consuming. The information input generation apparatus requires to emit a considerable amount of lights, so that the control of the lighting currents can contribute to the lower power consumption.

To this end, the light emission timing and the emitted light amount can be controlled to realize the lower power consumption. For example, when there is no object in front of the device, this fact can be detected as all the pixel values of the reflected light image become nearly zero. When this absence of an object is detected, or after a prescribed time elapsed since this absence of an object is detected, the light emission interval can be set longer. For instance, the light emission rate of once in every $\frac{1}{30}$ sec. can be lowered to once in every $\frac{1}{10}$ sec. In this manner, the lighting power can be lowered to $\frac{1}{3}$.

When an object appears in front of the device again, this fact can be detected from a change appearing in the reflected light image, so that the light emission rate can be set back to once in every $\frac{1}{30}$ sec. While actually moving the cursor, there would be an apparent difference in the smoothness of the cursor motion between a case of photo-detecting 30 times per second and a case of photo-detecting 10 times per second. In contrast, a slight delay in an appearance of a cursor since the hand is extended is not so frustrating.

It is also possible to realize the lower power consumption by controlling the emitted light amount rather than the light emission timing. In comparison to a light amount required for detecting the position of the finger tip at high precision, a light amount required for judging whether there is an object in front of the device or not is much smaller. Consequently, when an absence of an object in front is detected, the emitted light amount can be controlled to be

6,144,366

53

smaller, and only whether an object appears again or not Is checked. When the reappearance of an object is detected, the emitted light amount can be set back to the original amount.

The above described light emission timing control and the emitted light amount control may be carried out simultaneously. In such a case, even greater power consumption saving effect can be expected.

Now, in the information input generation apparatus of the present invention as described above, the CMOS sensors are used as the photo-detection means, and as described above, the CMOS sensors have the structural property that it is possible to control the photo-detection (charge storing) and the read out arbitrarily in unit of pixel, and the control time can be as short as about $\frac{1}{10000}$ second or less, but it can also be set to any sufficiently long time, so that it is possible to eliminate the influence of the external light fluctuation by selecting the optimum value according to the fluctuation of the external light. However, there still remains the problem as to how to realize the optimal setting according to the fluctuation state of the external light. In the following, the embodiments directed to this aspect will be described in detail.

The above described information input generation apparatus has the lighting unit and the photo-detection section, and outputs an image formed by the reflected light from an object resulting from the light emitted by the lighting unit, so as to enable the gesture recognition and so on. In this apparatus, the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, and cancels the image due to the external light components by taking difference between them, so as to obtain the reflected light image which is the image solely due to the reflected light of the object resulting from the light emitted by the lighting unit, as already described in detail above.

Here, the external lights include not just the sunlight but also the fluorescent light which regularly (periodically) fluctuates even under the stable operation state, and moreover there are various types of fluorescent light such as an ordinary fluorescent light, an inverter fluorescent light, etc., and their fluctuation periods vary.

Also, the same time period is assigned to the image acquisition (charge storing) operation at a time of light emission by the lighting unit and the image acquisition (charge storing) operation at a time of no light emission by the lighting unit, but when the external light fluctuates between these cases, the lowering of the quality of the difference image, that is, the degradation of the obtained reflected light image, may be caused depending on a size of a difference in the external light between these cases.

There are a case where the external light fluctuates irregularly and a case where the external light fluctuates regularly, and how to handle the external light is different in these two cases.

In the case of the irregular fluctuation, the level of degradation cannot be ascertained until the reflected light image is obtained, whereas in the case of the regular fluctuation, the relationship of the timings for the above described two image acquisition operations with respect to the fluctuation period is related to the image quality of the reflected light image.

In particular, when the time difference between a case of light emission and a case of no light emission is close to the fluctuation period of the external light, a difference between the stored charges in these two cases may include the contribution from the fluctuation of the external light.

54

When the influence due to the fluctuation of the external light remains in the reflected light image, it may not be possible to extracts only the reflected light of the target object under the light irradiation by the lighting unit at high precision, depending on a size of this influence due to the external light fluctuation.

Consequently, it is necessary to deal with the external light fluctuation, and the following embodiments are directed to this aspect.

<Ninth Embodiment>

Referring now to FIG. 80 to FIG. 84, the ninth embodiment of the present invention will be described in detail.

This ninth embodiment is directed to a case of dealing with the irregular external light fluctuation. In this ninth embodiment, a level of the external light alone is detected and the state of the external light is judged from the detected external light level, and then the acceptance or rejection of the reflected light image is determined according to the judged external light state.

FIG. 80 shows an exemplary configuration of the information input generation apparatus in this ninth embodiment, which comprises a lighting unit **1101** (corresponding to the lighting unit **101** of FIG. 1), a reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. 1), an optical filter **1202**, an external light detection unit **1203**, an external light state judgement unit **1204**, and a lighting and photo-detection operation control unit **1205** (corresponding to the timing signal generation unit **104** of FIG. 1). In FIG. 80, a target object **106** placed in front of this information input generation apparatus is constantly illuminated by the external light from an external light source **1201**.

The lighting unit **1101** is a light source for illuminating the target object **106**, which is the light source of the reflected light image. For this lighting unit **1101**, an LED for emitting lights with the wavelength in the infrared range can be used. This lighting unit **1101** is controlled by the lighting and photo-detection operation control unit **1205**.

The external light source **1201** is a light source of an indoor or outdoor environment under which the target object **106** is placed. The target object **106** always receives lights from this external light source **1201**.

The optical filter **1202** is a filter for blocking illumination lights in the infrared range from the lighting unit **1201**, for the purpose of extracting only the external light components.

The external light detection unit **1203** detects a level of the external light received through the optical filter **1202**, and outputs a detection output corresponding to the intensity of the entered external light.

The external light state judgement unit **1204** receives the detection output of the external light detection unit **1203**, and monitors the level and the fluctuation in time of the external light, so as to detect an external light state that has a possibility of largely affecting the reflected light image and generate an external light state intolerable signal when this state is detected.

The lighting and photo-detection operation control unit **1205** carries out control of various timing signals so as to realize the operations according to the output result of the external light state judgement unit **1204**. In this embodiment, when the external light state judgement unit **1204** judges that there is an external light fluctuation that has a possibility for largely affecting the reflected light image, the lighting and photo-detection operation control unit **1205** generates necessary timing signals for controlling the apparatus so that the acquisition of the image by the external light alone and the acquisition of the image in a case of light

6,144,366

55

emission by the lighting unit **1101** are carried out and the reflected light image is extracted as a difference between these images, once again, but after a prescribed time has elapsed, this control is not carried out and instead a signal indicating the poor reflected light image quality is generated and given to the reflected light image acquisition unit **1102**.

The reflected light image acquisition unit **1102** acquires the image in a case of light emission by the lighting unit **1101** and the image in a case of no light emission by the lighting unit **1101**, obtains a difference component between these images, and outputs it as the reflected light image, in response to the timing signal from the lighting and photo-detection operation control unit **1205**. When an external light state intolerable signal indicating the external light state that has a possibility of largely affecting the reflected light image is generated by the external light state judgement unit **1204**, the reflected light image acquisition unit **1102** is reset so that the processing for obtaining the reflected light image by carrying out the image acquisition and the difference extraction once again.

In this configuration of FIG. 80, the reflected light image acquisition unit **1102** acquires the image of the target object **106** illuminated by the light emitted by the lighting unit **1101** and the image of the target object **106** illuminated only by the external light without the light from the lighting unit **1101** according to the control of the lighting and photo-detection operation control unit **1205**, and obtains the reflected light image as the difference component between these two images.

On the other hand, at the image acquisition timing of the reflected light image acquisition unit **1102**, the external light detection unit **1203** detects the level of the light under the environment. In front of this external light detection unit **1203**, the optical filter **1202** is provided for blocking the reflected light from the target object **106** resulting from the light emitted by the lighting unit **1101**, so that only the external light is detected by the external light detection unit **1203**. The detection output of this external light detection unit **1203** is then given to the external light state judgement unit **1204**.

The external light state judgement unit **1204** is monitoring the level and the fluctuation in time of the external light according to this detection output, and detects a state which has a possibility of largely affecting the reflected light image. Then, an intolerable signal is generated when the state which has a possibility of largely affecting the reflected light image is detected, whereas this intolerable signal is not generated in cases of the other states.

The reflected light image acquisition unit **1102** acquires the target object images and the reflected light image as a difference component between the acquired target object images, according to the timing signals from the lighting and photo-detection operation control unit **1205** that may include the intolerable signal generated by the external light state judgement unit **1204**, and when the output result (intolerable signal) from the external light state judgement unit **1204** is present, the reflected light image acquisition unit **1102** once again repeats the operation to acquire the image of the target object **106** illuminated by the light emitted by the lighting unit **1101** and the image of the target object **106** illuminated only by the external light without the light from the lighting unit **1101** and obtain the reflected light image as the difference component between these two images.

Note that, although not shown in FIG. 80, it is also possible to provide a reflected light image processing unit at a next stage of the reflected light image acquisition unit **1102** so as to determine how to handle the reflected light image according to the output of the external light state judgement unit **1204**.

56

In the present invention, the CMOS sensors are used for the photo-detection section in the reflected light image acquisition unit **1102** to acquire the images of the target object **106** in real time, and the difference component of the acquired images is outputted as the reflected light image in forms of image signals for video image. The operation of the CMOS sensors for one frame is basically repetitions of the photo-detection and charge storing and the charge output.

FIG. 81 shows a timing chart for this operation, where a part (a) indicates the lighting pulse (the light emission by the lighting unit **1101**, that is, the irradiation of the illumination light) and a part (b) indicates the operation of the CMOS sensors. In FIG. 81, "R", "1" and "2" indicates the "reset of the stored charge", "storing into the first charge storage unit (corresponding to **109** of FIG. 2 or **119** of FIG. 4)" and "storing into the second charge storage unit (corresponding to **110** of FIG. 2 or **120** of FIG. 4)", respectively.

More specifically, this operation at the reflected light image acquisition unit **1102** is carried out according to the flow chart of FIG. 83 as follows.

Within one frame period, the charges in the first and second charge storage units in the photo-detection section are reset at the timing of "R" (step **831**), and then charges are stored for a prescribed period of time into the first charge storage unit at the timing of "1" (step **832**) so as to realize the photo-detection of the target object image. At the same time, the lighting unit **1101** emits the light for the same period of time.

Next, the charges of the photo-detection section are reset at the timing of next "R" that appears again (step **833**), and then charges are stored for a prescribed period of time into the second charge storage unit at the timing of "2" (step **834**) so as to realize the photo-detection of the target object image. At this point, the lighting unit **1101** does not emit any light.

The difference component of the two images so obtained is obtained as a reflected light image, and this reflected light image is outputted to the subsequent stage in the second half of one frame period (step **836**). In a case of using the CMOS sensors as in this ninth embodiment, at a time of the reflected light image output, the difference of the stored charges in two charge storage units for each unit pixel is outputted so as to output only the reflected light component from the object resulting from the light emitted by the lighting unit **1101**.

While operating according to the timings as indicated in FIG. 81 in which case the reflected light image can be successfully acquired by storing charges into the first and second charge storage units once, the time used for the charge storing is quite short, and there is a time margin before the data output. However, this is not the case in a situation where there is a problem regarding the reliability as many noise components are contained in the reflected light image, that is, in a state where the external light fluctuation is large.

Namely, in this ninth embodiment, in parallel to the reflected light image acquisition operation by the reflected light image acquisition unit **1102**, the external light level as indicated in a part (a) of FIG. 82 is detected by the external light detection unit **1203**. At this point, when the near infrared LED is used as the light source of the lighting unit **1101**, for example, the near infrared light blocking optical filter **1202** is provided in front of (i.e. the input side of) the external light detection unit **1203**, so that the reflected light resulting from the light of this light source does not enter into the external light detection unit **1203**.

Then, the external light state judgement unit **1204** monitors the external light level according to the detection output

6,144,366

57      58

of the external light detection unit **1203**, and detects a state in which the external light level fluctuation is large so that there is a possibility for largely affecting the reflected light image. When this state is detected, the external light state judgement unit **1204** outputs the external light state intolerable signal as indicated in a part (b) of FIG. **82** to notify this detection result. In this external light state intolerable signal, when the logical level of this is "H (HIGH)", it is indicated that a corresponding region is judged as having a poor external light state (that has a possibility of largely affecting the reflected light image).

This judgement is made, for example, when the external light fluctuation is abrupt (a case of first "H" state in the part (b) of FIG. **82**) or when the external light level is very high (a case of second "H" state in the part (b) of FIG. **82**).

When the external light fluctuation is abrupt, there is a large difference between the light amounts due to the external light as stored in the first charge storage unit and the second charge storage unit that constitute the reflected light image acquisition unit **1102**, so that the difference component between them will contain not just the reflected light component but also a large external light fluctuation part as well.

When it is under the environment where the external light level is very large, the rate of the reflected light with respect to the external light becomes very small, so that S/N (Signal to Noise ratio) becomes poor.

Consequently, when these types of the external light fluctuation is present, the noise components become large and it becomes impossible to extract the target object **106** at high precision.

In an example shown in FIG. **82**, the first lighting and storing operation is carried out within one frame period as described above, but by the time this operation is finished, it is ascertained that the external light state was poor during this storing operation (t1 in the part (b) of FIG. **82**), so that this operation is cancelled once and retried (step **835** YES).

In other words, the stored charges are reset again ("R"), and the storing into the first charge storage unit ("1") and the storing into the second charge storing unit ("2") are repeated again. During this second storing operation, the external light state was normal (the external light state intolerable signal was in "L" state), so that the obtained difference component (reflected light image) is outputted as it is (step **835** NO).

The extraction of the reflected light image and the output of this extracted reflected light image are to be carried out within a prescribed period of time (one frame period), so that the storing operation would overlap with the data output timing if the storing operation is retried too many times. For this reason, a prescribed number of times for which the retry is permitted at most is determined in advance, and the retry is not repeated beyond this prescribed number of times (step **837**).

When the normal reflected light image could not be obtained at the end, that is, when the normal reflected light image could not be obtained before the data output timing comes, the last obtained low reliability data are outputted, and at the same time, a signal indicating that this reflected light image has a lower reliability is also outputted by the separate line.

In the configuration of FIG. **80** described above, the image acquisition and difference (reflected light image) acquisition operation is retried according to the external light fluctuation state by directly controlling the lighting and photo-detection operation control unit **1205** according to the output of the external light state judgement unit **1204**.

However, instead of carrying out such a retry, it is also possible to determine the acceptance or rejection of the reflected light image outputted from the reflected light image acquisition unit **1102** according to the output of the external light state judgement unit **1204** at the subsequent stage so that the low reliability reflected light image will not be utilized.

FIG. **84** shows an exemplary configuration of the information input generation apparatus in this ninth embodiment for such a modified case.

In the configuration of FIG. **84**, the processing for acquiring the image illuminated by the light emitted by the lighting unit **1101**, acquiring the image due to the external light alone, and obtaining the reflected light image by obtaining the difference component between these images is carried out only once by the reflected light image acquisition unit **1102** within one frame period, and the obtained reflected light image is outputted within an output period.

The reflected light image obtained by the reflected light image acquisition unit **1102** is received at a reflected light image processing unit **1103**, which has a function for determining whether this received reflected light image is to be used or to be discard according to the output of the external light state judgement unit **1204**. The reflected light image processing unit **1103** may also have the other functions similar to those of the feature data generation unit **103** of FIG. **1**.

Thus, in this configuration of FIG. **84**, instead of controlling the reflected light image acquisition unit **1102** and the lighting unit **1101** according to the output of the external light state judgement unit **1204**, the reflected light image processing unit **1103** is provided to determine the acceptance or rejection of the reflected light image according to the output of the external light state judgement unit **1204**.

This reflected light image processing unit **1103** is basically a unit for further processing the outputted reflected light image, and changes the manner of processing the reflected light image according to the output (which is not necessarily binary) of the external light state judgement unit **1204** supplied thereto.

When the external light state is very poor, the reflected light image is discarded and not utilized, or the current frame is predicted by utilizing the previous frame, for example. In a case of using the prediction, it is preferable to control the procedure for making prediction by using how poor the external light state is as a parameter for indicating how low the reliability of the current frame is.

According to the ninth embodiment as described above, at a time of obtaining the reflected light image of the target object, when the adverse influence of the external light fluctuation is large, the reflected light image acquired in this state will not be used, so that only the high quality image of the target object alone can be easily acquired, and therefore it becomes possible to realize the acquisition of information on gesture or three-dimensional operation made by the target object at high precision.

<Tenth Embodiment>

The ninth embodiment described above is directed to a technique for monitoring the external light level and not utilizing the reflected light image obtained at a timing where the influence of the external light fluctuation is present.

However, in that case, the utilizable reflected light image cannot be obtained under the unstable environment where the external light fluctuation continues indefinitely. Also, under the environment where the light amount is constantly fluctuating in short period as in a case of using the inverter type fluorescent light, there may be cases in which the

6,144,366

59

utilizable reflected light image cannot be obtained forever. Also, in a case where it is necessary to extract the reflected light image at the rate as fast as 30 frames per second as in a case of the TV images, or in a case where it is necessary to extract the reflected light image at the rate even faster than that, there may be cases where the reflected light image cannot be obtained as the flickering of the fluorescent light has a directly influence on the external light fluctuation.

In view of these problems, this tenth embodiment is directed to a technique suitable for use under the environment involving the external light that is fluctuating constantly and periodically, and capable of obtaining the reflected light image in real time.

Referring now to FIG. 85 to FIG. 87, the tenth embodiment of the present invention will be described in detail.

In this tenth embodiment, a unit for monitoring the fluctuation of only the external light is provided to detect the fluctuation period of the external light, and the lighting and photo-detection operation control is carried out according to the detected external light fluctuation period.

FIG. 85 shows an exemplary configuration of the information input generation apparatus in this tenth embodiment, which comprises a lighting unit **1101** (corresponding to the lighting unit **101** of FIG. **1**), a reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. **1**), an optical filter **1202**, an external light detection unit **1203**, an external light fluctuation period detection unit **1301**, and a lighting and photo-detection operation control unit **1205** (corresponding to the timing signal generation unit **104** of FIG. **1**). In FIG. **85**, the target object **106** placed in front of this information input generation apparatus is constantly illuminated by the external light from the external light source **1201**.

The lighting unit **1101** is a light source for illuminating the target object **106**, which is the light source of the reflected light image. For this lighting unit **1101**, a LED for emitting lights with the wavelength in the infrared range can be used. This lighting unit **1101** is controlled by the lighting and photo-detection operation control unit **1205**.

The external light source **1201** is a light source of an indoor or outdoor environment under which the target object **106** is placed. The target object **106** always receives lights from this external light source **1201**.

The optical filter **1202** is a filter for blocking illumination lights in the infrared range from the lighting unit **1201**, for the purpose of extracting only the external light components.

The external light detection unit **1203** detects a level of the external light received through the optical filter **1202**, and outputs a detection output corresponding to the intensity of the external light.

The external light fluctuation period detection unit **1301** receives the detection output of the external light detection unit **1203**, and monitors the level and the fluctuation in time of the external light, so as to detect an external light fluctuation period.

The lighting and photo-detection operation control unit **1205** carries out control of various timing signals so as to realize the operations in synchronization with the external light fluctuation period, according to the fluctuation period information detected by the external light fluctuation period detection unit **1301**. In this embodiment, the lighting and photo-detection operation control unit **1205** generates timing signals for controlling the apparatus so that the light emission by the lighting unit **1101** and the first charge storing operation by the reflected light image acquisition unit **1102** are carried out in synchronization with one external light fluctuation period, and the second charge storing

60

operation by the reflected light image acquisition unit **1102** in a state of no light emission by the lighting unit **1101** is carried out in synchronization with a next external light fluctuation period so as to obtain the image due to the external light alone.

The reflected light image acquisition unit **1102** acquires the image in a case of light emission by the lighting unit **1101** (given by charges stored by the first charge storing operation) and the image in a case of no light emission by the lighting unit **1101** (given by changes stored by the second charge storing operation), obtains a difference component between these images, and outputs it as the reflected light image, in response to the timing signal from the lighting and photo-detection operation control unit **1205**.

In this configuration of FIG. **85**, the reflected light image acquisition unit **1102** acquires the image of the target object **106** illuminated by the light emitted by the lighting unit **1101** and the image of the target object **106** illuminated only by the external light without the light from the lighting unit **1101** according to the control of the lighting and photo-detection operation control unit **1205**, and obtains the reflected light image as the difference component between these two images.

On the other hand, the state of the external light is monitored by the external light detection unit **1203**. In front of this external light detection unit **1203**, the optical filter **1202** is provided for blocking the reflected light from the target object **106** resulting from the light emitted by the lighting unit **1101**, so that only the external light is detected by the external light detection unit **1203**. When the lighting unit **1101** emits the infrared light, this optical filter **1202** is realized in a form of an infrared light blocking filter.

The detection output of this external light detection unit **1203** is then given to the external light fluctuation period detection unit **1301**. In response, the external light fluctuation period detection unit **1301** detects the fluctuation period of the external light according to the supplied detection output. Then, this detected fluctuation period information is given to the lighting and photo-detection operation control unit **1205**.

The lighting and photo-detection operation control unit **1205** generates the control signals for the lighting and photo-detection operations so as to carry out these operations in synchronization with the external light fluctuation period detected by the external light fluctuation period detection unit **1301**.

FIG. **86** shows an exemplary case where the external light fluctuation occurs regularly. A part (a) of FIG. **86** shows the external light level (the output of the external light detection unit **1203**) in this case, while a part (b) of FIG. **86** shows the external light signals converted into pulses (output of the external light fluctuation period detection unit **1301**). Also, a part (c) of FIG. **86** shows a lighting pulse signal for the lighting unit **1101**, according to which the lighting unit **1101** emits the light, and a part (d) of FIG. **86** shows a signal for controlling the storing operation similar to that shown in FIG. **81**.

The pulse signal of the part (c) of FIG. **86** and the storing operation control signal of the part (d) of the FIG. **86** are generated according to the signal of the part (b) of FIG. **86**. Namely, the timing at which charges are stored into the first charge storage unit (**109** of FIG. **2** or **119** of FIG. **4**) and the timing at which charges are stored into the second charge storage unit (**110** of FIG. **2** or **120** of FIG. **4**) have the same phase with respect to the external light fluctuation period. Consequently, the light amounts due to the external light contained in the charges stored by these two storing opera-

6,144,366

61

tions are going to be equal. Thus, the difference between the stored charges in the first charge storage unit and the second charge storage unit contains hardly any part due to the external light fluctuation, and therefore it is possible to extract the reflected light image at high precision under the regularly fluctuating external light.

FIG. 87 shows an exemplary case where the external light fluctuation period is regular but short with respect to the charge storing time.

In this case, the processing for obtaining the the difference image from the images obtained by the first and second charge storing operations is carried out in synchronization with the external light fluctuation period, and in addition, the storing time of each charge storing operation is set to be n times a single period part of the external light fluctuation. Namely, in an example shown in FIG. 87, the storing operation is always carried out in the storing time which is twice the external light fluctuation period (n=2), when the external light fluctuation period is short with respect to the storing time.

For this reason, similarly as in the previous example, the light amounts due to the external light contained in the charges stored by these two storing operations are going to be equal. Note that the example of FIG. 87 shows a case of setting the storing time as an integer multiple of the external light fluctuation period, but the present invention is not necessarily limited to this case. For example, it is also possible to set the storing time to be 1.5 times, 2.7 times, or 3.3 times the external light fluctuation period, if desired. It is however necessary to have a correct matching of the phases.

Thus, in this tenth embodiment, the external light fluctuation period is detected and the image acquisition is carried out in unit of a prescribed time interval in synchronization with the external light fluctuation period, so that even under the environment in which the external light fluctuations constantly and periodically, it is possible to obtain the reflected light image in real time by eliminating the influence of the external light.

<Eleventh Embodiment>

The tenth embodiment described above is directed to a technique for controlling the acquisition timing of the images from which the reflected light image is to be obtained, with respect to the external light fluctuation. However, there are many cases where the external lights are artificially controllable, as in a case of using the room light.

In view of this fact, this eleventh embodiment is directed to a technique suitable for such a case, in which the light source of the external light is controlled so as to prevent the external light from affecting the reflected light image.

Referring now to FIG. 88 to FIG. 89, the eleventh embodiment of the present invention will be described in detail.

FIG. 88 shows an exemplary configuration of the information input generation apparatus in this eleventh embodiment, which comprises a lighting unit 1101 (corresponding to the lighting unit 101 of FIG. 1), a reflected light image acquisition unit 1102 (corresponding to the reflected light extraction unit 102 of FIG. 1), a light control signal generation unit 1401, and a lighting and photo-detection operation control unit 1205 (corresponding to the timing signal generation unit 104 of FIG. 1). In FIG. 88, the target object 106 placed in front of this information input generation apparatus is constantly illuminated by the external light from the external light source 1201 such as the room illumination light which is driven by a light driving device 1402.

62

The lighting unit 1101 is a light source for illuminating the target object 106, which is the light source of the reflected light image.

The external light source 1201 is a light source of an environment under which the target object 106 is placed. The target object 106 always receives lights from this external light source 1201.

The light driving device 1402 drives this external light source 1201 to emit the external light, and has a function for controlling the light amount of the external light source 1201 according to a light control signal supplied thereto.

The lighting and photo-detection operation control unit 1205 generates signals for controlling the lighting unit 1101 and the reflected light image acquisition unit 1102.

The light control signal generation unit 1401 generates the light control signal according to which the external light source 1201 is to be driven, such that the received light amounts due to the external light in two charge storing operations (the acquisition of the image under the lighting by the lighting unit 1101 and the acquisition of the image due to the external light alone) by the reflected light image acquisition unit 1102 are going to be equal.

The reflected light image acquisition unit 1102 acquires the image in a case of light emission by the lighting unit 1101 and the image in a case of no light emission by the lighting unit 1101, obtains a difference component between these images, and outputs it as the reflected light image, in response to the timing signal from the lighting and photo-detection operation control unit 1205.

In this configuration of FIG. 88, the lighting unit 1101, the reflected light image acquisition unit 1102, and the light control signal generation unit 1401 are controlled under the lighting and photo-detection operation control unit 1205, in such a manner that the lighting by the lighting unit 1101, and the image acquisition (the first charge storing and the second charge storing) and the reflected light image extraction by the reflected light image acquisition unit 1102 are carried out at specified timings.

On the other hand, the light control signal generation unit 1401 generates the light control signal in such a manner that the received light amounts due to the external light in two charge storing operations (the acquisition of the image under the lighting by the lighting unit 1101 and the acquisition of the image due to the external light alone) by the reflected light image acquisition unit 1102 are going to be equal. According to this light control signal, the light driving device 1402 controls the lighting by the external light source 1201 so that the external light source 1201 is controlled to emit the external light in such a manner that the external light amounts during the above described two charge storing operations become equal.

Consequently, when the reflected light image acquisition unit 1102 acquires the image in a case of light emission by the lighting unit 1101 and the image in a case of no light emission by the lighting unit 1101 according to the timing signal from the lighting and photo-detection operation control unit 1205, the light amounts given to the environment by the external light source 1201 are equal in these cases, so that when the difference component of these images is obtained, the obtained reflected light image is in a high precision.

FIG. 89 shows a timing chart for the operation in this eleventh embodiment, where a part (a) indicates the light control signal for controlling the external light source 1201, a part (b) indicates the control signal (lighting pulse) for the lighting unit 1101, and a part (c) shows an exemplary operation pattern (the charge storing operations) of the reflected light image acquisition unit 1102 in this eleventh embodiment.

6,144,366

**63**

The lighting and photo-detection operation control unit **1205** generates the control signals so that the reflected light image acquisition unit **1102** operates according to the operation pattern shown in the part (c) of FIG. **89**, while giving the lighting pulse of the part (b) of FIG. **89** to the lighting unit **1101**. On the other hand, at the same time, the light control signal generation unit **1401** generates the light control signal of the part (a) of FIG. **89**, so that the external light source **1201** is driven according to this light control signal.

For example, the external light source **1201** repeats the external light emission and no external light emission in such a pattern that the external light is emitted when the light control signal has a level "H", and no external light is emitted when the light control signal has a level "L". This operation is obviously repeated at high speed, so that the external light source **1201** appears to be lighting at the constant brightness to the human eyes.

However, the external light fluctuates in such a manner that is brightness is instantaneously lowered while the charge storing operation is carried out, so that at a time of obtaining the reflected light image, it is possible to obtain the reflected light image at high precision without receiving any influence from the external light.

The above described example is directed to a case of directly controlling the external light source (such as fluorescent light) whose emitted light amount periodically changes, so as to prevent the external light source from affecting the reflected light image.

On the contrary, there is also a scheme which utilizes the external light source as the light source for the reflected light image. Namely, the external light source itself is used as the light source of the lighting unit, and the reflected light from the target object resulting from the light emitted by the external light source is photo-detected by the photo-detection section. In this case, depending on the positional relationship between the external light source and the photo-detection section, the relationship of the reflected light amount being inversely proportional to the square of the distance may not hold, so that it becomes difficult to obtain the distance information, but there is no problem for the extraction of a shape of the target object. Such a modified scheme will be effective in a case where the entire room can be formed as a communication space as in a case of the amusement park.

<Twelfth Embodiment>

Referring now to FIG. **90** to FIG. **95**, the twelfth embodiment of the present invention will be described in detail.

In this twelfth embodiment, a plurality of lighting and charge storing operation patterns are provided in advance and selectively used according to the external light state, so as to make it possible to obtain the reflected light image at high precision regardless of the external light state.

This twelfth embodiment is based on the following principle. Namely, suppose that the photo-detection charge storing operation is carried out twice in a state of having no light emission by the lighting unit **101**, and a difference between the stored charges is outputted. In this case, if there was hardly any external light fluctuation between these two photo-detection charge storing operations, the output would be nearly equal to 0, and the resulting reflected light image would be completely dark. Namely, the light source is not emitting the light in this case, so that there is obviously no reflected light image component and therefore the reflected light image (output image) becomes completely dark. However, if there was some external light fluctuation between these two photo-detection charge storing operations, and if that fluctuation was a large one, then a

**64**

difference between the stored charges for these two photo-detection charge storing operations would not be zero, and therefore the output image would not be completely dark.

For this reason, in this twelfth embodiment, the respective reflected light images are acquired by using a plurality of charge storing operation patterns provided in advance, in a state of having no light emission by the lighting unit **101**, and the operation pattern from which the darkest image can be obtained is selected. Then, the lighting operation pattern having a lighting operation period corresponding to the selected charge storing operation pattern is selected, and the lighting by the lighting unit **101** is controlled by this selected lighting operation pattern.

To this end, the information input generation apparatus of this twelfth embodiment has an exemplary configuration as shown in FIG. **90**, which comprises the lighting unit **101**, the feature data generation unit **103**, the reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. 1), a lighting and photo-detection control signal generation unit **2104** (corresponding to the timing signal generation unit **104** of FIG. 1), an external light influence evaluation unit **2201**, and a lighting and photo-detection pattern selection and determination unit **2202**.

The lighting unit **101** is a light source for illuminating the target object, which is the light source of the reflected light image.

In this twelfth embodiment, two operation modes including an optimal operation pattern selection mode and a normal operation mode are provided in order to make it possible to obtain the optimal photo-detection operation pattern according to the external light fluctuation state. In a case of finding the photo-detection operation pattern which is optimal for the external light, that is, in a case of the optimal operation pattern selection mode, the lighting unit **101** is controlled to stop the light emission, whereas in a case of the normal operation mode, this control is cancelled and the lighting unit **101** is controlled to emit the light at prescribed timing specified from the lighting and photo-detection control signal generation unit **2104** so as to illuminate the target object.

The lighting and photo-detection control signal generation unit **2104** is provided for carrying out the timing control. This lighting and photo-detection control signal generation unit **2104** generates signals for controlling the reflected light image acquisition unit **1102** and the lighting unit **101** according to the setting information supplied from the lighting and photo-detection pattern selection and determination unit **2202**.

The lighting and photo-detection pattern selection and determination unit **2202** has two modes including the optimal operation pattern selection mode and the normal operation mode as well as a plurality of photo-detection charge storing operation patterns provided in advance. In a case of the optimal operation pattern selection mode, the lighting and photo-detection pattern selection and determination unit **2202** carries out the setting control with respect to the lighting and photo-detection control signal generation unit **2104** while sequentially using these various operation patterns so as to have the photo-detection carried out in the plurality of operation patterns. Then, the lighting and photo-detection pattern selection and determination unit **2202** receives the evaluation results for the reflected light images obtained by the respective operation patterns from the external light influence evaluation unit **2201**, and determines the operation pattern for which the evaluation result is best among these evaluation results, as the optimal operation pattern.

6,144,366

65

The external light influence evaluation unit **2201** evaluates the reflected light images obtained by the respective operation patterns according to the output images of the reflected light image acquisition unit **1102**, and gives the obtained evaluation values to the lighting and photo-detection pattern selection and determination unit **2202**, so that the optical operation pattern is determined according to the evaluation values. While the optimal operation pattern is determined, the lighting and photo-detection pattern selection and determination unit **2202** controls the lighting unit **101** to emit no light. After the optimal operation pattern is determined, it becomes the normal operation mode, and the reflected light image acquisition unit **1102** and the lighting and photo-detection control signal generation unit **2104** are controlled to realize a photo-detection charge storing period in accordance with the determined operation pattern.

The external light influence evaluation unit **2201** evaluates how much influence of the external light fluctuation is contained in each reflected light image, where the reflected light image is acquired from the reflected light image acquisition unit **1102**.

The reflected light image acquisition unit **1102** outputs a difference between an image photo-detected by the first photo-detection unit **109** and an image photo-detected by the second photo-detection unit **110**. The first photo-detection unit **109** outputs the image photo-detected in a state of having the light emission by the lighting unit **101**, and the second photo-detection unit **110** outputs the image photo-detected in a state of having no light emission by the lighting unit **101**, and in a case of the optimal operation pattern selection mode, the lighting and photo-detection pattern selection and determination unit **2202** sets the lighting unit **101** not to emit any light. Note that it is also alternatively possible to control the lighting and photo-detection control signal generation unit **2104** not to generate any signal for making the lighting unit **101** to carry out the lighting operation.

In this manner, by controlling the lighting unit **101** not to emit any light in a case of the optimal operation pattern selection mode, the reflected light image obtained by the reflected light image acquisition unit **1102**, that is, the difference output between the stored charges for the image photo-detected by the first photo-detection unit **109** and the stored charges for the image photo-detected by the second photo-detection unit **110**, indicates only the external light fluctuation, so that the brighter reflected light image implies the more influence received from the external light. In order to secure the reliability, the evaluation value is given by an average value obtained by repeating the operation of each operation pattern several times in a case of the optimal operation pattern selection mode. In other words, for each operation pattern, the average brightness over several frames of the reflected light image is obtained and outputted as the evaluation value.

Next, the operation of this information input generation apparatus of FIG. 90 will be described with reference to the flow chart of FIG. **91**.

Initially, this apparatus is set in the optimal operation pattern selection mode. In this mode, the lighting unit **101** is controlled not to emit any light first (step **1001**). Namely, the lighting and photo-detection pattern selection and determination unit **2202** sets the lighting unit **101** such that the lighting unit **101** does not carry out the lighting operation even during the second charge storing period, so as to make the acquired reflected light image completely dark.

Then, the lighting and photo-detection pattern selection and determination unit **2202** selects one photo-detection

66

operation pattern from a plurality of operation patterns provided in advance (step **1002**), and controls the lighting and photo-detection control signal generation unit **2104** such that the difference component is obtained by carrying out the charge storing operations in the selected photo-detection operation pattern. In response, the lighting and photo-detection control signal generation unit **2104** controls the reflected light image acquisition unit **1102** to carry out the first charge storing operation and the second charge storing operation for the image of the target object in the operation period corresponding to the selected photo-detection operation pattern and obtain the difference component between the stored charges.

Then, according to that, the external light influence evaluation unit **2201** evaluates the external light in this operation pattern (step **1003**). Here, the average brightness over several frames of the reflected light image is used as the evaluation value for the external light influence (which is of course smaller when it is darker). In other words, In other words, the above operation for obtaining the difference component is repeated for a plurality of times in one and the same operation pattern, and an average value of the respectively obtained difference component values is obtained as the evaluation value in that operation pattern. This evaluation result is then given to the lighting and photo-detection pattern selection and determination unit **2202**.

Next, the lighting and photo-detection pattern selection and determination unit **2202** checks whether all the patterns are tried or not (step **1004**), and if there is any pattern that is not tried yet, selects one of the untried patterns as the next photo-detection operation pattern (step **1005**). Then, the lighting and photo-detection pattern selection and determination unit **2202** controls the lighting and photo-detection control signal generation unit **2104** such that the difference component is obtained by carrying out the charge storing operations in the selected photo-detection operation pattern. In response, the lighting and photo-detection control signal generation unit **2104** controls the reflected light image acquisition unit **1102** to carry out the first charge storing operation and the second charge storing operation for the image of the target object in the operation period corresponding to the selected photo-detection operation pattern and obtain the difference component between the stored charges. Then, according to that, the external light influence evaluation unit **2201** evaluates the external light in this operation pattern (step **1003**). This evaluation result is then given to the lighting and photo-detection pattern selection and determination unit **2202**.

Next, the lighting and photo-detection pattern selection and determination unit **2202** checks whether all the patterns are tried or not (step **1004**), and if there is any pattern that is not tried yet, selects one of the untried patterns as the next photo-detection operation pattern (step **1005**) and the above described operation is repeated in the selected photo-detection operation pattern and the evaluation is made, but when the step **1004** judges that all the patterns are tried, the lighting and photo-detection pattern selection and determination unit **2202** compares the respective evaluation values of all the patterns, and selects one pattern with the best evaluation value as the optimal pattern (step **1006**).

Next, the lighting and photo-detection pattern selection and determination unit **2202** gives commands to the lighting unit **101** and the lighting and photo-detection control signal generation unit **2104** such that the lighting operation and the photo-detection operation are carried out in pattern and timing for realizing the charge storing period of that selected photo-detection operation pattern. As a result, the lighting

6,144,366

67                                                                    68

and photo-detection control signal generation unit **2104** is set to generate the lighting command and the photo-detection command in accordance with that selected operation pattern, while the lighting unit **101** is relieved from its lighting stop state (step **1007**).

In conjunction with this cancellation, the mode is changed from the optimal operation pattern selection mode to the normal operation mode.

In the normal operation mode, the photo-detection by the first photo-detection unit **109** in a state of having light emission by the lighting unit **101** is carried out for the charge storing period of the selected operation pattern, then the photo-detection by the second photo-detection unit **110** in a state of having node no light emission by the lighting unit **101** is carried out for the same charge storing period, and then the difference between the stored charges is obtained as the reflected light image without the influence of the external light.

In this manner, in this twelfth embodiment, a plurality of operation patterns with mutually different charge storing periods are provided in advance, and the optimal operation pattern selection mode is provided to carry out the photo-detection by the first photo-detection unit and the second photo-detection unit in a state of having no light emission by the lighting unit and obtain the difference output between the photo-detection outputs (image outputs) of these photo-detection units for each operation pattern, and then the operation pattern for which the difference image (reflected light image) is the darkest image is selected as the optimal operation pattern without the influence of the external light and the normal operation mode is carried out in that pattern.

In other words, the difference image is obtained without using the lighting unit for each of a plurality of operation patterns provided in advance and the influence of the external light is evaluated, and then the pattern indicating the best evaluation value is selected. After that, the image due to the external light alone and the image with the illumination by the lighting unit are acquired and the difference between them is obtained as the reflected light image in that selected pattern. As the evaluation value of the influence of the external light, the average brightness over several frames of the reflected light image is used, and this evaluation is tried for all the operation patterns provided in advance and then the operation pattern with the smallest average brightness (which received the least influence from the external light) is selected, so as to select the photo-detection period for the first photo-detection unit and the second photo-detection unit which is least influenced by the external light fluctuation under the current external light fluctuation state.

Consequently, it becomes possible to obtain the reflected light image in the operation pattern for which the influence of the external light fluctuation becomes minimum under the environment in which this apparatus is placed.

Now, the effect of this twelfth embodiment will be described more specifically.

FIGS. **92A** and **92B** show an exemplary case of the external light (indicated by a solid line) with a long fluctuation period, and FIGS. **93A** and **93B** show an exemplary case of the external light with a short fluctuation period. In these figures, the horizontal axis represents a time and the vertical axis represents an intensity of the light at the photo-detection plane. When the light is emitted, the output curve increases in proportion to the emitted light amount (that is, a level is increased).

The light intensity integrated over a prescribed period of time (indicated as L1, L2, L11 and L12 in the figures) corresponding to the stored charges. In FIGS. **92A** and **93A**, L1 is the stored charges of the first photo-detection unit **109** at a time of the light emission by the lighting unit **101**, and L2 is the stored charges of the second photo-detection unit **110** at a time of no light emission by the lighting unit **101**, for an exemplary case of using the charge storing period t1.

Also, in FIGS. **92B** and **93B**, L11 is the stored charges of the first photo-detection unit **109** at a time of the light emission by the lighting unit **101**, and L12 is the stored charges of the second photo-detection unit **110** at a time of no light emission by the lighting unit **101**, for an exemplary case of using the charge storing period t2, where ti is assumed to be sufficiently smaller than t2.

The difference between L1 and L2 and the difference between L11 and L12 can be regarded as the reflected light images. For the light source of the lighting unit **101**, an incandescent lamp or LED can be used, but it is more usual to use the LED in recent years. Then, the LED that is usually used for the lighting unit **101** can emit the higher power instantaneously for the shorter light emission time, so that the light intensity goes up higher for the shorter storing time cases in FIGS. **92A** and **92B**.

Here, when the external light fluctuation is gradual and large as shown in FIGS. **92A** and **92B**, it is possible to reduce the influence of the external light fluctuation in the difference between the stored charges for a time of light emission and a time of no light emission, by shortening the light emission time of the lighting unit **101**, and therefore the reflected light amount can be detected at high precision (FIG. **92A**). On the other hand, when the light emission time of the lighting unit **101** is made longer, the external light largely fluctuates during that period and therefore the large influence of the external light fluctuation will be contained in the difference between the stored charges for a time of light emission and a time of no light emission, so that the reflected light amount cannot be detected at high precision (FIG. **92B**).

Next, when the external light fluctuation period is short as shown in FIGS. **93A** and **93B** (for example, when the inverter fluorescent light is used for the indoor lighting, where the light amount of this fluorescent light that functions as the external light fluctuates at the period of about several tens of kHz), suppose that the light emission time of the lighting unit **101** is set as short as the external light fluctuation period and the charges are stored for the duration of this light emission period (ti) as shown in FIG. **93A**. In this case, if there is a displacement in phase between the external light fluctuation period and the lighting pulse of the lighting unit **101**, the influence of the external light is largely changed and the errors becomes noticeable so that the reflected light image component cannot be detected at high precision.

For this reason, in this case, the light emission time of the lighting unit **101** is made longer instead. In other words, the light emission time is set to be a long time L2 which can contain several external light fluctuation periods as shown in FIG. **93B**, and the charges are stored for the duration of this light emission period (t2). In this manner, the influence of the external light fluctuation can be reduced.

In a case where the external light fluctuation period is short, there is also a scheme for controlling the lighting unit **101** to emit the light in the light emission time which is even shorter than the external light fluctuation period. However, in general, when the light emission in an excessively short time is attempted, the driving frequency of the circuit increases, and the cost and the power consumption also increase.

As described, in this twelfth embodiment, the optimal operation pattern selection mode is provided, and a plurality

6,144,366

69

of patterns are tried automatically and the optimal one is determined automatically while operating in this mode. However, the present invention is not necessarily limited to this particular case, and it is also possible to provide a switching button such that the operator can select the operation pattern by depressing this button. In such a case, a complicated processing is not involved so that the low cost realization becomes possible. In this case, it is preferable to display the reflected light image on the screen so that the operator can select the operation pattern with least noises while watching the reflected light image on the screen. Thus, the present invention should be construed as encompassing such a case of not selecting the operation pattern automatically.

By means of this, even when the light fluctuation is present, it becomes possible to obtain the reflected light image at high precision and therefore it becomes possible to extract only the image of the target object at high precision.

When it becomes possible to extract the image of the target object from the image signals, it becomes possible to acquire information on its shape, motion, distance, etc., from the extracted image. For example, the reflected light from a position where the object is existing has some value, while there is hardly any reflected light from the remote background, so that it becomes possible to extract the shape of the object by thresholding the reflected light image at appropriate threshold. It also becomes possible to extract various feature data from that shape. By analyzing the time sequence of the shape, it also becomes possible to capture the motion or the deformation of the object. Since the concavity and convexity of the object can be captures as the difference in the reflected light amount, it also becomes possible to obtain the 3D structure of the target object.

Consequently, it also becomes possible to easily realize the three dimensional operation input or the three dimensional command operation according to such information, and this twelfth embodiment can be the significant contribution to the practical implementation of the present invention.

Note that, in the above description, the phrase like a difference between two images is used frequently, but this is more of a conceptual description, and it does not necessarily imply the two images actually exist. In the general configuration, the first and second charge storage units are provided in the unit photo-detector cell, and one image can be formed by using the stored charges of the first charge storage units of all the cells, while another image can be formed by using the stored charges of the second charge storage units of all the cells. In this sense, the references to "two images" are made, but in practice, each cell outputs the difference of the two charge storage units at a time of output from the photo-detection section, and it is not that these two images are to be extracted as such to the external. Consequently, a phrase "two images" used in the above description does not necessarily imply the output of two images that can be actually seen separately.

Also, a number of times for carrying out the lighting operation per one frame is not necessarily limited to just once. For example, the charge storing into the first charge storage unit 119 with the light emission and the charge storing into the second charge storage unit 120 with no light emission can be repeated for ten times, for example.

Also, as shown in FIG. 94, it is possible to further provide a difference circuit 2121 and the third charge storage unit 2122. In this case, the charge storing into the first charge storage unit 119 with the light emission by the lighting unit and the charge storing into the second charge storage unit

70

with no light emission by the lighting unit are carried out, a difference between the stored charges in the first and second charge storage units 119 and 120 is obtained by the difference circuit 2121, and the charges for this difference is transferred to the third charge storage unit 2122, while the first and second charge storage units 119 and 120 are reset only after that, as indicated in FIG. 95. In this case, only a difference is present even within each cell, and it is not quite appropriate to speak of two images.

Including those cases mentioned above, this twelfth embodiment is effective for all the reflected light image acquisition apparatus and method which have the same effect as obtaining the difference between two images.

<Thirteenth Embodiment>

In the above, various techniques for suppressing the degradation of the reflected light image due to the light amount fluctuation under the environment has been described. However, even when the light amount under the environment is stable, if the reflected light amount from the target object is not very large compared with the light amount under the environment, the S/N becomes poor so that the quality of the obtained reflected light image is going to be low.

Such a situation arises, for example, when the dynamic range of the CMOS sensor in the reflected light image acquisition unit 1102 is set to be an optimum state for detecting the reflected light amount from the target object within a prescribed distance range of the photo-detection optics. This is because the intensity of the light is inversely proportional to the square of the distance. Consequently, in a case where the information input generation apparatus of the present invention is to be implemented on a computer such as PC and utilized for the operation input, and when the target object is the hand of a user, it is normal for the user to try to make the operation input according to his own convenience so that the operation input may be made with the position of the hand outside the range intended by a designer.

In view of this problem, this thirteenth embodiment is directed to a technique capable of dealing with such a situation, for suppressing the degradation of the reflected light image by adjusting the emission light amount according to the distance to the target object.

In a case of detecting the reflected light from the target object by the sensor, the reflected light amount that can be detected by the sensor is inversely proportional to the square of the distance to the target object. Consequently, when the target object moves away from the sensor, the reflected light amount from the target object decreases abruptly. For example, compared to a case where the target object is located at the distance of 10 cm from the sensor, the reflected light amount that can be detected in a case where the target object is located at the distance of 30 cm will be decreased to ⅑.

In other words, when the measurement range is set to be an optimum state for the measurement of the object in a range of the distance up to 10 cm, the measurement precision of the object located at the distance of about 30 cm will be lowered abruptly as the received light amount itself will be decreased to ⅑.

In order to measure the target object located at the distance of about 30 cm at high precision without changing the measurement range, it is possible to raise the lighting power of the lighting unit so as to increase the reflected light amount from that target object. However, in this case, on the contrary, the reflected light amount from the object at the distance of about 10 cm would be excessively large and

6,144,366

71

could exceed the measurement range, and this can largely affect the image quality degradation in the image to be acquired.

In the information input generation apparatus of the present invention as described above, it is often difficult to take an image of the target object at the optimum position with respect to the sensor position in accordance with its measurement range. This is because, when the target object the hand, the hand will be set in various hand actions with various hand shapes, and when the user's attention is pre-occupied by the hand actions, the user tends to forget to keep the distance between the hand and the sensor position (the position of the photo-detection section of the reflected light image acquisition unit) within the intended range.

For this reason, this thirteenth embodiment is directed to a case of dealing with such a situation and making it possible to extract the reflected light image of the target object at high precision even when the located distance of the target object changes.

In this thirteenth embodiment, it is made possible to obtain the reflected light image of the target object at high precision by controlling the emission light amount of the lighting unit according to the distance between the sensor (the photo-detection section of the reflected light image acquisition unit) and the target object.

Namely, it is made possible to measure the distance at sufficient precision regardless of the distance at which the object is located, by means of the control that realizes an appropriate reflected light amount according to the distance at which the object is located.

Now, the basic configuration of the information input generation apparatus in this thirteenth embodiment and its variations will be described.

In the basic configuration, the apparatus includes the following three elements.

(1) A detection unit for detecting information regarding the distance of the object.

(2) A determination unit for determining a level of increase or decrease of the reflected light amount according to the detection result of the detection unit.

(3) A control unit for carrying out the control (the control of the emission light amount, the control of the amplifier, the control of the A/D conversion) for increasing or decreasing the reflected light amount according to the determination made by the determination unit.

In the practical implementation, each of these three elements can be realized in several different forms, including the following.

(1) The detection unit for detecting the distance of the object (or information related to it):

(1-1) The distance of the object is detected from an output (analog signals) of the cell array. The maximum value is then obtained by a maximum value detection circuit.

(1-2) The average signal amount is obtained by entering the signals through a low pass filter.

(1-3) The information is detected from digital data after the A/D conversion. The maximum value is then detected.

(1-4) The maximum value is calculated from the mean and variance.

(2) The determination unit for determining a level of increase or decrease of the reflected light amount according to the result obtained by the detection unit (1), so as to control the emission light amount of the lighting unit according to the determined content (either linearly or by stages).

(2-1) In case of controlling by stages, the control is made such that the reflected light amount changes in stages

72

such as twice, three times, four times, and so on of the reference state.

(2-2) In a case of controlling linearly, the reflected light amount is controlled to be arbitrary x times the current amount.

(3) The control unit for carrying out the control (the control of the emission light amount, the control of the amplifier, the control of the A/D conversion) for increasing or decreasing the reflected light amount according to the determination of the determination unit (2).

(3-1) The lighting by an LED that constitutes the lighting unit is controlled.

(3-2) The lighting power (lighting current) of an LED that constitutes the lighting unit is controlled.

(3-3) A number of lighting pulses for an LED that constitutes the lighting unit is controlled.

(3-4) A pulse length of the lighting driving pulses for an LED that constitutes the lighting unit is controlled.

(3-5) A gain of an amplifier is controlled.

(3-6) An input voltage range of an A/D converter is controlled.

Now, an exemplary specific configuration of the information input generation apparatus in this thirteenth embodiment will be described in detail. This specific example corresponds to a case of using (1-3), (2-1) and (3-3) noted above, in which the detected values of the reflected light amount from the target object are classified into several levels, and the emission light amount is adjusted by changing the number of pulses for driving the lighting unit according to the classified level.

More specifically, assuming that the hand as the target object is placed at the distance of 20 cm in front of the photo-detection section, for example, a state in which the CMOS sensor in this setting outputs the photo-detection output voltage (the stored charge voltage) of 1 [V], ½ [V], or ¼ [V] will be called "state-1", "state-2", or "state-3", respectively.

Then, the emission light amount of the lighting unit is switched according to the state, by changing the number of lighting pulses for driving the lighting unit. For the "state-1", four pulses are used. For the "state-2", two pulses are used. For the "state-3", one pulse is used.

The fine adjustment control is carried out as follows. The image signals (reflected light image) from the CMOS sensor are A/D converted and the maximum value among the pixel values (a position where the reflected light amount is largest, that is, a position which is closest) is obtained from the digital reflected light image. The digital output is given by 8 bits to realize the 256 step gradation, for example.

The digital output is monitored and when the maximum value exceeds "250", the state is lowered to one grade lower one ("state-1" to "state-2", for example). Also, when the maximum value becomes lower than "100", the state is raised to one grade higher one ("state-3" to "state-2", for example). Note however that, when there is nothing that can be identified as the object, the state transition does not occur.

In this specific example, the setting is made so that the reflected light amount are exactly doubled from "state-3" to "state-2" and from "state-2" to "state-1", so that the conversion to the distance can be made easily.

At this point, the property of the reflected light amount and the necessity of the emission light amount control will be explained.

In this apparatus, the light is emitted from the lighting unit to the target object and the reflected light amount from that target object is measured (detected). Then, the distribution of

6,144,366

73

the obtained reflected light amount is obtained in a form of an image, that is, the reflected light image of the target object. When the object surface is a uniform scattering surface, the reflected light amount (a value of each pixel in the reflected light image) indicates the distance. The value of each pixel (reflected light amount) is inversely proportional to the square of the distance to the object. This relationship between the distance to the object and the reflected light amount can be depicted in a form of a graph as shown in FIG. 96.

From this FIG. 96, it can be seen that, when the distance increases, the reflected light amount decreases and the distance resolution is lowered.

In order to make it possible to measure the sufficiently far distance, it suffices to increase the emission light amount of the lighting unit. However, when the emission light amount is increased, the reflected light amount is going to be excessively large when the object is located near on the contrary, so that there arises a problem that the reflected light amount may exceed the measurable range. Consequently, the solution for enabling the measurement of the distance at high precision over wide distance range is to suppress the change of the reflected light amount by controlling the emission light amount of the lighting unit according to the distance of the object.

With this in mind, the information input generation apparatus in this thirteenth embodiment has a configuration as shown in FIG. 97, which comprises the lighting unit 101, the reflected light image acquisition unit 1102, the reflected light image processing unit 1103, a maximum pixel value detection unit 1500, and a lighting state determination unit 1501.

The lighting unit 101 is a device for emitting the light to illuminate the target object placed under the external light.

The reflected light image acquisition unit 1102 detects the reflected light from the target object in a state of having the light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the first charge storage unit, and detects the reflected light from the target object in a state of having no light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the second charge storage unit, and then obtains and outputs the difference between the stored charges as the reflected light image.

The maximum pixel value detection unit 1500 detects the maximum pixel value from data of the reflected light image.

The lighting state determination unit 1501 sets the lighting state of the lighting unit 101 appropriately, which also has a function for determining whether or not to change the lighting state of the lighting unit 101 according to the maximum pixel value obtained by the maximum pixel value detection unit 1500. The lighting state of the lighting unit 101 takes any one of "state-1", "state-2", and "state-3". The lighting state determination unit 1501 selects one of these states according to the maximum pixel value, and controls the lighting unit 101 to carry out the lighting operation by using the number of pulses specified for the selected state.

The reflected light image processing unit 1103 obtains the three-dimensional operation information by analyzing the action or state of the target object according to the reflected light image obtained by the reflected light image acquisition unit 1102, which corresponds to the feature data generation unit 103 of FIG. 1.

In this configuration of FIG. 97, the lighting unit 101 emits the light to illuminate the target object placed under the external light. The reflected light image acquisition unit 1102 detects the reflected light from the target object in a state of having the light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the first

74

charge storage unit, and detects the reflected light from the target object in a state of having no light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the second charge storage unit, and then obtains and outputs the difference between the stored charges as the reflected light image.

The reflected light image acquisition unit 1102 is operated in synchronization with the lighting unit 101, so as to acquire a distribution of the light amount returned by the reflection of the object placed in front of the apparatus resulting from the light emitted by the lighting unit 101, that is, the reflected light image.

The reflected light image acquisition unit 1102 has the photo-detection cells arranged in an array structure. Each photo-detection cell carries out the photo-detection for the same time in a case of the light emission by the lighting unit 101 and in a case of no light emission by the lighting unit 101, stores respective charges, and detects the reflected light amount as the difference between the stored charges. Also, the reflected light image acquisition unit 1102 has an A/D converter for converting the detected reflected light amount into digital data and outputting the obtained digital data.

This A/D converter converts the input voltage in a range of 0 to 1 [V] into 8 bit digital data ranging from "0" to "255". Consequently, the distribution of the reflected light amount, that is, the pixel values of the reflected light image, will be outputted as the digital data from the reflected light image acquisition unit 1102.

The maximum pixel value detection unit 1500 detects the maximum value from a series of reflected light image data, and then gives the detected value to the lighting state determination unit 1501.

Upon receiving this detected value, the lighting state determination unit 1501 determines the optimum state among the three states of "state-1", "state-2" and "state-3", by judging which one of these three lighting states is optimum according to the detected value.

Here, the optimum state is determined as follows. Namely, the lighting state determination unit 1501 determines whether or not to change the lighting state according to the obtained maximum pixel value. Now, there are three states of "state-1", "state-2" and "state-3" that can be the lighting state of the lighting unit 101. Among them, the "state-1" is a mode by which the largest reflected light amount can be obtained, which is set such that the input voltage of the A/D converter becomes approximately 1 [V] when the hand as the target object is located at the distance of 20 cm.

Note however that the absolute distance value cannot be determined from the reflected light amount size alone, so that the above definition is only a standard one. For example, the reflected light amount may vary depending on the color or the surface state (dry or wet) of the hand.

The "state-2" is a mode by which the reflected light amount as much as about a half of that obtained by the "state-1" can be obtained.

The "state-3" is a mode by which the reflected light amount as much as about a quarter of that obtained by the "state-1" can be obtained.

In the following, the change of the state for increasing the reflected light amount to a double of the current value will be referred to as "raising the state by one grade" and the change of the state for decreasing the reflected light amount to a half of the current value will be referred to as "lowering the state by one grade". In other words, the state change is expressed in such a manner as "lowering from "state-1" to "state-2"", "raising from "state-3" to "state-2"", etc.

6,144,366

75

The lighting state determination unit **1501** controls the lighting state as follows. When the maximum pixel value is "250", the light state is lowered by one grade. In other words, when the hand comes too close for the current state, the reflected light amount is lowered by lowering the emission light amount, so that the input signals of the A/D converter will not be saturated.

On the other hand, when the maximum pixel value becomes lower than "100", the lighting state is raised by one grade. In other words, when the hand position is too far for the current state so that the reflected light amount is insufficient, the reflected light amount is increased by raising the emission light amount. Here, however, the "state-1" cannot be raised any higher, and the "state-3" cannot be lowered any lower. The state transition among these three states is summarized in a state transition diagram shown in FIG. **98**.

Here, a case of lowering the state when the maximum pixel value is greater than "250" and raising the state when the maximum pixel value is less than "100" has been described, but this thirteenth embodiment is not necessarily limited to these values.

The simplest case is to lower the state when the maximum pixel value is "255" (which is the maximum possible value) and raise the state when the maximum pixel value is "127" (a half of the maximum possible value). In this case, however, the input signals of the A/D converter will be saturated once before the state is lowered (that is, the state is lowered after the input signals are saturated). Also, by lowering the state by one grade when the maximum pixel value is "255", the output becomes "128" (or "127"), but if the reflected light amount becomes slightly less by then, the maximum pixel value immediately becomes lower than "127" and the state is immediately raised again.

As such, when the threshold for raising the state is set to be about a half of the threshold for lowering the state, the state is going to be changed frequently in a case where the reflected light amount remains around that threshold for raising the state.

For this reason, by setting the threshold for raising the state to be somewhat less than a half of the threshold for lowering the state so as to provide the hysteresis characteristic to the state transition, it is possible to prevent the frequent changes of the state. In this thirteenth embodiment, the threshold for lowering the state is set to be "250", so that the state is lowered immediately before the input signals of the A/D converter are saturated. Also, when the state is lowered by the threshold of "250", the value is lowered to about "125", and the threshold for raising the state is set to be "100" which is lower than that.

In this thirteenth embodiment, a number of states is set to be three. Then, by changing the state, the reflected light amount is controlled to be doubled or reduced in half. However, it is also possible to realize a somewhat finer controller by increasing a number of states,

The difference in the lighting states is controlled by the number of lighting pulses. In this thirteenth embodiment the lighting unit is driven by four lighting pulses in the "state-1" as shown in a part (a) of FIG. **99**, by two lighting pulses in the "state-2" as shown in a part (b) of FIG. **99**, or by one lighting pulse in the "state-3" as shown in a part (c) of FIG. **99**.

As shown in FIG. **99**, the length of each lighting pulse a-1, b-1, c-1 is the same, so that the "state-2" can obtain twice as much reflected light amount as the "state-3", and the "state-1" can obtain twice as much reflected light amount as the "state-2". In response to this lighting pulse, the charge storing control is carried out as follows.

76

In FIG. **99**, charts a-2, b-2, c-2 shown directly below the lighting pulses a-1, b-1, c-1 show the respective charge storing operations. In FIG. **99**, "1" indicates the charge storing into the first charge storage unit of the CMOS sensor in the reflected light image acquisition unit **1102** utilizing the CMOS sensor in a configuration of FIG. **3** and FIG. **4**, "2" indicates the charge storing into the second charge storage unit, and "R" indicates the reset for releasing the generated charges to the power source.

Namely, as described in relation to FIG. **3** and FIG. **4**, the CMOS sensor has a configuration in which the unit photo-detector cells PD are arranged in n×n pixel array, where each unit photo-detector cell PD has one photo-electric conversion unit **118** and two charge storage units **119** and **120**. Between the photo-electric conversion unit **118** and the charge storage units **119** and **120**, several gates (**122** and **123** in this example) are provided, so that the charges generated at the photo-electric conversion unit **118** can be selectively lead to either one of the two charge storage units **119** and **120** by controlling these gates. Here, the control signal for these gates and the lighting control signal for the lighting unit **101** are synchronized. Then, the difference between the stored charges of the two charge storage units is obtained as a component of the reflected light image at the corresponding pixel.

In the charge storing operation in the "state-3" shown in a part (c) of FIG. **99**, after the reset is made first, the generated changes of the photo-electric conversion unit **118** are stored into the first charge storage unit of the CMOS sensor in synchronization with the lighting pulse.

Next, after the reset is made once again, the generated charges of the photo-electric conversion unit **118** are stored into the second charge storage unit of the CMOS sensor, in a state of no light emission by the lighting unit **101** this time. The second charge storage unit stores the generated charges due to the external light such as the illumination light and the sunlight, while the first charge storage unit stores the generated charges due to the reflected light including the external light and the light returned by the reflection of the object resulting from the light emitted by the lighting unit **101**. Consequently, the reflected light amount can be obtained by taking a difference between the stored charges of the first charge storage unit and the second charge storage unit.

In the "state-2", the charge storing is carried out twice, so that the reflected light amount is doubled. In the "state-1", the charge storing is repeated for four times.

Note that, in this thirteenth embodiment, the emission light amount is controlled by the number of pulses, but this thirteenth embodiment is not necessarily limited to this case. For example, as shown in FIG. **100**, it is also possible to provide three states by setting the pulse length of the lighting pulse in three sizes, i.e., a unit length, twice the unit length, and four times the unit length. In this case, in any of "state-1", "state-2" and "state-3", the charge storing operation stores charges into each of the first and second charge storage units once, and only the storing period is different in three cases.

The total lighting time of the lighting unit **101** for each state is the same as in a case of FIG. **99**, so that the reflected light amount is also approximately the same as in a case of FIG. **99**. Note however that, when the external light is fluctuating, it is less likely to receive the influence of the external light by emitting a plurality of short light pulses, rather than emitting one long light pulse.

Besides those described above, there are still some other methods for controlling the reflected light amount. For example, there is a method for changing the emission light

6,144,366

77

intensity of the lighting unit **101**. Namely, in this case, the lighting current is to be changed. Also, when a plurality of light sources are used for the lighting unit **101**, there is a method for changing a number of light sources for emitting lights.

In addition, apart from these methods for controlling the reflected light amount, there are several methods for suppressing the variation of the digital data size after the A/D conversion. For example, there is a method for dynamically changing the amplification rate at an amplifier provided at a front stage of the A/D converter. Also, the A/D converter is to be given with input voltages corresponding to the 0 level output and the full scale output as references, and by changing these reference voltages, it is also possible realize the control such that the digital data will be contained within an appropriate range.

By inserting a logarithmic amplifier at a front stage of the A/D converter, the signal change with respect to the distance change can be suppressed as indicated in FIG. **101**, so that the measurable range for one mode can be widened. For this reason, there may be cases where the above described processing can be omitted. However, even in a case of using the logarithmic amplifier, the use of the above described processing can enable the measurement even when the hand as the target object is located at far distance, at the same S/N level as in a case where the target object is located near.

In the above, the lighting state is determined solely according to the maximum value among the pixel values of the reflected light image, but there are other methods as well. For example, it is also possible to determine the state according a number of pixels that satisfy the threshold condition, in such a manner that the state is lowered when there are ten or more pixels that have the pixel values above "250", the state is raised when there are ten or more pixels that have the pixel values below "100", etc. In this case, there is an advantage in that the state will not be changed even when there is a pixel with the pixel value above "250" that appears locally due to the noise.

There is also a method which utilizes the mean value of the pixel values in addition. In this method, the mean pixel value of the pixels with the pixel values above a certain value (that is the pixels not belonging to the background) is obtained, and the state is lowered when the maximum pixel value is above "250" and the mean pixel value is above "150" and so on, for example. According to this method, there is an advantage in that it is possible to avoid the problematic situation in which only the maximum pixel value is prominent but the other pixel values are relatively small so that the resolution would be lowered for the most part if the state is lowered.

It is also possible to determine the state at the analog signal level before the reflected light amount is A/D converted. When the analog signals before the A/D conversion are entered through the low pass filter, the average signal amount can be obtained. This average signal amount is entered into a comparator and the lighting state is determined according to the comparator output. Else, when the analog signals are entered into the maximum value holding circuit instead of the low pass filter, the maximum value of the input signals can be determined, so that it is also possible to determine the lighting state according to this maximum value of the input signals.

In the examples described above, the lighting state is changed by stages, using the number of lighting pulses or the pulse width. In other words, the emission light amount of the lighting unit **101** is changed by changing the number of lighting pulses or the pulse width in the light amount control.

78

In such a case, there is a drawback in that the fine light amount control is rather difficult. In order to realize the fine light amount control, it is necessary to control the light amount linearly.

In view of this, an exemplary case of changing the lighting state linearly will now be described.

In this case, an analog feedback circuit is from the analog signals before the A/D conversion by the A/D converter so as to control the lighting current, that is, the lighting power itself.

FIG. **102** shows an exemplary configuration for this case. In this configuration of FIG. **102**, the reflected light image acquisition unit **1102** outputs analog signals. These analog signals are entered through a low pass filter (LPF) **1602** so as to extract the DC (direct current) component of the frame. The apparatus also includes a lighting power determination unit **1603** having a feedback loop by which the emission light amount is lowered when the DC component is above a certain value or the emission light amount is raised when the DC component is below that certain amount.

With this configuration, the emission light amount of the lighting unit **101** can be automatically adjusted such that the average of the reflected light image always remains constant.

In the configuration of FIG. **102**, the low pass filter is used in order to extract the DC component of the frame from the analog signals, but this thirteen embodiment is not necessarily limited to this case. For example, it is also possible to realize the control such that the maximum value of the reflected light image always remains constant, by using the maximum value detection circuit instead. It is also possible to control the lighting pulse length linearly, instead of controlling the lighting current.

In these methods, the emission light amount is automatically controlled such that the average (or the maximum value) of the reflected light image always remains constant, so that when the distance of the hand as a whole is changed, it is impossible to detect this change. Consequently, these methods are effective when the automatic emission light amount control has a higher priority and the absolute distance value is required. Also, although the absolute distance value cannot be obtained, it is still possible to obtain the relative distance information, so that these methods are also suitable in a case of detecting the shape alone. Also, by supplying the emission light amount to the reflected light image processing unit **1103** somehow, it becomes possible to restore the range image from the obtained reflected light image and the emission light amount.

<Fourteenth Embodiment>

The thirteenth embodiment is directed to various cases for suppressing the influence of the distance (far or near) of the target object position on the image quality of the reflected light image, by controlling the emission light amount of the lighting unit.

In contrast, it is also possible to generate and acquire the reflected light image with a wide dynamic range by obtaining several reflected light images while changing the emission light intensity of the lighting unit, and composing these reflected light images. By means of this, the reflected light image in good quality can be obtained and the distance can be detected at high precision for a wide range of distances ranging from the near distance to the far distance. The fourteenth embodiment is directed to this case.

FIG. **103** shows an exemplary configuration of the information input generation apparatus in this fourteenth embodiment, which comprises the lighting unit **101**, the reflected light image acquisition unit **1102**, a frame buffer **1701**, a reflected light image composition unit **1702**, a control unit **1703**, and a lighting state control unit **1704**.

6,144,366

**79**

The lighting state control unit **1704** controls the lighting unit **101** to carry out the lighting operation in one of several lighting modes provided in advance. More specifically, for example, the lighting state control unit **1704** functions to generate the lighting pulse according to which the lighting unit **101** emits the light, and in this case, the lighting state control unit **1704** generates several patterns of the lighting pulse sequentially. At the same time, the lighting state control unit **1704** gives a storage control signal to the reflected light image acquisition unit **1102**. The charge storing operation at the reflected light image acquisition unit **1102** needs to be synchronized with the lighting operation, so that the lighting state control unit **1704** controls both of them simultaneously.

The reflected light image data outputted from the reflected light image acquisition unit **1102** are stored in the frame buffer **1701**. When data for a prescribed number of frames are stored in the frame buffer **1701**, the reflected light image composition unit **1702** reads out these data and carries out the composition processing. The control unit **1703** carries out the timing control for the apparatus as a whole.

Now, the composition processing by the reflected light image composition unit **1702** will be described in further detail.

Here, it is assumed that the lighting state control unit **1704** sequentially carries out the operations of "state-1", "state-2" and "state-3" as described in the thirteenth embodiment. In other words, the lighting unit **101** emits the light first at a prescribed lighting power, next at a half of that prescribed lighting power next, and finally at a quarter of that prescribed lighting power.

In synchronization with this lighting operation, the reflected light image acquisition processing by the reflected light image acquisition unit **1102** is carried out, and three frames of the reflected light images are stored in the frame buffer **1701**. The reflected light image composition unit **1702** carries out the composition processing by using these three frames of the reflected light images.

In the following, the reflected light images corresponding to "state-1", "state-2" and "state-3" will be referred to as "reflected light image-1", "reflected light image-2" and "reflected light image-3", respectively.

The "reflected light image-2" has the pixel values twice as high as those of the "reflected light image-3", and the "reflected light image-1" has the pixel values four times as high as those of the "reflected light image-3". Note however that the pixel value is "255" at most.

Now, the reflected light images are composed by the following algorithm according to the flow chart of FIG. **104**. Here, for each coordinate (x, y), the pixel value for the coordinate (x, y) in "reflected light image-1", "reflected light image-2" and "reflected light image-3" will be denoted as P1(x, y), P2(x, y) and P3(x, y), respectively, while the pixel value for this coordinate in the composed image will be denoted as P(x, y).

In this algorithm of FIG. **104**, one pixel (x, y) is selected (step 982) and for this one pixel (x, y), if P1(x, y)<255 (step 983 YES), then P(x, y) is set to be P(x, y)=P1(x, y) (step 984). Otherwise (step 983 NO), if P1(x, y)=255 and P2(x, y)<255 (step 985 YES), then P(x, y) is set to be P(x, y)=P2(x, y)×2 (step 986). Otherwise (step 985 NO), P1(x, y)=P2(x, y)=255, so that P(x, y) is set to be P(x, y)=P3(x, y)×4 (step 987). This operation is repeated for all the pixels of the reflected light image (step 981).

The above algorithm presupposes the fact that the pixel values are exactly doubled from "reflected light image-3" to "reflected light image-2" and from "reflected light image-2"

**80**

to "reflected light image-1", but in practice, there may be some errors due to the nonlinearity or the charge storage capacity characteristic of the circuit. These errors can be corrected as follows.

Namely, here, the "reflected light image-2" is how many times (ideally twice) of the "reflected light image-3" and the "reflected light image-1" is how many times (ideally twice) of the "reflected light image-2" are exactly determined.

First, all the pixels which have the pixel values less than "255" are taken out from the "reflected light image-2", and ratios with respect to the corresponding pixel values in the "reflected light image-3" are obtained. Then an average α23 of these ratios can be regarded as the multiplication factor of the "reflected light image-2" with respect to the "reflected light image-3".

Then, in the algorithm of FIG. **104**, this α23 is used instead of "2" appearing in the formula "P(x, y) P2(x, y)×2" of the step 986.

Also, the ratio α12 of the "reflected light image-1" with respect to the "reflected light image-2" is similarly obtained, and α12×α α23 is used instead of "4" appearing in the formula "P(x, y)=P3(x, y)×4" of the step 987.

Note here that, in the above, the ratio with respect to the "reflected light image-3" is obtained for all the pixels with the pixel values less than "255" in the "reflected light image-2", but when this ratio is too small, the ratio calculation error may be large, so that the processing target may be limited by selecting only those pixels which have sufficiently large pixel values, such as the pixel values less than "255" and greater than "100", for example.

It is to be noted that, besides those already mentioned above, many modifications and variations of the above embodiments may be made without departing from the novel and advantageous features of the present invention. Accordingly, all such modifications and variations are intended to be included within the scope of the appended claims.

What is claimed is:

1. An information input generation apparatus, comprising:

a timing signal generation unit for generating a timing signal;

a lighting unit for emitting a light whose intensity vary in time, according to the timing signal generated by the timing signal generation unit; and

a reflected light extraction unit having a sensor array for detecting a reflected light from a target object resulting from the light emitted by the lighting unit, in synchronization with the timing signal generated by the timing signal generation unit, so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object.

2. The apparatus of claim 1, wherein the reflected light extraction unit obtains the reflected light image in separation from the external light by detecting a plurality of image data in a state of having a light emission by the lighting unit and in a state of having no light emission by the lighting unit.

3. The apparatus of claim 2, wherein the reflected light extraction unit obtains the reflected light image as a difference between the image data detected in a state of having a light emission by the lighting unit and the image data detected in a state of having no light emission by the lighting unit.

4. The apparatus of claim 1, wherein the lighting unit emits the light which is invisible to human eyes.

5. The apparatus of claim 1, wherein the reflected light extraction unit includes:

6,144,366

81

at least one photo-electric conversion unit for generating charges corresponding to input lights of the reflected light extraction unit;

at least two charge storage units for storing the charges generated by the photo-electric conversion unit under different lighting states of the lighting unit; and

gates operated in synchronization with the timing signal generated by the timing signal generation unit, for selectively leading the charges generated by the photo-electric conversion unit to one of the charge storage units.

6. The apparatus of claim 1, wherein the reflected light extraction unit includes:

an optical filter for receiving input lights of the reflected light extraction unit, and passing those input lights which have wavelengths within a specified range and blocking those input lights which have wavelengths outside the specified range.

7. The apparatus of claim 1, wherein the target object is at least a part of a body of an operator, and the reflected light image is indicative of the information input for controlling a device to be operated by the operator.

8. The apparatus of claim 1, further comprising:

a feature data generation unit for generating feature data related to the target object from the reflected light image.

9. The apparatus of claim 8, wherein the feature data generation unit generates the feature data by extracting a distance information including a depth information of the target object.

10. The apparatus of claim 8, wherein the feature data generation unit generates the feature data by extracting an object property information including a color information or a material information of the target object.

11. The apparatus of claim 8, wherein the feature data generation unit includes:

an image extraction unit for extracting an object image of at least a part of the target object, from the reflected light image.

12. The apparatus of claim 11, wherein the image extraction unit extracts the object image according to one or both of a distance information including a depth information of the target object and an object property information including a color information or a material information of the target object.

13. The apparatus of claim 11, wherein the target object is at least a part of a body of an operator, and the object image extracted by the image extraction unit indicates the information input for a pointing operation by the operator.

14. The apparatus of claim 11, wherein the feature data generation unit also includes:

a shape interpretation unit for interpreting a shape of said at least a part of the target object in the object image extracted by the image extraction unit.

15. The apparatus of claim 14, wherein the target object is at least a part of a body of an operator, and the shape interpreted by the shape interpretation unit indicates the information input for a gesture input by the operator.

16. The apparatus of claim 14, wherein the target object is at least a part of a body of an operator, and the shape interpreted by the shape interpretation unit indicates the information input for a pointing operation by the operator.

17. The apparatus of claim 14, wherein the shape interpretation unit interprets the shape as a command to be used as the information input.

18. The apparatus of claim 14, wherein the shape interpretation unit interprets the shape as a viewpoint information

82

to be used as the information input, the viewpoint information indicating a viewpoint from which three-dimensional objects are to be displayed on a display device.

19. The apparatus of claim 11, wherein the feature data generation unit also includes:

a motion extraction unit for extracting a change of said at least a part of the target object in the object image extracted by the image extraction unit.

20. The apparatus of claim 19, wherein the motion extraction unit extracts the change as a command to be used as the information input.

21. The apparatus of claim 19, wherein the target object is at least a part of a body of an operator, and the change extracted by the motion extraction unit indicates the information input for a motion input by the operator.

22. The apparatus of claim 11, wherein the feature data generation unit also includes:

a shape interpretation unit for interpreting a shape of said at least a part of the target object in the object image extracted by the image extraction unit;

a motion extraction unit for extracting a change of said at least a part of the target object in the object image extracted by the image extraction unit; and

a command generation unit for generating at least one command to be used as the information input from the shape interpreted by the shape interpretation unit and the change extracted by the motion extraction unit.

23. The apparatus of claim 1, further comprising:

an imaging unit for imaging a visible light image of the target object.

24. The apparatus of claim 23, further comprising:

an image extraction unit for extracting at least one specific image region from the visible light image imaged by the imaging unit, according to one or both of the reflected light image and an information extracted from the reflected light image.

25. The apparatus of claim 24, further comprising:

an image memory unit for storing an extracted image data for said at least one specific image region extracted by the image extraction unit; and

an image composition unit for composing the extracted image data stored by the image memory unit with another image data in a specified manner.

26. The apparatus of claim 23, further comprising:

a Z-value image generation unit for generating a Z-value image by setting the visible light image imaged by the imaging unit in correspondence to a distance information of the target object which Is extracted from the reflected light image.

27. The apparatus of claim 26, further comprising:

an image extraction unit for extracting image data for a specific image region from the the Z-value image generated by the Z-value image generation unit, according to the distance information contained in the Z-value image, the specific image region being a region for which the distance information is within a specified range.

28. The apparatus of claim 26, wherein the Z-value image generation unit generates the Z-value image as the information input for texture information to be mapped onto a three-dimensional model.

29. The apparatus of claim 1, further comprising:

a conversion unit for converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

6,144,366

<table>
<tr><td>83</td><td>84</td></tr>
</table>

**30**. The apparatus of claim **29**, wherein the conversion unit is a logarithmic amplifier.

**31**. The apparatus of claim **1**, further comprising:

a correction unit for correcting a distortion of the reflected light image obtained by the reflected light extraction unit.

**32**. The apparatus of claim **1**, further comprising:

a correction and conversion unit for correcting a distortion of the reflected light image obtained by the reflected light extraction unit while converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

**33**. The apparatus of claim **1**, further comprising:

a nonlinear conversion unit for converting intensities of the reflected light defining pixel values of the reflected light image into rough distance values with respect to the target object; and

a correction unit for converting the rough distance values obtained by the nonlinear conversion unit into accurate distance values with respect to the target object so as to obtain a range image of the target object.

**34**. The apparatus of claim **1**, further comprising:

a reference object activation unit for moving a reference object with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

a correction data generation unit for generating correction data to be used in correcting a distortion of the reflected light image and/or generating a range image from the reflected light image, according to a position of the reference object moved by the reference object activation unit and the reflected light image of the reference object obtained by the reflected light extraction unit.

**35**. The apparatus of claim **1**, further comprising:

a user commanding unit for commanding a user to place a reference object at a specified position with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

a correction data generation unit for generating correction data to be used in correcting a distortion of the reflected light image and/or generating a range image from the reflected light image, according to a position of the reference object placed by the user in response to the user commanding unit and the reflected light image of the reference object obtained by the reflected light extraction unit.

**36**. The apparatus of claim **35**, further comprising:

a verification unit for checking whether the correction data generated by the correction data generation unit are correct or not by obtaining the reflected light image of the reference object within a prescribed distance range by using the correction data.

**37**. The apparatus of claim **1**, further comprising:

a filter for receiving the external light and the reflected light, and blocking the reflected light while passing the external light;

an external light detection unit for detecting a light amount of the external light received through the filter; and

an external light state judgement unit for judging whether the external light is in an intolerable state that has a possibility of largely affecting the reflected light image

or not according to the light amount detected by the external light detection unit, and generating an intolerable signal indicating the intolerable state when the external light is judged to be in the intolerable state.

**38**. The apparatus of claim **37**, wherein the timing signal generation unit controls the lighting unit and the reflected light extraction unit according to the intolerable signal generated by the external light state judgement unit, so as to obtain the reflected light image while the external light is not in the intolerable state.

**39**. The apparatus of claim **37**, further comprising:

a reflected light image processing unit for determining whether to accept or reject the reflected light image obtained by the reflected light extraction unit under the external light in the intolerable state, according to the intolerable signal generated by the external light state judgement unit.

**40**. The apparatus of claim **1**, further comprising:

a filter for receiving the external light and the reflected light, and blocking the reflected light while passing the external light;

an external light detection unit for detecting a light amount of the external light received through the filter; and

an external light fluctuation period detection unit for detecting a fluctuation period of the external light according to the light amount detected by the external light detection unit;

wherein the timing signal generation unit controls the lighting unit and the reflected light extraction unit in synchronization with the fluctuation period detected by the external light fluctuation period detection unit.

**41**. The apparatus of claim **1**, further comprising:

an external light control unit for controlling the external light in relation to the timing signal for controlling the lighting unit and the reflected light extraction unit.

**42**. The apparatus of claim **1**, wherein the timing signal generation unit controls the lighting unit and the reflected light extraction unit by using a plurality of operation patterns provided in advance, according to a change of the external light.

**43**. The apparatus of claim **42**, wherein the timing signal generation unit in an optimal operation pattern selection mode controls the lighting unit to stop emitting the light while controlling the reflected light extraction unit to obtain the reflected light images by executing each of said plurality of operation patterns sequentially, and the apparatus further comprises:

an evaluation unit for generating evaluation values for the reflected light images obtained by the reflected light extraction unit in the optimal operation pattern selection mode; and

an operation pattern selection unit for selecting an optimal operation pattern among said plurality of operation patterns according to the evaluation values generated by the evaluation unit, so that the timing signal generation unit in a normal operation mode controls the lighting unit and the reflected light extraction unit according to the optimal operation pattern selected by the operation pattern selection unit.

**44**. The apparatus of claim **43**, wherein the operation pattern selection unit selects the optimal operation pattern by which a darkest reflected light image is obtained in the optimal operation pattern selection mode.

**45**. The apparatus of claim **1**, further comprising:

a distance information detection unit for detecting a distance information indicating a distance of the target

6,144,366

85

object with respect to the reflected light extraction unit according to the reflected light image obtained by the reflected light extraction unit;

a determination unit for determining a reflected light amount to be increased or decreased according to the distance information detected by the distance information detection unit; and

a control unit for controlling the lighting unit or the reflected light extraction unit so that the reflected light amount received at the reflected light extraction unit is increased or decreased to the reflected light amount determined by the determination unit.

**46**. The apparatus of claim **45**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the control unit controls the lighting unit to be operated in one of said plurality of lighting modes according to the reflected light amount determined by the determination unit.

**47**. The apparatus of claim **1**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the apparatus further comprises:

a lighting state control unit for controlling the lighting unit to sequentially carry out lighting operations in said plurality of lighting modes so that the reflected light extraction unit obtains a plurality of reflected light images under the light emitted by the lighting unit in said plurality of lighting modes; and

a reflected light image composition unit for composing said plurality of reflected light images obtained by the reflected light extraction unit.

**48**. A method of information input generation, comprising the steps of:

(a) generating a timing signal;

(b) emitting a light whose intensity vary in time at a lighting unit, according to the timing signal generated by the step (a); and

(c) detecting a reflected light from a target object resulting from the light emitted by the step (b), in synchronization with the timing signal generated by the step (a), so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object, at a reflected light extraction unit.

**49**. The method of claim **48**, wherein the step (c) obtains the reflected light image in separation from the external light by detecting a plurality of image data in a state of having a light emission by the step (b) and in a state of having no light emission by the step (b).

**50**. The method of claim **49**, wherein the step (a) obtains the reflected light image as a difference between the image data detected in a state of having a light emission by the step (b) and the image data detected in a state of having no light emission by the step (b).

**51**. The method of claim **48**, wherein the step (b) emits the light which is invisible to human eyes.

**52**. The method of claim **48**, wherein the step (c) includes steps of:

(c1) generating charges corresponding to input lights of the reflected light extraction unit;

(c2) storing the charges generated by the step (c1) under different lighting states of the step (b), in at least two charge storage units; and

(c3) operating gates in synchronization with the timing signal generated by the step (a), for selectively leading

86

the charges generated by the step (c1) to one of the charge storage units.

**53**. The method of claim **48**, wherein the step (c) includes the step of receiving input lights of the reflected light extraction unit by an optical filter for passing those input lights which have wavelengths within a specified range and blocking those input lights which have wavelengths outside the specified range.

**54**. The method of claim **48**, wherein the target object is at least a part of a body of an operator, and the reflected light image is indicative of the information input for controlling a device to be operated by the operator.

**55**. The method of claim **48**, further comprising the steps of:

(d) generating feature data related to the target object from the reflected light image.

**56**. The method of claim **55**, wherein the step (d) generates the feature data by extracting a distance information including a depth information of the target object.

**57**. The method of claim **55**, wherein the step (d) generates the feature data by extracting an object property information including a color information or a material information of the target object.

**58**. The method of claim **55**, wherein the step (d) includes the step of:

(d1) extracting an object image of at least a part of the target object, from the reflected light image.

**59**. The method of claim **58**, wherein the step (d1) extracts the object image according to one or both of a distance information including a depth information of the target object and an object property information including a color information or a material information of the target object.

**60**. The method of claim **58**, wherein the target object is at least a part of a body of an operator, and the object image extracted by the step (d1) indicates the information input for a pointing operation by the operator.

**61**. The method of claim **58**, wherein the step (d) also includes the step of:

(d2) interpreting a shape of said at least a part of the target object in the object image extracted by the step (d1).

**62**. The method of claim **61**, wherein the target object is at least a part of a body of an operator, and the shape interpreted by the step (d2) indicates the information input for a gesture input by the operator.

**63**. The method of claim **61**, wherein the target object is at least a part of a body of an operator, and the shape interpreted by the step (d2) indicates the information input for a pointing operation by the operator.

**64**. The method of claim **61**, wherein the step (d2) interprets the shape as a command to be used as the information input.

**65**. The method of claim **61**, wherein the step (d2) interprets the shape as a viewpoint information to be used as the information input, the viewpoint information indicating a viewpoint from which three-dimensional objects are to be displayed on a display device.

**66**. The method of claim **58**, wherein the step (d) also includes the step of:

(d3) extracting a change of said at least a part of the target object in the object image extracted by the step (d1).

**67**. The method of claim **66**, wherein the step (d3) extracts the change as a command to be used as the information input.

**68**. The method of claim **66**, wherein the target object is at least a part of a body of an operator, and the change extracted by the step (d3) indicates the information input for a motion input by the operator.

6,144,366

87

**69**. The method of claim **58**, wherein the step (d) also includes:

(d4) interpreting a shape of said at least a part of the target object in the object image extracted by the step (d1);

(d5) extracting a change of said at least a part of the target object in the object image extracted by the step (d1); and

(d6) generating at least one command to be used as the information input from the shape interpreted by the step (d4) and the change extracted by the step (d5).

**70**. The method of claim **48**, further comprising the step of:

(e) imaging a visible light image of the target object.

**71**. The method of claim **70**, further comprising the step of:

(f) extracting at least one specific image region from the visible light image imaged by the step (e), according to one or both of the reflected light image and an information extracted from the reflected light image.

**72**. The method of claim **71**, further comprising the steps of:

(g) storing an extracted image data for said at least one specific image region extracted by the step (f); and

(h) composing the extracted image data stored by the step (g) with another image data in a specified manner.

**73**. The method of claim **70**, further comprising the step of:

(i) generating a Z-value image by setting the visible light image imaged by the step (e) in correspondence to a distance information of the target object which is extracted from the reflected light image.

**74**. The method of claim **73**, further comprising the step of:

(j) extracting image data for a specific image region from the the Z-value image generated by the step (i), according to the distance information contained in the Z-value image, the specific image region being a region for which the distance information is within a specified range.

**75**. The method of claim **73**, wherein the step (i) generates the Z-value image as the information input for texture information to be mapped onto a three-dimensional model.

**76**. The method of claim **48**, further comprising the steps of:

(k) converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

**77**. The method of claim **76**, wherein the step (k) converts the intensities by using a logarithmic amplifier.

**78**. The method of claim **48**, further comprising the step of:

(l) correcting a distortion of the reflected light image obtained by the reflected light extraction unit.

**79**. The method of claim **48**, further comprising the step of:

(m) correcting a distortion of the reflected light image obtained by the reflected light extraction unit while converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

**80**. The method of claim **48**, further comprising the steps of:

(n) nonlinearly converting intensities of the reflected light defining pixel values of the reflected light image into rough distance values with respect to the target object; and

88

(o) converting the rough distance values obtained by the step (n) into accurate distance values with respect to the target object so as to obtain a range image of the target object.

**81**. The method of claim **48**, further comprising the steps of:

(p) moving a reference object with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

(q) generating correction data to be used in correcting a distortion of the reflected light image and/or generating a range image from the reflected light image, according to a position of the reference object moved by the step (p) and the reflected light image of the reference object obtained by the reflected light extraction unit.

**82**. The method of claim **48**, further comprising the step of:

(r) commanding a user to place a reference object at a specified position with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

(s) generating correction data to be used in correcting a distortion of the reflected light image and generating a range image from the reflected light image, according to a position of the reference object placed by the user in response to the step (r) and the reflected light image of the reference object obtained by the reflected light extraction unit.

**83**. The method of claim **82**, further comprising the step of:

(t) checking whether the correction data generated by the step (s) are correct or not by obtaining the reflected light image of the reference object within a prescribed distance range by using the correction data.

**84**. The method of claim **48**, further comprising the steps of:

(u) receiving the external light and the reflected light, and blocking the reflected light while passing the external light, at a filter;

(v) detecting a light amount of the external light received through the filter; and

(w) judging whether the external light is in an intolerable state that has a possibility of largely affecting the reflected light image or not according to the light amount detected by the step (v), and generating an intolerable signal indicating the intolerable state when the external light is judged to be in the intolerable state.

**85**. The method of claim **84**, wherein the timing signal generated by the step (a) controls the lighting unit and the reflected light extraction unit according to the intolerable signal generated by the step (w), so as to obtain the reflected light image while the external light is not in the intolerable state.

**86**. The method of claim **84**, further comprising the step of:

(x) determining whether to accept or reject the reflected light image obtained by the reflected light extraction unit under the external light in the intolerable state, according to the intolerable signal generated by the step (w).

**87**. The method of claim **48**, further comprising the steps of:

(y) receiving the external light and the reflected light, and blocking the reflected light while passing the external light, at a filter;

6,144,366

<table>
<tr><td>89</td><td>90</td></tr>
</table>

(z) detecting a light amount of the external light received through the filter; and

(aa) detecting a fluctuation period of the external light according to the light amount detected by the step (z);

wherein the timing signal generated by the step (a) controls the lighting unit and the reflected light extraction unit in synchronization with the fluctuation period detected by the step (aa).

**88**. The method of claim **48**, further comprising the steps of:

(bb) controlling the external light in relation to the timing signal for controlling the lighting unit and the reflected light extraction unit.

**89**. The method of claim **48**, wherein the timing signal generated by the step (a) controls the lighting unit and the reflected light extraction unit by using a plurality of operation patterns provided in advance, according to a change of the external light.

**90**. The method of claim **89**, wherein the timing signal generated by the step (a) in an optimal operation pattern selection mode controls the lighting unit to stop emitting the light while controlling the reflected light extraction unit to obtain the reflected light images by executing each of said plurality of operation patterns sequentially, and the method further comprises the steps of:

(cc) generating evaluation values for the reflected light images obtained by the reflected light extraction unit in the optimal operation pattern selection mode; and

(dd) selecting an optimal operation pattern among said plurality of operation patterns according to the evaluation values generated by the step (cc), so that the timing signal generated by the step (a) in a normal operation mode controls the lighting unit and the reflected light extraction unit according to the optimal operation pattern selected by the step (dd).

**91**. The method of claim **90**, wherein the step (dd) selects the optimal operation pattern by which a darkest reflected light image is obtained in the optimal operation pattern selection mode.

**92**. The method of claim **48**, further comprising the steps of:

(ee) detecting a distance information indicating a distance of the target object with respect to the reflected light extraction unit according to the reflected light image obtained by the reflected light extraction unit;

(ff) determining a reflected light amount to be increased or decreased according to the distance information detected by the step (ee); and

(gg) controlling the lighting unit or the reflected light extraction unit so that the reflected light amount

received at the reflected light extraction unit is increased or decreased to the reflected light amount determined by the step (ff).

**93**. The method of claim **92**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the step (gg) controls the lighting unit to be operated in one of said plurality of lighting modes according to the reflected light amount determined by the step (ff).

**94**. The method of claim **48**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the method further comprises the steps of:

(hh) controlling the lighting unit to sequentially carry out lighting operations in said plurality of lighting modes so that the reflected light extraction unit obtains a plurality of reflected light images under the light emitted by the lighting unit in said plurality of lighting modes; and

(ii) composing said plurality of reflected light images obtained by the reflected light extraction unit.

**95**. An imaging apparatus, comprising:

a plurality of unit photo-detector cells arranged in a two-dimensional array on a semiconductor substrate, each unit photo-detector cell having:

a photo-detection unit for receiving an input light and outputting signals corresponding to a light amount of the input light;

an amplification unit for amplifying the signals outputted by the photo-detection unit;

a selection unit for selecting said each unit photo-detector cell;

a reset unit for resetting the photo-detection unit; and

at least two storage units for respectively storing the signals outputted by the photo-detection unit under different states and amplified by the amplification unit; and

a difference circuit, provided on the semiconductor substrate, for detecting a difference between the signals stored in said at least two storage units of each unit photo-detector cell.

**96**. The apparatus of claim **95**, wherein the photo-detection unit is formed by a photo-diode, the amplification unit is formed by an amplifying transistor, the resent unit is formed by a reset transistor, said at least two storage units are formed by capacitors, said photo-diode is connected with a gate of said amplifying transistor, and each of said capacitors has one electrode which is connected with the amplifying transistor and another electrode which is grounded.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

In re:  GESTURE TECHNOLOGY PARTNERS, LLC, )
Reexamination Control Number:  90/014,900 ) Appeal No. 2024-1037
Filed:  November 11, 2021 )
For:  MORE USEFUL MAN MACHINE )
    INTERFACES AND APPLICATIONS )

## NOTICE FORWARDING CERTIFIED LIST

A notice of appeal to the United States Court of Appeals for the Federal Circuit was timely filed on October 6, 2023, in the United States Patent and Trademark Office in connection with the above-identified ex parte reexamination application.  Pursuant to 35 U.S.C. § 143 and Federal Circuit Rule 17(b)(1), the United States Patent and Trademark Office (USPTO) is today forwarding a certified list of documents comprising the record in the USPTO.

Ms. Mary L. Kelly and Mr. Peter J. Sawert are representing the Director in this appeal. Appellant must contact Ms. Kelly or Mr. Sawert at (571) 272-9035 to arrange for designating the record.

Deliver all papers served on the Solicitor in connection with this appeal as follows:

By hand to:         Office of the Solicitor
                           600 Dulany Street
                           Madison West - Room 08C43
                           Alexandria, Virginia 22313-1450

By mail to:          U.S. Patent and Trademark Office
                           Office of the Solicitor
                           Mail Stop 8, P.O. Box 1450
                           Alexandria, VA 22313-1450

Respectfully submitted,


Katherine K. Vidal
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office



Date: November 22, 2023       By: */s/ Macia L. Fletcher*
Macia L. Fletcher
Paralegal Specialist
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
571-272-9035

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on appellant this 22nd day

of November, 2023 as follows:

>
> Fred Williams
> Todd Eric Landis
> John Wittenzellner
> WILLIAMS, SIMONS, AND LANDIS PLLC
> fwilliams@wsltrial.com
> tlandis@wsltrial.com
> johnw@wsltrial.com

By:*/s/ Macia L. Fletcher*
**Macia L. Fletcher**
Paralegal Specialist

Form PTO 55 (12-80)

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

<u>November 22, 2023</u>

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Ex Parte Reexamination* proceeding identified below:

## GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

Appeal 2023-001713
Reexamination Control No. 90/014,900
U.S. Patent No. 8,553,079 B2

By authority of the

## DIRECTOR OF THE UNITED STATES
## PATENT AND TRADEMARK OFFICE

*Macia L. Fletcher*

*Certifying Officer*



**Prosecution History ~ Reexamination Control Number 90/014,900**

| Date | Document |
|------|----------|
| 11/11/2021 | Transmittal of New Application |
| 11/11/2021 | Fee Worksheet |
| 11/11/2021 | Request for *Ex Parte* Reexamination |
| 11/11/2021 | Information Disclosure Statement |
| 11/12/2021 | Reexam Litigation Search Report |
| 11/17/2021 | Title Report |
| 11/18/2021 | Notice of Assignment of Reexamination Request |
| 11/18/2021 | Notice of Reexamination Request Filing Date |
| 11/19/2021 | Reexamination – Patent Owner Power of Attorney or Revocation of Power of Attorney with a New Power of Attorney and Change of Correspondence Address |
| 11/19/2021 | Assignee Showing of Ownership (37 C.F.R. § 3.73(b)) |
| 11/20/2021 | Bibliographic Data Sheet |
| 11/23/2021 | Notice of Acceptance of Power of Attorney |
| 11/23/2021 | Notice Regarding Change of Power of Attorney |
| 11/26/2021 | *Ex Parte* Reexamination Interview Summary – Pilot Program for Waiver of Patent Owner's Statement |
| 12/20/2021 | Order Granting Request for *Ex Parte* Reexamination |
| 12/20/2021 | Search Notes |
| 12/20/2021 | List of References Cited by Applicant and Considered by Examiner |
| 04/14/2022 | Non-Final Office Action |
| 04/14/2022 | Search Results |
| 05/16/2022 | Reply to Non-Final Office Action |
| 06/27/2022 | Final Rejection |
| 08/29/2022 | Notice of Appeal |
| 08/29/2022 | Fee Worksheet |
| 10/31/2022 | Appeal Brief |
| 12/12/2022 | Examiner's Answer to Appeal Brief |
| 02/13/2023 | Reply Brief |
| 02/13/2023 | Request for Oral Hearing |
| 02/13/2023 | Fee Worksheet |
| 03/02/2023 | Appeal Docketing Notice |
| 03/17/2023 | Update to Mandatory Notices |
| 05/02/2023 | Corrected – Notice of Hearing – Denver, Colorado |
| 05/03/2023 | Appellant Response to Notice of Hearing |
| 05/12/2023 | Order Granting Request for Video Hearing |
| 06/20/2023 | Appellant's Demonstratives |
| 08/04/2023 | Oral Hearing Transcript |
| 08/08/2023 | Decision on Appeal – Examiner Affirmed |
| 10/06/2023 | Appeal to U.S. Court of Appeals for the Federal Circuit |



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,900 | 11/11/2021 | 8553079 | 75281.00085 | 6522 |

184036        7590        08/08/2023
Williams Simons & Landis PLLC/GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/08/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2
Technology Center 3900

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

MacDONALD, *Administrative Patent Judge.*

DECISION ON APPEAL

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology
Partners, LLC (Appellant)[1] appeals from the final rejection of claims 1–9,
11, 12, and 14–30. Appeal Br. 6–33. Patent claims 10 and 13 have been
confirmed by the Examiner, and thus are not at issue. Final Act. 90. We
have jurisdiction under 35 U.S.C. § 6(b).

We affirm.

---

[1] Appellant identifies the real party in interest as Gesture Technology
Partners, LLC. Appeal Br. 1.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## CLAIMED SUBJECT MATTER

Claims 1–3, 8, and 11 are illustrative of the claimed subject matter (emphasis, formatting, and bracketed material added):

1. A computer implemented method comprising:

   [1.A.] providing a light source adapted to direct illumination through a work volume above the light source;

   [1.B.] providing a camera oriented to observe a gesture performed in the work volume, the camera being fixed relative to the light source; and

   [1.C.] determining, ***using*** the camera, the gesture performed in the work volume and illuminated by the light source.

2. The method according to claim 1 wherein the light source includes a light emitting diode.

3. The method according to claim 1 wherein the light source includes a plurality of light emitting diodes.

8. The method according to claim 1 further including determining the ***three-dimensional position*** of a point on a user.

11. A computer ***apparatus*** comprising:

   [11.A.] a light source adapted to illuminate a human body part within a work volume generally above the light source;

   [11.B.] a camera in fixed relation relative to the light source and oriented to observe a gesture performed by the human body part in the work volume; and

   [11.C.] a processor adapted to determine the gesture performed in the work volume and illuminated by the light source ***based on*** the camera output.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## REFERENCES[2]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Sako | US 5,689,575 | Nov. 18, 1997 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Sears | US 6,115,482 | Sept. 5, 2000 |
| Mack | US 6,198,485 B1 | Mar. 6, 2001 |

## REJECTIONS[3]

### A.[4]

The Examiner rejects claims 1, 4–9, 11, 12, and 17–20, under 35 U.S.C. § 102 as being anticipated by Liebermann. Final Act. 34–76.

Appellant presents arguments for claims 1, 8, and 11. Appeal Br. 6–20. Appellant does not present separate arguments for claims 4–7, 9, 12, and 17–20. We select claim 1 as the representative claim for the § 102 rejection of claims 4–7 and 9; and we select claim 11 as the representative claim for the § 102 rejection of claims 12 and 17–20. Except for our ultimate decision, we do not address the merits of this § 102 rejection of claims 4–7, 9, 12, and 17–20 further herein.

---

[2] All citations herein are by the first named inventor.

[3] For simplicity herein, we refer to the Examiner's rejection under § 102(e) as a rejection under § 102; and we refer to the Examiner's rejections under § 103(a) as rejections under § 103.

[4] Although the heading for this rejection also lists claims 21, 24–28, and 30 (Final Act. 34), these claims are not discussed in the § 102 rejection that follows the heading. Instead, these claims are separately rejected under § 103 as discussed *infra*.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## B.

The Examiner rejects claims 2, 3, 14, and 15 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sears. Final Act. 76–78.

Appellant presents separate arguments for claims 2 and 3. Appeal Br. 20–28. Appeal Br. 6–20. Appellant does not present separate arguments for claims 14 and 15. We select claim 2 as the representative claim for the § 103 rejection of claim 14; and we select claim 3 as the representative claim for the § 103 rejection of claim 15. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 14 and 15 further herein.

## C.

The Examiner rejects claim 16 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Mack. Final Act. 78–81.

To the extent that Appellant discusses this rejection of claim 16, Appellant merely references (or repeats) the argument directed to claim 11. Appeal Br. 28. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 16. Therefore, this rejection of claim 16 turns on our decision as to the rejection of claim 11. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 16 further herein.

4

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.

The Examiner rejects claims 21, 24–28, and 30 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sako. Final Act. 81–85.

To the extent that Appellant discusses this rejection of claims 21, 24–28, and 30, Appellant merely references (or repeats) the arguments directed to claims 1, 8, and/or 11. Appeal Br. 29–31. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claims 21, 24–28, and 30. Therefore, this rejection of claims 21, 24–28, and 30 turns on our decision as to the rejection of claims 1, 8, and/or 11. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 21, 24–28, and 30 further herein.

### E.

The Examiner rejects claims 22 and 23 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Sears, and Sako. Final Act. 85–87.

To the extent that Appellant discusses this rejection of claims 22 and 23, Appellant merely references (or repeats) the arguments directed to claims 2 and/or 3. Appeal Br. 32. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claims 22 and 23. Therefore, this rejection of claims 22 and 23 turns on our decision as to the rejection of claims 2 and/or 3. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 22 and 23 further herein.

5

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

F.

The Examiner rejects claim 29 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann, Mack, and Sako. Final Act. 87–90.

To the extent that Appellant discusses this rejection of claim 29, Appellant merely references (or repeats) the argument directed to claim 21. Appeal Br. 33. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 29. Therefore, this rejection of claim 29 turns on our decision as to the rejection of claim 21. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 29 further herein.

## PRINCIPLES OF LAW – CLAIM CONSTRUCTION

### A.[5]

During examination of a patent application, a claim is given its broadest reasonable construction consistent with the specification. *In re Prater*, 415 F.2d 1393, 1404–1405 (CCPA 1969). However, "[w]hen a patent expires during a reexamination proceeding, the PTO should thereafter apply the *Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)] standard for claim construction." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016).

---

[5] The subject patent of this appeal expired on November 3, 2019 before the filing of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 34 (last two lines). The Examiner acknowledges "the [']079 Patent expired in November 2019." Final Act. 5; Ans. 80.

6

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

B.

"Claims must be read in view of the specification, of which they are a part." *Markman v. Westview Insts., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). However, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)).

OPINION

We have reviewed the Examiner's rejections in light of Appellant's arguments (Appeal Brief) that the Examiner has erred. We disagree with Appellant's conclusions. Except as noted below, we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer in response to Appellant's Appeal Brief.

A. Claim 11 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 11 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 6–15.

7

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.1. Claim 11 − First Argument

#### A.1.a. Claim 11 − First Argument − Appellant's Contentions

Appellant argues:

> One need look no further than the plain language of claim 11 to determine that the claim ***does not cover a physically distributed system***. The preamble of claim 11 requires "a computer apparatus." That is why the claimed computer apparatus must include the claim elements that follow the preamble.

> The same holds true for the specification. In every disclosed embodiment of the '079 Patent that includes a "light source," a "camera," and a "processor" for determining a gesture, those components are located within the ***same computing device*** (e.g., laptop computer, handheld computer, etc.).

Appeal Br. 10 (emphasis added).

> The Examiner even acknowledges that "an apparatus [claim] recites what <u>a device</u> is rather than what <u>a device</u> does." Action, p. 58 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis added)). Accordingly, independent claim 11 requires that the claimed "processor," "camera," and "light source" all be components of the same computing device.

Appeal Br. 11.

> Claim element 11[c] requires "a processor adapted to determine the gesture performed in the work volume and illuminated by the light source based on the camera output" located in the same "computer apparatus" as the "camera" and "light source." But those requirements of claim 11 are fundamentally different than the distributed architecture of *Liebermann.*

Appeal Br. 12.

> In the present case, Patent Owner is not attempting to read limitations from the specification into the claims. Instead, Patent Owner is relying on the specification of the '079 Patent to

8

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> interpret the term "computer apparatus," which is expressly
> recited by independent claim 11.

Reply Br. 3.

### A.1.b. Claim 11 − First Argument − Panel's Analysis

We are not persuaded by Appellant's argument. First, the term

"apparatus" is not explicitly listed among the patent eligible subject matter

in the statute. Rather, the term "machine" is listed.

> Whoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor, subject
> to the conditions and requirements of this title.

35 U.S.C. § 101.

> A machine is a "concrete thing, consisting of parts, or of certain
> devices and combination of devices." *Digitech* [*Image Techs.,
> LLC v. Electronics for Imaging, Inc.*], 758 F.3d [1344,] 1348–49
> [(Fed. Cir. 2014)] (quoting *Burr v. Duryee*, 68 U.S. 531, 570 . . .
> (1863)). This category "includes every mechanical device or
> combination of mechanical powers and devices to perform some
> function and produce a certain effect or result." [*In re*] *Nuijten*,
> 500 F.3d [1346,] 1355[ (Fed. Cir. 2007)] (quoting *Corning v.
> Burden*, 56 U.S. 252, 267 . . . (1854)).

MPEP § 2106.03 I. Thus, the case law construes the statutory term

"machine" to include either a singular device or a combination of devices

(e.g., a system). We see no distinction between a 'machine' (as in the

statute) and an 'apparatus' (as claimed here). We therefore construe the

claim term "apparatus" to include either a singular device or a combination

of devices.

Second, we do not find where appellant cites either a reference (e.g.,

dictionary) or case law that actually requires Appellant's restrictive reading

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

of "apparatus." Rather, the general definition[6] of the term "apparatus" (a noun) is:

> 1. a collection of instruments, machines, tools, parts, or other equipment used for a particular purpose[.]
>
> 2. a machine having a specific function: *breathing apparatus.*

These definitions of "apparatus" include both a singular machine as well as a collection of machines. The definitions do not support Appellant's argument.

Third, our analysis of claim 11 finds nothing in the claim that precludes a distributed system. Although the particular same computer embodiment advocated by Appellant is well-supported in the Specification, and we do not read claim 11 to be so limited. Therefore, Appellant's narrow claim construction is improperly predicated on reading in a limitation from the Specification.

> "[L]imitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee[-]Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed.Cir.1989).

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (emphasis and parallel citation omitted).

---

[6] Dictionary.com, https://www.dictionary.com/browse/apparatus. Definitions numbers 1 and 2. (Accessed July 28, 2023). Based on Collins English Dictionary - Complete & Unabridged 2012 Digital Edition © William Collins Sons & CO. LTD. 1979, 1986 © Harpercollins Publishers 1998, 2000, 2003, 2005, 2006, 2007, 2009, 2012.

10

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2. Claim 11 − Second Argument

A.2.a. Claim 11 − Second Argument − Appellant's Contentions

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann*, 4:60-5:5 (emphasis added). The output of *Liebermann's* "camera 44" is one or more "images." But *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.* Thus, *Liebermann's* "central processing facility" (i.e., the Examiner identified "processor") is ***not determining anything based on*** *Liebermann's* "images" (i.e., the Examiner identified "camera output"). Accordingly, *Liebermann* fails to disclose claim element 11[c].

Appeal Br. 14−15 (Appellant emphasis omitted; Panel emphasis added).

11

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### A.2.b. Claim 11 – Second Argument – Panel's Analysis

We are not persuaded by Appellant's argument. As Appellant acknowledges, Liebermann's captured image is transformed into manageable identifiers and Liebermann's system executes (i.e., determines) its functions based on these identifiers. Since these identifiers are themselves based on the captured image, the executed functions are therefore also determined based on the captured image. Contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "based on" the captured image.

### B. Claim 1 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 1 under 35 U.S.C. § 102 as being anticipated.

### B.1. Claim 1 – First Argument

> Similar to independent claim 11, the fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann's **distributed system*** anticipates the claimed process, which is executed in a computer, not a distributed system. . . . As discussed above in reference to independent claim 11, in the '079 Patent, all of the components necessary to illuminate, capture, and determine a gesture are disposed within the same computer apparatus. Accordingly, the same computer must perform each step of independent claim 1.

Appeal Br. 15–16.

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.1.a. above for claim 11, and we reach the same result as in section A.1.b. above for claim 11.

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### B.2. Claim 1 − Second Argument

Also, Appellant argues:

*Liebermann* discloses that the Center does not process the output of the camera:

> [T]he deaf person uses sign language in front of a device containing a video camera . . . a captured image undergoes a process whereby ***the image is transformed into manageable identifiers***. It is the set of identifiers, in the form of tables of numbers, that travels the normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center.

*Liebermann,* 4:60-5:[5] (emphasis added). In other words, *Liebermann's* "central processing facility" executes its functions based on "identifiers," not the "images" themselves. *Id.* That is because the "images" from *Liebermann's* "camera 44" are not transmitted to the "central processing facility." *Id.* Only the "identifiers" generated at the public kiosk "travel[] the normal telephone lines to the central processing facility (i.e., the Center)." *Id.* Thus, *Liebermann's* "central processing facility" is ***not using*** *Liebermann's* ***"camera 44"*** (i.e., the Examiner identified "camera") ***to determine the gesture***. This is contrary to the requirements of claim element 1[c]. Accordingly, *Liebermann* fails to disclose claim element 1[c].

Appeal Br. 18 (Appellant emphasis omitted; Panel emphasis added).

We are not persuaded by Appellant's argument. Appellant repeats the same argument as in section A.2.a. above for claim 11, and we reach the same result as in section A.2.b. above for claim 11. As above, contrary to Appellant's argument, Liebermann column 4, line 60 to column 5, line 5 teaches determining "using" the captured image.

13

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### C. Claim 8 – Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claim 8 under 35 U.S.C. § 102 as being anticipated.

> The Examiner contends that Liebermann anticipates claim 8 because *Liebermann* "describes using three[-]dimensional video cameras to 'facilitate recognition of signing motions by enhancing spatial differences.'" Action, p. 53 (citing *Liebermann*, 13:29-31). But "enhancing spatial differences" does <u>not</u> necessarily mean "determining the three-dimensional position of a point on a user," as required by claim 8. The Examiner also contends that *Liebermann's*
>
>> method requires "calculating centers of gravity for both hands," which involves finding an "FFT [fast Fourier transform] of paths of the hands" as well as performing an "explicit path analysis" of the hands.
>
> Action, p. 53 (citing *Liebermann*, 4:31-32, FIG. 9). Notably, *Liebermann **does not characterize*** its calculation as "calculating centers of gravity for both hands." Putting that aside, *Liebermann **is silent*** regarding any of these analyses/calculations "determining the <u>three-dimensional</u> position of a point on a user," as required by claim 8. Performing a "path analysis" of hands does not necessarily implicate three-dimensions. For example, hands moving left to right follow a one- or two-dimensional path. Thus, *Liebermann* does not anticipate claim 8.

Appeal Br. 19 (emphasis and formatting added).

> [T]he Examiner now admits that the Examiner must "interpret" *Liebermann* or rely on what *Liebermann* "suggests" to find anticipation. But anticipation requires express teachings, not "interpretation" or "suggestions."

Reply Br. 4.

14

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We are not persuaded by Appellant's arguments. First, contrary to Appellant's argument, Liebermann ***does*** characterize its calculation as "calculating centers of gravity for both hands" at Figure 9 on the left side at the fifth box down in the figure.

Second, although we agree with Appellant that the Examiner's discussion of Liebermann, column 13, lines 22–23, by using the term "suggesting" (Final Act. 53; Ans. 67) does not support the anticipation rejection of claim 8, we find this Examiner error to be harmless in light of the Examiner's remaining reasoning at pages 52–53 of the Final Action. We agree with the Examiner's remaining reasoning and adopt it as our own. The remaining reasoning is by itself sufficient to support the anticipation rejection of claim 8. Particularly, as the Examiner finds:

> "ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations," "[a]t any particular instant, one has to combine information about the handshape (Stokoe's 'dez'), the motion (Stokoe's 'sig') and the **spatial location of the hands relative to the rest of the body** (Stokoe's 'tab')." [Liebermann,] 10:59-64 (internal quotations added). . . . FIG. 9 discloses in other portions of the conversion process that a **"2 hand FFT and their location"** are determined by the static gesture manager[.] . . . [A] POSITA would understand that calculating the center of gravity of a hand, performing a fast Fourier transform, and conducting path analysis as discussed in Liebermann includes determining the position of a point on the user's hand, which is a "point on a user."

Final Act. 52–53.

Third, contrary to Appellant's argument, we find no error in the Examiner's use of the term "interpreted" at page 69 of the Answer because, in this context, it is a reasonable substitute for an alternative term such as "understood."

15

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D. Claims 2 and 3 – Section 103 – Liebermann and Sears

Claims 2 and 3 depend from claim 1 and further recite "the light source includes" either "a light emitting diode" (claim 2) or "a plurality of light emitting diodes" (claim 3). The Examiner concludes:

> [I]t would have been obvious to an artisan to ***substitute*** one light source for the other to provide a light source such as "a light emitting diode", and "a plurality of light emitting diodes" so as to direct illumination through a work volume, to ["]ensure adequate lighting of the user's hands, face and body["] ([Liebermann], 5:52-58), and "to provide constant illumination over the field of view" ([Sears], 5:13-35).

Final Act. 78 (Examiner's emphasis omitted; Panel emphasis added).

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 2 and 3 under 35 U.S.C. § 103 over the combination of Liebermann and Sears. Appeal Br. 20–28.

### D.1. Analogous Art

Appellant correctly states:

> A reference qualifies as prior art for an obviousness determination ***only when it is analogous to the claimed invention***. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear*, LLC, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

Appeal Br. 20 (emphasis added).

16

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### D.1.a. Analogous Art – First Test

As to claims 2 and 3, Appellant argues:

> Regarding the first test for analogous art, *Sears* describes itself as relating to
>
> > an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.
>
> *Sears*, 1:23−29. In contrast, the '079 Patent is directed to computing devices (e.g., laptop computer, handheld computer, etc.) that "operat[e] by optically sensing object or human positions and/or orientations." '079 Patent, 1:54−57, Fig. 1, Fig. 6. These "human positions and/or orientations" include "gestures comprising a sequence of finger movements," and may "allow [for] typing as now, but without the physical keys." *Id.*, 3:48−60, 10:23−25. Accordingly, *Sears* and the '079 Patent are <u>not</u> from the same field of endeavor, and Sears fails the first test for analogous art.

Appeal Br. 21 (formatting added).

> It is clear . . . that "electronic reading machines" are absent from the Examiner-identified field of endeavor for *Sears*. This is improper. *Sears'* Title, Abstract, Technical Field section, Background Art section, Summary of the Invention section, and independent claims all disclose or reference electronic reading machines. See *Sears* at Title, Abstract, 1:23−29, 3:12−15, 4:12−19, independent claims 1, 31, and 33. Accordingly, *Sears'* field of endeavor necessarily includes electronic reading machines.

Reply Br. 6.

We are not persuaded by Appellant's argument. Firstly, Appellant starts from the wrong perspective—the field of endeavor of Sears—and then

17

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

looking to see if the '079 Patent is in that field. As Appellant notes in its
citation of the law, the focus of the first test is whether Sears is "within the
field of the inventor's endeavor," not the other way around. Appeal Br. 20;
*see also In re Klein*, 647 F.3d at 1348 (citing *In re Bigio,* 381 F.3d 1320,
1325 (Fed.Cir.2004); *In re Clay,* 966 F.2d 656, 658 (Fed.Cir.1992)). Thus,
even if Sears is focused on a subset of the field of endeavor of the '079
Patent, it can still be within the same field of the '079 Patent.

The '079 Patent states:

1. Field of the Invention

***The invention relates to simple input devices for
computers***, particularly, but not necessarily, intended for use
with 3-D graphically intensive activities, ***and operating by
optically sensing object or human positions and/or
orientations.***

'079 Patent, 1:53–57 (emphasis added).

Appellant too narrowly interprets Sears' field of endeavor to limit it to
be "an electronic reading system." Appeal Br. 21. Like the '079 Patent,
Sears points out that "[i]t is an object of the invention . . . ***to specify control
system parameters through manual gestures.***" Sears, 3:19–21. (emphasis
added). Also, Sears' title states his invention's concern with "Gesture-Based
Navigation." Further, Sears' states:

An optical-input print reading device with voice output for
people with impaired or no vision in which the user provides
input to the system from hand gestures. Images of the text to be
read, on which the user performs finger- and hand-based gestural
commands, are input to a computer, which decodes the text
images into their symbolic meanings through optical character
recognition, and further tracks the location and movement of the
hand and fingers in order to interpret the gestural movements into
their command meaning.

18

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Sears, Abstract. Furthermore, Sears at column 4, lines 3−7, states, "[t]he method includes . . . determining a command signal from a sequence of user-generated spatial configurations of at least one pointer[.]" Also further, Sears claims:

> capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;
>
> determining a command signal from the temporal sequence of digital images;

Sears claim 1, 28:39−42.

Thus, consistent with the Examiner's findings (Ans. 69–70), we conclude that Sears is within the field of endeavor of the claimed invention and thus analogous art.

### D.1.b. Analogous Art – Second Test

Turning to the second test for analogous art, Appellant also argues as follows:

> When addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory (i.e., the second test for analogous art), the ***problems*** to which both relate must be identified and compared. *Donner,* 979 F.3d at 1359. The problem being solved cannot be one that the patent or prior art identifies as being known: "As the '023 patent readily discloses, guitar effects had <u>already</u> been mounted on a pedalboard[.] . . . Thus, that <u>could not possibly</u> be a ***relevant purpose of the invention***." *Donner,* 979 F.3d at 1360 (emphasis added).
>
> . . . .
>
> *Sears* discloses
>
>> [t]hese <u>illumination sources</u> 45 may comprise rows of <u>LEDs,</u> thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on

19

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> portable computers), or may be other sources
> including incandescent sources.

*Sears*, 5:16-20 (emphasis added). The '079 Patent discloses

> FIG. 2 illustrates another keyboard embodiment
> using special datums or light sources such as LEDs.

'079 Patent, 2:19-20 (emphasis added). These passages from
*Sears* and the '079 Patent imply light emitting diodes were
known. Further, considering these passages both use the
acronym "LEDs" without first spelling it out only reinforces that
light emitting diodes were well-known. Accordingly, in view of
the *Donner* decision, the use of one or more LEDs for
illumination ***cannot be the purpose*** of *Sears* or the '079 Patent
***with respect to the analogous-art analysis***.

Appeal Br. 21–22 (formatting and emphasis added).

We are not persuaded by Appellant's argument. Essentially,
Appellant is arguing that "the use of one or more LEDs for illumination
cannot be the purpose of Sears or the '079 Patent with respect to the
analogous-art analysis" in this situation where claims 2 and 3 are directed to
the purpose of using a "light source includ[ing] a light emitting diode(s)."

We determine that Sears is "reasonably pertinent to the particular
problem with which the inventor is involved" because Appellant's claims
define the particular problem of these dependent claims as selecting a light
source. Even if we limit the inventor's particular problem to selecting a
light source for a gesture-based environment, we still determine that Sears is
"reasonably pertinent to the particular problem with which the inventor is
involved."

Appellant's citation to *Donner* is inapposite. In that case, the Federal
Circuit held that the Board defined the field of endeavor too "narrowly," not
too broadly. *Donner*, 979 F.3d at 1360. The analysis of "[t]he problems to

20

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

which the claimed invention and reference at issue relate" "must be carried out from the vantage point of a PHOSITA who is considering turning to the teachings of references outside her field of endeavor" and therefore must not "rule out all such art" that is "outside her field of endeavor." *Id.* Contrary to Appellant's argument, the Federal Circuit held that "if the two references have 'pertinent similarities' such that [the prior art reference] is reasonably pertinent to one or more of the problems to which the [patent-in-suit] pertains, then [the prior art reference] is analogous art." *Id.* at 1361. Such is the case here with Sears.

Therefore, we again conclude that Sears is analogous art.

### D.2. Claim 2

As to claim 2, Appellant further argues "*Sears* does not cure the deficiencies of *Liebermann.*" Appeal Br. 23.

> According to the Examiner, an LED "provides <u>more</u> intense light and is [a] <u>more</u> efficient light source [than *Liebermann's*] lamps." Action, p. 19 (emphasis added). This serves as the motivation for the Examiner's **substitution**. *See* Action, pp. 18-21. But the Examiner provides no evidence that *Sears'* LEDs actually have these superior properties compared to *Liebermann's* lamps. . . . Accordingly, the Examiner's proposed motivation for the substitution is defective.
>
> . . . .
>
> In view of the above, the Examiner's *prima facie* case of obviousness is improper because it lacks articulated reasoning and rational underpinnings. "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

21

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

Appeal Br. 24–25 (emphasis added).

> *Numazaki* discloses "a LED for emitting lights with the wavelength in the <u>infrared range</u> can be used." *Numazaki*, 54:35-36 (emphasis added). In other words, contrary to the Examiner's contentions, the Examiner's cited evidence discloses LEDs can and do emit light in the non-visible spectrum (e.g., infrared). Accordingly, the Examiner's proposed motivation for the substitution is defective.

Reply Br. 9.

We are not persuaded by Appellant's arguments. First, Federal Circuit precedent "does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away." *PAR Pharma., Inc. v. TWi Pharma., Inc.*, 773 F.3d 1186, 1197–1198 (Fed. Cir. 2014).

Second, as discussed above, Sears teaches a known light source technique for a gesture-based environment.

> And if there's a known technique to address a known problem using "prior art elements according to their established functions," then there is a motivation to combine.

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023).

> [I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 550 U.S. at 417.

Third, although Numazaki is cited by the Examiner in the responses to Appellant's arguments, it is Sears that is relied upon in the rejection, and we find Sears sufficient for this rejection without any reliance on Numazaki.

22

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

We conclude the Examiner has set forth a proper articulated reasoning
with a rational underpinning to support the legal conclusion of obviousness.

### D.3. Claim 3

As to claim 3, Appellant further argues "*Sears* does not cure the
deficiencies of *Liebermann.*" Appeal Br. 26.

> [T]he Examiner . . . fails to explain why a POSITA would
> replace the "bottom most lamp" of *Liebermann's* "public kiosk
> 42" with <u>multiple</u> LEDs, as required by claims 3 and 15. . . .
> Substituting the "bottom most lamp" of *Liebermann's* "public
> kiosk 42" with <u>multiple</u> LEDs, as proposed by the Examiner, is
> unnecessary and only increases the circuit complexity with little
> return.   Accordingly, the Examiner's *prima facie* case of
> obviousness is improper because it lacks articulated reasoning
> and rational underpinnings. *See KSR*[, 550 U.S. at 418].

Appeal Br. 27.

> Patent Owner asserts replacing a row of lamps with a row of
> LEDs is <u>not</u> the same as replacing a single lamp (i.e.,
> *Liebermann's* bottom most lamp) with multiple LEDs.

Reply Br. 10.

We are not persuaded by Appellant's argument.  First, for the reasons
already set forth above, we again conclude the Examiner has set forth a
proper articulated reasoning with a rational underpinning to support the legal
conclusion of obviousness.

Second, we conclude the premise of Appellant's argument is contrary
to our reviewing courts' guidance.  To the extent that Appellant argues an
artisan would not use Sears' LED teaching to "replac[e] a single lamp (i.e.,
*Liebermann's* bottom most lamp) with multiple LEDs" (Reply Br. 10),
Appellant is arguing that the artisan is an automaton capable of only rote
application of the teachings of the references and incapable of using plural

23

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

LEDs as set forth in the proposed combination.  To the contrary, "[a] person
of ordinary skill is also a person of ordinary creativity, not an automaton."
*KSR*, 550 U.S. at 421.  The Examiner here proposes a "simple substitution of
one light source for another," i.e., "a row of lamps in Lieberman[n]" (such as
seen in Figure 5C) with a "a row of LEDs in Sears."  Ans. 76.  Appellant
limits this to "substituting the 'bottom most lamp' of Liebermann's 'public
kiosk 42' with a <u>single</u> LED," i.e., rote replacement of a single LED for each
lamp in Liebermann.  Appeal Br. 27 (emphasis omitted).  That is not a fair
substitution, nor does it accurately reflect the Examiner's combination or the
knowledge of a person of ordinary skill in the art, including how small the
typical LED is.  Regardless of whether each lamp in Liebermann is replaced
by a single LED light bulb (i.e., *multiple* individual LEDs) or a row of LEDs
with enough individual LEDs to achieve the same brightness as
Liebermann's lamp, the combination of Liebermann and Sears renders this
claim obvious.


E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending
that the Examiner erred in granting the reexamination request filed in
November 2021 on a patent that expired in November 2019.  Appeal Br. 34.

> In *Oil States*, the Supreme Court explained that the
> "decision to *grant* a patent is a matter involving public rights-
> specifically, the grant of a public franchise." *Oil States Energy
> Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373
> (2018) (emphasis in original).  "Specifically, patents are public
> franchises that the Government grants to the inventors of new
> and useful improvements." *Id.* (internal quotation marks
> omitted).  The Court explained that "Congress [has] significant

24

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

latitude to assign [the] adjudication of public rights to entities
other than Article III courts." *Id.* at 1368[, 1373]. In exercising
its "significant latitude," Congress grants public franchises
"subject to the qualification that the PTO has the authority to
reexamine and perhaps cancel–a patent claim in an inter partes
review." *Id.* at 1368, 1374 (internal quotation marks omitted).
Accordingly, so long as the public franchise exists, the PTO may
have jurisdiction to amend and cancel the claims of the patent
(e.g., via *ex parte* reexamination).

When a patent expires, however, ***the public franchise
ceases to exist*** and the franchisee (e.g., the patent owner) no
longer has the right to exclude others. At most, the franchisee
may be entitled to collect damages from the public franchise that
formerly existed through an infringement action in district court.
But because the public franchise no longer exists, ***the USPTO
has nothing in its authority to cancel or amend***. Expiration
removes the patent from the USPTO's jurisdiction and returns it
to the sole jurisdiction of the Article III courts, which have
exclusive authority to govern claims for damages. If this were
not so, the USPTO would purport to have authority to
retroactively modify a public franchise that no longer exists, in a
setting where the expired public franchise does not enjoy any
presumption of validity and in which amendment of claims is no
longer permitted.

Appeal Br. 33–34 (emphasis added).

We are not persuaded by Appellant's argument. First, the statute

authorizing reexamination does not limit the timing of a reexamination in the

manner argued by Appellant. To the contrary, the statute states:

Any person ***at any time*** may file a request for reexamination by
the Office of any claim of a patent on the basis of any prior art
cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added).

Second, we disagree that Appellant has no rights under the expired

patent.

25

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

> It is well-established that [the Federal Circuit's] decision (and the Board's decision on remand) would have a consequence on any infringement that occurred during the life of the . . . patent. *See Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the patentee has fewer rights to transfer when the patent has expired," the owner of an expired patent can license the rights or transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an expired patent . . . includes more than merely the right to recover damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

Third, our reviewing court regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision. In none of these cases has the Federal Circuit found a lack of jurisdiction before the United States Patent and Trademark Office (USPTO). *See, e.g., In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an *inter partes* reexamination of expired U.S. patent 6,034,918)[7]; *see also CSB-Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the reexamination.").

We conclude the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent.

---

[7] The Board noted in a related *ex parte* reexamination appeal that "[t]he '918 patent term expired during the reexamination proceedings." *Ex parte Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12, 2011).

26

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

### F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

### F.1.

> As discussed above, *Liebermann* does not teach at least claim elements 1[c], 11[c], and 21[c]. In other words, *Liebermann* does not provide the teachings that were missing from the art during the original prosecution of the '079 Patent. Thus, a reasonable examiner would not consider *Liebermann* to be important in deciding whether one or more claims of the '079 Patent are patentable, and *Liebermann* does not raise a SNQ of patentability. The order for *ex parte* reexamination should be vacated.

Appeal Br. 36.

We are not persuaded by Appellant's argument. For the reasons already set forth above in section A.1., we determine that Liebermann does provide the teachings that were missing from the art during the original prosecution of the '079 Patent, and thus, does raise a SNQ of patentability.

## CONCLUSIONS

The Examiner has not erred in rejecting claims 1, 4–9, 11, 12, and 17–20 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 2, 3, 14–16, and 21–30 as being unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejection of claims 1, 4–9, 11, 12, and 17–20 as being anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejections of claims 2, 3, 14–16, and 21–30 as being unpatentable under 35 U.S.C. § 103.

27

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1, 4–9, 11, 12, 17–20 | 102(e) | Liebermann | 1, 4–9, 11, 12, 17–20 | |
| 2, 3, 14, 15 | 103(a) | Liebermann, Sears | 2, 3, 14, 15 | |
| 16 | 103(a) | Liebermann, Mack | 16 | |
| 21, 24–28, 30 | 103(a) | Liebermann, Sako | 21, 24–28, 30 | |
| 22, 23 | 103(a) | Liebermann, Sears, Sako | 22, 23 | |
| 29 | 103(a) | Liebermann, Mack, Sako | 29 | |
| **Overall Outcome** | | | 1–9, 11, 12, 14–30 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination

proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

Appeal 2023-001713
Reexamination Control 90/014,900
Patent 8,553,079 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX  78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

29

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

*In re* Reexam of: U.S. Patent No. 8,553,079 (Control No. 90/014,900)

Appeal No.: 2023-001713

Reexam Request Filed: November 11, 2021

Appellant/Patent Owner: Gesture Technology Partners, LLC

Art Group: 3992

Examiner: M. A. Sager

Title: More Useful Man Machine Interfaces and Applications

**PATENT OWNER'S NOTICE OF APPEAL
TO THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Mail Stop *Ex Parte* Reexam
Commission for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite 125, #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Reexam of U.S. Patent No.: 8,553,079 (Control No.: 90/014,900)
Appeal No.: 2023-001713

Pursuant to 35 U.S.C. §§ 141 and 142 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Patent Trial and Appeal Board's "Decision on Appeal" dated August 8, 2023, in the *ex parte* reexamination of U.S. Patent No. 8,553,079 (Control No. 90/014,900; Appeal No. 2023-001713).

Patent Owner's issues on appeal include at least (i) the Board's affirmation of the Examiner's rejections under 35 U.S.C. §§ 102 and 103, (ii) the USPTO's jurisdiction over expired patents, (iii) the existence of a substantial new question of patentability, and (iv) any finding or determination supporting or related to the aforementioned issues, including claim constructions, that are adverse to Patent Owner.

Copies of Patent Owner's Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent and Trial Appeal Board, and the United States Court of Appeals for the Federal Circuit.

Dated: October 6, 2023                     Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

1

Reexam of U.S. Patent No.: 8,553,079 (Control No.: 90/014,900)
Appeal No.: 2023-001713

## CERTIFICATE OF SERVICE

The undersigned certifies that, in addition to being electronically filed and served through EFS-Web, a true and correct copy of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express with the Director of the United States Patent and Trademark Office at the following address:

> Director of the United States Patent and Trademark Office
> c/o Office of the General Counsel
> Post Office Box 1450
> Alexandria, VA 22313-1450

The undersigned also certifies that a true and correct copy of this Notice of Appeal was filed electronically with the Clerk's Office of the United States Court of Appeals for the Federal Circuit, as well as sent via U.S.P.S. Priority Mail Express to the following address:

> Clerk of Court
> United States Court of Appeals for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, DC 20439

Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

2